**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **<u>TO BE FILED UNDER SEAL</u>** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DR. M. YAQUB MIRZA'S DEPOSITION QUESTIONS AND RESPONSES AND REQUEST FOR STATUS CONFERENCE**

# ATTACHMENT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

DAVIS WRIGHT TREMAINE LLP
Laura R. Handman (D.C. Bar No. 444386)
Amber L. Husbands (D.C. Bar No. 481565)
1919 Pennsylvania Avenue, NW, Suite 200
Washington, D.C. 20006-3402
202-973-4200 / 202-973-4499 facsimile
*Attorneys for Rita Katz, the SITE Institute, and IG, LLC*

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
Lee Levine (D.C. Bar No. 343095)
Gayle Sproul (D.C. Bar No. 495965)
Thomas Curley (D.C. Bar No. 473798)
1050 Seventeenth Street, NW, Suite 800
Washington, D.C. 20036-5514
202-508-1100 / 202-861-9888 facsimile
*Attorneys for CBS Broadcasting Inc.*

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. DOMESTIC/FOR PROFIT ENTITIES .......... 2

III. OFFSHORE ENTITIES .......... 8

IV. CHARITIES/NONPROFITS .......... 10

V. OWNERSHIP OF MAR-JAC-RELATED ENTITIES .......... 16

VI. FINANCING OF MAR-JAC-RELATED ENTITIES .......... 20

VII. DONATIONS .......... 22

VIII. DIVIDENDS AND LOANS .......... 39

IX. THE UNITED STATES GOVERNMENT'S INVESTIGATION .......... 55

X. THE CHART IN SUIT .......... 56

## I. INTRODUCTION

1. Please state your full name.

2. Please state your current home and business addresses.

3. Please state your home and business addresses in March 2002.

4. Were your home and office searched in March 2002 pursuant to a warrant issued by the United States District Court for the Eastern District of Virginia?

5. Have you been told at any time since 2001 that you are a target of an investigation by the United States government?

6. Have you received a target letter from the United States government at any time since 2001?

7. Have you been told at any time since 2001 by the United States government that you are a subject of a government investigation?

8. If the answer to Questions 5, 6, or 7 is yes, do you have knowledge that the investigation is continuing?

9. Do you believe that you are in ongoing jeopardy of criminal prosecution?

10. If your answer is yes, what is the basis for that belief?

11. Exhibit 1 contains copies of Forms 990 filed by Sterling Charitable Gift Fund (at pages 15-16), York Foundation (at pages 20-21), and Safa Trust, Inc. (at pages 23-24) in the year 2003. The Attachment to each of these Forms reads "In light of the allegations set forth in the [Kane] affidavit, this return lists as related organizations all entities for which returns were prepared by the preparer of this return. … Pending the conclusion of the investigation of all entities and individuals referred to in the [Kane Affidavit], upon advice of counsel, the individuals identified in Part V of this return have invoked the privileges afforded to them by the Fifth Amendment to the Constitution of the United States and each of them has declined, solely upon the basis of such protection, to execute this return as an officer, director, trustee or key employee. No responsible officer or individual is otherwise available to execute this return as of the date of filing of this return." Are you familiar with these documents?

12. Are you identified by name in Part V of each of these Forms 990 (Exhibit 1) as one of the persons invoking the privilege afforded by the Fifth Amendment with respect to each of these returns?

13. Have you invoked the Fifth Amendment privilege in any civil suit or proceeding, other than this suit? If so, please identify the caption, court and docket number of any such civil suit or proceeding.

14. Have you invoked the Fifth Amendment privilege in any criminal investigation or proceeding? If so, please identify the subject of investigation, the proceeding and the court.

## II. DOMESTIC/FOR PROFIT ENTITIES

**Mar-Jac, Inc. and Mar-Jac Holdings**

15. Exhibit 2 is a Dun & Bradstreet Business Information Report dated August 11, 2003. The sixth and seventh pages of this document state that Mar-Jac, Inc. was started in 1984 and that you were then its Secretary. Is that information contained in the referenced Report accurate?

16. Exhibit 3, Bates stamped MJ 0001888, is a document entitled "Minutes of Board of Directors' Meeting of Mar-Jac, Inc." dated October 7, 1996, which appears to be signed by you as Secretary of Mar-Jac, Inc. Did you in fact sign this document?

17. Were you in fact the Secretary of Mar-Jac, Inc. in October 1996?

18. Were you in fact one of the three directors of Mar-Jac, Inc. in October 1996, as Exhibit 3 states?

19. Were you the Secretary of Mar-Jac, Inc. at all times from its founding in 1984 until 1996?

20. Were you a Director of Mar-Jac, Inc. at all times from its founding in 1984 until 1996?

21. Exhibit 4 contains interrogatory responses produced in discovery in this case by Mar-Jac Poultry in July 2004. In response to Interrogatory No. 1, "For each of the Mar-Jac Entities, identify all past and present parents, subsidiaries and affiliates ...", Mar-Jac Poultry provided a chart entitled "Mar-Jac Complex Organizational Chart," at Tab A of Exhibit 4. Was Mar-Jac Poultry a wholly owned subsidiary of Mar-Jac, Inc. from 1984 until 1996, as the chart states?

22. Exhibit 5, Bates stamped MJ 0001885, is a document entitled "Minutes of Board of Directors' Meeting: Mena Investments, Inc." dated October 17, 1996, which appears to be signed by you. Did you in fact sign this document?

23. As of October 17, 1996, as stated in these minutes, did Mar-Jac, Inc. in fact own 100% of Mar-Jac Poultry?

24. Exhibit 6, Bates stamped in the range 0001835-0001913, includes minutes of meetings of the Board of Directors of Mar-Jac Holdings during the time period 1996 to 2001. The document Bates stamped MJ 0001878-1879 is entitled "Minutes of Board of Directors' Meeting: Mar-Jac Holdings, Inc.," dated October 21, 1996, and purports to approves the purchase of all of Mar-Jac Inc.'s stock by

Mar-Jac Holdings. Did Mar-Jac Holdings in fact purchase all of Mar-Jac, Inc.'s stock in 1996?

25. Exhibit 7, Bates stamped MJ 0024035, is a letter which appears to be signed by you as Vice Chairman of Mar-Jac, Inc., written on Mar-Jac, Inc. stationery, dated April 28, 1987. This letter purports to authorize various charitable contributions. In your position as Vice Chairman, Secretary and as a director of Mar-Jac, Inc. and its subsidiary Mar-Jac Poultry from 1984 until 1996, did you in fact approve the charitable contributions made by Mar-Jac, Inc. and Mar-Jac Poultry during the period from 1984 to 1996?

26. Exhibit 6, Bates stamped 0001835-0001913, consists of minutes of meetings of the Board of Directors of Mar-Jac Holdings during the time period 1996 to 2001. Did you in fact serve as Secretary and as one of three directors of Mar-Jac Holdings during that time period?

27. In your position as Secretary and as a director of Mar-Jac Holdings from 1996 to 2001, did you approve the charitable donations made by Mar-Jac Holdings and its subsidiary Mar-Jac Poultry during this period?

**Mar-Jac Poultry, Inc.**

28. Exhibit 8, Bates stamped 0001410-1414, is a copy of Mar-Jac Poultry Board minutes, dated November 22, 1996, which indicates that you then served as Secretary of Mar-Jac Poultry. Were you in fact Secretary of Mar-Jac Poultry?

29. Exhibit 9, Bates stamped 0001420, a document entitled "Consent of the Sole Shareholder of Mar-Jac Poultry, Inc." and dated November 22, 1996, indicates you were a director of Mar-Jac Poultry as of that date. Were you in fact a director of Mar-Jac Poultry?

30. Exhibit 10 is a document entitled "Affidavit in Support of Application for Search Warrant" ("Kane Affidavit"). Attachment C, page 9 of the Kane Affidavit states that, as of March 2002, you served as Secretary of Mar-Jac Poultry, Inc. Did you in fact serve as Secretary of Mar-Jac Poultry, Inc. in March of 2002?

31. Exhibit 4 contains interrogatory responses provided in discovery in this case by Mar-Jac Poultry in July 2004. In response to Interrogatory No. 2, "For each of the Mar-Jac Entities, identify all past and present directors and officers," Mar-Jac Poultry provided as a response the list at Tab B to Exhibit 4. Exhibit 4, Tab B identifies you as director. Did you in fact serve as a director of Mar-Jac Poultry during the time period covered by the interrogatories, namely, January 1, 1984 through July 2004?

32. Exhibit 4, Tab B also identifies Abdul Rahman Al-Rajhi as a member of the Board of Directors of Mar-Jac Poultry from November 1990 until November 1996. Did Mr. Al-Rajhi in fact serve on the Board of Directors during that time period?

33. In response to Interrogatory No. 4, "For each of the Mar-Jac Entities, identify any and all past and present directors, officers, employees, agents or representatives who have knowledge of each such entity's financial records during the pertinent time period," Mar-Jac Poultry provided the list at Tab D to Exhibit 4, which identifies you as a person having such knowledge. Do you in fact have knowledge of Mar-Jac Poultry's financial operations during the time period covered by the interrogatories, namely, January 1, 1984 through July 2004?

34. In response to Interrogatory No. 5, "For each of the Mar-Jac Entities, identify all individuals who have, or have had, signatory authority over bank accounts held, or otherwise controlled, by such entity," Mar-Jac Poultry provided the list at Tab E to Exhibit 4, which identifies you as a person having such authority. Did you in fact have authority over Mar-Jac Poultry's bank accounts during the time period covered by the interrogatories, namely, January 1, 1984 through July 2004?

35. Paragraph 109 of the Kane Affidavit, Exhibit 10, states that you had signatory authority over the bank accounts of Mar-Jac Poultry as of March 2002. Did you in fact have signatory authority over the bank accounts of Mar-Jac Poultry as of March 2002?

**Mar-Jac Investments**

36. Exhibit 11 is a copy of a document entitled "Sterling Stock Investments, LLC: Confidential Offering Memorandum," dated October 1, 1999. Are you familiar with this document?

37. Is the biographical information about you set forth on pages 9-10 of this document accurate?

38. Have you in fact been the President and CEO of Mar-Jac Investments, Inc. since 1995, as page 9 of Exhibit 11 indicates?

39. Were you in fact Executive Vice President of Mar-Jac Investments from 1987-1995, as page 9 of Exhibit 11 indicates?

40. Exhibit 12, Bates stamped MJ 0013361-13364, is an option agreement dated October 15, 1990, which you appear to have signed as Executive Vice President of Mar-Jac Investments. Did you in fact sign this agreement on behalf of Mar-Jac Investments?

**Mena Corporation**

41. Exhibit 13 is a copy of the Articles of Dissolution of Mena Corporation, filed on July 17, 2003, with the Maryland Department of Assessments and Taxation, which you appear to have signed as its Secretary. Directing your attention to the signature on the fourth page of Exhibit 13, is that your signature?

42. Were you in fact a director and Vice President/Secretary of Mena Corporation at the time of its dissolution in 2003 as the third page of Exhibit 13 indicates?

43. The first page of Exhibit 13 is a printout from the website of the Maryland Department of Assessments & Taxation, which indicates that Mena Corporation was incorporated on May 11, 1982. Was Mena Corporation in fact incorporated in 1982?

44. Did you hold the position of director and Vice President/Secretary of Mena Corporation from the time of its incorporation in 1982 until its dissolution in 2003?

45. Exhibit 14, Bates stamped MJ 0011370, is a memorandum, which appears to be signed by you, on behalf of Mena Corporation. Did you in fact sign this memorandum on behalf of Mena Corporation?

46. Exhibit 15, Bates stamped MJ 0013369, is a copy of a check from Mena Corporation dated November 10, 1990, which appears to be signed by you. Did you in fact sign this check?

47. Were you in fact authorized to sign checks on behalf of Mena Corporation in 1990 and from then until its dissolution in 2003?

**Mena Investments**

48. Exhibit 5, Bates stamped MJ 0001885, is a document entitled "Minutes of Board of Directors' Meeting: Mena Investments, Inc." dated October 17, 1996, which appears to be signed by you as its Secretary. Did you in fact sign this document?

49. Were you in fact the Secretary of Mena Investments, Inc. in October 1996?

50. Exhibit 16 contains copies of reports filed by Mena Investments with the Virginia State Corporation Commission in 1997 and 2001, which appear to be signed by you. Did you in fact sign these reports?

51. These reports at Exhibit 16 state that you were the Vice President, Secretary and a director of Mena Investments in 1997 and 2001, and that you were also its registered agent in each of those years. Is that correct?

**Grove Corporate Plaza, Inc.**

52. Directing your attention to the Kane Affidavit (Exhibit 10) at Attachment C, Page 5, which states that you were the President, Treasurer and registered agent of Grove Corporate Plaza, Inc. as of March 2002. Were you in fact the President, Treasurer, and registered agent for Grove Corporate Plaza, Inc. as of March 2002?

**Sterling Investment Group, LLC**

53. Directing your attention to the Kane Affidavit (Exhibit 10) at page 43, which states that you were an officer, director and/or trustee of Sterling Investment Group, LLC as of March 2002. Were you in fact an officer, director, and/or trustee of Sterling Investment Group, LLC as of March 2002?

**Aradi Inc.**

54. Directing your attention to the Kane Affidavit (Exhibit 10) at page 42, which states that you served as an officer, director and/or trustee of Aradi Inc. as of March 2002. Were you in fact an officer, director, and/or trustee of Aradi Inc. in March 2002?

55. Exhibit 17, Bates stamped MJ 0003198, is a letter written on Mar-Jac Poultry, Inc. letterhead dated May 2, 1997. The letter is addressed to "Aradi, Inc., c/o Mar-Jac Investments, Inc." Did Aradi Inc. receive mail in care of Mar-Jac Investments, Inc. and, if so, why did it do so?

**Sterling Management Group**

56. Exhibit 11 is a copy of a document entitled "Sterling Stock Investments, LLC: Confidential Offering Memorandum," dated October 1, 1999. Are you familiar with this document?

57. Exhibit 11 at page 9 states that Sterling Management Group "is wholly-owned and controlled by Dr. M. Yaqub Mirza." Is the quoted statement accurate?

58. Exhibit 11 at page 9 states that, as of October 1, 1999, you served as the President and Chief Executive Officer of Sterling Management Group. Have you, in fact, served as the President and Chief Executive Officer of Sterling Management Group?

59. Are you currently the President and Chief Executive Officer of Sterling Management Group?

60. Exhibit 18 is a copy of what appears to be a brochure for Sterling Management Group. Are you familiar with this document?

61. Did you participate in drafting it?

62. Did you approve its contents?

63. Page 5 of Exhibit 18 states that Sterling Management Group provides "management, finance & accounting services" for the following entities, among others:

- African Muslim Agency
- Heritage Education Trust
- Humana Charitable Trust
- Safa Trust
- Sanabel Al Kheer
- York Foundation
- Aradi, Inc.
- York International Trust
- Grove Corporate, Inc.
- Mar-Jac Investments, Inc.
- Mena Investments, Inc.

In your capacity as President and Chief Executive Officer of Sterling Management Group, did you provide "management, finance & accounting services" for each of these entities?

64. In your capacity as President and Chief Executive Officer of Sterling Management Group, did you direct investments on behalf of each of the entities referenced in Question 63?

65. In your capacity as President and Chief Executive Officer of Sterling Management Group, did you direct charitable donations on behalf of each of the entities referenced in Question 63?

66. In your capacity as President and Chief Executive Officer of Sterling Management Group, did you direct the making and receipt of loans on behalf of each of the entities referenced in Question 63?

**Sana-Bell, Inc.**

67. Directing your attention to Attachment C, Page 11 of the Kane Affidavit (Exhibit 10), which states that you served as Secretary of Sana-Bell, Inc. prior to March 2002. Were you in fact the Secretary of Sana-Bell, Inc. prior to March 2002?

68. Exhibit 19 is a document entitled "Articles of Incorporation of The Sana-Bell, Inc." dated July 28, 1989, and which states at page 6 that you were an Initial Trustee of The Sana-Bell, Inc. Were you in fact a trustee of Sana-Bell, Inc. as of July 1989?

69. Exhibit 19 also identifies, at page 6, "Solayman Alsalih Alragihi" as a trustee of Sana-Bell, Inc. Was Solayman Alsalih Alragihi in fact a trustee of Sana-Bell, Inc. as of July 1989?

70. Exhibit 20 is a document filed by the United States in U.S. District Court for the Northern District of Georgia on January 22, 2004 entitled "Government's Supplemental Opposition to Motion for Return of Seized Property" in the action captioned *In the Matter of The Search of Mar-Jac Poultry, Inc.*, Case No. 2-03-

CV-232-WCO ("01/22/04 Return of Property Filing"). Page 22-23 of Exhibit 20 states that "Solayman Alsalih Alragihi ... appears to be a reference to Sulaiman Saleh Al Rajhi, [who] sits on the Executive Committee" of the Board of the Al Rajhi Bank. Is the quoted statement accurate?

71. The 01/22/04 Return of Property Filing (Exhibit 20) states at page 23 that "there is direct evidence that Sana-Bell, Inc., was the North American financial arm of IIRO [the International Islamic Relief Organization]." Was Sana-Bell, Inc. in fact the North American financial arm of IIRO?

72. Exhibit 21 is exhibit 66 to the 01/22/04 Return of Property Filing and appears to be a letter from Dr. Abdullah Bin Salih Al-Obaid, "Secretary General, Muslim World League & Chairman of the Board IIRO" to you as "member of the Board of Trustees, SANA-BELL Company of USA," dated July 28, 1998. Were you in fact a member of the Board of Trustees of Sana-Bell, Inc. as of July 1998?

## III. OFFSHORE ENTITIES

### York International Trust

73. Directing your attention to the Kane Affidavit (Exhibit 10) at paragraph 103, which states that you served as a trustee of York International Trust in March 2002. Did you in fact serve as a trustee of York International Trust in March 2002?

74. Exhibit 22, Bates stamped MJ0004059-4060, is a document entitled "Sale and Assignment," which you appear to have signed on behalf of York International Trust and which identifies York International Trust as "an Isle of Man trust." Is York International Trust in fact organized under the laws of the Isle of Man?

### Humana Charitable Trust

75. Directing your attention to paragraph 170 of the Kane Affidavit (Exhibit 10), which states that you told an IRS agent that you founded Humana Charitable Trust in the Isle of Man. Did you in fact found the Humana Charitable Trust in the Isle of Man?

76. Exhibit 23 is the transcript of the deposition of M. Omar Ashraf, taken in this action on July 15, 2004. At page 254, lines 5-7 of that deposition, Mr. Ashraf was asked if he knew whether you formed Humana Trust, to which Mr. Ashraf testified, "Yes, he did." Did you in fact form the Humana Charitable Trust?

77. Directing your attention to paragraph 103 of the Kane Affidavit (Exhibit 10), which states that you are one of the three individuals who controls Humana Charitable Trust. Are you in fact one of the three individuals who control Humana Charitable Trust?

78. Exhibit 24, Bates stamped MJ 0011253, is a letter dated July 19, 2001, which appears to be signed by you on behalf of Humana Charitable Trust and appears to direct where interest owed to Humana Charitable Trust should be paid. Did you in fact sign this letter?

79. Exhibit 25, Bates stamped MJ 0014050-51, is a copy of the front and back of a check made out to Humana Charitable Trust, which you appear to have endorsed. Did you in fact endorse this check on behalf of Humana Charitable Trust?

80. Directing your attention to the Kane Affidavit (Exhibit 10) at paragraph 101, which states that you signed a letter dated December 3, 1997, on behalf of Amana Limited, as trustee for Humana Charitable Trust, that was addressed to you, as the director of SAAR Foundation, soliciting major donations from SAAR Foundation to Humana Charitable Trust. Did you in fact sign such a letter?

**Amtrax Holdings Limited**

81. Exhibit 26, Bates stamped MJ 0013349, is a letter dated January 15, 1989, that appears to be signed by you as Director of Amtrax Holdings Ltd. Did you sign this letter?

82. Were you in fact a Director of Amtrax Holdings Limited in January 1989?

83. Directing your attention to paragraph 245 of the Kane Affidavit (Exhibit 10), which states that you received correspondence addressed to Amtrax Limited at your residence in February 2002. Did you in fact receive correspondence addressed to Amtrax Holdings Limited at your residence at 11922 Safa Court, Herndon, Virginia in February 2002?

84. Exhibit 27, Bates stamped MJ 0013356, is a document produced in discovery in this case by Mar-Jac Poultry entitled "Certificate of Foreign Status," which indicates that Amtrax Holdings Limited's address is in Jersey, Channel Island. Is Amtrax Holding Limited in fact a Jersey, Channel Island corporation?

85. Exhibit 28, Bates stamped MJ 0006124, is a letter dated January 2, 1989, that appears to be signed by you as Vice President of SAAR Foundation, Inc. and states that Amtrax Holdings, Ltd. is a Jersey, Channel Island Corporation. Did you in fact sign this letter?

86. Is Amtrax Holdings, Ltd. in fact a Jersey, Channel Island Corporation?

**Key Overseas, Inc.**

87. Exhibit 29, Bates stamped MJ 0013624-13626, is a promissory note by Mar-Jac Poultry, Inc. in the amount of $5.1 million payable to "Key Overseas, Inc." dated October 5, 1990. This note appears to have been signed by you. Did you in fact sign this note?

88. The first page of the $5.1 million promissory note, Exhibit 29, states that Key Overseas, Inc. is "a corporation organized under the laws of Panama." Is Key Overseas, Inc. in fact organized under the laws of Panama?

89. Exhibit 30, Bates stamped MJ 0001928-1935, is a document memorializing certain amendments to the $5.1 million promissory note payable to Key Overseas, which amendments are dated November 27, 1996. These amendments appear to have been signed by you. Did you in fact sign these amendments?

90. On the final page of Exhibit 30, you are identified as "Secretary" of Key Overseas, Inc. Did you in fact serve as Secretary of Key Overseas, Inc.?

**Solmagic, S.A.**

91. Exhibit 31, Bates stamped MJ 0013621-13623, is a $4 million promissory note issued by Mar-Jac Poultry, dated October 15, 1993, and made payable to Solmagic, S.A., "a corporation organized under the laws of Panama." You appear to have signed this note. Did you in fact sign this note?

92. Is Solmagic, S.A. in fact a corporation organized under the laws of Panama?

## IV. CHARITIES/NONPROFITS

**SAAR Foundation**

93. Exhibit 32 consists of Forms 990 filed by SAAR Foundation with the IRS for the years 1986-1991, 1993-1995, and 1997-2000. Directing your attention to the signature page of those Forms 990 for the years 1986, 1987, 1988, 1989, 1990, 1993, 1994, 1997, 1998, and 2000, is that your signature on each of those forms?

94. Did you in fact execute SAAR Foundation's Forms 990 for the years 1986, 1987, 1988, 1989, 1990, 1993, 1994, 1997, 1998, and 2000?

95. Directing your attention to SAAR Foundation's Forms 990 for the years 1995 and 1999. For those years, the signature is redacted. Did you execute SAAR Foundation's Forms 990 for the years 1995 and 1999?

96. Directing your attention to SAAR Foundation's Forms 990 for the years 1998, 1999, and 2000. On page 5 of each of those forms, it states that the books of SAAR Foundation were in your care during each of those years. Is that correct?

97. Exhibit 28, Bates stamped MJ 0006124, is a letter dated January 2, 1989, that appears to be signed by you as Vice President of SAAR Foundation. Did you in fact sign this letter on behalf of SAAR Foundation?

98. Were you in fact Vice President of SAAR Foundation in 1989?

99. Directing your attention to Exhibit 32, SAAR Foundation's Forms 990 for the years 1987 through 1990, which state that you were Vice President of SAAR Foundation during each of those years. Were you in fact the Vice President of SAAR Foundation in each of those years?

100. On page 18 of SAAR Foundation's Form 990 for the year 1993, you are identified as the Vice President, Secretary and a Trustee of SAAR Foundation in 1993. Were you in fact Vice President, Secretary and a Trustee of SAAR Foundation in 1993?

101. Directing your attention to SAAR Foundation's Form 990 for the year 1994. On page 4 of that form, you are identified as the Chief Executive Officer and Secretary of SAAR Foundation during that year. Were you in fact Chief Executive Officer and Secretary of SAAR Foundation in 1994?

102. Directing your attention to SAAR Foundation's Form 990 for the year 1995. On page 3 of that form, you are identified as the President and Chief Executive Officer of SAAR Foundation during that year. Were you in fact President and Chief Executive Officer of SAAR Foundation in 1995?

103. Exhibit 33 is the transcript of the deposition of Dr. Jamal Barzinji, taken in this action on July 14, 2004. At page 140, lines 11-14 of that deposition, Dr. Barzinji testified that "Primarily the man who was really prime mover in establishing [SAAR Foundation was] Shaikh Sulaiman Al Rajhi…who was the greatest not only donor but also fundraiser for SAAR." Was Sulaiman Abdul Al-Rajhi in fact the greatest donor and fundraiser for the SAAR Foundation?

104. At page 67, line 16 through page 68, line 11 of his deposition, Dr. Barzinji testified that the SAAR Foundation was founded in 1983 and funded by the Al-Rajhi family. Is Dr. Barzinji's referenced testimony accurate?

105. At page 68, lines 8-9 of his deposition, Dr. Barzinji testified that "the primary people [who funded SAAR] were members of Al Rajhi family and his close friends." In fact, were the people who donated the money to start the SAAR Foundation primarily the Al-Rajhi family and its "close friends"?

106. Who were the "close friends" of the Al-Rajhi family who donated money to start SAAR Foundation?

107. Exhibit 32 contains SAAR Foundation's Form 990 filed with the IRS for the year 1989. Page 21 of the Form 990 contains a list of donors to SAAR Foundation, which includes "Al-Rajhi Banking & Investment Corp." and "Al-Rajhi Brothers." Did the donors to SAAR Foundation in 1989 include "Al-Rajhi Banking & Investment Corp." and "Al-Rajhi Brothers"?

108. At page 69, lines 11-15 of his deposition, Dr. Barzinji testified that, "during the time that I was associated with them," the Al Rajhi family continued to support

the SAAR Foundation. Did the Al-Rajhi family in fact continue to contribute to the SAAR Foundation from the time of its establishment at least until 1995?

109. At page 136, line 7 of his deposition, Dr. Barzinji testified that he ended his affiliation with SAAR Foundation in 1995. Did Dr. Barzinji end his affiliation with SAAR Foundation in 1995?

110. What is your understanding of why Dr. Barzinji ended his involvement with the SAAR Foundation in 1995?

111. At page 137, line 10 to page 138, line 6 of his deposition, Dr. Barzinji testified that "some people in the Saudi government didn't like that we were so free and so aggressive in pursuing our vision as American Muslims.... And they started putting the pressure on our major donors in Saudi Arabia. ... They wanted to promote their own vision...call it Wahhabism, fanaticism, and so on." Did the Saudi government in fact put pressure on the major donors of SAAR Foundation to remove Dr. Barzinji because he advocated a more liberal, non-violent approach to Islam?

112. Exhibit 34 is the transcript of the deposition of Dr. Hisham Altalib, taken in this action on July 12, 2004. At page 249, line 8 to 18 of that deposition, Dr. Altalib testified that he ended his affiliation with SAAR Foundation in 1995 at the request of its Board. Did Dr. Altalib end his affiliation with SAAR Foundation in 1995 at the request of its Board?

113. What is your understanding of why Dr. Altalib ended his involvement with SAAR Foundation in 1995?

114. At page 251, lines 7-21 of his deposition, Dr. Altalib testified that "Saudi authorities" did not want him and others to remain on the Board so that those authorities could assume control of the Board. Did the "Saudi authorities" in fact remove Dr. Altalib because they wanted to assume greater control of SAAR Foundation?

115. At page 256, line 16 of his deposition (Exhibit 33), Dr. Barzinji testified that you remained on the SAAR Foundation Board and continued to serve as an officer after Drs. Barzinji and Altalib resigned. Did you in fact remain on the Board and continue to serve as an officer of SAAR Foundation after Dr. Barzinji and Dr. Altalib resigned in 1995?

116. Why did you remain an officer of SAAR Foundation after Dr. Barzinji and Dr. Altalib resigned?

117. Did you do so, in whole or in part, because your ideological views were more consistent with those of the Saudi donors to SAAR Foundation and with the "Saudi authorities" referenced by Dr. Altalib and Dr. Barzinji in their depositions than with those of Dr. Barzinji and Dr. Altalib?

118. Directing your attention to Exhibit 32, SAAR Foundation's Forms 990 filed with the IRS for the years 1997 through 2000. On page 4 of each of those forms, you are identified as the President, Chief Executive Officer and a Trustee of SAAR Foundation during each of those years. Did you in fact serve as President, Chief Executive Officer and as a Trustee of SAAR Foundation during each of those years?

**Safa Trust, Inc.**

119. Exhibit 35 consists of Safa Trust, Inc.'s Forms 990 filed with the IRS for the years 1995, 1998, and 2000-2004. On page 5 of each of the Forms 990 for the years 1998 and 2000, it states that the books of Safa Trust were in your care during each of those years. Were the books of Safa Trust in fact in your care during each of those years?

120. Directing your attention to the signature page of Form 990 for the year 1998, you appear to have signed this form. Did you in fact sign Form 990 for Safa Trust, Inc. for the year 1998?

121. Directing your attention to the signature page of Form 990 for the year 2000, you appear to have signed this form. Did you in fact sign Form 990 for Safa Trust, Inc. for the year 2000?

122. Directing your attention to Safa Trust, Inc.'s Form 990 for the year 1995. At page 4 of that form, you are identified as Safa Trust's Vice President and Secretary in 1995. Were you in fact Safa Trust's Vice President and Secretary in 1995?

123. Directing your attention to Safa Trust, Inc.'s Forms 990 for the years 1998 and 2000-2004. At page 4 of the forms for 1998 and 2000-2004, you are identified as Safa Trust's Vice President during each of those years. Were you in fact Safa Trust's Vice President during each of those years?

124. Exhibit 36 consists of copies of reports filed by Safa Trust, Inc. with the Virginia State Corporation Commission in 2002 and 2004. Directing your attention to page 1 of each of those reports, which appear to contain your signature. Is that in fact your signature on each of those reports?

125. Did you in fact execute each of those forms on behalf of Safa Trust, Inc.?

126. Directing your attention to pages 1 and 2 of each of those reports. Both identify you as Vice President and registered agent of Safa Trust for each of those years. Were you in fact Vice President and registered agent of Safa Trust for each of those years?

127. Exhibit 15, Bates stamped MJ 0013369, is a copy of a check from Safa Trust, Inc. dated November 14, 1990 which appears to be signed by you. Is that in fact your signature?

128. Were you in fact authorized to sign checks on behalf of Safa Trust, Inc. in 1990?

**African Muslim Agency**

129. Exhibit 37 consists of African Muslim Agency's Forms 990 filed with the IRS for the years 1997 through 2002. Directing your attention to page 6 of Form 990 for 1997, which you appear to have signed. Did you in fact execute this form on behalf of African Muslim Agency?

130. On page 5 of Forms 990 for the years 1997, 1998, 1999, and 2000, it states that the books of African Muslim Agency were in your care during each of those years. Were the books of the African Muslim Agency in fact in your care during each of those years?

131. Directing your attention to African Muslim Agency's Forms 990 for the years 1997 through 2002. At page 4 of each of those forms, you are identified as Vice President and Secretary of African Muslim Agency during each of those years. Were you in fact President and Secretary of African Muslim Agency during each of those years?

**Sterling Charitable Gift Fund**

132. Exhibit 38 consists of copies of Sterling Charitable Gift Fund's Forms 990 filed with the IRS for the years 2000, 2001, and 2002. Directing your attention to page 6 of Form 990 for the year 2000, which appears to contain your signature. Is that your signature?

133. Did you in fact execute this Form 990 on behalf of Sterling Charitable Gift Trust?

134. On page 5 of Form 990 for the year 2000, it states that the books of Sterling Charitable Gift Fund were in your care during that year. Were the books of Sterling Charitable Gift Trust in fact in your care during that year?

135. Directing your attention to page 4 of Sterling Charitable Gift Fund's Forms 990 for the years 2000 and 2001, each of which identifies you as the President of Sterling Charitable Gift Fund for each of those years. Were you in fact President of Sterling Charitable Gift Trust during each of those years?

**Heritage Education Trust**

136. Paragraph 162 of the Kane Affidavit (Exhibit 10) states that you executed and filed with the IRS a Form 990 for the year 1996 on behalf of Heritage Education Trust. Did you in fact execute a Form 990 filed on behalf of Heritage Education Trust for the year 1996?

137. Were you in fact the Secretary, Treasurer, and a director of Heritage Education Trust in 1996, as the Kane Affidavit (Exhibit 10) states at paragraph 162?

138. Exhibit 39 is a memorandum filed in this case by Heritage Education Trust on June 18, 2004. Directing your attention to page 3 of that memorandum, which states that you were the Secretary of Heritage Education Trust until you resigned from the Board of Heritage Education Trust in 1997. Is that statement contained in the memorandum accurate?

139. Did you remain as an officer of Heritage Education Trust after you resigned from the Board?

140. Exhibit 40 is a report entitled "National Comprehensive Report Plus Associates" compiled on June 17, 2004. Directing your attention to page 4 of that report, which states that, as of that date, you were Heritage Education Trust's registered agent. Were you in fact Heritage Education Trust's registered agent in 2004?

**Sanabel Al Kheer, Inc.**

141. Exhibit 41 consists of copies of Sanabel Al Kheer, Inc.'s Forms 990 filed with the IRS for the years 2001, 2003, 2004, and 2007. Directing your attention to page 6 of Form 990 for the year 2001, which you appear to have signed. Did you in fact execute the form on behalf of Sanabel Al Kheer, Inc.?

142. Directing your attention to page 4 of Sanabel Al Kheer, Inc.'s Forms 990 for the years 2001 and 2003, each of which identify you as Secretary, Treasurer, and a Director of Sanabel Al Kheer, Inc. during each of those years. Were you in fact Secretary, Treasurer and a Director of Sanabel Al Kheer, Inc. during each of those years?

**York Foundation**

143. Exhibit 42 consists of copies of York Foundation's Forms 990 filed with the IRS for the years 1999, 2000, 2001, 2003, and 2004. Directing your attention to page 6 of the forms for 2000 and 2001, which you appear to have signed. Did you in fact execute each of these forms on behalf of York Foundation for each of these years?

144. On page 5 of Forms 990 for the years 1999 and 2000, it states that the books of York Foundation were in your care during each of those years. Were the books of York Foundation in your care during each of those years?

145. Directing your attention to page 4 of York Foundation's Forms 990 for the years 1999, 2000, 2001, 2003, and 2004, which identify you as the President and Treasurer of York Foundation during each of those years. Were you in fact the President and Treasurer of York Foundation during each of these years?

**International Institute of Islamic Thought**

146. Exhibit 43 consists of copies of Forms 990s filed with the IRS by the International Institute of Islamic Thought ("IIIT") for the years 1994, 1997-2001, and 2003.

On page 5 of each of those forms for the years 1998 and 1999, it states that the books of IIIT were in your care during each of those years. Were the books of IIIT in your care during each of those years?

**Muslim World League**

147. Attachment C, Page 9 of the Kane Affidavit (Exhibit 10) states that you were the Secretary, Treasurer and registered agent of the Muslim World League as of March 2002. Were you in fact the Secretary, Treasurer, and Registered Agent of Muslim World League as of March 2002?

**Other Entities**

148. Pages 42 and 43 of the Kane Affidavit (Exhibit 10) consists of a chart that lists 24 entities and states that you are a principal officer, director, and/or trustee of 22 of those entities. Is the information contained in the chart accurate?

149. Attachment C to the Kane Affidavit (Exhibit 10) is entitled "Safa Group Businesses and Corporations." It identifies several entities along with their business address, registered agent, officers, directors and/or trustees. Your name is listed under 30 of those entities. Is the information contained in Attachment C regarding your involvement in those 30 entities accurate as of March 2002?

150. Exhibit 44 is a chart entitled "Chart No. 1," which has been compiled by the defendants based on information contained in the documents previously identified as Exhibits to this deposition. Does Exhibit 44 constitute an accurate representation of the relationship you have or have had with each of the entities identified on Exhibit 44?

**V. OWNERSHIP OF MAR-JAC-RELATED ENTITIES**

151. Exhibit 4, Tab A, the "Mar-Jac Complex Organizational Chart" produced by Mar-Jac Poultry in this action, indicates that, in 1988, Mar-Jac, Inc. was the owner of Mar-Jac Poultry, Inc. Was Mar-Jac, Inc. the owner of Mar-Jac Poultry, Inc. in 1988?

152. Exhibit 4, Tab A, further indicates that, in 1988, SAAR Foundation owned Mar-Jac, Inc. Did SAAR Foundation in fact own Mar-Jac, Inc. in 1988?

153. Exhibit 45, Bates stamped MJ 0013368, is a document produced in discovery in this case by Mar-Jac Poultry which states that, in 1990, "Saar sells Mar-Jac Inc.'s stocks to Aradi 40% for $8.0 Million, Safa (gift from SAAR) 5% $1.0 Million, Mena Corp. 4% $800,000." In 1990, did SAAR Foundation in fact transfer 49% of Mar-Jac, Inc.'s stocks to Aradi, Inc., Safa Trust, and Mena Corporation?

154. Paragraph 111 and Attachment C, page 3, of the Kane Affidavit (Exhibit 10) state that Abdullah Sulaiman Al-Rajhi serves as a director and President of Aradi, Inc.

Was Abdullah Sulaiman Al-Rajhi in fact a director of Aradi, Inc. as well as its President as of March 2002?

155. Exhibits 14, 15, and 45 reference a loan from Mena Corporation to Mar-Jac, Inc. in 1990 in the amount of $400,000. Did Mar-Jac, Inc. in fact borrow $400,000 from Mena Corporation in 1990?

156. Exhibit 45 references a loan from Safa Trust to Mar-Jac, Inc. in 1990 in the amount of $500,000. Did Mar-Jac, Inc. in fact borrow $500,000 from Safa Trust in 1990?

157. Exhibit 14 is a memorandum from Mena Corp. to Mar-Jac, Inc., which appears to be signed by you, that states "as of September 19, 1996 Mena Corporation has sold its shares in Mar-Jac, Inc. ... to Mena Investments, Inc." Did you in fact sign this memorandum on behalf of Mena Corporation?

158. Did Mena Corporation in fact sell its shares in Mar-Jac, Inc. to Mena Investments, Inc. on September 19, 1996?

159. Exhibit 23 is the deposition of M. Omar Ashraf in this action. At page 368, lines 17-21 of that deposition, Mr. Ashraf testified that, after a November 1996 reorganization, SAAR Foundation had no further interest in Mar-Jac Poultry or Mar-Jac Holdings. In November 1996, did SAAR Foundation sell its remaining interest in Mar-Jac, Inc. (and, by extension its interest in Mar-Jac Poultry) to Safa Trust and Mena Investments?

160. Exhibit 35 contains Safa Trust, Inc.'s Forms 990 filed with the IRS for the years 1998, 2000, 2001, 2002 and 2003. Page 21 of the 1998 form, pages 24-25 of the 2000 form, page 22 of the 2001 and 2003 forms, and page 27 of the 2002 form each indicate that Safa Trust owned 100% of Mena Corporation, Inc. during each of those years. Was Mena Corporation in fact a wholly owned subsidiary of Safa Trust, Inc. during each of those years?

161. Directing your attention to Exhibit 38, which contains Form 990 filed with the IRS by Sterling Charitable Gift Fund for the year 2001. Page 15 of that form indicates that Sterling Charitable Gift Fund received a donation of $575,400 in the form of 1000 shares of Mena Corporation in 2001. Did Sterling Charitable Gift Fund in fact receive such a donation?

162. Exhibit 32 contains copies of Forms 990 filed with the IRS by SAAR Foundation for the years 1993-1995 and 1997-1999. Each of those forms states that Mar-Jac Investments was a subsidiary of SAAR Foundation during each of those years (at page 16 for 1993, at page 16 for 1994, at page 18 for 1995, at Part IX for 1997, at page 15 for 1998, and at Part IX for 1999). Is that statement contained in each of those forms accurate?

163. Exhibit 4, Tab A, indicates that, in 1988, Grove Corporate Plaza, Inc. was a wholly owned subsidiary of Mar-Jac, Inc., which was itself owned by SAAR

Foundation. Was Grove Corporate Plaza, Inc. in fact a wholly owned subsidiary of Mar-Jac, Inc. in 1988?

164. Directing your attention to Exhibit 35, which contains a copy of Form 990 filed by Safa Trust, Inc. with the IRS for the year 2002. At page 26, that form identifies the following entities, among others, as "related organizations:"

- Heritage Education Trust
- Sterling Charitable Gift Fund
- African Muslim Agency
- Sanabel Al Kheer, Inc.
- International Institute of Islamic Thought
- York Foundation

Was that representation accurate at the time it was made?

165. Was it accurate for the years 1995, 1998, 2000, and 2001 as well?

166. Why were Heritage Education Trust, Sterling Charitable Gift Fund, African Muslim Agency, Sanabel Al Kheer, Inc. and York Foundation not identified as "related organizations" on the Forms 990 filed by Safa Trust, Inc. in 1995, 1998, 2000, and 2001?

167. Why were they not identified in Safa Trust, Inc.'s Forms 990 for the years 1998 and 2000 that you appear to have signed on behalf of Safa Trust, Inc.?

168. Exhibit 46 contains copies of Forms 990 filed by Heritage Education Trust with the IRS for the years 1998 through 2002. Directing your attention to page 21 of the Form 990 for the year 2002, the form identifies the following entities as "related organizations:"

- Sterling Charitable Gift Fund
- African Muslim Agency
- Sanabel Al Kheer, Inc.
- International Institute of Islamic Thought
- York Foundation
- Safa Trust, Inc.

Was that representation accurate at the time it was made?

169. Was it accurate for the years 1998 through 2001 as well?

170. Why were none of these entities identified as "related organizations" on Forms 990 filed by Heritage Education Trust in 1998 through 2001?

171. Directing your attention to Exhibit 41, which contains a copy of Form 990 filed by Sanabel Al Kheer, Inc. with the IRS for the year 2003. At page 16, the form identifies the following entities as "related organizations:"

- Sterling Charitable Gift Fund
- Heritage Education Trust
- African Muslim Agency
- International Institute of Islamic Thought
- York Foundation
- Safa Trust, Inc.

Was that representation accurate at the time it was made?

172. Was it accurate for the year 2001 as well?

173. Why were none of these entities identified as "related organizations" on Form 990 filed by Sanabel Al Kheer, Inc. in 2001 (Exhibit 41) and apparently signed by you?

174. Exhibit 41 contains Forms 990 filed with the IRS by Sanabel Al Kheer, Inc. for the years 2001 and 2003. At page 4 of each of these forms, Dr. Hassan Bahafzallah is identified as Vice President and as a Director of Sanabel Al Kheer, Inc. during each of those years. Did Dr. Bahafzallah in fact serve as Vice President and as a Director of Sanabel Al Kheer, Inc. during each of the referenced years?

175. When you served as Secretary, Treasurer and as a Director of Sanabel Al Kheer, Inc. during each of those years (*see* Question 142 *supra*), did you have personal interactions with Dr. Bahafzallah?

176. Exhibit 47 is a list entitled "Office of Foreign Assets Control Specially Designated Nationals and Blocked Persons" ("OFAC List"). Page 89 of the OFAC List identifies the Benevolence International Foundation (aka "BIF") as a Specially Designated Global Terrorist. Are you aware that BIF has been designated as a Specially Designated Global Terrorist by the United States?

177. Exhibit 20, the 01/22/04 Return of Property Filing, at page 21, identifies Hassan Bahafzallah as the Executive Director of BIF's predecessor organization. Are you aware that Dr. Bahafzallah served as Executive Director of BIF's predecessor organization?

178. Exhibit 41 contains Forms 990 filed with the IRS by Sanabel Al Kheer, Inc. for the years 2004 and 2007. You are no longer identified as Secretary, Treasurer, or as a Director of Sanabel Al Kheer, Inc. Did you in fact end your formal association with Sanabel Al Kheer, Inc. after 2003?

179. Did you end your association with Sanabel Al Kheer, Inc. after BIF was added to the OFAC List?

180. Directing your attention to Exhibit 42, which contains the Form 990 filed by the York Foundation with the IRS for the year 2003. At page 21, the Form identifies the following entities as "related organizations":

- Sterling Charitable Gift Fund
- African Muslim Agency
- Sanabel Al Kheer, Inc.
- International Institute of Islamic Thought
- Safa Trust, Inc.
- Heritage Education Trust

Was that representation accurate at the time it was made?

181. Was it accurate for the years 1999 through 2001 as well?

182. Why were African Muslim Agency, Sanabel Al Kheer, IIIT, Safa Trust, Inc. and Heritage Education Trust not identified as "related organizations" on Forms 990 filed by York Foundation in 1999 through 2001?

183. Why were they not identified as "related organizations" on Forms 990 filed by York Foundation for the years 2000 and 2001 and which you appear to have signed?

184. Directing your attention to Exhibit 43, which contains Form 990 filed by IIIT with the IRS for the year 2003. At page 23, the form identifies the following entities as "related organizations:"

- Sterling Charitable Gift Fund
- Heritage Education Trust
- African Muslim Agency
- York Foundation
- Safa Trust, Inc.
- Sanabel Al Kheer, Inc.

Was that representation accurate at the time it was made?

185. Was it accurate for the years 1997 through 2001 as well?

186. Why were Sterling Charitable Gift Fund, Heritage Education Trust, African Muslim Agency, York Foundation and Sanabel Al Kheer, Inc. not identified as "related organizations" on Forms 990 filed by IIIT in 1997 through 2001?

## VI. FINANCING OF MAR-JAC-RELATED ENTITIES

187. Directing your attention to Exhibit 37, which contains a copy of Form 990 filed by African Muslim Agency with the IRS for the years 1998 and 1999. The last page of each of these forms each report that African Muslim Agency made a loan to Safa Trust, Inc. on January 1, 1987, in the amount of $766,711. Did African Muslim Agency in fact make a loan to Safa Trust, Inc. on January 1, 1987, in the amount of $766,711?

188. Directing your attention to Exhibit 37, which contains a copy of Form 990 filed by African Muslim Agency with the IRS for the year 2001. At the seventeenth page, it reports that, as of the end of 2001, Safa Trust, Inc. owed $720,000 on the original loan of $766,711. Is the statement contained in that Form 990 accurate?

189. Directing your attention to Exhibit 37, Form 990 filed by the African Muslim Agency for the year 2001 at page 17, it reports that the interest rate for this loan is 0%. Was the interest rate in fact 0%?

190. Why did Safa Trust pay only a little more than 6% of the balance of the loan over a period of 14 years and no interest?

191. Exhibit 4 contains interrogatory responses produced in discovery in this case by Mar-Jac Poultry in July 2004. In response to Interrogatory No. 6, "Identify the sources of all contributions, gifts, grants, loans and allocations received by each of the Mar-Jac Entities during the pertinent time period, including the source and amount of such income and the date such income was made," Mar-Jac Poultry provided the chart attached at Tab F of Exhibit 4. Directing your attention to Exhibit 4, Tab F, which states that SAAR Foundation loaned $7,500,000 to Grove Corporate Plaza in April 1987. Did SAAR Foundation in fact loan $7,500,000 to Grove Corporate Plaza in April 1987?

192. Exhibit 4, Tab F, indicates that SAAR Foundation loaned $1,650,000 to Mar-Jac, Inc. in February 1988. Did SAAR Foundation in fact loan $1,650,000 to Mar-Jac, Inc. in February 1988?

193. Exhibit 45, Bates stamped 0013368, references a loan from Solmagic to Mar-Jac, Inc. in 1990 in the amount of $4,000,000. Did Mar-Jac Inc. in fact borrow $4,000,000 from Solmagic in 1990?

194. Exhibit 45, Bates stamped 0013368, references a loan from Key Overseas Inc. to Mar-Jac, Inc. in 1990 in the amount of $5,100,000. Did Mar-Jac Inc. in fact borrow $5,100,000 from Key Overseas Inc. in 1990?

195. Directing your attention to Exhibit 35, which contains a copy of Form 990 filed by Safa Trust, Inc. with the IRS for the year 1995. At page 17 of that form, Safa Trust reported that it loaned $4.5 million to SAAR Foundation on January 1, 2004. Is that statement contained in the Form 990 accurate?

196. Directing your attention to Exhibit 32, page 14 of SAAR Foundation's Form 990 filed with the IRS for 1995, which indicates that SAAR Foundation made a loan

to Mar-Jac Investments in the amount of $15,000,000, with a balance then-owing of $15,178,641. Is that statement contained in the Form 990 accurate?

197. Directing your attention to Exhibit 46, which contains a copy of Form 990 filed by Heritage Education Trust with the IRS for the year 1998. At Statement 6, that form reports that Heritage Education Trust loaned $5,500,000 to Mar-Jac Holdings, Inc. on November 27, 1996. Is that statement contained in the Form 990 accurate?

198. Exhibit 32 includes a copy of Form 990 filed with the IRS by SAAR Foundation in 1997. Page 16 of that Form 990 states that SAAR Foundation made a loan to Mar-Jac Poultry in the amount of $109,890 in 1997. In 1997, did SAAR Foundation in fact make a loan to Mar-Jac Poultry in the amount of $109,890?

199. Directing your attention to Exhibit 4, Tab F, which states that SAAR Foundation made a loan to Mar-Jac Holdings in the amount of $1,785,000 in April 1997. Did SAAR Foundation in fact make a loan to Mar-Jac Holdings Inc. in the amount of $1,785,000 in April 1997?

200. Directing your attention to Exhibit 46, which contains a copy of Form 990 filed by Heritage Education Trust with the IRS for the year 1999. At Statement 6, the form reports that Heritage Education Trust borrowed $1,400,000 through a mortgage held by Humana Charitable Trust. Is that statement contained in the Form 990 accurate?

201. Directing your attention to Exhibit 32, which contains a copy of Form 990 filed by SAAR Foundation with the IRS for the year 1995. Page 14 of that Form 990 reports that SAAR Foundation made a loan to Amtrax Holdings Limited in the amount of $192,511, with a remaining balance of $182,511. Is that statement contained in the Form 990 accurate?

## VII. DONATIONS

202. Exhibit 4 contains interrogatory responses produced in discovery in this case by Mar-Jac Poultry in July 2004. In response to Interrogatory No. 7, "Identify the recipients of all contributions, gifts, grants, loans and allocations received by each of the Mar-Jac Entities during the pertinent time period, including the recipient and amount of such payment and the date such payment was made," Mar-Jac Poultry provided the chart attached at Tab G of Exhibit 4. Tab G is represented by Mar-Jac Poultry to be a listing of its charitable donations between March 6, 1989 and June 25, 2004. Are the representations reflected in Tab G accurate?

203. Did each of these donees referenced in Exhibit 4 make a request for financial assistance to Mar-Jac Poultry that included information explaining the purpose of the donee organization?

204. Did each of these donees referenced in Exhibit 4 make a request for financial assistance that disclosed their other sources of funding?

205. Did each of these donees referenced in Exhibit 4 make a request for financial assistance that included the amount of the grant needed to undertake a specific activity?

206. Did each of these donees referenced in Exhibit 4 describe a specific project or program for which it was requesting funding?

207. Did each of these donees referenced in Exhibit 4 report back to Mar-Jac Poultry concerning the use to which the funds received from Mar-Jac Poultry were put?

208. Did Mar-Jac Poultry ever seek to ensure that its donations were used for the stated purposes for which they were made?

209. Did Mar-Jac Poultry ever require that these donees provide it with external audit reports or other third party verifications of their activities?

210. Did Mar-Jac Poultry institute any procedural safeguards to ensure that its donations to charitable organizations did not end up in the hands of terrorist organizations?

211. Did Mar-Jac Poultry place any restrictions on what the money it donated could be used for?

212. Did Mar-Jac Poultry require that the money it donated be used by the donee organization, as distinct from some other person or entity?

213. Did Mar-Jac Poultry require that the money it donated be used for charitable purposes?

214. Exhibit 47 is the OFAC List. Did Mar-Jac Poultry ever donate money directly to any entities that are currently designated on the OFAC List?

215. If so, state which organizations received donations, in which years, and in what amounts.

216. Exhibit 48 is a document prepared by the United Nations entitled "The Consolidated List established and maintained by the 1267 Committee with respect to Al-Qaida, Usama bin Laden, and the Taliban and other individuals, groups, undertakings and entities associated with them" (the "U.N. List"). Did Mar-Jac Poultry ever donate money directly to any entities that are currently designated on the U.N. List?

217. If so, state which organizations received donations, in which years, and in what amounts.

218. Exhibit 49 contains documents entitled "Terrorist Exclusion List" and "Foreign Terrorist Organizations" that identify persons and entities designated as terrorists and terrorist organizations by the United States Department of State ("State

Department Lists"). Did Mar-Jac Poultry ever donate money directly to any entities that are currently designated on the State Department Lists?

219. If so, state which organizations received donations, in which years, and in what amounts.

220. Did any of the organizations to which Mar-Jac Poultry donated money give or loan money to entities that provide material support or resources to terrorist organizations?

221. If so, state which organizations gave or loaned money to entities that provide material support or resources to terrorist organizations, in which years, and in what amounts.

222. Exhibit 50 is a copy of the United States Department of the Treasury Anti-Terrorist Financing Guidelines: Voluntary Practices for U.S. Based Charities (2005). Before March 2002, did Mar-Jac Poultry follow any of the practices that are suggested in these guidelines?

223. If not, why did Mar-Jac Poultry fail to follow these practices?

224. Directing your attention to Exhibit 42, which contains a copy of Form 990 filed by York Foundation with the IRS for the year 2000. At page 15-16 and 19-20, the form reports the donation to the York Foundation of HFC Feed Mill, LLC, valued at $4,402,000. Is that statement contained in the Form 990 accurate?

225. Was it Mar-Jac Poultry, Inc. that donated HFC Feed Mill, LLC to the York Foundation?

226. Referencing Exhibit 4, Tab G, which purports to be a complete list of Mar-Jac Poultry's charitable donations during the time period in which the donation to York Foundation was made, the donation of the HFC Feed Mill, LLC to York Foundation was not included. Are there any other donations that were not included?

227. Exhibit 51 is Exhibit 36 to the 01/22/04 Return of Property Filing. The document appears to be a report authored by Kroll Associates, which was apparently retained by the SAAR Foundation "to conduct a due diligence on the SAAR Foundation and determine the public's perception of the organization" (the "Kroll Report"). Are you familiar with Exhibit 51?

228. Did SAAR Foundation in fact retain Kroll Associates for these purposes?

229. Did Kroll Associates in fact create this report?

230. Directing your attention to page 2 of the Kroll Report, Exhibit 51, which states that "SAAR contributed monies to more than 30 Islamic organizations. Of those 30, published reports and congressional testimony indicates that four are linked

with militant organizations and figures." The four referenced organizations are identified as International Institute of Islamic Thought of Herndon or "IIIT", the Muslim Arab Youth Association of Indianapolis, the Dar Al Hijra Mosque of Falls Church, and the American Muslim Council/Foundation of Washington. Is this conclusion reached by Kroll Associates and reported to SAAR Foundation with respect to these four organizations accurate?

231. With specific respect to IIIT, the Kroll Report states that IIIT "has been closely aligned with figures surrounding Islamic Jihad, Hamas as well as a Florida-based organization investigated by the FBI for its links to Islamic radicals." Is the conclusion reached by Kroll Associates with respect to IIIT accurate?

232. With specific respect to the Muslim Arab Youth Association, the Kroll Report states that it "is perceived to be led by radical Islamics with strong links to militant organizations, from Islamic Jihad to Hamas." Is the conclusion reached by Kroll Associates with respect to Muslim Arab Youth Association accurate?

233. With specific respect to the Dar Al Hijra Mosque, the Kroll Report states it "has strong ties to Saudi radical, Usama Bin Ladin." Is the conclusion reached by Kroll Associates with respect to Dar Al Hijra Mosque accurate?

234. With specific respect to the American Muslim Council/Foundation, the Kroll Report states that the founder of this organization, Abdulrahman Alamoudi, was identified in congressional testimony as a spokesman for "a Hamas chieftain." Is the conclusion reached by Kroll Associates with respect to American Muslim Council/Foundation accurate?

**International Institute of Islamic Thought (IIIT)**

235. Exhibit 32, the Form 990 filed with the IRS by SAAR Foundation for 1993, reports at page 14 of that Form that SAAR Foundation contributed $285,720 to IIIT in 1993. Did SAAR Foundation in fact contribute $285,720 to IIIT in 1993?

236. Exhibit 7, Bates stamped MJ 0024035, is a letter dated April 28, 1987, which appears to be signed by you as Vice Chairman of Mar-Jac, Inc. Is this letter in fact signed by you?

237. The letter states in part that "I [Dr. Mirza] am confirming approval for contributions to the following organizations" and indicates that contributions totaling $400,000 "may be sent to IIIT, Inc." Did you in fact instruct that Mar-Jac, Inc. make a $400,000 contribution to IIIT?

238. Did you in fact instruct that Mar-Jac, Inc. make the other donations set forth in Exhibit 7, Bates stamped MJ 0024035?

239. Exhibit 52, Bates stamped MJ 0024026, 0024027, 0024029 and 0024034, are copies of four Check Requests together with four checks, each dated May 1, 1987, each made payable to IIIT, Inc. in the sum of $100,000. Each Check Request

states "Contribution[] as Per Dr. Mirza's approval dated 4/28/87." Did Mar-Jac, Inc. in fact follow your instruction and send checks totaling $400,000 to IIIT on or about May 1, 1987?

240. Directing your attention to page 4 of the Kroll Report, Exhibit 51, which states that IIIT was one of the largest funders of an entity known as the World and Islam Studies Enterprise (WISE). Is that statement contained in the Kroll report accurate?

241. Did IIIT in fact contribute money to WISE?

242. Directing your attention to Exhibit 10, the Kane Affidavit, at paragraph 126, which states that IIIT was "the largest contributor to WISE." Was IIIT in fact the largest contributor to WISE?

243. Directing your attention to Exhibit 10, the Kane Affidavit, at paragraph 126, which states that, in 1991 and 1992, IIIT "contributed at least $50,000 to PIJ front-group WISE." In 1991 and 1992, did IIIT in fact contribute at least $50,000 to WISE, which was a front group for Palestinian Islamic Jihad (PIJ)?

244. Directing your attention to Exhibit 10, the Kane Affidavit, at paragraph 83, which states that, on February 2, 1995, you signed a check for $15,000 made payable to WISE. Did you in fact on February 2, 1995 sign a check for $15,000 that was made payable to WISE?

245. Exhibit 53 contains a copy of a check dated February 2, 1995 in the amount of $15,000 from Safa Trust and made payable to WISE. This check appears to be signed by you. Was this check in fact signed by you?

246. Was this the check referred to at paragraph 83 of the Kane Affidavit?

247. Exhibit 54 is an article published in the Washington Post on October 7, 2002, entitled "U.S. Trails Va. Muslim Money, Ties; Clues Raise Questions About Terror Funding," which reports that, in 1995, the United States government executed search warrants in connection with its investigation of Sami Al-Arian, then a professor at the University of South Florida. Are you aware of such a search? *See* Question 249 *infra.*

248. If so, when did you first become aware of it?

249. Directing your attention to Exhibit 10, the Kane Affidavit, at paragraphs 33, 37, and 38, which states that Sami Al-Arian incorporated WISE in 1991, that he was its Chairman, and that WISE became inactive following the United States government's search of its offices in Tampa on November 20, 1995. Is it your understanding that Sami Al-Arian incorporated WISE in 1991 and that he was its Chairman from 1991 until November 20, 1995, the date that WISE became inactive following the United States government's search of its offices in Tampa?

250. Exhibit 55 is a Department of Justice press release, dated April 17, 2006, and entitled "Sami Al-Arian Pleads Guilty to Conspiracy to Provide Services to Palestinian Islamic Jihad," which states that Mr. Al-Arian pled guilty to "conspiracy to make or receive contributions of funds, goods, or services to or for the benefit of the Palestinian Islamic Jihad" and that he "admit[ted] that he performed services for the PIJ ... after he knew that the PIJ had been designated by President Clinton as a terrorist organization." Are you aware that the prosecution of Sami Al-Arian resulted in his plea of guilty to conspiracy to make or receive contributions of funds, goods or services to or for the benefit of Specially Designated Terrorists, namely, Palestinian Islamic Jihad?

251. Exhibit 43 contains a copy of Form 990 filed with the IRS by IIIT in 1994. Dr. Taha Jaber Al-Alwani is listed at President on page 16 of that Form. Was Dr. Al-Alwani in fact the President of IIIT in 1994?

252. Exhibit 56 is a transcript of a July 19, 2004 hearing in this case. At pages 15-16 of that transcript, attorney for Mar-Jac Poultry and Heritage Education Nancy Luque identified Taha Jaber Al-Alwani as having been named as an unindicted co-conspirator in the prosecution of Sami Al-Arian. Are you aware that Dr. Al-Alwani was named as an unindicted co-conspirator in the Sami Al-Arian case?

253. Directing your attention to Exhibit 10, the Kane Affidavit, at paragraph 82, which states that SAAR Foundation made contributions of $10,000 and $5,000 to Sami Al-Arian in 1994. Did SAAR Foundation in fact make contributions of $10,000 and $5,000 to Sami Al-Arian in 1994?

254. Exhibit 32 contains a copy of SAAR Foundation's Forms 990 filed with the IRS for the years 1989 and 1990. Exhibit 32, Bates stamped MJ 0002201 and MJ 0002426 reflects that SAAR Foundation made a loan to "Sami A. Al-Arian" in 1984 in the original amount of $41,581. Did SAAR Foundation in fact make this loan to Sami Al-Arian?

255. With regard to the $400,000 donation to IIIT by Mar-Jac, Inc., *see* Question 237 *supra*, what investigation did Mar-Jac, Inc. undertake to ensure that none of the funds it donated to IIIT were used to provide material support or resources to foreign terrorist organizations?

256. Was any part of the $400,000 donation to IIIT by Mar-Jac, Inc. used to provide material support or resources to terrorist organizations?

257. Do you know that none of Mar-Jac, Inc.'s donations to IIIT were used to provide material support or resources to terrorist organizations?

258. With regard to the $285,720 donated by SAAR Foundation to IIIT in 1993, *see* Question 235 *supra*, what investigation did SAAR undertake to ensure that IIIT would not use funds received from SAAR Foundation to support the activities of WISE?

259. Was any portion of the $285,720 given by SAAR Foundation to IIIT used to support the activities of WISE?

260. Was any part of the funds sent to IIIT by SAAR Foundation used to support the activities of Palestinian Islamic Jihad ("PIJ")?

261. Do you know that none of SAAR Foundation's contributions to IIIT were used to support PIJ?

262. With regard to Safa Trust's donation to WISE, *see* Question 245 *supra*, what investigation did Safa Trust undertake to ensure that WISE did not use any portion of those funds to support PIJ?

263. Was any part of the donations made by Safa Trust used to support PIJ?

264. Do you know that none of Safa Trust's funds were used to support PIJ?

**American Muslim Council/Foundation**

265. Exhibit 4 is a copy of Tab G to Mar-Jac Poultry's interrogatory responses in this case. Tab G reflects that Mar-Jac Poultry donated $12,500 to the American Muslim Council (AMC) between March 6, 1989 and June 25, 2004. Did Mar-Jac Poultry in fact contribute $12,500 to AMC during this time period?

266. Is the American Muslim Council/Foundation one of the four organizations identified in the Kroll Report, *see* Exhibit 51 at page 2, as being "linked with militant organizations and figures?"

267. What investigation did Mar-Jac Poultry undertake to ensure that the $12,500 it donated to the American Muslim Council was not used in support of "militant organizations and figures"?

268. Was any part of the donation made by Mar-Jac Poultry to the American Muslim Council used to support "militant organizations and figures"?

269. What investigation did Mar-Jac Poultry undertake to ensure that the American Muslim Council did not use the $12,500 donated to it to provide material support and resources to terrorist organizations?

270. Was any part of the $12,500 donated by Mar-Jac Poultry to the American Muslim Council used to support provide material support or resources to terrorist organizations?

271. Exhibit 57 is a Department of Justice press release entitled "Abdurahman Alamoudi Sentenced to Jail in Terrorism Financing Case." The press release states that Mr. Alamoudi, the "founder and former executive director of the American Muslim Council" and "the founder of the American Muslim Foundation" pled guilty to three federal offenses "related to his activities in the

United States and abroad with nations and organizations that have ties to terrorism." Do you know Mr. Alamoudi?

272. Exhibit 58 is a copy of a resume for Abdurahman M. Alamoudi. Exhibit 58 indicates that Mr. Alamoudi worked at SAAR Foundation from 1985 to 1990 as "Executive Assistant to President." Did Mr. Alamoudi in fact work at SAAR Foundation from 1985-1990 as the Executive Assistant to the President?

273. Directing your attention to Exhibit 32, which contains a copy of Form 990 filed by SAAR Foundation with the IRS for the year 1994. At page 12, the form reports that SAAR Foundation contributed $40,000 to American Muslim Foundation, the organization founded by Mr. Alamoudi, during that year. Is that statement contained in the Form 990 accurate?

274. What investigation did SAAR Foundation undertake to ensure that the $40,000 it donated to American Muslim Foundation was not used in support of "militant organizations and figures"?

275. Was any part of this money donated by SAAR Foundation to American Muslim Foundation used to support "militant organizations and figures"?

276. Do you know that none of SAAR Foundation's contribution to American Muslim Foundation was used to support "militant organizations and figures"?

277. What investigation did SAAR Foundation undertake to ensure that American Muslim Foundation did not use the $40,000 donated to it to provide material support and resources to terrorist organizations?

278. Was any part of the $40,000 donated by SAAR Foundation to American Muslim Foundation used to provide material support and resources to terrorist organizations?

279. Do you know that none of SAAR Foundation's $40,000 contribution to American Muslim Foundation was used to provide material support or resources to terrorist organizations?

**Dar Al Hijrah Mosque**

280. Exhibit 59, Bates stamped MJ 0024216, is a copy of a letter dated December 4, 1989, from the Dar Al Hijrah Mosque seeking $50,000 from Mar-Jac, Inc. Handwritten notes on the document further reflect that the money was "P'd [paid] to ISNA on 12/4/89 as Per Al-Amoudi." Did Dar Al Hijrah Mosque in fact seek a donation from Mar-Jac, Inc. of $50,000?

281. Exhibit 4 is a copy of Mar-Jac Poultry's interrogatory responses. Tab G to this Exhibit reflects that $50,000 was paid to ISNA on December 4, 1989. Did Mar-Jac Poultry make a $50,000 contribution to ISNA on December 4, 1989 in response to a request for $50,000 from Dar Al Hijrah Mosque?

282. Is Dar Al Hijrah Mosque identified in the Kroll Report, Exhibit 51, at page 2?

283. Is ISNA the Islamic Society of North America?

284. Was the $50,000 contribution by Mar-Jac Poultry to ISNA used to benefit the Dar Al Hijrah mosque?

285. What investigation did Mar-Jac Poultry undertake to ensure that the $50,000 it donated to ISNA in response to a request for $50,000 from Dar Al Hijrah Mosque was not used in support of "militant organizations and figures"?

286. Was any part of this money donated by Mar-Jac Poultry to ISNA in response to the request from Dar Al Hijrah Mosque used to support "militant organizations and figures"?

287. What investigation did Mar-Jac Poultry undertake to ensure that ISNA and/or Dar Al Hijrah Mosque did not use the $50,000 donated to it by Mar-Jac Poultry to provide material support and resources to terrorist organizations?

288. Was any part of the $50,000 donated by Mar-Jac Poultry to ISNA in response to the request from Dar Al Hijrah Mosque used to provide material support or resources to terrorist organizations?

289. Do you know that none of the $50,0000 donated by Mar-Jac Poultry to ISNA in response to a request from Dar Al Hijrah Mosque was used to provide material support or resources to terrorist organizations?

290. Directing your attention to Exhibit 32, which contains a copy of Form 990 filed with the IRS by SAAR Foundation for the year 1994. At page 12, the form reports that SAAR Foundation made a contribution in the amount of $15,100 to Dar Al Hijrah Mosque during that year. Is this statement contained in the Form 990 accurate?

291. What investigation did SAAR Foundation undertake to ensure that the contribution was not used in support of "militant organizations and figures"?

292. Was any part of this money donated by SAAR Foundation to Dar Al Hijrah Mosque used to support "militant organizations and figures"?

293. What investigation did SAAR Foundation undertake to ensure that Dar Al Hijrah Mosque did not use the contribution sent to it to provide material support or resources to terrorist organizations?

294. Was any part of the contribution made by SAAR Foundation to Dar Al Hijrah mosque used to provide material support or resources to terrorist organizations?

295. Do you know that none of SAAR Foundation's contribution to Dar Al Hijrah Mosque was used to provide material support or resources to terrorist organizations?

**Muslim Arab Youth Association**

296. Directing your attention to Exhibit 32, which contains a copy of Form 990 filed with the IRS by SAAR Foundation for the year 1994. At page 12, the form reports that SAAR Foundation contributed $13,206 to Muslim Arab Youth Association during that year. Is that statement contained in the Form 990 accurate?

297. Is Muslim Arab Youth Association identified in the Kroll Report, Exhibit 51, at page 2?

298. What investigation did SAAR Foundation undertake to ensure that the $13,206 it donated to the Muslim Arab Youth Association was not used in support of "militant organizations and figures"?

299. Was any part of this money donated by SAAR Foundation to the Muslim Arab Youth Association used to support "militant organizations and figures"?

300. What investigation did SAAR Foundation undertake to ensure that the Muslim Arab Youth Association did not use the $13,206 donated to it to provide material support or resources to terrorist organizations?

301. Was any part of the $13,206 donated by SAAR Foundation to the Muslim Arab Youth Association used to provide material support or resources to terrorist organizations?

302. Do you know that none of SAAR Foundation's contribution to Muslim Arab Youth Associations was used to provide material support or resources to terrorist organizations?

**Islamic Society of North American (ISNA)**

303. Exhibit 4, at Tab G, reflects that between March 6, 1989 and June 25, 2004, Mar-Jac Poultry contributed $99,000 to ISNA, including the $50,000 payment on or about December 4, 1989 referenced in Question 281 *supra*. Did Mar-Jac Poultry in fact contribute $99,000 to ISNA between March 6, 1989 and June 25, 2004?

304. Exhibit 7, Bates stamped MJ 0024035, is letter dated April 28, 1987, which appears to be signed by you as Vice Chairman of Mar-Jac, Inc. Is this letter in fact signed by you?

305. Did you in fact instruct, as the letter indicates, that $25,000 be paid to ISNA by Mar-Jac, Inc. in April 1987?

306. Was that payment in fact made to ISNA?

307. Exhibit 60 is a court document filed by the United States in the action captioned *United States v. Holy Land Foundation for Relief and Development et al.*, Case No. 3:04-cr-00240 on May 29, 2007, a criminal prosecution of the Holy Land Foundation for Relief and Development charitable organization ("HLF") and certain of its principals. The document, at pages 1 and 8, identifies ISNA as an "Unindicted Co-conspirator[] and/or Joint Venturer[]" in the prosecution of HLF. Exhibit 61 is another court document filed by the United States in the same action which states, at page 14: "During the early years of the HLF's operation, HLF raised money and supported HAMAS through a bank account it held with ISNA at NAIT [North American Islamic Trust]. ... From that ISNA/NAIT account, the HLF sent hundreds of thousands of dollars to HAMAS leader Mousa Abu Marzook ... and a number of other individuals associated with HAMAS." Are these statements made by the United States with respect to ISNA's involvement in the funding of HAMAS accurate?

308. Exhibit 47 is the OFAC List, which designates both HAMAS and HLF as Specially Designated Nationals at pages 160 and 170, respectively. Was HAMAS in fact designated by the United States government as a terrorist entity?

309. Was HLF in fact designated by the United States government as a terrorist entity?

310. Exhibit 62 is a press release issued November 24, 2008 by the Department of Justice which states that HLF has been convicted of providing material support to HAMAS. Are you aware, as Exhibit 62 reflects, that HLF and certain of its principals were convicted of a conspiracy to provide funds, goods and services to a designated foreign terrorist organization, specifically HAMAS?

311. What investigation did Mar-Jac Poultry undertake to ensure that the $124,000 it donated to ISNA was not used to support the activities of HAMAS?

312. Was any of the $124,000 donated to ISNA by Mar-Jac Poultry used to support the activities of HAMAS?

313. Do you know that none of Mar-Jac Poultry's donation to ISNA was used to support HAMAS?

**North American Islamic Trust ("NAIT")**

314. Exhibit 2 is a Dun & Bradstreet Business Information Report dated August 11, 2003. Page 7 of this document states that you were employed by North American Islamic Trust (NAIT) from 1981 until 1983. Is that statement contained in the D&B Report accurate?

315. Exhibit 60 represents that, in the same criminal prosecution against HLF and its principals in which ISNA was named as an "Unindicted Co-conspirator[] and/or Joint Venturer[]," NAIT was also named by the United States as an "Unindicted

Co-conspirator[] and/or Joint Venturer[]." In Exhibit 61, the United States represented, at page 14, that: "During the early years of the HLF's operation, HLF raised money and supported HAMAS through a bank account it held with ISNA at NAIT. ... From that ISNA/NAIT account, the HLF sent hundreds of thousands of dollars to HAMAS leader Mousa Abu Marzook ... and a number of other individuals associated with HAMAS." Are these statements made by the United States with respect to NAIT's involvement in the funding of HAMAS accurate?

316. Exhibit 4 is a copy of Mar-Jac Poultry's interrogatory responses in this case. Tab G reflects that, between March 6, 1989 and June 25, 2004, Mar-Jac Poultry contributed $150,000 to NAIT. Did Mar-Jac Poultry in fact contribute $150,000 to NAIT during this time period?

317. What investigation did Mar-Jac Poultry undertake to ensure that none of the $150,000 it donated to NAIT would be used to support HAMAS?

318. Was any of the $150,000 donated to NAIT by Mar-Jac Poultry used to support the activities of HAMAS?

319. Do you know that none of $150,000 Mar-Jac Poultry gave to NAIT was used to support HAMAS?

**African Muslim Agency**

320. Exhibit 4, Tab G, reflects that between March 6, 1989 and June 25, 2004 Mar-Jac Poultry and/or Mar-Jac, Inc. contributed a total of $2,585,000 to African Muslim Agency. Did Mar-Jac Poultry in fact make these contributions?

321. Directing your attention to Exhibit 37, African Muslim Agency's Forms 990 filed with the IRS for the years 1997, 1998, 1999, 2000, and 2001. At page 4 of each of those forms, you are identified as Vice President and Secretary of African Muslim Agency during each of those years. Were you in fact Vice President and Secretary of African Muslim Agency during each of those years?

322. Directing your attention to Exhibit 37, which contains Form 990 filed with the IRS by African Muslim Agency for the year 1999. At page 1, it reports that African Muslim Agency had only one contributor in 1999, who contributed $1,125,000. Is that statement contained in the Form 990 accurate?

323. Was that single donor Mar-Jac Poultry, as reported on Tab G of Exhibit 4?

324. Directing your attention to Exhibit 37, which contains Form 990 filed with the IRS by African Muslim Agency for the year 1998. At page 13, it reports that African Muslim Agency made a contribution of $600,000 to IIIT during that year. Is that statement contained in the Form 990 accurate?

325. Directing your attention to Exhibit 37, which contains Form 990 filed with the IRS by African Muslim Agency for the year 2001. At page 15, it reports that African Muslim Agency made a contribution of $158,000 to IIIT during that year. Is that statement contained in the Form 990 accurate?

326. Was IIIT identified in the Kroll Report, Exhibit 51 at page 2, as being "linked with militant organizations and figures"? *See* Question 230 *supra.*

327. Was any of the money donated by Mar-Jac Poultry to African Muslim Agency used to support the activities of IIIT?

328. Directing your attention to Exhibit 37, which contains Form 990 filed with the IRS by African Muslim Agency for the year 1998. At page 13, it reports that African Muslim Agency made a contribution of $355,000 to York International Trust during that year. Is that statement contained in the Form 990 accurate?

329. Directing your attention to Exhibit 37, which contains Form 990 filed with the IRS by African Muslim Agency for the year 2000. At page 15, it reports that African Muslim Agency made an additional contribution of $90,000 to York International Trust during that year. Is that statement contained in the Form 990 accurate?

330. Is York International Trust organized under the laws of the Isle of Man? *See* Question 74 *supra.*

331. As a trust organized and located in the Isle of Man, was York International Trust required to make financial disclosures to the United States government?

332. The Kane Affidavit, Exhibit 10 at paragraph 104, states that "[t]he movement of funds into entities in the Isle of Man, a known tax haven, makes it difficult to verify whether these funds were used for terrorist financing or some other non-exempt purpose." Is that statement contained in the Kane Affidavit accurate?

333. Was any of the money donated by Mar-Jac Poultry to African Muslim Agency subsequently donated by African Muslim Agency to York International Trust and sent by York International Trust overseas to the Isle of Man?

**Sterling Charitable Gift Fund**

334. Exhibit 4, Tab G, reflects that, between March 6, 1989 and June 25, 2004, Mar-Jac Poultry and/or Mar-Jac, Inc. contributed a total of $3,650,000 to Sterling Charitable Gift Fund. Did Mar-Jac Poultry in fact make these contributions?

335. Directing your attention to Sterling Charitable Gift Fund's Forms 990 filed with the IRS for the years 2000 and 2001 at Exhibit 38, each of which identifies you at page 4 as the President of Sterling Charitable Gift Fund for each of those years. Are the statements contained in the Forms 990 accurate? *See* Question 135 *supra.*

336. Directing your attention to Exhibit 38, which contains Form 990 filed with the IRS by Sterling Charitable Gift Fund for the year 2001. At page 16, it reports that, in the year 2001, Sterling Charitable Gift Fund made contributions totaling $450,000 to IIIT. Is that statement contained in the Form 990 accurate?

337. Was IIIT identified in the Kroll Report as being "linked with militant organizations and figures"? *See* Question 230 *supra* & Exhibit 51.

338. Directing your attention to Exhibit 38, which contains Form 990 filed with the IRS by Sterling Charitable Gift Fund for the year 2001. At page 16, it states that, in the year 2001, Sterling Charitable Gift Fund made a contribution of $10,000 to ISNA. Is that statement contained in the Form 990 accurate?

339. Was ISNA identified by the United States in the criminal prosecution of the Holy Land Foundation as an "unindicted co-conspirator" and/or "joint venturer" because "HLF raised money and supported HAMAS through a bank account it held with ISNA ..."? *See* Question 307 *supra* & Exhibits 60, 61.

340. Was any of the $3,650,000 donated by Mar-Jac Poultry to the Sterling Charitable Gift Fund used by Sterling Charitable Gift Fund to support the activities of ISNA? *See* Questions 334, 338 *supra.*

341. Was any of the $3,650,000 donated by Mar-Jac Poultry to the Sterling Charitable Gift Fund then used by ISNA to support the activities of HAMAS? *See* Questions 334, 338 *supra.*

**York Foundation**

342. Exhibit 4, Tab G, reflects that, between March 6, 1989 and June 25, 2004, Mar-Jac Poultry and/or Mar-Jac, Inc. contributed a total of $175,000 to York Foundation. Did Mar-Jac Poultry in fact make these contributions?

343. Directing your attention to Exhibit 42, which contains Form 990 filed with the IRS by York Foundation for the year 2000. At page 17, the form reports that York Foundation made donations of $392,000 to IIIT, $400,000 to York International Trust and $19,500 to ISNA. Are those statements made in the Form 990 accurate?

344. Directing your attention to Exhibit 42, which contains the Form 990 filed with the IRS by York Foundation for the year 2001. At page 17, the form reports that York Foundation made donations of $100,000 to IIIT, $145,000 to York International Trust and $3,000 to ISNA. Are those statements made in the Form 990 accurate?

345. Was any of the $175,000 that Mar-Jac Poultry donated to York Foundation used by York Foundation to fund the activities of IIIT, York International Trust and/or ISNA? *See* Questions 342-344 *supra.*

**Safa Trust**

346. Exhibit 4, Tab G, reflects that, between March 6, 1989 and June 25, 2004, Mar-Jac Poultry and/or Mar-Jac, Inc. contributed a total of $957,500 to Safa Trust. Did Mar-Jac Poultry in fact make these contributions?

347. Directing your attention to Exhibit 35, which contains Safa Trust, Inc.'s Forms 990 filed with the IRS for the years 1995, 1998, 2000, and 2001-2003. Those forms report that Safa Trust made payments to IIIT in the amounts of $182,192 (page 15 of the 1995 form), $159,178 (page 14 of the 1998 form), $984,000 (page 18 of the 2000 form), $785,000 (page 14 of the 2001 form), $2,045,000 (page 18 of the 2002 form), and $2.1 million (page 16 of the 2003 form) during those years. Are those statements contained in the Forms 990 accurate?

348. Directing your attention to Exhibit 35, which contains copies of Forms 990 filed by Safa Trust, Inc. with the IRS for the years 1998, and 2001 and 2002. Those forms report that Safa Trust made donations to York International Trust in the amounts of $600,000 (page 14 of the 1998 form), $890,700 (page 14 of the 2001 form), and $400,000 (page 18 of the 2002 form) during those years. Are those statements contained in the Forms 990 accurate?

349. Was any of the money that Mar-Jac Poultry donated to Safa Trust, or otherwise paid to Safa Trust, used by Safa Trust to fund the activities of IIIT and/or York International Trust? *See* Questions 346-348 *supra.*

350. Was any part of the money that Mar-Jac Poultry donated or paid to Safa Trust then used by IIIT to provide material support or resources to WISE and/or Sami Al-Arian? *See* Questions 240, 245, 346 *supra.*

351. Were any of the funds that Mar-Jac Poultry donated or paid to Safa Trust used by WISE to provide material support or resources to PIJ? *See* Questions 243, 245, 346.

352. The Kane Affidavit (Exhibit 10) at paragraph 85 states that in 1997, HLF received three Safa Trust checks in the amounts of $75,000, $87,500, and $162,500, all signed by you. Did HLF in fact receive three Safa Trust checks in the amounts of $75,000, $87,500, and $162,500, all signed by you?

353. Was HLF in fact designated by the United States government as a terrorist entity? *See* Question 308 *supra* & Exhibit 47.

354. Were HLF and certain of its principals convicted in 2008 of providing funds, goods and services to a Specially Designated Global Terrorist, specifically HAMAS? *See* Question 310 *supra* & Exhibit 62.

355. Was any of the money that Mar-Jac Poultry donated to Safa Trust, or otherwise paid to Safa Trust, used to fund the activities of HLF?

356. Do you know that none of the monies donated by Safa Trust to HLF were used to support HAMAS?

357. Was any of the money that Mar-Jac Poultry donated or otherwise paid to Safa Trust used to fund WISE? *See* Question 245 *supra.*

358. Were any of the funds that Safa Trust donated or paid to WISE used to provide material support or resources to PIJ?

359. Do you know that none of the monies donated to WISE by Safa Trust were used to support PIJ?

**SAAR Foundation**

360. Directing your attention to Exhibit 32, which includes the Forms 990 filed with the IRS by SAAR Foundation for the years 1993, 1994, 1995, 1997, and 1998, including a supplementary statement included in SAAR Foundation's Forms 990 filed in these years. Did the donees identified on these supplementary statements in fact receive the donations attributed to them there?

361. Directing your attention to Tab G of Exhibit 4, which states that Mar-Jac Poultry made a donation to SAAR Foundation in 1997 in the amount of $125,000. Did Mar-Jac Poultry in fact make a donation to SAAR Foundation in 1997 in the amount of $125,000?

362. Directing your attention to Exhibit 32, which contains a copy of Form 990 filed by SAAR Foundation with the IRS for the year 1997. Page 15 of that form reports that, in 1997, SAAR Foundation donated $12,000,000 to Humana Charitable Trust. Is that statement contained in the Form 990 accurate?

363. Is Humana Charitable Trust organized under the laws of the Isle of Man? *See* Question 75 *supra.*

364. As a trust organized under the laws of the Isle of Man, was Humana Charitable Trust required to make financial disclosures to the United States government?

365. The Kane Affidavit, Exhibit 10 at paragraph 104, states that "[t]he movement of funds into entities in the Isle of Man, a known tax haven, makes it difficult to verify whether these funds were used for terrorist financing or some other non-exempt purpose." Is that statement contained in the Kane Affidavit accurate?

366. Was the $12 million received by Humana Charitable Trust from SAAR Foundation ultimately deposited in overseas accounts maintained by Humana Charitable Trust located in the Isle of Man?

367. If so, did those funds include the $125,000 donated by Mar-Jac Poultry to SAAR Foundation? *See* Question 361 *supra.*

368. Directing your attention to Exhibit 32, which contains Form 990 filed by SAAR Foundation with the IRS for the year 2000. At pages 1 and 15, the form reports that the SAAR Foundation was dissolved on December 20, 2000. Is that statement contained in the Form 990 accurate?

369. Directing your attention to paragraph 146 of Exhibit 10, the Kane Affidavit, which states that, from 1997 to 2000, SAAR Foundation contributed the majority of its assets to Humana Charitable Trust. Is that statement contained in the Kane Affidavit accurate?

370. Directing your attention to paragraph 105 of Exhibit 10, the Kane Affidavit, which states that, "although required by law to monitor whether its grants to overseas charities were being used for charitable purposes, SAAR had no such records at its U.S. offices." Is this statement contained in the Kane Affidavit accurate?

371. Did SAAR Foundation transfer the majority of its assets to Humana Charitable Trust to reduce the risk that its funds would be frozen by or forfeited to the United States?

372. Directing your attention to paragraph 133 of Exhibit 10, the Kane Affidavit, which states that you told representatives of the IRS during an audit of SAAR Foundation that the decision to transfer SAAR Foundation's assets to Humana Charitable Trust was made in response to negative publicity tying SAAR Foundation to terrorist organizations. Is that statement made in the Kane Affidavit accurate?

373. Exhibit 63 is an article published in *Newsday* on March 7, 1997, entitled "Bankrolling terror with U.S. Dollars/Ties to Palestinian front groups." The article reads, in part, "One U.S. official familiar with the case identified one of the so-called 'front organizations' by its acronym, SAAR. A counterterrorism source described SAAR as an investment-management agency that supports Hamas, a radical Palestinian group linked to numerous terrorist acts in Israel, and that has ties to Osama Bin Laden, a wealthy Saudi radical who funds terrorist organizations." Did you read this article in 1997?

374. Were you aware of other press reports during 1997 that linked SAAR Foundation to terrorist organizations?

375. Did this article (Exhibit 63) constitute a part of the "negative publicity" that led to the dissolution of SAAR Foundation?

376. Are the statements made about SAAR Foundation in this article accurate?

377. Exhibit 64 is a chart entitled "Chart No. 2," which has been compiled by the defendants based on information contained in the documents previously identified as Exhibits to this deposition. Does Exhibit 64 constitute an accurate

representation of the relationships between and among the entities identified on Exhibit 64?

## VIII. DIVIDENDS AND LOANS

**Assignment by Dr. Mirza of Mar-Jac Loan Payments due to SAAR Foundation to Humana Charitable Trust**

378. Exhibit 65, Bates stamped MJ 0001923-1924, is a promissory note, dated November 27, 1996, issued by Mar-Jac Holdings and made payable to SAAR Foundation in the amount of $1,785,000. Are you familiar with the transaction represented by this promissory note?

379. Exhibit 66, Bates stamped MJ 0005799, is a letter dated March 31, 1998 on the letterhead of SAAR Foundation, which appears to be signed by you as President of SAAR Foundation. The letter states in relevant part, "Please pay to the order of Humana Charitable Trust on November 27, 1998 the balance amount of $765,000.00 due to us [the SAAR Foundation] under that certain Promissory Note in the original principal amount of US$1,785,000.00 dated November 27, 1996 subject to all terms and conditions thereof." Did you in fact sign this letter?

380. Were you in fact President of SAAR Foundation as of the date of this letter? *See* Questions 102, 118 *supra* & Exhibit 32.

381. Were you a director and a founder of Humana Charitable Trust as of the date of this letter? *See* Questions 75-77 *supra* & Exhibits 10, 23 .

382. Is Humana Charitable Trust organized under the laws of the Isle of Man? *See* Question 75 *supra* & Exhibit 10.

383. Why was the $765,000 amount due to SAAR Foundation under this promissory note assigned to Humana Charitable Trust?

384. Was the effect of this assignment to send $765,000 due to SAAR Foundation from Mar-Jac Holdings to an entity outside the United States?

385. Was SAAR Foundation obliged to report to the IRS any charitable contributions it made with the funds it received from Mar-Jac Holdings?

386. Was Humana Charitable Trust, organized under the laws of the Isle of Man and located in the Channel Islands, obliged to report to the IRS or any other agency of the United States government its charitable contributions?

387. Was the effect of the assignment to permit charitable contributions to be made with those funds by Humana Charitable Trust in a manner that would be difficult for the United States government to trace?

388. What, if anything, did SAAR Foundation receive in consideration from Humana Charitable Trust in return for the assignment of this note to Humana Charitable Trust?

389. Exhibit 67, Bates stamped MJ 0005770, is a "Mar-Jac, Inc. Check Request" dated October 2, 1998 in the amount of $753,263.52. The "Purpose of Expenditure" on the Check Request is stated as "payment made on behalf of Mar-Jac Holdings[.] Not due until 11/27/98[.] Received 10% Disc. [discount] for 56 days." Exhibit 68, Bates stamped MJ 0005772, is a memorandum on Mar-Jac Poultry letterhead dated October 2, 1998 and directing payment by wire transfer of $753,263.52 to "Humana Charitable Trust with Bank Leu, Geneva Branch." Exhibit 69, Bates stamped, MJ 0005773, is a confirmation of the wire transfer to Humana Charitable Trust from Mar-Jac Poultry on October 2, 1998, in the amount of $753,263.52. These exhibits appear to indicate that the October 2, 1998 payment of $753,263.52 to a Humana Charitable Trust bank account in Switzerland was for the payment of the promissory note assigned by the SAAR Foundation to Humana Charitable Trust in your letter of March 31, 1998. Why were these funds sent to Switzerland?

390. Were the funds deposited in Bank Leu, Geneva Bank subject to Swiss bank secrecy laws?

391. How were these funds used by Humana Charitable Trust?

392. Were any of the proceeds used to provide material support or resources to entities or persons who have been designated by the United States or the United Nations as a terrorist-related organization?

393. What steps, if any, did Humana Charitable Trust take to ensure that none of the proceeds were used to provide material support or resources to designated entities or persons?

394. Exhibit 70 is a chart entitled "Chart No. 3," which has been compiled by the defendants based on information contained in the documents previously identified as Exhibits to this deposition. Does Exhibit 70 constitute an accurate representation of the assignment by SAAR Foundation to Humana Charitable Trust of the $765,000 balance due to SAAR Foundation from Mar-Jac Holdings?

**Assignment of Mar-Jac Loan Payments due to Key Overseas to Humana Charitable Trust**

395. Exhibit 29, Bates stamped MJ 0013624-13626, is a promissory note by Mar-Jac Poultry, Inc. in the amount of $5.1 million payable to "Key Overseas, Inc." and dated October 15, 1990. This note appears to have been signed by you. Did you in fact sign this note?

396. As of October 15, 1990, were you a director and/or Secretary of Key Overseas, Inc.? *See* Question 90 *supra* & Exhibit 30.

397. Is Key Overseas, Inc. organized under the laws of Panama? *See* Question 88 *supra* & Exhibit 29.

398. Exhibit 30, Bates stamped MJ 0001928-1935, are documents memorializing certain amendments to the $5.1 million promissory note payable to Key Overseas, which amendments are dated November 27, 1996. These amendments appear to have been signed by you. Did you in fact sign these amendments?

399. On the final page of Exhibit 30, you are identified as "Secretary" of Key Overseas, Inc. Did you in fact hold this position as of the date of the amendments?

400. Exhibit 71, Bates stamped MJ 0024395, is an assignment dated April 1, 1998, by Key Overseas, Inc. of the $5.1 million promissory note to Humana Charitable Trust. As of April 1, 1998, were you a director and/or Secretary of Key Overseas?

401. As of April 1, 1998, were you a director and a founder of Humana Charitable Trust? *See* Questions 75-77 *supra* & Exhibits 10, 23.

402. Was this assignment of the Mar-Jac Poultry loan from Key Overseas to Humana Charitable Trust in fact made?

403. Why was this assignment of the Mar-Jac Poultry loan from Key Overseas to Humana Charitable Trust made?

404. What, if anything, did Key Overseas receive in consideration for the assignment of this note to Humana Charitable Trust?

405. Exhibit 72 is a document filed as exhibit 42 to the 01/22/04 Return of Property Filing. The document appears to be a request for a wire transfer dated March 31, 1998, to be debited from the account of Humana Charitable Trust in the amount of $5,800,000. Exhibit 72 states that the amount of the wire transfer is for further credit to the account of "Shaikh Sulaiman A. Al Rajhi" for "payment Key Overseas loan." This wire transfer request appears to be signed by you. Did you in fact sign this request?

406. Was the wire transfer in fact made?

407. Was the referenced bank account in Exhibit 72 maintained by a member of the Al Rajhi family, specifically Shaikh Sulaiman A. Al Rajhi?

408. Why was the payment made to this bank account?

409. What is the relationship, if any, between the $5.8 million payment to this bank account and the $5.1 million note payable issued by Mar-Jac Poultry in 1990 to Key Overseas and assigned to by Key Overseas to Humana Charitable Trust in 1998? *See* Questions 395-400 *supra*.

410. What was the source of funds used by Humana Charitable Trust to make the $5.8 million wire transfer reflected in Exhibit 72?

411. Exhibit 73, Bates stamped MJ 0024398, appears to be a letter from you to Mahmoud D. Mohammed of Mar-Jac Poultry in which you instruct that, following the assignment of the Key Overseas note, interest payments should henceforth be made to the Geneva, Switzerland bank account of Humana Charitable Trust. Are you in fact the author of Exhibit 73?

412. Did you in fact make this instruction?

413. Was the Geneva, Switzerland bank account of Humana Charitable Trust subject to Swiss bank secrecy laws?

414. Was the effect of this instruction to permit Mar-Jac Poultry to transfer funds, through Key Overseas and Humana Charitable Trust, to a Swiss bank account?

415. What use did Humana Charitable Trust make of the proceeds of the Mar-Jac Poultry note it received as a result of the assignment it received from Key Overseas?

416. Were any of the proceeds used to provide material support or resources to any entities or persons who have been designated at any time by the United States or the United Nations as terrorist-related organizations or persons?

417. What steps, if any, did Humana Charitable Trust take to ensure that none of the proceeds were used to provide material support or resources to designated entities or persons?

418. Exhibit 74, Bates stamped MJ 0025830, 0025835, 0025846 are audited financial statements for Mar-Jac Poultry, which indicate that no principal payments had been made on the $5.1 million note as of 2003. Exhibit 74, Bates stamped 0011278, 0011302, 0011238-11241, are accounting records produced by Mar-Jac Poultry which further reflect that between 1990 and 2003, $5.1 million in interest payments were made. Were any principal payments in fact made on this loan?

419. If not, why were no principal payments made?

420. Exhibit 75 is a chart, entitled "Chart No. 4," which has been compiled by the defendants based on information contained in the documents previously identified as Exhibits to this deposition. Does Exhibit 75 constitute an accurate representation of payments and assignments related to the $5.1 million note payable to Key Overseas?

**Sale of Mar-Jac Holdings' Ownership Interest in Sterling Investment Group to York International Trust**

421. Exhibit 6, at Bates stamp MJ 0001851, is a document titled "Minutes of the Board of Directors' Meeting of Mar-Jac Holdings, Inc.," dated March 6, 1997 ("3/6/97 Minutes"). The 3/6/97 Minutes appear to be signed by you as "Secretary" of Mar-Jac Holdings, Inc. Did you in fact sign these Minutes?

422. Were you in fact Secretary of Mar-Jac Holdings, Inc. as of March 6, 1997? *See* Question 26 *supra* & Exhibit 6.

423. The 3/6/97 Minutes authorize Mar-Jac Holdings to invest between $1.5 million and $1.7 million in Sterling Investment Group. Did the directors of Mar-Jac Holdings in fact authorize such an investment in Sterling Investment Group?

424. On March 6, 1997, were you an officer, director and/or trustee of Sterling Investment Group? *See* Question 53 *supra* & Exhibit 10.

425. Is Sterling Investment Group also known as SIG?

426. Exhibit 76, Bates stamped MJ 0005026, appears to reflect an instruction by Mar-Jac Poultry to Wachovia Bank of Georgia on March 18, 1997, for a $1.5 million wire transfer to a Chilean bank account. Does this $1.5 million wire transfer constitute the investment in Sterling Investment Group authorized by the 3/6/97 Minutes?

427. Exhibit 77, Bates stamped, MJ 0001759, is a letter to Mar-Jac Poultry, Inc., which is dated April 30, 1998, written on the letterhead of "York International Trust c/o Reston Investments, Inc." at 555 Grove Street in Herndon. The letter from York International Trust instructs Mar-Jac Poultry to wire $125,000 to a bank account "for further credit to Sterling Investment Group, L.L.C." It appears from a Post-It note on the letter that you received this letter, *i.e.*, the note indicates "To Dr. Yaqub." Did you in fact receive this letter?

428. Did you instruct the author of this letter to direct Mar-Jac Poultry to make this $125,000 payment to Sterling Investment Group?

429. Were you at the time of this letter an officer, director and/or trustee of Sterling Investment Group? *See* Question 53 *supra* & Exhibit 10.

430. Were you at the time of this letter a trustee of York International Trust? *See* Question 73 *supra* & Exhibit 10.

431. Exhibit 78, Bates stamped MJ 0004954, is a letter to Mar-Jac Poultry, Inc. which is also dated April 30, 1998, and is written on the letterhead of "Sterling Investment Group, L.L.C." The letter from Sterling Investment Group instructs Mar-Jac Poultry to wire $392,500 to a bank account "for further credit to Sterling Investment Group, L.L.C." The letter further states "This is for the capital increase (investment) in Sterling Investment Group, L.L.C." Is this letter dated the same day as Exhibit 77?

432. Other than the sum to be wired, and the fact that one is written on the letterhead of Sterling Investment Group, Exhibit 77, and the other is written on the letterhead of York International Trust, Exhibit 78, are the texts of the two letters identical?

433. Did you instruct the author of Exhibit 78 to direct Mar-Jac Poultry to make the referenced $392,500 payment to Sterling Investment Group?

434. Exhibit 79, Bates stamped MJ 0004958-4959, is an instruction dated May 4, 1998, by Mar-Jac Poultry to NationsBank to wire $517,500.00 for further credit to "Sterling Investment Group, L.L.C." and a confirmation from NationsBank of the receipt of the faxed instruction. Does the wire transfer referenced in these exhibits reflect the total of the $125,000 payment and $392,500 payment that were requested of Mar-Jac Poultry in Exhibits 77 and 78 on April 30, 1998, by York International Trust and Sterling Investment Group, respectively?

435. Did Mar-Jac Poultry in fact make a single $517,000 payment to Sterling Investment Group as a result of two separate requests received by it the same day – one by York International Trust that Mar-Jac Poultry wire $125,000 to Sterling Investment Group and one by Sterling Investment Group itself that Mar-Jac Poultry wire to it an additional $392,500?

436. What was the legitimate business purpose, if any, of each payment?

437. Exhibit 80, Bates stamped MJ 0004059-4060, is an agreement dated June 5, 1999, between York International Trust and Mar-Jac Holdings. In this agreement, Mar-Jac Holdings assigns 95.54 percent of its ownership interest in "Sterling Investment Group, LLC" to York International Trust for $150,000. The document appears to be signed by you on behalf of the "Buyer," York International Trust. Is this in fact your signature?

438. As of June 5, 1999, were you a trustee of York International Trust? *See* Question 73 *supra* & Exhibit 10.

439. As of June 5, 1999, were you a director and Secretary of Mar-Jac Holdings? *See* Question 26 *supra* & Exhibit 6.

440. As of June 5, 1999, were you a director, officer, and/or trustee of Sterling Investment Group? *See* Question 53 *supra* & Exhibit 10.

441. Exhibit 81, Bates stamped MJ 0004058, is a check from "York International Trust c/o Reston Investment Inc." dated August 27, 1999. The check appears to be signed by you and the Memo line states "purchase of SIG interest." Was this check in fact signed by you?

442. Was this payment made in furtherance of the June 5, 1998 agreement for York International to purchase the interest of Mar-Jac Holdings in Sterling Investment Group, also known as SIG?

443. Is York International Trust organized under the laws of the Isle of Man? *See* Question 74 *supra* & Exhibit 22.

444. Was the effect of this purchase to transfer Mar-Jac Holdings' ownership interest in Sterling Investment Group to an entity organized outside the United States?

445. Exhibit 82, Bates stamped MJ 0004194, is a "Closing Journal" reflecting certain financial transactions made by Mar-Jac Holdings in June 1999. The entries include the receipt of a $150,000 account receivable from "York Int. Trust " for "Sterling Invt. Group." Mar-Jac Holdings "loss on sale of investment in Sterling Group per sale & assignment" is calculated at $1,742,500. Did Mar-Jac Holdings, as this entry reflects, record a loss of nearly $1.75 million as a result of the sale of its interest in Sterling Investment Group to York International Trust?

446. What was the value of the ownership interest in Sterling Investment Group transferred by Mar-Jac Holdings to York International as recorded by York International in its accounting records?

447. What use did York International Trust make of the assets it acquired from Mar-Jac Holdings in the form of its interest in Sterling Investment Group?

448. Did York International Trust make use of the acquired assets to generate funds that it in turn transferred to other entities or persons?

449. Were any of these funds used to support entities or persons who have been designated at any time by the United States or the United Nations as terrorist-related organizations?

450. Exhibit 83 is a chart entitled "Chart No. 5," which has been compiled by the defendants based on information contained in the documents previously identified as Exhibits to this deposition. Does Exhibit 83 constitute an accurate representation of the disposition of Mar-Jac Holdings' interest in Sterling Investment Group to York International Trust?

**Assignment of Loan Payments due to SAAR Foundation to Amtrax Holdings**

451. Exhibit 4, Tab F, is Plaintiff's interrogatory responses in this action. Tab F reflects a $7.5 million loan made in 1987 from SAAR Foundation to Grove Corporate Plaza. As of the date of this note, was Grove Corporate Plaza a subsidiary of Mar-Jac, Inc.? *See* Question 163 *supra.*

452. As of the date of this note, was Mar-Jac, Inc., in turn, owned by the SAAR Foundation? *See* Question 163 *supra* & Exhibit 4.

453. Exhibit 28, Bates stamped MJ 0006124, is a letter dated January 2, 1989, which appears to be signed by you as Vice President of SAAR Foundation and on SAAR Foundation letterhead. The letter states that SAAR Foundation has assigned principal and interest payments on the $7.5 million note to "Amtrax Holdings,

Ltd., a Jersey Channel Island corporation." Is that in fact your signature on this letter?

454. Were you in fact Vice President of SAAR Foundation on January 2, 1989? *See* Question 99 *supra* & Exhibit 32.

455. As of the date of this letter, were you a director of Amtrax Holdings? *See* Questions 81-82 *supra* & Exhibit 26.

456. Why did you make this assignment?

457. Was the effect of this assignment to transfer interest and principal payments due to SAAR Foundation from a subsidiary of Mar-Jac Holdings to an entity organized under the laws of the Channel Islands?

458. Was SAAR Foundation obliged to report to the IRS any charitable contributions it made with the funds it received from Mar-Jac Holdings?

459. Was Amtrax Holdings, organized under the laws of the Channel Islands, obliged to report to the IRS or any other agency of the United States government charitable contributions it made?

460. Was the effect of the assignment of $7.5 million referenced in Exhibit 28 from SAAR Foundation to Amtrax Holdings to permit disbursements in that amount to be made with those funds by Amtrax Holdings in a manner that would be difficult to trace by the United States government?

461. What use did Amtrax Holdings make of the proceeds of the note it received as a result of the assignment it received from SAAR Foundation?

462. Were any of those proceeds used to provide material support or resources to entities or persons designated at any time by the United States or the United Nations as terrorist-related organizations?

463. Exhibit 84, Bates stamped MJ 0013365, appears to be a facsimile cover sheet from you forwarding a $1.5 million wire payment to Amtrax Holdings on or about November 1990. Did you in fact forward the referenced wire payment?

464. What did this payment represent?

465. Did the amount represent an interest payment on the $7.5 million note?

466. If this was an interest payment, what period of interest did this $1.5 million amount relate to and how was the amount calculated?

467. Exhibit 85, Bates stamped MJ 0026072, 0026084, 0012170, 0012183, are financial records produced in this litigation by Mar-Jac Poultry. They appear to

reflect that no principal payments were made on this $7.5 million loan from 1987 to 1996. Is it correct that no principal payments were made in this time period?

468. Exhibit 85 further reflects that principal payments appear to have been required under the terms of this loan. Were principal payments in fact required to be made?

469. Why were no principal payments made during this nine year period?

470. Exhibit 86 is a chart entitled "Chart No. 6," which has been compiled by the defendants based on information contained in the documents previously identified as Exhibits to this deposition. Does Exhibit 86 constitute an accurate representation of the assignment of loan payments due to the SAAR Foundation to Amtrax Holdings?

**Mar-Jac Payments on $4 Million Loan to Al Rajhi Company**

471. Exhibit 31, Bates stamped MJ 0013621-13623, is a $4 million promissory note issued by Mar-Jac Poultry, dated October 15, 1990 and made payable to Solmagic, S.A., "a corporation organized under the laws of Panama." You appear to have signed this note. Did you in fact sign this note?

472. Under the terms of this note, interest and principal payments are due quarterly to "Al Rajhi Company for Islamic Investments Limited" in London. What is the nature of the relationship between the Al Rajhi Company for Islamic Investments Limited and Solmagic, S.A.?

473. Exhibit 87, Bates stamped MJ 0011532, is a July 5, 1994, facsimile which appears to be from you to Mar-Jac Poultry with the subject "Solmagic," instructing that a payment be made to the "Al Rajhi Banking & Investment Corp.," with further credit to "Abdullah Abdul Aziz Ali A-Direibi with their Al-Rabwa Branch No. 341." Did you send this facsimile?

474. Does Exhibit 87 relate to a payment to be made pursuant to the terms of the $4 million note issued by Mar-Jac Poultry to Solmagic in 1993 (Exhibit 31)?

475. Did you instruct that this payment be made?

476. Were the funds represented by this payment ultimately transferred to a bank account in Saudi Arabia?

477. Is that bank account maintained by a company owned or controlled by the Al Rajhi family?

478. Exhibit 88, Bates stamped MJ 0011279, 0011304 and 0011243, are financial records indicating that, between 1990 and 1996, payments totaling $2.6 million were made pursuant to the terms of the $4 million note issued by Mar-Jac Poultry

to Solmagic in 1993 (Exhibit 31). Were the referenced payments made to a bank account maintained by a company owned or controlled by the Al Rajhi family?

479. Were any of these payments by Mar-Jac Poultry to Solmagic and the Al Rajhi Company for Islamic Investments Limited subsequently transferred to other entities or persons?

480. If so, were any of the proceeds used to provide material support or resources to other entities or persons who have been designated at any time by the United States or the United Nations as terrorist-related organizations?

481. Do you know that none of the proceeds were used to provide material support or resources to designated entities or persons?

**$6.8 Million Payment by Humana Charitable Trust to Shaikh Sulaiman A. Al Rajhi**

482. Exhibit 89 is a document submitted as exhibit 45 to the 01/22/04 Return of Property Filing by the United States. It appears to be a request for a wire transfer dated on or about December 8, 1998, to be debited from the account of Humana Charitable Trust in the amount of $6,800,000. The amount is to be credited to the account of "Shaikh Sulaiman A. Al Rajhi" in Jersey for "payment of loan." This document appears to be signed by you. Did you in fact sign this document?

483. Was the wire transfer in fact made?

484. What is the loan to which the request refers?

485. What was the purpose of the loan to Humana Charitable Trust that was being repaid?

486. What was the source of funds used by Humana Charitable Trust to make this wire transfer?

487. Was the effect of this transfer to make it more difficult for the United States government to trace the uses of funds?

488. Were these payments made to a bank account maintained by a company owned or controlled by the Al Rajhi family, or a member of the Al Rajhi family?

489. Was the referenced bank account subject to Channel Island bank secrecy laws?

490. Were any of the proceeds used to provide material support or resources to any entities or persons who have been designated at any time by the United States or the United Nations as terrorist-related organizations?

491. Do you know that none of the proceeds were used to provide material support or resources to any designated entity or person?

**$24 Million Payment to Jersey Channel Island Account of Shaikh Sulaiman Al Rajhi**

492. Exhibit 90 is a document submitted as exhibit 43 to the 01/22/04 Return of Property Filing by the United States and appears to be a facsimile to the "Office of Mr. Abdullah S. Al Rajhi," which appears to be from you and is dated April 1, 1998. It states that $24 million was transferred "yesterday" for further credit to Chase (Jersey), Channel Islands, Acct. ... of Shaikh Sulaiman." Is that correct?

493. Are you in fact the author of this document?

494. Did you in fact transfer $24 million to the referenced account on or about this date?

495. What was the source(s) of these transferred funds?

496. Did some of the money originate with SAAR Foundation in the United States?

497. Paragraph 104 of the Kane Affidavit (Exhibit 10) states that $21,128,978 was transferred from SAAR Foundation to Humana Charitable Trust. Was $21,128,978 in fact transferred from SAAR Foundation to Humana Charitable Trust?

498. Was any of the $21,128,978 transferred from SAAR Foundation to Humana Charitable Trust used to fund the wire transfer to the Al-Rajhi account in Jersey referenced in Question 492 *supra*?

499. Was the effect of this transfer to make it difficult for the United States government to trace the use of these funds?

500. Were these payments made to a bank account maintained by a company owned or controlled by the Al Rajhi family, or a member of the Al Rajhi family?

501. Was the effect of this transfer of funds to move $24 million from bank accounts in the United States to a bank account in the Channel Islands?

502. Was the bank account to which the $24 million was transferred subject to the bank secrecy laws of the Channel Islands?

503. Were any of these funds used to provide material support or resources to entities or persons who have been designated at any time by the United States or the United Nations as terrorist-related organizations?

504. Do you know that none of these proceeds were used to provide material support or resources to designated entities or persons?

**Mar-Jac Stock Dividend Payment Converted to Promissory Note and Assigned to York International Trust**

505. Exhibit 6, at Bates stamp MJ 0001913, is a document entitled "Minutes of Directors' Meeting of Mar-Jac Holdings, Inc." and dated October 21, 1997 ("10/21/97 Minutes"). The 10/21/97 Minutes appear to be signed by you as "Secretary" of Mar-Jac Holdings, Inc. Did you in fact sign these 10/21/97 Minutes?

506. Were you in fact Secretary of Mar-Jac Holdings, Inc. as of October 21, 1997? *See* Question 26 *supra* & Exhibit 6.

507. The 10/21/97 Minutes authorize the payment by Mar-Jac Holdings of a "cash dividend" in the total amount of $1 million jointly to Safa Trust, Inc. and Mena Investments, Inc. as "stockholders of record," on or before October 31, 1997. Did the directors of Mar-Jac Holdings in fact authorize such a dividend?

508. On October 21, 1997, were you a director and Vice President of Safa Trust? *See* Questions 122-123 *supra* & Exhibit 35.

509. On October 21, 1997, were you a director and Vice President of Mena Investments? *See* Questions 50-51 *supra* & Exhibit 16.

510. On October 21, 1997, did Safa Trust own 65 percent of Mar-Jac Holdings?

511. Was Safa Trust therefore entitled to a dividend payment from Mar-Jac Holdings of $650,000?

512. On October 21, 1997, did Mena Investments own 35 percent of Mar-Jac Holdings?

513. Was Mena Investments therefore entitled to a dividend payment of $350,000?

514. On October 21, 1997, did Mar-Jac Holdings have sufficient cash on hand to pay the $1 million dividend to its stockholders in cash?

515. Was the dividend paid in cash on or before October 31, 1997?

516. Exhibit 91, Bates stamped MJ 0005285, is a Promissory Note dated November 1, 1997, from Mar-Jac Holdings, Inc. to Safa Trust, Inc. in the amount of $650,000. Did Mar-Jac Holdings make this promissory note to Safa Trust, Inc. in order to provide payment for the $650,000 cash dividend that Safa Trust was entitled to receive?

517. Did Mar-Jac Holdings issue this promissory note because it did not have enough cash on hand to pay Safa Trust the $650,000 dividend that it was entitled to receive?

518. Why did Mar-Jac Holdings declare a $1 million cash dividend to its shareholders if it lacked sufficient cash on hand to pay that dividend?

519. The $650,000 promissory note, Exhibit 91, Bates stamped MJ 0005285, is payable "on DEMAND to the order of Safa Trust, Inc. … with Ten percent (10%) interest per annum." Was the promissory note in fact payable to Safa Trust, Inc. on demand?

520. Did the fact that the note was payable "on DEMAND" mean that Safa Trust, Inc. was free to demand payment at any time it elected to make such a demand?

521. Exhibit 92, Bates stamped MJ 0005281, is a letter dated November 13, 1997, which appears to be written by you to Mar-Jac Holdings, Inc. on "Safa Trust, Inc." letterhead, which letter states in part "Please note that Safa Trust has assigned all its rights under that certain promissory note dated November 1, 1997 for $650,000 (Six Hundred Fifty Thousand Dollars) to York International Trust." Exhibit 92 appears to be signed by you. Did you in fact sign this letter?

522. The letter identifies you as "Vice President" of Safa Trust. Did you in fact hold this position on the date of the letter? *See* Questions 122-123 *supra* & Exhibit 35.

523. Did you have authority as Vice President of Safa Trust to transfer this $650,000 promissory note to York International Trust?

524. Why did you instruct Mar-Jac Holdings to assign the $650,000 promissory note from Safa Trust to York International Trust?

525. Were you a trustee of York International Trust as of the date of the letter? *See* Question 73 & Exhibit 10.

526. Is York International Trust organized under the laws of the Isle of Man? *See* Question 74 *supra* & Exhibit 22.

527. Exhibit 93, Bates stamped MJ 0001914, is a cancelled $650,000 Promissory Note from Mar-Jac Holdings, Inc. to Safa Trust, Inc. with the handwritten note "Cancelled 11/13/97." Exhibit 94, Bates stamped MJ 0005282, is a Promissory Note from Mar-Jac Holdings, Inc. to York International Trust in the amount of $650,000 and dated November 1, 1997. Did Mar-Jac Holdings, as it appears from these documents, in fact follow the instruction in your letter dated November 13, 1997, and assign the $650,000 promissory note from Safa Trust, Inc. to York International Trust?

528. Why was the $650,000 promissory note to York International back-dated to November 1, 1997?

529. What, if anything, did Safa Trust receive from York International Trust in consideration for the assignment of the $650,000 note?

530. Was the effect of this assignment of the $650,000 promissory note to transfer dividends from Mar-Jac Holdings to which Safa Trust was entitled to an offshore entity, specifically York International Trust?

531. The $650,000 promissory note Exhibit 94, Bates stamped MJ 0005282, is payable "on DEMAND to the order of York International Trust ... with Ten percent (10%) interest per annum." Was the promissory note in fact payable to York International Trust on demand?

532. Did the fact that the note was payable "on demand" mean that York International Trust was free to demand payment at any time it elected to make such a demand?

533. Exhibit 95, Bates stamped MJ 0004938, are handwritten notes together with what appears to be a copy of an accounting machine tape setting forth multiple sums. The handwritten notes state in part, with apparent reference to the sums on the tape, "Pls' [please] Pay Per Dr. Mirza on 10/16/98." With specific regard to the sum of "$54,327.83" referenced on Exhibit 95, handwritten notes further indicate that payment should be made "to York" for the payment of "Interest." Did you in fact direct, on or about October 16, 1998, that $54,327.83 in interest be paid to York International Trust?

534. Exhibit 96, Bates stamped MJ 0004937, is a "Mar-Jac, Inc. Check Request" dated October 16, 1998 in the amount of $54,327.83. The "Purpose of Expenditure" on the Check Request is indicated as "payment of interest on note ...." Was the purpose of the directed payment of $54,327.83 to York International Trust to compensate York for the interest due it under the terms of the $650,000 Promissory Note issued to it by Mar-Jac Holdings on November 1, 1997?

535. Exhibit 97, Bates stamped MJ 0005068-5069, is a check for $54,327.83 made payable to "York International Trust" dated October 16, 1998. The back of the check appears to be endorsed by you with the notation "TTEE, York Int" and the further notation "Pay to Sterling Investment Group." Did you in fact endorse this check?

536. Were you, at the time of this endorsement, a trustee for York International Trust, as the "TTEE" endorsement appears to indicate?

537. Were you at the time of this endorsement an officer, director and/or trustee of Sterling Investment Group? *See* Question 53 *supra* & Exhibit 10.

538. Why did you direct the proceeds of this check from York International Trust be paid to Sterling Investment Group?

539. How were the proceeds of this check used by Sterling Investment Group?

540. What, if anything, did York International receive in consideration from Sterling Investment Group for the assignment of this interest payment?

541. Exhibit 98, Bates stamped MJ 0001759, is a letter to Mar-Jac Poultry, Inc., which is dated April 30, 1998 and is on the letterhead of "York International Trust c/o Reston Investments, Inc." at 555 Grove Street in Herndon. The letter from York International Trust instructs Mar-Jac Poultry to wire $125,000 to a bank account

"for further credit to Sterling Investment Group, L.L.C." The purpose for the wire transfer is stated as "for a partial payment of the $650,000 promissory note of York International Trust." It appears from a Post-It note on this exhibit that you received this letter, as the note indicates "To Dr. Yaqub." Did you in fact receive this letter?

542. Did you instruct the author of this letter, or anyone else, to direct Mar-Jac Poultry to make this $125,000 payment to Sterling Investment Group?

543. Why was this payment made to Sterling Investment Group and not to York International Trust?

544. What, if anything, did York International Trust receive from Sterling Investment Group in consideration for the assignment of this $125,000 payment?

545. Were you, as of the date of this letter, an officer, director and/or trustee of Sterling Investment Group? *See* Question 53 *supra* & Exhibit 10.

546. Exhibit 99 is a chart entitled "Chart No. 7", which has been compiled by the defendants based on information contained in the documents previously identified as Exhibits to this deposition. Does Exhibit 99 constitute an accurate representation of transactions related to the dividend to Safa Trust declared by the Board of Directors of Mar-Jac Holdings, Inc. on October 21, 1997?

**Mar-Jac Stock Dividend Payment Converted to Promissory Note and Assigned to Safa Trust**

547. Exhibit 100, Bates stamped MJ 0005284, is a Promissory Note dated November 1, 1997, from Mar-Jac Holdings, Inc. payable to Mena Investments, Inc. in the amount of $350,000. Did Mar-Jac Holdings make this promissory note to Mena Investments for the $350,000 cash dividend that Mena Investments was entitled to receive pursuant to the October 21, 1997 Minutes of the meeting of Mar-Jac Holdings' Board of Directors? *See* Exhibit 101, Bates stamped MJ 0001913.

548. Did Mar-Jac Holdings issue this $350,000 promissory note because it did not have enough cash on hand to pay Mena Investments the $350,000 dividend that it was entitled to receive pursuant to the 10/21/97 Minutes?

549. Why did Mar-Jac Holdings declare a cash dividend to its shareholders if it lacked sufficient cash on hand to pay that dividend?

550. The $350,000 promissory note Exhibit 100, Bates stamped MJ 0005284 states that it is payable "on DEMAND to the order of Mena Investments, Inc. ... with Ten percent (10%) interest per annum." Was the promissory note in fact payable to Mena Investments, Inc. on demand?

551. Did the fact that the note was payable "on demand" mean that Mena Investments was free to demand payment from Mar-Jac Holdings at any time it elected to make such a demand?

552. Exhibit 102, Bates stamped MJ 0004972, is a letter dated February 10, 1998, which appears to be written by you to Mar-Jac Holdings, Inc. on "Mena Investments, Inc." letterhead, which letter states in part "Kindly re-issue as of December 31, 1997 the enclosed promissory note of $350,000 as $200,000 payable to Safa Trust and $150,000 payable to us [Mena Investments]." Did you in fact sign this letter?

553. Were you a director and Vice President of Mena Investments, Inc. as of the date of this letter? *See* Question 50 *supra* & Exhibit 16.

554. Were you a director and Vice President of Safa Trust as of the date of this letter? *See* Question 123 *supra* & Exhibit 35.

555. Was Mena Investments a wholly owned subsidiary of Safa Trust as of the date this letter?

556. Why did you instruct Mar-Jac Holdings to assign $200,000 of the $350,000 Promissory Note from Mena Investments to Safa Trust?

557. Why did you instruct Mar-Jac Holdings to "re-issue [the note] as of December 31, 1997," a date prior to the date of the February 10, 1998 letter?

558. Exhibit 103, Bates stamped MJ 0004975, is a $350,000 Promissory Note from Mar-Jac Holdings to Mena Investments dated November 1, 1997, with the handwritten note "Cancelled." Exhibit 104, Bates stamped MJ 0004973, is a Promissory Note from Mar-Jac Holdings, Inc. to Safa Trust, Inc. in the amount of $200,000 and dated December 31, 1997. Exhibit 105, Bates stamped MJ 0004974, is a Promissory Note from Mar-Jac Holdings, Inc. to Mena Investments, Inc. in the amount of $150,000 and dated December 31, 1997. Did Mar-Jac Holdings, as it appears from these documents, follow the instruction in your letter dated February 10, 1998, and assign the $350,000 Promissory Note to Safa Trust in the amount of $200,000 and to Mena Investments in the amount of $150,000?

559. What, if anything, did Mena Investments receive in consideration from Safa Trust in exchange for assignment of the $200,000 note?

560. Did this assignment of the $200,000 promissory note serve to transfer dividends from Mar-Jac Holdings to which Mena Investments was entitled to Safa Trust because Safa Trust had assigned the $650,000 in dividends to which it was entitled to an offshore entity, specifically York International Trust?

561. Exhibit 106 is a chart entitled "Chart No. 8," which has been compiled by the defendants based on information contained in the documents previously identified as Exhibits to this deposition. Does Exhibit 106 constitute an accurate

representation of transactions related to the dividend to Mena Investments declared by the Board of Directors of Mar-Jac Holdings, Inc. on October 21, 1997?

## IX. THE UNITED STATES GOVERNMENT'S INVESTIGATION

562. Exhibit 10 is the Kane Affidavit. Paragraph 93 of the Kane Affidavit states there was "a conspiracy" between you and others "to route money through hidden paths to terrorists." Is that statement contained in the Kane Affidavit accurate?

563. Paragraph 103 of the Kane Affidavit states that, between 1996 and 2000, approximately $26 million was moved from seven charities, five of which you served as a director and/or officer, to offshore entities Humana Charitable Trust and York International Trust. Is that statement contained in the Kane Affidavit accurate?

564. Paragraph 105 of the Kane Affidavit states that you in fact "stymied" the efforts of IRS auditors in their efforts to verify the ultimate disposition of funds sent to Humana Charitable Trust and York International Trust. Is that statement contained in the Kane Affidavit accurate?

565. Paragraph 107 of the Kane Affidavit states that seven charities, five of which you served as a director and/or officer, were in fact "operated to hide the distribution of monies to PIJ and HAMAS." Is that statement contained in the Kane Affidavit accurate?

566. Paragraph 115 of the Kane Affidavit states that, on October 26, 2001, the Sterling Charitable Gift Fund deposited a check received from Mar-Jac Poultry for $250,000 and, on November 2, 2001, Sterling Charitable Gift Fund then transferred $100,000 to SAAR Foundation from the same First Union account that received the check from Mar-Jac Poultry. Finally, on November 29, 2001, Sterling Charitable Gift Fund wire transferred the remaining $150,000 to SAAR Foundation. Is the description of this series of transactions accurate?

567. Paragraph 116 of the Kane Affidavit states that the United States government "suspect[ed] that [this series of transactions] was first routed to Sterling only to make it more difficult for investigators to decipher the ultimate disposition of the $250,000 apparently generated by Mar-Jac Poultry." Was this in fact the purpose of this series of transactions?

568. Paragraph 117 of the Kane Affidavit (Exhibit 10) states that, according, to a Form 990 filed with the IRS by Safa Trust, it contributed $8.6 million to Heritage Education Trust in 1996. It further states in the same paragraph that, in the same year, Heritage Education Trust loaned $5.5 million to Mar-Jac Holdings, Safa Trust's majority-owned subsidiary (and Mar-Jac Poultry's parent company). Is this description of these transactions accurate?

569. Paragraph 118 of the Kane Affidavit states "There is no reason Safa could not have made the loan directly to Mar-Jac Holdings, its subsidiary. I believe that the route the funds traveled, from Safa to Heritage to Mar-Jac, with a portion being returned to Safa, was designed to disguise the true nature of the transaction and the ultimate disposition of these funds." Was this in fact the purpose of this series of transactions?

570. Paragraph 119 of the Kane Affidavit states that the United States government suspected that moneys had been transferred directly to terrorist organizations from the referenced entities on the Isle of Man. Did you in fact participate in the transfer of funds to terrorist organizations by routing those funds through offshore entities?

571. Did a portion of those funds come from charitable contributions made, dividends paid, and/or loans made or paid by Mar-Jac Poultry?

572. Did a portion of those funds come from charitable contributions made, dividends paid, and/or loans made or paid by Mar-Jac Holdings?

573. Did a portion of those funds come from charitable contributions made, dividends paid, and/or loans made or paid by Mar-Jac, Inc.?

574. Paragraph 174 of the Kane Affidavit states you concealed the existence of Sterling Charitable Gift Fund from IRS auditors. Is that statement contained in the Kane Affidavit accurate?

575. Paragraph 176 of the Kane Affidavit states that you concealed the relationship between SAAR Foundation and Safa Trust from IRS auditors. Is that statement in the Kane Affidavit accurate?

576. Paragraph 177 of the Kane Affidavit states that you concealed the relationship between SAAR Foundation and York Foundation from IRS auditors. Is that statement in the Kane Affidavit accurate?

577. Paragraph 171 of the Kane Affidavit states that you informed IRS audit examiners that Humana Charitable Trust's funds were distributed to beneficiaries through Al Rajhi charities. Is that statement contained in the Kane Affidavit accurate?

## X. THE CHART IN SUIT

578. Exhibit 107 is a chart that appeared on the broadcast at issue in this lawsuit ("Chart"). Are you familiar with the Chart?

**Al Rajhi Family**

579. The Chart depicts persons identified as the "al-Rajhi Family" and posits that financial support or resources flowed from the Al-Rajhi family to SAAR

Foundation. Did you serve on the Board of Directors of Mar-Jac Poultry with a member of the Al-Rajhi family? *See* Question 32 *supra*.

580. Did Sulaiman Al-Rajhi fund SAAR Foundation at its inception? *See* Question 103 *supra*.

581. Did Sulaiman Al-Rajhi, members of his family and friends provide the bulk of the initial funding of SAAR Foundation? *See* Question 105 *supra*.

582. Did you serve on the Board of Directors of SAAR Foundation and as its President, Secretary and Chief Executive Officer? *See* Questions 100-102 *supra*.

583. Exhibit 108 is an article published in The Wall Street Journal on July 26, 2007, entitled "U.S. Tracks Saudi Bank Favored By Extremists." The article states that Sulaiman Al-Rajhi is the head of Al-Rajhi Bank, the largest Islamic bank in Saudi Arabia. Are these statements about Sulaiman Al-Rajhi and Al-Rajhi bank accurate?

584. The article states that "U.S. intelligence reports, heretofore secret, describe how Al Rajhi Bank has maintained accounts and accepted donations for Saudi charities that the U.S. and other nations have formally designated as fronts for al Qaeda or other terrorist groups." Is this statement about Al Rajhi Bank accurate?

585. The article states that "Mr. Al Rajhi and family members have been major donors to Islamic charities that are suspected by Western intelligence agencies of funding terrorism, according to CIA reports and federal-court filings by the Justice Department." Is this statement about Mr. Al-Rajhi and his family accurate?

586. The article states that, "A 2003 CIA report claims that a year after Sept. 11, with a spotlight on Islamic charities, Mr. Al-Rajhi ordered Al-Rajhi Bank's board 'to explore financial instruments that would allow the bank's charitable contributions to avoid Saudi scrutiny.'" Are you aware that Mr. Al-Rajhi gave such an order?

587. Did Mr. Al-Rajhi ever ask you to "explore financial instruments that would allow" the charitable contributions of SAAR Foundation, Safa Trust, Mar-Jac Holdings or Mar-Jac Poultry to avoid government scrutiny?

**Muslim World League and IIRO**

588. The Chart depicts an entity identified as the Muslim World League and posits that financial support or resources flowed from the Muslim World League to an entity identified as the International Islamic Relief Organization ("IIRO"). Did you in fact serve as Secretary, Treasurer and registered agent of the Muslim World League? *See* Question 147 *supra*.

589. Directing your attention to Attachment E, Page 6 of the Kane Affidavit (Exhibit 10), which states that the Muslim World League was "founded by the founders of

Al-Qaida." Was the Muslim World League in fact "founded by the founders of Al-Qaida"?

590. Directing your attention to Attachment E, Page 6 of the Kane Affidavit (Exhibit 10), which states that the International Islamic Relief Organization ("IIRO") served as the "operational arm" of the Muslim World League. Did IIRO serve as the operational arm of the Muslim World League?

591. Did material support or resources in fact flow from the Muslim World League to IIRO?

592. Exhibit 20, the 01/22/04 Return of Property Filing, states at page 23 that "there is direct evidence that Sana-Bell, Inc., was the North American financial arm of IIRO [the International Islamic Relief Organization]." *See* Question 71 *supra.* Was Sana-Bell, Inc. in fact the North American financial arm of IIRO?

593. Exhibit 21 is exhibit 66 to the 01/22/04 Return of Property Filing and appears to be a letter from Dr. Abdullah Bin Salih Al-Obaid, "Secretary General, Muslim World League & Chairman of the Board IIRO" to you as "member of the Board of Trustees, SANA-BELL Company of USA," dated July 28, 1998. The letter states that IIRO investments were used to establish Sana-Bell in the United States. Was Sana-Bell in fact established with funds provided by IIRO?

594. Exhibit 20, the 01/22/04 Return of Property Filing, states at page 23 that "International Relief Organization (IRO) [is] the 'United States arm' of IIRO." Is IRO in fact the "United States arm" of IIRO?

595. Exhibit 109 is Exhibit 68 to the 01/22/04 Return of Property Filing and states at page 5 that Sana Bell, Inc. owns the building at 360 S. Washington Street, Falls Church, Virginia. Did Sana-Bell, Inc. in fact own that building?

596. Exhibit 109, Exhibit 68 to the 01/22/04 Return of Property Filing, states at page 7 that IRO occupied the third floor of the building at 360 S. Washington Street, Falls Church, Virginia and paid to Sana-Bell, Inc. a nominal rent that was insufficient to permit Sana-Bell, Inc. to cover its costs, which consisted only of real estate taxes, utilities, and maintenance, but not a mortgage. Did Sana-Bell, Inc. in fact provide the building to IRO at a nominal cost that was insufficient for Sana-Bell, Inc. to cover its costs?

597. Did material support or resources in fact flow from Sana-Bell, Inc. to IRO, the U.S. arm of IIRO, in the form of nominal rent on the building at 360 S. Washington Street?

598. Exhibit 108 is the Wall Street Journal article entitled "U.S. Tracks Saudi Bank Favored By Extremists." The article states that "the U.N. has labeled two of the IIRO's branches and some of its officials as al Qaeda supporters." Did you read this article in 2007?

599. Are you aware whether two IIRO branches have been identified as supporters of al Qaeda by the United Nations?

600. Exhibit 47 is a copy of the current OFAC List, which includes IIRO on its list of Specially Designated Nationals at page 180. Are you aware that IIRO has been identified by the United States government in this manner?

601. Exhibit 48 is a copy of the current U.N. List, which includes IIRO at pages 61-62. Are you aware that IIRO is on the U.N. List?

**Youssef Nada, Nada International, and Bank al-Taqwa**

602. The Chart depicts a person identified as Youssef Nada and posits that financial support or resources flowed from SAAR Foundation to Youssef Nada. Exhibit 54 is the article published in the Washington Post on October 7, 2002, entitled "U.S. Trails Va. Muslim Money, Ties; Clues Raise Questions About Terror Funding." The article reads, in part, "Early last year [2001], an individual connected to SAAR arranged for funds to be moved from a joint account of several SAAR executives to [Youssef] Nada as a loan, [SAAR representatives] said." Did you serve on the Board of Directors of SAAR Foundation and as its President, Secretary and Chief Executive Officer? *See* Questions 100-102 *supra*.

603. Do you know the identities of the "SAAR representatives" referenced in the Washington Post article?

604. Did you make the referenced statement to the Washington Post?

605. Is the quoted statement contained in the Washington Post article accurate?

606. Did material support or resources in fact flow from SAAR Foundation to Mr. Nada?

607. Dr. Altalib (Exhibit 34, at page 155, lines 4-8) and Dr. Barzinji (Exhibit 33, page 50, lines 8-11) each asserted their Fifth Amendment privilege and declined to any answer questions about their knowledge of loans provided to Youssef Nada beginning in 1998. Do you have any knowledge of any loan provided to Youssef Nada beginning in 1998?

608. Page 247 of the OFAC List (Exhibit 47) states that Youssef Nada has been identified by the United States as a Specially Designated National. Are you aware that Youssef Nada has been designated by the United States as a Specially Designated National?

609. Page 247 of the OFAC List (Exhibit 47) states that Nada International has been identified by the United States as a Specially Designated National. Are you aware that Nada International has been designated by the United States as a Specially Designated National?

610. Page 83 of the OFAC List states that Bank Al Taqwa has been identified by the United States as a Specially Designated National. Are you aware that Bank Al Taqwa has been designated by the United States as a Specially Designated National?

611. Exhibit 48 is a copy of the current U.N. List, which includes Youssef Nada. Are you aware that Youssef Nada is on the U.N. List?

612. Exhibit 48 is a copy of the current U.N. List, which includes Nada International. Are you aware that Nada International is on the U.N. List?

613. Exhibit 48 is a copy of the current U.N. List, which includes Bank Al Taqwa. Are you aware that Bank Al Taqwa is on the U.N. List?

614. Exhibit 110 is a copy of a letter from George B. Wolfe, Deputy General Counsel of the United States Department of the Treasury, to M. Claude Nicati, of Substitut du Procereur, Switzerland, dated January 4, 2002, purporting to provide "an unclassified summary of certain information" concerning Mr. Nada which "supports the decision to block the assets of Nada and Nada Management Organization" (the "Treasury Letter"). The Treasury Letter states that "Nada has a controlling interest in, and is chairman of, Bank Al Taqwa." Was Mr. Nada, in fact, the chairman of Bank Al Taqwa?

615. The Treasury Letter states that "Bank Al Taqwa ... has long been thought to be involved in financing radical groups like the Palestinian HAMAS." Did Bank Al Taqwa in fact finance HAMAS?

616. The Treasury Letter states that, "[a]s of late September 2001, bin Laden and his Al Qa'ida organization received financial assistance from Youssef M. Nada." Is the statement that Mr. Nada provided financial assistance to Al Qaeda accurate?

**WISE, Sami Al-Arian and PIJ**

617. The Chart depicts an entity identified as "WISE" and posits that financial support or resources flowed from IIIT to WISE. Was IIIT in fact one of the largest funders of WISE? *See* Question 240 *supra* & Exhibit 51.

618. Did WISE also receive funds from Safa Trust in 1995? *See* Question 245 *supra* & Exhibit 51.

619. The Chart depicts a person identified as Sami Al-Arian and posits that financial support or resources flowed from SAAR Foundation to Mr. Al-Arian. Did SAAR Foundation in fact make contributions of $10,000 and $5,000 to Sami Al-Arian in 1994? *See* Question 253 *supra* & Exhibit 10.

620. Were Safa Trust and SAAR Foundation owners of Mar-Jac Poultry at the time of these donations to WISE and Mr. Al-Arian? *See* Questions 151-153 *supra.*

621. Did SAAR Foundation in fact make a loan to Sami Al-Arian in 1984 in the original amount of $41,581? *See* Question 254 *supra* & Exhibit 32.

622. Did Sami Al-Arian in fact plead guilty to engaging in a conspiracy to make and receive contributions of funds, goods or services to or for the benefit of Specially Designated Terrorists, namely, the Palestinian Islamic Jihad (PIJ)? *See* Question 250 *supra* & Exhibit 55.

623. Did Sami Al-Arian serve as the Chairman of WISE? *See* Question 249 *supra* & Exhibit 10.

**Holy Land Foundation and HAMAS**

624. The Chart depicts an entity identified as the Holy Land Foundation (HLF) and posits HLF received financial support or resources from one of the entities identified on the chart as the "SAAR Network" (that is, SAAR Foundation, IIIT, Mar-Jac Poultry, Muslim World League, and Safa Trust) and that HLF in turn provided financial support or resources to HAMAS. Did one or more the referenced entities in fact provide financial support or resources to HLF?

625. The Kane Affidavit (Exhibit 10) at paragraph 85 states that, in 1997, HLF received three Safa Trust checks in the amounts of $75,000, $87,500, and $162,500, all signed by you. Did HLF in fact receive three Safa Trust checks in the amounts of $75,000, $87,500, and $162,500, all signed by you? *See* Question 352 *supra* & Exhibit 10.

626. Was Safa Trust an owner of Mar-Jac Poultry in 1997? *See* Question 153 *supra*.

627. Exhibit 111 is a May 27, 2009 press release issued by the Department of Justice, which states that HLF has been convicted of providing material support to HAMAS. Are you aware that the HLF has been convicted of providing material support to HAMAS?

628. Did Mar-Jac Poultry contribute to ISNA and NAIT, both named as unindicted co-conspirators and/or joint venturers in the prosecution and conviction of HLF for providing material support of HAMAS? *See* Question 307 *supra* & Exhibit 60.

629. Did SAAR Foundation contribute to ISNA and NAIT, both named as unindicted co-conspirators and/or joint venturers in the prosecution and conviction of HLF for providing material support of HAMAS? *See* Question 307 *supra* & Exhibit 60.

Dated: July 15, 2009

Respectfully Submitted,

/s/ Lee Levine
Lee Levine (D.C. Bar No. 343095)
Gayle Sproul (D.C. Bar No. 495965)
Thomas Curley (D.C. Bar No. 473798)
Levine Sullivan Koch & Schulz, L.L.P.
1050 Seventeenth Street, NW, Suite 800
Washington, D.C. 20036-5514
(202) 508-1100
(202) 861-9888 fax

*Attorneys for Defendant CBS Broadcasting Inc.*

/s/ Laura Handman
Laura R. Handman (D.C. Bar No. 444386)
Amber L. Husbands (D.C. Bar No. 481565)
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW, Suite 200
Washington, D.C. 20006-3402
(202) 973-4200
(202) 973-4499 fax

*Attorneys for Defendants Rita Katz, the SITE Institute, and IG, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 15th day of July 2009, a true and correct copy of the foregoing, along with the Exhibits thereto, was served by hand delivery upon:

Lynne Bernabei, Esq.
Alan R. Kabat, Esq.
Bernabei & Wachtel, PLLC
1775 T Street, NW
Washington, D.C. 20009

/s/ Amber L. Husbands
Amber L. Husbands