**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 1

# Part 1

Form **990**

Department of the Treasury
Internal Revenue Service

# Return of Organization Exempt From Income Tax

**Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)**

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No 1545-0047

**2003**

**Open to Public Inspection**

**A For the 2003 calendar year, or tax year beginning** and ending

B Check if applicable: ☐ Address change ☐ Name change ☐ Initial return ☐ Final return ☐ Amended return ☐ Application pending

Please use IRS label or print or type. See Specific Instructions.

C Name of organization: STERLING CHARITABLE GIFT FUND

Number and street (or P.O. box if mail is not delivered to street address): 555 GROVE STREET — Room/suite: 116

City or town, state or country, and ZIP + 4: HERNDON, VA 20170

D Employer identification number: 54-1978669

E Telephone number: 703-471-6060

F Accounting method: ☐ Cash [X] Accrual ☐ Other (specify) ▶

NOV 15 2004

ENVELOPE POSTMARK DATE

• **Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).**

*H and I are not applicable to section 527 organizations*

H(a) Is this a group return for affiliates? ☐ Yes [X] No

H(b) If "Yes," enter number of affiliates ▶

H(c) Are all affiliates included? N/A ☐ Yes ☐ No (If "No," attach a list.)

H(d) Is this a separate return filed by an organization covered by a group ruling? ☐ Yes [X] No

**G** Website: ▶N/A

**J** Organization type (check only one) ▶ [X] 501(c) ( 3 ) ◀ (insert no) ☐ 4947(a)(1) or ☐ 527

I Group Exemption Number ▶

K Check here ▶ ☐ if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS; but if the organization received a Form 990 Package in the mail, it should file a return without financial data. **Some states require a complete return.**

M Check ▶ ☐ if the organization is **not** required to attach Sch. B (Form 990, 990-EZ, or 990-PF).

L Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 ▶ 10,263.

## Part I Revenue, Expenses, and Changes in Net Assets or Fund Balances

| | Line | Description | Sub-line | Sub-amount | Line | Amount |
|---|---|---|---|---|---|---|
| Revenue | 1 | Contributions, gifts, grants, and similar amounts received: | | | | |
| | a | Direct public support | 1a | 10,160. | | |
| | b | Indirect public support | 1b | | | |
| | c | Government contributions (grants) | 1c | | | |
| | d | Total (add lines 1a through 1c) (cash $ 5,000. noncash $ 5,160. ) | | | 1d | 10,160. |
| | 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | | | 2 | |
| | 3 | Membership dues and assessments | | | 3 | |
| | 4 | Interest on savings and temporary cash investments | | | 4 | 103. |
| | 5 | Dividends and interest from securities | | | 5 | |
| | 6 a | Gross rents | 6a | | | |
| | b | Less: rental expenses | 6b | | | |
| | c | Net rental income or (loss) (subtract line 6b from line 6a) | | | 6c | |
| | 7 | Other investment income (describe ▶ ) | | | 7 | |
| | 8 a | Gross amount from sales of assets other than inventory — (A) Securities: ; (B) Other: | 8a | | | |
| | b | Less: cost or other basis and sales expenses | 8b | | | |
| | c | Gain or (loss) (attach schedule) | 8c | | | |
| | d | Net gain or (loss) (combine line 8c, columns (A) and (B)) | | | 8d | |
| | 9 | Special events and activities (attach schedule). If any amount is from **gaming**, check here ▶ ☐ | | | | |
| | a | Gross revenue (not including $ ____ of contributions reported on line 1a) | 9a | | | |
| | b | Less: direct expenses other than fundraising expenses | 9b | | | |
| | c | Net income or (loss) from special events (subtract line 9b from line 9a) | | | 9c | |
| | 10 a | Gross sales of inventory, less returns and allowances | 10a | | | |
| | b | Less: cost of goods sold | 10b | | | |
| | c | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) | | | 10c | |
| | 11 | Other revenue (from Part VII, line 103) | | | 11 | |
| | 12 | **Total revenue** (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | | | 12 | 10,263. |
| Expenses | 13 | Program services (from line 44, column (B)) | | | 13 | |
| | 14 | Management and general (from line 44, column (C)) | | | 14 | 2,527. |
| | 15 | Fundraising (from line 44, column (D)) | | | 15 | |
| | 16 | Payments to affiliates (attach schedule) | | | 16 | |
| | 17 | **Total expenses** (add lines 16 and 44, column (A)) | | | 17 | 2,527. |
| Net Assets | 18 | Excess or (deficit) for the year (subtract line 17 from line 12) | | | 18 | 7,736. |
| | 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | | | 19 | 2,654,125. |
| | 20 | Other changes in net assets or fund balances (attach explanation) SEE STATEMENT 1 | | | 20 | 322. |
| | 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | | | 21 | 2,662,183. |

RECEIVED NOV 21 2004 OGDEN, UT

SCANNED DEC 13 2004

323001 12-17-03 LHA **For Paperwork Reduction Act Notice, see the separate instructions.** Form **990** (2003)



13301026 130118 SCGF-01 2003.05050 STERLING CHARITABLE GIFT FU SCGF-011

STERLING CHARITABLE GIFT FUND 54-1978669

**Part II Statement of Functional Expenses** All organizations must complete column (A). Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others. Page 2

| *Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I.* | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
|---|---|---|---|---|---|
| 22 Grants and allocations (attach schedule) cash $ ______ noncash $ ______ | 22 | | | | |
| 23 Specific assistance to individuals (attach schedule) | 23 | | | | |
| 24 Benefits paid to or for members (attach schedule) | 24 | | | | |
| 25 Compensation of officers, directors, etc. | 25 | 0. | 0. | 0. | 0. |
| 26 Other salaries and wages | 26 | | | | |
| 27 Pension plan contributions | 27 | | | | |
| 28 Other employee benefits | 28 | | | | |
| 29 Payroll taxes | 29 | | | | |
| 30 Professional fundraising fees | 30 | | | | |
| 31 Accounting fees | 31 | 2,500. | | 2,500. | |
| 32 Legal fees | 32 | | | | |
| 33 Supplies | 33 | | | | |
| 34 Telephone | 34 | | | | |
| 35 Postage and shipping | 35 | | | | |
| 36 Occupancy | 36 | | | | |
| 37 Equipment rental and maintenance | 37 | | | | |
| 38 Printing and publications | 38 | | | | |
| 39 Travel | 39 | | | | |
| 40 Conferences, conventions, and meetings | 40 | | | | |
| 41 Interest | 41 | | | | |
| 42 Depreciation, depletion, etc. (attach schedule) | 42 | | | | |
| 43 Other expenses not covered above (itemize): | | | | | |
| a BANK CHARGES | 43a | 27. | | 27. | |
| b | 43b | | | | |
| c | 43c | | | | |
| d | 43d | | | | |
| e | 43e | | | | |
| 44 Total functional expenses (add lines 22 through 43) Organizations completing columns (B)-(D), carry these totals to lines 13-15 | 44 | 2,527. | 0. | 2,527. | 0. |

**Joint Costs.** Check ▶ ☐ if you are following SOP 98-2.

Are any joint costs from a combined educational campaign and fundraising solicitation reported in **(B)** Program services? ▶ ☐ Yes ☒ No

If "Yes," enter **(i)** the aggregate amount of these joint costs $ ______; **(ii)** the amount allocated to Program services $ ______;
**(iii)** the amount allocated to Management and general $ ______; and **(iv)** the amount allocated to Fundraising $ ______.

**Part III Statement of Program Service Accomplishments**

What is the organization's primary exempt purpose? ▶ SEE STATEMENT 2

All organizations must describe their exempt purpose achievements in a clear and concise manner. State the number of clients served, publications issued, etc. Discuss achievements that are not measurable. (Section 501(c)(3) and (4) organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others.)

| | Program Service Expenses (Required for 501(c)(3) and (4) orgs., and 4947(a)(1) trusts, but optional for others.) |
|---|---|
| a THE CORPORATION WAS UNABLE TO FUND ANY ACTIVITIES DURING THE CURRENT FILING PERIOD. (Grants and allocations $ 0.) | 0. |
| b (Grants and allocations $ ) | |
| c (Grants and allocations $ ) | |
| d (Grants and allocations $ ) | |
| e Other program services (attach schedule) (Grants and allocations $ ) | |
| f **Total of Program Service Expenses** (should equal line 44, column (B), Program services) ▶ | 0. |

323011 12-17-03

Form **990** (2003)

## Part IV Balance Sheets

| Note: Where required, attached schedules and amounts within the description column should be for end-of-year amounts only. | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|
| **Assets** | | | | |
| 45 Cash - non-interest-bearing | | 14,418. | 45 | 14,501. |
| 46 Savings and temporary cash investments | | | 46 | |
| 47 a Accounts receivable | 47a | | | |
| b Less: allowance for doubtful accounts | 47b | | 47c | |
| 48 a Pledges receivable | 48a | | | |
| b Less: allowance for doubtful accounts | 48b | | 48c | |
| 49 Grants receivable | | | 49 | |
| 50 Receivables from officers, directors, trustees, and key employees | | | 50 | |
| 51 a Other notes and loans receivable | 51a | | | |
| b Less: allowance for doubtful accounts | 51b | | 51c | |
| 52 Inventories for sale or use | | | 52 | |
| 53 Prepaid expenses and deferred charges | | | 53 | |
| 54 Investments - securities STMT 3 ▶ ☐ Cost ☒ FMV | | 2,650,000. | 54 | 2,660,475. |
| 55 a Investments - land, buildings, and equipment: basis | 55a | | | |
| b Less: accumulated depreciation | 55b | | 55c | |
| 56 Investments - other | | | 56 | |
| 57 a Land, buildings, and equipment: basis | 57a | | | |
| b Less: accumulated depreciation | 57b | | 57c | |
| 58 Other assets (describe ▶ ) | | | 58 | |
| 59 **Total assets** (add lines 45 through 58) (must equal line 74) | | 2,664,418. | 59 | 2,674,976. |
| **Liabilities** | | | | |
| 60 Accounts payable and accrued expenses | | 10,293. | 60 | 12,793. |
| 61 Grants payable | | | 61 | |
| 62 Deferred revenue | | | 62 | |
| 63 Loans from officers, directors, trustees, and key employees | | | 63 | |
| 64 a Tax-exempt bond liabilities | | | 64a | |
| b Mortgages and other notes payable | | | 64b | |
| 65 Other liabilities (describe ▶ ) | | | 65 | |
| 66 **Total liabilities** (add lines 60 through 65) | | 10,293. | 66 | 12,793. |
| **Net Assets or Fund Balances** | | | | |
| **Organizations that follow SFAS 117, check here** ▶ ☒ and complete lines 67 through 69 and lines 73 and 74. | | | | |
| 67 Unrestricted | | 4,125. | 67 | 1,708. |
| 68 Temporarily restricted | | | 68 | 10,475. |
| 69 Permanently restricted | | 2,650,000. | 69 | 2,650,000. |
| **Organizations that do not follow SFAS 117, check here** ▶ ☐ and complete lines 70 through 74. | | | | |
| 70 Capital stock, trust principal, or current funds | | | 70 | |
| 71 Paid-in or capital surplus, or land, building, and equipment fund | | | 71 | |
| 72 Retained earnings, endowment, accumulated income, or other funds | | | 72 | |
| 73 **Total net assets or fund balances** (add lines 67 through 69 **or** lines 70 through 72; column (A) **must** equal line 19; column (B) **must** equal line 21) | | 2,654,125. | 73 | 2,662,183. |
| 74 **Total liabilities and net assets / fund balances** (add lines 66 and 73) | | 2,664,418. | 74 | 2,674,976. |

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization. How the public perceives an organization in such cases may be determined by the information presented on its return. Therefore, please make sure the return is complete and accurate and fully describes, in Part III, the organization's programs and accomplishments.

**Part IV-A Reconciliation of Revenue per Audited Financial Statements with Revenue per Return**

| | | | |
|---|---|---|---|
| a | Total revenue, gains, and other support per audited financial statements | a | 10,263. |
| b | Amounts included on line a but not on line 12, Form 990: | | |
| (1) | Net unrealized gains on investments $ | | |
| (2) | Donated services and use of facilities $ | | |
| (3) | Recoveries of prior year grants $ | | |
| (4) | Other (specify): $ | | |
| | Add amounts on lines (1) through (4) | b | 0. |
| c | Line a minus line b | c | 10,263. |
| d | Amounts included on line 12, Form 990 but not on line a: | | |
| (1) | Investment expenses not included on line 6b, Form 990 $ | | |
| (2) | Other (specify): $ | | |
| | Add amounts on lines (1) and (2) | d | 0. |
| e | Total revenue per line 12, Form 990 (line c plus line d) | e | 10,263. |

**Part IV-B Reconciliation of Expenses per Audited Financial Statements with Expenses per Return**

| | | | |
|---|---|---|---|
| a | Total expenses and losses per audited financial statements | a | 2,527. |
| b | Amounts included on line a but not on line 17, Form 990: | | |
| (1) | Donated services and use of facilities $ | | |
| (2) | Prior year adjustments reported on line 20, Form 990 $ | | |
| (3) | Losses reported on line 20, Form 990 $ | | |
| (4) | Other (specify): $ | | |
| | Add amounts on lines (1) through (4) | b | 0. |
| c | Line a minus line b | c | 2,527. |
| d | Amounts included on line 17, Form 990 but not on line a: | | |
| (1) | Investment expenses not included on line 6b, Form 990 $ | | |
| (2) | Other (specify): $ | | |
| | Add amounts on lines (1) and (2) | d | 0. |
| e | Total expenses per line 17, Form 990 (line c plus line d) | e | 2,527. |

**Part V List of Officers, Directors, Trustees, and Key Employees** (List each one even if not compensated.)

| (A) Name and address | (B) Title and average hours per week devoted to position | (C) Compensation (If not paid, enter -0-.) | (D) Contributions to employee benefit plans & deferred compensation | (E) Expense account and other allowances |
|---|---|---|---|---|
| M. YAQUB MIRZA, PHD<br>1922 SAFA COURT<br>HERNDON, VA 20170 | PRESIDENT<br>0 | 0. | 0. | 0. |
| M. OMAR ASHRAF<br>12541 BROWNS FERRY ROAD<br>HERNDON, VA 20170 | TREASURER<br>0 | 0. | 0. | 0. |
| MUHAMMAD ASHRAF<br>12528 ROCK RIDGE ROAD<br>HERNDON, VA 20170 | SECRETARY<br>0 | 0. | 0. | 0. |

75 Did any officer, director, trustee, or key employee receive aggregate compensation of more than $100,000 from your organization and all related organizations, of which more than $10,000 was provided by the related organizations? If "Yes," attach schedule. ▶ [ ] Yes [X] No

**Part VI Other Information**

| | | | Yes | No |
|---|---|---|---|---|
| 76 | Did the organization engage in any activity not previously reported to the IRS? If "Yes," attach a detailed description of each activity | 76 | | X |
| 77 | Were any changes made in the organizing or governing documents but not reported to the IRS? If "Yes," attach a conformed copy of the changes. | 77 | | X |
| 78 a | Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? | 78a | | X |
| b | If "Yes," has it filed a tax return on Form 990-T for this year? N/A | 78b | | |
| 79 | Was there a liquidation, dissolution, termination, or substantial contraction during the year? If "Yes," attach a statement | 79 | | X |
| 80 a | Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization? | 80a | X | |
| b | If "Yes," enter the name of the organization ▶ SEE STATEMENT 4 and check whether it is ☐ exempt or ☐ nonexempt. | | | |
| 81 a | Enter direct or indirect political expenditures. See line 81 instructions — 81a: 0. | | | |
| b | Did the organization file Form 1120-POL for this year? | 81b | | X |
| 82 a | Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value? | 82a | | X |
| b | If "Yes," you may indicate the value of these items here. Do not include this amount as revenue in Part I or as an expense in Part II. (See instructions in Part III.) — 82b: N/A | | | |
| 83 a | Did the organization comply with the public inspection requirements for returns and exemption applications? | 83a | X | |
| b | Did the organization comply with the disclosure requirements relating to quid pro quo contributions? | 83b | X | |
| 84 a | Did the organization solicit any contributions or gifts that were not tax deductible? | 84a | | X |
| b | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? N/A | 84b | | |
| 85 | *501(c)(4), (5), or (6) organizations.* a Were substantially all dues nondeductible by members? N/A | 85a | | |
| b | Did the organization make only in-house lobbying expenditures of $2,000 or less? N/A | 85b | | |
| | If "Yes" was answered to either 85a or 85b, **do not** complete 85c through 85h below unless the organization received a waiver for proxy tax owed for the prior year. | | | |
| c | Dues, assessments, and similar amounts from members — 85c: N/A | | | |
| d | Section 162(e) lobbying and political expenditures — 85d: N/A | | | |
| e | Aggregate nondeductible amount of section 6033(e)(1)(A) dues notices — 85e: N/A | | | |
| f | Taxable amount of lobbying and political expenditures (line 85d less 85e) — 85f: N/A | | | |
| g | Does the organization elect to pay the section 6033(e) tax on the amount on line 85f? N/A | 85g | | |
| h | If section 6033(e)(1)(A) dues notices were sent, does the organization agree to add the amount on line 85f to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the following tax year? N/A | 85h | | |
| 86 | *501(c)(7) organizations.* Enter: a Initiation fees and capital contributions included on line 12 — 86a: N/A | | | |
| b | Gross receipts, included on line 12, for public use of club facilities — 86b: N/A | | | |
| 87 | *501(c)(12) organizations* Enter: a Gross income from members or shareholders — 87a: N/A | | | |
| b | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) — 87b: N/A | | | |
| 88 | At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership, or an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? If "Yes," complete Part IX | 88 | | X |
| 89 a | *501(c)(3) organizations* Enter: Amount of tax imposed on the organization during the year under: section 4911 ▶ 0. ; section 4912 ▶ 0. ; section 4955 ▶ 0. | | | |
| b | *501(c)(3) and 501(c)(4) organizations.* Did the organization engage in any section 4958 excess benefit transaction during the year or did it become aware of an excess benefit transaction from a prior year? If "Yes," attach a statement explaining each transaction | 89b | | X |
| c | Enter: Amount of tax imposed on the organization managers or disqualified persons during the year under sections 4912, 4955, and 4958 ▶ 0. | | | |
| d | Enter: Amount of tax on line 89c, above, reimbursed by the organization ▶ 0. | | | |

90 a List the states with which a copy of this return is filed ▶ NONE

b Number of employees employed in the pay period that includes March 12, 2003 — 90b: 0

91 The books are in care of ▶ WASEEM ZAFAR Telephone no. ▶ 703-471-6060

Located at ▶ 555 GROVE STREET, HERNDON, VA ZIP + 4 ▶ 20170

92 *Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of* **Form 1041**- Check here ▶ ☐
and enter the amount of tax-exempt interest received or accrued during the tax year ▶ 92 N/A

## Part VII Analysis of Income-Producing Activities (See page 33 of the instructions.)

| Note: *Enter gross amounts unless otherwise indicated* | Unrelated business income | | Excluded by section 512, 513, or 514 | | |
|---|---|---|---|---|---|
| | (A) Business code | (B) Amount | (C) Exclusion code | (D) Amount | (E) Related or exempt function income |
| 93 Program service revenue: | | | | | |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| f Medicare/Medicaid payments | | | | | |
| g Fees and contracts from government agencies | | | | | |
| 94 Membership dues and assessments | | | | | |
| 95 Interest on savings and temporary cash investments | | | 14 | 103. | |
| 96 Dividends and interest from securities | | | | | |
| 97 Net rental income or (loss) from real estate: | | | | | |
| a debt-financed property | | | | | |
| b not debt-financed property | | | | | |
| 98 Net rental income or (loss) from personal property | | | | | |
| 99 Other investment income | | | | | |
| 100 Gain or (loss) from sales of assets other than inventory | | | | | |
| 101 Net income or (loss) from special events | | | | | |
| 102 Gross profit or (loss) from sales of inventory | | | | | |
| 103 Other revenue: | | | | | |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| 104 Subtotal (add columns (B), (D), and (E)) | | 0. | | 103. | 0. |
| 105 Total (add line 104, columns (B), (D), and (E)) ▶ | | | | | 103. |

Note: *Line 105 plus line 1d, Part I, should equal the amount on line 12, Part I.*

## Part VIII Relationship of Activities to the Accomplishment of Exempt Purposes (See page 34 of the instructions.)

| Line No. ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes). |
|---|---|
| | |

## Part IX Information Regarding Taxable Subsidiaries and Disregarded Entities (See page 34 of the instructions.)

| (A) Name, address, and EIN of corporation, partnership, or disregarded entity | (B) Percentage of ownership interest | (C) Nature of activities | (D) Total income | (E) End-of-year assets |
|---|---|---|---|---|
| | % | | | |
| N/A | % | | | |
| | % | | | |
| | % | | | |

## Part X Information Regarding Transfers Associated [redacted]

(a) Did the organization, during the year, receive any funds, directly or indirectl[redacted]

(b) Did the organization, during the year, pay premiums, directly or indirectly, [redacted]

Note: *If "Yes" to (b), file Form 8870 and Form 4720 (see instructions).* [redacted]

**Please Sign Here**

Under penalties of perjury, I declare that I have examined this return, including acc[redacted] correct, and complete Declaration of preparer (other than officer) is based on all in[redacted]

▶ Signature of officer Dat[redacted]

**Paid Preparer's Use Only**

Preparer's signature ▶ [signature] [redacted]

Firm's name (or yours if self-employed), address, and ZIP + 4 ▶ RICHARD H CHAMPION
30 TYSON DRIVE
FAIR HAVEN, NJ 07704 [redacted]

323161 12-17-03

SCHEDULE A (Form 990 or 990-EZ)

Department of the Treasury Internal Revenue Service

# Organization Exempt Under Section 501(c)(3)

(Except Private Foundation) and Section 501(e), 501(f), 501(k), 501(n), or Section 4947(a)(1) Nonexempt Charitable Trust

**Supplementary Information-(See separate instructions.)**

▶ MUST be completed by the above organizations and attached to their Form 990 or 990-EZ

OMB No 1545-0047

**2003**

Name of the organization: STERLING CHARITABLE GIFT FUND

Employer identification number: 54 1978669

**Part I** **Compensation of the Five Highest Paid Employees Other Than Officers, Directors, and Trustees**

(See page 1 of the instructions. List each one. If there are none, enter "None.")

| (a) Name and address of each employee paid more than $50,000 | (b) Title and average hours per week devoted to position | (c) Compensation | (d) Contributions to employee benefit plans & deferred compensation | (e) Expense account and other allowances |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Total number of other employees paid over $50,000 ▶ | 0 | | | |

**Part II** **Compensation of the Five Highest Paid Independent Contractors for Professional Services**

(See page 2 of the instructions. List each one (whether individuals or firms). If there are none, enter "None.")

| (a) Name and address of each independent contractor paid more than $50,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |
| | | |
| Total number of others receiving over $50,000 for professional services ▶ 0 | | |

## Part III Statements About Activities (See page 2 of the instructions.)

| | | | Yes | No |
|---|---|---|---|---|
| 1 | During the year, has the organization attempted to influence national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum? If "Yes," enter the total expenses paid or incurred in connection with the lobbying activities ▶ $ ______ $ ______ (Must equal amounts on line 38, Part VI-A, or line i of Part VI-B.) Organizations that made an election under section 501(h) by filing Form 5768 must complete Part VI-A. Other organizations checking "Yes," must complete Part VI-B AND attach a statement giving a detailed description of the lobbying activities. | 1 | | X |
| 2 | During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any substantial contributors, trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary? *(If the answer to any question is "Yes," attach a detailed statement explaining the transactions.)* | | | |
| | a Sale, exchange, or leasing of property? | 2a | | X |
| | b Lending of money or other extension of credit? | 2b | | X |
| | c Furnishing of goods, services, or facilities? | 2c | | X |
| | d Payment of compensation (or payment or reimbursement of expenses if more than $1,000)? | 2d | | X |
| | e Transfer of any part of its income or assets? | 2e | | X |
| 3 | a Do you make grants for scholarships, fellowships, student loans, etc.? (If "Yes," attach an explanation of how you determine that recipients qualify to receive payments.) | 3a | | X |
| | b Do you have a section 403(b) annuity plan for your employees? | 3b | | X |
| 4 | Did you maintain any separate account for participating donors where donors have the right to provide advice on the use or distribution of funds? | 4 | | X |

## Part IV Reason for Non-Private Foundation Status (See pages 3 through 6 of the instructions.)

The organization is not a private foundation because it is: (Please check only **ONE** applicable box.)

5 [ ] A church, convention of churches, or association of churches. Section 170(b)(1)(A)(i).

6 [ ] A school. Section 170(b)(1)(A)(ii). (Also complete Part V.)

7 [ ] A hospital or a cooperative hospital service organization. Section 170(b)(1)(A)(iii).

8 [ ] A Federal, state, or local government or governmental unit. Section 170(b)(1)(A)(v).

9 [ ] A medical research organization operated in conjunction with a hospital. Section 170(b)(1)(A)(iii). **Enter the hospital's name, city, and state** ▶ ______

10 [ ] An organization operated for the benefit of a college or university owned or operated by a governmental unit. Section 170(b)(1)(A)(iv). (Also complete the **Support Schedule** in Part IV-A.)

11a [X] An organization that normally receives a substantial part of its support from a governmental unit or from the general public. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

11b [ ] A community trust. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

12 [ ] An organization that normally receives: **(1) more than 33 1/3%** of its support from contributions, membership fees, and gross receipts from activities related to its charitable, etc., functions - subject to certain exceptions, and **(2) no more than 33 1/3%** of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See section 509(a)(2). (Also complete the **Support Schedule** in Part IV-A.)

13 [ ] An organization that is not controlled by any disqualified persons (other than foundation managers) and supports organizations described in: **(1)** lines 5 through 12 above; or **(2)** section 501(c)(4), (5), or (6), if they meet the test of section 509(a)(2). (See section 509(a)(3).)

Provide the following information about the supported organizations. (See page 5 of the instructions.)

| **(a)** Name(s) of supported organization(s) | **(b)** Line number from above |
|---|---|
| | |
| | |
| | |

14 [ ] An organization organized and operated to test for public safety. Section 509(a)(4). (See page 6 of the instructions.)

**Part IV-A** **Support Schedule** (Complete only if you checked a box on line 10, 11, or 12.) **Use cash method of accounting.**
**Note:** *You may use the worksheet in the instructions for converting from the accrual to the cash method of accounting.*

| Calendar year (or fiscal year beginning in) ▶ | (a) 2002 | (b) 2001 | (c) 2000 | (d) 1999 | (e) Total |
|---|---|---|---|---|---|
| 15 Gifts, grants, and contributions received. (Do not include unusual grants. See line 28.) | | 1,500,000. | 300. | | 1,500,300. |
| 16 Membership fees received | | | | | |
| 17 Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is related to the organization's charitable, etc., purpose | | | | | |
| 18 Gross income from interest, dividends, amounts received from payments on securities loans (section 512(a)(5)), rents, royalties, and unrelated business taxable income (less section 511 taxes) from businesses acquired by the organization after June 30, 1975 | 1,586. | 493. | | | 2,079. |
| 19 Net income from unrelated business activities not included in line 18 | | | | | |
| 20 Tax revenues levied for the organization's benefit and either paid to it or expended on its behalf | | | | | |
| 21 The value of services or facilities furnished to the organization by a governmental unit without charge. Do not include the value of services or facilities generally furnished to the public without charge | | | | | |
| 22 Other income. Attach a schedule. Do not include gain or (loss) from sale of capital assets | | | | | |
| 23 Total of lines 15 through 22 | 1,586. | 1,500,493. | 300. | 0. | 1,502,379. |
| 24 Line 23 minus line 17 | 1,586. | 1,500,493. | 300. | | 1,502,379. |
| 25 Enter 1% of line 23 | 16. | 15,005. | 3. | | |

26 **Organizations described on lines 10 or 11:** **a** Enter 2% of amount in column (e), line 24 ▶ **26a** 30,048.

**b** Prepare a list for your records to show the name of and amount contributed by each person (other than a governmental unit or publicly supported organization) whose total gifts for 1999 through 2002 exceeded the amount shown in line 26a. **Do not file this list with your return** Enter the total of all these excess amounts ▶ **26b** 0.

**c** Total support for section 509(a)(1) test Enter line 24, column (e) ▶ **26c** 1,502,379.

**d** Add: Amounts from column (e) for lines: 18 2,079. 19 ______ 22 ______ 26b ______ ▶ **26d** 2,079.

**e** Public support (line 26c minus line 26d total) ▶ **26e** 1,500,300.

**f** **Public support percentage (line 26e (numerator) divided by line 26c (denominator))** ▶ **26f** 99.8616%

27 **Organizations described on line 12:** **a** For amounts included in lines 15, 16, and 17 that were received from a "disqualified person," prepare a list for your records to show the name of, and total amounts received in each year from, each "disqualified person." **Do not file this list with your return.** Enter the sum of such amounts for each year: N/A

(2002) (2001) (2000) (1999)

**b** For any amount included in line 17 that was received from each person (other than "disqualified persons"), prepare a list for your records to show the name of, and amount received for each year, that was more than the **larger** of **(1)** the amount on line 25 for the year or **(2)** $5,000. (Include in the list organizations described in lines 5 through 11, as well as individuals.) **Do not file this list with your return** After computing the difference between the amount received and the larger amount described in **(1)** or **(2)**, enter the sum of these differences (the excess amounts) for each year: N/A

(2002) (2001) (2000) (1999)

**c** Add: Amounts from column (e) for lines: 15 ______ 16 ______ 17 ______ 20 ______ 21 ______ ▶ **27c** N/A

**d** Add: Line 27a total ______ and line 27b total ______ ▶ **27d** N/A

**e** Public support (line 27c total minus line 27d total) ▶ **27e** N/A

**f** Total support for section 509(a)(2) test Enter amount on line 23, column (e) ▶ **27f** N/A

**g** **Public support percentage (line 27e (numerator) divided by line 27f (denominator))** ▶ **27g** N/A %

**h** **Investment income percentage (line 18, column (e) (numerator) divided by line 27f (denominator))** ▶ **27h** N/A %

28 **Unusual Grants:** For an organization described in line 10, 11, or 12 that received any unusual grants during 1999 through 2002, prepare a list for your records to show, for each year, the name of the contributor, the date and amount of the grant, and a brief description of the nature of the grant. **Do not file this list with your return** Do not include these grants in line 15.

NONE

**Part V** **Private School Questionnaire** (See page 7 of the instructions.) N/A

**(To be completed ONLY by schools that checked the box on line 6 in Part IV)**

| | | | Yes | No |
|---|---|---|---|---|
| 29 | Does the organization have a racially nondiscriminatory policy toward students by statement in its charter, bylaws, other governing instrument, or in a resolution of its governing body? | 29 | | |
| 30 | Does the organization include a statement of its racially nondiscriminatory policy toward students in all its brochures, catalogues, and other written communications with the public dealing with student admissions, programs, and scholarships? | 30 | | |
| 31 | Has the organization publicized its racially nondiscriminatory policy through newspaper or broadcast media during the period of solicitation for students, or during the registration period if it has no solicitation program, in a way that makes the policy known to all parts of the general community it serves? | 31 | | |
| | If "Yes," please describe; if "No," please explain. (If you need more space, attach a separate statement.) | | | |
| 32 | Does the organization maintain the following: | | | |
| a | Records indicating the racial composition of the student body, faculty, and administrative staff? | 32a | | |
| b | Records documenting that scholarships and other financial assistance are awarded on a racially nondiscriminatory basis? | 32b | | |
| c | Copies of all catalogues, brochures, announcements, and other written communications to the public dealing with student admissions, programs, and scholarships? | 32c | | |
| d | Copies of all material used by the organization or on its behalf to solicit contributions? | 32d | | |
| | If you answered "No" to any of the above, please explain. (If you need more space, attach a separate statement.) | | | |
| 33 | Does the organization discriminate by race in any way with respect to: | | | |
| a | Students' rights or privileges? | 33a | | |
| b | Admissions policies? | 33b | | |
| c | Employment of faculty or administrative staff? | 33c | | |
| d | Scholarships or other financial assistance? | 33d | | |
| e | Educational policies? | 33e | | |
| f | Use of facilities? | 33f | | |
| g | Athletic programs? | 33g | | |
| h | Other extracurricular activities? | 33h | | |
| | If you answered "Yes" to any of the above, please explain. (If you need more space, attach a separate statement.) | | | |
| 34 a | Does the organization receive any financial aid or assistance from a governmental agency? | 34a | | |
| b | Has the organization's right to such aid ever been revoked or suspended? | 34b | | |
| | If you answered "Yes" to either 34a or b, please explain using an attached statement. | | | |
| 35 | Does the organization certify that it has complied with the applicable requirements of sections 4.01 through 4.05 of Rev. Proc. 75-50, 1975-2 C.B. 587, covering racial nondiscrimination? If "No," attach an explanation | 35 | | |

**Part VI-A** **Lobbying Expenditures by Electing Public Charities** (See page 9 of the instructions.) N/A

(To be completed **ONLY** by an eligible organization that filed Form 5768)

Check ▶ **a** ☐ if the organization belongs to an affiliated group. Check ▶ **b** ☐ if you checked "a" and "limited control" provisions apply.

| **Limits on Lobbying Expenditures** (The term "expenditures" means amounts paid or incurred.) | | (a) Affiliated group totals | (b) To be completed for ALL electing organizations |
|---|---|---|---|
| | | N/A | |
| 36 Total lobbying expenditures to influence public opinion (grassroots lobbying) | 36 | | |
| 37 Total lobbying expenditures to influence a legislative body (direct lobbying) | 37 | | |
| 38 Total lobbying expenditures (add lines 36 and 37) | 38 | | |
| 39 Other exempt purpose expenditures | 39 | | |
| 40 Total exempt purpose expenditures (add lines 38 and 39) | 40 | | |
| 41 Lobbying nontaxable amount. Enter the amount from the following table - | 41 | | |
| 42 Grassroots nontaxable amount (enter 25% of line 41) | 42 | | |
| 43 Subtract line 42 from line 36. Enter -0- if line 42 is more than line 36 | 43 | | |
| 44 Subtract line 41 from line 38. Enter -0- if line 41 is more than line 38 | 44 | | |

| **If the amount on line 40 is -** | **The lobbying nontaxable amount is -** |
|---|---|
| Not over $500,000 | 20% of the amount on line 40 |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000 |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000 |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000 |
| Over $17,000,000 | $1,000,000 |

**Caution:** *If there is an amount on either line 43 or line 44, you must file Form 4720.*

**4-Year Averaging Period Under Section 501(h)**

(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the instructions for lines 45 through 50 on page 11 of the instructions.)

**Lobbying Expenditures During 4-Year Averaging Period** N/A

| Calendar year (or fiscal year beginning in) ▶ | (a) 2003 | (b) 2002 | (c) 2001 | (d) 2000 | (e) Total |
|---|---|---|---|---|---|
| 45 Lobbying nontaxable amount | | | | | 0. |
| 46 Lobbying ceiling amount (150% of line 45(e)) | | | | | 0. |
| 47 Total lobbying expenditures | | | | | 0. |
| 48 Grassroots nontaxable amount | | | | | 0. |
| 49 Grassroots ceiling amount (150% of line 48(e)) | | | | | 0. |
| 50 Grassroots lobbying expenditures | | | | | 0. |

**Part VI-B** **Lobbying Activity by Nonelecting Public Charities**

(For reporting only by organizations that did not complete Part VI-A) (See page 12 of the instructions.) N/A

| During the year, did the organization attempt to influence national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | Yes | No | Amount |
|---|---|---|---|
| a Volunteers | | | |
| b Paid staff or management (Include compensation in expenses reported on lines **c** through **h**.) | | | |
| c Media advertisements | | | |
| d Mailings to members, legislators, or the public | | | |
| e Publications, or published or broadcast statements | | | |
| f Grants to other organizations for lobbying purposes | | | |
| g Direct contact with legislators, their staffs, government officials, or a legislative body | | | |
| h Rallies, demonstrations, seminars, conventions, speeches, lectures, or any other means | | | |
| i Total lobbying expenditures (Add lines **c** through **h**.) | | | 0. |

If "Yes" to any of the above, also attach a statement giving a detailed description of the lobbying activities.

**Part VII Information Regarding Transfers To and Transactions and Relationships With Noncharitable Exempt Organizations** (See page 12 of the instructions.)

51 Did the reporting organization directly or indirectly engage in any of the following with any other organization described in section 501(c) of the Code (other than section 501(c)(3) organizations) or in section 527, relating to political organizations?

| | | Yes | No |
|---|---|---|---|
| a Transfers from the reporting organization to a noncharitable exempt organization of: | | | |
| (i) Cash | 51a(i) | | X |
| (ii) Other assets | a(ii) | | X |
| b Other transactions: | | | |
| (i) Sales or exchanges of assets with a noncharitable exempt organization | b(i) | | X |
| (ii) Purchases of assets from a noncharitable exempt organization | b(ii) | | X |
| (iii) Rental of facilities, equipment, or other assets | b(iii) | | X |
| (iv) Reimbursement arrangements | b(iv) | | X |
| (v) Loans or loan guarantees | b(v) | | X |
| (vi) Performance of services or membership or fundraising solicitations | b(vi) | | X |
| c Sharing of facilities, equipment, mailing lists, other assets, or paid employees | c | | X |

d *If the answer to any of the above is "Yes," complete the following schedule. Column (b) should always show the fair market value of the goods, other assets, or services given by the reporting organization. If the organization received less than fair market value in any transaction or sharing arrangement, show in column (d) the value of the goods, other assets, or services received:* N/A

| (a) Line no. | (b) Amount involved | (c) Name of noncharitable exempt organization | (d) Description of transfers, transactions, and sharing arrangements |
|---|---|---|---|
| | | | |

52 a Is the organization directly or indirectly affiliated with, or related to, one or more tax-exempt organizations described in section 501(c) of the Code (other than section 501(c)(3)) or in section 527? ▶ ☐ Yes ☒ No

b If "Yes," complete the following schedule: N/A

| (a) Name of organization | (b) Type of organization | (c) Description of relationship |
|---|---|---|
| | | |

323151
12-05-03

STERLING CHARITABLE GIFT FUND 54-1978669

FORM 990 OTHER CHANGES IN NET ASSETS OR FUND BALANCES STATEMENT 1

| DESCRIPTION | AMOUNT |
|---|---|
| UNREALIZED GAIN ON INVESTMENTS | 315. |
| TO RECONCILE WITH B/S - ( ROUNDING ADJUSTMENTS) | 7. |
| TOTAL TO FORM 990, PART I, LINE 20 | 322. |

FORM 990 STATEMENT OF ORGANIZATION'S PRIMARY EXEMPT PURPOSE STATEMENT 2
PART III

EXPLANATION

TO RECEIVE AND DISTRIBUTE CONTRIBUTIONS TO QUALIFIED CHARITABLE ORGANIZATION

FORM 990 NON-GOVERNMENT SECURITIES STATEMENT 3

| :URITY DESCRIPTION | CORPORATE STOCKS | CORPORATE BONDS | OTHER PUBLICLY TRADED SECURITIES | OTHER SECURITIES | TOTAL NON-GOV'T SECURITIES |
|---|---|---|---|---|---|
| 1000 SHARES OF MAR-JAC INVESTMENTS, INC.(BOOK VALUE) | 2,650,000. | | | | 2,650,000. |
| AMANA MUTUAL FUND-(GROWTH & INCOME) | | | 10,475. | | 10,475. |
| TO 990, LN 54 COL B | 2,650,000. | | 10,475. | | 2,660,475. |

FORM 990 IDENTIFICATION OF RELATED ORGANIZATIONS STATEMENT 4
PART VI, LINE 80B

| NAME OF ORGANIZATION | EXEMPT | NONEXEMPT |
|---|---|---|
| HORIZONS EDUCATION FOUNDATION ID # 54-2031540 | X | |
| THE HERITAGE EDUCATION TRUST, INC ID# 54-1782520 | X | |
| AFRICAN MUSLIM AGENCY ID# 54-1382088 | X | |
| THE CHILD DEVELOPMENT FOUNDATION ID# 54-1977160 | X | |
| AMERICAN INSTITUTE FOR SOCIETAL STUDIES ID# 54-2014800 | X | |
| SANABEL AL KHEER, INC ID# 54-2003505 | X | |
| ITAGE HOLDING, INC ID# 54-1898830 | X | |
| INTERNATIONAL ISLAMIC CHARITABLE ORGANIZATION ID# 54-1979172 | X | |

| | |
|---|---|
| THE GRADUATE SCHOOL OF ISLAMIC AND SOCIAL SCIENCES ID# 54-1758322 | X |
| TERNATIONAL INSTITUTE OF ISLAMIC THOUGHT ID# -2202414 | X |
| YORK FOUNDATION ID# 31-1621645 | X |
| SAFA TRUST, INC ID# 54-1399426 | X |

STERLING CHARITABLE GIFT FUND

TIN: 54-1978669

PERIOD: 2003

ATTACHMENT TO FORM 990

PART VI, Line 80b

In or about March, 2002, a Senior Special Agent of the United States Custom Service filed an affidavit in the United States District Court for the Eastern District of Virginia alleging that, "The Safa Group and Associated Individuals" were ardent supporters of the Palestinian Islamic Jihad – Shikaki Faction ("PIJ") and Hamas. The affidavit was submitted to the court in support of an application for a search warrant of the business premises of this organization and of the residences of a number of individuals alleged to control, directly or indirectly, the activities of the organization. The court approved the search warrant application and the organization's records were seized on March 22, 2002.

In light of the allegations set forth in the affidavit, this return lists as related organizations all entities for which returns were prepared by the preparer of this return. The returns of all of the organizations listed in this return are available for public inspection at 555 Grove Street, Suite 116, Herndon, VA 20170.

PART 5 and Page 6

Pending the conclusion of the investigation of all entities and individuals referred to in the Application for Search Warrant filed March, 2002 in the United States District Court for the Eastern District of Virginia, upon advice

of counsel, the individuals identified in Part V of this return have invoked the privileges afforded to them by the Fifth Amendment to the Constitution of the United States and each of them has declined, solely upon the basis of such protection, to execute this return as an officer, director, trustee or key employee. No responsible officer or individual is otherwise available to execute this return as of the date of filing of this return.

ENVELOPE POSTMARK DATE 3 1 0 2004

Form 8868 (12-2000) 17 — Page 2

- If you are filing for an **Additional (not automatic) 3-Month Extension, complete only Part II** and check this box . . ▶ ☒

**Note:** *Only complete Part II if you have already been granted an automatic 3-month extension on a previously filed Form 8868.*

- If you are filing for an **Automatic 3-Month Extension, complete only Part I** (on page 1).

**Part II** **Additional (not automatic) 3-Month Extension of Time—Must File Original and One Copy.**

| | | |
|---|---|---|
| **Type or print** | Name of Exempt Organization: STERLING CHARITABLE GIFT FUND | Employer identification number: 54 1978669 |
| File by the extended due date for filing the return. See instructions. | Number, street, and room or suite no. If a P.O. box, see instructions.: 555 GROVE STREET, SUITE 116 | For IRS use only |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions.: HERNDON, VA 20170 | |

**Check type of return to be filed** (File a separate application for each return):

☒ Form 990 ☐ Form 990-EZ ☐ Form 990-T (sec. 401(a) or 408(a) trust) ☐ Form 1041-A ☐ Form 5227 ☐ Form 8870
☐ Form 990-BL ☐ Form 990-PF ☐ Form 990-T (trust other than above) ☐ Form 4720 ☐ Form 6069

**STOP: Do not complete Part II if you were not already granted an automatic 3-month extension on a previously filed Form 8868.**

- If the organization does **not** have an office or place of business in the United States, check this box . . . . . . . ▶ ☐
- If this is for a **Group Return,** enter the organization's four digit Group Exemption Number (GEN) ________ . If this is for the **whole** group, check this box ▶ ☐ . If it is for **part** of the group, check this box ▶ ☐ and attach a list with the names and EINs of all members the extension is for.

4 I request an additional 3-month extension of time until NOVEMBER 15 2004

5 For calendar year 2003 , or other tax year beginning ............, 20.... and ending ............, 20....

6 If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period

7 State in detail why you need the extension, Time to Collect data to file a Complete and accurate tax return, that is required.

8a If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions . . . . $ —

b If this application is for Form 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit and any amount paid previously with Form 8868 . . . . $ —

c **Balance Due.** Subtract line 8b from line 8a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions . . . . $ —

## Signature and Verification

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ▶ Waseem Zafar Title ▶ Manager, Audit & Taxation Date ▶ 08-09-04

## Notice to Applicant—To Be Completed by the IRS

☑ We **have** approved this application. Please attach this form to the organization's return.

☐ We **have not** approved this application. However, we have granted a 10-day grace period from the later of the date shown below or the due date of the organization's return (including any prior extensions). This grace period is considered to be a valid extension of time for elections otherwise required to be made on a timely return. Please attach this form to the organization's return.

☐ We **have not** approved this application. After considering the reasons stated in item 7, we cannot grant your request for an extension of time to file. We are not granting a 10-day grace period.

☐ We **cannot consider** this application because it was filed after the due date of the return for whicl

☐ Other ............

EXTENSION APPROVED
AUG 3 1 2004
, FIELD DIRECTOR,
SUBMISSION PROCESSING, OGDEN

Director ____________ By ____________

**Alternate Mailing Address** — Enter the address if you want the copy of this application for a returned to an address different than the one entered above.

| | |
|---|---|
| **Type or print** | Name |
| | Number and street (include suite, room, or apt. no.) Or a P.O. box number |
| | City or town, province or state, and country (including postal or ZIP code) |

**8868**
(December 2000)
Department of the Treasury
Internal Revenue Service

# Application for Extension of Time To File an Exempt Organization Return

▶ File a separate application for each return.

OMB No 1545-1709

- If you are filing for an **Automatic 3-Month Extension, complete only Part I** and check this box . . . . . . . . . ▶ ☒
- If you are filing for an **Additional (not automatic) 3-Month Extension, complete only Part II** (on page 2 of this form).

**Note:** ***Do not complete Part II unless you have already been granted an automatic 3-month extension on a previously filed Form 8868.***

**Part I** **Automatic 3-Month Extension of Time**—Only submit original (no copies needed)

**Note:** *Form 990-T corporations requesting an automatic 6-month extension—check this box and complete Part I only* . . . ▶ ☐

*All other corporations (including Form 990-C filers) must use Form 7004 to request an extension of time to file income tax returns. Partnerships, REMICs and trusts must use Form 8736 to request an extension of time to file Form 1065, 1066, or 1041.*

| | | |
|---|---|---|
| **Type or print** | Name of Exempt Organization<br>STERLING CHARITABLE GIFT FUND | Employer identification number<br>54 : 1978669 |
| File by the due date for filing your return See instructions | Number, street, and room or suite no. If a P.O. box, see instructions.<br>555 GROVE STREET, SUITE 116 | |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions.<br>HERNDON, VA 20170 | |

**Check type of return to be filed** (file a separate application for each return):

| | | |
|---|---|---|
| ☒ Form 990 | ☐ Form 990-T (corporation) | ☐ Form 4720 |
| ☐ Form 990-BL | ☐ Form 990-T (sec. 401(a) or 408(a) trust) | ☐ Form 5227 |
| ☐ Form 990-EZ | ☐ Form 990-T (trust other than above) | ☐ Form 6069 |
| ☐ Form 990-PF | ☐ Form 1041-A | ☐ Form 8870 |

- If the organization does **not** have an office or place of business in the United States, check this box . . . . . . . ▶ ☐
- If this is for a **Group Return,** enter the organization's four digit Group Exemption Number (GEN) ________ . If this is for the **whole** group, check this box ▶ ☐ . If it is for part of the group, check this box ▶ ☐ and attach a list with the names and EINs of all members the extension will cover.

1 I request an automatic 3-month (6-month, for **990-T corporation**) extension of time until AUGUST 15, 2004, to file the exempt organization return for the organization named above. The extension is for the organization's return for:

▶ ☒ calendar year 2003 or

▶ ☐ tax year beginning .............................., 20 ..., and ending .............................., 20 ....

2 If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period

3a If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions . . . . . . . . . . . . . . . . . . . . . . . . $ —

b If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit . . . . . . . . . . . . . . . . $ —

c **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ N/A

## Signature and Verification

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form

Signature ▶ Malcolm Jafar    Title ▶ Manager, Audit | Taxation    Date ▶ 05-14-04

**For Paperwork Reduction Act Notice, see Instruction**    Cat No 27916D    Form **8868** (12-2000)

Form **990** | **Return of Organization Exempt From Income Tax** | OMB No 1545-0047

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

Department of the Treasury Internal Revenue Service

**2003** Open to Public Inspection

A For the 2003 calendar year, or tax year beginning and ending

B Check if applicable: Address change; Name change; Initial return; Final return; Amended return; Application pending

Please use IRS label or print or type. See Specific Instructions.

C Name of organization: YORK FOUNDATION

Number and street (or P.O. box if mail is not delivered to street address): 555 GROVE STREET — Room/suite: 114

City or town, state or country, and ZIP + 4: HERNDON, VA 20170-4705

D Employer identification number: 31-1621645

E Telephone number: 703-471-9494

F Accounting method: Cash [X] Accrual; Other (specify) ▶

• Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).

H and I are not applicable to section 527 organizations.

H(a) Is this a group return for affiliates? Yes [X] No

H(b) If "Yes," enter number of affiliates ▶

H(c) Are all affiliates included? N/A Yes No (If "No," attach a list.)

H(d) Is this a separate return filed by an organization covered by a group ruling? Yes [X] No

I Group Exemption Number ▶

G Website: ▶N

J Organization type (check only one) ▶ [X] 501(c) ( 3 ) ◀ (insert no) 4947(a)(1) or 527

K Check here ▶ if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS; but if the organization received a Form 990 Package in the mail, it should file a return without financial data. Some states require a complete return

M Check ▶ if the organization is **not** required to attach Sch. B (Form 990, 990-EZ, or 990-PF).

L Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 ▶ 334,207.

## Part I Revenue, Expenses, and Changes in Net Assets or Fund Balances

| | | | | | |
|---|---|---|---|---|---|
| Revenue | 1 | Contributions, gifts, grants, and similar amounts received: | | | |
| | a | Direct public support | 1a 234,524. | | |
| | b | Indirect public support | 1b | | |
| | c | Government contributions (grants) | 1c | | |
| | d | Total (add lines 1a through 1c) (cash $ 234,524. noncash $ ) | | 1d | 234,524. |
| | 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | | 2 | |
| | 3 | Membership dues and assessments | | 3 | |
| | 4 | Interest on savings and temporary cash investments | | 4 | 68. |
| | 5 | Dividends and interest from securities | | 5 | 13,161. |
| | 6 a | Gross rents SEE STATEMENT 2 | 6a 399,996. | | |
| | b | Less: rental expenses | 6b | | |
| | c | Net rental income or (loss) (subtract line 6b from line 6a) | | 6c | 399,996. |
| | 7 | Other investment income (describe ▶ SEE STATEMENT 1 ) | | 7 | <313,542.> |
| | 8 a | Gross amount from sales of assets other than inventory | (A) Securities 8a / (B) Other | | |
| | b | Less: cost or other basis and sales expenses | 8b | | |
| | c | Gain or (loss) (attach schedule) | 8c | | |
| | d | Net gain or (loss) (combine line 8c, columns (A) and (B)) | | 8d | |
| | 9 | Special events and activities (attach schedule). If any amount is from **gaming**, check here ▶ | | | |
| | a | Gross revenue (not including $ of contributions reported on line 1a) | 9a | | |
| | b | Less: direct expenses other than fundraising expenses | 9b | | |
| | c | Net income or (loss) from special events (subtract line 9b from line 9a) | | 9c | |
| | 10 a | Gross sales of inventory, less returns and allowances | 10a | | |
| | b | Less: cost of goods sold | 10b | | |
| | c | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) | | 10c | |
| | 11 | Other revenue (from Part VII, line 103) | | 11 | |
| | 12 | **Total revenue** (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | | 12 | 334,207. |
| Expenses | 13 | Program services (from line 44, column (B)) | | 13 | 183,846. |
| | 14 | Management and general (from line 44, column (C)) | | 14 | 111,597. |
| | 15 | Fundraising (from line 44, column (D)) | | 15 | |
| | 16 | Payments to affiliates (attach schedule) | | 16 | |
| | 17 | **Total expenses** (add lines 16 and 44, column (A)) | | 17 | 295,443. |
| Net Assets | 18 | Excess or (deficit) for the year (subtract line 17 from line 12) | | 18 | 38,764. |
| | 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | | 19 | 5,671,051. |
| | 20 | Other changes in net assets or fund balances (attach explanation) SEE STATEMENT 3 | | 20 | 474,496. |
| | 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | | 21 | 6,184,311. |

ENVELOPE POSTMARK DATE NOV 15 2004

NOV 21 2004

SCANNED DEC 13 2004

323001 12-17-03 LHA **For Paperwork Reduction Act Notice, see the separate instructions.** Form 990 (2003)



13571103 130118 YORK01 2003.05051

YORK FOUNDATION 31-1621645

Form 990 (2003) Page 2

**Part II Statement of Functional Expenses** All organizations must complete column (A). Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others.

| *Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I* | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
|---|---|---|---|---|---|
| 22 Grants and allocations (attach schedule) cash $179,684. noncash $ | 22 | 179,684. | 179,684. | | |
| 23 Specific assistance to individuals (attach schedule) | 23 | 4,162. | 4,162. | | |
| 24 Benefits paid to or for members (attach schedule) | 24 | | | | |
| 25 Compensation of officers, directors, etc. | 25 | 0. | 0. | 0. | 0. |
| 26 Other salaries and wages | 26 | | | | |
| 27 Pension plan contributions | 27 | | | | |
| 28 Other employee benefits | 28 | | | | |
| 29 Payroll taxes | 29 | | | | |
| 30 Professional fundraising fees | 30 | | | | |
| 31 Accounting fees | 31 | 3,500. | | 3,500. | |
| 32 Legal fees | 32 | 55,486. | | 55,486. | |
| 33 Supplies | 33 | 137. | | 137. | |
| 34 Telephone | 34 | | | | |
| 35 Postage and shipping | 35 | | | | |
| 36 Occupancy | 36 | | | | |
| 37 Equipment rental and maintenance | 37 | | | | |
| 38 Printing and publications | 38 | | | | |
| 39 Travel | 39 | | | | |
| 40 Conferences, conventions, and meetings | 40 | | | | |
| 41 Interest | 41 | | | | |
| 42 Depreciation, depletion, etc. (attach schedule) | 42 | | | | |
| 43 Other expenses not covered above (itemize): | | | | | |
| a | 43a | | | | |
| b | 43b | | | | |
| c | 43c | | | | |
| d | 43d | | | | |
| e | 43e | 52,474. | | 52,474. | |
| 44 Total functional expenses (add lines 22 through 43) Organizations completing columns (B)-(D), carry these totals to lines 13-15 | 44 | 295,443. | 183,846. | 111,597. | 0. |

**Joint Costs** Check ▶ ☐ if you are following SOP 98-2.

Are any joint costs from a combined educational campaign and fundraising solicitation reported in (B) Program services? ▶ ☐ Yes ☒ No

If "Yes," enter (i) the aggregate amount of these joint costs $ ________ ; (ii) the amount allocated to Program services $ ________ ;

(iii) the amount allocated to Management and general $ ________ ; and (iv) the amount allocated to Fundraising $ ________ .

**Part III Statement of Program Service Accomplishments**

What is the organization's primary exempt purpose? ▶

EDUCATION AND TO SUPPORT RELIGIOUS AND CHARITABLE ACTIVITIES

All organizations must describe their exempt purpose achievements in a clear and concise manner. State the number of clients served, publications issued, etc. Discuss achievements that are not measurable. (Section 501(c)(3) and (4) organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others.)

| | Program Service Expenses (Required for 501(c)(3) and (4) orgs., and 4947(a)(1) trusts, but optional for others.) |
|---|---|
| a PROVIDES ASSISTANCE TO EXEMPT ORGANIZATIONS WHICH PROMOTE REASEARCH PROJECTS, ORGANIZE INTELLECTUAL AND CULTURAL MEETINGS AND PUBLISH SCHOLARLY WORKS. (Grants and allocations $ 27,484.) | 27,484. |
| b PROVIDES ASSISTANCE TO ORGANIZATIONS WHICH PROMOTE RELIGIOUS, CHARITABLE, CULTURAL, EDUCATIONAL AND SCIENTIFIC PURPOSES AND HELP THE DESTITUTE AND REFUGEES. (Grants and allocations $ 39,163.) | 39,163. |
| c FINANCIAL ASSISTANCE: PROVIDE ASSISTANCE TO VARIOUS RELIGIOUS CHARITABLE, EDUCATIONAL ORGANIZATIONS AND COMMUNITY CENTER. (Grants and allocations $ 109,537.) | 109,537. |
| d EDUCATION: PROVIDE TUITION ASSISTANCE TO DESERVING STUDENT. (Grants and allocations $ 7,662.) | 7,662. |
| e Other program services (attach schedule) (Grants and allocations $ ) | |
| f Total of Program Service Expenses (should equal line 44, column (B), Program services) ▶ | 183,846. |

SCHEDULE A
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Organization Exempt Under Section 501(c)(3)

(Except Private Foundation) and Section 501(e), 501(f), 501(k), 501(n), or Section 4947(a)(1) Nonexempt Charitable Trust

Supplementary Information-(See separate instructions.)

▶ MUST be completed by the above organizations and attached to their Form 990 or 990-EZ

OMB No 1545-0047

2003

Name of the organization: YORK FOUNDATION

Employer identification number: 31 1621645

## Part I Compensation of the Five Highest Paid Employees Other Than Officers, Directors, and Trustees

(See page 1 of the instructions. List each one. If there are none, enter "None.")

| (a) Name and address of each employee paid more than $50,000 | (b) Title and average hours per week devoted to position | (c) Compensation | (d) Contributions to employee benefit plans & deferred compensation | (e) Expense account and other allowances |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Total number of other employees paid over $50,000 ▶ 0

## Part II Compensation of the Five Highest Paid Independent Contractors for Professional Services

(See page 2 of the instructions. List each one (whether individuals or firms). If there are none, enter "None.")

| (a) Name and address of each independent contractor paid more than $50,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |
| | | |

Total number of others receiving over $50,000 for professional services ▶ 0

**Part III Statements About Activities** (See page 2 of the instructions.)

| | | Yes | No |
|---|---|---|---|
| 1 During the year, has the organization attempted to influence national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum? If "Yes," enter the total expenses paid or incurred in connection with the lobbying activities ▶ $ ______ $ ______ (Must equal amounts on line 38, Part VI-A, or line i of Part VI-B.) Organizations that made an election under section 501(h) by filing Form 5768 must complete Part VI-A. Other organizations checking "Yes," must complete Part VI-B AND attach a statement giving a detailed description of the lobbying activities. | 1 | | X |
| 2 During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any substantial contributors, trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary? *(If the answer to any question is "Yes," attach a detailed statement explaining the transactions.)* | | | |
| a Sale, exchange, or leasing of property? | 2a | | X |
| b Lending of money or other extension of credit? | 2b | | X |
| c Furnishing of goods, services, or facilities? | 2c | | X |
| d Payment of compensation (or payment or reimbursement of expenses if more than $1,000)? | 2d | | X |
| e Transfer of any part of its income or assets? | 2e | | X |
| 3 a Do you make grants for scholarships, fellowships, student loans, etc.? (If "Yes," attach an explanation of how you determine that recipients qualify to receive payments.) | 3a | | X |
| b Do you have a section 403(b) annuity plan for your employees? | 3b | | X |
| 4 Did you maintain any separate account for participating donors where donors have the right to provide advice on the use or distribution of funds? | 4 | | X |

**Part IV Reason for Non-Private Foundation Status** (See pages 3 through 6 of the instructions.)

The organization is not a private foundation because it is: (Please check only **ONE** applicable box.)

5 ☐ A church, convention of churches, or association of churches. Section 170(b)(1)(A)(i).

6 ☐ A school. Section 170(b)(1)(A)(ii). (Also complete Part V.)

7 ☐ A hospital or a cooperative hospital service organization. Section 170(b)(1)(A)(iii).

8 ☐ A Federal, state, or local government or governmental unit. Section 170(b)(1)(A)(v).

9 ☐ A medical research organization operated in conjunction with a hospital. Section 170(b)(1)(A)(iii). **Enter the hospital's name, city, and state** ▶ ______

10 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit. Section 170(b)(1)(A)(iv). (Also complete the **Support Schedule** in Part IV-A.)

11a ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

11b ☐ A community trust. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

12 ☐ An organization that normally receives: **(1) more than 33 1/3%** of its support from contributions, membership fees, and gross receipts from activities related to its charitable, etc., functions - subject to certain exceptions, and **(2) no more than 33 1/3%** of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See section 509(a)(2). (Also complete the **Support Schedule** in Part IV-A.)

13 ☐ An organization that is not controlled by any disqualified persons (other than foundation managers) and supports organizations described in: (1) lines 5 through 12 above; or (2) section 501(c)(4), (5), or (6), if they meet the test of section 509(a)(2). (See section 509(a)(3).)

Provide the following information about the supported organizations. (See page 5 of the instructions.)

| (a) Name(s) of supported organization(s) | (b) Line number from above |
|---|---|
| | |
| | |
| | |

14 ☐ An organization organized and operated to test for public safety. Section 509(a)(4). (See page 6 of the instructions.)

Schedule A (Form 990 or 990-EZ) 2003 YORK FOUNDATION 31-1621645 Page 3

**Part IV-A** **Support Schedule** (Complete only if you checked a box on line 10, 11, or 12.) **Use cash method of accounting.**
**Note:** *You may use the worksheet in the instructions for converting from the accrual to the cash method of accounting*

| Calendar year (or fiscal year beginning in) ▶ | (a) 2002 | (b) 2001 | (c) 2000 | (d) 1999 | (e) Total |
|---|---|---|---|---|---|
| 15 Gifts, grants, and contributions received. (Do not include unusual grants. See line 28.) | 121,870. | 221,890. | 565,762. | 1,432,500. | 2,342,022. |
| 16 Membership fees received | | | | | |
| 17 Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is related to the organization's charitable, etc., purpose | | | | | |
| 18 Gross income from interest, dividends, amounts received from payments on securities loans (section 512(a)(5)), rents, royalties, and unrelated business taxable income (less section 511 taxes) from businesses acquired by the organization after June 30, 1975 | 411,201. | 402,492. | 287,489. | 4,290. | 1,105,472. |
| 19 Net income from unrelated business activities not included in line 18 | | | | | |
| 20 Tax revenues levied for the organization's benefit and either paid to it or expended on its behalf | | | | | |
| 21 The value of services or facilities furnished to the organization by a governmental unit without charge. Do not include the value of services or facilities generally furnished to the public without charge | | | | | |
| 22 Other income. Attach a schedule. Do not include gain or (loss) from sale of capital assets | | | | | |
| 23 Total of lines 15 through 22 | 533,071. | 624,382. | 853,251. | 1,436,790. | 3,447,494. |
| 24 Line 23 minus line 17 | 533,071. | 624,382. | 853,251. | 1,436,790. | 3,447,494. |
| 25 Enter 1% of line 23 | 5,331. | 6,244. | 8,533. | 14,368. | |

26 **Organizations described on lines 10 or 11: a** Enter 2% of amount in column (e), line 24 ▶ 26a 68,950.

b Prepare a list for your records to show the name of and amount contributed by each person (other than a governmental unit or publicly supported organization) whose total gifts for 1999 through 2002 exceeded the amount shown in line 26a. **Do not file this list with your return.** Enter the total of all these excess amounts ▶ 26b 12,272.

c Total support for section 509(a)(1) test: Enter line 24, column (e) ▶ 26c 3,447,494.

d Add: Amounts from column (e) for lines: 18 1,105,472. 19 ______ 22 ______ 26b 12,272. ▶ 26d 1,117,744.

e Public support (line 26c minus line 26d total) ▶ 26e 2,329,750.

f **Public support percentage (line 26e (numerator) divided by line 26c (denominator))** ▶ 26f 67.5781%

27 **Organizations described on line 12: a** For amounts included in lines 15, 16, and 17 that were received from a "disqualified person," prepare a list for your records to show the name of, and total amounts received in each year from, each "disqualified person." **Do not file this list with your return.** Enter the sum of such amounts for each year: N/A

(2002) (2001) (2000) (1999)

b For any amount included in line 17 that was received from each person (other than "disqualified persons"), prepare a list for your records to show the name of, and amount received for each year, that was more than the **larger** of **(1)** the amount on line 25 for the year or **(2)** $5,000. (Include in the list organizations described in lines 5 through 11, as well as individuals.) **Do not file this list with your return.** After computing the difference between the amount received and the larger amount described in **(1)** or **(2)**, enter the sum of these differences (the excess amounts) for each year: N/A

(2002) (2001) (2000) (1999)

c Add: Amounts from column (e) for lines: 15 ______ 16 ______ 17 ______ 20 ______ 21 ______ ▶ 27c N/A

d Add: Line 27a total ______ and line 27b total ______ ▶ 27d N/A

e Public support (line 27c total minus line 27d total) ▶ 27e N/A

f Total support for section 509(a)(2) test: Enter amount on line 23, column (e) ▶ 27f N/A

g **Public support percentage (line 27e (numerator) divided by line 27f (denominator))** ▶ 27g N/A %

h **Investment income percentage (line 18, column (e) (numerator) divided by line 27f (denominator))** ▶ 27h N/A %

28 **Unusual Grants:** For an organization described in line 10, 11, or 12 that received any unusual grants during 1999 through 2002, prepare a list for your records to show, for each year, the name of the contributor, the date and amount of the grant, and a brief description of the nature of the grant. **Do not file this list with your return.** Do not include these grants in line 15.

NONE

**Part V** **Private School Questionnaire** (See page 7 of the instructions.) N/A

**(To be completed ONLY by schools that checked the box on line 6 in Part IV)**

| | Question | Line | Yes | No |
|---|---|---|---|---|
| 29 | Does the organization have a racially nondiscriminatory policy toward students by statement in its charter, bylaws, other governing instrument, or in a resolution of its governing body? | 29 | | |
| 30 | Does the organization include a statement of its racially nondiscriminatory policy toward students in all its brochures, catalogues, and other written communications with the public dealing with student admissions, programs, and scholarships? | 30 | | |
| 31 | Has the organization publicized its racially nondiscriminatory policy through newspaper or broadcast media during the period of solicitation for students, or during the registration period if it has no solicitation program, in a way that makes the policy known to all parts of the general community it serves? If "Yes," please describe; if "No," please explain. (If you need more space, attach a separate statement.) | 31 | | |
| 32 | Does the organization maintain the following: | | | |
| a | Records indicating the racial composition of the student body, faculty, and administrative staff? | 32a | | |
| b | Records documenting that scholarships and other financial assistance are awarded on a racially nondiscriminatory basis? | 32b | | |
| c | Copies of all catalogues, brochures, announcements, and other written communications to the public dealing with student admissions, programs, and scholarships? | 32c | | |
| d | Copies of all material used by the organization or on its behalf to solicit contributions? If you answered "No" to any of the above, please explain. (If you need more space, attach a separate statement.) | 32d | | |
| 33 | Does the organization discriminate by race in any way with respect to: | | | |
| a | Students' rights or privileges? | 33a | | |
| b | Admissions policies? | 33b | | |
| c | Employment of faculty or administrative staff? | 33c | | |
| d | Scholarships or other financial assistance? | 33d | | |
| e | Educational policies? | 33e | | |
| f | Use of facilities? | 33f | | |
| g | Athletic programs? | 33g | | |
| h | Other extracurricular activities? If you answered "Yes" to any of the above, please explain. (If you need more space, attach a separate statement.) | 33h | | |
| 34 a | Does the organization receive any financial aid or assistance from a governmental agency? | 34a | | |
| b | Has the organization's right to such aid ever been revoked or suspended? If you answered "Yes" to either 34a or b, please explain using an attached statement. | 34b | | |
| 35 | Does the organization certify that it has complied with the applicable requirements of sections 4.01 through 4.05 of Rev. Proc. 75-50, 1975-2 C.B. 587, covering racial nondiscrimination? If "No," attach an explanation | 35 | | |

Schedule A (Form 990 or 990-EZ) 2003 YORK FOUNDATION 31-1621645 Page 5

**Part VI-A** **Lobbying Expenditures by Electing Public Charities** (See page 9 of the instructions.) N/A
(To be completed ONLY by an eligible organization that filed Form 5768)

Check ▶ a ☐ if the organization belongs to an affiliated group. Check ▶ b ☐ if you checked "a" and "limited control" provisions apply.

| **Limits on Lobbying Expenditures** (The term "expenditures" means amounts paid or incurred.) | | (a) Affiliated group totals | (b) To be completed for ALL electing organizations |
|---|---|---|---|
| 36 Total lobbying expenditures to influence public opinion (grassroots lobbying) | 36 | N/A | |
| 37 Total lobbying expenditures to influence a legislative body (direct lobbying) | 37 | | |
| 38 Total lobbying expenditures (add lines 36 and 37) | 38 | | |
| 39 Other exempt purpose expenditures | 39 | | |
| 40 Total exempt purpose expenditures (add lines 38 and 39) | 40 | | |
| 41 Lobbying nontaxable amount. Enter the amount from the following table - | 41 | | |
| 42 Grassroots nontaxable amount (enter 25% of line 41) | 42 | | |
| 43 Subtract line 42 from line 36. Enter -0- if line 42 is more than line 36 | 43 | | |
| 44 Subtract line 41 from line 38. Enter -0- if line 41 is more than line 38 | 44 | | |

| If the amount on line 40 is - | The lobbying nontaxable amount is - |
|---|---|
| Not over $500,000 | 20% of the amount on line 40 |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000 |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000 |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000 |
| Over $17,000,000 | $1,000,000 |

**Caution:** *If there is an amount on either line 43 or line 44, you must file Form 4720*

**4-Year Averaging Period Under Section 501(h)**
(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the instructions for lines 45 through 50 on page 11 of the instructions.)

| | Lobbying Expenditures During 4-Year Averaging Period | | | | N/A |
|---|---|---|---|---|---|
| Calendar year (or fiscal year beginning in) ▶ | (a) 2003 | (b) 2002 | (c) 2001 | (d) 2000 | (e) Total |
| 45 Lobbying nontaxable amount | | | | | 0. |
| 46 Lobbying ceiling amount (150% of line 45(e)) | | | | | 0. |
| 47 Total lobbying expenditures | | | | | 0. |
| 48 Grassroots nontaxable amount | | | | | 0. |
| 49 Grassroots ceiling amount (150% of line 48(e)) | | | | | 0. |
| 50 Grassroots lobbying expenditures | | | | | 0. |

**Part VI-B** **Lobbying Activity by Nonelecting Public Charities**
(For reporting only by organizations that did not complete Part VI-A) (See page 12 of the instructions.) N/A

| During the year, did the organization attempt to influence national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | Yes | No | Amount |
|---|---|---|---|
| a Volunteers | | | |
| b Paid staff or management (Include compensation in expenses reported on lines c through h.) | | | |
| c Media advertisements | | | |
| d Mailings to members, legislators, or the public | | | |
| e Publications, or published or broadcast statements | | | |
| f Grants to other organizations for lobbying purposes | | | |
| g Direct contact with legislators, their staffs, government officials, or a legislative body | | | |
| h Rallies, demonstrations, seminars, conventions, speeches, lectures, or any other means | | | |
| i Total lobbying expenditures (Add lines c through h.) | | | 0. |

If "Yes" to any of the above, also attach a statement giving a detailed description of the lobbying activities.

**Part VII Information Regarding Transfers To and Transactions and Relationships With Noncharitable Exempt Organizations** (See page 12 of the instructions.)

51 Did the reporting organization directly or indirectly engage in any of the following with any other organization described in section 501(c) of the Code (other than section 501(c)(3) organizations) or in section 527, relating to political organizations?

| | | Yes | No |
|---|---|---|---|
| a Transfers from the reporting organization to a noncharitable exempt organization of: | | | |
| (i) Cash | 51a(i) | | X |
| (ii) Other assets | a(ii) | | X |
| b Other transactions: | | | |
| (i) Sales or exchanges of assets with a noncharitable exempt organization | b(i) | | X |
| (ii) Purchases of assets from a noncharitable exempt organization | b(ii) | | X |
| (iii) Rental of facilities, equipment, or other assets | b(iii) | | X |
| (iv) Reimbursement arrangements | b(iv) | | X |
| (v) Loans or loan guarantees | b(v) | | X |
| (vi) Performance of services or membership or fundraising solicitations | b(vi) | | X |
| c Sharing of facilities, equipment, mailing lists, other assets, or paid employees | c | | X |

d If the answer to any of the above is "Yes," complete the following schedule. Column (b) should always show the fair market value of the goods, other assets, or services given by the reporting organization. If the organization received less than fair market value in any transaction or sharing arrangement, show in column (d) the value of the goods, other assets, or services received: N/A

| (a) Line no. | (b) Amount involved | (c) Name of noncharitable exempt organization | (d) Description of transfers, transactions, and sharing arrangements |
|---|---|---|---|
| | | | |

52 a Is the organization directly or indirectly affiliated with, or related to, one or more tax-exempt organizations described in section 501(c) of the Code (other than section 501(c)(3)) or in section 527? ▶ ☐ Yes ☒ No

b If "Yes," complete the following schedule: N/A

| (a) Name of organization | (b) Type of organization | (c) Description of relationship |
|---|---|---|
| | | |

YORK FOUNDATION 31-1621645

FORM 990 OTHER INVESTMENT INCOME STATEMENT 1

| DESCRIPTION | AMOUNT |
|---|---|
| LOSS FROM STERLING STOCK INVESTMENTS LLC | <48,543.> |
| LOSS FROM STERLING PACKET STREAM,LLC | <124,999.> |
| LOSS FROM STERLING PACKET STREAM,INC | <140,000.> |
| TOTAL TO FORM 990, PART I, LINE 7 | <313,542.> |

FORM 990 RENTAL INCOME STATEMENT 2

| KIND AND LOCATION OF PROPERTY | ACTIVITY NUMBER | GROSS RENTAL INCOME |
|---|---|---|
| FEED MILL LAND,BUILDING AND IMPROVEMENTS | 1 | 399,996. |
| TOTAL TO FORM 990, PART I, LINE 6A | | 399,996. |

FORM 990 OTHER CHANGES IN NET ASSETS OR FUND BALANCES STATEMENT 3

| DESCRIPTION | AMOUNT |
|---|---|
| INCREASE IN UNREALIZED ( LOSSES ) OR GAINS | 474,494. |
| TO RECONCIL WITH BALANCE SHEET- ROUNDING DIFFERENCE | 2. |
| TOTAL TO FORM 990, PART I, LINE 20 | 474,496. |

FORM 990 OTHER EXPENSES STATEMENT 4

| DESCRIPTION | (A) TOTAL | (B) PROGRAM SERVICES | (C) MANAGEMENT AND GENERAL | (D) FUNDRAISING |
|---|---|---|---|---|
| BANK CHARGES | 315. | | 315. | |
| LICENSES AND TAXES | 80. | | 80. | |
| MISC.EXPENSES- SUPPLIES, ETC. | 329. | | 329. | |
| MANAGEMENT FEES | 23,112. | | 23,112. | |
| HOSPITALITY | 1,429. | | 1,429. | |
| PROFESSIONAL FEE- AUDIT & TAX (4YRS) | 19,500. | | 19,500. | |

YORK FOUNDATION 31-1621645

| RM 990 | SPECIFIC ASSISTANCE TO INDIVIDUALS | STATEMENT 7 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| MEDICAL ASSISTANCE - DR. MOHAMMAD ASHRAF, A/5 JINNAH COLONY,SIALKOT,PAKISTAN | 1,500. |
| MEDICAL ASSISTANCE - ISHMAIL DAVIS<br>TUITION ASSISTANCE - AMMAR YOUSUF | 2,662. |
| TOTAL TO FORM 990, PART II, LINE 23 | 4,162. |

| FORM 990 | NON-GOVERNMENT SECURITIES | STATEMENT 8 |
|---|---|---|

| SECURITY DESCRIPTION | CORPORATE STOCKS | CORPORATE BONDS | OTHER PUBLICLY TRADED SECURITIES | OTHER SECURITIES | TOTAL NON-GOV'T SECURITIES |
|---|---|---|---|---|---|
| STERLING INFOGAIN FUND, LLC. | | | | 500,000. | 500,000. |
| STERLING STOCK INVESTMENTS, LLC | | | | 1,016,760. | 1,016,760. |
| S RLING PACKET EAM FUND LLC. | | | | 0. | |
| PACKET STREAM, INC. | 0. | | | | |
| FIDUS MEDICAL TECHNOLOGY | 100,000. | | | | 100,000. |
| PACKETPASS, INC. | 50,000. | | | | 50,000. |
| HFC FEED MILLS, LLC | | | | 4,402,000. | 4,402,000. |
| RESERVE FOR INVESTMENTS LOSS | | | | 266,044. | 266,044. |
| TO 990, LN 54 COL B | 150,000. | | | 6,184,804. | 6,334,804. |

| FORM 990 | OTHER ASSETS | STATEMENT 9 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| GAINSVILLE MASJID - ( BUILDING & LAND ) | 61,500. |
| TOTAL TO FORM 990, PART IV, LINE 58, COLUMN B | 61,500. |

YORK FOUNDATION 31-1621645

FORM 990 OTHER NOTES AND LOANS PAYABLE STATEMENT 10

| LENDER'S NAME | | TERMS OF REPAYMENT | |
|---|---|---|---|
| YORK INTERNATIONAL TRUST | | DEMAND | |

| DATE OF NOTE | MATURITY DATE | ORIGINAL LOAN AMOUNT | INTEREST RATE |
|---|---|---|---|
| 09/30/01 | | 879,075. | .00% |

| SECURITY PROVIDED BY BORROWER | PURPOSE OF LOAN |
|---|---|
| NONE | INVESTMENT |

RELATIONSHIP OF LENDER

NONE

| DESCRIPTION OF CONSIDERATION | FMV OF CONSIDERATION | BALANCE DUE |
|---|---|---|
| NONE | 0. | 389,075. |

| LENDER'S NAME | TERMS OF REPAYMENT |
|---|---|
| SAFA TRUST, INC | DEMAND |

| DATE OF NOTE | MATURITY DATE | ORIGINAL LOAN AMOUNT | INTEREST RATE |
|---|---|---|---|
| 06/30/02 | | 160,000. | .00% |

| SECURITY PROVIDED BY BORROWER | PURPOSE OF LOAN |
|---|---|
| NONE | INVESTMENT |

RELATIONSHIP OF LENDER

NONE

| DESCRIPTION OF CONSIDERATION | FMV OF CONSIDERATION | BALANCE DUE |
|---|---|---|
| NONE | 0. | 150,000. |

TOTAL INCLUDED ON FORM 990, PART IV, LINE 64, COLUMN B 539,075.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 1

# Part 2

YORK FOUNDATION 31-1621645

FORM 990 IDENTIFICATION OF RELATED ORGANIZATIONS STATEMENT 11
PART VI, LINE 80B

| NAME OF ORGANIZATION | EXEMPT | NONEXEMPT |
|---|---|---|
| STERLING CHARITABLE GIFT FUND ID # 54-1978669 | X | |
| HORIZONS EDUCATION FOUNDATION ID# 54-2031540 | X | |
| THE HERITAGE EDUCATION TRUST, INC ID# 54-1782520 | X | |
| AFRICAN MUSLIM AGENCY ID# 54-1382088 | X | |
| THE CHILD DEVELOPMENT FOUNDATION ID# 54-1977160 | X | |
| AMERICAN INSTITUTE FOR SOCIETAL STUDIES ID# 54-2014800 | X | |
| SANABEL AL KHEER, INC ID# 54-2003505 | X | |
| HERITAGE HOLDING, INC ID# 54-1898830 | X | |
| INTERNATIONAL ISLAMIC CHARITABLE ORGANIZATION ID# 54-1979172 | X | |
| THE GRADUATE SCHOOL OF ISLAMIC AND SOCIAL SCIENCES ID# 54-1758322 | X | |
| INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT ID# 23-2202414 | X | |
| SAFA TRUST, INC ID# 54-1399426 | X | |

YORK FOUNDATION

TIN: 31-1621645

PERIOD: 2003

ATTACHMENT TO FORM 990

PART VI, Line 80b

In or about March, 2002, a Senior Special Agent of the United States Custom Service filed an affidavit in the United States District Court for the Eastern District of Virginia alleging that, "The Safa Group and Associated Individuals" were ardent supporters of the Palestinian Islamic Jihad – Shikaki Faction ("PIJ") and Hamas. The affidavit was submitted to the court in support of an application for a search warrant of the business premises of this organization and of the residences of a number of individuals alleged to control, directly or indirectly, the activities of the organization. The court approved the search warrant application and the organization's records were seized on March 22, 2002.

In light of the allegations set forth in the affidavit, this return lists as related organizations all entities for which returns were prepared by the preparer of this return. The returns of all of the organizations listed in this return are available for public inspection at 555 Grove Street, Suite 116, Herndon, VA 20170.

PART 5 and Page 6

Pending the conclusion of the investigation of all entities and individuals referred to in the Application for Search Warrant filed March, 2002 in the United States District Court for the Eastern District of Virginia, upon advice

of counsel, the individuals identified in Part V of this return have invoked the privileges afforded to them by the Fifth Amendment to the Constitution of the United States and each of them has declined, solely upon the basis of such protection, to execute this return as an officer, director, trustee or key employee. No responsible officer or individual is otherwise available to execute this return as of the date of filing of this return.

Form **8868** (December 2000) Department of the Treasury Internal Revenue Service

# Application for Extension of Time To File an Exempt Organization Return

► File a separate application for each return.

OMB No. 1545-1709

- If you are filing for an **Automatic 3-Month Extension, complete only Part I** and check this box . . . . . . . . . ► ☒
- If you are filing for an **Additional (not automatic) 3-Month Extension, complete only Part II** (on page 2 of this form).

**Note:** *Do not complete Part II unless you have already been granted an automatic 3-month extension on a previously filed Form 8868.*

**Part I** **Automatic 3-Month Extension of Time**—Only submit original (no copies needed)

**Note:** *Form 990-T corporations requesting an automatic 6-month extension—check this box and complete Part I only* . . . ► ☐

*All other corporations (including Form 990-C filers) must use Form 7004 to request an extension of time to file income tax returns. Partnerships, REMICs and trusts must use Form 8736 to request an extension of time to file Form 1065, 1066, or 1041.*

| Type or print | Name of Exempt Organization: YORK FOUNDATION | Employer identification number: 31 : 1621645 |
|---|---|---|
| File by the due date for filing your return. See instructions | Number, street, and room or suite no. If a P.O. box, see instructions. 555 GROVE STREET, SUITE #114 | |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions. HERNDON, VA 20170 | |

**Check type of return to be filed** (file a separate application for each return):

☒ Form 990 ☐ Form 990-T (corporation) ☐ Form 4720
☐ Form 990-BL ☐ Form 990-T (sec. 401(a) or 408(a) trust) ☐ Form 5227
☐ Form 990-EZ ☐ Form 990-T (trust other than above) ☐ Form 6069
☐ Form 990-PF ☐ Form 1041-A ☐ Form 8870

- If the organization does **not** have an office or place of business in the United States, check this box . . . . . . . ► ☐
- If this is for a **Group Return,** enter the organization's four digit Group Exemption Number (GEN) ________ . If this is for the **whole** group, check this box ► ☐ . If it is for part of the group, check this box ► ☐ and attach a list with the names and EINs of all members the extension will cover.

**1** I request an automatic 3-month (6-month, for **990-T corporation)** extension of time until AUGUST 15, 2004 to file the exempt organization return for the organization named above. The extension is for the organization's return for:
► ☒ calendar year 2003 or
► ☐ tax year beginning ............ , 20..., and ending ............ , 20...

**2** If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period

**3a** If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions . . . . . $ —

**b** If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit . . . . . $ —

**c** **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions . . . . . $ N/A

## Signature and Verification

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ► [signature] Title ► Manager, Audit & Taxation Date ► 05-14-04

For Paperwork Reduction Act Notice, see Instruction. Cat. No. 27916D Form **8868** (12-2000)

ENVELOPE POSTMARK DATE 6 10 2004

Form 8868 (12-2000) 67

Page 2

- If you are filing for an **Additional (not automatic) 3-Month Extension, complete only Part II** and check this box . . ▶ ☒

**Note:** *Only complete Part II if you have already been granted an automatic 3-month extension on a previously filed Form 8868.*

- If you are filing for an **Automatic 3-Month Extension, complete only Part I** (on page 1).

**Part II** **Additional (not automatic) 3-Month Extension of Time—Must File Original and One Copy.**

| Type or print<br>File by the extended due date for filing the return. See instructions | Name of Exempt Organization<br>YORK FOUNDATION | Employer identification number<br>31 : 1621645 |
|---|---|---|
| | Number, street, and room or suite no. If a P.O. box, see instructions.<br>555 GROVE STREET, SUITE 114 | For IRS use only |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions.<br>HERNDON, VA 20170 | |

**Check type of return to be filed** (File a separate application for each return):

☒ Form 990 ☐ Form 990-EZ ☐ Form 990-T (sec. 401(a) or 408(a) trust) ☐ Form 1041-A ☐ Form 5227 ☐ Form 8870
☐ Form 990-BL ☐ Form 990-PF ☐ Form 990-T (trust other than above) ☐ Form 4720 ☐ Form 6069

**STOP: Do not complete Part II if you were not already granted an automatic 3-month extension on a previously filed Form 8868.**

- If the organization does **not** have an office or place of business in the United States, check this box . . . . . . ▶ ☐
- If this is for a **Group Return,** enter the organization's four digit Group Exemption Number (GEN) ____________ . If this is for the **whole** group, check this box ▶ ☐ . If it is for **part** of the group, check this box ▶ ☐ and attach a list with the names and EINs of all members the extension is for.

4 I request an additional 3-month extension of time until NOVEMBER 15, 2004

5 For calendar year 2003, or other tax year beginning ..................., 20.... and ending ..................., 20....

6 If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period

7 State in detail why you need the extension, time to collect data to file a complete and accurate tax return, that is required.

8a If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions . . . . . . . . . . . . . . . . $ —

b If this application is for Form 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit and any amount paid previously with Form 8868 . . . . . . . . . . . . . . . . . $ —

c **Balance Due.** Subtract line 8b from line 8a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions . . . . . . . . . . . . . . . . . $ —

## Signature and Verification

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ▶ Waseem Zafar Title ▶ Manager, Audit & Taxation Date ▶ 08-09-04

## Notice to Applicant—To Be Completed by the IRS

☑ We **have** approved this application. Please attach this form to the organization's return.

☐ We **have not** approved this application. However, we have granted a 10-day grace period from the later of the date shown below or the due date of the organization's return (including any prior extensions). This grace period is considered to be a valid extension of time for elections otherwise required to be made on a timely return. Please attach this form to the organization's return.

☐ We **have not** approved this application. After considering the reasons stated in item 7, we can[not grant your request for an extension of time] to file. We are not granting a 10-day grace period.

☐ We **cannot consider** this application because it was filed after the due date of the return for [which an extension was requested].

☐ Other ....................................

RECEIVED

EXTENSION APPROVED

AUG 3 1 2004

FIELD DIRECTOR, SUBMISSION PROCESSING, OGDEN

Director _______________ By: _______________

**Alternate Mailing Address** — Enter the address if you want the copy of this application returned to an address different than the one entered above.

| Type or print | Name |
|---|---|
| | Number and street (include suite, room, or apt. no.) Or a P.O. box number |
| | City or town, province or state, and country (including postal or ZIP code) |

Form **990** — **Return of Organization Exempt From Income Tax**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

Department of the Treasury
Internal Revenue Service

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No 1545-0047
**2003**
Open to Public Inspection

A For the 2003 calendar year, or tax year beginning and ending

B Check if applicable: Address change / Name change / Initial return / Final return / Amended return / Application pending

Please use IRS label or print or type. See Specific Instructions.

C Name of organization: SAFA TRUST, INC.

Number and street (or P.O. box if mail is not delivered to street address): 555 GROVE STREET — Room/suite: 114

City or town, state or country, and ZIP + 4: HERNDON, VA 20170

D Employer identification number: 54-1399426

E Telephone number: 703-471-9494

F Accounting method: [ ] Cash [X] Accrual [ ] Other (specify) ▶

• Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ)

H and I are not applicable to section 527 organizations.
H(a) Is this a group return for affiliates? [ ] Yes [X] No
H(b) If "Yes," enter number of affiliates ▶
H(c) Are all affiliates included? N/A [ ] Yes [ ] No (If "No," attach a list.)
H(d) Is this a separate return filed by an organization covered by a group ruling? [ ] Yes [X] No
I Group Exemption Number ▶

G Website: ▶N/A

J Organization type (check only one) ▶ [X] 501(c) ( 3 ) ◀ (insert no) [ ] 4947(a)(1) or [ ] 527

K Check here ▶ [ ] if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS; but if the organization received a Form 990 Package in the mail, it should file a return without financial data. Some states require a complete return

M Check ▶ [ ] if the organization is not required to attach Sch. B (Form 990, 990-EZ, or 990-PF).

L Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 ▶ 6,385,545.

NOV 15 2004 — ENVELOPE POSTMARK DATE

## Part I Revenue, Expenses, and Changes in Net Assets or Fund Balances

| Line | Description | | | Line | Amount |
|---|---|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received: | | | | |
| a | Direct public support | 1a | | | |
| b | Indirect public support | 1b | | | |
| c | Government contributions (grants) | 1c | | | |
| d | Total (add lines 1a through 1c) (cash $ ____ noncash $ ____ ) | | | 1d | 0. |
| 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | | | 2 | |
| 3 | Membership dues and assessments | | | 3 | |
| 4 | Interest on savings and temporary cash investments | | | 4 | 6,654. |
| 5 | Dividends and interest from securities | | | 5 | 5,510,808. |
| 6 a | Gross rents SEE STATEMENT 1 | 6a | 236,399. | | |
| b | Less: rental expenses SEE STATEMENT 2 | 6b | 405,566. | | |
| c | Net rental income or (loss) (subtract line 6b from line 6a) | | | 6c | <169,167.> |
| 7 | Other investment income (describe ▶ ) | | | 7 | |

| Line | Description | (A) Securities | | (B) Other | Line | Amount |
|---|---|---|---|---|---|---|
| 8 a | Gross amount from sales of assets other than inventory | | 8a | 631,684. | | |
| b | Less: cost or other basis and sales expenses | 799,098. | 8b | 898,144. | | |
| c | Gain or (loss) (attach schedule) | <799,098.> | 8c | <266,460.> | | |
| d | Net gain or (loss) (combine line 8c, columns (A) and (B)) | STMT 3 | | STMT 4 | 8d | <1,065,558.> |

| Line | Description | | | Line | Amount |
|---|---|---|---|---|---|
| 9 | Special events and activities (attach schedule). If any amount is from gaming, check here ▶ [ ] | | | | |
| a | Gross revenue (not including $ ____ of contributions reported on line 1a) | 9a | | | |
| b | Less: direct expenses other than fundraising expenses | 9b | | | |
| c | Net income or (loss) from special events (subtract line 9b from line 9a) | | | 9c | |
| 10 a | Gross sales of inventory, less returns and allowances | 10a | | | |
| b | Less: cost of goods sold | 10b | | | |
| c | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) | | | 10c | |
| 11 | Other revenue (from Part VII, line 103) | | | 11 | |
| 12 | Total revenue (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | | | 12 | 4,282,737. |
| 13 | Program services (from line 44, column (B)) | | | 13 | 2,309,680. |
| 14 | Management and general (from line 44, column (C)) | | | 14 | 1,393,908. |
| 15 | Fundraising (from line 44, column (D)) | | | 15 | |
| 16 | Payments to affiliates (attach schedule) | | | 16 | |
| 17 | Total expenses (add lines 16 and 44, column (A)) | | | 17 | 3,703,588. |
| 18 | Excess or (deficit) for the year (subtract line 17 from line 12) | | | 18 | 579,149. |
| 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | | | 19 | 14,875,477. |
| 20 | Other changes in net assets or fund balances (attach explanation) SEE STATEMENT 5 | | | 20 | 10,088,268. |
| 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | | | 21 | 25,542,894. |

Revenue / Expenses / Net Assets

RECEIVED NOV 2 1 2004 (stamp)

SCANNED DEC 1 3 2004

323001 12-17-03 LHA **For Paperwork Reduction Act Notice, see the separate instructions.** Form 990 (2003)

SAFA TRUST, INC. 54-1399426

**Part II Statement of Functional Expenses**

All organizations must complete column (A). Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others.



| *Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I.* | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
|---|---|---|---|---|---|
| 22 Grants and allocations (attach schedule) cash $2309680. noncash $ | 22 | 2,309,680. | 2,309,680. | STATEMENT 7 | |
| 23 Specific assistance to individuals (attach schedule) | 23 | | | | |
| 24 Benefits paid to or for members (attach schedule) | 24 | | | | |
| 25 Compensation of officers, directors, etc. | 25 | 0. | 0. | 0. | 0. |
| 26 Other salaries and wages | 26 | | | | |
| 27 Pension plan contributions | 27 | | | | |
| 28 Other employee benefits | 28 | <16,000.> | | <16,000.> | |
| 29 Payroll taxes | 29 | | | | |
| 30 Professional fundraising fees | 30 | | | | |
| 31 Accounting fees | 31 | | | | |
| 32 Legal fees | 32 | 227,045. | | 227,045. | |
| 33 Supplies | 33 | | | | |
| 34 Telephone | 34 | | | | |
| 35 Postage and shipping | 35 | | | | |
| 36 Occupancy | 36 | | | | |
| 37 Equipment rental and maintenance | 37 | | | | |
| 38 Printing and publications | 38 | | | | |
| 39 Travel | 39 | | | | |
| 40 Conferences, conventions, and meetings | 40 | | | | |
| 41 Interest | 41 | | | | |
| 42 Depreciation, depletion, etc. (attach schedule) | 42 | | | | |
| 43 Other expenses not covered above (itemize): | | | | | |
| a | 43a | | | | |
| b | 43b | | | | |
| c | 43c | | | | |
| d | 43d | | | | |
| e SEE STATEMENT 6 | 43e | 1,182,863. | | 1,182,863. | |
| 44 Total functional expenses (add lines 22 through 43) Organizations completing columns (B)-(D), carry these totals to lines 13-15 | 44 | 3,703,588. | 2,309,680. | 1,393,908. | 0. |

**Joint Costs.** Check ▶ ☐ if you are following SOP 98-2.

Are any joint costs from a combined educational campaign and fundraising solicitation reported in (B) Program services? ▶ ☐ Yes ☒ No

If "Yes," enter (i) the aggregate amount of these joint costs $ ______ ; (ii) the amount allocated to Program services $ ______ ; (iii) the amount allocated to Management and general $ ______ ; and (iv) the amount allocated to Fundraising $ ______

**Part III Statement of Program Service Accomplishments**

What is the organization's primary exempt purpose? ▶

PROMOTE RELIGIOUS, EDUCATIONAL & CULTURAL PROJECTS.

All organizations must describe their exempt purpose achievements in a clear and concise manner. State the number of clients served, publications issued, etc. Discuss achievements that are not measurable. (Section 501(c)(3) and (4) organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others.)

| | Program Service Expenses (Required for 501(c)(3) and (4) orgs., and 4947(a)(1) trusts, but optional for others.) |
|---|---|
| a ASSIST OTHER ORGANIZATIONS IN THEIR EFFORTS TO PROVIDE RELIGIOUS, EDUCATIONAL, CULTURAL AND CHARITABLE ACTIVITIES. AND TO PROVIDE HUMANITARIAN RELIEF. (Grants and allocations $ ) | 2,309,680. |
| b (Grants and allocations $ ) | |
| c (Grants and allocations $ ) | |
| d (Grants and allocations $ ) | |
| e Other program services (attach schedule) (Grants and allocations $ ) | |
| f **Total of Program Service Expenses** (should equal line 44, column (B), Program services) ▶ | 2,309,680. |

Form 990 (2003) SAFA TRUST, INC. 54-1399426 Page 3

## Part IV Balance Sheets

| | Note: *Where required, attached schedules and amounts within the description column should be for end-of-year amounts only.* | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|---|
| Assets | 45 Cash - non-interest-bearing | | | 79,216. | 45 | 1,224,168. |
| | 46 Savings and temporary cash investments | | | | 46 | 1,506,646. |
| | 47 a Accounts receivable | 47a | 339,543. | | | |
| | b Less: allowance for doubtful accounts | 47b | | 342,889. | 47c | 339,543. |
| | 48 a Pledges receivable | 48a | | | | |
| | b Less: allowance for doubtful accounts | 48b | | | 48c | |
| | 49 Grants receivable | | | | 49 | |
| | 50 Receivables from officers, directors, trustees, and key employees | | | | 50 | |
| | 51 a Other notes and loans receivable STMT 8 | 51a | 1,083,120. | | | |
| | b Less: allowance for doubtful accounts | 51b | | 2,102,040. | 51c | 1,083,120. |
| | 52 Inventories for sale or use | | | | 52 | |
| | 53 Prepaid expenses and deferred charges | | | 100. | 53 | 10,618. |
| | 54 Investments - securities STMT 9 ▶ [X] Cost [ ] FMV | | | 8,366,316. | 54 | 15,919,120. |
| | 55 a Investments - land, buildings, and equipment: basis | 55a | 3,197,921. | | | |
| | b Less: accumulated depreciation STMT 10 | 55b | 531,438. | 2,737,814. | 55c | 2,666,483. |
| | 56 Investments - other SEE STATEMENT 11 | | | 2,460,131. | 56 | 2,960,943. |
| | 57 a Land, buildings, and equipment: basis | 57a | | | | |
| | b Less: accumulated depreciation | 57b | | | 57c | |
| | 58 Other assets (describe ▶ ) | | | | 58 | |
| | 59 **Total assets** (add lines 45 through 58) (must equal line 74) | | | 16,088,506. | 59 | 25,710,641. |
| Liabilities | 60 Accounts payable and accrued expenses | | | 57,005. | 60 | 15,500. |
| | 61 Grants payable | | | | 61 | |
| | 62 Deferred revenue | | | | 62 | |
| | 63 Loans from officers, directors, trustees, and key employees | | | | 63 | |
| | 64 a Tax-exempt bond liabilities | | | | 64a | |
| | b Mortgages and other notes payable | | | | 64b | |
| | 65 Other liabilities (describe ▶ SEE STATEMENT 12 ) | | | 1,156,024. | 65 | 152,247. |
| | 66 **Total liabilities** (add lines 60 through 65) | | | 1,213,029. | 66 | 167,747. |
| Net Assets or Fund Balances | **Organizations that follow SFAS 117, check here** ▶ [X] and complete lines 67 through 69 and lines 73 and 74. | | | | | |
| | 67 Unrestricted | | | 13,870,541. | 67 | 24,544,770. |
| | 68 Temporarily restricted | | | 1,004,936. | 68 | 998,124. |
| | 69 Permanently restricted | | | | 69 | |
| | **Organizations that do not follow SFAS 117, check here** ▶ [ ] and complete lines 70 through 74. | | | | | |
| | 70 Capital stock, trust principal, or current funds | | | | 70 | |
| | 71 Paid-in or capital surplus, or land, building, and equipment fund | | | | 71 | |
| | 72 Retained earnings, endowment, accumulated income, or other funds | | | | 72 | |
| | 73 **Total net assets or fund balances** (add lines 67 through 69 **or** lines 70 through 72; column (A) **must** equal line 19; column (B) **must** equal line 21) | | | 14,875,477. | 73 | 25,542,894. |
| | 74 **Total liabilities and net assets / fund balances** (add lines 66 and 73) | | | 16,088,506. | 74 | 25,710,641. |

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization. How the public perceives an organization in such cases may be determined by the information presented on its return. Therefore, please make sure the return is complete and accurate and fully describes, in Part III, the organization's programs and accomplishments.

323021
12-17-03

Form 990 (2003) SAFA TRUST, INC. 54-1399426 Page 4

**Part IV-A Reconciliation of Revenue per Audited Financial Statements with Revenue per Return**

| | | | |
|---|---|---|---|
| a | Total revenue, gains, and other support per audited financial statements | a | 4,282,737. |
| b | Amounts included on line a but not on line 12, Form 990: | | |
| (1) | Net unrealized gains on investments $ | | |
| (2) | Donated services and use of facilities $ | | |
| (3) | Recoveries of prior year grants $ | | |
| (4) | Other (specify): $ | | |
| | Add amounts on lines (1) through (4) | b | 0. |
| c | Line a minus line b | c | 4,282,737. |
| d | Amounts included on line 12, Form 990 but not on line a: | | |
| (1) | Investment expenses not included on line 6b, Form 990 $ | | |
| (2) | Other (specify): $ | | |
| | Add amounts on lines (1) and (2) | d | 0. |
| e | Total revenue per line 12, Form 990 (line c plus line d) | e | 4,282,737. |

**Part IV-B Reconciliation of Expenses per Audited Financial Statements with Expenses per Return**

| | | | |
|---|---|---|---|
| a | Total expenses and losses per audited financial statements | a | 3,703,588. |
| b | Amounts included on line a but not on line 17, Form 990: | | |
| (1) | Donated services and use of facilities $ | | |
| (2) | Prior year adjustments reported on line 20, Form 990 $ | | |
| (3) | Losses reported on line 20, Form 990 $ | | |
| (4) | Other (specify): $ | | |
| | Add amounts on lines (1) through (4) | b | 0. |
| c | Line a minus line b | c | 3,703,588. |
| d | Amounts included on line 17, Form 990 but not on line a: | | |
| (1) | Investment expenses not included on line 6b, Form 990 $ | | |
| (2) | Other (specify): $ | | |
| | Add amounts on lines (1) and (2) | d | 0. |
| e | Total expenses per line 17, Form 990 (line c plus line d) | e | 3,703,588. |

**Part V List of Officers, Directors, Trustees, and Key Employees** (List each one even if not compensated.)

| (A) Name and address | (B) Title and average hours per week devoted to position | (C) Compensation (If not paid, enter -0-) | (D) Contributions to employee benefit plans & deferred compensation | (E) Expense account and other allowances |
|---|---|---|---|---|
| DR. JAMAL BARZINJI<br>11919 SAFA COURT,<br>HERNDON,VA 20170 | DIRECTOR & PRESIDENT<br>2 | 0. | 0. | 0. |
| DR. M. YAQUB MIRZA<br>11922 SAFA COURT,<br>HERNDON, VA 20170 | VICE PRESIDENT<br>5 | 0. | 0. | 0. |
| DR. AHMED TOTONJI<br>305 MARJORIE LANE<br>HERNDON, VA 20170 | DIRECTOR & SECRETARY<br>2 | 0. | 12,170. | 0. |
| DR. HISHAM ALTALIB<br>11776 STRATFORD, HOUSE PLACE# 1403<br>RESTON, VA 20190 | DIRECTOR & TREASURER<br>2 | 0. | 0. | 0. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

75 Did any officer, director, trustee, or key employee receive aggregate compensation of more than $100,000 from your organization and all related organizations, of which more than $10,000 was provided by the related organizations? If "Yes," attach schedule. ☐ Yes ☒ No

323031 12-17-03

## Part VI Other Information

| | | | Yes | No |
|---|---|---|---|---|
| 76 | Did the organization engage in any activity not previously reported to the IRS? If "Yes," attach a detailed description of each activity | 76 | | X |
| 77 | Were any changes made in the organizing or governing documents but not reported to the IRS? If "Yes," attach a conformed copy of the changes. | 77 | | X |
| 78 a | Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? | 78a | | X |
| b | If "Yes," has it filed a tax return on Form 990-T for this year? N/A | 78b | | |
| 79 | Was there a liquidation, dissolution, termination, or substantial contraction during the year? If "Yes," attach a statement | 79 | | X |
| 80 a | Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization? | 80a | X | |
| b | If "Yes," enter the name of the organization ▶ SEE STATEMENT 13 and check whether it is ☐ exempt or ☐ nonexempt. | | | |
| 81 a | Enter direct or indirect political expenditures. See line 81 instructions — 81a: 0. | | | |
| b | Did the organization file Form 1120-POL for this year? | 81b | | X |
| 82 a | Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value? | 82a | | X |
| b | If "Yes," you may indicate the value of these items here. Do not include this amount as revenue in Part I or as an expense in Part II. (See instructions in Part III.) — 82b: N/A | | | |
| 83 a | Did the organization comply with the public inspection requirements for returns and exemption applications? | 83a | X | |
| b | Did the organization comply with the disclosure requirements relating to quid pro quo contributions? | 83b | X | |
| 84 a | Did the organization solicit any contributions or gifts that were not tax deductible? | 84a | | X |
| b | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? N/A | 84b | | |
| 85 | *501(c)(4), (5), or (6) organizations.* a Were substantially all dues nondeductible by members? N/A | 85a | | |
| b | Did the organization make only in-house lobbying expenditures of $2,000 or less? N/A | 85b | | |
| | If "Yes" was answered to either 85a or 85b, **do not** complete 85c through 85h below unless the organization received a waiver for proxy tax owed for the prior year. | | | |
| c | Dues, assessments, and similar amounts from members — 85c: N/A | | | |
| d | Section 162(e) lobbying and political expenditures — 85d: N/A | | | |
| e | Aggregate nondeductible amount of section 6033(e)(1)(A) dues notices — 85e: N/A | | | |
| f | Taxable amount of lobbying and political expenditures (line 85d less 85e) — 85f: N/A | | | |
| g | Does the organization elect to pay the section 6033(e) tax on the amount on line 85f? N/A | 85g | | |
| h | If section 6033(e)(1)(A) dues notices were sent, does the organization agree to add the amount on line 85f to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the following tax year? N/A | 85h | | |
| 86 | *501(c)(7) organizations.* Enter: a Initiation fees and capital contributions included on line 12 — 86a: N/A | | | |
| b | Gross receipts, included on line 12, for public use of club facilities — 86b: N/A | | | |
| 87 | *501(c)(12) organizations.* Enter: a Gross income from members or shareholders — 87a: N/A | | | |
| b | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) — 87b: N/A | | | |
| 88 | At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership, or an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? If "Yes," complete Part IX | 88 | X | |
| 89 a | *501(c)(3) organizations.* Enter: Amount of tax imposed on the organization during the year under: section 4911 ▶ 0. ; section 4912 ▶ 0. ; section 4955 ▶ 0. | | | |
| b | *501(c)(3) and 501(c)(4) organizations.* Did the organization engage in any section 4958 excess benefit transaction during the year or did it become aware of an excess benefit transaction from a prior year? If "Yes," attach a statement explaining each transaction | 89b | | X |
| c | Enter: Amount of tax imposed on the organization managers or disqualified persons during the year under sections 4912, 4955, and 4958 ▶ 0. | | | |
| d | Enter: Amount of tax on line 89c, above, reimbursed by the organization ▶ 0. | | | |

90 a List the states with which a copy of this return is filed ▶ NONE

b Number of employees employed in the pay period that includes March 12, 2003 — 90b: 0

91 The books are in care of ▶ AMAL BEVERLY HASSAN, ACCOUNTANT Telephone no. ▶ 703-471-9494

Located at ▶ 555 GROVE STREET, HERNDON, VA ZIP + 4 ▶ 20170

92 *Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of* **Form 1041**- Check here ▶ ☐
and enter the amount of tax-exempt interest received or accrued during the tax year ▶ 92 N/A

Form 990 (2003) SAFA TRUST, INC. 54-1399426 Page 6

**Part VII** **Analysis of Income-Producing Activities** (See page 33 of the instructions.)

| Note: *Enter gross amounts unless otherwise indicated* | Unrelated business income | | Excluded by section 512, 513, or 514 | | (E) |
|---|---|---|---|---|---|
| | (A) Business code | (B) Amount | (C) Exclusion code | (D) Amount | Related or exempt function income |
| 93 Program service revenue: | | | | | |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| f Medicare/Medicaid payments | | | | | |
| g Fees and contracts from government agencies | | | | | |
| 94 Membership dues and assessments | | | | | |
| 95 Interest on savings and temporary cash investments | | | 14 | 6,654. | |
| 96 Dividends and interest from securities | | | 14 | 5,510,808. | |
| 97 Net rental income or (loss) from real estate: | | | | | |
| a debt-financed property | | | | | |
| b not debt-financed property | | | 16 | <169,167.> | |
| 98 Net rental income or (loss) from personal property | | | | | |
| 99 Other investment income | | | | | |
| 100 Gain or (loss) from sales of assets other than inventory | | | 18 | <1,065,558.> | |
| 101 Net income or (loss) from special events | | | | | |
| 102 Gross profit or (loss) from sales of inventory | | | | | |
| 103 Other revenue: | | | | | |
| a | | | | | |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| 104 Subtotal (add columns (B), (D), and (E)) | | 0. | | 4,282,737. | 0. |

105 **Total** (add line 104, columns (B), (D), and (E)) ▶ 4,282,737.

Note: *Line 105 plus line 1d, Part I, should equal the amount on line 12, Part I.*

**Part VIII** **Relationship of Activities to the Accomplishment of Exempt Purposes** (See page 34 of the instructions.)

| Line No ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes). |
|---|---|
| | |
| | |
| | |
| | |

**Part IX** **Information Regarding Taxable Subsidiaries and Disregarded Entities** (See page 34 of the instructions.)

| (A) Name, address, and EIN of corporation, partnership, or disregarded entity | (B) Percentage of ownership interest | (C) Nature of activities | (D) Total income | (E) End-of-year assets |
|---|---|---|---|---|
| SEE STATEMENT 14 | % | | | |
| | % | | | |
| | % | | | |
| | % | [redacted] | | |

**Part X** **Information Regarding Transfers Associated** [redacted]

(a) Did the organization, during the year, receive any funds, directly or indirectly [redacted]

(b) Did the organization, during the year, pay premiums, directly or indirectly, or [redacted]

Note: *If "Yes" to (b), file Form 8870 and Form 4720 (see instructions).*

Please Sign Here — Under penalties of perjury, I declare that I have examined this return, including acc[redacted] correct, and complete Declaration of preparer (other than officer) is based on all inf[redacted]

▶ Signature of officer Date [redacted]

Paid Preparer's Use Only — Preparer's signature ▶ [signature] [redacted]

Firm's name (or yours if self-employed), address, and ZIP + 4 ▶ RICHARD H CHAMPION
30 TYSON DRIVE
FAIR HAVEN, NJ 07704 [redacted]

323161
12-17-03

**SCHEDULE A** (Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Organization Exempt Under Section 501(c)(3)

(Except Private Foundation) and Section 501(e), 501(f), 501(k), 501(n), or Section 4947(a)(1) Nonexempt Charitable Trust

**Supplementary Information-(See separate instructions.)**

▶ MUST be completed by the above organizations and attached to their Form 990 or 990-EZ

OMB No 1545-0047

**2003**

| Name of the organization | Employer identification number |
|---|---|
| SAFA TRUST, INC. | 54 1399426 |

**Part I** **Compensation of the Five Highest Paid Employees Other Than Officers, Directors, and Trustees**
(See page 1 of the instructions. List each one. If there are none, enter "None.")

| (a) Name and address of each employee paid more than $50,000 | (b) Title and average hours per week devoted to position | (c) Compensation | (d) Contributions to employee benefit plans & deferred compensation | (e) Expense account and other allowances |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Total number of other employees paid over $50,000 ▶ | 0 | | | |

**Part II** **Compensation of the Five Highest Paid Independent Contractors for Professional Services**
(See page 2 of the instructions. List each one (whether individuals or firms). If there are none, enter "None.")

| (a) Name and address of each independent contractor paid more than $50,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |
| | | |
| Total number of others receiving over $50,000 for professional services ▶ | 0 | |

**Part III Statements About Activities** (See page 2 of the instructions.)

| | | | Yes | No |
|---|---|---|---|---|
| 1 | During the year, has the organization attempted to influence national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum? If "Yes," enter the total expenses paid or incurred in connection with the lobbying activities ▶ $ ______ $ ______ (Must equal amounts on line 38, Part VI-A, or line i of Part VI-B.) | 1 | | X |
| | Organizations that made an election under section 501(h) by filing Form 5768 must complete Part VI-A. Other organizations checking "Yes," must complete Part VI-B AND attach a statement giving a detailed description of the lobbying activities. | | | |
| 2 | During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any substantial contributors, trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary? *(If the answer to any question is "Yes," attach a detailed statement explaining the transactions.)* | | | |
| a | Sale, exchange, or leasing of property? | 2a | | X |
| b | Lending of money or other extension of credit? | 2b | | X |
| c | Furnishing of goods, services, or facilities? | 2c | | X |
| d | Payment of compensation (or payment or reimbursement of expenses if more than $1,000)? | 2d | | X |
| e | Transfer of any part of its income or assets? | 2e | | X |
| 3 a | Do you make grants for scholarships, fellowships, student loans, etc.? (If "Yes," attach an explanation of how you determine that recipients qualify to receive payments.) | 3a | | X |
| b | Do you have a section 403(b) annuity plan for your employees? | 3b | | X |
| 4 | Did you maintain any separate account for participating donors where donors have the right to provide advice on the use or distribution of funds? | 4 | | X |

**Part IV Reason for Non-Private Foundation Status** (See pages 3 through 6 of the instructions.)

The organization is not a private foundation because it is: (Please check only **ONE** applicable box.)

5 ☐ A church, convention of churches, or association of churches. Section 170(b)(1)(A)(i).

6 ☐ A school. Section 170(b)(1)(A)(ii). (Also complete Part V.)

7 ☐ A hospital or a cooperative hospital service organization. Section 170(b)(1)(A)(iii).

8 ☐ A Federal, state, or local government or governmental unit. Section 170(b)(1)(A)(v).

9 ☐ A medical research organization operated in conjunction with a hospital. Section 170(b)(1)(A)(iii). **Enter the hospital's name, city, and state** ▶ ______

10 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit. Section 170(b)(1)(A)(iv). (Also complete the **Support Schedule** in Part IV-A.)

11a ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

11b ☐ A community trust. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

12 ☐ An organization that normally receives: **(1) more than 33 1/3%** of its support from contributions, membership fees, and gross receipts from activities related to its charitable, etc., functions - subject to certain exceptions, and **(2) no more than 33 1/3%** of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See section 509(a)(2). (Also complete the **Support Schedule** in Part IV-A.)

13 ☐ An organization that is not controlled by any disqualified persons (other than foundation managers) and supports organizations described in: **(1)** lines 5 through 12 above; or **(2)** section 501(c)(4), (5), or (6), if they meet the test of section 509(a)(2). (See section 509(a)(3).)

Provide the following information about the supported organizations. (See page 5 of the instructions.)

| (a) Name(s) of supported organization(s) | (b) Line number from above |
|---|---|
| | |
| | |
| | |

14 ☐ An organization organized and operated to test for public safety. Section 509(a)(4). (See page 6 of the instructions.)

**Part IV-A** **Support Schedule** (Complete only if you checked a box on line 10, 11, or 12.) **Use cash method of accounting.**
**Note:** *You may use the worksheet in the instructions for converting from the accrual to the cash method of accounting.*

| Calendar year (or fiscal year beginning in) ▶ | (a) 2002 | (b) 2001 | (c) 2000 | (d) 1999 | (e) Total |
|---|---|---|---|---|---|
| 15 Gifts, grants, and contributions received. (Do not include unusual grants. See line 28.) | | | 47,290. | 1,759,025. | 1,806,315. |
| 16 Membership fees received | | | | | |
| 17 Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is related to the organization's charitable, etc., purpose | | | | | |
| 18 Gross income from interest, dividends, amounts received from payments on securities loans (section 512(a)(5)), rents, royalties, and unrelated business taxable income (less section 511 taxes) from businesses acquired by the organization after June 30, 1975 | 4,207,767. | 1,630,128. | 955,763. | 3,026,828. | 9,820,486. |
| 19 Net income from unrelated business activities not included in line 18 | | | | | |
| 20 Tax revenues levied for the organization's benefit and either paid to it or expended on its behalf | | | | | |
| 21 The value of services or facilities furnished to the organization by a governmental unit without charge. Do not include the value of services or facilities generally furnished to the public without charge | | | | | |
| 22 Other income. Attach a schedule. Do not include gain or (loss) from sale of capital assets | | | | | |
| 23 Total of lines 15 through 22 | 4,207,767. | 1,630,128. | 1,003,053. | 4,785,853. | 11,626,801. |
| 24 Line 23 minus line 17 | 4,207,767. | 1,630,128. | 1,003,053. | 4,785,853. | 11,626,801. |
| 25 Enter 1% of line 23 | 42,078. | 16,301. | 10,031. | 47,859. | |

26 **Organizations described on lines 10 or 11:** **a** Enter 2% of amount in column (e), line 24 ▶ **26a** 232,536.

**b** Prepare a list for your records to show the name of and amount contributed by each person (other than a governmental unit or publicly supported organization) whose total gifts for 1999 through 2002 exceeded the amount shown in line 26a. **Do not file this list with your return** Enter the total of all these excess amounts ▶ **26b** 0.

**c** Total support for section 509(a)(1) test: Enter line 24, column (e) ▶ **26c** 11,626,801.

**d** Add: Amounts from column (e) for lines: 18 9,820,486. 19 ______ 22 ______ 26b ______ ▶ **26d** 9,820,486.

**e** Public support (line 26c minus line 26d total) ▶ **26e** 1,806,315.

**f** **Public support percentage (line 26e (numerator) divided by line 26c (denominator))** ▶ **26f** 15.5358%

27 **Organizations described on line 12:** **a** For amounts included in lines 15, 16, and 17 that were received from a "disqualified person," prepare a list for your records to show the name of, and total amounts received in each year from, each "disqualified person." **Do not file this list with your return.** Enter the sum of such amounts for each year: N/A

(2002) (2001) (2000) (1999)

**b** For any amount included in line 17 that was received from each person (other than "disqualified persons"), prepare a list for your records to show the name of, and amount received for each year, that was more than the **larger** of **(1)** the amount on line 25 for the year or **(2)** $5,000. (Include in the list organizations described in lines 5 through 11, as well as individuals.) **Do not file this list with your return.** After computing the difference between the amount received and the larger amount described in **(1)** or **(2)**, enter the sum of these differences (the excess amounts) for each year: N/A

(2002) (2001) (2000) (1999)

**c** Add: Amounts from column (e) for lines: 15 ______ 16 ______ 17 ______ 20 ______ 21 ______ ▶ **27c** N/A

**d** Add: Line 27a total ______ and line 27b total ______ ▶ **27d** N/A

**e** Public support (line 27c total minus line 27d total) ▶ **27e** N/A

**f** Total support for section 509(a)(2) test: Enter amount on line 23, column (e) ▶ **27f** N/A

**g** **Public support percentage (line 27e (numerator) divided by line 27f (denominator))** ▶ **27g** N/A %

**h** **Investment income percentage (line 18, column (e) (numerator) divided by line 27f (denominator))** ▶ **27h** N/A %

28 **Unusual Grants:** For an organization described in line 10, 11, or 12 that received any unusual grants during 1999 through 2002, prepare a list for your records to show, for each year, the name of the contributor, the date and amount of the grant, and a brief description of the nature of the grant. **Do not file this list with your return** Do not include these grants in line 15.

NONE

**Part V** **Private School Questionnaire** (See page 7 of the instructions.) N/A

**(To be completed ONLY by schools that checked the box on line 6 in Part IV)**

| | | | Yes | No |
|---|---|---|---|---|
| 29 | Does the organization have a racially nondiscriminatory policy toward students by statement in its charter, bylaws, other governing instrument, or in a resolution of its governing body? | 29 | | |
| 30 | Does the organization include a statement of its racially nondiscriminatory policy toward students in all its brochures, catalogues, and other written communications with the public dealing with student admissions, programs, and scholarships? | 30 | | |
| 31 | Has the organization publicized its racially nondiscriminatory policy through newspaper or broadcast media during the period of solicitation for students, or during the registration period if it has no solicitation program, in a way that makes the policy known to all parts of the general community it serves? | 31 | | |
| | If "Yes," please describe; if "No," please explain. (If you need more space, attach a separate statement.) | | | |
| 32 | Does the organization maintain the following: | | | |
| a | Records indicating the racial composition of the student body, faculty, and administrative staff? | 32a | | |
| b | Records documenting that scholarships and other financial assistance are awarded on a racially nondiscriminatory basis? | 32b | | |
| c | Copies of all catalogues, brochures, announcements, and other written communications to the public dealing with student admissions, programs, and scholarships? | 32c | | |
| d | Copies of all material used by the organization or on its behalf to solicit contributions? | 32d | | |
| | If you answered "No" to any of the above, please explain. (If you need more space, attach a separate statement.) | | | |
| 33 | Does the organization discriminate by race in any way with respect to: | | | |
| a | Students' rights or privileges? | 33a | | |
| b | Admissions policies? | 33b | | |
| c | Employment of faculty or administrative staff? | 33c | | |
| d | Scholarships or other financial assistance? | 33d | | |
| e | Educational policies? | 33e | | |
| f | Use of facilities? | 33f | | |
| g | Athletic programs? | 33g | | |
| h | Other extracurricular activities? | 33h | | |
| | If you answered "Yes" to any of the above, please explain. (If you need more space, attach a separate statement.) | | | |
| 34 a | Does the organization receive any financial aid or assistance from a governmental agency? | 34a | | |
| b | Has the organization's right to such aid ever been revoked or suspended? | 34b | | |
| | If you answered "Yes" to either 34a or b, please explain using an attached statement. | | | |
| 35 | Does the organization certify that it has complied with the applicable requirements of sections 4.01 through 4.05 of Rev. Proc. 75-50, 1975-2 C.B. 587, covering racial nondiscrimination? If "No," attach an explanation | 35 | | |

**Part VI-A Lobbying Expenditures by Electing Public Charities** (See page 9 of the instructions.) N/A

(To be completed ONLY by an eligible organization that filed Form 5768)

Check ▶ a ☐ if the organization belongs to an affiliated group. Check ▶ b ☐ if you checked "a" and "limited control" provisions apply.

| Limits on Lobbying Expenditures (The term "expenditures" means amounts paid or incurred.) | | (a) Affiliated group totals | (b) To be completed for ALL electing organizations |
|---|---|---|---|
| | | N/A | |
| 36 Total lobbying expenditures to influence public opinion (grassroots lobbying) | 36 | | |
| 37 Total lobbying expenditures to influence a legislative body (direct lobbying) | 37 | | |
| 38 Total lobbying expenditures (add lines 36 and 37) | 38 | | |
| 39 Other exempt purpose expenditures | 39 | | |
| 40 Total exempt purpose expenditures (add lines 38 and 39) | 40 | | |
| 41 Lobbying nontaxable amount. Enter the amount from the following table - | | | |
| If the amount on line 40 is - / The lobbying nontaxable amount is - | | | |
| Not over $500,000 / 20% of the amount on line 40 | | | |
| Over $500,000 but not over $1,000,000 / $100,000 plus 15% of the excess over $500,000 | | | |
| Over $1,000,000 but not over $1,500,000 / $175,000 plus 10% of the excess over $1,000,000 | 41 | | |
| Over $1,500,000 but not over $17,000,000 / $225,000 plus 5% of the excess over $1,500,000 | | | |
| Over $17,000,000 / $1,000,000 | | | |
| 42 Grassroots nontaxable amount (enter 25% of line 41) | 42 | | |
| 43 Subtract line 42 from line 36. Enter -0- if line 42 is more than line 36 | 43 | | |
| 44 Subtract line 41 from line 38. Enter -0- if line 41 is more than line 38 | 44 | | |

**Caution:** *If there is an amount on either line 43 or line 44, you must file Form 4720*

**4-Year Averaging Period Under Section 501(h)**

(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the instructions for lines 45 through 50 on page 11 of the instructions.)

**Lobbying Expenditures During 4-Year Averaging Period** N/A

| Calendar year (or fiscal year beginning in) ▶ | (a) 2003 | (b) 2002 | (c) 2001 | (d) 2000 | (e) Total |
|---|---|---|---|---|---|
| 45 Lobbying nontaxable amount | | | | | 0. |
| 46 Lobbying ceiling amount (150% of line 45(e)) | | | | | 0. |
| 47 Total lobbying expenditures | | | | | 0. |
| 48 Grassroots nontaxable amount | | | | | 0. |
| 49 Grassroots ceiling amount (150% of line 48(e)) | | | | | 0. |
| 50 Grassroots lobbying expenditures | | | | | 0. |

**Part VI-B Lobbying Activity by Nonelecting Public Charities**

(For reporting only by organizations that did not complete Part VI-A) (See page 12 of the instructions.) N/A

| During the year, did the organization attempt to influence national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | Yes | No | Amount |
|---|---|---|---|
| a Volunteers | | | |
| b Paid staff or management (Include compensation in expenses reported on lines c through h.) | | | |
| c Media advertisements | | | |
| d Mailings to members, legislators, or the public | | | |
| e Publications, or published or broadcast statements | | | |
| f Grants to other organizations for lobbying purposes | | | |
| g Direct contact with legislators, their staffs, government officials, or a legislative body | | | |
| h Rallies, demonstrations, seminars, conventions, speeches, lectures, or any other means | | | |
| i Total lobbying expenditures (Add lines c through h.) | | | 0. |

If "Yes" to any of the above, also attach a statement giving a detailed description of the lobbying activities.

**Part VII Information Regarding Transfers To and Transactions and Relationships With Noncharitable Exempt Organizations** (See page 12 of the instructions.)

51 Did the reporting organization directly or indirectly engage in any of the following with any other organization described in section 501(c) of the Code (other than section 501(c)(3) organizations) or in section 527, relating to political organizations?

| | | Yes | No |
|---|---|---|---|
| a Transfers from the reporting organization to a noncharitable exempt organization of: | | | |
| (i) Cash | 51a(i) | | X |
| (ii) Other assets | a(ii) | | X |
| b Other transactions: | | | |
| (i) Sales or exchanges of assets with a noncharitable exempt organization | b(i) | | X |
| (ii) Purchases of assets from a noncharitable exempt organization | b(ii) | | X |
| (iii) Rental of facilities, equipment, or other assets | b(iii) | | X |
| (iv) Reimbursement arrangements | b(iv) | | X |
| (v) Loans or loan guarantees | b(v) | | X |
| (vi) Performance of services or membership or fundraising solicitations | b(vi) | | X |
| c Sharing of facilities, equipment, mailing lists, other assets, or paid employees | c | | X |

d If the answer to any of the above is "Yes," complete the following schedule. Column (b) should always show the fair market value of the goods, other assets, or services given by the reporting organization. If the organization received less than fair market value in any transaction or sharing arrangement, show in column (d) the value of the goods, other assets, or services received: N/A

| (a) Line no. | (b) Amount involved | (c) Name of noncharitable exempt organization | (d) Description of transfers, transactions, and sharing arrangements |
|---|---|---|---|
| | | | |

52 a Is the organization directly or indirectly affiliated with, or related to, one or more tax-exempt organizations described in section 501(c) of the Code (other than section 501(c)(3)) or in section 527? ▶ ☐ Yes ☒ No

b If "Yes," complete the following schedule: N/A

| (a) Name of organization | (b) Type of organization | (c) Description of relationship |
|---|---|---|
| | | |

SAFA TRUST, INC. 54-1399426

| FORM 990 | RENTAL INCOME | STATEMENT 1 |
|---|---|---|

| KIND AND LOCATION OF PROPERTY | ACTIVITY NUMBER | GROSS RENTAL INCOME |
|---|---|---|
| RENTAL INCOME GEORGIA WAREHOUSE | 2 | 15,300. |
| RENTAL INCOME 500 GROVE STREET | 3 | 183,332. |
| RENTAL INCOME 746 WALKER ST, GREAT FALL | 4 | 37,767. |
| TOTAL TO FORM 990, PART I, LINE 6A | | 236,399. |

| FORM 990 | RENTAL EXPENSES | STATEMENT 2 |
|---|---|---|

| DESCRIPTION | | ACTIVITY NUMBER | AMOUNT | TOTAL |
|---|---|---|---|---|
| DEPRECIATION | | | 93,917. | |
| GEORGIA WAREHOUSE | | | 3,116. | |
| | - SUBTOTAL - | 2 | | 97,033. |
| 500 GROVE STREET | | | 287,421. | |
| | - SUBTOTAL - | 3 | | 287,421. |
| 746 WALKER ST, GREAT FALL | | | 21,112. | |
| | - SUBTOTAL - | 4 | | 21,112. |
| TOTAL TO FORM 990, PART I, LINE 6B | | | | 405,566. |

SAFA TRUST, INC. 54-1399426

FORM 990 GAIN (LOSS) FROM NON-PUBLICLY TRADED SECURITIES STATEMENT 3

| DESCRIPTION | DATE ACQUIRED | DATE SOLD | METHOD ACQUIRED | |
|---|---|---|---|---|
| PACKETSTREAM | VARIOUS | 12/31/03 | PURCHASED | |
| NAME OF BUYER | GROSS SALES PRICE | COST OR OTHER BASIS | EXPENSE OF SALE | NET GAIN OR (LOSS) |
| | 0. | 530,800. | 0. | <530,800.> |

| DESCRIPTION | DATE ACQUIRED | DATE SOLD | METHOD ACQUIRED | |
|---|---|---|---|---|
| SILICON VALLEY VENTURE FUND-K1 | 10/30/99 | 12/31/03 | PURCHASED | |
| NAME OF BUYER | GROSS SALES PRICE | COST OR OTHER BASIS | EXPENSE OF SALE | NET GAIN OR (LOSS) |
| | 0. | 40,000. | 0. | <40,000.> |

| DESCRIPTION | DATE ACQUIRED | DATE SOLD | METHOD ACQUIRED | |
|---|---|---|---|---|
| PACKETSTREAM, LLC | 12/31/02 | 12/31/03 | PURCHASED | |
| NAME OF BUYER | GROSS SALES PRICE | COST OR OTHER BASIS | EXPENSE OF SALE | NET GAIN OR (LOSS) |
| | 0. | 70,000. | 0. | <70,000.> |

| DESCRIPTION | DATE ACQUIRED | DATE SOLD | METHOD ACQUIRED | |
|---|---|---|---|---|
| CHESAPEAKE & STERLING PFC - K1 | VARIOUS | 12/31/03 | PURCHASED | |
| NAME OF BUYER | GROSS SALES PRICE | COST OR OTHER BASIS | EXPENSE OF SALE | NET GAIN OR (LOSS) |
| | 0. | 158,298. | 0. | <158,298.> |
| TOTAL TO FM 990, PART I, LN 8 | | 799,098. | 0. | <799,098.> |

SAFA TRUST, INC. 54-1399426

FORM 990 GAIN (LOSS) FROM SALE OF OTHER ASSETS STATEMENT 4

| DESCRIPTION | DATE ACQUIRED | DATE SOLD | METHOD ACQUIRED |
|---|---|---|---|
| SURTI- SALE OF HOUSE - | 01/13/95 | 09/02/03 | PURCHASED |

| NAME OF BUYER | GROSS SALES PRICE | COST OR OTHER BASIS | EXPENSE OF SALE | DEPREC | NET GAIN OR (LOSS) |
|---|---|---|---|---|---|
| MR.SURTI | 279,601. | 286,082. | 0. | 0. | <6,481.> |

| DESCRIPTION | DATE ACQUIRED | DATE SOLD | METHOD ACQUIRED |
|---|---|---|---|
| MILL BRANCH HOLDING LLC-LAND SALE | 12/31/99 | 05/13/03 | DONATED |

| NAME OF BUYER | GROSS SALES PRICE | COST OR OTHER BASIS | EXPENSE OF SALE | DEPREC | NET GAIN OR (LOSS) |
|---|---|---|---|---|---|
| F.F. SUMMERS | 352,083. | 612,062. | 0. | 0. | <259,979.> |
| TO FM 990, PART I, LN 8 | 631,684. | 898,144. | 0. | 0. | <266,460.> |

FORM 990 OTHER CHANGES IN NET ASSETS OR FUND BALANCES STATEMENT 5

| DESCRIPTION | AMOUNT |
|---|---|
| UNREALIZED GAINS OR (LOSSES) ON INVESTMENTS | 10,088,268. |
| DECREASE IN RESTRICTED FUND BALANCE | |
| TOTAL TO FORM 990, PART I, LINE 20 | 10,088,268. |

SAFA TRUST, INC. 54-1399426

FORM 990 OTHER EXPENSES STATEMENT 6

| DESCRIPTION | (A) TOTAL | (B) PROGRAM SERVICES | (C) MANAGEMENT AND GENERAL | (D) FUNDRAISING |
|---|---|---|---|---|
| ACCOUNTING & MANAGEMENT FEE | 89,912. | | 89,912. | |
| BANK CHARGES & INVESTMENT EXPENSE | 5,223. | | 5,223. | |
| BUSINESS LICENCES | 314. | | 314. | |
| MISC. EXPENSE | 3. | | 3. | |
| DUES & SUBSCRIPTION | 100. | | 100. | |
| AUDIT & TAX FEES ( 3 YEAR AUDIT ACCRU) | 21,500. | | 21,500. | |
| MEALS | 133. | | 133. | |
| HOSPITALITIES | 115. | | 115. | |
| TRAVEL EXPENSE | 4. | | 4. | |
| LOSS ON INVESTMENTS-SALES OF ASSETS & NON | 1,065,559. | | 1,065,559. | |
| TOTAL TO FM 990, LN 43 | 1,182,863. | | 1,182,863. | |

FORM 990 CASH GRANTS AND ALLOCATIONS STATEMENT 7

| CLASSIFICATION | DONEE'S NAME | DONEE'S ADDRESS | DONEE'S RELATIONSHIP | AMOUNT |
|---|---|---|---|---|
| EDUCATIONAL RESEARCH | INTL INST OF ISLAMIC THOUGHT | 500 GROVE ST, HERNDON,VA 20170 | AFFILIATE | 2100000. |
| EDUCATION, RESEARCH | YORK FOUNDATION | 555 GROVE ST, HERNDON, VA 20170 | AFFILIATE | 100,000. |
| PROGRAM ASSISTANCE/EDUCATIONAL | ALL DULLES AREA MUSLIM SOCIETY | 46903 SUGARLAND ROAD, STERLING VA 20164 | NONE | 42,700. |
| SCHOLARSHIP/GRNTS | GRADUATE SCHOOL OF ISLAMIC AND SOCI | 45150 RUSSELL BRANCH PARKWAY, SUITE 303,ASHBURN, | AFFILIATE | 55,000. |
| EDUCATION PROGRAM | WETA | P.O. BOX 96100, WASHINGTON, D.C. 20090 | NONE | 1,000. |
| SCHOLARSHIP/GR ...S/TUITION ...SISTANCE | THE GEORGE WASHINGTON UNIV-RAIS MAZ | 1614 RICHENBECHER RD #F ESSEX MD 21221 | NONE | 3,760. |

| | | | | |
|---|---|---|---|---|
| PROGRAM ASSISTANCE/EDU ATIONAL | AMNESTY INTERNATIONAL USA | 322 EIGHTH AVENUE, NEW YORK, NY 1001 | NONE | 350. |
| PROGRAM ASSISTANCE/HUM NITARIAN | ISNA DEVELOPMENT FOUNDATION | 6555 SOUTH COUNTY RD, 750 EAST, PLAINFIELD, IN | NONE | 1,000. |
| PROGRAM ASSISTANCE/HUM NITARIAN | VARIOUS- $300 OR UNDER | | NONE | 550. |
| PROGRAM ASSISTANCE/EDU ATIONAL | IQRA INTERNATIONAL EDUCATIONAL FOUN | 7450 SKOKIE BOULEVARD, SKOKIE, ILLINOIS 60077 | NONE | 1,000. |
| PROGRAM ASSISTANCE/HUM NITARIAN | AMERICAN MUSLIM COUNCIL | 1212 NEW YORK AVE. NW. SUITE 400 WASHINTION, DC | NONE | 2,320. |
| PROGRAM ASSISTANCE/HUM NITARIAN/SOCIA | FAITH | 500 GROVE ST, HERNDON,VA 20170 | NONE | 2,000. |

TOTAL INCLUDED ON FORM 990, PART II, LINE 22 2309680.

SAFA TRUST, INC. 54-1399426

FORM 990 OTHER NOTES AND LOANS REPORTED SEPARATELY STATEMENT 8

| BORROWER'S NAME | TERMS OF REPAYMENT |
|---|---|
| TAURN SURTI, TN | DEMAND |

| DATE OF NOTE | MATURITY DATE | ORIGINAL LOAN AMOUNT | INTEREST RATE | FMV OF CONSIDERATION |
|---|---|---|---|---|
| 06/01/93 | 06/01/03 | 411,000. | 7.25% | 0. |

| SECURITY PROVIDED BY BORROWER | PURPOSE OF LOAN |
|---|---|
| MORTGAGE | INVESTMENT |

| RELATIONSHIP OF BORROWER | DESCRIPTION OF CONSIDERATION | DOUBTFUL ACCT ALLOWANCE | BALANCE DUE |
|---|---|---|---|
| NONE | | 0. | 0. |

| BORROWER'S NAME | TERMS OF REPAYMENT |
|---|---|
| GROVE CORPORATE, INC. | DEMAND |

| DATE OF NOTE | MATURITY DATE | ORIGINAL LOAN AMOUNT | INTEREST RATE | FMV OF CONSIDERATION |
|---|---|---|---|---|
| 12/01/97 | 12/31/00 | 263,000. | .00% | 0. |

| SECURITY PROVIDED BY BORROWER | PURPOSE OF LOAN |
|---|---|
| NONE | LAND DEVELOPMENT |

| RELATIONSHIP OF BORROWER | DESCRIPTION OF CONSIDERATION | DOUBTFUL ACCT ALLOWANCE | BALANCE DUE |
|---|---|---|---|
| WHOLLY OWNED SUBSIDIARY | | 0. | 175,000. |

SAFA TRUST, INC. 54-1399426

| BORROWER'S NAME | TERMS OF REPAYMENT | | | |
|---|---|---|---|---|
| RESTON INVESTMENT, INC. | DEMAND | | | |

| DATE OF NOTE | MATURITY DATE | ORIGINAL LOAN AMOUNT | INTEREST RATE | FMV OF CONSIDERATION |
|---|---|---|---|---|
| 05/01/99 | 12/31/00 | 900,000. | .00% | 0. |

| SECURITY PROVIDED BY BORROWER | PURPOSE OF LOAN |
|---|---|
| NONE | WORKING CAPITAL |

| RELATIONSHIP OF BORROWER | DESCRIPTION OF CONSIDERATION | DOUBTFUL ACCT ALLOWANCE | BALANCE DUE |
|---|---|---|---|
| WHOLLY OWNED SUBSIDIARY | | 0. | 558,120. |

| BORROWER'S NAME | TERMS OF REPAYMENT |
|---|---|
| STERLING INVESTMENT GROUP (SIG) | DEMAND |

| DATE OF NOTE | MATURITY DATE | ORIGINAL LOAN AMOUNT | INTEREST RATE | FMV OF CONSIDERATION |
|---|---|---|---|---|
| 29/01 | | 350,000. | .00% | 0. |

| SECURITY PROVIDED BY BORROWER | PURPOSE OF LOAN |
|---|---|
| NONE | INVESTMENT |

| RELATIONSHIP OF BORROWER | DESCRIPTION OF CONSIDERATION | DOUBTFUL ACCT ALLOWANCE | BALANCE DUE |
|---|---|---|---|
| | | 0. | 350,000. |

| | | |
|---|---|---|
| TOTALS INCLUDED ON FORM 990, PART IV, LINE 51 | 0. | 1,083,120. |

SAFA TRUST, INC. 54-1399426

FORM 990 NON-GOVERNMENT SECURITIES STATEMENT 9

| SECURITY DESCRIPTION | CORPORATE STOCKS | CORPORATE BONDS | OTHER PUBLICLY TRADED SECURITIES | OTHER SECURITIES | TOTAL NON-GOV'T SECURITIES |
|---|---|---|---|---|---|
| AMANA MUTUAL FUNDS-EMPLOYEE TRUST | 46,231. | | | | 46,231. |
| GROVE CORPORATE INC, SUSIDIARY | 2,438,560. | | | | 2,438,560. |
| LYNUXWORKS, COMM.& PREFERRED | 477,055. | | | | 477,055. |
| MARJAC HOLDINGS, INC 65% OWNERSHIP | 4,550,000. | | | | 4,550,000. |
| MARKETABLE SECURITIES | | | 423,799. | | 423,799. |
| MILL BRANCH HOLDINGS, LLC | 0. | | | | |
| MILLENIUM PRECISION MACHINING | 181,210. | | | | 181,210. |
| PACKET STREAM | 0. | | | | |
| POCKETPASS.COM | 65,000. | | | | 65,000. |
| RESERVE FOR INVESTMENT LOSS | | | <422,628.> | | <422,628.> |
| RESERVE FOR INVESTMENT GAIN OR (LOSS) | 8,158,893. | | | | 8,158,893. |
| RESTON INVESTMENTS, SUBSIDIARY | 1,000. | | | | 1,000. |
| TO 990, LN 54 COL B | 15,917,949. | | 1,171. | | 15,919,120. |

FORM 990 DEPRECIATION OF ASSETS HELD FOR INVESTMENT STATEMENT 10

| DESCRIPTION | COST OR OTHER BASIS | ACCUMULATED DEPRECIATION | BOOK VALUE |
|---|---|---|---|
| LAND | 324,000. | 0. | 324,000. |
| UNIT 12 GREAT FALLS | 369,441. | 66,309. | 303,132. |
| BUILDING 500 GROVE STREET | 2,088,494. | 374,857. | 1,713,637. |
| GEORGIA BUILDING | 121,530. | 21,812. | 99,718. |
| DATA PROCESSING EQUIPMENT | 1,299. | 1,299. | 0. |
| TENANT FITOUT | 260,605. | 65,152. | 195,453. |
| BUILDING 500 GROVE STREET | 9,966. | 586. | 9,380. |
| 500 PARKING LOT - IMPROVEMTENT | 13,302. | 665. | 12,637. |
| BUILDING 500 GROVE STREET-COMMON AREA IMPROVEMENTS | 3,364. | 561. | 2,803. |

SAFA TRUST, INC. 54-1399426

| | | | |
|---|---|---|---|
| TENANT FITOUT-FAITH | 5,920. | 197. | 5,723. |
| TAL TO FORM 990, PART IV, LN 55 | 3,197,921. | 531,438. | 2,666,483. |

| FORM 990 | OTHER INVESTMENTS | STATEMENT 11 |
|---|---|---|

| DESCRIPTION | VALUATION METHOD | AMOUNT |
|---|---|---|
| CHESAPEKE CAPITAL, L/P | COST | 10,625. |
| MILL BRANCH DEVELOPEMENT, LLC | COST | 0. |
| SILICON VALLEY VENTURE FUND 1 | COST | 0. |
| STERLING INVESTMENTS, LLC | COST | 2,239,750. |
| STERLING PACKETSTREAM FUND LLC | COST | 0. |
| STERLING TECHNOLOGY FUND LLC | COST | 73,058. |
| STERLING STOCK INVESTMENT, LLC | COST | 500,000. |
| STERLING PFG, LLC | COST | 137,510. |
| TOTAL TO FORM 990, PART IV, LINE 56, COLUMN B | | 2,960,943. |

| FORM 990 | OTHER LIABILITIES | STATEMENT 12 |
|---|---|---|

| SCRIPTION | AMOUNT |
|---|---|
| TENANT SECURITY DEPOSIT | 32,247. |
| OTHER PAYABLE- MARJAC HOLDING, INC. | 0. |
| OTHER PAYABLE- THE CHILD DEVELOPMENT FOUNDATION | 120,000. |
| TOTAL TO FORM 990, PART IV, LINE 65, COLUMN B | 152,247. |

| FORM 990 | IDENTIFICATION OF RELATED ORGANIZATIONS PART VI, LINE 80B | STATEMENT 13 |
|---|---|---|

| NAME OF ORGANIZATION | EXEMPT | NONEXEMPT |
|---|---|---|
| INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHTS ID# 23-2202414 | X | |
| STERLING CHARITABLE GIFT FUND ID# 54-1978669 | X | |
| HORIZONS EDUCATION FOUNDATION ID# 54-2031540 | X | |
| THE HERITAGE EDUCATION TRUST, INC ID# 54-1782520 | X | |
| AFRICAN MUSLIM AGENCY ID# 54-1382088 | X | |
| THE CHILD DEVELOPMENT FOUNDATION ID# 54-1977160 | X | |
| AMERICAN INTITUTE FOR SOCIETAL STUDIES ID# 5·-2014800 | X | |
| ABEL AL KHEER, INC ID# 54-2003505 | X | |
| HERITAGE HOLDING, INC ID# 54-1898830 | X | |

SAFA TRUST, INC. 54-1399426

| | |
|---|---|
| INTERNATIONAL ISLAMIC CHARITABLE ORGANIZATION ID# 54-1979172 | X |
| E GRADUATE SCHOOL OF ISLAMIC AND SOCIAL SCIENCES ID# 54-1758322 | X |
| YORK FOUNDATION ID# 31-1621645 | X |

FORM 990 PART IX STATEMENT 14

INFORMATION REGARDING TAXABLE SUBSIDIARIES

| NAME, ADDRESS & ID NUMBER OF CORP OR PARTNERSHIP | PCT OWN | NATURE OF BUSINESS | TOTAL INCOME | END-OF-YEAR ASSETS |
|---|---|---|---|---|
| MARJAC HOLDINGS, INC<br>GAINSVILLE , GA<br>58-2270434 | 65.00% | HOLDING COMPANY | | |
| GROVE CORPORATE, INC.<br>HERNDON, VA 20170<br>52-1542215 | 100.00% | REAL ESTATE DEVELOPMENT | | |
| RESTON INVESTMENTS, INC.<br>HERNDON, VA 20170<br>54-1745672 | 100.00% | SMALL INVESTMENTS | | |
| MENA CORPORATION, INC.<br>HERNDON, VA 20170<br>52-1548503 | 100.00% | SMALL INVESTMENTS | | |

SAFA TRUST, INC

TIN: 54-1399426

PERIOD: 2003

ATTACHMENT TO FORM 990

PART VI, Line 80b

In or about March, 2002, a Senior Special Agent of the United States Custom Service filed an affidavit in the United States District Court for the Eastern District of Virginia alleging that, "The Safa Group and Associated Individuals" were ardent supporters of the Palestinian Islamic Jihad – Shikaki Faction ("PIJ") and Hamas. The affidavit was submitted to the court in support of an application for a search warrant of the business premises of this organization and of the residences of a number of individuals alleged to control, directly or indirectly, the activities of the organization. The court approved the search warrant application and the organization's records were seized on March 22, 2002.

In light of the allegations set forth in the affidavit, this return lists as related organizations all entities for which returns were prepared by the preparer of this return. The returns of all of the organizations listed in this return are available for public inspection at 555 Grove Street, Suite 116, Herndon, VA 20170.

PART 5 and Page 6

Pending the conclusion of the investigation of all entities and individuals referred to in the Application for Search Warrant filed March, 2002 in the United States District Court for the Eastern District of Virginia, upon advice

of counsel, the individuals identified in Part V of this return have invoked the privileges afforded to them by the Fifth Amendment to the Constitution of the United States and each of them has declined, solely upon the basis of such protection, to execute this return as an officer, director, trustee or key employee. No responsible officer or individual is otherwise available to execute this return as of the date of filing of this return.

ENVELOPE POSTMARK DATE AUG 10 2004

Form 8868 (12-2000) 67 Page 2

- If you are filing for an Additional (not automatic) 3-Month Extension, complete only Part II and check this box ▶ ☒

**Note:** *Only complete Part II if you have already been granted an automatic 3-month extension on a previously filed Form 8868.*

- If you are filing for an Automatic 3-Month Extension, complete only Part I (on page 1).

**Part II** **Additional (not automatic) 3-Month Extension of Time—Must File Original and One Copy.**

| Type or print | Name of Exempt Organization: SAFA TRUST, INC. | Employer identification number: 54 1399426 |
|---|---|---|
| File by the extended due date for filing the return. See instructions. | Number, street, and room or suite no. If a P.O. box, see instructions. 555 GROVE STREET, SUITE 116 | For IRS use only |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions. HERNDON, VA 20170 | |

**Check type of return to be filed** (File a separate application for each return):

☒ Form 990 ☐ Form 990-EZ ☐ Form 990-T (sec. 401(a) or 408(a) trust) ☐ Form 1041-A ☐ Form 5227 ☐ Form 8870
☐ Form 990-BL ☐ Form 990-PF ☐ Form 990-T (trust other than above) ☐ Form 4720 ☐ Form 6069

**STOP: Do not complete Part II if you were not already granted an automatic 3-month extension on a previously filed Form 8868.**

- If the organization does not have an office or place of business in the United States, check this box ▶ ☐
- If this is for a **Group Return,** enter the organization's four digit Group Exemption Number (GEN) ________. If this is for the **whole** group, check this box ▶ ☐. If it is for **part** of the group, check this box ▶ ☐ and attach a list with the names and EINs of all members the extension is for.

4 I request an additional 3-month extension of time until NOVEMBER 15, 2004

5 For calendar year 2003, or other tax year beginning ________, 20__ and ending ________, 20__.

6 If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period

7 State in detail why you need the extension. Time to collect data to file a complete and accurate tax return, that is required.

8a If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions . . . $ —

b If this application is for Form 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit and any amount paid previously with Form 8868 . . . $ —

c **Balance Due.** Subtract line 8b from line 8a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions . . . $ —

**Signature and Verification**

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ▶ Waleem Jafar Title ▶ Manager, Audit & Taxation Date ▶ 08-09-04

**Notice to Applicant—To Be Completed by the IRS**

☒ We have approved this application. Please attach this form to the organization's return.

☐ We have not approved this application. However, we have granted a 10-day grace period from the later of the date shown below or the due date of the organization's return (including any prior extensions). This grace period is considered to be a valid extension of time for elections otherwise required to be made on a timely return. Please attach this form to the organization's return.

☐ We have not approved this application. After considering the reasons stated in item 7, we cannot grant your request for an extension of time to file. We are not granting a 10-day grace period.

☐ We cannot consider this application because it was filed after the due date of the return for which

☐ Other ________

RECEIVED

EXTENSION APPROVED

AUG 31 2004

FIELD DIRECTOR, SUBMISSION PROCESSING, OGDEN

________ By: ________

Director

**Alternate Mailing Address** — Enter the address if you want the copy of this application for an returned to an address different than the one entered above.

| Type or print | Name |
|---|---|
| | Number and street (include suite, room, or apt. no.) Or a P.O. box number |
| | City or town, province or state, and country (including postal or ZIP code) |

**8868** (December 2000)
Department of the Treasury Internal Revenue Service

# Application for Extension of Time To File an Exempt Organization Return

► File a separate application for each return

OMB No. 1545-1709

- If you are filing for an **Automatic 3-Month Extension, complete only Part I** and check this box . . . . . . . . . ► ☒
- If you are filing for an **Additional (not automatic) 3-Month Extension, complete only Part II** (on page 2 of this form).

**Note:** *Do not complete Part II unless you have already been granted an automatic 3-month extension on a previously filed Form 8868.*

**Part I** **Automatic 3-Month Extension of Time**—Only submit original (no copies needed)

**Note:** *Form 990-T corporations requesting an automatic 6-month extension—check this box and complete Part I only* . . . ► ☐

*All other corporations (including Form 990-C filers) must use Form 7004 to request an extension of time to file income tax returns. Partnerships, REMICs and trusts must use Form 8736 to request an extension of time to file Form 1065, 1066, or 1041.*

| | | |
|---|---|---|
| **Type or print** | Name of Exempt Organization: SAFA TRUST, INC. | Employer identification number: 54 : 1399426 |
| File by the due date for filing your return. See instructions | Number, street, and room or suite no. If a P.O. box, see instructions: 555 GROVE STREET . SUITE 116 | |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions: HERNDON, VA 20170 | |

**Check type of return to be filed** (file a separate application for each return):

| | | |
|---|---|---|
| ☒ Form 990 | ☐ Form 990-T (corporation) | ☐ Form 4720 |
| ☐ Form 990-BL | ☐ Form 990-T (sec. 401(a) or 408(a) trust) | ☐ Form 5227 |
| ☐ Form 990-EZ | ☐ Form 990-T (trust other than above) | ☐ Form 6069 |
| ☐ Form 990-PF | ☐ Form 1041-A | ☐ Form 8870 |

- If the organization does **not** have an office or place of business in the United States, check this box . . . . . . . ► ☐
- If this is for a **Group Return,** enter the organization's four digit Group Exemption Number (GEN) ________ . If this is for the **whole** group, check this box ► ☐ . If it is for part of the group, check this box ► ☐ and attach a list with the names and EINs of all members the extension will cover.

1 I request an automatic 3-month (6-month, for **990-T corporation**) extension of time until AUGUST 15 , 2004, to file the exempt organization return for the organization named above. The extension is for the organization's return for:
► ☒ calendar year 2003 or
► ☐ tax year beginning .................... , 20 ..., and ending .................... , 20 ....

2 If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period

3a If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions . . . . . . . . . . . . . . . . . . . . . . . . $ —

b If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit . . . . . . . . . . . . . . . . $ —

c **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ N/A

## Signature and Verification

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ► [signature] Title ► Manager, Audit & Taxation Date ► 05-14-04

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 10

# Part 1

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| IN THE MATTER OF SEARCHES | ) | |
| INVOLVING 555 GROVE STREET, | ) | Misc. No. |
| HERNDON, VIRGINIA, AND | ) | |
| RELATED LOCATIONS | ) | UNDER SEAL |

"(PROPOSED REDACTED) AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT (OCTOBER 2003)

I, David Kane, a Senior Special Agent with the United States Customs Service ("USCS"), in Baltimore, Maryland, being duly sworn, depose and state:

I. Professional Experience of Affiant

1. I have served as a Special Agent ("SA") with the USCS for approximately five years. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant application, computer crimes, terrorism, and various other crimes. I have been the case agent on complex money laundering investigations that involved the domestic and international transfers of money, layering processes, falsified records and front organizations. I have been the case agent on four cases that were terrorism-related and the affiant on six federal search warrants involving money laundering violations.

2. Prior to joining the USCS, I obtained a B.A. degree in Government and Politics and a Masters degree in International Transactions from George Mason University. I worked as a financial services agent with Prudential Preferred Financial Services, where I analyzed financial structures and executed financial transactions with complex, international financial instruments on a regular basis.

II. The Investigation

3. Since December 2001, I and other agents of the USCS, the Internal Revenue Service-Criminal Investigation ("IRS-CI"), and the Federal Bureau of Investigation ("FBI"), have been investigating a group of individuals that are suspected of providing material support to terrorists, money laundering, and tax evasion through the use of a variety of related for-profit companies and ostensible charitable entities under their control, most of which are located at 555 Grove Street, Herndon, Virginia. For ease of reference, I will refer to the web of companies and charities controlled by these individuals as the "*Safa Group*." To a large extent, the present investigation has built on the findings of an investigation previously conducted with respect to these individuals between 1998 and 2000 by the USCS, the FBI, and the Immigration and Naturalization Service ("INS"), for suspicion of the same violations.

4. I will show in this affidavit that probable cause exists to believe that these individuals have committed and conspired to commit the following offenses:

a. Transmit money internationally for the purpose of promoting offenses against foreign nations involving murder or the destruction of property by means of explosives, fire, kidnaping or extortion, in violation of 18 U.S.C. § 1956(a)(2)(A) and (h);

b. Provide material support or resources to foreign terrorist organizations, in violation of 18 U.S.C. § 2339B;

c. Provide material support or conceal or disguise the source or ownership of material support intended for use in preparation for or in carrying out a terrorist act, in violation of 18 U.S.C. § 2339A;

d. Defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the Internal Revenue Service of the Department of the Treasury in the ascertainment, computation, assessment, and collection of federal income taxes, in violation of 18 U.S.C. § 371, by availing themselves of the advantages of exemption from federal income taxation while abusing the

requirements for tax exempt status; using a web of related corporate entities to move funds through a series of transactions designed to conceal the true nature, source, disposition and taxability of revenues moved between these entities; and misrepresenting the nature of the relationship between charities and for- profit companies to avoid scrutiny of their financial transactions;

e. Engage in a scheme to file or cause the filing of materially false Forms 990 (Return of Organization Exempt from Tax), concealing the relationships and financial transactions between the related entities, in violation of 26 U.S.C. § 7206(1) and (2);

f. Engage in a corrupt endeavor to impede and impair the due administration of the internal revenue laws by, during an audit conducted by the IRS, misrepresenting the status of the *SAAR Foundation* and the disposition of its assets, and concealing the relationships between *SAAR* and related entities, in violation of 26 U.S.C. §7212(a); and

g. File false individual income tax returns for the years 1997 and 1998, in violation of 26 U.S.C. §7206(1).

5. Because the factual context of this case is so complicated, and the legal context may be one with which the Court is relatively unfamiliar, this is a long affidavit. For ease of reference, I have included a glossary of the individuals involved in this affidavit and attached it to this affidavit as Attachment E. I have tried to italicize the type for each individual and organization included in the glossary so that the Court may check the glossary for a short identification of the entities mentioned it reads the affidavit.

III. Places to be Searched

6. This application seeks search warrants for the following locations (as specifically described in Attachment "A" to this affidavit and incorporated herein), within which the facts set forth in this affidavit will show that there is probable cause to believe will be found the "Items To Be Seized During Execution of Search Warrants" (as specifically described in Attachment "B", attached to this affidavit and incorporated herein) relating to transfers of money between the

various entities and other individuals and organizations connected to terrorists, as well as evidence of tax evasion and tax fraud:

a. 555 Grove Street, Office Suite Behind the Door Labeled 110, 114, and 116, Herndon, Virginia

The office suite behind the door marked as the door for Suites 110, 114, and 116 in the building at 555 Grove Street is the business premises of the *SAAR Foundation*, *Safa Trust, Inc.*, and dozens of other related entities in the *Safa Group* that are controlled by the individuals that are the subject of this investigation.

b. 500 Grove Street, 2nd Floor, Herndon, Virginia

The second floor of 500 Grove Street is the business premises of *International Institute For Islamic Thought* ("*IIIT*"), a *Safa Group* company controlled by the individuals that are the subject of this investigation.

c. 750-A Miller Dr. SE, Leesburg, Virginia

750-A Miller Drive SE is the business premises of *Heritage Education Trust*, a *Safa Group* company controlled by the individuals that are the subject of this investigation.

d. The Administrative Offices of *Mar-Jac Poultry* at 1020 Aviation Blvd., Gainesville, Georgia

1020 Aviation Blvd., Gainesville, Georgia, is the business premises of *Mar-Jac Poultry, Inc.*, a *Safa Group* company controlled by the individuals that are the subject of this

investigation. The Administration Building at *Mar-Jac Poultry* contains the business's financial records.[1]

e. The Residence of *Al-Alwani* at 1105 Safa Street, Herndon, Virginia

1105 Safa Street in Herndon is the residence of *Taha Jaber Al-Alwani*, an officer and/or director of *Safa Group* companies including *International Institute of Islamic Thought* ("*IIIT*"), *FIQH Council of North America* ("*FIQH*"), *Graduate School of Islamic & Social Sciences* ("*GSISS*") (formerly known as the *School of Islamic and Social Sciences* ("*SISS*")) and *Heritage Education Trust*.

f. The Residence of *Barzinji* at 11919 Safa Court, Herndon, Virginia

11919 Safa Court in Herndon is the residence of *Jamal Barzinji*, an officer and/or director of *Safa Group* companies, including *Mar-Jac Poultry, Inc.*, *Mena Investments, Inc.*, *Reston Investments, Inc.*, and *Safa Trust*.

g. The Residence of *Mirza* at 11922 Safa Court, Herndon, Virginia

11922 Safa Court in Herndon is the residence of *M. Yacub Mirza*, an officer and/or director of *Safa Group* companies including *African Muslim Agency, GSISS, Grove Corporate Plaza, Mar-Jac Investments, Mar-Jac Poultry, Mena Investments, Reston Investments, SAAR Foundation*, *Safa Trust*, *Sterling Management Group*, and *York Foundation*.

[1] It is perhaps worthwhile to note here that, pursuant to the USA PATRIOT ACT, enacted in October 2001, Rule 41 of the Federal Rules of Criminal Procedure now authorizes warrants to be issued by a Federal magistrate judge in any district in which activities related to terrorism may have occurred, for property outside the district.

h. The Residence of *Jaghlit* at 9034 Swift Creek Road, Fairfax Station, Virginia

9034 Swift Creek Road in Fairfax Station is the residence of *Mohammad Jaghlit*, an officer and/or director of *Safa Group* companies, including *Heritage Education Trust* and *SAAR Foundation.*

i. The Residence of *Totonji* at 305 Marjorie Lane, Herndon, Virginia

305 Marjorie Lane in Herndon is the residence of *Ahmad Totonji*, an officer and/or director of *Safa Group* companies, including *IIIT* and *Safa Trust, Inc.*

j. The Residence of *Unus* at 12607 Rock Ridge Road, Herndon, Virginia

12607 Rock Ridge Road in Herndon is the residence of *Iqbal Unus*, an officer and/or director of *Safa Group* companies including *Child Development Foundation*, as well as the administrative and billing contact for web sites for *IIIT* and *FIQH Council of North America.*

k. The Residence of *M. Omar Ashraf* at 12541 Browns Ferry Road, Herndon, VA .

12541 Browns Ferry Road in Herndon is the residence of *Mohammad Omar Ashraf,* an officer and/or director of *Safa Group* companies, including *Grove Corporate Plaza*, *Mar-Jac Investments*, and *Sterling Charitable Gift Fund.*

l. The Residence of *Muhammad Ashraf* at 12528 Rock Ridge Road, Herndon, VA.

12528 Rock Ridge Road in Herndon is the residence of *Muhammad Ashraf,* an officer and/or director of *Safa Group* companies including *Sterling Investment Group*, *Sterling Charitable Gift Fund*, and *York Foundation.*

## Executive Summary of This Affidavit

1. I am investigating a criminal conspiracy to provide material support to terrorist organizations by a group of Middle Eastern nationals living in Northern Virginia. These

individuals operate or have operated over 100 different organizations, on which they commonly serve as corporate officers. These organizations include charitable organizations, educational and cultural organizations, for-profit businesses and investment firms. For the purpose of this affidavit, this group of individuals and the organizations that they operate will be referred to as the "*Safa Group*."

2. Many organizations in the *Safa Group* dissolve and are replaced by other organizations under the control of the same individuals. Most of these *Safa Group* organizations, which present themselves as Islamic educational and charitable organizations, are "paper" organizations that are registered at common addresses, but have no apparent physical presence on the premises. The majority of these organizations is or was located at 555 Grove Street, Herndon, Virginia.

3. I have seen evidence of the transfer of large amounts of funds from the *Safa Group* organizations directly to terrorist-front organizations since the early 1990's. Some of this information was developed by the FBI, the USCS, and the INS, in previous investigations conducted of terrorist financing that focused on *Sami Al-Arian*, who fronted for the *Palestinian Islamic Jihad-Shikaki Faction* ("*PIJ*"), an organization that has been formally designated by the President of the United States as a terrorist organization since 1995. This previous investigation, which resulted in search warrants being executed in Tampa, Florida, in 1995, showed that money was being provided directly to *PIJ* front organizations by individuals controlling the *Safa Group*.

4. In 1998, the FBI opened an investigation of the *Safa Group*'s terrorist financing connections as a result of the seizures made in the *Al-Arian* search warrants in Tampa in 1995. Investigators then noticed that the pattern of direct funding to the *PIJ* front organizations had

changed since the mid-1990s. By the late 1990's, the finances of the *Safa Group*, including charities required by law to open their books to the public, exhibited a convoluted web of multiple transactions between related corporations and charities that made it virtually impossible for federal investigators to ascertain where the money that finally left the web of the *Safa Group* ultimately went. Indeed, the current investigation has traced millions of dollars through layers of related companies and to charities in the Isle of Man – from which point the trail cannot practically be followed.

5. The FBI, USCS, and IRS agents involved in this investigation at various times since 1998 suspect that, as a result of the 1995 searches in Tampa, the *Safa Group* engaged in the money laundering tactic of "layering" to hide from law enforcement authorities the trail of its support for terrorists. There appears to be no innocent explanation for the use of layers and layers of transactions between *Safa Group* companies and charities *other than* to throw law enforcement authorities off the trail; this inference is strengthened by the *Safa Group*'s repeated failure to disclose on tax forms as required the connections between various members of the *Safa Group*. Accordingly, I and the other agents involved in this investigation believe that some of the moneys that move overseas are destined to the *PIJ* and other terrorist organizations; at the least, the money is being used for other than tax-exempt purposes in violation of the tax laws.

6. I will show in this affidavit that evidence exists that individuals associated with the *Safa Group* are using the various affiliated charities and companies under their control to transfer money in convoluted transactions through a network of inter-related organizations designed to prevent the United States from tracking the ultimate recipients, in violation of the charter of the charitable organizations and the laws relating to the use of tax exempt status.

7. Based on the past histories of the individuals involved with respect to their overt financial support for terrorist organizations, their repeated misrepresentations by omissions on tax forms of information concealing the interrelationships between the *Safa Group* companies and charities under their control, and the lack of an innocent reason to conduct transactions in these convoluted manners, there is probable cause that the *Safa Group* companies and charities are being used to transfer money to terrorist front groups or some other illicit application. At the very least, however, this evidence constitutes probable cause that the individuals and entities involved have repeatedly made false tax filings and are conspiring to abuse the tax exempt status claimed by many of the related *Safa Group* charities.

8. I will also show in this affidavit that records relevant to material support to terrorists, money laundering, and tax evasion likely have been generated or maintained by the *Safa Group* companies and charities, and by the individuals involved. Finally, I will show in this affidavit that these records will be found at the business premises of the *Safa Group* companies and charities, such as 555 Grove Street, in Herndon, and at the homes of some of the individuals involved.

IV. Overview of Terrorism and Terrorist-Financing Techniques

9. Based upon my training and experience, and that of other agents from the USCS, the FBI, the IRS, and the INS, involved in this and related investigations, I know the following regarding terrorist financing techniques:

a. Many terrorist organizations have a financial support structure in the United States and in virtually every other developed country.

b. Often, terrorists and their supporters who are motivated by religious ideology, such as Islamic fundamentalist terrorists and their supporters,

adhere to their ideological creed and inclination to engage in and/or support terrorist activities for life.

c. Terrorist groups differ from other criminal networks because of the motive behind their crimes. Unlike drug traffickers and organized crime groups that primarily seek monetary gain, terrorist groups usually have non-financial goals, including publicity, dissemination of ideology, political legitimacy, and political influence. Terrorist fundraising is a means to these ends. While they do not seek financial gain as an end, international terrorist groups need money to attract and retain adherents and to support their presence and activities. Some foreign terrorist organizations need funds for media campaigns, to buy political influence, and even to undertake social projects such as hospitals, orphanages, schools, etc., largely with the aim of maintaining membership and attracting sympathetic supporters. For some terrorist groups, the planning and execution of violent attacks seems to comprise a small part of their total budget.

d. A substantial portion of the terrorist funding comes from contributors, some of whom know the intended purpose of their contribution and some of whom do not. With relatively small sums of money generated from traditional illegal activities, terrorism financing contrasts with the finances of a drug trafficking network, which earns virtually all of its profits from illegal activities. When compared with a financial investigation of a drug trafficker who has unexplained wealth and sham business dealings, investigating the financial dealings of a terrorist organization is considerably more difficult. Their members may live modestly. Their funds may be derived from outwardly innocent contributors to apparently legitimate humanitarian, social and political efforts. These funds are also only diverted, in part, to terrorist activity.

e. Terrorist groups tap a range of sources for their financial support. Illicit revenues derived from the proceeds of traditional criminal activities are commingled with legitimate funds because radical organizations have been able to draw on profits from commercial enterprises and on donations from witting and unwitting sympathizers. Significant funding originates from the U.S., Europe, and the Middle East. Some funding is provided by state sponsors. A summary of the various sources of terrorist financing follows:

1. Otherwise Legitimate Commercial Enterprises: Terrorist groups earn profits from businesses they own and also secure donations from sympathetic entrepreneurs. Some of the businesses set up to

provide profits to terrorists include: construction companies, tanneries, banks, agricultural commodity growers and brokers, trade businesses, bakeries, restaurants, bookstores, and other proprietorships.

2. Social and Religious Organizations: Since the early 1990s, terrorist groups have relied increasingly on donations for financial support, much of it from like-minded, non-governmental organizations (such as charities) in the West and Persian Gulf states.

3. State Sponsors: Several rogue nations provide material assistance or resources to terrorists and some provide financial support to terrorists. Other, more moderate governments also have been a source of financial support for some terrorist organizations.

f. Tracking terrorist financial transactions is more difficult than following the money trails of mainstream criminal groups because of the relatively small amounts of funds required for terrorist actions, the broad range of "legitimate" sources and uses of funds. While many organized crime groups are adept at concealing their wealth and cash flows for long periods of time, their involvement in the physical trade of illicit drugs, arms, and other commodities often exposes the revenues and expenditures connected to these illegal dealings. In contrast, terrorist actions generally are comparatively inexpensive and their financing often is overshadowed by the larger financial resources allocated for the group's political and social activities, making it more difficult to uncover the illicit nexus. For example, investigations into the terrorist attacks on the World Trade Center and the Pentagon on September 11, 2001 have revealed that the overall financing for the attacks totaled approximately $500,000.

g. Terrorist groups use a variety of means to move their funds, including

1. Physical Transportation: Cash physically transported by trusted operatives (couriers) is the most difficult to track because it usually leaves no paper trail.

2. Traditional Financial Institutions: The international nature of most foreign terrorist groups forces them to rely on banks and other financial institutions. Cells of extremists need local access to funds, and organizations with substantial assets seek the safety and productive management offered by banks, insurance companies, and foundations, albeit in the names of trusted nominees, cover companies, or religious fronts.

3. Offshore Banks: As do traditional criminal enterprises, terrorist organizations often utilize offshore banks to move their "licit" and illicit funds. Terrorists know that it is difficult for U.S. investigators to track these moneys, due to the financial secrecy and lack of regulated oversight associated with offshore banking centers. Traditional tax haven centers where offshore banking and money laundering tend to thrive include the Isle of Man, the Channel Islands, and Switzerland.

h. Charitable Organizations: Terrorists often establish or utilize "charitable organizations" to move their illicit proceeds. Terrorists know that many charities receive contributions in the form of cash, and that it is very difficult for investigators to trace money moving through these organizations. Most charitable organizations are assumed to be of an altruistic and benevolent nature, so criminals often use them knowing that charities are subjected to less government scrutiny.

i. Layering: Terrorist organizations, like traditional criminal organizations, often "launder" their illicit proceeds by utilizing a complex sequence of financial transactions. Sophisticated terrorist financiers try to make the money trail left by their transactions as difficult to follow as possible by "layering" their transactions; that is to say, by routing their money through numerous paths and indirect channels before ultimately causing their money to arrive at the desired location. These "layering" transactions often utilize many different individuals and corporations and involve many different bank accounts, false names, "front companies", and "phantom" organizations. These layering processes are designed to both disguise the true origin and end-destination of the funds and to render exceedingly difficult and confusing any prospective investigation by law enforcement authorities.

j. Foreign Bank Accounts: Terrorists will hide the existence of their personal or their company's foreign bank accounts to obfuscate the trail of international financial transactions and evade law enforcement.

k. Saudi Arabian nationals who are suspected of providing funds to terrorists are subject to scrutiny by the Saudi Arabian authorities. Due to this scrutiny, these individuals cannot provide money to terrorists via direct transfers from their bank accounts in Saudi Arabia. Therefore, they find alternate methods and routes to fund terrorists. This often involves utilizing their own or other overseas organizations to funnel money to terrorists. These organizations are located in many different parts of the

world. The paths of these moneys are often very complex and involve significant "layering."

l. Whether by their host governments or by the Israeli government, individuals and organizations throughout the Islamic world often are barred from sending money to individuals and organizations in Israel and/or the West Bank and Gaza. One way that supporters of terrorism in Israel deliver money to terrorists in Israel and/or the West Bank and Gaza is by first transporting the money to the United States and only later sending it to Israel and/or the West Bank and Gaza from the United States. Accordingly, while terrorist financing money collected in the United States is simply transported abroad, terrorist financing money collected abroad may enter the United States either to facilitate its later transport to terrorist organizations abroad or simply to fund terrorist activity in the United States.

10. Based upon my training and experience, and that of other agents from the USCS, the FBI, the IRS, and the INS, involved in this and related investigations, I know the following regarding the laws relating to terrorist financing:

a. Funds involved in traditional money laundering transactions usually are the proceeds of some prior-in-time, specified unlawful activity, as defined by 18 U.S.C. 1956(c)(7). With the exception of the funds generated by traditional crimes for profit, funds used or intended to be used to finance particular acts of terrorism or to be sent to a designated foreign terrorist organization generally will not be related to a prior-in-time, specified unlawful activity. Rather, such funds will acquire their criminal "taint" from their involvement in a transaction intended to assist in or promote an act of terrorism or to fund a designated foreign terrorist organization. As a result, the money laundering charge that is most applicable to financiers of terrorism is 18 U.S.C. § 1956(a)(2)(A), which prohibits the international transfer of money to promote a "specified unlawful activity."

b. Pursuant to 18 U.S.C. § 1956(c)(7)(B)(ii), "specified unlawful activities" include offenses against the United States or a foreign nation involving murder, kidnaping, robbery, extortion, or destruction of property by means of explosive or fire, or other terrorism-related specified unlawful activities enumerated under 18 U.S.C. § 1956(c)(7).

c. Title 18 U.S.C. § 2339A makes it a crime for persons within the U.S. to provide or to conceal or disguise the nature, location, source, or ownership

of "material support or resources," knowing or intending that they are to be used in preparation for or in carrying out a violation of any of the predicate enumerated crimes, including those relating to terrorist acts abroad against United States nationals, use of weapons of mass destruction, international terrorist acts transcending national boundaries, destruction of aircraft, kidnaping, extortion, and murder.

d. Pursuant to 18 U.S.C. § 2339A(b), the term material support or resources is defined to include, "currency or monetary instruments or financial securities, financial services, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials."

e. On January 25, 1995, President Clinton signed Executive Order 12947, Prohibiting Transactions With Terrorists Who Threaten To Disrupt The Middle East Peace Process, declaring a national emergency to deal with the threat to the national security posed by foreign terrorists disrupting the Middle East peace process. This executive order prohibited any transaction or dealing with persons designated in or pursuant to the order. This order designated the *Palestinian Islamic Jihad-Shiqaqi Faction* ("*PIJ*") and *Islamic Resistance Movement* ("*HAMAS*") as Specially Designated Terrorist organizations ("SDTs") which threaten to disrupt the Middle East peace process.

f. Since October 8, 1997, pursuant to 18 U.S.C. § 2339B(a)(1), no individual or entity may provide material support or resources to an organization designated by the Secretary of State as a "Foreign Terrorist Organization" ("FTO"), or attempt or conspire to do so. An organization is designated as an FTO for up to two years if the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, finds that it is foreign; engages in terrorist activity; and that the terrorist activity threatens U.S. national security or the security of U.S. nationals.

g. On October 8, 1997, the Secretary of State designated 30 Groups, including *HAMAS* and *PIJ* as "FTOs." See 62 F.R. 52650. On October 8, 1999, the Secretary re-designated most of the originally designated Groups (including *HAMAS* and *PIJ*) and added a new Group, Al Qaida. See 64

F.R. 55112. On October 5, 2001, *HAMAS*, *PIJ*, and Al Qaida were redesignated as FTOs. See 66 F.R. 51088.

V. Laws Relating to Charitable Organizations

11. Based on the training and experience of IRS-CI Special Agents Mary Balberchak, Paul Shanks, and Steven Smith, I understand the following regarding the laws relating to tax-exempt organizations:

a. The Internal Revenue Code ("IRC") creates an exemption from federal income taxation for certain organizations which comply with the provisions of 26 U.S.C. § 501(c)(3). § 501(c)(3) provides an exemption from federal income taxation for:

b. Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, . . . purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation . . ., and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

c. An organization obtains an exemption from federal income taxation under § 501(c)(3) by applying to the Internal Revenue Service ("IRS") for a letter determining that it meets the requirements for exemption. The application process is generally prospective in nature; thus, the IRS generally relies on the representations made by the organization in the documents it submits as to how the organization intends to operate in the future. An organization receiving a favorable determination letter may generally continue to rely upon the letter as long as there are no substantial changes in the organization's character, purposes, or method of operations.

d. There are two general categories of § 501(c)(3) entities--private foundations and public charities. Private foundations are generally supported by investment income and not contributions. Organizations that are public charities are set up to receive charitable contributions from the public.

e. The most significant benefit of public charity status is that, pursuant to IRC §§ 4940-45, private foundations are subject to an annual 2% tax on their net investment income but public charities are not. In addition, there are several restrictions and requirements on private foundations, including (1) restrictions on self-dealing between private foundations and their substantial contributors and other disqualified persons; (2) requirements that the foundation annually distribute income for charitable purposes; (3) limits on their holdings in private businesses; (4) provisions that investments must not jeopardize the carrying out of exempt purposes; and (5) provisions to assure that expenditures further exempt purposes. Violations of these provisions give rise to taxes and penalties against the private foundation and, in some cases, its managers, its substantial contributors, and certain related persons.

f. § 501(c)(3) organizations are presumed to be private foundations unless they fall into one of the exceptions in the IRC. One such exception is for publicly-supported organizations. An organization qualifies as publicly-supported if it passes the one-third support test, or, failing that, it may qualify under the facts and circumstances test.

g. The one-third support test is satisfied if the organization normally receives at least one-third of its support from governmental units, contributions made directly or indirectly by the general public, or from a combination of these sources. An organization normally meets the one-third support test for the current tax year and the following year if for the four years immediately before the current year, it met the one third test on an aggregate basis.

h. The facts and circumstances test treats an entity as publicly-supported if it normally receives 10 percent of its support from governmental units or contributions made directly or indirectly by the general public or from a combination of these sources; *and* it meets the "attraction of public support" requirement. An organization meets the attraction of public support element if it maintains a continuous and bona fide program for solicitation of funds from the general public, community or membership Group or from other charities.

i. Under the Internal Revenue Regulations an organization "will be regarded as "operated exclusively" for one or more exempt purposes only if it *engages primarily* in activities which accomplish the exempt purposes specified in section § 501(c)(3). An organization is not primarily engaged in activities which accomplish an exempt purpose if more than an *insubstantial* part of its activities is not in furtherance of an exempt

purpose." 26 CFR §1.501(c)(3)-1. An organization which is organized and operated for the primary purpose of carrying on an unrelated trade or business is not exempt under § 501(c)(3).

j. An organization may meet the requirements of § 501(c)(3) although it operates a trade or business as a substantial part of its activities, if the operation of such trade or business is in furtherance of the organization's exempt purpose or purposes and if the organization is not organized or operated for the primary purpose of carrying on an unrelated trade or business. In determining the primary purpose, all the circumstances must be considered, including the size and extent of the trade or business and the size and extent of the activities which are in furtherance of one or more exempt purposes. 26 CFR 1.501(c)(3)-1

k. Like for-profit entities, tax exempt entities are subject to audit. If upon review the IRS determines that an organization is not operating consistently with its tax exempt purpose, the IRS may revoke the tax exemption, or impose excise taxes depending upon the nature, degree and severity of the violation. Once an organization loses tax-exempt status, its total revenues are subject to federal income taxation, based upon its business form.

12. Based on the training and experience of IRS-CI Special Agents Balberchak, Shanks, and Smith, I understand the following regarding reporting requirements for tax-exempt charities:

a IRC §§ 6033 and 6043(b) require exempt organizations to file returns, if their annual receipts are in excess of $25,000 and they do not fall into a category otherwise exempt from the filing requirement. Form 990 (Return of Organization Exempt from Income Tax) is used by tax-exempt organizations to provide the IRS with the information required by Section 6033. Form 990s depict information about contributions received, grants and allocations made, assets and liabilities, organizational relationships, and other financial and organizational information. This form requires an organization to document, that, in actual operations, it adhered to the standards and procedures it said that it would use when its application for tax exempt status was approved.

b The IRS relies upon Form 990 to gather information to administer the applicable provisions of the IRC. In addition, an organization's completed Form 990 (except for the schedule of contributors) is available for public inspection as required by Section 6104 of the IRC. Form 990 returns are signed under penalty of perjury. Willful failure to provide information

that is required to be disclosed on a Form 990 is subject to prosecution under 26 U.S.C. 7203. Willfully filing a fraudulent Form 990 is subject to prosecution under 26 U.S.C. 7206(1).

c. The IRS has an examination program designed to determine if tax-exempt organizations are complying with the tax laws. The Form 990 is used in the process of defining and determining the scope of an audit of a tax-exempt organization. A "Yes" response to a question on the Form 990 may not necessarily lead to an audit of the entity; however, if the entity is selected for audit, the responses on the form discussed hereafter would be reviewed and considered in pre-audit planning to decide what issues or aspects of the organization's operations warrant detailed scrutiny. If an organization fails to furnish accurate information regarding its relationships to other organizations, then the Revenue Agent may miss an issue for examination which he should otherwise be investigating.

d. One statutory requirement for the operation of a tax-exempt entity is that no part of its earnings inure to the benefit of its shareholders or any individual. Various parts of the Form 990 elicit information designed to determine whether the organization has engaged in transactions which raise issues of potential personal inurement or private benefits. Thus, in Part VI of the Form 990, Question 80(a) requires the reporting entity to list any organization to which it is related and whether the related entity is exempt or non exempt. The information disclosed in this question is utilized to determine whether the entity is operated for an exempt purpose and whether the earnings of the entity are being used for personal or private gain.

e. Similarly, Schedule A to the Form 990, Part III, Question 2 requires the disclosure of certain transactions (such as loans, sales or exchanges of property or transfer of assets) between the reporting organization and certain insiders or with a taxable entity with which those insiders are affiliated. If such transactions occurred, the entity is required to attach a detailed statement explaining the transactions. This question is directed at issues of self-dealing, in which the transaction may have been motivated by private gain.

f. Part I, Form 990, line 1(d) requires the exempt organization to report its total contributions and attach a schedule of all contributors who gave, in the aggregate more than $5,000 during the year.

g. Part II, Form 990, line 22 requires the exempt organization to list its grants and allocations identifying the donee's name, address and the amount given and the purpose of the donation.

h. A § 501(c)(3) organization can make grants to foreign charities, even if the foreign organizations are not recognized as charities under IRC § 501(c)(3), if the § 501(c)(3) organization maintains control and discretion over the use of its funds and maintains adequate records. Control and discretion means that the domestic § 501(c)(3) organization can make an independent decision as to whether it will provide funds to a foreign organization. The domestic § 501(c)(3) organization is deemed to have control and discretion if it:

1. makes a pre-grant inquiry concerning the use of its grant so as to obtain reasonable assurance that the grant will be used for charitable purposes; and

2. obtains reports on the use of its funds.

i. If the domestic § 501(c)(3) organization does not have control and discretion over the use of its funds, then contributions to the domestic § 501(c)(3) would not be deductible by the donor. Further, the organization may be determined to be not operating for an exempt purpose. If it were determined not to be operating for an exempt purpose, its tax-exempt status could be revoked.

j. All charitable entities are subject to the requirement that the purpose of the charity not be illegal or contrary to public policy. Illegal acts which make up a substantial part of an organization's activities disqualify it from exemption. The relative amount required to be considered substantial will vary according to the character and non-exempt quality of the activity. Thus, a great many violations of a local pollution regulations would be required, whereas very little planned violence or terrorism would be enough to preclude exemption. For an organization to lose its tax-exempt status, the illegal activity must be undertaken on behalf of the organization, i.e., they must be actions taken by officials of the organization, their agents or actions ratified by the organization. In instances where tax-exempt status is revoked, contributions to the organization would not be deductible under Section 170 of the IRC.

k. It is not unusual for tax cheaters to try to receive their income and hold their assets in bogus 501(c)(3) organizations. Some may attempt to make otherwise non-deductible contributions to non-exempt recipients appear

> deductible by initially routing their contributions through an organization claiming tax-exempt status, when the ultimate disposition of the contribution is still a non-exempt entity. Individuals who set up such organizations or claim such status to fraudulently evade income or excise taxes may be prosecuted for tax evasion, as can those who set up ostensibly exempt organizations for the purpose of making their contributions to non-exempt entities appear deductible by first being routed through ostensibly exempt organizations.

## VI. Sources of Information

13. All information contained in this affidavit is based upon my review of documents related to this investigation, and information furnished to me by other Special Agents of the USCS, INS, IRS, and FBI. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I, or others, have learned during the course of this investigation.

## VII. Overview of Terrorists and Terrorist Organizations

### A. The Terrorists

14. I will show in this affidavit that various individuals associated with the *Safa Group* are providing material or financial support to international terrorists and terrorist organizations through terrorist front organizations. The terrorist groups and terrorists that are receiving this support through individuals associated with the *Safa Group* are briefly described below.

15. *HAMAS*: *HAMAS* is an acronym for the arabic term for the *Islamic Resistance Movement*, an international terrorist organization founded in 1987 and dedicated to the elimination of the State of Israel. A "Specially Designated Terrorist" ("SDT") organization since 1995, and a designated Foreign Terrorist Organization ("FTO") since 1997, *HAMAS* espouses an extremist Islamic fundamentalist ideology, and is dedicated to the establishment of an Islamic Palestinian State that encompasses Israel, the West Bank and Gaza. *HAMAS*'s primary tenets are

opposition to compromise with Israel over creation of a Palestinian State and replacement of the Palestinian Authority as the sole representative of the Palestinian people. To these ends, *HAMAS* pursues a combined program of violence and terror on the one hand, and educational, charitable, and social functions on the other. The principal purpose of its armed attacks is to intimidate and coerce the Government of Israel and its civilian population. Its benevolent programs are used to enhance its image and earn goodwill in the Palestinian community.

16. The use of suicide bombers has become a *HAMAS* trademark. Between October 1, 2000 and September 10, 2001, *HAMAS* claimed responsibility for at least 20 bombings (including a suicide bombing at an Israeli disco on June 1, 2001, that resulted in the deaths of 21 youths), two shootings, one kidnapping, and one mortar attack, that cumulatively resulted in at least 77 deaths (including three Americans) injuries to at least 547 others, including four Americans.

17. On August 13, 2001, <u>USA Today</u> ran an article describing how *HAMAS* -run schools serve its ends:

> In *HAMAS* -run kindergartens, signs on the walls read: "The children of the kindergarten are the shaheeds [holy martyrs] of tomorrow." The classroom signs at Al-Najah University in the West Bank and at Gaza's Islamic University say, "Israel has nuclear bombs, we have human bombs." At an Islamic school in Gaza City run by *HAMAS*, 11-year-old Palestinian student Ahmed state, "I will make by body a bomb that will blast the flesh of Zionists, the sons of pigs and monkeys . . . . I will tear their bodies into little pieces and cause them more pain than they will ever know." "Allah Akbar," his classmates shout in response: "God is great." "May the virgins give you pleasure," his teacher yells, referring to one of the rewards awaiting martyrs in paradise.

18. <u>*Palestine Islamic Jihad-Shikaki Faction* ("*PIJ*")</u>, also known as the <u>*Islamic Jihad of Palestine*</u>: *PIJ*, a SDT since 1995, and a FTO since 1997, was founded in the early 1980s by

*Fathi Shikaki.* Another terrorist organization dedicated to the elimination of the State of Israel, *PIJ* is responsible for many suicide bomb attacks in Israel that have resulted in the death of both U.S. and Israeli nationals. One of these attacks includes the Gaza Strip bus bombing in April 1995, in which U.S. citizen Alyssa Flatow was killed. The Shura Council is the decision-making body of the *PIJ* and is composed of the highest level *PIJ* officials.

19. *Mousa Abu Marzook* has been the political and operational leader of *HAMAS* from the time of its establishment in 1987. *Marzook* is a native of Gaza who lived in the United States - -in Northern Virginia in specific - - until 1993; he was arrested trying to reenter the United States in July 1995, and underwent proceedings for extradition to Israel. In In the Matter of the Extradition of Abu Marzook v. Christopher, 924 F.Supp. 565 (S.D.N.Y. 1996), the district court found that *Marzook* directed *HAMAS*'s terrorist activities.

20. *Sheik Abdel Aziz Odeh* is the spiritual leader and a co-founder of *PIJ.*

21. *Sheik Omar Abdel Rahman,* also known as the "Blind Sheik," is considered the spiritual leader of the radical Islamic terrorists who bombed the World Trade Center in February, 1993. *Rahman* was convicted of seditious conspiracy based on a plot to blow up New York City tunnels and the United Nations in October 1995, for which he received a life sentence in prison.

22. *Ramadan Abdullah Shallah* is the current leader of the *PIJ* and resides in Damascus, Syria. An SDT, *Shallah* replaced *PIJ* founder *Fathi Shikaki* as the leader of the *PIJ*, after *Shikaki*'s assassination in Malta in 1995. Prior to taking this position, *Shallah* had resided in Tampa, Florida and was employed as an adjunct professor at the University of South Florida while working as a U.S. representative of the *PIJ* with *Sami Al-Arian* and *Basheer Nafi*. In executing search warrants in Tampa in 1995, federal agents seized a video of a speech made by

*Shallah* at an *Islamic Committee for Palestine* ("*ICP*") conference in December 1992 organized by *Al-Arian*, in which *Shallah* said that Jihad is a holy war aimed at killing every enemy of Islam, including (among others) the New World Order symbolized by the United States. *Shallah* stated that Muslims should not be defensive or apologize against charges of terrorism, because Jihad required them to terrorize, devastate, humiliate, and degrade their enemies.

B. The Terrorist Financiers and Front Groups (Outside of the *Safa Group* )

23. Terrorist organizations such as *HAMAS* and *PIJ* have worked in the United States through front Groups and individuals. They include *Sami Al-Arian, Basheer Nafi*, *the Islamic Committee for Palestine* ("*ICP* "), *the World Islamic Studies Enterprise* ("*WISE* "), and the *Holy Land Foundation for Relief and Development* ("*HLF*").

24. *Sami Al-Arian* is a Palestinian national employed until earlier this year as a professor at the University of South Florida in Tampa. *Al-Arian* incorporated *PIJ* front organizations known as *ICP* and *WISE* in Florida, in 1988 and 1991, respectively. Based in large part on documents seized from his home and offices pursuant to federal search warrants in 1995, I believe that *Al-Arian* has been a leader of *PIJ*, its representative in the United States, and responsible for raising funds for Jihad, or "holy war." I will describe much more about *Al-Arian* later in the affidavit when I recount the historical background of this investigation.

25. *Basheer Nafi* was an active directing member of *PIJ* front organizations *ICP* and *WISE* in Tampa, Florida, and later *International Institute For Islamic Thought* ("*IIIT* ") of the *Safa Group*, until he was deported by the INS in 1996. According to the May 31, 1995, edition of Al-Hayat, an Arabic newspaper printed in London, fierce differences erupted within the *PIJ* between founder *Fathi Shikaki* and elected members of the Shura Council, leading to

resignations of members of the Shura Council including Taysir Al-Khatib and *Basheer Nafi*. Yet, the November 6, 1995, edition of the Jordanian newspaper Al-Urdun, regarding the selection of *Shallah* as the new leader of *PIJ,* noted that several other leading *PIJ* members, including *Nafi*, had *not* been selected. Thus, it appears that after *Shallah* replaced *Shikaki* as head of the *PIJ* after the latter's assassination in October 1995, *Nafi* reentered the organization's leadership.

26. *Al-Arian* sponsored *Nafi* into the United States in 1992 and 1995, on the grounds that *Nafi* was to be the Director of Research for *WISE* in Tampa, Florida. In July 1996, *Nafi* was removed from the United States pursuant to a deportation order based on allegations that included that although he was admitted as a worker for *WISE*, in October 1994 he was employed at *IIIT*, a *Safa Group* charity in Herndon, Virginia.

27. *Mazen al-Najar* is a brother-in-law of *Sami Al-Arian* who worked as a professor at the University of South Florida while running the day-to-day operations of *WISE*. *Al-Najar* was arrested and ordered deported on visa violations and immigration fraud charges after a hearing in July 1996, in which INS SA William West testified that *Al-Najar* was a "mid-level operative" in *ICP* and *WISE*, both of which were characterized by SA West as *PIJ* front groups. *Al-Najar* was released in December 2000, however, for the government's refusal to provide *Al-Najar* with classified information underlying its case that the government claimed warranted his continued detention; that order was reversed and *Al-Najar* is again in custody. Al Najjar v. Ashcroft, 257 F.3d 1262 (11th Cir. 2001).

28. *Khalil Shikaki,* the brother of *PIJ* leader *Fathi Shikaki*, was involved in the day-to-day operations of *ICP* and *WISE* in the early to mid-1990s, along with *Al-Arian, al-Najar*, and *Shallah.*

29. *Holy Land Foundation for Relief and Development* ("*HLF*"): On December 4, 2001, President Bush designated *HLF* an FTO on findings that it was a *HAMAS* front. *HLF* was determined to provide financial support for families of *HAMAS* suicide bombers, as well as the Palestinians who adhere to the *HAMAS* movement. By providing annuities to families of suicide bombers, *HLF* encouraged the flow of suicide volunteers to *HAMAS* and buttressed its terrorist infrastructure.

30. *HLF*, a charity in Richardson Texas, was started in large part with $210,000 from *HAMAS* leader *Marzook* as a support structure for the terrorist group after it was banned in Israel. *HLF*'s stated mission was to pursue "charitable-relief for refugees and the indigent needy, fund raising furthering the corporation's exempt purposes, and to sponsor charitable activities benefiting and to make contributions or distributions to other 501(c)(3) organizations[.]" Between 1998 and 2000, *HLF* raised over $24,000,000.

31. I have read the FBI Memorandum to the Treasury Department's Office of Foreign Assets Control, dated November 5, 2001, that contributed to the basis of *HLF*'s FTO designation OFAC The memo disclosed that, in a meeting in a Marriott hotel in Philadelphia that the FBI covertly recorded, five *HAMAS* leaders met with the three top executives of *HLF*, and decided that most or almost all of the funds collected by *HLF* in the future would be directed to *HAMAS.*

32. In a meeting the next year in Oxford, Mississippi, also recorded by the FBI, *HAMAS* representatives explained to the representatives of the *al-Aqsa Educational Fund* - - another

fund-raising organization acting as a *HAMAS* front (and a member of the *Safa Group*) - - that *al-Aqsa* should curtail its fundraising activities because *Marzook* had designated *HLF* as the primary fund-raising entity for *HAMAS*. *Marzook* may have so designated *HLF* because of family connections; according to FBI SA Robert Miranda, who has been investigating the connection between *HAMAS* and *HLF; Marzook* is married to the cousin of *HLF* head Ghassan Elashi, and two other close relatives of *HAMAS* leaders worked for *HLF*.

33. *ICP / WISE*: The *Islamic Concern Project*, also known as the *Islamic Committee for Palestine* ("*ICP* "), and the *World Islamic Studies Enterprise* ("*WISE* ") were incorporated by *Al-Arian* in Florida as educational organizations in 1989 and 1991, respectively, but actually served as front organizations to raise funds for *PIJ* operations. *Al-Arian* was assisted in the day-to-day operations of *ICP* and *WISE* by *Nafi*, *al-Najar*, *Khalil Shikaki*, and *Shallah*. Then the Director of Research for *WISE*, *Shallah* is now the current leader of *PIJ*, living in Syria, as he has been since the assassination of *PIJ* founder *Fathi Shikaki* in 1995. *ICP* and *WISE* have been inactive since execution of the Tampa search warrants in 1995.

VIII. <u>The Tampa Investigation</u>

34. In May 1995, INS SA William West, in conjunction with USCS SA John Canfield and FBI SA Barry Carmody, began a criminal investigation of *ICP* and *WISE* after published newspaper articles stated these organizations were fronts used to raise funds in support of *PIJ* and *HAMAS*.

35. After *Fathi Shikaki*, the leader of *PIJ*, was assassinated in Malta in 1995, the agents investigating *ICP* and *WISE* saw news accounts that reported that, before replacing *Shikaki* as the

leader of *PIJ*, *Shallah* had left his position as a professor at the University of Southern Florida - the same institution that employed *Al-Arian*.

36. INS records revealed 1993 and 1994 entry records for *Shallah* as a temporary specialized worker who would be based at the *WISE* address in Tampa, Florida. INS records further revealed that *Al-Arian* had filed three different visa petitions on behalf of *Shallah* and in so doing had identified himself as the Chairman of the Board of *WISE*.

37. As a result of discovering the immigration records relating to *Al-Arian* and *Shallah*, a further search was made of the INS visa petition records reflecting *Al-Arian* as the petitioner. This search identified two visa petitions filed with INS by *Al-Arian* on behalf of Basheer *Nafi*, who was of interest to the investigators because, on the basis of news reports, they believed him to be another leader of *PIJ*. These petitions reflected *Al-Arian* as the Chairman of *WISE*, with *Nafi* to be the "director of research." A check of INS entry records for *Nafi* revealed four entries, on two of which he listed his destination address as 5207 East 12th Avenue, Tampa, Florida, the residence of *Al-Arian*, as well as the listed address of *ICP* on its articles of incorporation.

38. In light of *Al-Arian*'s ties to *PIJ* terrorists *Shallah* and *Nafi*, federal agents executed search warrants on November 20, 1995, at the residence of *Al-Arian*, his office at the University of South Florida, and the co-located offices of *WISE* and *ICP*, all in Tampa.

39. Found in the search on *Al-Arian*'s home computer was a 40-page document entitled "The Manifesto of the Islamic Jihad in Palestine." The Manifesto said that movement was led by the Secretary General Fathi *Shikaki*, on a "Shura" (consultative) basis, and was based on the "rejection of any peaceful solution for the Palestinian cause, and the affirmation of the Jihad solution and the martyrdom style as the only choice for liberation." The document stated that the

United Nations "is a supercilious tool to pass the plans of the Great Satan America, which makes the wrong right and the right wrong." Because *Al-Arian*'s computer contained both what appear to be a draft of the *PIJ* Manifesto and a final version of the *PIJ* Manifesto, I believe that *Al-Arian* drafted the *PIJ* Manifesto.

40. Also uncovered was a form letter in *Al-Arian*'s computer inviting recipients to a general conference for the "Movement." Included in the letter were items of the conference agenda including: Reviewing the activities of the Secretary General and the Command Committee of the Movement; endorsing the Manifesto; and electing the General Shura (consultative) Council. The letter also stated that the Manifesto draft was enclosed. While the letter did not name the "Movement", the letter was located in the same computer folder as the draft of the Manifesto of the Islamic Jihad Movement in Palestine. The terminology used in the letter regarding the Manifesto, the General Conference, the Secretary General, and the Shura Council was the same as that used in the Islamic Jihad Movement's literature. Thus, I conclude from these documents that *Al-Arian* was organizing the *PIJ* from his home in Tampa.

41. Also found in the search of *Al-Arian*'s residence were statements from several bank accounts, including one that he shared with Mohammed Taysir El-Khatib, a member of the *PIJ* Shura Council. The bank statement reflected that, on May 29, 1992, El-Khatib wire transferred $102,000 from Beirut, Lebanon, into the account he shared with *Al-Arian* in Tampa, Florida. I conclude from this that *Al-Arian* handled money for *PIJ* leaders overseas.

42. The search also uncovered a letter from *Al-Arian* to an Islamic Fundamentalist elected to the Kuwaiti Parliament seeking funds for the families of *PIJ* martyrs, on the stated grounds that the movement "carries out selective operations that all the Arab armies together couldn't do."

*Al-Arian* told the Kuwaiti that "[r]elations with the brothers who are part of HAMAS is very good, and progressing well. There are serious attempts at establishing permanent coordination and unity of action." Enclosing his address and phone number, *Al-Arian* called upon the Kuwaiti "to strongly support the Jihad effort in Palestine in order for such operations to continue." I conclude from this that *Al-Arian* engaged in international fund-raising for *PIJ* from his home in Tampa; it also confirms that it is not inconsistent for a *PIJ* supporter to also support *HAMAS.*

43. Also located at the search of *Al-Arian*'s residence was a document, hand written in Arabic, called the Charter of the Center of the Studies, the Intelligence and the Information. This document, hereinafter called "the Charter," set forth a comprehensive plan to establish a hostile intelligence organization in the United States and elsewhere. It stated that:

> Our presence in North America gives us a unique opportunity to monitor, explore and follow up . . . . We are in the center which leads the conspiracy against our Islamic world . . . . Therefore, we, here can monitor and watch the American policies and the activities of those questionable organizations . . . . Therefore, we have the capability to establish a Center for Studies, Intelligence and Information.

44. The Charter provided for a "Division of Security and Military Affairs," whose functions were to

> prepare training programs for the brothers. These programs include physical training, surveillance training . . . programs for military training benefitting from the available opportunities that exist in this country . . . . To make technical studies with the objective of availing spying and military tools and devices to the Group in America and the East and about the spying methods and equipment in these countries.

45. The Charter provided for an Organization/Law Studies Section whose job it would be to study the legal aspect of establishing charitable organizations in America.

46. The Charter provided for the establishment of an Intelligence and Monitoring Apparatus, part of which would be responsible to "to watch the individuals who oppose the Movement and the Islamic actions. To watch them, monitor them and to make files on them. . . ." Members of the Group should be able to "infiltrate the sensitive intelligence agencies or the embassies in order to collect information and build close relationships with the people in charge in these establishments." They should also use every opportunity to "collect information from those relatives and friends who work in sensitive positions in the government, et cetera . . . ."

47. The Charter further provided for the establishment of a "Branch of Information and Security and Military Studies"

> to perform special studies such as purchasing and retaining arms and training on these arms. The situation of the camps and the training locations to be studied. To study the matters of exporting arms in special ways in relation to the source of these arms and the implications of exporting it. Also, to follow up on the scientific development relating to spying operations, the intelligence agencies and its tools.

48. Also seized during the search was a videocassette of the First Annual Conference of *ICP* organized by *Al-Arian* and held on December 22-26, 1988, in St. Louis. At that conference, *Al-Arian* told the audience that "Islam means Jihad, resistance, fight, and martyrdom. . . . " *Al-Arian* repeated slogans including "Jihad is our way. Victory to Islam. Death to Israel. Revolution until victory."

49. Another item obtained in the search was a videocassette of the Fourth Annual conference of the *ICP* held on December 27-30, 1991 in Chicago, also organized by *Al-Arian.* At that conference, *PIJ* spiritual leader Sheikh Abdel Aziz *Odeh* told the audience that "Muslims should not fear accusation of terrorism or extremism. There are no other choices for Muslims."

50. Another videotape seized during this search contains activities recorded at the Islamic Center of Cleveland on April 7, 1991. Fawaz Abu-Damra, the Imam at the Islamic Mosque in Cleveland, introduced *Al-Arian* as the guest for the evening. As *Al-Arian* came forward, Damra told the audience that *Al-Arian* "heads the *ICP* - and as small excerpt about the *ICP* - it is the active arm of the Islamic Jihad Movement in Palestine in North America. We call it the *ICP* here for security reasons."

51. That same videotape depicted Damra then asking that all video and audio recording devices be turned off for security reasons and the tape goes blank. The tape was turned off and on several times. It later depicted *Al-Arian* stating that "we must continue with the Resistance . . . let's damn America, let's damn Israel, let's damn their allies until death."

52. The tape further depicted Damra telling the audience as *Al-Arian* ended his speech that anyone who donates money to the Intifadah and the Islamic Jihad is like that warrior who is waging holy war on behalf of Allah. He asked for money for Islamic Jihad, whose martyr "Nidal Zaloom went out with a dagger and stabbed four Jews in Jerusalem."

53. Damra repeatedly stated that the money would go to the Islamic Jihad. Damra told the audience that anyone who wanted to write a check should make it out to the *ICP*. During this time, the video depicts the crowd coming to the podium area and laying money at Damra's feet. As Damra was requesting money for the Islamic Jihad, it was announced that $6,785 had been contributed so far. Damra announced that there would be a permanent *ICP* fund in Cleveland for anyone who wanted to donate to the Islamic Jihad.

54. An undated document was seized containing a speech given by *Al-Arian* as president of *ICP* in which he describes a struggle between Islam and the West and stated that "we are in a

battle of life and death, in a battle of fate and future against the Western Hegemony and tyranny wanting to control the capabilities of the nations in order to enslave steal and control them." Further on he stated "What is needed is the dismantling of the cultural system of the West."

55. Investigators who seized *Al-Arian*'s home computer found in it files for three wills for three individuals who were planning to die as martyrs on Jihad. In the first, dated 2/19/92, Nizar Mahmoud wrote "the Jihad for Palestine is a Jihad for Allah, it is an obligation for you wherever you are, because there is no one more loved by Allah than the martyr." In the second, Adel Daher wrote about his desire to be a martyr and quoted the Koran regarding Allah's reward for those who fight and are slain in his cause. In the third, Khaled Muhammad *Hassan* stated:

> If we cannot destroy today this house, the Jew's State, we can ignite the fire in its regions, and if we ignite it every where no one will be able to extinguish it. We should charge the atmosphere of enmity and create a flammable Jihad climate that needs a match stick only.

The location of these wills on *Al-Arian*'s Macintosh home computer illustrates the close connection between *Al-Arian* and *PIJ* suicide bombers.

56. I know from the Tampa investigation that Sheik *Rahman* (the "Blind Sheik") visited *Al-Arian* at his residence in Tampa and spoke at his mosque, as did Sheik *Odeh*.

57. In sum, there is probable cause to believe that, until 1995, *Al-Arian* used *ICP* and *WISE* as the American front for *PIJ*, and that until December 2001, *HLF* acted as the primary American front for *HAMAS*. There is probable cause to believe that money sent to *Al-Arian* was really money going to *PIJ*, and that money sent to *HLF* was really money going to *HAMAS*.

58. Further, there is probable cause to believe that those who knew *Al-Arian, Shallah, al-Najar*, *Khalil Shikaki*, or *Nafi* from their conferences or writings and sent money to *ICP* or *WISE*

- - or directly to *Al-Arian* himself - - knew that they were sending it to support suicide bombings and terrorism conducted by *PIJ*. Similarly, there is probable cause to believe that those contributors to *HLF* who knew the leaders of *HAMAS* or *HLF* - -and at least some of those who did not - - contributed their money to support suicide bombings and terrorism conducted by *HAMAS*.

59. Finally, there is probable cause to believe that many of those who sent money to *Al-Arian, WISE*, and *ICP* for *PIJ*, as well as some of those who sent money to *HLF*, conspired to provide material support to terrorists, and to engage in international transfers of money to promote offenses against a foreign nation involving murder, kidnaping, robbery, extortion, and the destruction of property by means of explosive or fire, in violation of 18 U.S.C. §§ 1956(a)(2) and (h) and 2339A and 2339B.

IX. The *Safa Group* and Associated Individuals

60. In the next sections of this affidavit, I will show the probable cause to believe that the individuals controlling the *Safa Group* sent money to *HLF* and *Al-Arian* to support suicide bombings conducted by *HAMAS* and *PIJ*. First I will establish that the individuals controlling the share a common ideology with *HAMAS* and *PIJ* and know exactly what *HAMAS* and *PIJ* do with the monies they receive. Then I will establish that these individuals have continued to send money to *HLF* and *Al-Arian* for *HAMAS* and *PIJ*, through ever more concealed methods.

A. The Ideology

61. I have found information indicative of a conspiracy between *Safa Group* individuals and Sami *Al-Arian* to support and fund terrorists and terrorist groups including *HAMAS* and *PIJ*. A most striking example is a letter seized during the 1995 search warrants, from a central figure

in the *Safa Group*, *Al-Alwani* at *IIIT* (both of which will be further identified below) to *Al-Arian* at *WISE*, and dated November 19, 1991. In that letter, *Al-Alwani* referred to the payment of monies from *IIIT* to *PIJ*, and wrote that he and his colleagues, and their organizations, considered themselves to be indistinguishable from *Al-Arian*, *Shallah* (now the head of *PIJ*) and other founders and members of *PIJ*. In specific, *Al-Alwani* stated in his letter to *Al-Arian*:

> Honorable brother, I think we do not need to affirm that we consider you as a Group, you and brother *Mazen* [*al-Najar*] and brother *Khalil* [*Shikaki*, brother of *PIJ* founder *Fathi Shikaki*] and brother *Bashir* [*Nafi* ] and Brother *Ramadan* [*Shallah*, present head of *PIJ*] and *Sheikh Abdel Aziz* [*Odeh*, a founder and spiritual leader of the *PIJ*], a part of us and an extension of us, and us part of you and extension of you also, we never experienced any doubts about that since we knew you and we will continue like that.

62. *Al-Alwani* continued:

> And the matter of the financial support was never the basis of our relationship, for our relation added to the brotherhood of faith and Islam is an ideological and cultural concordance with the same objectives and all of your institutions are considered by us as ours, and they receive all the attention, and I explained to you the circumstances the institutions of your brother go through, and despite which we can truthfully say that we gave your institutions or our institutions that you manage more attention than institutions we manage by ourselves, because you are in an important positions without a doubt, and you deserve from us and our likes all cooperation, God willing . . . .

63. *Al-Alwani* stated that he was speaking not only for himself, but also for other members of the *Safa Group*:

> And I would like to affirm these feelings to you directly on my behalf and on the behalf of all my brothers, Dr. *Abdel Hamid* [*Abusulayman]*, Dr. *Jamal* [*Barzinji* ], Dr. *Ahmad* [*Totonji* ], Dr. *Hisham* [*Al-Talib*] . . . .

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 10

# Part 2

64. *Al-Alwani* noted that it didn't matter to the *Safa Group* how *Al-Arian* characterized the $45,000 *Al-Arian* received from the *Safa Group*, as part of its total contribution of $50,000 (I have added the bold type):

> And I would like to affirm these feelings to you directly on my behalf and on the behalf of all my brothers, Dr. Abdel Hamid, Dr. Jamal, Dr. Ahmad, Dr. Hisham, and at the same time, affirm to you that when we make a commitment to you, or we try to offer, we do it for you as a Group, **regardless of the side or the facade you use the donation for**...." What is left is to remind you that what is mentioned in your letter is that what you already received is forty thousands, and what we have in the records for you is forty-five thousands, and I will inquire about the matter with the brothers accountants so I will send you what will complete the amount of fifty thousands, God willing . . . .

B. The Individuals

65. The below-listed individuals are the founding and facilitating members of the *Safa Group,* an interwoven set of organizations that were established in the U.S. with the assistance of other Saudi Arabian and other Middle Eastern nationals. Based on the evidence in this affidavit, I know that they are ardent supporters of *PIJ* and *HAMAS*. They have repeatedly voiced their ideological support. I have seen repeated instances of their financial support, and believe that they have acted to conceal many other instances of their financial support.

66. *Abdulhamid Abusulayman* incorporated *IIIT* in Virginia with *Taha Jaber Al-Alwani* in 1982. In the letter from *Al-Alwani* to *Al-Arian* seized in the 1995 searches in Tampa, quoted

above, *Al-Alwani* affirmed that *PIJ* and the *Safa Group* shared a common ideology. *Al-Alwani* expressly mentioned *Abusulayman* as having the same sentiments as the entire *Safa Group*.

67. *Taha Jaber Al-Alwani* incorporated *IIIT* with *Abusulayman* in 1982, and was the president of *IIIT* from about 1986 through 1997. *Al-Alwani* wrote the letter to *Al-Arian* expressing solidarity as quoted above. In another seized document, *Al-Alwani* refers to $50,000 in financing that he and the *Safa Group* provided to *WISE* /*ICP*.

68. Various documents and videotapes obtained in the Tampa searches show that *Al-Alwani*, the President of *IIIT*, attended and spoke at *ICP* conferences with *Al-Arian*, *Shallah*, *Sheik Odeh* (spiritual leader and co-founder of *PIJ*) and *Sheik Rahman* (the "Blind Sheik" convicted of conspiracy to blow up New York tunnels and the United Nations in New York in October 1995). Inasmuch as *ICP* conferences were, in essence, *PIJ* conferences, I know that *Al-Alwani* has long been a supporter of *PIJ*.

69. In October 1999, a confidential asset of the FBI, who has provided reliable information in the past, furnished the Washington Field Office of the FBI a copy of a fatwa (declaration) signed by *Al-Alwani* at some point between December 1988 and November 1989, proclaiming

> the truth by the powers invested in us by Allah, that Jihad is the only way to liberate Palestine; that no person or authority may settle the Jews on the land of Palestine or cede to them any part thereof, or recognize any right therein for them.

70. In early 2000, *Al-Alwani* spoke with FBI Special Agents Ammerman and Wyman. *Al-Alwani* admitted to attending several *ICP* meetings with *Al-Arian*, as well as being acquainted with *Nafi* and *Shallah*. *Al-Alwani* stated that he maintained regular contact with *Al-Arian*, and

that *Al-Arian* typically contacts him when *Al-Arian* visits the Washington, D.C. area several times a year.

71. *Hisham Al-Talib* is a director or officer of several *Safa Group* organizations, including *Safa Trust, Inc.* and *IIIT*. *Al-Talib* was referenced in *Al-Alwani*'s 1991 letter expressing solidarity with *Al-Arian*.

72. *M. Omar Ashraf* is a director or officer of seven *Safa Group* organizations, including *Grove Corporate Plaza*, *Mar-Jac Investments*, and *Sterling Charitable Gift Fund*.

73. *Muhammed Ashraf* is a director or officer of over 20 *Safa Group* organizations incorporated with the address of 555 Grove Street, Herndon, Virginia, including *Sterling Investment Group*, *Sterling Charitable Gift Fund*, and *York Foundation*.

74. *Jamal Barzinji* has been the officer or director of numerous *Safa Group* organizations, including *Mar-Jac Poultry*, *Reston Investments*, and *Safa Trust*. *Barzinji* was referenced in *Al-Alwani*'s 1991 letter expressing solidarity with *Al-Arian*. I believe that *Barzinji* is not only closely associated with *PIJ* (as evidenced by ties to *Al-Arian*, including documents seized in Tampa in 1995 reflecting direct correspondence between *Barzinji* and *Al-Arian*), but also with *HAMAS*. **REDACTED** xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx Xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxx.

75. *Mohammed Jaghlit* has been an active supporter of *Al-Arian* and *PIJ*, both ideologically and financially. Two documents seized in Tampa in 1995 were letters sent by *Jaghlit* to *Al-Arian* in 1994, referencing enclosed checks from *SAAR Foundation* for $10,000 and

$5,000. In both of these letters, *Jaghlit* instructed *Al-Arian* not to disclose the contribution publicly or to the media.

76. Moreover, *Jaghlit* also has been an active supporter of *HAMAS*. As noted above, the *Safa Group* charity *al-Aqsa Educational Fund* acted as an American front for *HAMAS* until the 1994 meeting in Oxford, Mississippi, described above, during which *HAMAS* representatives explained to *al-Aqsa* representatives that *Marzook* had designated *HLF* as *HAMAS's* primary fund-raising entity. I have seen the IRS Forms 1023, Application for Recognition of Exemption, and the 990-EZ, filed by the *Al-Aqsa Educational Fund, Inc.*, for 1990 and 1996, respectively. Each of the two IRS forms reflects that the president of *Al-Aqsa* is Mohammad El-Gajhleet of 555 Grove Street in Herndon, Virginia. I believe that "Mohammad El-Gajhleet" is an alternative spelling for *Mohammad Jaghlit*, and the two names refer to the same individual.

77. *M. Yaqub Mirza* is a corporate officer or director of numerous *Safa Group* organizations located at 555 Grove Street in Herndon, including *Safa Trust, Inc.*, *SAAR Foundation, Inc.*, *Reston Investments, Inc.*, *Mar-Jac Investments*, and *African Muslim Agency*. *Mirza* is the predominant signatory on *Safa Group* checks.

78. *Cherif Sedky* was a director of the *SAAR Foundation* and now is a director of at least two *Safa Group* companies.

79. *Ahmad Totonji* is a corporate officer of several *Safa Group* organizations, including *Safa Trust, Inc.*, and was referenced in *Al-Alwani*'s 1991 letter expressing solidarity with *Al-Arian*. *Totonji* is also referenced in another seized letter from *Al-Arian* to *Al-Alwani*. In this letter, *Al-Arian* solicited more funding and referred to a meeting he had with *Totonji* where *Totonji* promised him another $20,000. As recently as November 1, 2001, *Totonji* signed a

check for $10,000 to *Al-Arian* through *Al-Arian*'s organization known as the Tampa Bay Coalition for Justice and Peace, drafted on the account of *Safa Group* charity *IIIT*.

80. *Iqbal Unus* is a director of the *Child Development Foundation*, a *Safa Group* organization, along with *Abusulayman* and *Al-Talib*, an advisor on the *Sterling Charitable Gift Fund* and *Sterling Management Group* organizations, and the administrative and billing contact for web sites for *IIIT* and *FIQH Council of North America*.

C. The Funding

81. Discovered in the Tampa searches in 1995 were letters indicating that in 1991 and 1992, *IIIT* contributed at least $50,000 to *PIJ* front-group *WISE*. Moreover, another document seized during these warrants was a 1991 letter from *Shallah* – now the leader of *PIJ* – to an administrator of the University of South Florida, with a copy to *Nafi*, stating that *IIIT* was the largest contributor to *WISE*.

82. Additional documents seized in Tampa in 1995 include two that *Jaghlit* sent to *Al-Arian* in 1994, referencing checks enclosed by with the letters from *Safa* Group charity the *SAAR Foundation* for $10,000 and $5,000, respectively. In both of these letters, *Jaghlit* instructed *Al-Arian* not to disclose the contribution publicly or to the media. I conclude from *Jaghlit*'s instructions that *Jaghlit* knew very well that the *SAAR* money was going to *PIJ* to support terrorism.

83. On February 2, 1995, *Mirza* signed a check for $15,000 to *WISE* on a *Safa* bank account, the deposit slip for which was found in *Al-Arian*'s home during execution of the 1995 search warrants.

84. As recently as November 1, 2001, *Totonji* wrote a check for $10,000 to *Al-Arian* through *Al-Arian*'s Tampa Bay Coalition for Justice and Peace, drafted on *IIIT*'s account at First Union Bank in Herndon.

85. IRS Form 990 for *Safa Trust, Inc.* for tax year 1996 indicated that *Safa* maintained $162,000 as "a library trust" for *HAMAS* -front *HLF*. In 1997, HLF received three *Safa Trust* checks in the amounts of $75,000, $87,500, and $162,500, all signed by *Mirza*.

X. Evidence of Layering Indicative of Money Laundering, Tax Evasion, and Material Support to Terrorists

A. Overview

86. The investigation has focused on the organizations associated with the *Safa Group* through corporate records, tax filings, financial transactions, interviews with confidential informants, and visual surveillance. I have determined that the individuals associated with the *Safa Group* use or have used over 100 organizations, which are interrelated through corporate officers and holding company - subsidiary relationships, to facilitate the funding of terrorist operations. Many of these organizations are listed in Attachment C. A list of most of the individuals acting as officers of *Safa Group* organizations referencing the organizations with which they are associated is included as Attachment D; both Attachments C and D are incorporated by reference here.

87. This array of organizations includes for-profit businesses, purported educational institutions, and charities. Many of the organizations have identical or overlapping directorates or management. Many of the organizations of the *Safa Group* are phantom entities with no physical presence, as evidenced by the multiple addresses for the organizations provided on official documents and the lack of signs announcing the various organizations at what is represented to be their business address. The relationships and operations of these organizations are convoluted not only by the repeating pattern of corporate officers and directors but also the large number of entities involved.

88. While I don't now know for sure why the labyrinth of organizations and charities that comprise the *Safa Group* was constructed, there does not appear to be any innocent explanation. In the course of the investigation, I have considered why this labyrinth was constructed. Possible explanations include

a. To conceal support for terrorism;

b. To conceal support for otherwise non-exempt organizations (for example, to conceal support to foreign charities over which domestic charities do not maintain control, or even to political parties);

c. To shelter income derived from what actually are personal investments; and

d. To shelter income derived what actually was someone else's personal investments for which individuals in the United States were trustees (for example, to shelter income on the investments of a member of the *Al Rajhi* family);

e. To shelter income from personal investments in the course of sheltering income for someone else (some combination of "c" and "d" above); and

f. To avoid excise taxes that would otherwise be due and payable on private foundations.

Based on the past history of the individuals involved, I believe that the most likely reason is to conceal support for terrorism.

89. Although the *Safa Group* consists of over 100 interwoven organizations, the investigation has focused on approximately 20 core organizations, and their associated corporate officers and directors. The table below illustrates the overlapping directorates by listing the *Safa Group* members on which this investigation has focused and their principal officers, directors and trustees:

| | Abusulayman | Al-Alwani | Al-Rajhi | Al-Talib | Ashraf, M. Omar | Ashraf, Muh. | Barzinji | Jaghlit | Mirza | Sedky | Totonji | Unus |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| African Muslim Agency | | | | x | | | | | x | | | |
| Amana Limited | | | | | x | | | | x | x | | |
| Aradi Inc. | | | x | x | | x | | | x | x | | |
| Grove Corp. | | | | x | | | x | | x | | | |
| Grove Corporate Plaza | | | | | x | | | | x | | | |
| GSISS | x | x | | | | | | | | | | |
| Heritage Education Trust | | x | | | | | x | x | x | | | |
| HFC Feed Mill | | | | | | x | | | x | | | |
| Humana Charitable Trust | | | | | x | | | | x | x | | |
| IIIT | x | x | | x | | | x | | | | x | x |
| Mar-Jac Investments, Inc | | | | x | x | x | x | | x | | | |
| Mar-Jac Poultry Inc. | | | | x | x | | x | | x | | | |
| Mena Corporation | | | | x | | | x | | x | | | |
| Mena Investments, Inc. | | | | x | | | x | | x | | | |
| Reston Investments Inc | | | | x | | | x | x | x | | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAAR Foundation | | | | x | | | x | x | x | x | | |
| SAAR Foundation, Canada | | | | x | | | x | | x | | | |
| SAAR International | | | | x | | | x | | x | | | |
| Safa Trust, Inc. | | x | | x | | | x | x | x | | x | |
| Sterling Charitable Gift Fund. | | | | | | x | | | x | | | |
| Sterling Investment Group | | | | | x | x | | | x | | | |
| Sterling Management Group | | | | | x | x | | | x | | | |
| York Foundation | x | | | | | x | | | x | | | |
| York International | | | | | | | | | x | | | |

B. Analysis of the *Safa Charities*

90. IRS tax files and corporation documents disclose that 555 Grove Street, 500 Grove Street, and associated addressed in Herndon are the corporate offices of record for over 100 active and defunct corporations, partnerships and tax exempt charitable organizations that are woven together by common officers and directors. According to the Virginia Secretary of State, approximately 40 active corporations claim their offices to be located at 555 Grove Street, alone.

91. IRS Special Agents Mary Balberchak, Paul Shanks and Steven Smith reviewed Forms 990 (Return of Organization Exempt From Income Tax) and additional tax-related information for seven tax-exempt *Safa Group* organizations. Many of the conspirators are officers in one or more of those charitable organizations. All seven of the charitable organizations (hereinafter, the "*Safa Charities*") are located in or near Herndon, Virginia, and five are co-located at the same 555 Grove Street address. The *Safa Charities* are:

| | | |
|---|---|---|
| *African Muslim Agency* | *Heritage Education Trust* | *IIIT* |
| *SAAR Foundation* | *Safa Trust* | *Sterling Charitable Gift Fund* |
| *York Foundation* | | |

92. The IRS Special Agents also reviewed individual tax returns of certain officers of the same tax-exempt organizations as well as corporate returns of for profit businesses that are wholly owned by a *Safa Charity* and/or controlled by the same officers, directors and trustees that control the charities. In 2000 the IRS conducted a limited examination on one of those charities. The IRS Special Agents reviewed the audit file and consulted with the two IRS Revenue Agents that conducted the examination on that entity. Other documents were also reviewed, including corporation documents for the same entities and other related companies, certain real estate settlement documents and bank records.

93. Analysis of the above returns and available supporting documentation disclosed a series of transactions between related companies that, when examined in their entirety, evidences a conspiracy between *Mirza*, *Abusulayman*, *Al-Alwani*, *Barzinji*, *Al-Talib*, *M. Omar Ashraf*, *Muhammad Ashraf*, *Jaghlit*, *Sedky*, *Ahmad Totonji*, and others, known and unknown, to route money through hidden paths to terrorists, and to defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment, and collection of federal income taxes. What follows is a summary of allegations, evidence of which will be detailed in this affidavit.

94. The conspirators have moved or authorized the movement of funds through a series of transactions involving the *Safa Group*, which includes the *Safa Charities*, and also for-profit corporations owned by or related to them. The evidence to date demonstrates that multiple millions of dollars have been moved between the *Safa Charities*, between the for-profit members of the *Safa Group* and the *Safa Charities*, and between the *Safa Charities* and foreign entities represented to be charitable in nature. The financial transactions involve contributions to the *Safa Charities* from for-profit corporations of the *Safa Group*, loans to for-profit corporations in the *Safa Group*, contributions, loans, and grants between the *Safa Charities* and the movement of funds from the *Safa Charities* into offshore trusts and other foreign entities.

95. Although, based on their representations to the IRS, each of the *Safa Charities* is treated as a public charity under federal tax laws, their gross revenues derive from sources which make the basis for their meeting the public support test unclear. Of the contributions to the *Safa Charities* for 1996-2000, the vast majority, over 71.8% percent, comes from other members of the *Safa Group* or from their principals. Of that support which does not emanate from the *Safa*

*Group* or its principals another 12.2% is reportedly derived from the unidentified contributors labeled "overseas general public." 13.2%, is comprised of funds from other overseas entities including benefactors in Kuwait, Saudi Arabia, and Malaysia.

96. Similarly, the pattern of grants and allocations made does not demonstrate the *Safa Charities* are operating for an exempt purpose. The grants and allocations made by the *Safa Charities* generally go to other members of the *Safa Charities*, or in some instances, other charities within the *Safa Group*. For the years in question 84.4% went to these entities. Another 14.3% was reportedly given to recipients which, contrary to law, the *Safa Charities* did not identify on the relevant Forms 990.

97. In addition, of the $54 million in grants and allocations reported for 1996-2000, $26 million (or 49%) was transferred to entities in the Isle of Man, $20 million (or 37%) remained within the *Safa Charities*. Of the balance approximately $7.7 (or 14.3%) went to unidentified donees. Accordingly, I believe that the *Safa Charities* are used to shuttle monies between them, blur the trail, and hinder the ability of investigators to ascertain the ultimate disposition of those monies. This investigation *has* followed the complex trail and determined, as stated above, that, of the funds whose recipients can be identified, virtually the only monies disbursed by the *Safa Charities* are monies that were disbursed *either* to other *Safa Charities*, or transferred to the name of off shore entities in tax havens.

98. By exercising common control, the *Safa Charities* ensure the tax benefits of their movement of funds between tax-exempt and for-profit entities, without ever having to surrender control of the funds. Although substantial funds are moved between various entities, the conspirators have maintained control over their disposition even after the funds are transferred

through the use of interlocking directorates and common officers, the common physical location of members of the *Safa Group* at 555 Grove Street, and the centralization of control over monetary transfers among the *Safa Group* in the persons of *Mirza* and *Safa Group* employee *Beverly Hassan*.

99. For example, *Mirza* has signatory authority over 27 different bank accounts associated with 15 different organizations of the *Safa Group*, including five of the *Safa Charities*. *Al-Talib* has signatory authority over 21 different bank accounts associated with nine members of the *Safa Group*, including two *Safa Charities*. *Barzinji* has signatory authority over 18 different bank accounts associated with nine members of the *Safa Group*, including three *Safa Charities*.

100. In addition, although *Hassan* is shown as an employee of *Mar-Jac Investments, Inc.* between 1996 and 2000 and also of *Sterling Management Group* at 555 Grove Street, she conducts financial transactions for many of the *Safa Group* members. In the 90-day period between October and December 2001, *Hassan* authorized 16 transactions on behalf of seven different organizations: *Safa Trust, York Foundation, Sterling Charitable Gift Fund, Sterling Management Group, Mar-Jac Investments*, *Reston Investments*, *Inc.*, and *African Muslim Agency*.

101. A further example is found in a letter obtained by IRS auditors in 2000 in connection with an audit of *SAAR Foundation*. The letter, dated December 3,1997, from *Humana Charitable Trust*, P.O. Box 1297, Herndon, Virginia, was addressed to *Mirza* of the *SAAR Foundation*. The letter explained that *Humana* was an Isle of Man trust, stated *Humana's* purpose, and requested *Mirza*, on behalf of *SAAR* to become a "major sponsor" of *Humana*. The

letter was signed "*Amana Limited* Trustee" and bore what appears to be the signature of *Mirza*. In other words, *Mirza*, on behalf of *Amana Limited*, the trustee for *Humana*, sent a letter to *Mirza*, Director of *SAAR*, soliciting major donations from *SAAR* to *Humana* in the Isle of Man.

102. Further, except for *IIIT*, the *Safa Charities* do not report active fundraising programs. Of the seven entities examined, only *IIIT* and *Safa* Trust report expenditures indicating significant fundraising. *York*, *AMA*, *Heritage* and *Sterling Charitable Gift Fund* report no expenses for fundraising. SAAR reports $806 in fundraising for over five years. Further, although Virginia law requires any charity soliciting for public funds in the state of Virginia to be registered with the Virginia Office of Consumer Affairs, Vernon Paige of the Virginia State Office of Consumer Affairs advised Special Agent Balberchak on January 30, 2002 that none of the *Safa Charities* are registered in Virginia.

103. The vast majority of the funds leaving the circle of the *Safa Charities* is distributed to two Isle of Man entities (purportedly charitable trusts): *Humana Charitable Trust*, which is controlled by *Mirza*, *Sedky* and *M. Omar Ashraf*; and *York International*, for which the *Mirza* is a trustee. Between 1996 and 2000, approximately $26 million was moved from the *Safa Charities* to *Humana* and *York*. The disposition of funds from these entities is unknown.

104. The movement of funds into entities in the Isle of Man, a known tax haven, makes it difficult to verify whether these funds were used for terrorist financing or some other non-exempt purpose. The table below summarizes the funds which moved to the Isle of Man:

| **Entity** | **Amount** | **Recipient** | **Location** |
|---|---|---|---|
| *African Muslim Agency* | $ 445,000 | *York International Trust* | Isle of Man |
| | | | |

| | | | |
|---|---|---|---|
| *SAAR Foundation* | $21,128,978 | *Humana Charitable Trust* | Isle of Man |
| *Safa Trust* | $ 4,462,147 | *York International Trust* | Isle of Man |
| *York Foundation* | $ 400,000 | *York* International Trust | Isle of Man |

105. When the IRS attempted through an audit to verify the ultimate disposition of the funds sent to the Isle of Man entities, their efforts were stymied by *Mirza* and *Qureshi*. The auditors never learned of the $5.3 million moved to *York International* because relationships between *SAAR*, *African Muslim Agency, Safa Trust* and *York Foundation*, were concealed from them. As for the funds moved to *Humana*, the auditors learned that, although required by law to monitor whether its grants to overseas charities were being used for charitable purposes, *SAAR* had no such records at its U.S. offices. Ultimately, *SAAR* produced checks amounting to $168,667, or 0.8%, of the $21.1 million that *SAAR* represented had moved from *SAAR* to *Humana*.

106. The Form 990 tax returns for the *Safa Charities* concealed relationships that existed between certain charities and concealed certain financial transactions between the charities and the for-profit members of the *Safa Group*. The direct impact of this non-disclosure is the concealment of transactions which may be taxable, partially taxable, or subject to excise taxes or similar penalties imposed for violation of limitations on how exempt organizations conduct their business. In addition, the disclosure of such relationships could lead to an inquiry as to whether the entity was being operated for an exempt purpose and ultimately revocation of tax exempt status.

107. On the basis of the foregoing, I have probable cause to believe that the *Safa Charities* are being operated to hide the distribution of monies to *PIJ* and *HAMAS*, and, I have probable cause to believe that they are being operated for the primary purpose of conducting a business unrelated to their exempt purposes, *i.e.*, investing and managing the substantial funds accumulated by the *Safa Charities*.

108. The money movements between the *Safa Charities* create the false impression they are publicly supported and operating for an exempt purpose, when, by and large, the funds never leave the control of the *Safa Charities* and their offshore related entities. Thus, the principals of the *Safa Charities* are manipulating the tax exempt status of the *Safa Charities* as part of a conspiracy to impede and impair the Internal Revenue Service in the determination and collection of federal tax, and to do so, are misrepresenting the nature of the operations of the *Safa Charities* to IRS officials and the public.

109. It is important to remember that many of the organizations in the *Safa Group* as listed in Attachment C are for-profit businesses. One, *Mar-Jac Poultry, Inc.*, is a large poultry processor located at 1020 Aviation Boulevard, Gainesville, Georgia, whose principal officers are *Barzinji, Al-Talib, M. Omar Ashraf* and *Mirza*. The bank signature cards for *Mar-Jac Poultry, Inc.* show that *Barzinji, Al-Talib, Mirza* and *M. Omar Ashraf* have signatory authority over the bank accounts. Additionally, UCC-1 filings show that *Humana* was a creditor of *Mar-Jac Poultry* after July 2000.

110. First Union and IRS records reflect that *Mar-Jac Poultry* transferred millions of dollars to *Safa Group* businesses and charities between 1997 and 2000. IRS filings and corporate bank records show that *Mar-Jac Poultry* is owned by *Mar-Jac Holdings, Inc.*, which is a

majority-owned subsidiary of *Safa Trust, Inc. Mar-Jac Poultry* was purchased by the *Safa Group* in 1985.

111. Based on my examination of financial documents, correspondence, and interviews with confidential witnesses, I believe that the first members of *Safa Group* were established in the early 1980's. I believe that one source of funds flowing through the *Safa Group* is from the wealthy *Al-Rajhi* family in Saudi Arabia. The *SAAR Foundation*, a *Safa Charity*, was named after Sulaiman Abdul Aziz *Al-Rajhi* (*SAAR* ), head of a wealthy Saudi family. Abdullah Sulaiman *Al-Rajhi*, a relative of Sulaiman Abdul Aziz, is one of the directors of the *Safa Group* corporation, *Aradi, Inc.*, located at 555 Grove Street, Herndon, Virginia.

112. I have found that members of the *Safa Group* moved large amounts of funds into the United States to support their organizational infrastructure. Some of these occurred in the late 1970's and 1980's. As documented by a USCS Currency and Monetary Instrument Report, *Safa Group* member *Ibrahim Hassaballa* brought $3,388,000 in cash into the United States from Saudi Arabia in 1980. These funds allowed the individuals to both start and acquire businesses and organizations in the United States.

113. *SAAR Foundation* first applied for recognition of exempt status in 1983. At that time it listed its governing body as consisting of nine members, including *Totonji, Barzinji, Al-Talib*, and *Abusulayman*. Presently, *Barzinji, Totonji,* and *Al-Talib* comprise the three directors of *Safa Trust, Inc*, and, with Mirza, *Safa*'s only officers. *Abusulayman, Al-Talib, Barzinji*, and *Totonji* are presently the only officers of *IIIT*.

114. The *Safa Group* organizations routinely transfer large amounts of funds between each other. Often, the bank accounts through which the funds move appear to be utilized as "pass

through" accounts. A "pass through" account is an account that is utilized as part of a layering process. Money that enters these accounts tend to remain there for short periods of time, after which the money is then transferred on to another account. "Pass through" accounts are commonly utilized by criminal organizations to convolute the trail of any illicit moneys.

115. An example of an intra-*Safa Group* money transfer and apparent "pass through" activity that I believe is conducted for the purpose of layering financial transactions and confusing any ostensible investigation of the group occurred just last fall. First Union records reflect that the *Sterling Charitable Gift Fund* deposited a check received from *Mar-Jac* Poultry for $250,000 on October 26, 2001. Those records further show that *Sterling* transferred $100,000 to *SAAR Foundation* on November 2, 2001, from the same First Union account that received the check from *Mar-Jac* Poultry. Moreover, *Sterling* wire transferred the remaining $150,000 to *SAAR Foundation* on November 29, 2001.

116. Inasmuch as the money from *Mar-Jac Poultry* obviously was destined for *SAAR Foundation* (however temporarily), I suspect that it was first routed to *Sterling* only to make it more difficult for investigators to decipher the ultimate disposition of the $250,000 apparently generated by *Mar-Jac Poultry*. But the difficulty created by the positioning of *Sterling* between *Mar-Jac* and *SAAR* on the money trail is only one of many barriers created by the *Safa* Group to any investigator trying to ascertain the ultimate disposition of *Safa Group* money. As explained above, it is impossible to determine from domestic bank records the ultimate location of money received by *SAAR,* for *SAAR* was itself but a way-station for money being routed around the world by the *Safa* Group; before *SAAR* was officially dissolved in 2000 (long before receiving

the $250,000 from *Mar-Jac* by way of *Sterling*), it made virtually all of its disbursements to "charities" located in the Isle of Man.

117. As an example of layering involved a charitable contribution and loan, *Safa* contributed $8.6 million to *Heritage* according to the *Safa* Trust 990. In that same year *Heritage* loaned $5.5 million to *Mar-Jac Holdings*, *Safa's* majority owned subsidiary. In the following year, Heritage transferred $4.1 million to *Safa*, reporting that this was a return of the 1996 contribution.

118. There is no reason *Safa* could not have made the loan directly to *Mar-Jac Holdings*, its subsidiary. I believe that the route the funds traveled, from *Safa* to *Heritage* to *Mar-Jac*, with a portion being returned to *Safa*, was designed to disguise the true nature of the transaction and the ultimate disposition of these funds.

119. All of these financial activities listed above are indicative of money laundering. The layering and pass through activities that occur are designed to disguise the origin and ultimate destination of the moneys. I suspect that moneys ultimately are transferred directly to terrorist organizations from the *Safa Group* entities on the Isle of Man, or that funds are otherwise expended for purposes which do not further the *Safa Charities*' exempt purpose(s). Due to bank secrecy laws in such tax havens, it is very difficult for investigators to have access to bank account information. I expect evidence related to these money laundering, terrorist support activities and tax fraud to be found at the subject addresses of this affidavit.

C. Particulars

120. Based on the work of the IRS-CI Special Agents, I will now turn to the particulars of the *Safa Charities*:

1. *African Muslim Agency*

121. IRS records show the *African Muslim Agency* is a tax-exempt organization located at 555 Grove Street, Herndon, Virginia, with a reported purpose to "help other charitable organizations." According to its Form 990 filed in May 2001, two of its three officers were *Al-Talib* and *Mirza*.

122. 91.3% of *African Muslim Agency*'s contributions between 1996-2000 were derived from *Safa* Group related entities[2] and/or individuals; at least 4.1% came from unidentified contributors. For the same period, 42.2% of *African Muslim Agency*'s grants and allocations were made to *Safa* Group related entities and 53% were made to unidentified donees. No contributions, grants or allocations were identified on the 1996 Form 990. The 1997 return showed $100,000 in contributions and $144,000 in grants and allocations, but no identified contributors or donees. The 1998 return showed contributions received of $1,110,000 - - 99% of which came from *Mar-Jac* Poultry, *Inc.*, a *Safa Group* company for which *Mirza, Altaib, Barzinji* and *M. Omar Ashraf* are officers - - and grants/allocations disbursed of $1,065,000 - - of which 90% went to *Safa* Group companies *IIIT* and *York* International. The 1999 Form 990 showed $1,125,000 contributions from one contributor – *Mar-Jac* Poultry, *Inc.*

[2]"Related entities and/or individuals" as used herein refers to either other *Safa Charities*, officer(s), director(s), or trustee(s) of one of the *Safa Charities*, or for-profit or tax-exempt organizations for which one or more officer(s), director(s), or trustee(s) of the seven charities are also officer(s), director(s), or trustee(s) within the *Safa Group*. This is not the same definition applied to the various questions on Form 990.

2. The *Heritage* Education Trust, Inc.

123. IRS records show that The *Heritage Education Trust, Inc.* is a tax-exempt organization located at 750-A Miller Drive, SE, Leesburg, Virginia, with a purpose to "assist educational institutions." According to its Form 990 filed on October 16, 2001, its officers are *Al-Alwani* and *Jaghlit.*

124. 58.9% of *Heritage*'s contributions between 1996 and 2000 were derived from *Safa Group* related entities and/or individuals; 41.1% came from overseas. For the same period, 75% of its grants and allocations were made to *Safa Group* related entities; 24.9% were made to unidentified donees. Its 1996 Form 990 reflects that it received $8,600,000 from *Safa Trust* and another $4,400,500 from overseas, but made a grant only to *SISS* - - a *Safa Group* entity - - in the amount of $800,000. In 1997, it received $1,600,000 from overseas and made grants and allocations of over $5,000,000, split between *SISS* and *Safa Trust, Inc.* It received no contributions of significance between 1998 and 2000 except for $23,500 from *Jaghlit*, but during that time granted $1,903,000 to *SISS* and another $2,802,939 to unidentified donees.

3. International Institute of Islamic Thought ("*IIIT*")

125. IRS records show that *IIIT* is a tax-exempt organization located at 500 Grove Street in Herndon, Virginia with a purpose of "research and education for religion of Islam." According to its Form 990 filed in November 2001, its officers consisted of *Abusulayman*, *Al-Talib*, *Barzinji*, and *Totonji.*

126. As noted above, correspondence seized pursuant to the search warrants in 1995, reflected direct communications between the *IIIT* officers and *Al-Arian* in which the former expressed solidarity with the latter. Discovered in the searches were letters indicating that in

1991 and 1992 *IIIT* contributed at least $50,000 to *PIJ* front-group *WISE*. Moreover, another document seized during these warrants was a 1991 letter from present *PIJ* leader *Shallah* to an administrator of the University of Southern Florida (with a copy to *Nafi*) stating that *IIIT* was the largest contributor to *WISE*.

127. In January 2000, *Jaghlit* told FBI agents that *Nafi* started working at *IIIT* around April 1994. According to *Jaghlit*, *Nafi* was "on loan" from *WISE* until 1996 at which time *IIIT* decided to sponsor *Nafi* in his immigration and naturalization proceedings. *Jaghlit* told the FBI that *IIIT* paid *WISE* an unspecified amount of money in return for allowing *Nafi* to work at *IIIT*. I believe that *Jaghlit* told the FBI that *IIIT* paid *WISE* for allowing *Nafi* to work at *IIIT* in order to conceal the fact that *IIIT* transferred money to *WISE* precisely because *WISE* was a front receiving money for *PIJ*.

128. In June 1998, **redacted xxxxxxxxxxxxxxxxxxxxx** at *IIIT*'s physical address and its post office box in Herndon revealed the receipt of mail from the *El-Shifa Pharmaceutical Industries Company*, in Khartoum, Sudan. That company's facility, believed to be producing ingredients used in chemical weapons, was the target of an August 20, 1998 American cruise missile attack that retaliated for the bombing of American embassies in Kenya and Tanzania.

129. **Redacted xxxxxxxxxxxx** revealed that between October and November 1998, *IIIT* received one parcel through the U.S. mail from *Al-Arian* in Tampa, and another mailed from Lebanon to B.M. *Nafi* at *IIIT*. This confirms to me that the connections between the *Safa Group* and both *Al-Arian*, and *Nafi* remained close even after *WISE* and *ICP* shut down operations.

130. 97.9% of all contributions to *IIIT* between 1997and 2000 were derived from *Safa Group* related entities and/or individuals; another 1.5% came from overseas entities. Over the

same period, 72.7% of *IIIT*'s grants and allocations were reported to be for "Free distribution of books and publications." Unlike the other *Safa Charities*, this appears to be a substantial grant of funds outside the *Safa Charities*, but it is impossible to tell, based on this generic description, what *IIIT* (who earlier funded *PIJ*) ultimately did with these funds.

131. On *IIIT*'s returns, the majority of *IIIT*'s grants and allocations are not identified as to donee. Rather, the returns reflect donations going to generic categories (i.e., free distribution of books and publications). According to *IIIT*'s 1998 Form 990, it received $634,936 in contributions - - 96% of which came from *Safa* Trust and the *African Muslim Agency* - - and disbursed $73,998 in grants and allocations, 82% of which was for "free book distribution." In 1999, it received $721,500 -- the majority of its contributions -- from the *African Muslim Agency* and the *Safa Trust, Inc.*, and made grants of $50,700. In 2000, 100% of its contributions for the year, $1,376,000, came from *Safa Trust* and *York Foundation*.

4. <u>The *SAAR Foundation, Inc.*</u>

132. IRS records show that *SAAR Foundation, Inc.* ("*SAAR* ") was a tax-exempt organization at 555 Grove Street with a purpose to "assist and promote religious and educational research" that was dissolved on December 20, 2000. According to its last Form 990 return, filed May 18, 2001, *SAAR*'s officers and trustees consisted of *Mirza*, *Jaghlit,* and *Sedky.*

133. 90.3% of *SAAR*'s contributions between 1996-2000 were derived from related *Safa* Group entities; the remaining 9.7% came from overseas. Over the same period, 94.6% of its grants and allocations were made to *Safa Group* related entities - - including $21,128,978 to *Humana Charitable Trust* in the Isle of Man. When an IRS audit was conducted on *SAAR* in

2000, *Mirza* told auditors that he had set up *Humana Charitable Trust* in the Isle of Man to receive transferred assets from *SAAR*, due to publicity tying *SAAR* to terrorist organizations.

134. *SAAR*'s 2000 return shows that it dissolved on December 20, 2000. The return shows that it made a grant/allocation consisting of $2,650,000 of *Mar-Jac Investments, Inc*. stock to *Sterling Charitable Gift Fund* ("*Sterling* "), another *Safa Charity*.

5. *Safa Trust, Inc.*

135. IRS records show *Safa Trust, Inc.* is a tax-exempt organization located at 555 Grove Street with a purpose to "[p]romote religious, educational & cultural projects." Its Form 990 return filed November 6, 2001 listed *Barzinji, Mirza*, Totonji, and *Al-Talib* as its officers, directors, and trustees.

136. 53.7% of *Safa Trust*'s contributions between 1996 and 2000 were derived from *Safa Group* related entities and/or individuals; 39.6% came from overseas entities. For the same period, 84% of *Safa Trust*'s grants and allocations were made to *Safa Group* related entities; 15.3% was made to unidentified donees. In 1996, *Safa* received $2,935,695, all from unidentified entities overseas, and made grants or allocations of $4,955,900, over 99% of which went to *Heritage Education Trust*, and *IIIT*. In 1997, it received $6,594,988 contributions, over 99% of which came from overseas or related individuals and entities, and provided grants and allocations of over $3,800,000 -- over 99% of which went to related *Safa Group* entities. In 1998, it received about $95,000 - - mostly from *Mirza* - - and disbursed $764,793, over 99% of which went to *IIIT* and *York* International. In 1999, *Safa* received about $1,759,025 in contributions ($1,128,125 of which came from *Mirza*), and made cash grants and allocations of $2,108,756 to unidentified donees. In 2000, *Safa* received only minor contributions but

distributed $2,072,681 in grants and allocations, 97% of which went to *IIIT*, the *York Foundation* (in Herndon), and *York International* in the Isle of Man.

6. <u>*Sterling Charitable Gift Fund*</u>

137. IRS records show *Sterling Charitable Gift Fund* ("*Sterling* ") is a tax-exempt organization located at 555 Grove Street with a purpose "to support charitable organizations which conduct, promote and administer charitable, religious and educational programs and activities described in 501(c)(3)." The 2000 Form 990, filed in May 2001, lists *Mirza*, *M. Omar Ashraf*, and Muhammad *Ashraf* as *Sterling*'s officers, directors, and trustees.

138. *Sterling Charitable Gift Fund* began operation in 2000. There were only two transactions recorded for that year. First, *Mirza*, *M. Omar Ashraf* and Muhammad *Ashraf* collectively contributed $300 to *Sterling*. Second, *Sterling* received 1000 shares of *Mar-Jac Investments, Inc.* stock, valued at $2,650,000, from *SAAR* (as noted above, this was virtually all of *SAAR's* remaining assets). According to the IRS Form 990, *Sterling* made no grants or allocations in 2000.

7. <u>*York Foundation*</u>

139. IRS records show *York Foundation* is a tax-exempt organization located at 555 Grove Street with a purpose of "education, research, charity." The Form 990 return filed on May 20, 2001 lists *Abusulayman*, *Mirza*, and Muhammad *Ashraf* as its officers, directors, and trustees.

140. 96.4% of *York*'s contributions during 1999 and 2000 were derived from *Safa Group* related entities and/or individuals. During the same period, 72.4% of its grants and allocations were made to *Safa Group* related entities and 21.8% were made to unidentified donees. *York*'s

Form 990 for 1999 reflects contributions of $1,432,500, 93% of which were received from related *Safa Group* individuals and entities. *York* illegally failed to identify any of its donees for the year. In 2000, at least 97% of the $4,967,762 it received came from related *Safa Group* individuals and entities; it made cash grants and contributions of $392,000 to *IIIT* and $400,000 to *York* International in the Isle of Man.

XI. False Statements on the Forms 990

A. General

141. In the course of their review of the Forms 990 for the *Safa Charities*, the agents assigned to this investigation have discussed and reviewed certain entities on these returns with tax law specialists from IRS's Tax-Exempt and Government Entities, Exempt Organization Division. These specialists confirmed, based on evidence presented to them by the investigating agents, that infomation as to relationships to the reporting entity required by Form 990, Part VI, Question 80(a) and Form 990, Schedule A, Part III, Question 2 should have been disclosed by the tax exempt entity. The succeeding paragraphs describe the information sought by those questions and the evidence which demonstrates the answers provided were false.

B. False Statements Regarding Relationships to Other Organizations

142. Part VI, Line 80a, Form 990, asks, " Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc. to any other exempt or nonexempt organization?" If answered "yes", the name of the organization is required to be identified. The instructions for Form 990 indicate that a "yes" answer to Line 80a is required if most (more than 50%) of the organization's governing body, officers, directors, trustees, or membership are also officers, directors, trustees, or members of any other organization. The officers, directors, trustees, or members need not constitute 50% or more of the other organization. Thus, if the reporting organization has a total of five officers and three of those officers sit on the board of 12 directors of another entity, then the organizations are related and the relationship must be disclosed.

143. A review of the Forms 990 filed with IRS, tax returns of other related entities, tax related information, and corporate information obtained from the Virginia State Corporation Commission revealed the following:

144. *Mirza*, *M. Omar Ashraf*, and *Muhammad Ashraf* were the sole individuals listed as officers, directors, trustees, and key employees on *Sterling Charitable Gift Fund*'s Form 990 for the year 2000. Line 80a, Part VI, of this return, concerning related organizations, was answered "no". However, a review of the 1999 and 2000 Forms 990 for *York Foundation* revealed that *Mirza* and *Muhammad Ashraf* were also two of the three listed officers, directors, trustees, and key employees of *York Foundation*. *York*'s Form 990 also reflected the answer "no" on line 80a, Part VI. *Mirza* signed as President on both the *York* Form 990 and the *Sterling* Form 990. The responses on both returns are false because they failed to report that the two organizations were related to each other.

145. According to Virginia State corporation records, *Mirza*, *M. Omar Ashraf*, and *Muhammad Ashraf* were either the only officers and directors, or comprised the majority (greater than 50%) of the officers or directors of: *Mar-Jac Investments, Inc.* (located at 555 Grove Street, Suite 110, Herndon, VA), of *Grove Corporate Plaza, Inc.* (no longer in business; formerly located at 555 Grove St., Suite 110, Herndon, VA), and of *Sterling Management Group, Inc.* (located at 555 Grove St., Suite 116) for the year 2000. None of these relationships are disclosed on *Sterling Charitable Gift Fund*'s 2000 Form 990, Part VI, Line 80a and 80b. The failure to disclose these relationships is material for the following reasons. *Sterling Charitable Gift Fund*'s primary asset in the year 2000 was 1,000 shares of *Mar-Jac Investments, Inc.* stock. Also, Georgia State corporation records reflect that *Sterling Management Group, Inc.* is the manager of HFC Feed Mill, LLC. *York Foundation*'s 2000 Form 990 shows that during the year 2000, *Mar-Jac Poultry* contributed its 100% interest in *HFC Feed Mill, LLC*, worth $4,402,000, to *York Foundation*.

146. The *SAAR Foundation*'s 1997-2000 Form 990 lists *Mirza* and *Sedky* as two of its three listed officers, directors, trustees, and key employees. *SAAR*'s 1997 and 1999 Forms 990 reflects the answer "yes" to question 80a, Part VI, but names only relationships with *SAAR* International (1997) and *Mar-Jac* Investments (1999). However, documents found in a settlement file for the sale of the real estate located at 555 and 585 Grove Street and 596 and 598 Grant Street, Herndon, VA, show that *Humana Charitable Trust* is an Isle of Man trust. The documents show that *Humana* was set up on November 12, 1997 by *Amana Limited*, with *Amana* being the original Trustee whose directors are *Mirza* and *Sedky*. The documents further indicate that *Amana Limited* is an Isle of Man corporation whose appointed officers are *Mirza*, *Sedky*, and

*M. Omar Ashraf.* The Forms 990 for *SAAR* fail to disclose this relationship. From 1997 through 2000, *SAAR* contributed the majority of its assets ($21.1 million) to *Humana Charitable Trust* but did not disclose the relationship between the donor (*SAAR* ) and the donee (*Humana*) on its Forms 990 as required.

147. *SAAR*'s 1996 Form 990 return lists *Mirza* and *Jaghlit* as two of its three officers, directors, trustees, and key employees. *SAAR*'s 1996 Form 990, Part VI, Question 80(a) reflects the answer "yes", but identifies only *SAAR* International DC, Inc. as a related organization. Yet, in 1996, *Mirza* and *Jaghlit* were also officers of *Safa Trust, Inc.* and of *Heritage Education Trust, Inc.* as evidenced by their respective Form 990s for 1996. These relationships are not disclosed in *SAAR*'s 1996 Form 990 return.

C. False Statements on Schedule A (Supplementary Information), Form 990 Relating to Statements About Activities

148. Section 501(c)(3) organizations must attach a completed Schedule A (Form 990-Supplementary Information) to their Form 990. Part III of Schedule A requests information about the organization's activities during the year. Question 2, Part III, Schedule A asks, "During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any of its trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary:

a. Sale, exchange, or leasing of property?
b. Lending of money or other extension of credit?
c. Furnishing of goods, services, or facilities?
d. Payment of compensation (or payment or reimbursement of expenses if more than $1,000)?
e. Transfer of any part of its income or assets?

149. The Schedule A instructions specify that Part III, lines 2(a) through 2(e) apply to both sides of a listed transaction. Reporting is required, for example, whether the exempt organization is a payer or payee, buyer or seller, lender or borrower.

D. False Statements Relating to Question 2b, Part III, <u>Schedule A – Lending of Money or Extension of Credit</u>

1. *<u>SAAR Foundation</u>*

150. A review of the Forms 990 show that sometime prior to 1996, the *SAAR Foundation, Inc.* made a $15,000,000 loan to *Mar-Jac Investments, Inc.*, a taxable entity. On its 1997 Form 990, *SAAR* listed *Mar-Jac* Investments as a 100% subsidiary with assets of $11,500,000. This loan was carried as a loan receivable on *SAAR*'s Forms 990 for 1996 through 1998. Although the loan was not made during the years 1996 through 1998, *SAAR* continued to extend credit to *Mar-Jac* Investments during these years as a balance was still due. No interest rate is shown. On each of *SAAR*'s returns for 1996-98, however, the answer to Question 2(b), Part III, Schedule A (hereafter "Q2b") is "no".

151. These are false statements because Virginia State corporate records reflect that *Mirza* was a registered agent, director, president, and treasurer of *Mar-Jac* Investments from 1997-2000. *SAAR*'s 1996-2000 Forms 990 demonstrate that *Mirza* was the President, CEO, and Trustee of *SAAR* during those years. On its 2000 return, *SAAR* reported that its interest in *Mar-Jac Investments* had been contributed to *Sterling Charitable Gift Fund* but *Mirza,* who signed the Forms 990 for *SAAR* and for *Sterling*, concealed that he was on both ends of this transaction.

152. *SAAR*'s 1996 and 1997 Forms 990 also reflect a $109,890 demand loan made by *SAAR* to *Mar-Jac* Poultry. Again, the answer to Q2b is "no". This is a false statement because, according to State of Georgia corporation records, *Mirza* is an officer of *Mar-Jac Poultry, Inc.*

2. *Safa Trust*

153. *Safa Trust, Inc.*'s 1999 and 2000 Form 990 returns show that *Safa Trust* made a loan of $900,000 to *Reston Investments, Inc.*, a taxable entity, during 1999, the balance of which had increased to $1,364,972 by the end of the year 2000. In addition, *Safa Trust*'s 1998 Form 990 shows that it had a note payable (liability) to *Reston Investments, Inc.* in the amount of $352,857. *Barzinji*, *Mirza*, and *Al-Talib* were all officers of both *Safa Trust* and of *Reston Investments, Inc.* in 1998-2000, according to *Safa*'s Forms 990 and Virginia State corporation records. Yet, the *Safa Trust* Form 990s for 1998, 1999, and 2000, signed by *Mirza*, falsely show the answer "no" to Q2b.

154. In addition, *Safa Trust*'s Forms 990 reflect that it had also made a $263,000 working capital loan to *Grove Corporate, Inc.* in 1997 and a $500,000 loan to *Mar-Jac* Poultry sometime prior to 1996, the balance of which carried into 1996. *Mirza* was an officer of both of these taxable entities. *Barzinji* and *Al-Talib* were also officers of *Grove Corporate, Inc.* Yet, on *Safa*'s returns for 1996 and 1997, the answer to Q2b is falsely stated as "no".

E. False Statements Relating to Question 2a (Sale, exchange, or leasing of property) and 2e (Transfer of any part of income or assets), Part III, Schedule A

1. *African Muslim Agency*

155. 1998 and 1999 Forms 990 for the *African Muslim Agency* report that *Mar-Jac Poultry*, a taxable entity, donated $1,100,000 cash to the *African Muslim Agency* in 1998 and

$1,125,000 cash to the *African Muslim Agency* in 1999. Georgia State corporation records reflect that *Mirza* and *Al-Talib* were both officers of *Mar-Jac Poultry*. *African Muslim Agency*'s Form 990 shows both individuals were also officers of the *African Muslim Agency*. Yet, *African Muslim Agency*'s Forms 990 for 1998 and 1999 both answer "no" for question 2e. These are false statements since *Mar-Jac Poultry* transferred assets to *African Muslim Agency* while *Mirza* and *Al-Talib* were officers of both entities.

2. *SAAR Foundation*

156. *SAAR*'s 1999 Form 990 reflects that it invested $2,703,760 in corporate bonds of *Mar-Jac* Investments, a taxable entity. *Mirza* was the President, CEO, and a trustee of *SAAR* and the President, Treasurer, and a director of *Mar-Jac Investments*. *SAAR*'s 1999 return reflects the answer "no" to Questions 2a and 2e. These are false statements since *Mar-Jac Investments* sold corporate bonds to *SAAR* and *SAAR* transferred assets (i.e., funds) to *Mar-Jac Investments* to purchase the bonds.

3. *Safa Trust*

157. *Safa Trust*'s Forms 990 reflect that during 1997, *Safa* invested $2,000,000 in the corporate stock of *Grove Corporate, Inc*. According to Maryland State Personal Property Returns, *Barzinji*, *Mirza*, and *Al-Talib* were all officers of *Grove Corporate, Inc.* and of *Mena* Corporation, both taxable entities. According to *Safa*'s 1997 return, all three were also officers of *Safa Trust*. Yet, *Safa Trust*'s 1997 return reflects the answer "no" to Questions 2a and 2e. These are false statements since *Grove Corporate, Inc*. sold corporate stock to *Safa* and *Safa* transferred assets (i.e. funds) to *Grove Corporate* to purchase the stock.

4. *York Foundation*

158. *York Foundation*'s 2000 Form 990 shows that *Mar-Jac Poultry* , a taxable entity, donated 100% ownership of HFC Feed Mill, LLC, valued at $4,402,000, to *York Foundation*. *York*'s 1999 Form 990 shows that *Mar-Jac Poultry* donated $175,000 cash to *York* in 1999. Georgia State corporation records reflect that *Mirza* was an officer of *Mar-Jac Poultry* . *York*'s Forms 990 identifies *Mirza* as an officer of *York*. On *York*'s Forms 990 for 1999 and 2000, however, question 2e was answered "no". These are false statements since *Mar-Jac Poultry* transferred assets to *York Foundation* while *Mirza* was an officer of both *Mar-Jac Poultry* and *York*.

F. False Statements Relating to Contributions Received and Grants Made by Tax Exempt Organizations

1. *African Muslim Agency* and *IIIT*

159. The *African Muslim Agency*'s 1998 Form 990 reflects that it made a $600,000 cash donation to *IIIT*. On its 1998 Form 990, however, *IIIT* only reported that it received a $370,000 contribution from *African Muslim Agency*. One or both of these returns are false statements. The *African Muslim Agency*'s 1997 Form 990 does not report making any donations to *IIIT* in 1997. However, *IIIT*'s Form 990 for 1997 shows that *African Muslim Agency* contributed $265,000 to *IIIT* in 1997. One of these is a false statement.

160. *IIIT*'s 1997 and 1998 returns appear to have been signed by *Al-Talib*. *African Muslim Agency*'s 1997 and 1998 returns were signed by *Mirza*.

2. *Safa Trust*

161. Between January 17, 1997, and July 1997, checks totalling $325,000 were drawn on the *Safa Trust, Inc.* bank account at First Union Bank and made payable to *HLF* - - the *HAMAS* front group. This amount is not reflected on *Safa Trust*'s 1997 Form 990 as a contribution. I believe that *Safa* did not mention this contribution on its return to make it less likely that law enforcement authorities would track money from *Safa* to *HLF*.

3. *Safa Trust* and *Heritage Education Trust*

162. On its 1996 Form 990, *Safa Trust* reported that it made grants and allocations of $3,602,009 to *Heritage Education Trust*. On *Heritage*'s 1996 Form 990, *Heritage* reported that it received $8,600,000 in contributions from *Safa Trust*. One of these returns is a false statement. *Safa*'s 1996 return was signed by *Mirza*. *Heritage*'s 1996 return was also signed by *Mirza*, who was *Heritage*'s Secretary, Treasurer, and Director in 1996.

4. *Safa Trust* and *IIIT*

163. On its Form 990 for 1997, *IIIT* reported that it received contributions of $522,007 from *Safa Trust* in 1997, but on its own Form 990, *Safa Trust* reported that it donated $585,649 to *IIIT* the same year. On its Form 990 for 1998, *IIIT* reported that it received contributions of $240,000 from *Safa Trust*, but *Safa Trust* reported that it only donated $159,178 to *IIIT* the same year. At least one of these returns is false. *Mirza* signed *Safa*'s Forms 990 for 1997 and 1998. *Al-Talib* appears to have signed *IIIT* Forms 990 for 1997 and 1998.

5. *Heritage Education Trust* and *SISS*

164. *Heritage Education Trust*'s 1996 Form 990 reflects that *Heritage* gave a grant/allocation of $800,000 in that year to its affiliate, *SISS*. In its 1996 Form 990, *SISS*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| v. | ) | Case No. 03-2422 (RMC) |
| RITA KATZ, et al., | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 10

# Part 3

reported that it received only $450,000 in total contributions (contributors not shown) the same year, a difference of $350,000. One of these returns is false.

6. *SAAR and Safa*

165. A check written by *Mirza* from the account of *SAAR Foundation* to *All Dulles Area Muslim Society ("ADAMS")*, in the amount of $250,000, was deposited into a *Safa Trust* account on December 15, 1997. On *SAFA*'s 1997 Form 990, however, this amount is not reflected as a contribution received from either *ADAMS* or *SAAR*. Moreover, *Safa*'s 1997 Form 990 does not reflect any other transactional relationship with *ADAMS* or *SAAR* (i.e., a loan receivable or loan payable) that would explain the transaction. Furthermore, *SAAR*'s Form 990 for 1997 does not reflect a grant/allocation to either *ADAMS* or *SAFA* in 1997, not does *SAAR*'s return show any other transactional relationship with *ADAMS* or *Safa* (i.e. loan receivable or loan payable) that would explain the transaction. (*M. Omar Ashraf*, of *Sterling Charitable Gift Fund*, is listed as an officer of *ADAMS*).

XII. THE *SAAR* Audit

A. Observations of and Information Obtained from Auditors

166. In March of 1999 the Internal Revenue Service, Tax Exempt/Government Entities, Exempt Organizations Division began an audit of *SAAR*'s Forms 990 for the year 1997 and 1998. The audit concluded on February 21, 2001. At the conclusion of the audit the IRS issued a notification to *SAAR* that it was continuing to recognize its status as exempt pursuant to Section 501(c)(3). Revenue Agents Eugene Gilmartin and Michael Bieloski, who conducted the audit were interviewed by agents assigned to this investigation.

167. Gilmartin and Bieloski audited the Forms 990 returns filed by *SAAR* for the years 1997 and 1998. At the outset *SAAR* represented it was not conducting any business during the examined years other than distributing its assets. As a result, the examination was limited in scope to attempting to verify that the grants and allocations made by *SAAR* were for religious, scientific or educational purposes. As part of their examination, the auditors met with *Mirza* and *SAAR*'s return preparer, *Manzoor Qureshi*,, at *SAAR*'s office at 555 Grove Street in Herndon. *Mirza* was not present for the entire audit; however, *Qureshi* called him in on several occasions to answer specific questions.

168. The investigation has obtained the audit file from Revenue Agent Gilmartin. The file contained correspondence, work papers and some cancelled checks. As a result of his review of the file and interview of the examining agents, investigators learned the following:

169. The revenue agents were told that *SAAR* was created for people overseas to pay scholarships for Muslims in the United States.

170. *Mirza* told the examining agents that he had founded *Humana Charitable Trust* in the Isle of Man ("*Humana*") and was transferring *SAAR*'s assets to it as a result of negative newspaper publicity that associated *SAAR* and *Safa Trust* with terrorist groups. Gilmartin and Bieloski stated that *Mirza* and/or *Qureshi* led them to believe that *Mirza* intended to move these two charities out of the country.

171. In order to verify that *SAAR*'s grants/allocations were being used for an exempt purpose, the examiners requested a list of donee-beneficiaries that had received grants from *SAAR* and/or *Humana* for the years 1997 and 1998. They contacted those donees located in the United States, who denied having any knowledge of *Humana* or *SAAR*. *Mirza* advised the

examiners that *Humana*'s funds were distributed to Al *Rajhi* Charities in Saudi Arabia and then to the beneficiaries through *Al-Rajhi*. *Qureshi* sent a letter stating that *Mirza* had traveled to Saudi Arabia and obtained copies of wire transfers and checks aggregating $168,667 that went from *Al-Rajhi* to U.S. beneficiaries. The auditors obtained confirmation from recipients that they received grants from *Al-Rajhi* Charities, but never received documentation that *Humana* funds were ever disbursed to *Al-Rajhi*.

B. Misstatements/Misrepresentations During the Audit

172. I have spoken with IRS agents who have reviewed the file associated with the audit. In light of their knowledge of the investigation and facts set forth elsewhere in this affidavit, there is probable cause that *Mirza* and *Qureshi* obstructed or attempted to obstruct the successful completion of the audit by providing false and/or misleading information to the auditors. In particular, when the auditors made inquiries into entities related to *SAAR* they were met by false denials of such relationships.

173. At the outset of the audit, the agents asked for an "organizational chart of all subordinate or related entities." At the opening meeting on April 6, 2000, *Mirza* and *Qureshi* stated the universe of related entities is substantially smaller than the agents had anticipated. They subsequently received a chart which showed that the only active members were *SAAR Foundation, Inc.*, and it wholly owned subsidiary *Mar-Jac Investments, Inc.* In light of the evidence set forth in this affidavit, this representation is patently false.

174. The auditors were told that *SAAR* was winding down its operations and that all of its assets had been transferred overseas to *Humana Charitable Trust*. In the course of the audit they were provided a resolution of the Board of Directors of *SAAR*, directing that all assets be

transferred to *Humana* and that *SAAR* be dissolved. In fact, $2,650,000 of *SAAR* assets were transferred to a domestic tax exempt organization, *Sterling Charitable Gift Fund*, an organization whose identity and existence were concealed from the auditors. According to IRS records, *Sterling Charitable* Fund was established in March 2000, 11 months before the *SAAR* audit was concluded. The transfer of the $2,650,000 occurred on December 20, 2000, the date of *SAAR*'s purported dissolution. By the formation of *Sterling Charitable Gift Fund* and the transfer of *SAAR* assets to it, *SAAR* became *Sterling*. In other words *SAAR* simply changed its name to *Sterling*.

175. In addition, *SAAR* still had an active bank account with First Union Bank until October 2001. The address on the account was 555 Grove Street, Herndon, Virginia. *SAAR*'s 2000 Form 990 shows that it transferred the majority of its assets, consisting primarily of stock in *Mar-Jac Investments*, to *Sterling Charitable Gift Fund*. According to *Sterling*'s Form 990 for 2000, *Sterling*'s address is the same as *SAAR*'s – 555 Grove Street in Herndon. *Mirza* is listed on *Sterling*'s 2000 return as the President of *Sterling*. Furthermore, according to First Union statements, *Sterling* transferred $250,000 to "*SAAR Foundation*, Int'l Institute of Islamic Thought (*IIIT*), 555 Grove Street, Herndon, VA 22070" during November 2001. The money was deposited into an account in the name of *IIIT* at P.O. Box 669, Herndon, VA 20170. However, the transfer of money in November 2001 indicates that *SAAR* operated as alter ego or nominee of *IIIT* even though, according to IRS records, it was dissolved as a 501(c)(3) charity in December 2000.

176. During an April 6, 2000 meeting attended by *Mirza* and *Qureshi*, the auditors were told that there was no overlap of officers or trustees between *SAAR* and *Safa Trust, Inc.* In

addition they were told that *Mirza*'s company, *Sterling Investments*, provided management and accounting services for *Safa Trust*, creating the impression that the only relationship between *Sterling* and *Safa* was an arm's length business relationship. Further, they were told that *Safa Trust* had its offices in Herndon, but at a location different from *SAAR*'s. In fact, in an interview for Regardie's Magazine published in October 1988, *Mirza* admitted that *Safa Trust* was an entity related to *SAAR*. Moreover, from 1996-2000, *Mirza*, the President/CEO/Trustee of *SAAR* at 555 Grove Street, was listed on *Safa*'s Forms 990 as a Vice President of *Safa Trust* and its registered agent for service of process at 555 Grove Street. In addition *Safa*'s bank statements for October-December 2001 went to the same address as *SAAR*'s.

177. At the same April 6, 2000 meeting the auditors were told of the existence of *York Foundation*, a new entity represented to be independent from the *SAAR Foundation*. In fact, *Mirza*, the President and Treasurer of *York Foundation*, is also the President/CEO and Trustee of *SAAR Foundation*, which was located at the same address as *York Foundation*.

C. Additional Information Concerning *Al-Rajhi* Charity

178. IRS-CI Special Agents have reviewed the copies of 14 checks provided during the audit as substantiation that *SAAR* had made grants/allocations to beneficiaries through *Humana Charitable Trust* and *Al-Rahji* Charity. They found that the checks were drawn on a Chase Manhattan Bank Account in New York. The account is in the name of *Al-Rahji* Banking & Investment Corp, Riyadh, Saudi Arabia. Eleven of the checks indicate on the face that the amount of the check came, not from *Al-Rahji* Charity, but from an individual named Abdul Rahman *Al-Rajhi*. The other three checks do not identify from whom the amounts came. The eleven checks, totaling $104,000, show that someone, not *Al-Rajhi* Charity, remitted the stated

amount to the account holder, *Al-Rajhi* Banking & Investment Corp., which in turn drew checks on a New York bank account in the stated amounts to the payees. Nothing on any of the 14 checks identifies the funds as having been issued from *Al-Rajhi* Charity, much less from *Humana*.

179. The remitter, Abdul Raham *Al-Rajhi*, is identified on a website as the Vice Chairman & Executive Manager of *Al-Rahji* Commerical Foreign Exchange. Correspondence with the *Al-Rahji* Charity purportedly related to the donations does not indicate that Abdul Rahman *Al-Rahji* is with *Al-Rajhi* Charity. A web search did not locate a web address for *Al-Rajhi* Charity. The only evidence that Abdul Rahman *Al-Rajhi* is connected with an *Al-Rajhi* Charity Office comes from a statement prepared by *Mirza* in the course of the audit, dated December 29, 2000, which asserts Abdul Rahman *Al-Rajhi* is a manager of *Al-Rajhi* Charity.

180. *Al-Rajhi* Banking & Investment Corp.'s website indicates that Abdullah Sulaiman *Al-Rajhi* is the General Manager of *Al-Rajhi* Banking & Investment Corp. Virginia corporation information indicates he is also the President of *Aradi, Inc.*, located at the same address as *SAAR*, 555 Grove Street. Other officers listed for *Aradi, Inc.* are *Al-Talib* and *Sedky*. Thus, while the *Safa Group* cannot be said to have formal control over *Al-Rajhi* Banking & Investment Corp., the *Safa Group* had access to a bank and banking officials through Abdullah Sulaiman *Al-Rajhi* for purposes of producing checks purportedly paid for *SAAR*'s charitable purposes.

XIII. Additional Layering in Connection with *SAAR Foundation*'s Dissolution

181. *Mirza* stated in the audit that *SAAR* had been founded as a charitable organization in the United States to earn a better yield on funds collected in Saudi Arabia for charitable purposes. This was done because the members of the *Al-Rahji* family believed that, by investing in the

United States, they could earn a higher yield on the funds collected prior to the time they were disbursed for charitable purposes.

182. After what he described alternatively as adverse publicity in papers about connections to terrorism, or the media becoming too probing in 1995 -1996 (which appears to refer to the press reporting *SAAR* giving money to *PIJ* through *IIIT* ), *Mirza* stated that *Humana* was formed in the Isle of Man in November 1997. He then explained that rather than establishing its own disbursement office (to determine who would receive grants), *Humana* decided it would use the *Al-Rajhi* Charity office in Saudi Arabia. As a result of this restructuring, *SAAR* placed its considerable asset pool beyond the immediate reach of United States law enforcement and added at least two additional layers (*Humana* and *Al-Rajhi*) to any grant purportedly made for charitable purposes. With respect to disbursements to United States-based donees, this path requires all disbursements to be moved from *SAAR*, overseas, through a minimum of two financial institutions, before being returned to the ultimate beneficiary in the United States.

183. There is no innocent reason which accounts for these additional financial transactions connected with these disbursements. *SAAR* performed a role as the money managers for this huge asset pool. Even if *SAAR* was incapable of determining who was entitled to the grants, the names of the recipients could have been relayed to *SAAR* - - and the disbursement by *SAAR* could have been made directly to those recipients - - without first forwarding the funds through the additional financial institutions.

XIV. Evidence of Personal Inurement

184. In this section I will detail the supporting evidence uncovered in the financial investigation which has established probable cause to believe that *Safa Group* individuals have obtained personal inurement as a result of their control over the businesses and charities described above. As a result, principals of the *Safa Group* have also committed tax fraud in connection with their individual income tax returns.

185. One of the primary reasons the Form 990 requires disclosure of transactions between related entities and individuals is because of the prospect of personal inurement, i.e., individuals profiting personally from a § 501(c)(3) entity. The evidence reviewed to date demonstrates several examples of personal inurement.

**Paragraphs 192 through 213 REDACTED**

E. Failure to Disclose Foreign Bank Accounts

186. A business account application signature card from 1st American Bank shows that *SAAR* International, with an address of 555 Grove Street in Herndon opened a bank account at 1st American Bank on 09/19/89. *Mirza*, *Al-Talib*, and *Barzinji* all had signatory authority. The bank statement reflects the use of the same taxpayer EIN number as the one used by *SAAR Foundation, Inc.* The use of the same taxpayer EIN number demonstrates that *Mirza* represented to the bank that *SAAR Foundation, Inc.* and *SAAR* International were the same entity.

187. A business account application signature card from 1st American Bank shows that *SAAR Foundation Canada, Inc.*, Grove Street in Herndon, opened a bank account at 1st American Bank on 02/22/90. *Mirza*, *Al-Talib*, and *Barzinji* all had signatory authority.

188. A review of *SAAR* bank records for account # 2000071284015 at First Union revealed seven debit memos for transfers cumulatively totaling over $200,000 to either *"SAAR Foundation* Canada" or "*SAAR Foundation*" at Canadian Imperial Bank of Commerce. While I have not yet obtained foreign bank accounts, this evidence gives me reasonable cause to believe that they are signatories on a foreign bank account in the name of *SAAR Foundation Canada* and/or *SAAR Foundation* at the Canadian Imperial Bank of Commerce.

189. The accounts of *SAAR Foundation* and *SAAR Foundation Canada* at First Union in Virginia include *Mirza*, *Barzinji*, *Al-Talib*, and/or *Jaghlit* as the signatories on those accounts. Thus, I have probable cause to believe that *Mirza*, *Barzinji*, *Jaghlit* and *Al-Talib* have signatory authority over accounts at Canadian Imperial Bank and thus have filed materially false tax returns for the year 1996 in that they failed to disclose on Schedule B of their personal tax returns that they had signatory authority over a bank account in a foreign country. A review of the relevant returns demonstrates that each individual answered "No" to the question related to foreign bank accounts.

190. Further, a document dated 12/15/97 and entitled, "Consent to Action Taken in Lieu of an Organizational Meeting of *Amana Limited*" that investigators obtained from BB&T Bank, shows that the directors of *Amana* (*Sedky* and *Mirza*) resolved that *Amana*, an Isle of Man corporation (and the Trustee for *Humana*, an Isle of Man trust) designated Commerce Bank of Maryland (later taken over by BB&T) and Bank Leu as depositories for the funds of *Amana Limited* and *Humana*. Moreover, First Union records for *SAAR* contain debit memos for three international fund transfers on October 15, 1998, totaling $2,000,000, to Credit Suisse / Bank Leu for the benefit of *Humana*. Thus, I have probable cause to believe that *Mirza* had signature

or other authority over any accounts in the name of *Humana Charitable Trust*, including Bank Leu, a foreign bank account and, accordingly, filed a materially false tax return for 1998 in that he failed to disclose on his return's Schedule B that he had signatory authority over a bank account in a foreign country.

191. Moreover, *Mirza* had control over the overseas bank accounts for the Isle of Man entities *Humana* and *York International Trust*.

192. On October 16, 1998, *Mar-Jac Holdings, Inc.* wrote a check to *York International Trust* in the amount of $54,327.83. The notation on the check evidenced a loan made to *Mar-Jac* Holdings, *Inc.* by *York International Trust*. The check was endorsed, "Pay to *Sterling Investment Group*," and signed by *Mirza*, trustee for *"York Int."*

193. A review of *Mirza*'s 1998 individual income tax return shows that *Mirza* failed to identify signature or other authority over a foreign bank account. On the basis of the foregoing evidence, I have probable cause to believe this is a materially false statement.

XV. Conclusions Regarding Offenses Committed

194. On the basis of the facts set forth in the foregoing affidavit, I have probable cause to believe that:

a. At all times relevant to this affidavit, *Al-Arian*, *WISE*, *ICP*, and *HLF* were fund raising fronts for *HAMAS* and *PIJ*.

b. *Al-Alwani*, *Barzinji*, *Jaghlit*, *Mirza*, and others in the *Safa* Group maintained a financial and ideological relationship with persons and entities (*WISE*, *ICP*, *HLF*, *Al-Arian*, *Nafi*, and Ramadan *Shallah* ) with known affiliations to the designated terrorist Groups *PIJ* and *HAMAS*.

c. *Al-Alwani*, *Barzinji*, *Jaghlit*, *Mirza*, and others in the *Safa* Group maintained their financial relationships with *WISE*, *ICP*, *HLF*, *Al-Arian*, *Nafi*, and *Shallah* through various members of the *Safa Group* particularly including *IIIT*.

d. Before search warrants were executed in 1995, the financial support provided to terrorist front-groups provided by the organizers of the *Safa Group* was sometimes relatively open and sometimes hidden.

e. After the search warrants were executed in 1995, the members of the *Safa Group* continued to ideologically support *HAMAS* and *PIJ* but generally did not provide overt financial support to those organizations.

f. After the search warrants were executed in 1995, the members of the *Safa Group* stopped providing open support to *HAMAS* and *PIJ*. Instead, they concentrated on routing financial support to those same organizations by layering financial transactions through charities and businesses within the *Safa Group* to conceal and disguise the fact that they were continuing to send money from the United States to the Middle East to fund international terrorism, in violation of 18 U.S.C. § 1956(a)(2), 18 U.S.C. § 2339A, and 18 U.S.C. § 2339B.

195. On the basis of the facts set forth in the foregoing affidavit, even if the *Safa Group* is not sending money to *HAMAS* and *PIJ*, I have probable cause to believe that *Abusulayman, Al-Alwani, Barzinji, Al-Talib, M. Omar Ashraf, Muhammad Ashraf, Jaghlit, Sedky, Ahmad Totonji*, and others, have engaged in a conspiracy to defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the Internal Revenue Service of the Department of the Treasury in the ascertainment, computation, assessment, and collection of federal income taxes, in violation of 18 U.S.C. §371, by -

a. Using the *Safa Charities* to take advantage of exemptions from federal income taxation while abusing the requirements for tax exempt status;

b. Using a web of corporate entities, both exempt and non-exempt, over which they exercised actual or effective control to move funds between entities, through a series of transactions designed to conceal the true nature, source, disposition and taxability of revenues moved between these entities; and

c. Misrepresenting the nature of the relationship between the *Safa Charities* and for-profit members of the *Safa Group* to avoid scrutiny of their financial transactions.

196. Further, I have probable cause to believe that *Mirza*, *Abusulayman*, *Al-Alwani*, *Barzinji*, *Al-Talib*, *M. Omar Ashraf*, *Muhammad Ashraf*, *Jaghlit*, *Sedky*, *Ahmad Totonji*, and others engaged in a scheme to file or cause the filing of materially false Forms 990 concealing the relationships between the *Safa Charities*, certain for-profit companies and the financial transactions between these related entities, all in violation of 26 U.S.C. § 7206(1) and (2).

197. Further, I have probable cause to believe that *Mirza* and *Qureshi* engaged in a corrupt endeavor to impede and impair the due administration of the internal revenue laws in violation of 26 U.S.C. § 7212(a) during the *SAAR* audit by:

a. affirmatively misrepresenting the status of *SAAR Foundation* and the disposition of its assets;

b. concealing from the auditors the identity of *Sterling Charitable Gift Fund*, which was organized in March 2000, utilized the same address as *SAAR* and received *SAAR*'s major asset;

c. concealing the fact that *SAAR* maintained an active bank account until at least October 2001;

d. affirmatively misrepresenting that there was no overlapping of officers between *SAAR Foundation* and *Safa Trust, Inc.*, when *Mirza* was an officer of both *SAAR* and *Safa*;

e. affirmatively misrepresenting the relationship between *Al-Rahji* Charities and *SAAR*, by omitting that Abdul Rahman *Al-Rahji* is an officer of *Aradi, Inc.*, located at the same address as *SAAR*; and

f. concealing the relationship between *York Foundation* and *SAAR*.

198. Finally, I have probable cause to believe that *Al-Alwani*, *M. Omar Ashraf*, *Muhammad Ashraf*, *Mirza*, *Jaghlit*, *Barzinji*, *Totonji*, and *Al-Talib* each have willfully filed false individual income tax returns for the years 1997 and 1998 in violation of 26 U.S.C. § 7206(1) by

over-reporting deductions, under-reporting income, and/or failing to report signatory authority over foreign bank accounts.

XVI. Records Created and Maintained by the Targets

199. There is probable cause to believe that the items listed in Attachment B will be found at the locations to be searched, and represent contraband, instrumentalities, fruits, and evidence of the commission of criminal violations against the United States. In the following paragraphs, I will set forth my basis to support that the items set forth in Attachment B will be located on the premises for which this application seeks search warrants.

A. Records Required to be Maintained by *Safa Charities*

200. Part IV, line 91 of the IRS Form 990 requires tax-exempt entities filing Forms 990 to identify their custodians of records as well as the physical locations where the records are maintained. While the instructions to Form 990 do not directly address what records are referenced by this line, the IRC and Regulations set forth comprehensive record-keeping requirements which the entity admits exist when it answers line 91.

201. 26 U.S.C. § 6001 generally requires the keeping of records. It states:

> Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe.

202. The regulations under Section 6001 require that:

> [A]ny person required to file a return of information with respect to income, shall keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information. 26 C.F.R. § 1.6001-2(a).

203. With respect to exempt organizations the regulations state:

> [E]very organization exempt from tax under section 501(a) shall keep such permanent books of account or records, including inventories, as are sufficient to show specifically the items of gross income, receipts and disbursements. Such organizations shall also keep such books and records as are required to substantiate the information required by section 6033. See section 6033 and §§ 1.6033-1 through 1.6033-3. 26 CFR § 1.6001-1(c).

204. Section 1.6033-2 of the regulations requires that "every organization exempt from taxation under section 501(a) shall file an annual information return specifically setting forth its items of gross income, gross receipts and disbursements, and such other information as may be prescribed in the instructions issued with respect to the return."

205. The references in 26 C.F.R. §§1.6001-2(a) & 1.6003-2 to "any information on the return" or "prescribed in the instructions" describe the duty of the entity to maintain specific records, which relates to the admission as to the custodian and location of records. The statement on the Form 990 can be construed to be an admission that the full panoply of records to support any entry on the return, or required by the instructions, is at the physical location identified on the return.

206. Based on my examination of the IRS Forms 990 and conversations with the IRS-CI agents involved in this case, I know that records to support entries on the IRS Forms 990 are required by law to be maintained by the *Safa Charities* at the locations identified by those charities in their most recent IRS Form 990s. These records include all records regarding officers, directors, employees, grants received, expenses, employee salaries, distributions, investments, contributions received, grants and allocations made, assets, loans, liabilities, and other financial and organizational relationships.

B. Records of Money Laundering, Tax Evasion, and Support for Terrorists

207. In my experience, and as shown in this affidavit, providing support to terrorists through layered transactions, and/or tax evasion accomplished through misuse of charitable status, results in the production and maintenance of records. Records relating to the acquisition and disposition of the money transferred to overseas money laundering havens, as well as to terrorists, are produced and likely to be maintained in residential and business locations used by the conspirators of these crimes. Accordingly, records relating to transfers of money to, from, and between companies and charities in the *Safa Group* are likely to be maintained in the business and residential locations used by the individuals controlling the *Safa Group*.

208. Based upon my experience and training in investigations involving the transfer of funds offshore to evade taxes or hinder law enforcement's ability to trace their ultimate disposition, I know that individuals accomplishing such transfers often maintain some form of records. They tend to maintain records either at their business or residence reflect their interest in the offshore accounts under their control, as well as how much money they transferred to ultimate destinations from those offshore accounts. Accordingly, regardless of whether the individuals connected with the *Safa Group* engaged in material support to terrorists or merely tax evasion, there is probable cause that they maintain records relevant to the offenses described in this affidavit in their business premises or in their homes.

209. In the course of this investigation, I have seen various spellings of the names of many of the individuals controlling the *Safa Group*, as well as various spellings of the names of terrorists and terrorist-front groups. For example, I have seen *Barzinji* also as "albarzinji;" *Al-Talib* as "Altalib;" *Jaghlit* as "El-Gajhleet;" *Najar* as "Naajar," "Najjar," and "al-Najar;" *Shikaki*

as "Shiqaqi;" and Mohammad spelled in various ways such as "Mohamed," "Muhamed," and "Muhammed." Based on my training and experience, I know that many Arabic names are not consistently translated into English, at least in part because the Arabic language does not have letters equivalent to our vowels. Accordingly, the records that I seek to seize include those referencing aliases, fictitious, and nominee names of individuals otherwise relevant to this investigation.

C. Computer Files

210. Based on my training and experience, I know that businesses ordinarily maintain records relating to their financial activities. Some or all of these records typically are maintained at the location where the businesses conducts their operations. Additionally, businesses today routinely utilize computers to generate correspondence, maintain financial records, and electronically communicate with other businesses and persons. I am further aware that the use of computer networks is increasingly common, even in modest-sized companies.

211. Data generated on individual computers in a network can be stored on the hard drive of individual computers and/or on the computer network's server. In addition, individual users of this network can save data outside the computer network on electronic storage media, including diskettes, and other electronic and optical storage mediums.

212. I know that the *Safa Gr*oup utilizes computers to maintain books and records. On its Form 990 for 1999 filed with the IRS in May 2000, *SAAR Foundation* listed fully depreciated computers/printers with an original basis of $14,959. Although *SAAR* may have dissolved in December 2000, it transferred its assets to *Sterling Charitable Gift Fund.* Moreover, First Union

records reflect a $3,533.02 check dated September 30, 1997, on the account of *Safa Trust, Inc.*, payable to Micron Electronics, a computer equipment manufacturer.

213. On its IRS Form 990 for the year 2000, filed in January 2001, *IIIT* showed that it was depreciating almost $50,000 of computer equipment and software. On its Form 990 for the year 2000, filed in October 2001, *Heritage Education Trust, Inc.*, represented that was depreciating a computer.

214. On its 1997 Form 1120, U.S. Corporation Income Tax Return, filed in September 1998, *Mar-Jac Investments, Inc.* showed that it was depreciating various assets, including computer hardware and software with a basis of over $75,000. In January 2000, *Mar-Jac Investments* employee Beverly *Hassan* told FBI agents that *Mar-Jac Investments* and *Reston Investments* provided management, accounting, payroll, and administrative services for the *SAAR* affiliated companies operating in the Northern Virginia area.

215. I learned from USCS SA Augustus Acquino that the USCS has conducted an investigation to determine the locations of web sites and email addresses used by members of the *Safa Group*. SA Acquino told me that *IIIT* maintains several web pages both in English and Arabic that appear to be mirror images located on the same Internet service. One web page is located at web address www.iiit.org;; the other is identified only by the IP address of 209.35.161.210. Both of these web addresses reside on the computer network of the Internet Service Provider ("ISP") Interland of Atlanta, GA. Investigation by USCS indicates that both pages provide links to the email address of iiit@iiit.org to contact the organization. The Internet domain registration information lists the domain of iiit.org as registered to *IIIT* in Herndon,

Virginia, with an administrative and billing contact listed as *Iqbal Unus*, at *IIIT,* in Herndon, with the email address of iqbalunus@iiit.org.

216. SA Acquino told me that the web site located at web address www.iiit.org has a direct link from the main home web page to the *Child Development Foundation* ("*CDF*"), another *Safa Group* organization. This link is the only external link displayed on the main web page. Account subscriber records obtained from Interland identify *Iqbal Unus* and *IIIT* as the subscriber of the *CDF* and the *IIIT* sites; in fact both accounts appear on the same subscriber record. Moreover, a commercial data base check for *CDF* listed *Unus* as the email contact at iqbalunus@hotmail.com. Hotmail records reflect that this account is subscribed by *Iqbal Unus*.

217. SA Acquino told me that USCS investigation revealed that the *Sterling Management Group* ("*SMG*") maintains a web site located at the web address/Uniform Resource Locator (URL) of www.sterlingmgmt.com. The web site, hosted on the network of Ardent Communications, an ISP in McLean, Virginia, provides an address of 555 Grove Street, Suite 116, in Herndon, and an email address of smg@sterlingmgmt.com. In addition to providing information about various *SMG* investment projects, the web site offers extensive information about the donation of funds to the *Sterling Charitable Gift Fund*. Subscriber information obtained from Ardent Communications for the account relating to the *SMG* web page indicates that the account is in the name of *Omar Ashraf* of *Sterling Management Group* of 555 Grove Street in Herndon, with a contact email address of admin@sterlingmgmt.com.

218. SA Acquino told me that an online query of *Mar-Jac Investments, Inc.* revealed that the administrative and billing contact for *Mar-Jac* is *Omar Ashraf*, at 555 Grove Street in Herndon, with an email contact of marjac@erols.com. SA Acquino told me that investigation

revealed that this email account is hosted by RCN Communications, in Fairfax, Virginia, and is subscribed to by *M. Omar Ashraf, Mar-Jac Investments*, 555 Grove Street, in Herndon.

219. SA Acquino told me investigation of *Amana Mutual Funds Trust* revealed that it maintains that a web page at web address/URL of www.amanafunds.com, hosted on the computers or network of Advanced Telcom Group, a Santa Rosa, CA Internet service provider. The *Amana* web page offers an email address of AMANA@SATURNA.COM as a contact point.

220. SA Acquino further told me that *FIQH* maintains a web page located at web address/URL www.fiqhcouncil.org. Internet domain registration information identifies *Iqbal Unus* as the billing and administrative contact for this domain, with an email contact address of iqbalunus@aol.com. According to records received from AOL, the email account iqbalunus@aol.com is subscribed to by *Iqbal Unus* at 12607 Rock Ridge Road in Herndon.

221. SA Acquino further told me the *All Dulles Area Muslim Society ("ADAMS")*, maintains an Internet presence in the form of a world wide web page located at web address www.adamscenter.org which provides information about the organization, its activities, the identities of the officers of the organization, and actively solicits charity contributions. The web sited identifies *Totonji* as the chairman of the Board of Trustees, with an email contact listed as totonji@iiit.org. *Omar Ashraf* is listed as the registered agent, with a contact email address at omar@sterlingmgmt.org.

222. The host of the ADAMS web site as CI Host of Bedford, Texas. Account records obtained from CI Host identified the administrator of the ADAMS web page as Muhammad Rahman. Account records indicate that Rahman communicates with CI host via email using the email address of mrahman@meisoft.com. Rahman's name and email address are also listed as

the administrative, billing and technical contact on the adams.org domain information. Account records further indicate that Rahman is the person that administers the web site and also maintains the database relating to the contributions raised by *ADAMS*.

223. SA Acquino told me that a commercial database check for *Iqbal Unus* located his resume, including *ADAMS* and *Amana* as organizations with which he was associated. The resume lists two email addresses for *Unus,* iunus@iiftihar.org and iqbalunus@aol.com.

224. Based the facts previously set forth, I have probable cause to believe that the computers in their business premises and homes, as well as their email accounts and web sites are among the locations in which the targets of this investigation maintain the files and records described in Attachment B.

225. Each computer file is the equivalent of a hard copy file, but possibly containing many pages of information. By analogy to hard copy data, it will be necessary for seizing agents to look at least at the first "page" of each file in order to determine whether the contents of the file is seizable under the warrant language. In order to identify whether the records relate to the illegal activity, agents would have to, either: (a) remain on the premises for an extended period in order to view each file contents to determine whether they are relevant and seizable, and then print hard copies of the identified file records, or alternatively, (b) seize the computer and its internal hard-drive, and related equipment, to permit examination of the contents of the hard-drive files at an off-site location to separate out the magnetically stored documents within the scope of the warrant. The records in the hard-drive are, at this point, inseparable, in the sense that no single record can be seized in this present form without first performing operations on the information with the computer equipment. Therefore, authority is requested to remove the

computer from the premises, given that this is the less intrusive of the two alternatives cited above.

226. The removal of the computers and related equipment is also necessary to determine whether any security devices have been installed which might either prevent copying of the records, or cause their destruction within the system. The requirements of additional time and facilities to achieve this objective constitute additional reasons for removal of the equipment.

227. The software programs used in connection with the data stored in the hard disk or on diskettes must also be examined by the investigating agents in order to determine that they are in fact standard, commercially-available software, so that we may obtain identical programs if necessary for the examination, copying and possible introduction into evidence at any trial which may ensue, of the data files which contain records authorized to be seized. For the same reason, the system operating manuals and all documentation relating to the hardware or software must be examined by the investigating agents in connection with the examination of the system. Removal of the equipment from the premises during the examination is necessary because computer-based evidence is quickly and easily destroyed.

228. For the reasons stated above, it is proposed that, upon approval of the warrant, the computer equipment, its related program documentation and peripheral equipment which is known to be compatible and necessary for the proper functioning of the system, be removed to the safekeeping of the investigating agencies for proper examination, and copies be made of the relevant records. Chain of custody will be maintained by the seizing agent, a trained computer specialist and the investigating agent charged with the duty of determining whether a particular

record is within the scope of the warrant. Copies of such materials as necessary for the ongoing course of business will be made on request of the entities from whom they were seized.

XVII. Locations of Records

229. There is probable cause to believe that evidence of the crimes described in this affidavit will be found in the following locations:

A. Business Premises

1. 555 Grove Street

230. There is reasonable cause to believe that the books and records, as required under IRC 6001 and the regulations promulgated thereunder and as described below, for the *Safa Group* Companies and Charities are presently located in the office suite behind the door marked as the door for Suites 110, 114, and 116 in the building at 555 Grove Street. This belief is founded on the following facts.

231. I visited 555 Grove Street and observed the office suite behind the door marked as the door for Suites 110, 114, and 116 to be one common suite. I entered the office from the office building's hallway through the one door jointly listing *Mar-Jac Investments, Inc.*, *Reston Management, Inc.*, and *Sterling Management Group, Inc.* at Suites 110, 114 and 116, respectively, and found the interior office space to be a common area with a common receptionist desk. I saw various offices inside the common area, but there was no differentiation between the companies, nor numbers on the various office doors; instead, there were only names of individuals on placards at the offices within the suite.

232. According to the most recent IRS Forms 990 filed by the *Safa Charities*, the records of the *African Muslim Agency*, *SAAR Foundation*, *Safa Trust*, *Sterling Charitable Gift Fund*, and

*York Foundation* are all located at 555 Grove Street, Herndon, Virginia, under the care of *Mirza*. The address for *African Muslim Agency* as shown on the front of the 1997 IRS Form 990 is 555 Grove Street, Suite 110. The address for the *Sterling Charitable Gift Fund*, as shown on the front of the 2000 IRS Form 990 is 555 Grove Street, Suite 116.

233. First Union National Bank records reflect that statements for bank accounts in the names of the following *Safa Group* entities are being mailed to 555 Grove Street, Herndon, VA 22070:

| *Safa* Company | Date of Statement Seen |
|---|---|
| *African Muslim Agency* | 1/31/01 |
| *Reston Investments, Inc.* | 12/31/01 |
| *Mar-Jac Investments* | 12/31/01 |
| *SAAR Foundation, Inc.* | 9/28/01 |
| *Sterling Charitable Gift Fund* | 12/31/01 |
| *Safa Trust, Inc.* | 12/31/01 |
| *Sterling Management Group, Inc.* | 12/31/01 |

234. IRS Exempt Organization Specialists Michael Bieloski and Eugene Gilmartin recently advised IRS-CI special agents that, in June 2000, they personally met with *Mirza* and the *SAAR* return preparer at 555 Grove Street in the course of conducting an audit of *SAAR Foundation*, and, in a conference room at that location, received from them various records – including computer records – and observed a computer in the office.

2. <u>500 Grove Street</u>

235. According to the IRS Form 990 filed by *IIIT* on November 20, 2001, the records of *IIIT* are maintained at 500 Grove Street, 2nd Fl., in Herndon, Virginia, in the care of Beverly *Hassan*. *IIIT* is on file with the Virginia Secretary of State as an active corporation domiciled at 500 Grove Street, Suite 114, Herndon, Virginia. In January 2002, an IRS special agent made a pretext telephone call to the publicly listed number for the *IIIT*. A woman answered the telephone with the words "*IIIT*" and advised the agent that the company had recently moved to the second floor of 500 Grove Street.

3. <u>750-A Miller Drive SE, Leesburg, Virginia</u>

236. The location 750-A Miller Drive SE, Leesburg, Virginia is the office of *Heritage Education Trust*, *FIQH*, and *GSISS*. *Heritage* filed a Form 990 on October 16, 2001 which represents that its corporate records are located at 750-A Miller Drive SE, Leesburg, Virginia. According to Virginia Secretary of State Corporation Commission records, the *Heritage Education Trust, Inc.*, *Heritage Holdings, Inc.*, *SISS*, and *FIQH* are located at 750-A Miller Drive SE, Leesburg, Virginia.

237. In January 2002, government agents followed a gray 1999 Chrysler Concord bearing Virginia registration, ZHT 5636, from the residence of *Al-Alwani* at 1105 Safa Street in Herndon, to 750-A Miller Drive in Leesburg. Virginia Department of Motor Vehicles ("DMV") records reflect the vehicle is registered to *SISS* at 750-A Miller Drive, Leesburg, Virginia.

238. IRS Information Returns for the year 2000 reflect that *Jaghlit* Family Trust No. 1 and *Jaghlit* Family Trust No. 2 both reflect the address of 750-A Miller Drive, SE, Leesburg, VA

20175. As noted above, the records of *Jaghlit* Family Trust No. 1 are relevant to any determination of personal income tax evasion by *Jaghlit*.

4. The Administration Offices of *Mar-Jac Poultry* at 1020 Aviation Boulevard, Gainesville, GA

239. *Mar-Jac Poultry* is headquartered at 1020 Aviation Boulevard, Gainesville, Georgia. On February 13, 2002, INS SA Beamish spoke with *Mar-Jac Poultry* personnel manager Don Bull under the pretext of learning where immigration records were maintained. Bull told SA Beamish that the company's corporate and financial records were maintained in the administrative offices in a one-story building with a sign on it reading "Administrative Offices."

B. Residences

240. Based on my experience as a criminal investigator, individuals typically keep personal financial records in their residence. The records include bank records, investment records, records of purchases, records of expenditures, loan documentation, IRS information returns (e.g, W-2s, 1099s, 1098s, etc.) as well as other financial documents. Individuals also typically keep retained copies of their tax returns in their residence along with supporting schedules and documentation.

241. Through my participation on this investigation, I am aware of the addresses where paper and electronic records are kept concerning the money laundering and terrorist support activities of the conspirators and the organizations that they use. These records are stored at business and charity locations, as well as residences. Based upon my training and experience, I know that individuals commonly keep, store, and maintain records of organizations in which they are members or officers at their residence as well as their offices. Individuals involved in

"layering" schemes, especially when these schemes include organizations with little or no physical presence, will commonly use their residence as a base of operations, from which they conduct their daily illegal activities.

242. I have spoken with INS Senior SA William West, who as explained above executed search warrants in November 1995 at the residence of *Al-Arian*, and the office locations of *ICP* and *WISE*. SA West related to me that upon executing the search warrants, he found that the documents relating to *Al-Arian*'s terrorist affiliations, which had been seized at *Al-Arian*'s residence, were roughly equal in number and importance to the criminal case as the documents seized at the business locations. Furthermore, SA West told me that he seized more documents at the residence relating to foreign terrorist connections. It is SA West's opinion that the residences of terrorists and their supporters are just as likely to contain records of contacts with terrorists, operative documents, and other related material in their homes as in their businesses.

243. In this matter, the history of the *Safa Charities* and the past investigations of it and the entities in Tampa, Florida, increase the probability that important evidence will be stored off the business premises. The *Safa Charities*' activities first came under scrutiny in the aftermath of the search warrants executed at the offices of *WISE/ICP* and the residence of *Al Arian* in 1995. Thereafter, *Mirza* complained that the press was getting too probing in 1995-96. *Mirza* also related that one reason for moving assets of *SAAR* off shore was because of adverse publicity in 1997 and 1998 linking *SAAR* and *Safa* to terrorism. Eventually, in January of 2000, *Al-Alwani, Jaghlit*, and *Hassan*, were interviewed by the FBI in connection with a criminal investigation. This was followed closely by an IRS audit of *SAAR* and scrutiny of the final destination of the funds headed off shore. The principals of the *Safa Group* have every reason to believe that they

are the subject of growing government scrutiny. In view of these circumstances, it is my experience that organizational records are even more likely to have been removed from office addresses and maintained at residences.

5. The Residence of *Mirza* at 11922 Safa Court, Herndon, VA

244. I know that the single-family dwelling at 11922 Safa Court, Herndon, Virginia, is the residence of *Mirza*. On April 5, 2001, *Mirza* signed his 2000 tax return, which listed his personal address as 11922 *Safa* Court, Herndon, Virginia. The Forms W-2 from *Mar-Jac Investments, Inc.* and *Mar-Jac Poultry, Inc.* which were attached to his 2000 tax return also list that as his address. In January 2002, Fairfax County property records reflected that *Mirza* was the owner of 11922 Safa Court, and Virginia Power identified him as the subscriber for electricity at this address. In addition, Virginia Power records show that *Mirza* listed his employer as *Mar-Jac Investments Inc.* Finally, *Mirza* is a registered officer or agent of three businesses registered with the Virginia Secretary of State located at this same address.

245. On February 4, 2002, a mail cover was obtained on the residence of *Mirza* at 11922 *Safa* Court to ascertain the senders of mail received at that address. In February 2002 various documents were found indicating that *Mirza* receives business mail at his house, including correspondence for *Mar-Jac Poultry, Inc.* (for which *Mirza* is an officer); *Amana* (the Isle of Man corporation that set up *Humana)*; and Amtrax Limited (a company that likely is related to Amtrax Holding, Inc., an overseas company that, according to *Safa Trust*'s Form 990, contributed $250,000 to *Safa Trust* in 1997).

6. <u>The Residence of *Jaghlit* at 9034 Swift Creek Road, Fairfax Station, VA</u>

246. I know that the single-family residence at 9034 Swift Creek Road, Fairfax, Virginia is the residence of Mohammad *Jaghlit*. According to a January 2002 Virginia DMVs records check, Mohammad Ali *Jaghlit* was issued a Virginia driver's license with a listed address of 9034 Swift Creek Road, Fairfax Station, Virginia. In January 2002, government agents observed a white Volvo with Virginia plates YNU8077 parked in the driveway of the residence near the garage entrance. According to Virginia DMV records, the vehicle's registered owners are Noor and Mohammad Ali *Jaghlit* of 9034 Swift Creek Road, Fairfax, Virginia.

247. On February 4, 2002, government agents recovered trash thrown out from *Jaghlit*'s residence at 9034 Swift Creek Road. One document that was found was a fax, dated August 9, 2001, from the *HLF* in Gaza to the *HLF* in Richardson, Texas, containing notes of a meeting ordering actions on various *HLF* projects.

7. The Residence of *Barzinji* at 11919 Safa Court, Herndon, Virginia

248. I know that the single family dwelling located at 11919 Safa Court, Herndon, Virginia is the residence of *Barzinji*. A Fairfax County Police Department criminal history check revealed that in November 2000, Jamal *Barzinji* was arrested at 11919 Safa Court, Herndon, Virginia, and charged with Domestic Abuse and Resisting Arrest. Fairfax County Police performed tax records checks for that property and found records identifying *Barzinji* as the registered property owner. Moreover, while Jamal M. and Suzanne F *Barzinji*'s U. S. Individual Income Tax Returns for the years 1996-2000 reflect the address 555 Grove Street in Herndon, the W-2 forms attached to the returns reflect the address of 11919 Safa Court. Finally, First Union records reflect that address for the account of Jamal M. *Barzinji*, Suzanne F. *Barzinji*, and Suhaib Al*Barzinji* on the statement for the period ending January 23, 2002.

8. The Residence of *Al-Alwani* at 1105 Safa Street, Herndon, Virginia

249. I know the single family dwelling at 1105 Safa Street, Herndon, Virginia to be the residence of *Al-Alwani* In January 2002, the Fairfax County Police performed tax records checks finding that 1105 Safa Street, was owned by Al Alwani. The Virginia DMV confirmed that Al Alwani has a valid driver's license and that the address used on his license is 1105 Safa Street. In January 2002, Virginia Power information identified Al Alwani, the president of *IIIT*, as the subscriber for power at that address.

9. <u>The Residence of *Totonji* at 305 Marjorie Lane, Herndon, Virginia</u>

250. I know the single family dwelling at 305 Marjorie Lane, Herndon, Virginia to be the residence of Ahmad *Totonji*. In January 2002, Virginia Power information reflected that Ahmad M. *Totonji,* a Director of *IIIT,* and Maysoon *Al-Talib* were the subscribers for power at that location. Virginia DMV records reflect Ahmad *Totonji* was issued a Virginia driver's license with a listed address of 305 Marjorie Lane, Herndon, Virginia.

251. In January 2002, law enforcement agents working on the *Safa Group* investigation retrieved from trash discarded from the house at 305 Marjorie Lane a roster of *IIIT* employees with their telephone extensions and e-mail addresses. I know, therefore, that *Totonji* has recently maintained *IIIT* records in his house.

10. <u>The Residence of *Unus* at 12607 Rock Ridge Road, Herndon, Virginia</u>

252. I know the single family dwelling at 12607 Rock Ridge Road, Herndon, Virginia to be the residence of *Iqbal Unus*. According to Virginia Secretary of State records, *Unus* is the registered agent of Education, Training and Research Associates of 12607 Rock Ridge Road, Herndon, Virginia. In January 2002, Fairfax County Police performed tax record checks for 12607 Rock Ridge Road and determined *Iqbal* and Aysha *Unus* as the registered property owners. In January 2002, Virginia Power identified *Iqbal* J. and Aysha A. *Unus* as active subscribers for that address, and identified *Iqbal Unus*' employment as the Director of Human Development for *Mar-Jac, Inc.*

253. On February 11, 2002, a trash run was conducted by government agents to recover refuse disposed of by the residents of 12607 Rock Ridge Road. Various documents were found

indicating that *Unus* maintains records at his house, including June 7, 2001, correspondence for the *Amana Mutual Funds Trust*, of which *Unus* is a trustee.

254. On January 28, 2002, a law enforcement agent conducted an Internet registrant query on the domain name "*FIQH*COUNCIL.NET." The administrative and billing point of contact for this domain name is *Iqbal Unus* at the International Islamic Forum for Science, Technology, and Human Research Development (*IIFSTHRD*), 12607 Rock Ridge Rd., Herndon, Virginia 20170. *FIQH* and *IIFSTHRD* are *Safa Group* organizations.

11. The Residence of *M. Omar Ashraf* at 12541 Browns Ferry Road, Herndon, VA

255. I know the single family dwelling at 12541 Browns Ferry Road, Herndon, Virginia, to be the residence of *M. Omar Ashraf.* Virginia Secretary of State records reflect that *Mohammad Omar Ashraf* is president of two corporations at this address. According to Virginia DMV records, *Mohammad Omar Ashraf* was issued a Virginia driver's license with a listed address of 12541 Browns Ferry Road. In January 2002, an IRS special agent observed three vehicles at that address, two of which Virginia DMV records reflected to be registered to *Mohammad Omar Ashraf* and Zahida P. Ashraf at that address; the third was registered to *Mar-Jac Poultry , Inc.*, at 555 Grove Street in Herndon. Finally, Virginia Power identified *Mohammad Ashraf* and Zahida Ashraf as active subscribers for power last month at 12541 Browns Ferry Road, and listed *Mohammad Ashraf*'s employment as the Project Manager for *Mar-Jac Investments Inc.*

12. The Residence of *Muhammad Ashraf* at 12528 Rock Ridge Road, Herndon, VA.

*Muhammad Ashraf* is the registered agent of Enterprise Investment Group, Inc., a company incorporated on September 12, 2001, at 12528 Rock Ridge Road. Further, in January

2002, Virginia Power identified an active subscriber account for this address in the names of *Muhammad* and Munawar *Ashraf,* and reflected *Muhammad Ashraf's* employment as a legal writer for *Mar-Jac.*

CONCLUSION

256. I have probable cause to believe from the foregoing affidavit that the targets of this investigation identified in this affidavit have engaged in a long standing, ongoing pattern of criminal activity. Further, I have probable cause to believe that evidence of these violations will be found in the business premises and residences for which warrants are sought.

257. Accordingly, based on the information outlined above, there is probable cause to believe that the items and records as set forth in Attachment B, attached hereto and incorporated herein, constituting evidence of violations of 18 U.S.C. §§ 371, 1956(a)(2)(A) and (h), 2339A, and 2339B, and 26 U.S.C. §§ 7201, 7206, and 7212 are contained within the premises and properties known as:

1. 555 Grove Street, Suites 110 through 116, Herndon, Virginia;
2. 500 Grove Street, 2nd Floor, Herndon, Virginia;
3. 750-A Miller Dr. SE, Leesburg, Virginia;
4. The Administration Offices of *Mar-Jac Poultry* at 1020 Aviation Blvd., Gainesville, Georgia;
5. The residence of *Mirza* at 11922 Safa Court, Herndon, Virginia;
6. The Residence of *Jaghlit* at 9034 Swift Creek Road, Fairfax Station, Virginia;
7. The Residence of *Barzinji* at 11919 Safa Court, Herndon, Virginia;
8. The Residence of *Al-Alwani* at 1105 Safa Street, Herndon, Virginia;

9. The Residence of *Totonji* at 305 Marjorie Lane, Herndon, Virginia; and

10. The Residence of *Unus* at 12607 Rock Ridge Road, Herndon, Virginia;

11. The Residence of *M. Omar Ashraf* at 12541 Browns Ferry Road, Herndon, VA;

12. The Residence of *Muhammad Ashraf* at 12528 Rock Ridge Road, Herndon, VA

all of which properties are more particularly described in Attachment A, which is incorporated herein.

WHEREFORE, your affiant requests that search warrants be issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure.

FURTHER THIS AFFIANT SAYETH NOT.

**SIGNATURE ON ORIGINAL**
DAVID KANE, Senior Special Agent
United States Customs Service

Subscribed to and sworn before me this ___ day of March 2002.

**SIGNATURE ON ORIGINAL**
THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

Attachment A

1. 555 Grove Street, Office Suite Behind the Door Labeled 110, 114, and 116, Herndon, Virginia

555 Grove Street is a three-story brick, contemporary-style building with dark gray-tinted windows that extend continuously and horizontally along the length of the structure and each of the two floors that can be viewed from the street. Just above each of the windows on each floor there is beige trim that also extends continuously and horizontally along the entire length of the building. The building is marked by the numbers "555" in white directly above the front lobby door. The door leading to the office suite behind the door marked as the door for Suites 110, 114, and 116 in that building has on it a brass sign listing Mar-Jac Investments, Inc. 110, Reston Management, Inc. 114 and Sterling Management Group, Inc. 116.

2. 500 Grove Street, 2nd Floor, Herndon, Virginia

500 Grove Street is a three story, beige and dark brown brick colored, contemporary style building on the north side of Grove Street approximately 1/10th of a mile east of the intersection of Grove and Van Buren Streets. It has tinted windows that extend continuously and horizontally along the length of the structure and along each of the three floors viewable from the street. The building is marked by the numbers "500" on the front of the building. The building directory lists IIIT (International Institute of Islamic Though) as being located on the second floor.

3. 750-A Miller Dr. SE, Leesburg, Virginia

The building known as 750-A Miller Drive, SE, Leesburg, Virginia is a two-story red brick building with gray bricks across the top and two horizontal lines of gray bricks as an accent, on the west side of Miller Drive approximately ¼ mile from the intersection of Miller Drive and Sycolin Road SE. The building, which houses multiple commercial offices, is located directly across Miller Drive from the Leesburg Airport. The main entrance to the building has glass double doors with the numerals and letter "750-A" in white above the doors on a large plate of glass. Below "750-A" are white letters, which read, "School of Islamic and Social Sciences." In the front of 750-A, on the lawn, there is a black sign with the numerals and letter, "750-A" a green square portion with white letters stating, "School of Islamic and Social Sciences."

4. The Administrative Offices of Mar-Jac Poultry at 1020 Aviation Blvd., Gainesville, Georgia

Mar Jac-Poultry, with an address of 1020 Aviation Blvd., Gainesville, Georgia, is located on the northwest corner of Aviation Boulevard SW and Dorsey Street SW in Gainesville,

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 10

# Part 4

Georgia, just west of the Gainesville Airport and Aviation Boulevard, SW, south of the Georgia Department of Public Safety Drivers License Bureau, and east of railroad tracks. The plant, surrounded by a chain link fence, is comprised of numerous white and yellow buildings made of prefabricated materials. A brown tan stucco sign depicting a chicken with the letters "M/J" encased within a house-like emblem on its chest, and the words "Mar-Jac" written under the chicken, is located on the south end on the property facing Dorsey St., SW, just west of a gate into the property located on the SE corner of the property west of the intersection of Aviation Boulevard SW and Dorsey St. SW. The Administrative Offices of Mar-Jac Poultry are located in (1) a one-story building with a sign on it reading "Administrative Offices," located near the gate at the Northeast corner of the property. On the left side of the gate is a green and blue sign, with white letters, which reads, "All Visitors Must Report To Main Office". The sign on the north side of the gate is a red sign with white letters that reads, "Administrative Offices Only No Tractors-Trailers Allowed". The sign on the south side of the gate is of faded tan color with white letters that reads, "Administrative Offices Only No Tractors/Trailers Allowed."

5. The Residence of Mirza at 11922 Safa Court, Herndon, Virginia

The residence of Mirza is a beige-colored 1½-story house located at 11922 Safa Court, Herndon, Virginia 20170. The house is in the Shaker West Subdivision, on the north side of Safa Court approximately 1/10th of a mile from the intersection of Safa Court and Safa Street. The house is located next door to 11926. A red and white fire hydrant is next to the mailbox, which has the number 11922 and the name "Mirza" on it. The numbers 11922 are affixed to the house next to the garage.

6. The Residence of Jaghlit at 9034 Swift Creek Road, Fairfax Station, Virginia

The residence of Jaghlit is located at 9034 Swift Creek Road, Fairfax, Virginia 22039. A mailbox located at the very end of Swift Creek Road off of a cul-de-sac, and is identified by the number 9034. The site is a heavily wooded area and no house is visible from the cul-de-sac. The mailbox is positioned at the beginning of a long sand and gravel winding driveway. Two red "Posted - No Trespassing" signs are affixed to trees bordering the driveway. The driveway becomes blacktop as it nears a house. The house is a large two-story, symmetrical, modern design dwelling with large arch roofline over the center entrance. The house has gray siding, with black window shutters. Silver-colored stone surrounds the center area. The front door is red and surrounded by white wood trim. Brass numbers 9034 are vertically affixed to the white wood trim on the left side of the front door. A large inter-county power line is to the left of the dwelling. A two-car attached garage is on the right side of the dwelling with a white/cream colored garage door.

7. The Residence of Barzinji at 11919 Safa Court, Herndon, Virginia

The residence of Barzinji is located at 11919 Safa Court, Herndon, Virginia 20170. This residence is in the Shaker West Subdivision, on a pipe-stem private driveway off of Safa Court approximately 1/10th of a mile from the intersection of Safa Court and Safa Street. The house is a blue two-story wooden custom house with a brown front door with a large oval glass in the center. Before this house, there is a green sign on the right side of a private driveway which reads "11919, 11921, 11923" identifying the three houses on that private driveway. Houses 11921 and 11923 are identified by numbers affixed to the houses; house 11919 is the only house without a number and is located just past this sign, on the right side.

8. The Residence of Al-Alwani at 1105 Safa Street, Herndon, Virginia

The residence of Alwani, is located at 1105 Safa Street, Herndon, Virginia 20170. This residence is a contemporary two-story single family house situated on a semi-secluded lot, approximately ½ acre in size. It is the first house on the right side of Safa Street as one enters Safa Street northbound from Sugarland Road. The exterior of the house is constructed with tan siding and the front doors are gray. The address, 1105, is reflected both on the house (to the right of the two car garage) and on the mailbox.

9. The Residence of Totonji at 305 Marjorie Lane, Herndon, Virginia

The residence of Totonji is located at 305 Marjorie Lane, Herndon, Virginia 20170, approximately 1/10th of a mile to the east of the intersection of Marjorie Lane and Leona Lane. This structure is a two-story colonial with beige stucco front and a two-car garage. Numbers #305 are affixed above the garage door. The roof is made of three copper eaves. The front door is a single door, brown in color with a brown gated storm door. A brown mailbox is situated at the bottom of the driveway.

10. The Residence of Unus at 12607 Rock Ridge Road, Herndon, Virginia

The residence of Iqbal Unus is located at 12607 Rock Ridge Road, Herndon, Virginia 20170. The residence of is a two-story detached single family home with a two-car garage, immediately to the north of the intersection of Rock Ridge Road and Hawks Nest Court. The home has light-yellow vinyl siding and a light-brown shingled roof. The numbers 12607 are centered across the front porch of the residence.

11. The Residence of Mohammad Omar Ashraf
<u>at 12541 Browns Ferry Road, Herndon, Virginia</u>

The residence of Mohammad Omar Ashraf is located at 12541 Browns Ferry Road, Herndon, Virginia 20170. The residence is the last house on the left, prior to entering the cul-de-sac where the road ends. The residence is a two-story colonial-style house with white siding, black shutters, a covered porch, and a blacktop driveway from the street leading to a two-car attached garage. The number "12541" is on the curb of the residence, on the black mailbox located near the curb and on the house, to the right of the front door.

12. The Residence of Muhammad Ashraf
<u>at 12528 Rock Ridge Road, Herndon, Virginia</u>

The residence of Muhammad Ashraf is located at 12528 Rock Ridge Road, Herndon, Virginia 20170, between 12530 and 12526 on the north side of Rock Ridge Road between Cellar Creek Way and Dardanelle Road. The residence is a two-story single family residence with an attached two-car garage, the seventh home from either Cellar Creek Way or Dandanelle Road on Rock Ridge Road. The front of the residence is constructed of red brick on the lower half and yellow siding on the upper half. The front windows have gray shutters. The front entrance has a small stoop with a white post on the left. The number "12528" is stenciled on the white post of the stoop. A light post is located left of the driveway along the walkway toward the entrance of the residence. A mailbox is located curbside left of the driveway of the residence.

Attachment B

**Items to be Seized**

a. Any and all records including financial information, including tax returns and IRS filings, and any work papers related thereto; bank, credit or securities account statements, applications, deposit tickets, receipts, canceled checks, cashier checks, money orders, wire transfer records, debit/credit memos; financial ledgers, journals, investment records, real estate records, other records of assets; records of or related to contributions, grants or disbursements made or received, and/or allocations; loan records, financial statements, audit work papers, audit reports (or correspondence, transmittals or document related to any of the foregoing), regarding any or all of the following entities:

African Muslim Agency
Aradi, Inc.
FIQH Council
Grove Corporate, Inc.
Graduate School of Islamic Social Sciences (formerly SISS)
Heritage Education Trust
Humana Charitable Trust
International Institute of Islamic Thought
Mar-Jac Holdings, Inc.
Mar-Jac Investments, Inc.
Mar-Jac Poultry, Inc.
Mena Corporation
Reston Investments, Inc.
SAAR Foundation
SAAR International
Safa Trust
Sterling Charitable Gift Fund
Sterling Management Group, Inc.
York Foundation
York International

and/or any other entity sharing officers, directors, trustees, or employees with the listed entities ("the Safa Group"), and/or any other individual or entity designated as a terrorist by the President of the United States, the United States Department of Treasury, or the Secretary of State.

b. Any and all information regarding financial transfers of any kind undertaken by any officer, director, trustee, or employee of any member of the Safa Group, and any other individual or entity designated as a terrorist by the President of the United States, the United States Department of Treasury, or the Secretary of State. .

c. Any and all information referencing in any way PIJ, Hamas, Al-Qaida, WISE, ICP, Sami Al-Arian, Basheer Nafi, Mazen al-Najar, Ramallah Shallah, Khalil Shikaki, Sheik Odeh, Sheik Rahman, Usama Bin Laden, and any other individual or entity designated as a terrorist by the President of the United States, the United States Department of Treasury, or the Secretary of State.

d. Any and all corporate records for any member of the Safa Group, including articles of incorporation, corporate/organizational minute books, stock certificates, membership rosters, lease agreements and applications.

e. Any and all telephone bills and statements for any member of the Safa Group.

f. Any and all travel records - including itineraries and tickets/ticket copies for any officer, director, employee, or trustee of any member of the Safa Group.

g. Any and all correspondence referencing in any way PIJ, Hamas, Al-Qaida, WISE, ICP, Sami Al-Arian, Basheer Nafi, Mazen al-Najar, Ramallah Shallah, Khalil Shikaki, Sheik Odeh, Sheik Rahman, Usama Bin Laden, and any other individual or entity designated as a terrorist by the President of the United States, the United States Department of Treasury, or the Secretary of State.

h. Any individual income tax returns or other tax returns, and drafts or work papers or documentation related thereto, for or related to any officer, director, trustee or employee of the *Safa Group*.

i. Any and all financial documents related to the individual tax returns or other tax returns of Al-Alwani, M. Omar Ashraf, Muhammad Ashraf, Jaghlit, Barzinji, Totonji, and Mirza, and the returns of the Mirza Revocable Family Trust, Mirza Family Partnership, Jaghlit Family Trust No. 1, Jaghlit Family Trust No. 2.

j. Immigration documents related to WISE, ICP, Sami Al-Arian, Ramadan Shallah, Basheer Nafi, Mazen al-Najar, Khalil Shikaki, PIJ, HAMAS, Al-Qaida, any director, officer, trustee, or employee of any member of the Safa Group, and any individual or entity designated as a terrorist by the President of the United States, the United States Department of Treasury, or the Secretary of State.

k. Pamphlets, leaflets, booklets, video and audio tapes related to IIIT, WISE, ICP, Sami Al-Arian, Ramadan Abdullah Shallah, Mazen al-Najar, Khalil Shikaki, Basheer Nafi, PIJ, HAMAS, Al-Qaida, any officer, director, or employee of any member of the Safa Group, or any other individual or entity designated as a terrorist by the President of the United States, the United States Department of Treasury, or the Secretary of State, and any member of the Safa Group.

l. Personnel records identifying employees of WISE, ICP, or any member of the Safa Group, the dates of their employment, their areas of responsibility, and reasons for termination.

m. Diaries, organizers, day planners, appointment books, telephone message pads, address books and the like, for any any director, officer, trustee, or employee of any member of the Safa Group.

n. All identification documents reflecting the use of an alias, fictitious, or nominee name, including passports, social security cards, immigration papers (to include but not limited

to green cards, work permits, visa) drivers license (domestic or foreign), and state identification cards (domestic or foreign).

o. Contents of safes, lock boxes, file cabinets and other locked containers within the business and/or residence and information or keys regarding safe deposit boxes.

p. All computer and network equipment and peripherals, the software to operate them, and related instruction manuals to include the items listed below:

q. Any and all information and/or data stored in the form of magnetic, digital, or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment. This media includes but is not limited to floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, videocassettes, and any other media, which is capable of storing magnetic coding.

r. Any and all electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data. These devices include but are not limited to computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer related electronic devices.

s. Any and all instructions or programs stored in the form of electronic or magnetic media, which are capable of being interpreted by a computer, or related components. The items to be seized could include but would not be limited to operating systems, application software, utility programs, compilers, interpreters, and any other programs or software used to communicate with computer programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, DSL lines, cable lines, radio or other means of transmission.

t. Any and all written or printed material which provides instructions or examples concerning the operation of a computer system, computer software, and/or any related device.

**Attachment C**

## Safa Group Businesses & Corporations

A & W Stores, Inc. - Status: "Terminated (Automatic)"
555 Grove St., Suite 110, Herndon, VA
George, Jawad F. – Registered Agent

African Muslim Agency - Status: Active
555 Grove St., Herndon, VA (no suite #)
Alsumait, Adbulrahman - President
Altalib, Hisham - Treasurer
Mirza, M. Yaqub – Vice President

Al-Aqsa Educational Fund – Status: Active
PO Box 1124, Oxford, Mississippi 38655
Mushtaha, Fawaz – former director
Bushnaq, Yaser – former director
El-Gajleet(Jaghlit), Mohammad – former President
Al-Ashkar, Abdelhaleem – Vice President

Al-Wahyayn Publishing Company - Status: "Terminated (Automatic)"
555 Grove St., Suite 200, Herndon, VA
Aqeel, Abdul R. – President/Treasurer
Barzinji, Jamal - Secretary

All Dulles Area Muslim Society (ADAMS) - Status: Active
46970 Community Plaza, Suite 218, Sterling, VA
500 Grove St., Herndon, VA;
Alkhairo, Wael – President/Registered Agent
Ashraf, M. Omar – Registered Agent
Awand, Mazhar A. – Treasurer
Bari, Aziz – Secretary/Chairman
Jaka, Rizwan – Vice President
Khan, Bashir Ahmad – Treasurer/CFO
Khan, Mumtaz – President
Latib, Abdulrahman - Chairman
Manraj, Abdul Hafez – CFO
Noor, Ahmed - Treasurer
Rayyan, Ahmad I – Secretary/Officer
Salah, Said - Secretary
Unus, Iqbal J. – Vice President

Attachment C
Page 2

Altalib Family Limited Partnership – Status: Active
11776 Stratford House Pl.,#1403, Reston,VA
Altalib, Hisham Yahya – Registered Agent

AMC Foundation - Status: Active
555 Grove St., Suite 116, Herdon, VA
Ashraf, Muhammad - Registered Agent

Amana Limited
Isle of Man

Amana Mutual Funds
1300 North State Street, Bellingham, Washington

American Institute for Societal Studies - Status: Active
555 Grove St., Suite 116, Herdon, VA
Ashraf, Muhammad – President/Secretary/Treasurer
Altalib, Hisham – Registered Agent

American Products International, Inc. - Status: Active
11919 Safa Ct., Herndon, VA; 1162 (Registered Office)
Kandil, Osama – Registered Agent
Sadoun, Jamal - Director
Sadoun, Nabil – Director

American Projects Investments Corporation - Status: "Terminated (Automatic)"
555 Grove St., Suite 110, Herndon, VA
George, Jawad F. – Registered Agent

Arabic Software Computer, Inc. - Status: Inactive-Dissolved
555 Grove St., Suite 110, Herndon, VA
Ashraf, Mohammad Omar – President/Chairman
Iqbal, Mahamed – Registered Agent
Russel, William R. – Register Agent

Association of Muslim Social Scientists – Status: Active
1145 Herndon Pky, #500, Herndon, VA
Ahmad, Dr. Mumtaz – President
El-Ansary, Waleed – Treasurer
Haq, Faizan – Secretary
Safi, Dr. Louay – Vice-President
Abusulayman, Abdelhamid – former director

Attachment C
Page 3

Aradi, Inc. - Status: Active
555 Grove St., Suite 110, Herndn, VA;
Al-Rajhi, Abdullah Sulaiman – President
Altalib, Hisham – Vice-President/Treasurer
Sedky, Cherif – Secretary

Attia Grafisk USA, Inc. - Status: "Terminated (Automatic)"
555 Grove St., Herndon, VA
Mohamed, Abla M. – President
Hadeed, Michael Jr., P.C. – Registered Agent

Beauregard Associates, LC - Status: Active
555 Grove St., Suite 104,Herdon, VA
Totonji, Irfan K. – Register Agent

Bone Shami Ventures, Inc. - Status: "Terminated (Automatic)"
555 Grove St., Suite 110, Herndon, VA
George, Jawad F. – Registered Agent

Capital Diamond Center, Inc. - Status: "Terminated (Automatic)"
555 Grove St., Suite 110, Herndon, VA
George, Jawad F. – Registered Agent

Child Development Foundation - Status: Active
555 Grove St., Suite 114, Herndon, VA
Abusulayman, Dr. Abdulhamid – President/Registered Agent
Altalib, Dr. Hisham – Vice-President/Treasurer
Unus, Dr. Iqbal J. – Secretary

Courtland Farm Conservancy Lots Homeowners Assn., Inc. - Status: Active
555 Grove St., Suite 112, Herndon, VA
Mirza, M. Yaqub – President/Treasurer
Ashraf, Muhammad – Secretary
Altalib, Hisham – Registered Agent

Creativity International Productions, LLC - Status: Canceled
555 Grove St., Suite 116, Herndon, VA
Mirza, M. Yacub – Registered Agent

Dar El-Eiman USA, Inc. - Status: Active
360 S. Washington St., Ste. 101, Falls Church, VA
Mushtaha, Fawaz - Registered Agent/President/Treasurer

East Stratford Phase A & B Homeowners Association -- Status: Active
555 Grove St., Suite 104, Herndon, VA
Totonji, Irfan K. – President/Registered Agent

Education, Training and Research Associates - Status: Active
Unus, Iqbal J. - Registered Agent

Elite Investment and Management Group, Inc. - Status: Active
555 Grove St., Suite 104, Herndon, VA
Totonji, Irfan K. – President/Secretary/Treasurer/Registered Agent
Al Younes-Totonji, Ghazwa A. – Vice President

Elite Management Resources, Inc. - Status: "Terminated (Automatic)"
Totonji, Irfan K. – President/Secretary
Al-Hassan, Yazen M. – Vice-President/Treasurer/Registered Agent

Elite Trading and Contracting, Inc. - Status: "Terminated (Voluntary)"
555 Grove St., Suite 104, Herndon, VA
Totonji, Irfan K. – President/Treasurer/Registered Agent
Almoayyad, Abdulelah, - Chairman
Alyounes-Totonji, Ghazwa – Vice President

Equity Investors Associates, Ltd. - Status: "Terminated (Automatiac)"
555 Grove St., Suite 110, Herndon, VA
George, Jawad F. – Registered Agent

Enterprise Investment Group, Inc. - Status: Active
12528 Rock Ridge Rd., Herndon, VA
Ashraf, Muhammad - Registered Agent

Executive Building Maintenance - Status: Active
555 Grove St., Suite 104, Herndon, VA
Totonji, Irfan K. – President/Treasurer/Secretary/Registered Agent
Alyounes-Totonji, Ghawza – Vice-President
Almoayyad, Abdulelah – Chairman

FIQH Council of North America, Inc. - Status: Active
750-A Miller Dr., SE, Leesburg, VA
Al-Alwani, Taha J. - Registered Agent
Issam, Akkad - Treasurer

Ghazwa Associates, LLC - Status: Active
c/o Elite Investment & Management, 555 Grove St., Suite 104, Herndon, VA
Sanderson, Douglas J. – Registered Agent

Attachment C
Page 5

Global Enterprises, LLC - Status: Active
555 Grove St., Suite 116, Herndon, VA
Ashraf, Muhammad – Registered Agent

Global Holdings, LLC - Status: Active
555 Grove St., Suite 116, Herndon, VA
Ashraf, Muhammad – Registered Agent

Graduate School of Islamic & Social Sciences - Status: Active
(Formerly known as The Islamic Institute of Advanced Studies [IIAS] and the School of Islamic and Social Sciences [SISS])
750-A Miller Dr., SE,Leesburg, VA
Al-Alwani, Taha J. - Registered Agent
Abusulayman, Dr. Abdulhamid - Secretary
Mirza, M. Yacub - Treasurer

Grove Corporate Plaza - Status: Active
555 Grove St., Suite 110, Herndon, VA
Mirza, M. Yaqub – President/Treasurer/Registered Agent
Ashraf, M. Omar – Vice-President/Secretary

Grove Street Corporation – Inactive
555 Grove Street, Herndon, Virginia
Al-Talib, Hisham
Ashraf, Omar

Heritage Education Trust, Inc. - Status: Active
750-A Miller Dr.,SE, Leesburg, VA
Jaghlit, Mohammad – Secretary/Treasurer/Registered Agent
Al-Alwani, Taha J. - President

Heritage Holdings - Status: Active
750-A Miller Dr., SE, Leesburg, VA
Al-Alwani, Taha J. - Registered Agent

Herndon Grand, Inc. - Status: "Terminated (Automatic)"
555 Grove St., Suite 205, Herndon, VA
Altalib, Hisham – President/Treasurer/Registered Agent
Totonji, Irfan – Vice-President
Ashraf, Muhammad – Secretary

HFC Feed Mill, LLC - Status: Active
555 Grove St., Suite 116, Herndon, VA
Ashraf, Muhammad – Registered Agent

Attachment C
Page 6

Home Owners of Mena Estates Association - Status: "Terminated (Automatic)"
555 Grove St., Herndon, VA
Barzinji, Jamal – Secretary
Estwani, Bassam – Treasurer
Becker, Larry E. – Registered Agent

Horizons Education Association - Status: Active
555 Grove St., Suite 116, Herndon, VA
Mirza, M. Yaqub – Registered Agent

Humana Charitable Trust c/o Amana Ltd.,
Abacus House, Mona Street, Douglas, Isle of Man
P.O. Box 1297, Herndon, VA

IFSO Training Bureau - Status: "Terminated (Automatic)"
555 Grove St., Herndon, VA
Kasule, Omar. H. – Registered Agent

Impact Training Center, Inc. - Status: "Terminated (Voluntary)
501 Merlins Lane, Herndon, VA
Salah, Samir I. -- Registered Agent

International Education Trust, Inc. - Status: Active
9034 Swift Creek Rd., Fairfax Station, VA
Jaghlit, Mohammad – President/Treasurer/Registered Agent
Malkawi, Fathi – Vice-President/Secretary
Rashdan, Mahmouda – Vice-President

International Institution of Islamic Thought, Inc. - Status: Active
500 Grove St., Herndon, VA
Abusulayman, Abdulhamid – Chairman/President/Director
Al Alwani, Taha J. – Chief Financial Officer
Altalib, Hisham – Vice-President/Registered Agent
Barzinji, Jamal – Treasurer/Secretary/CFO
Jaghlit, Mohammad – President/Treasurer/Registered Agent

International Islamic Charitable Organization (IICO) - Status: Active
555 Grove St., Suite 116, Herndon, VA
Hassaballa, Ibrahim – Vice-President
Mirza, M. Yacub – Treasurer/Registered Agent
Mohamed, Mohieldin A. – Vice-President
Ashraf, Muhammad – Secretary

International Islamic Forum for Science, Technology and Human Resources Development, Inc. dba IIFTIKHAR - Status: Active
1145 Herndon Pky,#500A, Herndon, VA
Totonji, Dr. Ahmad – President
Barzinji, Dr. Jamal - Vice-President
Abusulayman, Dr. Abdulhamid - Chairman
Unus, Dr. Iqbal J. - Secretary/Treasurer/Registered Agent

International Relief Organization (a.k.a. International Islamic Relief Organization)
Status: Active
P.O.Box 8125, Falls Church, VA; 360 S. Washington St., Falls Church, VA; 5501 Backlick Rd., #220, Springfield, VA (Registered Agent)
Al Suwaidan, Tareq – Secretary/Treasurer
Al Sulaiman, Ali – President
Al Mahdi, Abdullah M. – Vice-President, Chief Financial Officer
Al Mahdi, Tareq M. – Secretary
Hadeed, Michael – Registered Agent
Omeish, Mohamed S. – President/Secretary

International Technology Marketing, Inc. Status: "Terminated (Automatic)"
501 Merlins Lane, Herndon, VA
Salah, Samir I. – Registered Agent

International Origin Solutions, LLC Status: Active
555 Grove St., Suite 116, Herndon, VA
Ashraf, Muhammad – Registered Agent

Jet Express, Inc. - Status: "Terminated (Automatic)"
555 Grove St., Suite 110, Herndon, VA
George, Jawad F. - Registered Agent

Jucosa USA, Inc. Status: Active
555 Grove St., Suite 116, Herndon, VA
(Registered Agent: 555 Grove St., Suite 114, Herndon, VA)
Uziel, Sergio Araya – President
Silva, Miguel Montes – Vice-President
Ashraf, M. Omar – Secretary/Treasurer
Mirza, Dr. M. Yacub – Chairman/Registered Agent

Latib International, Inc. - Status: "Terminated (Automatic)"
555 Grove St., Suite 110, Herndon, VA
George, Jawad F. – Registered Agent

Light Star Travel Agency, Inc.– Status: active
360 South Washington St., Ste. 102, Falls Church, Virginia 22046
Abdelellah, Aber – Vice Presdient
Mushtaha, Fawaz – President/Registered Agent

Lynx Holdings, Inc. - Status: "Terminated (Automatic)"
555 Grove St., (no suite #), Herndon, VA
Barzinji, Jamal – President
Mirza, M. Y. – Vice-President/Secretary
Altalib, Hisham – Treasurer/Registered Agent

Lynx Real Estate, Inc. - Status: "Withdrawn"
555 Grove St., 1st Floor, Herndon, VA
(Registered Agent) 555 Grove St., Suite 230, Herndon, VA
Altalib, Hisham Dr. – President/Treasurer/Registered Agent
Ashraf, Muhammad - Secretary

Makkah Mukarramah Charity Trust, Inc. - Status: "Terminated (Automatic)"
Almoayyad, Abdulelah – Vice President
Mirza, Yaqub – Secretary/Treasurer
Totonji, Ahmad – President

Mar-Jac Investments - Status: Active
555 Grove St., Suite 110, Herndon, VA
Mirza, M. Yacub – President/Treasurer/Registered Agent
Ashraf, M. Omar – Vice-President/Secretary

Mar-Jac Farms, Inc. - Status: "Merged"
P.O. Box 1017, Gainesville, GA
Al-Barzinji, Jamal Dr. – Chief Executive Officer
Al-Talib, Hisham Dr. – Chief Financial Officer
Mirza, M.Y. Dr. – Director
Mohamed, Mahmoud – Registered Agent

Mar-Jac Holdings, Inc. – Active
555 Grove Street, Herndon, Virginia
Safa Trust, Inc.

Attachment C
Page 9

Mar-Jac Poultry, Inc. – Status: Active
Aviation Blvd., P.O. Box 1017, Gainesville, GA
Al-Barzinji, Jamal Dr. – Chief Executive Officer
Al-Talib, Hisham – Chief Financial Officer
Mirza, M.Y. Dr. – Secretary
Carnes, Doug – Registered Agent

Mena Corporation – Inactive
555 Grove Street, Herndon, Virginia

Mena Estates, Inc., DBA Mena for Development - Status: Active
555 Grove St., Suite 212, Herndon, VA
Barzinji, Jamal – President
Altalib, Hisham – Secretary/Treasurer/Registered Agent
Mirza, M. Yaqub – Vice-President

Mena Investments, Inc. - Status: Active
555 Grove St., (no suite #), Herndon, VA
Barzinji, Jamal – President
Altalib, Hisham – Secretary/Treasurer/Registered Agent
Mirza, M. Yaqub – Vice-President

Mirza Family Limited Partnership - Status : Active
11922 Safa Ct., Herndon, VA
Mirza, Tanveer A. – Registered Agent

Muslim World League - Status: Active
360 S. Washington St., #300, Falls Church, VA
(Registered Office: 555 Grove St., Suite 116), Herndon, VA)
Al Obaid, Dr. Abdullah Bin Saleh – President
Bahafzallah, Dr. Hassan A.A. – Vice-President
Mirza, Dr. M. Yaqub -- Secretary/Treasurer/Registere Agent

Newcom Investors, LLC - Status: anceled
555 Grove St., Suite 116, Herndon, VA
Ashraf, Muhammad – Registered Agent

Noor International - Status:Active
12028 Waterside View Apt #12, Reston, VA
Yacoob, Snober - Registerd Agent
Mirza, Tanveer A. – Vice President/ Seretary/
Yacoob, Sanobar Akhtr – President

Ozaan Capital Management, Inc. - Status: Active
12541 Browns Ferry Rd., Herndon, VA
Ashraf, Mohammad O. -- Registered Agent/President
Ashraf, Zahida P. - Scretary

Piedmont Medical Services, Inc. - Status: Active
501 Merlins Lane, Herndon, VA
Salah, Samir I. – Registered Agent/President/Secretary
Salah, Saniya S. - Vice-President

Properties Development Corp. - Status: "Revoked (Automatic)"
555 Grove St., (no suite #), Herndon, VA
Altalib, Dr. Hisham – President/Treasurer/Registered Agent
Ashraf, Muhammad – Secretary

R & S International, Inc. - Status: "Terminated (Automatic)"
555 Grove St., Suite 140, Herndon, VA
Yacoob, Sanobar A. – President
Irshad, Tariq M. – Secretary/Registered Agent
Lehan, Sultan A. – Treasurer

Reston Investments, Inc. - Status: Active
555 Grove St., Suite 114, Herndon, VA
Barjinji, Jamal - President
Mirza, Dr. M. Yaqub - Vice-President/Secretary
Altalib, Dr. Hisham - Treasurer

SAAR Foundation Canada, Inc.

SAAR Foundation, Inc. – Status: "Terminated (Voluntary)"
555 Grove St., Suite 110, Herndon, VA
Mirza, M. Yaqub – President/Chief Executive Officer/Registered Agent
Jaghlit, Mohammad - Treasurer
Sedky, Cherif – Secretary

SAAR International, Inc.
1212 New York Avenue, 12th Fl., Washington, DC
1212 New York Avenue, Inc.

Safa Trust - Status: Active
555 Grove St., Suite 114, Herndon, VA
Barzinji, Jamal – President
Mirza, M. Yaqub – Vice-President/Registered Agent
Altalib, Hisham – Treasurer
Totonji, Ahmad – Secretary

Safty, LLC - Status: Active
11922 Safa Court, Herndon, VA
Mirza, M. Yacub – Registered Agent

Sanabel Al Kheer, Inc. - Status: Active
555 Grove St., Suite 116, Herndon, VA
Al Obaid, Dr. Abdullah Bin Saleh – President
Bahafzallah, Dr. Hassan A.A. – Vice-President
Mirza, Dr. M. Yaqub – Secretary/Treasurer/Registered Agent

Sana-Bell, Inc. - Status: "Revoked (Automatic)"
555 Grove St., Suite 116, Herndon, VA
Obad, Bin Saleh L. – President
Bahafzallah, Hassan M. – Vice-President
Al Noshan, Abdullah M. – Treasurer
Mirza, M. Yacub – Secretary

Silicon Valley Venture Fund I, LLC - Status: Active
555 Grove St., Suite 116, Herndon, VA
Ashraf, Muhammad – Registered Agent

Silicon Valley Venture Fund II, LLC - Status: Active
555 Grove St., Suite 116, Herndon, VA
Ashraf, Muhammad – Registered Agent

Sterling Advisors, Inc. - Status: Active
555 Grove St., Suite 116, Herndon, VA
(Registered Office 555 Grove St., Suite 114, Herndon, VA)
Mirza, Dr. M. Yacub – Chairman/President/Chief Executive Officer
Ashraf, M. Omar – Executive Vice-Pres/President/Treasurer/Reg. Agent
Ashraf, Muhammad – Vice-President/Secretary

Sterling Charitable Gift Fund - No Record (VASOS)
Mirza, Yacub – President/CEO/Chairman
Ashraf, Muhammad – Vice-President/Secretary
Ashraf, M. Omar – Executive Vice-President/Treasurer/Reg. Agent
Zeki, Nabil A.M. – Vice-President

Sterling Infogain, Fund, LLC - Status: Active
555 Grove St., Suite 116, Herndon, VA
Ashraf, Muhammad – Registered Agent

Sterling Investment Group, LLC - Status: Active
555 Grove St., Suite 110, Herndon, VA
Ashraf, Muhammad – Registered Agent

Sterling Lynux Works, LLC - Status: Active
555 Grove St., Suite 116, Herndon, VA
Ashraf, Muhammad – Registered Agent

Sterling Management Group, Inc. - Status: Active
555 Grove St., Suite 116, Herndon, VA
Mirza, Yacub – President/CEO/Chairman
Ashraf, Muhammad – Vice-President/Secretary
Ashraf, M. Omar – Executive Vice-President/Treasurer/Reg. Agent
Zeki, Nabil A.M. – Vice-President

Sterling Packet Stream Fund, LLC - Status: Active
555 Grove St., Suite 116, Herndon, VA
Ashraf, Muhammad - Registered Agent

Sterling Ptech Fund, LLC - Status: Active
555 Grove St., Suite 114, Herndon, VA
Ashraf, Muhammad – Registered Agent

Sterling Poultry Company - Status: "Terminated (Voluntary)"
555 Grove St., (no suite #), Herndon, VA
Barzinji, Jamal – President
Mirza, M. Yacub – Vice-President/Secretary/Registered Agent
Altalib, Hisham - Treasurer

Sterling Stock Invesments, LLC- Status: "Canceled"
555 Grove., Suite 114, Herndon, VA
Ashraf, M. Omar – Registered Agent

Sterling Technology Fund, LLC - Status: Active
Formerly: Sterling Malaysian Fund, LLC
555 Grove St., Suite 116, Herndon, VA
Mirza, M. Yacub – Registered Agent

Stratford Associates, LC - Status: Active
555 Grove St., Suite 104, Herndon, VA
Totonji, Irfan K. / Elite Investment & Mgmt Group – Registered Agent

Stratford Commercial Associates, LC - Status: "Canceled"
555 Grove St., Suite 104, Herndon, VA
Totonji, Irfan K./Elite Investments & Mgmt Group – Registered Agent

Stuart Road Associates, LC - Status: "Active"
555 Grove St., Suite 104, Herndon, VA
Totonji, Irfan K./Elite Investments & Mgmt Group – Registered Agent

The Success Foundation, Inc.
3606 Forest Drive, Alexandria, Virginia 22302; 360 South Washington St., Ste. 300
Falls Church, Virginia 22046
Omeish, Mohamed – President
Alamoudi, Abdulrahman – Secretary
Nouri, Khaled - Treasurer

Sugarland Road Development, LLC - Status: Active
447 Carlisle Dr., Herndon, VA
(Registered Office: 56970 Community Plaza, Suite 218, Sterling, VA)
Ashraf, M. Omar – Registered Agent

Tafy Enterprises, Inc. - Status: Active
11922 Safa Court, Herndon, VA
Mirza, Tanveer A. - President/Secretary/Registered Agent
Mirza, M. Yaqub - Treasurer

Taibah International Aid Association - Status: Active
360 S. Washington St., #104, Falls Church, VA
Al-Almoudi, Abdul Rahman - Director
Hajjaj, Anwar - Vice-Chairman/Registered Agent
Salah, Samir - Treasurer

Union Capital Corporation - Status: Active
12541 Browns Ferry Rd., Herndon, VA
Ashraf, Mohammad O. – Registered Agent

United Investments Group, Inc. - Status: "Terminated (Automatic)"
555 Grove St., Suite 110C, Herndon, VA
Ashraf, Muhammad – Registered Agent

Vale Ridge Associates, LC - Status: Canceled
555 Grove St., Suite 104, Herndon, VA
Totonji, Irfan K. dba Elite Investments & Mgmt Group – Registered Agent

Virginia American Properties, Inc. - Status: "Terminated (Voluntary)"
555 Grove Street, Herndon, VA
Altalib, Hisham – President/Treasurer/Registered Agent
Ashraf, Muhammad - Secretary

Woodland Development, LLC - Status: "Canceled"
555 Grove St., Suite 110, Herndon, VA
Mirza, M. Yacub – Registered Agent

York Foundation - Status: Active
555 Grove St., Suite 114, Herndon, VA
Mirza, M. Yacub – President/Treasurer/Registered Agent
Ashraf, Muhammad – Secretary

York International – Active
Isle of Man

500 Grove Street, LLC - Status: Active
555 Grove St., Suite 116, Herndon, VA
Ashraf, Muhammad – Registered Agent

## ATTACHMENT D

**Safa Group**
**Officers and Directors & Their Related Businesses and Organizations**

| Name Of Officer | Associated/Related Corporation/Business |
|---|---|
| **Abdelellah, Aber** | Light Star Travel |
| **Abusulayman, Abdulhamid** | Child Development Foundation<br>IIIT<br>GSISS<br>International Islamic Forum for Science, Technology & Human Resources Development, Inc. (IIFTIKHAR) |
| **Ahmad, Mumtaz** | Assn of Muslim Social Scientists |
| **Ahmed, Gamal** | Boshra, Inc. |
| **Al Almoudi, Abdul Rahman** | Taibah International Aid Association<br>Success Foundation<br>American Muslim Foundation American Muslim Council |
| **Al Alwani, Taha J.** | IIIT<br>FIQH<br>GISS<br>Heritage Education Trust Inc.<br>Heritage Holdings |
| **Al Ashkar, Abdelhaleem** | Al-Aqsa Educational Fund |
| **Al Hassan, Yazen M** | Elite Management Resources, Inc. |
| **Al Mahdi, Abdullah M.** | International Relief Organization |
| **Al Mahdi, Tareq M.** | International Relief Organization |
| **Al Noshan, Abdullah M.** | Sana-Bell, Inc. |
| **Al Obaid, Abdullah Bin Saleh** | Muslim World League<br>Sana-Bell, Inc.<br>Sanabel Al Kheer, Inc. |

| | |
|---|---|
| **Al Rajhi, Abdullah Sulaiman** | Aradi, Inc. |
| **Al Sulaiman, Ali** | International Relief Organization |
| **Al Suwaidan, Tareq** | International Relief Organization |
| **Al Younes-Totonji, Ghazwa A.** | Elite Investment & Management Group Inc.<br>Elite Training & Contracting Inc.<br>Executive Building Maintenance |
| **Alkhairo, Wael** | All Dulles Area Muslim Society |
| **Almoayyad, Abdulelah** | Elite Training & Contracting Inc.<br>Executive Building Maintenance<br>Makkah Mukarramah Charity Trust |
| **Alsumait, Adbulrahman** | African Muslim Agency |
| **Altalib, Hisham** | Aradi Inc.<br>African Muslim Agency<br>Altalib Family Limited Partnership<br>American Institute for Islamic Societal Studies<br>Child Development Foundation<br>Courtland Farm Conservancy Lots Homeowners Assn., Inc.<br>Herndon Grand, Inc.<br>IIIT<br>Lynx Holdings Inc.<br>Lynx Real Estate Inc.<br>Mar-Jac Farms, Inc.<br>Mar-Jac Poultry, Inc.<br>Mena Estates Inc., DBA Mena for Development<br>Mena Investments Inc.<br>Properties Development Corp.<br>Reston Investments Inc.<br>Safa Trust<br>Sterling Poultry Co.<br>Virginia American Properties Inc. |
| **Aqeel, Abdul R.** | Al-Wahyayn Publishing Co. |

Attachment D
Page 3

| | |
|---|---|
| **Ashraf, M. Omar** | All Dulles Area Muslim Society<br>Arabic Software Computer, Inc.<br>Grove Corporate Plaza<br>Jucosa USA, Inc.<br>Mar-Jac Investments Inc.<br>Ozaan Capital Management, Inc.<br>Sterling Advisors Inc.<br>Sterling Management Group<br>Sterling Stock Investments LLC<br>Sugarland Road Development Inc.<br>Union Capital Corporation |
| **Ashraf, Muhammad** | AMC Foundation Inc.<br>American Institute for Islamic Societal Studies<br>Courtland Farm Conservancy Lots<br>Homeowners Association Inc.<br>Herndon Grand Inc.<br>HFC Feed Mill LLC<br>Enterprise Investment Group Inc.<br>Global Enterprises LLC<br>Global Holdings LLC<br>International Islamic Charitable Organization<br>International Origin Solutions LLC<br>Lynx Real Estate Inc.<br>Newcom Investors LLC<br>Properties Development Corporation<br>Silicon Valley Venture Fund I, LLC<br>Silicon Valley Venture Fund II, LLC<br>Sterling Advisors Inc.<br>Sterling Infogain Fund LLC<br>Sterling Investment Group LLC<br>Sterling Lynux Works LLC<br>Sterling Management Group Sterling<br>Packet Stream Fund, LLC<br>Sterling Ptech Fund, LLC<br>United Investment Group<br>Virginia American Properties, Inc.<br>York Foundation<br>500 Grove Street LLC |
| **Ashraf, Zahida P.** | Ozaan Capital Management Inc. |
| **Awand, Mazhar A.** | All Dulles Area Muslim Society |

Attachment D
Page 4

| | |
|---|---|
| **Babafzallah, Hassan A.A.** | Muslim World League<br>Sana-Bell Inc.<br>Sanabel Al Kheer Inc. |
| **Bari, Aziz** | All Dulles Area Muslim Society |
| **Barzinji, Jamal** | Al-Wahyayn Publishing Company<br>Home Owners of Mena Estates Assn.<br>Heritage Holdings<br>IIFSTHRD<br>Lynx Holdings Inc.<br>Mar-Jac Farms, Inc.<br>Mar-Jac Poultry, Inc.<br>Mena Estates, Inc.<br>Mena Investments Inc.<br>Home Owners of Mena Estates Assn.<br>Reston Investments Inc.<br>Safa Trust<br>Sterling Poultry Company<br>American Muslim Council |
| **Becker, Larry E.** | Mena Estates Assn. |
| **Bushnaq, Yaser** | Al-Aqsa Educational Fund |
| **El Ansary, Waleed** | Association of Muslim Social Scientists |
| **Estwani, Bassam** | Boshra, Inc.<br>Home Owners of Mena Estates Association |
| **George, Jawad F.** | A & W Stores Inc.<br>American Projects Investments, Corporation<br>Bone Shami Venture<br>Capital Diamond Center<br>Equity Investors Associates Ltd.<br>Jet Express Inc.<br>Latib International Inc. |
| **Hadeed, Michael Jr.** | Attia Grafisk USA Inc.<br>International Relief Organization |
| **Hajjaj, Anwar** | Taibah International Aid Association |

| | |
|---|---|
| **Hansen, David** | Courtland Farm Homeowners Assn. |
| **Haq, Faizan** | Association of Muslim Social Scientists |
| **Hassaballa, Ibrahim** | International Islamic Charitable Organization |
| **Holt, James W.** | Courtland Farm Homeowners Assn. |
| **Iqbal, Mahamed** | Arabic Software Computer, Inc. |
| **Irshad, Tariq M.** | R & S International, Inc. |
| **Isam, Akkad** | FIQH Council of North America |
| **Jaghlit, Mohammad** | International Education Trust, Inc.<br>Heritage Education Trust Inc.<br>Heritage Holdings<br>SAAR Foundation Inc.<br>Al-Aqsa Educational Fund |
| **Jaka, Rizwan** | All Dulles Area Muslim Society |
| **Kandil, Osama** | American Products International |
| **Kasule, Omar H.** | IFSO Training Bureau |
| **Khan, Bashir Ahmad** | All Dulles Area Muslim Society |
| **Khan, Mumtaz** | All Dulles Area Muslim Society |
| **Kline, Bradford S.** | Courtland Farm Homeowners Assn. |
| **Latib, Abdulrahman** | All Dulles Area Muslim Society |
| **Lehan, Sultan A.** | R & S International Inc. |
| **Malkawi, Fathi** | International Education Trust Inc. |
| **Manraj, Abdul Hafez** | All Dulles Area Muslim Society |

| | |
|---|---|
| **Mirza, M. Yaqub** | African Muslim Agency<br>Courtland Farms Homeowners Association Inc.<br>Horizons Education Association Creativity<br>International Productions, LLC<br>GSISS<br>Grove Corporate Plaza<br>Jucosa USA, Inc.<br>Lynx Holdings Inc.<br>Mar-Jac Investments<br>Mar-Jac Farms Inc.<br>Mar-Jac Poultry Inc.<br>Makkah Mukarramah Charity Trust<br>Mena Estates Inc. DBA Mena for Development<br>Mena Investments Inc.<br>Mirza Family Limited Partnership<br>Muslim World League<br>Reston Investments Inc.<br>SAAR Foundation Inc.<br>Safa Trust Inc.<br>Safty LLC<br>Sanabel Al Kheer Inc.<br>Sana-Bell Inc.<br>Sterling Advisors Inc.<br>Sterling Management Group<br>Sterling Poultry Company<br>Sterling Technology Fund LLC<br>Tafy Enterprises Inc.<br>Woodland Development LLC<br>York Foundation |
| **Mirza, Tanveer A.** | Mirza Family Limited Partnership<br>Noor International<br>Tafy Enterprises |
| **Mohamed, Alba M.** | Attia Grafisk USA, Inc. |
| **Mohamed, Mahmoud** | Mar-Jac Farms, Inc. |
| **Mohamed, Mohieldin A.** | International Islamic Charitable Organization |
| **Mushtaha, Fawaz** | Dar El-Eiman USA Inc.<br>Light Star Travel Agency<br>Al-Aqsa Educational Fund |

| | |
|---|---|
| **Noor, Ahmed** | All Dulles Area Muslim Society |
| **Omeish, Mohamed S.** | International Relief Organization (IRO)/International Islamic Relief Organization(IIRO)/ Success Foundation |
| **Rashdan, Mahmouda** | International Education Trust Inc. |
| **Rayyan, Ahmad I.** | All Dulles Area Muslim Society |
| **Safi, Louay** | Association of Muslim Social Scientists (AMSS) |
| **Salah, Said** | All Dulles Area Muslim Society |
| **Salah, Samir I.** | Impact Training Center Inc.<br>International Technology Marketing<br>Piedmont Medical Services<br>Taibah International<br>SAAR Foundation<br>Mar-Jac Investments<br>Piedmont Trading<br>Piedmont Management<br>Piedmont Medical<br>Marwa Investments<br>All Dulles Area Muslim Society |
| **Salah, Saniyz S.** | Piedmont Medical Services, Inc. |
| **Sedky, Cherif** | Al-Murjan Corporation<br>Aradi Inc.<br>SAAR Foundation Inc.<br>Courtland Farm Conservancy<br>Nimir Petroleum<br>Yeminvest |
| **Silva, Miguel Montes** | Jucosa USA Inc. |
| **Totonji, Irfan K.** | Beauregard Associates LLC<br>Herndon Grand Inc.<br>East Stratford Phase A & B Homeowners Ass'n<br>Elite Investment & Management Group Inc.<br>Elite Management Resources Inc.<br>Elite Training & Contracting Inc.<br>Executive Building Maintenance |

| | |
|---|---|
| **Totonji, Ahmad** | IIIT<br>IIFTIKHAR<br>Makkah Mukarramah Charity Trust |
| **Unus, Iqbal J.** | All Dulles Area Muslim Society<br>Child Development Foundation<br>Education, Training & Research Associates<br>IIFTIKHAR |
| **Uziel, Sergio Araya** | Jucosa USA, Inc. |
| **Yacoob, Sanobar** | R & S International Inc.<br>Noor International |
| **Yacoob, Snober** | Noor International |
| **Zeki, Nabil A.M.** | Sterling Management Group |

Attachment E

**Glossary of Terms, Individuals, and Organizations Relevant To This Affidavit**

Abusulayman, Abdulhamid - President of IIIT and associated with other Safa Group entities, Abusulayman shared ideological affinities with PIJ fund raiser Sami Al-Arian.

African Muslim Agency – Safa Group entity located on "paper" at 555 Grove Street, Herndon, Virginia, operated by Al-Talib and Mirza.

Al-Alwani, Taha Jaber Officer or director of IIIT, FIQH, GSISS and other Safa Group entities. Al-Alwani shared ideological affinities with PIJ fund raiser Sami Al-Arian.

Al-Arian, Sami – Al-Arian is a PIJ fund raiser in Tampa Florida, who founded ICP and WISE, and authored the PIJ manifesto found in the search warrant at his house in 1995.

Al-Aqsa Educational Fund – Mohammed Jaghlit was the president of this charity, which raised funds for HAMAS.

Al-Fawwaz, Khalid – An aide of Osama Bin Laden, Al-Fawwaz is an SDT and is awaiting extradition to the United States for his part in the Embassy Bombings.

Alamoudi, Abdulrahman – Director of the American Muslim Council, the American Muslim Foundation, and many other Islamic fundamentalist organizations.

Ali, Ahmed Mohammed – The Secretary General of the Muslim World League (MWL). Ali publicly stated that the International Islamic Relief Organization is the "operational arm" of the MWL.

All Dulles Area Muslim Society (ADAMS) – A member of the Safa Group that transferred large amounts of money to other members of the Safa Group.

Alshehri, Fayez Ahmed – September 11, 2001 hijacker who worked for the International Islamic Relief Organization in the United States.

Al-Rajhi, Abdullah Sulaiman – Safa Group member and member of wealthy Al-Rajhi family in Saudi Arabia. He is also a director of Aradi, Inc. at 555 Grove Street, Herdon, Virginia

Al-Rajhi Charity – An alleged charity operated by the Al-Rajhi family in Saudi Arabia.

Al-Rajhi Commercial and Foreign Exchange – Business operated by members of the Al-Rajhi family in Saudi Arabia.

Al-Rajhi, Sulaiman Abdul Aziz – Founder and head of the Al-Rajhi conglomerate in Saudi Arabia, and the namesake of the SAAR Foundation.

Attachment E
Page 2

Al-Shifa Pharmaceutical Industries Company – Company located in Khartoum, Sudan which was the subject of a U.S. cruise missile attack on August 20, 1998 for its involvement in the Embassy bombings in Tanzania and Kenya.

Al-Talib Family Limited Partnership – Limited partnership operated by Hisham Al-Talib and incorporated at his home residence, 11776 Stratford House Pl., Suite 1403, Reston, Virginia.

Al-Talib, Hisham - Officer or director of various Safa Group entities, Al-Talib shared ideological affinities with PIJ fund raiser Sami Al-Arian.

Alamoudi, Abdurahman – Safa Group member and current director of the Success Foundation, the American Muslim Foundation, and the American Muslim Council, among others. Previous director of the SAAR Foundation. Was recorded on video during a year 2000 Islamic rally in Lafayette Park, Washington, D.C. stating that he supported HAMAS and Hezbollah.

Amana Limited – Safa Group corporation located in the Isle of Man.

Amana Mutual Funds Trust – Safa Group mutual fund company.

Aradi, Inc. – "Safa Group" corporation located on "paper" at 555 Grove Street, Herndon, Virginia. Operated by Cherif Sedky, Abdullah Sulaiman Al-Rajhi and Hisham Al-Talib.

Ashraf, M. Omar – Officer and/or director of Mar-Jac Investments, Sterling Charitable Gift Fund, and other companies listed in Attachment C.

Ashraf, Muhammed – Officer and/or director of Courtland Farm Conservancy Lots Homeowners Association, Inc., International Islamic Charitable Organization, Sterling Charitable Gift Fund, Sterling Management Group, and others entities listed in Attachment C.

Atef, Mohammed – A high-ranking Al-Qaida member and designated terrorist who was killed by U.S. forces in the war on terrorism in 2001.

Barzinji, Jamal - Officer or director of various Safa Group entities. Barzinji shared ideological affinities with PIJ fund raiser Sami Al-Arian.

Bin Laden, Osama/Usama – Islamic fundamentalist terrorist and founder of Al-Qaida who has orchestrated several terrorist attacks, including the attacks on the World Trade Center and Pentagon. Bin Laden is a designated terrorist and the FBI's #1 most wanted person.

Child Development Foundation – "Safa Group" organization located at 555 Grove Street, #114, Herndon, Virginia, operated by Abdulhamid Abusulayman, Hisham Al-Talib and Iqbal Unus.

Courtland Farm Conservancy Lots Homeowners Association, Inc. – "Safa Group" organization located at 555 Grove Street, #112, Herndon, Virginia, operated by Muhammad Ashraf, Yacub Mirza and Hisham Al-Talib.

El-Khatib, Mohammed Taysir – member of the PIJ Shura Council.

Elbarasse, Ismail – Directed funds for HAMAS through confessed HAMAS member Mohammed Salah.

Elite Investment and Management Group, Inc. – "Safa Group" corporation located at 555 Grove Street, #104, Herndon, Virginia, and operated by Ghazwa Al Younes-Totonji and Irfan Totonji.

Elite Trading and Contracting, Inc. - "Safa Group" organization located at 555 Grove Street, #104, Herndon, Virginia, and operated by Abdulelah Almoayyad, Ghazwa Alyounes-Totonji, and Irfan Totonji.

FIQH Council of North America, Inc. – "Safa Group" corporation located at 750-A Miller Dr., SE, Leesburg, Virginia, operated by Taha Al-Alwani.

Foreign Terrorist Organization (FTO) Terrorist organization as designated the U.S. Department of State.

Graduate School of Islamic and Social Sciences (GSISS) – "Safa Group" corporation located at 750-A Miller Drive, SE, Leesburg, Virginia, operated by Taha Al-Alwani. Formerly known as the Islamic Institute of Advanced Studies (IIAS)/School of Islamic and Social Sciences (SISS).

Grove Corporate Plaza – "Safa Group" corporation located at 555 Grove Street, #110, Herndon, Virginia, operated by Omar Ashraf and Yaqub Mirza..

Grove Street Corporation – Safa organization previously located at 555 Grove Street.

HAMAS Terrorist Group – a/k/a Islamic Resistance Movement. HAMAS is a Designated Terrorist Organization that is responsible for numerous terrorist attacks that have resulted in the death of innocent civilians, including American nationals.

Hamdi, Tariq Abdulmelik (a/k/a Tariq Hamdi Ismael Azami) - Employed by IIIT, Hamdi delivered a satellite telephone battery to an aide to Bin Laden in May 1998, that enabled Bin Laden to communicate with his followers in preparation for the Embassy Bombings in Kenya and Tanzania.

Hassaballah, Ibrahim - Director of International Islamic Charitable Organization (IICO), along with Muhammad Ashraf, Yaqub Mirza and Mohieldin Mohamed. Currency and Monetary Instrument

Reports (CMIRs) registered on Hassaballah show that he has moved large amounts of currency into the United States from abroad, including over $3 million on one occasion in the early 1980s.

Hassan, Beverly -- The custodian of records on various Safa Group 990s.

Heritage Education Trust, Inc. -- "Safa Group" corporation located at 750-A Miller Drive, SE, Leesburg, Virginia, operated by Mohammed Jaghlit.

HFC Feed Mill, LLC – Safa Group corporation located at 555 Grove Street, Herndon, Virginia, managed by Muhammad Ashraf

Holy Land Foundation (HLF) – A Designated Terrorist Organization. The HLF's primary purpose is to fund HAMAS.

Home Owners of Mena Estates Association -- "Safa Group" organization previously located at 555 Grove Street, Herndon, Virginia, and operated by Jamal Barzinji and Bassam Estwani.

Hozien, Wafa - Wife of Tariq Hamdi.

Humana Charitable Trust -- Safa Group organization located in the Isle of Man. Large amounts of Safa Group money are sent to this entity.

International Education Trust, Inc. - "Safa Group" corporation located at the residence of Mohammad Jaghlit.

International Institute of Islamic Thought (IIIT) – IIIT is a core member of the Safa Group. Employs Tariq Hamdi. Corresponded directly with Al-Arian's groups in Tampa.

International Islamic Charitable Organization (IICO) – "Safa Group" corporation located at 555 Grove Street, #116, Herndon, Virginia, operated by Muhammad Ashraf, Ibrahim Hassaballa, Yaqub Mirza and Mohieldin Mohamed.

International Islamic Relief Organization (IIRO) – A subsidiary of the Muslim World League.

International Relief Organization (IRO) – Variation of IIRO.

Intifadah – Uprising in Israel and the Palestinian Authority Controlled Areas by the Palestinians. The Jihad Intifadah refers to an armed struggle as it relates to the "Holy War" against the infidels, which are considered the Jews, Christians (the West), and complacent Arab regimes. The main scope of the Intifadah is to drive the Israelis out of Israel and to reclaim the Palestinian homeland.

Attachment E
Page 5

Islamic Committee for Palestine (ICP) - a/k/a Islamic Concern Project. ICP was a Palestine Islamic Jihad front organization operated and incorporated by Sami Al-Arian in close relationship with World Islamic Studies Enterprise (WISE).

Islamic Concern Project (ICP) - a/k/a Islamic Committee for Palestine. ICP is a Palestine Islamic Jihad front organization incorporated by Sami Al-Arian in close relationship with World Islamic Studies Enterprise (WISE).

Islamic Jihad of Palestine – another variation of the Palestinian Islamic Jihad.

Islamic Relief Organization (IRO) – Same entity as International Islamic Relief Organization/Success Foundation.

Islamic Resistance Movement – HAMAS

Islamic Studies Enterprise (ISE) – An Islamic organization linked to Sami Al-Arian and the PIJ..

Jabala, Mohamoud – Suspected Egyptian militant who worked for the International Islamic Relief Organization (IIRO). Jabala is currently incarcerated in Canada, awaiting trial on terrorism charges.

Jaghlit, Mohammad Officer or director of various Safa Group entities. Jaghlit shared ideological affinities with PIJ fund raiser Sami Al-Arian and also with HAMAS.

Jaghlit Family Trust Number 1/Number 2 – Family Trusts used by Safa Group member Mohammad Jaghlit.

Khaleel, Ziyad - A Designated Terrorist. Purchased satellite telephone battery for Osama Bin Laden that allegedly facilitated the Al-Qaeda attack on the U.S. embassies in Tanzania and Kenya.

Khalifa, Mohammed Jamal – Brother-in-law of Osama Bin Laden involved in secessionist militant movement in the southern Philippines.

Makkah Mukarramah Charity Trust, Inc. – "Safa Group" charity which was previously located at 555 Grove Street, Herndon, Virginia and operated by Abdulelah Almoayyad, Yaqub Mirza and Ahmad Totonji.

Mar-Jac Holdings, Inc. – Subsidiary of Safa Trust, Inc., used for transferring large amounts of funds between various Safa Group organizations.

Mar-Jac Poultry, Inc. – Poultry farm and producing plant in Gainesville, Georgia controlled by the Safa Group.

Attachment E
Page 6

Mar-Jac Investments, Inc., Safa Group corporation managed by M. Omar Ashraf and Yaqub Mirza.

Mar-Jac Farms – "Safa Group" organization operated by Barzinji, Al-Talib, and Mirza.

Marzook, Mousa Abu (SDT) -- Current head of HAMAS, Marzouk is a Specially Designated Terrorist.

Mena Corporation – Safa Group organization.

Mena Investments, Inc. - Safa Group corporation located at 555 Grove Street, Herndon, Virginia, managed by Al-Talib, Barzinji and Mirza.

Mirza, M. Yaqub - Officer or director of numerous Safa Group entities, including African Muslim Agency, Courtland Farm Conservancy, Grove Corporate Plaza, International Islamic Charitable Organization, Makkah Mukarramah Charity Trust, Mar-Jac Investments, Muslim World League, Reston Investments, Sana-Bell, SAFA Trust, SAAR Foundation, Sterling Charitable Gift Fund.

Mirza Revocable Living Trust – Safa Group trust operated by Yaqub Mirza.

Muslim World League (MWL) – MWL was founded by the founders of Al-Qaida. International Islamic Relief Organization is the operational arm of the MWL.

Nafi, Bashir – Active directing member of the World Islamic Studies Enterprise/ Islamic Committee for Palestine until he was deported for visa fraud in mid 1990's. Nafi was sponsored into the U.S. by Sami Al-Arian and later worked at IIIT.

Najar, Mazen – Currently incarcerated in the United States for immigration violations, Najar was formerly involved in the daily operations of WISE and ICP in Florida, along with Al-Arian, Khalil Shikaki, Bashir Nafi and Ramadan Shallah.

Naseef, Abdullah Omar -- Officer and/or Director of Makkah Murrah Charity Trust and Rabita Trust.

Nasir, Sayed Abu - Bangladeshi national alleged by India's Deputy Commissioner of Police to have targeted U.S. Consulates for bombings.

Nouri, Khaled – Director of the Success Foundation.

Odeh, Sheik Abdel Aziz – Spiritual leader of the Palestinian Islamic Jihad-SF, Odeh was a cofounder of the PIJ-SF along with Fathi Shikaki.

Omeish, Mohamed – President of Islamic Relief Organization, Success Foundation, and IIRO.

Orr, Mark – Director of the International Affairs Center, University of South Florida. Orr was the addressee on a letter from Ramadan Abdallah Shallah, wherein Shallah identifies IIIT as the largest contributor to the World Islamic Studies Enterprise.

Ozaan Capital Management, Inc. – "Safa Group" corporation located at the residence of Mohammad Omar Ashraf.

Palestine Islamic Jihad-Shikaki Faction (PIJ-SF) – A Specially Designated Terrorist Group founded by Fathi Shikaki in 1980, with the mission of the elimination and destruction of Israel. After Shikaki was assassinated in 1995, Ramadan Abdallah Shallah succeeded Shikaki as the organization's leader.

Qureshi, Manzoor – Now deceased, Quereshi was the accountant for many of the Safa Group organizations.

Rabita Trust – A designated terrorist organization, Rabita Trust is a Pakistani-based contingent of the Muslim World League, which has no branches or offices in the U.S.

Rahman, Sheik Omar Abdel (a.k.a the "Blind Sheik") – A convicted terrorist who orchestrated the World Trade Center bombing in 1993.

Reston Investments, Inc. – "Safa Group" corporation located at 555 Grove Street, Ste. 114, Herndon, Virginia, currently operated by Al-Talib, Barzinji, and Mirza.

SAAR Foundation - The SAAR Foundation at 555 Grove Street, Herndon, Virginia was dissolved in December 2000 and replaced by the Sterling Charitable Gift Fund. Its directors were Mirza, Sedky and Jaghlit.

SAAR Foundation, Canada The SAAR Foundation Canada is an affiliate of the SAAR Foundation.

SAAR International – A "Safa Group" corporation currently incorporated in Washington, D.C. and operated by the company 1212 New York Avenue, Inc., a company itself operated by Lynx Systems of 555 Grove Street, Herndon, Virginia.

Safa Charities – Charities utilized by the Safa Group, including the African Muslim Agency, Heritage Education Trust, the IIIT, the SAAR Foundation, Safa Trust, Inc., the Sterling Charitable Gift Fund, and the York Foundation, among others.

Safa Group – A complex coalition of overlapping companies in Northern Virginia controlled by individuals who have shown support for terrorists and or terrorist fronts. The primary business

addresses associated with these individuals are 500 and 555 Grove Street, Herndon, Virginia; and 750-A Miller Drive, SE, Leesburg, Virginia.

Safa Trust, Inc. – A "Safa Group" corporation.

Salah, Mohammed – After he was arrested by Israeli authorities, Salah stated that authorities that he received funds from Elbarasse for HAMAS military operations.

Salah, Samir – Safa Group member. Director of ADAMS, Taibah International Aid Association and former director of both the SAAR Foundation and Mar-Jac Investments.

Sana-Bell Al Kheer, Inc. – A corporation with a mailing address of 555 Grove Street, Ste. 114, Herndon, Virginia, operated by Hassan Bahafzallah, Yaqub Mirza and Abdullah Bin Saleh Al-Obaid. Sana-Bell receives rent from the Muslim World League and International Islamic Relief Organization.

School of Islamic and Social Sciences (SISS) – Safa Group entity now known as the GSISS, located at 750-a Miller Dr., Leesburg, Virginia.

Sedky, Cherif – Officer and/or director of Aradi, Inc., SAAR Foundation, and Yeminvest.

Shallah, Ramadan Abdullah – Shallah is the current leader of the Palestine Islamic Jihad. He previously was involved in the operations of the Islamic Concern Project and World Islamic Studies Enterprise.

Shikaki, Fathi - Founded Palestine Islamic Jihad-Shikaki Faction (PIJ-SF) in 1980. Shikaki led the PIJ-SF until his assassination in 1995.

Shikaki, Khalil – PIJ member and brother of slain PIJ founder, Khalil Shikaki. Khalil also helped Ramadan Shallah, Sami Al-Arian, Bashir Nafi and Mazen Al-Najar in the day to day operations of the ICP and WISE in Florida. Khalil also received direct money transfers from the SAAR Foundation.

Specially Designated Terrorist (SDT) - Term used in this affidavit to describe those individuals who have been designated terrorists by either the U.S. Department of State or by the President of the United States.

Sterling Charitable Gift Fund (d/b/a Sterling Management Corporation) – "Safa Group" corporation managed by M. Omar Ashraf, Muhammad Ashraf, Yaqub Mirza and Nabil Zeki.

Sterling Investment Group – Safa Group corporation directed by Muhammad Ashraf.

Attachment E
Page 9

Sterling Management Group, Inc. – Listed operating name of Sterling Charitable Gift Fund.

Success Foundation – An affiliate of the International Islamic Relief Organization (IIRO/IRO).

Totonji, Ahmad - Director of Makkah Mukarramah Charity Trust, Safa Trust and other companies.

Unus, Iqbal – An officer or director of organizations in the "Safa Group".

World Islamic Studies Enterprise (WISE) – A Palestine Islamic Jihad (PIJ-SF) front organization closely connected to the Islamic Concern Project/Islamic Committee for Palestine, all formed by Al-Arian in Tampa.

York International – Safa Group organization located in the Isle of Man.

York Foundation - Safa Group organization located at 555 Grove Street, Herndon, Virginia, managed by Mirza and Muhammad Ashraf.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| **RITA KATZ, et al.,** | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 11

# Part 1

# STERLING STOCK INVESTMENTS, LLC

## CONFIDENTIAL OFFERING MEMORANDUM

**Securities Offered:** Limited Liability Company Units

**Minimum Purchase:** $50,000

---

**Sterling Stock Investments, LLC** (the "**Company**") is offering limited liability company units ("**Units**"). The investment objective of the Company is long-term capital growth, consistent with Islamic principles. Therefore, the Company will neither make investments that generate interest nor knowingly invest in certain businesses, such as pork, pork products, liquor, wine, pornography, gambling, banks and loan associations (or any other businesses) that are not based on Islamic principles. The Company may invest in publicly-traded and restricted common stocks, warrants and preferred stocks of U.S. and foreign issuers and in U.S. equity mutual funds, and write covered call options related to its publicly-traded common stocks. The Company may also hold cash.

---

**THIS OFFERING IS NOT A PUBLIC OFFERING. THE UNITS HAVE NOT BEEN REGISTERED OR QUALIFIED WITH, NOR APPROVED OR DISAPPROVED BY, THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE SECURITIES REGULATORY AUTHORITY, NOR HAS THE SEC OR ANY REGULATORY AUTHORITY DETERMINED IF THIS CONFIDENTIAL OFFERING MEMORANDUM IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

---

**THIS CONFIDENTIAL OFFERING MEMORANDUM IS NOT AN OFFER TO SELL NOR IS IT SEEKING AN OFFER TO BUY UNITS IN ANY STATE IN WHICH THE OFFER OR SALE IS NOT PERMITTED, OR IN WHICH THE PERSON MAKING THE OFFER OR SALE IS NOT QUALIFIED TO DO SO.**

| | |
|---|---|
| | 70 |
| Name of Offeree | Memorandum No. |

October 1, 1999

11029971.19

**Units will be issued only on the basis of the information and representations contained in this Confidential Offering Memorandum (this "Memorandum"), including the Operating Agreement of Sterling Stock Investments, LLC (the "Operating Agreement") and the Subscription Agreement, and no other information or representation has been authorized.**

**Any purchase made by any person on the basis of statements or representations not contained in, or inconsistent with, information herein shall be solely at the risk of the purchaser. Neither delivery of this Memorandum nor anything stated herein should be taken to imply that any information herein is correct as of any time subsequent to the date hereof.**

**This Memorandum constitutes an offer to an offeree only if the name of such offeree appears in the appropriate space provided on the cover page of this Memorandum and only if delivery of this Memorandum to such offeree is properly authorized by the Company. This Memorandum has been prepared by the Company solely for the benefit of persons interested in the proposed sale of Units, and any reproduction of this Memorandum, in whole or in part, or the divulgence of any of its contents, without the prior written consent of the Company, is prohibited.**

**No offering literature or advertising in any form whatever may be employed in the offering of Units except for this Memorandum.**

**In considering whether to invest in Units, a prospective purchaser should be aware that Units are speculative securities.**

**The Units have not been registered under the United States Securities Act of 1933 (the "1933 Act"). They are being offered as a private placement under Rule 506 of Regulation D promulgated thereunder.**

**For Georgia Residents Only: THESE SECURITIES HAVE BEEN ISSUED OR SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE "GEORGIA SECURITIES ACT OF 1973" AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.**

**Do not construe the contents of this Memorandum as legal or tax advice.**

**If you are in any doubt about the contents of this Memorandum, you should consult your financial, tax or legal advisor(s).**

**The value of Units may go down as well as up.**

**Contents** **Page**


Summary .......... 1
The Manager and Advisers .......... 9
Investment Objective, Methods and Strategies .......... 12
Risk Factors .......... 18
Conflicts of Interest .......... 25
Fiduciary Responsibility of the Manager .......... 26
Brokerage and Other Arrangements .......... 26
Operating Agreement .......... 28
The Offering .......... 33
Description of Charges to the Company .......... 36
Income Tax Aspects .......... 37
ERISA Considerations .......... 45
Additional Information Factors .......... 47
Counsel and Auditors .......... 47

Operating Agreement .......... Exhibit A
Subscription Agreement .......... Exhibit B
Purchaser Representative Questionnaire .......... Exhibit C

## SUMMARY

The following summary highlights certain information contained in the body of this Confidential Offering Memorandum (this "**Memorandum**") and is intended for reference only. ***YOU SHOULD CAREFULLY READ THE ENTIRE MEMORANDUM AND EXHIBITS BEFORE DECIDING WHETHER TO INVEST.***

**The Company**

Sterling Stock Investments, LLC (the "**Company**") is a limited liability company formed under Delaware law in October 1998. Its address is 1020 Aviation Blvd., Gainesville, GA 30501. Its telephone number is (770) 539-9539, and its facsimile number is (770) 539-9540.

**The Manager and Advisers**

Sterling Advisory Services, Inc., the Company's manager (the "**Manager**"), will be responsible for the overall management and administration of the Company. The Manager may divide the responsibility for making the investment and trading decisions for the Company among itself and various independent investment advisers (collectively, the "**Advisers**"). The Manager presently intends to allocate the management of the Company's assets approximately as follows: (1) 70% to Saturna Capital Corporation ("**Saturna**"), (2) 25% to Equitable Asset Management, Inc. ("**EAM**") and (3) 5% to manage itself. The Manager may vary this allocation of the Company's assets in the future and may add additional or replacement Advisers without prior notice to the Members. The Manager expects that the rate of reallocation will be low.

The Manager, which was formed in August 1999, is a wholly-owned subsidiary of Sterling Management Group, Inc. ("**SMG**"), which is wholly-owned and controlled by Dr. M. Yaqub Mirza. Its officers, in addition to their activities on behalf of the Company, have experience in managing investment portfolios of companies of which they have been officers and directors and have had active roles in identifying, structuring and managing strategic capital investments in the United States and in various countries throughout the world.

Saturna, which was formed in 1989, is a registered investment adviser under the U.S. Investment Advisers Act of 1940 (the "**Advisers Act**"). Saturna advises a variety of accounts, including individuals, families, trusts, estates, corporations, retirement plans and mutual funds. Saturna sponsors seven mutual funds for which it provides both management and administration.

EAM, which was formed in 1989, is a registered investment adviser under the Advisers Act. EAM advises a variety of accounts, including individuals, families, trusts, estates, corporations, retirement plans, mutual funds and Taft Hartley Plans.

The Manager's address is 1020 Aviation Blvd., Gainesville, GA 30501. Saturna's address is 1300 N. State Street, Bellingham, WA 98225. EAM's address is 800 Nashville City Center, Nashville, TN 37219.

**Investment Objective/ Islamic Principles**

The Company's investment objective is long-term capital growth, consistent with Islamic principles. Therefore, the Company will neither make investments that generate interest nor knowingly invest in certain businesses, such as pork, pork products, liquor, wine, pornography, gambling and banks and loan associations (or any other businesses) that are not based on Islamic principles. The Company may invest in publicly-traded and restricted common stocks, warrants and preferred stocks of U.S. and foreign issuers and in U.S. equity mutual funds (collectively, "**Securities**") and write covered call options related to its publicly-traded common stocks. The Company may also hold cash. See "INVESTMENT OBJECTIVE, METHODS AND STRATEGIES – Investment Objective."

In attempting to insure that Company's investments meet the requirements of the Islamic faith, the Manager has engaged the services of Islamic scholars (the "**Islamic Scholars**") and will consult with them concerning the general investment requirements necessary to comply with the Islamic faith. Upon the request of the Manager or any Adviser, the Islamic Scholars will make good faith determinations, based on readily-available information, that the Company's investments are made in accordance with Islamic principles and will advise the Manager or such Adviser accordingly. The Manager may change or appoint additional scholars.

**Investment Methods and Strategies**

In order to achieve the Company's investment objective, the Manager and the Advisers may use various investment strategies.

- Saturna's investment strategy is value-oriented and will focus primarily on publicly-traded equity Securities of small- and mid-cap companies and, to a lesser extent, on those of large-cap companies. This strategy is moderately risk adverse, which may cause Saturna to

trail the averages in rising markets, as it seeks to minimize losses during falling markets.

- EAM's investment strategy is long-term capital appreciation and will focus on investments in publicly-traded equity Securities of small- and mid-cap companies that it believes have the potential for rapidly accelerating earnings per share growth.
- The Manager's strategy will focus on investments in private placements and special situations where it believes the potential for significant gains outweighs the greater risks involved in these types of investments. The Manager may designate certain investments that it expects to be relatively illiquid or to lack a public market for more than one year as "**Designated Investments**."

The Manager will actively monitor the performance and risk profile of the investment strategies employed by it and the Advisers and will reallocate the Company's assets at such times as the Manager deems appropriate.

**Deduction of Zakah**

Zakah is paid by Muslims as a right of God in wealth. It is a mandatory social tax on a person's yearly earnings less reasonable living expenses and on all investments and accumulated savings held for more than a lunar year. The paying of Zakah is a cleansing process for the wealth of the person paying Zakah. According to the Islamic faith, God not only promises to reward in the Hereafter, but also to bless an enterprise so that it will become more profitable.

Following the opinions of contemporary scholars on how to calculate Zakah on investments, the Manager has determined that Zakah will be 10% of the lunar year profits (i.e., 10.3% of the annual aggregate Capital Appreciation of each Member's Unit(s) in the Company). Unless a Member indicates otherwise in his Subscription Agreement or in a written notice to the Company, Zakah will be deducted from his Unit(s) and distributed as described in "INVESTMENT OBJECTIVE AND STRATEGIES – Deduction of Zakah" below.

**Portfolio Turnover**

The anticipated portfolio turnover rate is initially expected to be moderate; however, given the Manager's discretion to change Advisers and strategies, the turnover rate may vary significantly from the anticipated rate.

## The Offering

**Securities Offered**

The Company, which will operate as a private investment company under Section 3(c)(1) of the Investment Company Act of 1940 (the "**1940 Act**"), is offering its Class A limited liability company units ("**Units**") to qualified investors pursuant to a private placement exemption under the Securities Act of 1933 (the "**1933 Act**"). The Company may, as determined by the Manager, offer Units of different classes having different rights and obligations from the Class A Units offered hereby. It is currently offering its Class B Units to investors who qualify for them, pursuant to a Supplement to this Memorandum. Unless otherwise specified, "Units" refers to all classes of Units.

No sales charges are payable by the Company or the Members. Placement agents and finders may be used and compensated by the Manager. The initial offering period will commence on the date hereof and will continue until November 1, 1999, unless terminated earlier or extended by the Manager, in its sole discretion, for an additional 60 days (the "**Initial Offering Period**"; the last day of which, the "**Initial Subscription Acceptance Date**"). Once the Company commences operations, it may continue to accept subscriptions for Units at monthly closing (each, a "**Subscription Acceptance Date**"), to be held as of the close of business on the last Business Day of each month (effective as of the first day of the following month) or at such other times as the Manager may determine.

If at least $1,000,000 has been subscribed for and not rejected by the Company at any time during the Initial Offering Period, the Manager may elect to terminate the Initial Offering Period and commence operations or continue to offer Units until the conclusion or earlier termination of the Initial Offering Period. If for any reason the Initial Subscription Acceptance Date does not occur, the offering of Units will terminate and subscriptions will promptly be returned to subscribers, without interest or charges for the Organization Fee (as defined below).

**Organization Fee**

An Organization Fee of .75% of the amount of each subscription will be deducted from the amount paid to the Company by each subscriber in order to compensate the Company for its organization and offering costs, which were advanced by the Manager. The Manager will be reimbursed only to the extent of the Organization Fees received by the Company.

| | |
|---|---|
| **Suitable Investors** | In order to be eligible to purchase a Unit, a Subscriber (1) generally must be an "**Accredited Investor**" as defined in Rule 501(a) of Regulation D under the 1933 Act, and (2) must have a pre-existing substantive relationship with the Manager or its principals, employees, agents or representatives. Such investors (as more fully described in the Subscription Agreement) include individuals whose net worth, or joint net worth with their spouse, exceeds $1,000,000 and entities with total assets in excess of $5,000,000.<br><br>The Company may also offer Units to a limited number of non-Accredited Investors, as permitted under Rule 506 of the 1933 Act, each of whom either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of an investment in the Company.<br><br>The Company is limiting the value of Units held by Benefit Plan Investors to less than 25% of the value of outstanding Units in the Company at any time in order to avoid having the underlying assets of the Company being deemed to be "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"). |
| **Minimum Subscription** | The minimum subscription is $50,000 for new Members. A subscription in excess of the minimum must be in $10,000 increments. However, the Manager may accept subscriptions for amounts that are less than these minimums. Members may make additional subscriptions to the Company in an amount equal to at least $10,000. Any initial or additional subscriptions may be accepted or rejected, in whole or in part, in the sole discretion of the Manager. |
| **Subscription Procedures** | To purchase a Unit, a Subscriber must deliver to the Company: (1) a fully completed, dated and signed Subscription Agreement in the form annexed hereto as Exhibit B; and (2) payment in full of the purchase price by check or wire transfer in accordance with the instructions in the Subscription Agreement. |
| **Risks** | Units are speculative non-liquid investments and their purchase involves a high degree of risk. Accordingly, prospective investors should carefully review the sections of this Memorandum entitled "RISK FACTORS" and "CONFLICTS OF INTEREST" before deciding to invest. |

## Charges, Fees and Expenses

**Management Fee**

The Manager will receive a quarterly "**Management Fee**" equal to .50% of the Company's quarter-end Net Asset Value (approximately 2% per annum). The payment of management fees to the Advisers will be the sole responsibility of the Manager. The amount of such management fees will be based upon a percentage of the Company's assets under the management of each of the Advisers and certain other factors.

**Performance Allocation**

At the end of each year, 20% of Net Capital Appreciation of each Unit in excess of a non-cumulative annual return of 8% (both realized and unrealized) (the "**Priority Return**") will be reallocated to the Manager's Capital Account on a Unit-by-Unit basis (the "**Performance Allocation**"). The Priority Return will be prorated for partial years and withdrawals. A Performance Allocation also will be assessed on the withdrawn portion of a Member's Unit(s) if a total or partial withdrawal occurs other than at the end of a year. Performance Allocations will not be made on the recoupement of any net losses allocated to any Unit in prior years.

**Other Fees and Expenses**

The Company will also have other on-going costs and expenses, including, without limitation, offering, legal, accounting, auditing, bookkeeping and tax return preparation expenses; administrative and other operating expenses, such as printing, postage, telephone and photocopying charges; and extraordinary expenses, if any. The Company estimates that its other on-going cost and expenses will be approximately 1.3% per annum of its assets.

## General Information

**Withdrawals**

Withdrawals generally will not be permitted until an investor has been a Member for at least 24 months. Thereafter, a Member may, upon written request (a "**Withdrawal Request**"), withdraw all or a portion of his Unit(s), as of March 31, June 30, September 30 and December 31 of each year (each, a "**Withdrawal Date**"), on at least 45 days' prior written notice to the Company. A partial withdrawal will not be permitted if less than $50,000 would remain in the Capital Account(s) of a Member's Unit(s) after the withdrawal.

| | |
|---|---|
| | Generally, withdrawal payments to a Member will be made within 30 days following the Withdrawal Date; however, the Manager has the right to withhold payment with respect to a withdrawing Member's pro rata share of any Designated Investment if sale or other liquidation of the Designated Investment is not possible or would be materially adverse to the interests of the Company (as determined in the sole discretion of the Manager), in which case withdrawal payments will be made without interest as soon as practicable after the Withdrawal Date (which may be a significant period of time with respect to such Designated Investment). Withdrawal payments will generally be made in cash, but may be made in cash or in kind, in whole or in part, using Securities (including Designated Investments) selected by the Manager. |
| **Mandatory Withdrawals** | The Manager may, in its sole discretion, require that a Member withdraw from the Company on at least 20 days' prior written notice. |
| **Allocation of Profit and Losses** | The Company's Net Profit and Net Loss generally will be allocated for tax and financial purposes to all Members in proportion to their respective Capital Accounts. |
| **Distributions** | The Company does not currently intend to make any distributions. |
| **Transfers** | A Member may not, without the prior written consent of the Manager, which consent can be given or withheld in the Manager's sole discretion, voluntarily or involuntarily, sell, assign or transfer such Member's Unit(s) in the Company (or any portion thereof). |
| **Tax Considerations** | Under present law, the Company will be treated as a partnership for federal income tax purposes, not as an association taxable as a corporation. The Manager and Advisers generally do not consider the tax consequences in managing the Company assets. Therefore, each prospective investor should satisfy itself as to the income tax and other tax consequences of an investment in the Company with specific reference to its own tax situation by obtaining legal advice from its own tax counsel before purchasing a Unit. |
| **Reports to Members** | Members will receive annual reports containing audited financial statements, Forms K-1 and quarterly up-dates concerning their investments in the Company. |

| | |
|---|---|
| **Fiscal Year** | The Company will operate on a calendar year basis. |
| **Additional Information** | Prospective Members are invited to meet with the Manager for a further explanation of the terms and conditions of this offering of Units and to obtain any additional information necessary to verify the information contained herein, to the extent the Manager possesses such information or can acquire it without unreasonable effort or expense. Also, Part II of Form ADV for any federal or state registered Adviser will be made available, if requested. Requests for such information should be directed to Dr. M. Yaqub Mirza, Sterling Advisory Services, Inc. at 1020 Aviation Blvd., Gainesville, GA 30501, phone (770) 539-9539. |
| **Definition of Terms** | Various terms used in this Memorandum are defined in the Company's Operating Agreement (Exhibit A hereto) under the heading "Definitions." |
| **Counsel** | Rosenman & Colin LLP |
| **Auditors** | Tait, Weller & Baker |

## THE MANAGER AND ADVISERS

### The Manager

Sterling Advisory Services, Inc., the Company's manager (the "**Manager**"), will be responsible for the overall management and administration of the Company. The Manager may divide the responsibility for making the investment and trading decisions for the Company among itself and various independent investment advisers (collectively, the "**Advisers**"). The Manager presently intends to allocate the Company's assets approximately as follows: (1) 70% to Saturna Capital Corporation ("**Saturna**"), (2) 25% to Equitable Asset Management, Inc. ("**EAM**") and (3) 5% to manage itself. The Manager may vary this allocation of the Company's assets in the future and may add additional or replacement Advisers without prior notice to the Members. The Manager expects that the rate of reallocation will be low.

The Manager, which was formed in August 1999, is a wholly-owned subsidiary of Sterling Management Group, Inc. ("**SMG**"), which is wholly-owned and controlled by Dr. M. Yaqub Mirza. Its officers, in addition to their activities on behalf of the Company, have experience in managing investment portfolios of companies of which they have been officers and directors and have had active roles in identifying, structuring and managing strategic capital investments in the United States and in various countries throughout the world.

Biographical information about the Manager's investment and management officers is set forth below:

***Dr. M. Yaqub Mirza*** has been President and CEO of SMG since 1998, of the Manager since its inception, and President and CEO of MarJac Investments, Inc. ("**MarJac**") since 1995. From 1987-1995, he served as Executive Vice President of MarJac. MarJac makes proprietary investments in U.S. and foreign securities and provides international business management services. MarJac and its affiliates operate in the United States, Canada, Chile, Egypt, Malaysia, Turkey and Zimbabwe. He also served as Vice President (1984-1994) and President (1995-to date) of The Saar Foundation Inc., a Virginia not-for-profit corporation. Since 1984, Dr. Mirza has been actively negotiating mergers, acquisitions and sales of various sized companies located in different parts of the world. After many of the acquisitions, Dr. Mirza is involved as director and officer in the development of the company by evaluating top management to maximize efficiency and profitability and then restructuring, streamlining or expanding the company. In addition, Dr. Mirza has more than 15 years of experience in stock investments and portfolio management for his employers involving assets ranging from $1-$10 million. Since 1987, Dr. Mirza has served as a Trustee and Treasurer of Amana Mutual Fund Trust, which is registered with the Securities and Exchange Commission as an open-end investment company and managed by Saturna. In addition, Dr. Mirza currently serves as chairman of the Board of Directors of Jugos Concentrados, S.A. ("**Jucosa**"), a Chilean manufacturer of juice concentrates, traded on the Santiago Stock Exchange. He also served on the Board of Mylex Corporation, a NASDAQ

listed, world leader in RAID technology and network management products from December 1998 until September 1999 when Mylex was acquired by IBM for $240 million. He holds a M.Sc. from University of Karachi (1969), a Ph.D. in Physics (1974) and M.A. in Teaching Science (1975) from University of Texas at Dallas.

***M. Omar Ashraf*** has been Executive Vice President of SMG since 1998, Vice-President of the Manager since its inception, Vice President of MarJac Investments, Inc. since 1990 and Executive Vice President of Mar-Jac Poultry, Inc. ("**Mar-Jac Poultry**") since 1996. He has been involved in the management as project manager of Mar-Jac Poultry, an integrated poultry company located in Gainesville, Georgia, since 1986. Mr. Ashraf is also currently involved in the management of Jucosa and serves as a member of its Board of Directors. He is also a managing director of Anchor Yeast (Pvt.) Ltd., a yeast producer in Zimbabwe. From 1978 to 1985, Mr. Ashraf worked at Gulfco Industries as Vice President of Manufacturing and Production Engineering Manager. In addition, Mr. Ashraf has more than a decade of experience in stock investments, involving assets ranging from $1-10 million at MarJac. He holds a M.B.A. from Central Oklahoma University (1983) and a M.S. in industrial engineering from North Dakota State University (1976).

## Saturna

Saturna, which was formed in 1989, is a registered investment adviser under the U.S. Investment Advisers Act of 1940 (the "**Advisers Act**"). Saturna advises a variety of accounts, including individuals, families, trusts, estates, corporations, retirement plans and mutual funds. Saturna sponsors seven mutual funds for which it provides both management and administration. As of June 30, 1999, Saturna had $68,348,847 assets under management.

The Manager has appointed Saturna to perform certain administrative functions for the Company for no separate compensation.

Biographical information about certain key investment officers of Saturna is set forth below:

***Nicholas Kaiser***, director and president of Saturna, was born in Bellingham, Washington in 1946. Mr. Kaiser graduated from Yale College with a degree in economics, and obtained his M.B.A. from the University of Chicago in 1968, with dual majors in international economics and finance. Mr. Kaiser purchased control of Unified Management Corporation (Indianapolis) ("**Unified**") in 1976, and built it into a significant firm in investment management, mutual funds, stock brokerage and financial software. After selling Unified, he returned to Bellingham in 1989 to found Saturna. Mr. Kaiser will be primarily responsible for managing the investments made by Saturna on behalf of the Company.

Mr. Kaiser and his wife Markell own or control 80% of Saturna's stock. A Chartered Financial Analyst, he is Saturna's research director and oversees the design and implementation of Saturna's investment systems. He also serves Saturna's mutual funds as a trustee, officer and equity portfolio manager.

Mr. Kaiser's industry activities include service for the Investment Company Institute (Small Funds and Operations Committees, past Governor), Association for Investment Management and Research (past chapter president), International Association of Financial Planners (past chapter president), and No-Load Mutual Fund Association (past national president).

***Phelps McIlvaine***, director and vice president, joined Saturna in 1993. He serves Saturna as a research analyst, among other duties. Mr. McIlvaine graduated from the University of Denver in 1975 with a degree in economics. Mr. McIlvaine entered the investment business in 1976, and from 1987 to 1993, he managed pooled commodity funds for Hickey Financial Services in London and Chicago.

***Markell Kaiser***, director and treasurer of Saturna, is chief operations officer and supervises the daily details of the firm's activities. Mrs. Kaiser graduated from Vassar College with a degree in history. From 1980 to 1989, Mrs. Kaiser worked in management positions for Unified.

***Meredith Ross*** directs Saturna's trust operations. Her daily activities focus on the operations of Investors National Corporation, Saturna's brokerage subsidiary. Mrs. Ross graduated from Oregon State University with a degree in education, then earned her M.B.A. from the University of Utah in 1980. Before joining Saturna in 1989, she worked in the insurance industry in Bozeman, Montana. Prior to that time, she was employed for eight years as a bank trust officer in Milwaukee, Wisconsin, specializing in retirement plans.

## EAM

EAM, which was formed in 1989, is a registered investment adviser under the Advisers Act. EAM advises a variety of accounts, including individuals, families, trusts, estates, corporations, retirement plans, mutual funds and Taft Hartley Plans. As of May 31, 1999, EAM had $522,866,988 assets under management.

Biographical information about certain key investment officers of EAM is set forth below:

***Frank D. Inman***, chief investment officer, joined EAM in 1989. He serves EAM as co-portfolio manager and as a research analyst. Mr. Inman graduated from the University of Georgia with a degree in English, then earned his M.B.A. from Georgia State University in 1979. Before joining EAM, he was employed for eight years by Interstate Securities Corporation as the director of institutional equity sales. Prior to that time, he worked in sales for Kidder Peabody & Company. Mr. Inman will be primarily responsible for managing the investments made by EAM on behalf of the Company.

***W. Howard Cammack, Jr.***, president, is also involved in investment oversight and client services. He graduated from Tulane University in 1979 with a degree in history and then in 1990 went back to school and completed the Harvard Business School's Owner/President Management Program. Mr. Cammack joined EAM in 1979 and is currently a director of SunTrust Equitable Securities.

***Brian M. Sites***, portfolio manager and research analyst, joined EAM in 1995. He graduated from the University of Miami with a degree in finance and the Georgia Institute of Technology in 1989 with a M.S. in finance/accounting. Before joining EAM, he was employed by The Robinson-Humphrey Company as a research analyst.

***Eve R. Hanely***, trader and research associate, jointed EAM in 1994. She graduated from Boston University in 1992 with a degree in economics. From 1992 to 1993, she was a sales assistant at Morgan Keegan & Co., Inc.

---

## INVESTMENT OBJECTIVE, METHODS AND STRATEGIES

---

### Investment Objective

The Company's investment objective is long-term capital growth, consistent with Islamic principles. Therefore, the Company will neither make investments that generate interest nor knowingly invest in certain businesses, such as pork, pork products, liquor, wine, pornography, gambling and banks and loan associations (or any other businesses) that are not based on Islamic principles. For example, certain business that have a high debt to equity ratio, may not, in the opinion of the Islamic Scholars, conform to Islamic principles. The Company may invest in publicly-traded and restricted common stocks, warrants and preferred stocks of U.S. and foreign issuers and U.S. equity mutual funds (collectively, "**Securities**") and write covered call options related to its publicly-traded common stocks. The Company may also hold cash. In conformity with the 1940 Act, the Company will limit its investment in any one mutual fund to 3% of the fund's outstanding voting shares.

In accordance with Islamic principles, the Company will not purchase bonds, debentures, notes or other interest-bearing debt obligations and will not have interest-bearing bank accounts. In addition, the Company may not make loans, lend portfolio Securities, make short sales, borrow money or purchase or sell options, except that it may write covered call options on its publicly-traded common stocks and purchase call options for the purpose of closing out covered call option positions.

### Islamic Scholars

In attempting to have the Company's investments meet the requirements of the Islamic faith, the Manager has engaged the services of Islamic Scholars (the "**Islamic Scholars**"). The Manager may change or appoint additional scholars.

The Manager will consult with the Islamic Scholars concerning the general investment requirements necessary to comply with the Islamic faith. Also, whenever the Manager or any Adviser has a question concerning whether any proposed or existing investment by the Company complies with the requirements of the Islamic faith, the Islamic Scholars will be consulted. Upon the request of the Manager or any Adviser, the Islamic Scholars will make good faith determinations, based on readily-available information, that the Company's investments are made in accordance with Islamic principles and will advise the Manager or such Adviser accordingly. The Islamic Scholars will review these interpretations of the requirements of the Islamic faith as they deem, in their good faith judgments, appropriate.

The possibility exists, however, that, due to the inaccuracy or incompleteness of such information or a change in the business of a company in which the Company has invested ("**Portfolio Companies**"), the business of a Portfolio Company may violate the requirements of the Islamic faith. Whenever the Manager or any Adviser learns that any investment is not permissible, they will, with reasonable promptness, sell the Securities of such Portfolio Company.

Biographical information about the initial Islamic Scholars is set forth below:

***Dr. Taha Jabir Al-Alwani*** is the President of the School of Islamic and Social Sciences ("**SISS**") in Leesburg, Virginia.

From 1975 to 1985, Dr. Al-Alwani was a professor at The College of Shariah Science, Imam Muhammad Bin Saud University in Riyadh, Saudi Arabia and Legal Advisor to the Home Ministry Government of Saudi Arabia. He is a member of the Editorial Board of The American Journal of Islamic Social Sciences in Herndon, Virginia. He is also a member of many Islamic educational and charitable organizations, including the International Fiqh Council, Jeddah, Saudi Arabia; Islamic Fiqh Council of North America; and Rabita Alam-e-Islami (Muslim World League) in Makkah, Saudi Arabia, of which he is a founding member.

Dr. Al-Alwani is an authority on Shariah Law and Islamic Banking and Economics and has written numerous articles on these subjects. He has conducted many seminars, in coordination with the International Monetary Fund, Association of Muslim Social Scientists and other universities and institutions, on various topics, including Islamic Banking and Investment, Islamic Economics and Fiqh. He holds a Ph.D. in Islamic Shariah and Law from Al-Azhar University, Cairo, Egypt (1973).

***Shaikh Abdul Rahman Bin Abdullah Bin Aqil*** is a member of the Board of Directors of Shariah Council of Al-Rajhi Banking & Investment Corporation in Riyadh, Saudia Arabia and of the Shariah Council of The International Investor, a mutual fund company in Kuwait, where he also serves as secretary.

Shaikh Bin Aqil has been supervising the Research Center of Darul Ta'sil, Egypt, which utilizes computer technology in Tafseer and Hadith studies and research, since 1987. He worked for 15 years at the Research and Fatwa Administration in Saudi Arabia and later served as General Manager for Administrative Affairs of Haram Sharif, a holy Mosque, in Madinah. He has also served as an advisor and assistant to the Secretary General of the King Fahd Foundation

for printing of Quran in Madinah. Shaikh Bin Aqil was the Deputy General Manager for Shariah Research and the Director of Research Center of Al-Rajhi Banking & Investment Corporation in Riyadh for over ten years. He holds a graduate degree from Imam Muhammad Bin Saud University.

## Deduction of Zakah

Zakah is paid by Muslims as a right of God in wealth. It is a mandatory social tax on a person's yearly earnings less reasonable living expenses and on all investments and accumulated savings acquired and held for more than a lunar year. The paying of Zakah is a cleansing process for the wealth of the person paying Zakah. According to the Islamic faith, God not only promises to reward in the Hereafter, but also to bless an enterprise so that it becomes more profitable.

Following the opinions of contemporary scholars on how to calculate Zakah on investments, the Manager has determined that Zakah will be 10% of the lunar year profits (i.e., 10.3% of the annual aggregate Capital Appreciation of each Member's Unit(s) in the Company). Unless a Member indicates otherwise in his Subscription Agreement or in a written notice to the Company, Zakah will be deducted from his Unit(s) and distributed, in the Manager's discretion, to a qualifying charity or to a charity of a Member's choice.

The Manager presently intends that the distribution of Zakah will be made through ISNA, the Islamic Society of North America.

The contributions made by the Company to certain tax-exempt charitable organizations may qualify as deductions for federal income tax purposes and will be passed on to Members and indicated in the Members' Forms K-1.

## Investment Methods and Strategies

### Selection of Investment Strategies and Advisers

In order to achieve the Company's investment objective, the Manager and the Advisers may use various investment strategies.

In evaluating the viability of a given investment strategy that a potential Adviser will utilize, the Manager will consider, among other things, the following factors:

- an estimate of potential returns from a given strategy over a minimum time period (usually three to five years);
- an estimate of the strategy's potential risk and volatility; and
- the correlation of price movement between a strategy and other related or different strategies.

Once an appropriate investment strategy has been identified and analyzed by the Manager, the Manager will then seek to locate an appropriate Adviser to execute the strategy. The Manager will consider the following factors, among others, in making its selections:

- past performance record and stability of the Adviser;
- the investment philosophy, research resources and overall discipline of the Adviser;
- the ability to perform well and maintain prudent risk controls in markets with difficult investment conditions;
- the Adviser's brokerage arrangements; and
- the ability of the Adviser to manage an investment portfolio for the Company in conformity with Islamic principles.

The Manager will actively monitor the performance and risk profile of the investment strategies employed by it and the Advisers and will reallocate the Company's assets at such times as the Manager deems appropriate. The Company will notify the Members if an Adviser is terminated or a new Adviser selected.

***The Company Will Not Be Bound By Any Fixed Guidelines In Allocating Its Assets To Particular Investment Strategies or Advisers.***

The percentages of assets managed by the Manager, Saturna, EAM or any other Adviser employing any particular investment strategy will depend upon the amount of capital contributions and will be affected constantly by changes in market value and the size of the Company. In addition, as market conditions change, the Manager may, in its sole discretion, adjust the proportion of assets in various types of investments.

While the size, nature and timing of the Company's allocation of assets to an Adviser are in the exclusive control of the Manager, once such an allocation is made, the Manager will not influence or control the investments or the investment policies of an Adviser, except with regard to compliance with Islamic principles. In addition, the Manager will be able to increase or decrease the amount of assets managed by a particular Adviser only in accordance with the terms and conditions of the agreement between the Company and the Adviser.

THE MANAGER WILL NOT FOLLOW ANY FIXED POLICIES IN ALLOCATING AND REALLOCATING THE COMPANY'S ASSETS AND WILL IN ALL CASES BE GUIDED BY ITS SUBJECTIVE JUDGMENT.

**Saturna's Strategy**

Saturna's investment strategy is value-oriented and will focus primarily on publicly-traded equity Securities of small- and mid-cap companies and, to a lesser extent, on those of large-cap companies. Saturna is reluctant to pay a premium for a security and endeavors to buy securities when they are out of favor with the market. Saturna does not chase fad stocks or

fashionable investment trends. Rather, it seeks companies that represent high quality operations, with large free cash flows, sustainable growth rates, increasing dividends and low price volatility. Saturna favors companies in which management has a considerable stake, and generally sells those issues and industries in which the insiders are liquidating.

Saturna's normal investment horizon is one to four years. The annual portfolio turnover rate of the assets Saturna will manage is not expected to exceed 40%. Saturna believes that sufficient diversification can be obtained with fifteen to thirty stocks.

Because Saturna's strategy is moderately risk-averse, Saturna's performance may trail the averages in rising markets, as it seeks to minimize losses during falling markets.

Saturna believes the largest stocks are so widely researched and traded, they generally present few opportunities for uncovering hidden value and believes that values more often may be found among the smaller second- and third-tier companies. For equities, Saturna starts with computer screening of approximately 7,400 US-traded issues. Its system of seventeen proprietary evaluation factors rates issues on expected market return for the succeeding twelve months. This process produces a rating for each issue. Analytical responsibility is divided among members of its investment committee by sectors and industries, who review these ratings and recommend approximately 170 issues to portfolio managers.

Saturna gathers investment information from a wide variety of sources. It subscribes to electronic trading information services covering exchanges world-wide, as well as financial data and news on companies and markets. Saturna maintains its own research files on several hundred actively followed companies and mutual funds. Its staff regularly reviews a large number of publications for financial and market information, and also reviews securities and markets citing independent analytical services. In contrast to many firms in the investment advisory industry, Saturna pays for this information itself.

Saturna may invest in equity mutual funds, including up to 20% of the assets of the Company that it manages in equity mutual funds that are managed by it or one of its affiliates.

**EAM's Strategy**

EAM's investment strategy is long-term capital appreciation and will focus on investments in publicly-traded equity Securities of small- and mid-cap companies that it believes have the potential for rapidly accelerating earnings per share growth. EAM will invest in equity Securities of companies believed by EAM to show superior prospects for growth due, for example, to promising new products, new distribution strategies, new manufacturing strategies or new management philosophy or management teams. In EAM's view, such companies tend to be responsible for technological breakthroughs and/or unique solutions to market needs.

By developing and maintaining contacts with management, customers, competitors and suppliers of current and potential Portfolio Companies, EAM attempts to invest in those companies that are generally not well followed by securities analysts and the financial press. EAM believes that these companies' securities are usually not efficiently priced and therefore offer potentially superior investment opportunities. EAM favors common stock of companies

whose price, when purchased, is between five and fifteen percent times projected earnings for the coming year.

In selecting investments, EAM considers the company's growth rate in earnings, financial performance, management strengths and weaknesses and current market valuation relative to earnings growth as well as historic and comparable company valuations. EAM also analyzes the level and nature of a company's debt, cash flow, working capital and the quality of a company's assets. Typically, EAM invests in companies that it expects to show earnings growth exceeding 20% compared to the previous year's comparable period.

EAM's investments will consist primarily of common stocks, but may also include convertible preferred, participating preferred, straight preferred stocks and equity mutual funds. EAM's non-mutual fund investments will be traded on domestic or foreign securities exchanges or in over-the-counter markets.

**Manager's Strategy**

The Manager's strategy will focus on investments in private placements and special situations where it believes the potential for significant gains outweighs the greater risks involved in these types of investments. The Manager may designate certain investments that it expects to be relatively illiquid or to lack a public market for more than one year as "**Designated Investments.**"

Private placements may include, without limitation, investments in non-public start-up and/or developmental stage technology, Internet, manufacturing and agricultural companies, domestic or foreign, as well as later stage equity investments in such companies. Special situations may include, without limitation, public companies undergoing corporate reorganizations and restructurings, divestitures and/or significant management changes.

The Manager and/or its affiliates may be investors or otherwise financially interested in companies in which the Manager invests for the Company.

**Covered Call Writing**

A call option is a right to buy a fixed number of shares of common stock at a set price (strike price) prior to the option's expiration date. The writer (seller) of a call option receives a premium in payment for the option.

The Company may engage in covered call writing in seeking to profit from correct forecasts of the maximum market prices of the publicly-traded common stocks underlying the options during their periods. A covered call involves the Company's writing a call option against shares of the underlying common stock that the Company already owns or simultaneously purchases and does not expect to increase significantly in price prior to the option's expiration date. When the Company writes a covered call option, it limits the profit it can realize from any gain in the price of the underlying common stock during the option period because the call buyer can purchase the common stock from the Company at the strike price prior to the option's expiration date. The Company's profit, if any, from writing the option

during the option period will equal the premium received by the Company plus any gain in the value of the underlying common stock up to the strike price. Also, writing covered calls offsets, to the extent of the premium received, any decline in the price of the underlying common stock.

**Defensive Investment Positions**

During uncertain market or economic conditions, the Company may adopt a temporary defensive position. The Company cannot invest, for its economic benefit, in interest-bearing instruments frequently used by private and public investment funds and others for this purpose. When markets are unattractive, each Adviser will have to choose between continuing to follow its investment strategy or selling Securities and holding cash for temporary defensive purposes. This choice will be based on the Manager's, Saturna's, EAM's or any other Adviser's subjective evaluation of the market conditions and the Company's assets which it manages.

Notwithstanding the general prohibition on the Company making investments that generate interest income, the Company may purchase shares of money market funds subject to the principles of the Islamic faith which require that the net investment income generated be contributed to charity or the poor. Money market funds are mutual funds that are required by law to have short-term investments that meet certain quality, maturity and diversification standards.

**Portfolio Turnover**

The Company's overall portfolio turnover rate is initially expected to be moderate; however, given the Manager's discretion to change Advisers and strategies, the turnover rate may vary significantly from the anticipated rate.

---

## RISK FACTORS

---

### Business, Investment and Trading Risks

**Risks Associated With Investments in Securities**

Any investment in Securities carries certain risks, including the volatility of their market prices. There is no assurance that the Company will achieve its investment objective of long-term capital growth, and investors in the Company may lose money.

**Risks of Securities of Issuers with Small Capitalization**

Because Saturna and EAM will focus on smaller capitalization companies, their investments for the Company may be subject to considerably more risks than investing primarily in large capitalization companies. These risks may be the result of various factors, including more limited product lines, markets and financial resources; lack of management depth; less publicly available financial information; wider spreads between bid and ask prices; more limited trading volumes; and abrupt and erratic price movements.

**Concentration of Investments**

Neither the Manager, Saturna, EAM nor any other Adviser is limited in the amount of Company assets which it may commit to any one investment. Although the Manager, Saturna and EAM will generally follow a non-binding policy of seeking to diversify the Company's investments, they may depart from such policy from time to time. As a result, the Company may invest its assets in only a few large Securities positions in only one or a few industries. The result of such concentration of investments is that a loss in only one or two such positions could materially reduce the value of an investment in the Company.

**Risks Related to Adherence to Islamic Principles**

Investments will be made in Portfolio Companies which, to the knowledge of the Manager or the applicable Adviser (based upon information reasonably available to them), do not violate the requirements of the Islamic faith. The possibility exists, however, that, due to the inaccuracy of such information or a change in the business of a Portfolio Company (through acquisition or otherwise), the business of a Portfolio Company may violate the requirements of the Islamic faith. Whenever the Manager or any Adviser learns that any investment is no longer permissible, it will, with reasonable promptness, sell the Securities of such a Portfolio Company. This may have a material adverse impact on the investment performance of the Company, especially if the investment is a Designated Investment.

**Investments in Distressed Securities**

The Company may invest in Securities of public companies that are experiencing significant financial or business difficulties, including companies involved in bankruptcy or other reorganization and liquidation proceedings. Although such investments may result in significant returns to the Company, they involve a substantial degree of risk. Any one or all of the issuers of these Securities may be unsuccessful or not show any return for a considerable period of time. The level of analytical sophistication, both financial and legal, necessary for successful investment in companies experiencing significant business and financial difficulties is unusually high. There is no assurance that the Manager or any Adviser will correctly evaluate the value of the assets underlying the Company's investments in such companies. Under such circumstances, the returns generated from investments may not compensate the Members for the risks undertaken.

**Purchases of Restricted Securities in Private Placements**

The Company may purchase restricted Securities in private placements. The Manager generally intends to limit the Company's investments in private placements, including Designated Investments purchased in private placements, to not more than 10% of the value of the Company's assets at the time of investment. Typically, only a limited number of investors purchase Securities in the private placement, and there are substantial restrictions on the Securities' transferability. Furthermore, no market exists, at least initially, for such Securities. The investors may have certain registration rights that allow them to register these Securities for public sell at a future date, but the exercise of those rights depends upon various conditions. There is no assurance that such conditions will occur or that such registration rights will otherwise be exercisable.

**Designated Investments**

The Manager may also make certain Designated Investments (i.e., investments that are expected to be relatively illiquid or to lack a public market for more than one year). There is no limitation concerning the percentage of the Company's assets that may be committed to Designated Investments, though the Manager will seek to limit the value of Designated Investments to not more than 15% of the value of the Company's assets at the time of investment. The risk of loss associated with a Designated Investment is greater than that related to investments in publicly-traded securities because, even if the Manager determines that a Designated Investment is likely to be unprofitable, the Company may be unable to dispose of the Designated Investment in a liquid market.

In addition, Units purchased subsequent to the Company's acquisition of a Designated Investment will not benefit from any gains or income therefrom (but will also not be subject to the risk of loss associated therewith). Finally, the Manager will value Designated Investments only once per year, at an amount which it determines to be the fair value thereof.

**Foreign Securities Risks**

Investing in Securities issued by foreign companies involves considerations and possible risks not typically associated with investing in domestic companies. The values of foreign investments may be affected by changes in currency exchange rates or exchange control regulations. The forces of supply and demand in the foreign exchange markets and the relative merits of investments in different countries, as seen from an international perspective, affect currency exchange rates. Currency exchange rates can also be affected unpredictably by intervention by the U.S. or foreign governments or central banks or by currency controls or political developments in the United States or abroad.

Investment in foreign Securities also may be subject to local economic or political risks, including instability of some foreign governments, the possibility of currency blockage, expropriation, limitations on the use or removal of funds or other assets, changes in governmental administration or economic or monetary policy (in the United States or abroad), changed circumstances in dealings between nations or the failure of foreign brokers holding the

Company's assets. The application of foreign tax laws (e.g., the imposition of withholding taxes on dividend or interest payments) or confiscatory taxation may also affect investment in foreign Securities.

Higher expenses may result from investment in foreign Securities than would result from investment in domestic Securities because of the costs that must be incurred in connection with conversions between various currencies and foreign brokerage commissions that may be higher than in the United States. Foreign securities markets also may be less liquid, more volatile and less subject to governmental supervision than in the United States. Investments in foreign countries could be affected by other factors not present in the United States, including lack of uniform accounting, auditing and financial reporting standards and potential difficulties in enforcing contractual obligations.

The Manager may invest the Company's assets in emerging markets and in non-public foreign companies (including venture stage companies), and these risks are even greater for such investments.

**Hot Issues**

The Company may, if given the opportunity to do so, purchase so-called "hot issues" (i.e., securities of those public offerings which trade at a premium when trading in the secondary market begins). The risk of loss associated with securities purchased in initial public offerings is greater than for general securities trading. While the Manager believes that "hot issues" offer significant potential for gain, the prices of newly-issued securities may not continue to increase as expected, and in fact may decline to a significant extent. The Manager or any Adviser will have access to new issue markets only if it is able to generate relationships with broker-dealers that underwrite or receive allocations of new issues. Also, if the Manager or any Adviser is not correct in its assessment of which new issues will appreciate, the Company will suffer losses. If the Company is unable to liquidate such positions in a timely manner, the Company will be exposed to further losses, which could be considerable.

The National Association of Security Dealers ("**NASD**") prohibits certain persons, referred to as "restricted persons," from participating in the profits or losses generated by these hot issues. If a Member is a restricted person as defined under the NASD's regulations, that Member will not share in any profits or losses generated by an investment in hot issues, and these profits or losses will be allocated to the other Members who are not restricted persons.

**Bankruptcy of Brokers and Other Financial Intermediaries**

Under Rule 15c3-3 of the U.S. Securities Exchange Act of 1934, as amended, a broker is required to segregate its customers' securities. If the broker fails to do so, its customers may be subject to a risk of loss of the assets held by the broker in the event of the broker's bankruptcy. In the event of a failure of a broker used by the Company, the Securities Investor Protection Corporation ("**SIPC**") provides a maximum of US$500,000 of account insurance for its "customers," only US$100,000 of which covers cash in the account. Excess coverage may be obtained by a particular broker. For example, Saturna, which will initially manage 70% of the

Company's assets intends to effect brokerage transactions for the Company through Investors National Corporation ("**INC**"), its subsidiary, and INC presently clears its customer brokerage transactions through Investec Ernst & Company ("**Investec**"), which provides $24.5 million of excess account insurance. If Company assets on deposit with a broker exceed the amounts of the SIPC and any excess account insurance, the Company may receive only a pro rata share of the remaining assets deposited with the failed broker.

## Company Risks

### Company's Lack of Operating History

The Company has no prior operating history upon which subscribers can evaluate its prospective performance.

### Company's Success Dependent on the Manager, Saturna, EAM and other Advisers

The success of the Company depends primarily upon the Manager, Saturna, EAM and any other Advisers. The investments that the Manager, Saturna, EAM or any other Adviser selected by the Manager will make may not be successful, and Members may lose money. The Manager cannot be replaced without its prior consent.

### Units Are Illiquid

Because (1) withdrawals will not be permitted until an investor has been a Member for at least 24 months, (2) a Unit may be withdrawn only at the end of each calendar quarter thereafter and (3) Units are not readily transferable, an investment in the Company is illiquid. A subscription for a Unit should be considered only by an investor who is able to assess the risks related to the illiquidity of Units, is financially able to maintain its investment and can afford to lose all or a substantial portion of its investment. UNITS MAY NOT BE TRANSFERRED OR ASSIGNED WITHOUT THE PRIOR WRITTEN CONSENT OF THE MANAGER.

### Fees and Expenses Will be Paid, Regardless of Whether the Company Has Any Profits

The Company will incur obligations to pay various fees, costs and expenses regardless of whether the Company has any profits, including the Management Fee payable to the Manager. See "DESCRIPTION OF CHARGES TO THE COMPANY."

### Risks Associated with the Performance Allocation

The fact that the Manager's share of profits from the Company's investments is based on the performance of the Company could arguably create an incentive for the Manager to make, and to select Advisers that make, investments that are more speculative than would be the case in the absence of the Performance Allocation. Decisions to sell investments may arguably be similarly affected.

Under this arrangement, the Manager may receive an allocation in respect of unrealized gains which may never be realized. Any Performance Allocation received by the Manager will not be repaid in subsequent years in which losses may be incurred.

**Withdrawal Risks**

If the continued participation of a Member in the Company might cause the Company to violate any law or to be subject to adverse tax or regulatory treatment or if any litigation is commenced or threatened against the Company, the Manager or any Member arising out of, or relating to, the participation of a Member in the Company, the Manager may require the withdrawal of such Member on 5 days' prior written notice.

**Liability and Indemnification of the Manager**

Neither the Manager nor any of its officers, directors, employees, shareholders, other affiliates, representatives or agents or any Adviser will be liable, responsible or accountable, in damages or otherwise, to the Company or any of the Members successors, assignees or transferees for any act performed or omitted to be performed by them on behalf of the Company in good faith and in a manner they reasonably believed to be within the scope of their authority. Moreover, neither the Manager nor any of its officers, directors, employees, shareholders, other affiliates or representatives will have any such liability for any losses suffered due to the action or inaction of any Adviser or other person retained by or for the Company or the Manager, whether through negligence, dishonesty or otherwise, provided that the Adviser or other person was selected by the Manager with reasonable care.

**The Year 2000 Issue**

The Company will rely extensively on various computer systems in carrying out its business activities, including the computer systems of the Manager, Saturna, EAM or any other Adviser and its service providers, such as its brokers and accountants (the "**Service Providers**"). In this connection, the Company is aware of the so-called "Year 2000 Issue" which involves potential problems that may be confronted by computer systems, when computers using date-sensitive software must be able to properly identify the Year 2000 in their systems. In the event that a computer fails to make the proper identification of the Year 2000, this could result in a system failure or miscalculation causing disruptions of operations such as pricing errors and account maintenance failures. The Manager intends to discuss this issue with the Company's Service Providers. The Manager has no reason to believe that the Service Providers will not takes steps necessary to avoid any material adverse impact on the Company, though there can be no assurance that this will be the case. The costs or consequences of incomplete or untimely resolution of the Year 2000 Issue by the Service Providers, or by governments, brokers, markets, banks and other third parties, are unknown to the Manager at this time, but could have a material adverse impact on the operations of the Company.



MJ 0007926
CONFIDENTIAL

## Regulatory and Income Tax Risks

**Statutory Regulation; Lack of Protection under Investment Company Act**

The Company is somewhat similar in operation to a registered open-end investment company (a mutual fund), in that, among other things, it is engaged in the business of investing in, holding and trading Securities and, after a 24 month holding period, permits quarterly redemptions of its Units. The Company has not registered as an investment company under the 1940 Act in reliance upon the exclusion from the definition of an "investment company" provided by Section 3(c)(1) of the 1940 Act (requiring beneficial ownership by not more than 100 persons). Accordingly, the provisions of the 1940 Act that, among other things, require that a fund's board of directors, including a majority of disinterested directors, approve certain of a fund's activities and contractual relationships, and prohibit a fund from engaging in certain transactions with its affiliates, will not be applicable. In addition, the Company will not operate subject to requirements such as annual review and approval of an investment advisory contract by a disinterested majority of a board of directors and other governance safeguards that the 1940 Act imposes.

Further, the Manager is not registered, and is not required to be registered by reason of an exemption from registration, as an investment adviser under the Advisers Act (or any similar state law). Investors, therefore, are not accorded most of the protections provided by the Advisers Act or any such law. Also, though Saturna and EAM are registered as investment advisers under the Advisers Act, there is no requirement that additional or replacement Advisers be similarly registered.

**Tax Considerations**

The Company is not required to distribute profits, and the Manager does not intend to make any distributions to Members. If the Company has taxable income in a fiscal year, such income will be taxable to the Members in accordance with their distributive shares of the Company's profits, whether such profits have been distributed to the Members. Accordingly, the tax liability of Members for any profits of the Company very likely will exceed any distributions received from the Company. Also, the Company could sustain losses offsetting profits recognized at the end of a prior year (when taxable income is determined), so that a Member who did not redeem his Unit(s) as of the year-end would never receive any of the profits on which taxes were paid. Furthermore, Zakah or other charitable contributions may not be deductible against taxable income or the extent of the deduction may be subject to limitations, and, as a result of these and other various limitations imposed by the tax laws, Members may realize taxable income from an investment in the Company notwithstanding that such Members realize no economic return. No ruling from any taxing authority or an opinion of counsel as to any tax matters has been obtained, and there can be no assurance that the relevant taxing authority or court will follow the views set forth in "INCOME TAX ASPECTS." Accordingly, each prospective investor should satisfy himself as to the income tax and other tax consequences of an investment in the Company with specific reference to his own tax situation by obtaining advice from his own tax counsel before purchasing a Unit.

* * *

The foregoing risk factors do not purport to be a complete explanation of all the risks involved in purchasing Units. Potential investors should read this Memorandum, including the Exhibits, before determining whether to subscribe for Units.

---

## CONFLICTS OF INTEREST

---

### Decision of the Manager to Act as the Company's Investment Manager

The Company's trading is not subject to review or oversight by an independent investment manager. As a result of the Manager's decision to select itself as the Company's investment manager, the terms upon which it renders investment management services to the Company have not been negotiated at arm's length. In addition, the Company does not have available an independent entity to monitor trading conducted for its account by the Manager, Saturna, EAM or any other Adviser. The Manager could also in the future have a conflict between its interest in directing trading for the Company and the discharge of its responsibilities to the Company regarding oversight of trading conducted for the Company, when such oversight could, in certain circumstances, indicate that the engagement of an independent investment manager would be in the best interests of the Company.

### Co-Investments And Other Interested Investments by the Manager and Its Affiliates

The Manager and its affiliates are active investors for their own separate accounts, and the Manager may decide to invest a portion of the Company's assets in the same or different securities of the same companies in which the Manager and/or its affiliates have already invested or are simultaneously investing. This may cause a conflict of interest between the Manager's obligation to make investments in the best interest of the Company and the Manager's desire to protect or enhance its or an affiliate's existing or proposed investment in a Portfolio Company by investing certain of the Company's assets in the Portfolio Company.

### An Affiliate of Saturna Will Effect Brokerage Transactions

Saturna has been authorized to select the brokers to be used for transactions for the portion of the Company's assets which it will manage. Saturna intends to direct such transactions to INC, a wholly-owned subsidiary of Saturna that is a deep discount broker. This may cause a potential conflict of interest between Saturna's duty to seek best execution of the Company's brokerage transactions and Saturna's desire to allocate transactions to its subsidiary.



MJ 0007928
CONFIDENTIAL

**The Company May Invest in Mutual Funds which Advisers Advise**

Each of Saturna and EAM act as an investment adviser to certain mutual funds and may act as an investment adviser to other mutual funds or private investment funds in the future. Also, the Manager may select other Advisers that similarly act as investment advisers to such funds. The Company may invest in one or more of these mutual funds. This creates a conflict of interest between an Adviser's obligation to the Members to make investments which are in the best interest of the Members and its interest in increasing the assets under management in mutual funds for which it acts as an investment adviser and thereby increase the fees that the Adviser receives from such funds, as well as cause the Company's investment in such mutual funds to be subject to their other operating expenses.

**Multiple Representations of Counsel**

Rosenman & Colin LLP, counsel to the Company, also represents the Manager in connection with this transaction and, as a result, certain conflicts may arise.

---

## FIDUCIARY RESPONSIBILITY OF THE MANAGER

---

The Manager has a responsibility to the Members to exercise good faith and fairness in all dealings affecting the Company. The responsibility of a manager to members of a limited liability company is a changing area of the law, and Members who have questions concerning the responsibilities of the Manager should consult their legal counsel.

---

## BROKERAGE AND OTHER ARRANGEMENTS

---

**Selection of Broker-Dealers**

The Manager is authorized to select, and to authorize Advisers to select, the brokers to be used for Securities transaction for the Company. The Manager has authorized each of Saturna and EAM to select the brokers to be used for each Securities transaction effected by it for the Company. (As used in this section, "**Portfolio Manager**" means each of the Manager, EAM and any other Adviser, except Saturna, authorized to select brokers to be used for the Company's Securities transactions.) In selecting brokers to execute transactions, a Portfolio Manager need not solicit competitive bids and does not have an obligation to seek the lowest available



MJ 0007929
CONFIDENTIAL

commission cost. Thus, Portfolio Managers may not seek "execution only" commission rates. Rather, in making its selection of brokers, each Portfolio Manager may take into account the broker's reliability, reputation, financial responsibility, stability, ability to execute difficult trades, nature and frequency of sales coverage, commission rate, if any, and responsiveness to the Portfolio Manager, and the Company may be deemed to be paying for other products and services provided by the broker which are included in the commission rate. However, each Portfolio Manager will attempt to have the Company's brokerage arrangements competitive based on its knowledge of the industry. In addition, in selecting brokers, a Portfolio Manager may consider the value of the following, either provided by the broker or paid for by the broker (either by cash payments or by commissions) and provided by others (collectively, "**Products and Services**"): brokerage (such as clearing, order routing, custodial and settlement services), research and research products and services (described below).

Research may include, among other things, proprietary research from brokers, which may be written, oral or on-line. Research products may include, among other things, computers or terminals, computer databases and quotation equipment, in each case, to access research or which provide research directly. Research services may include, among other things, research concerning market, economic and financial data, statistical information, data on pricing and availability of Securities, financial publications, electronic market quotations, performance measurement services, analyses concerning specific Securities, companies or sectors, and market, economic and financial studies and forecasts. Research services may be in written or oral form or on-line.

The Portfolio Managers will not be expected to adhere to any rigid formulas in making their selections of brokers, but may weigh a combination of the preceding criteria. The Company will not have any fixed internal brokerage allocation procedures designating specific percentages of brokerage commissions to particular firms. Each Portfolio Manager will seek best execution in transactions for the Company and will direct brokerage to firms providing Products and Services when they are able to provide best execution. In recognition of the value of Products and Services provided by a broker, a Portfolio Manager may effect Securities transactions which cause the Company to pay the broker an amount of commission in excess of the amount of commission another broker would have charged.

To the extent a Portfolio Manager can obtain Products and Services from, or to be paid for by, brokers at a commission rate which is not higher than the rate it customarily pays for brokerage services alone (although the Portfolio Manager may have to allocate more commission business to brokers who also provide Products and Services), the Portfolio Manager may do so. In exchange for the direction of commission dollars to certain brokers, credits may be generated which may be used by a Portfolio Manager to pay for the Products and Services provided by, or paid for by, such brokers. To the extent that such credits are generated or such Products and Services are obtained, a Portfolio Manager and possibly the Company will be receiving a benefit by reason of the direction of commissions.

In making its selection of brokers, Saturna will take into account solely the broker's reliability, reputation, financial responsibility, stability, ability to execute trades, nature and frequency of sales coverage, commission rate, if any, and responsiveness to it. It is Saturna's

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 11

# Part 2

practice to seek "execution only" commission rates from brokers. Subject to these considerations, Saturna intends to direct all agency transactions effected with respect to the portion of the Company's assets it will manage to its subsidiary INC, which clears all of its customer brokerage transactions through Investec. This may cause a potential conflict of interest between Saturna's duty to seek best execution of the Company's brokerage transactions and Saturna's desire to allocate transactions to itself.

## OPERATING AGREEMENT

The following is a description of certain of the provisions governing the Company, which are set forth in the Operating Agreement. The description of the terms of the Operating Agreement is qualified in its entirety by reference to the form of such Operating Agreement attached hereto as Exhibit A and made a part of this Memorandum. Prospective investors should read such Operating Agreement carefully before deciding to subscribe for Units.

### Liability of Members

A Member will not generally be held liable for obligations of the Company in excess of such Member's Capital Contribution. A Member's **"Capital Contribution"** is the total amount of cash contributed to the Company by each Member, from time to time, in accordance with the terms of the Operating Agreement. A Member will, however, be liable for (1) that portion, if any, of any distribution of capital to the Member which is in violation of the Delaware Limited Liability Company Act and which is required to be returned to the Company pursuant to such Act, and (2) for any Company funds or property wrongfully distributed to him.

### Term of Company

The Company may be terminated at any time by the Manager or otherwise as set forth in the Operating Agreement.

### Sharing of Profits and Losses

A Capital Account will be established for each Unit with an initial balance equal to such Member's Capital Contribution. Thereafter, the Capital Account for a Unit will be reduced by the amount of any distributions made to or withdrawals by the Member holding the Unit. Each Member will have a separate Unit with respect to each Capital Contribution. The Company will determine any increase or decrease in the Net Asset Value of the Company monthly and credit or debit the Capital Account of each Unit in the ratio that the balance of each account bears to the balance of all accounts the amount of any increase or decrease in Net Asset Value. See "DESCRIPTION OF CHARGES TO THE COMPANY."

**Federal Tax Allocations**

At the end of each fiscal year, the Company's realized profit or loss will be allocated among the Members, and each Member will be required to include in such Member's personal federal income tax return such Member's share of such items. Allocations will be pro rata. For the purpose of allocating net profit and net loss, an allocation account is established with respect to each Unit, the initial balance of which is the amount of the Capital Contribution made with respect to such Unit. Thereafter, the allocation account for a Unit will be reduced by the amount of any distributions made to the Member holding the Unit. At the end of each fiscal year, each outstanding Unit's allocation account will be increased by the amount of income allocated to the Member holding the Unit and decreased by the amount of loss and expense allocated to the Member holding the Unit. The allocation account with respect to a redeemed Unit will be eliminated.

Net realized profit will be allocated first to each Member who has redeemed a Unit (or any portion thereof) during the year to the extent that the amount such Member received on redemption exceed the allocation account as of the date of redemption with respect to the Unit redeemed. Net realized profit remaining after the allocation to the Members who have redeemed Units will be allocated among the Members whose Capital Accounts are in excess of their Units' allocation accounts in the ratio that each Member's excess bears to all Members' excesses to the extent of such excesses. Any remaining net realized capital gain will be allocated among all Members in proportion to their capital accounts.

Net realized loss will be allocated first to each Member who has redeemed a Unit (or any portion thereof) during the year to the extent that the allocation account as of the date of redemption with respect to the Unit redeemed exceed the amount such Member received on redemption. Net realized loss remaining after the allocation to Members who have redeemed Units will be allocated among the Members who hold Units with allocation accounts which are in excess of the Members' Capital Accounts in the ratio that each such Member's excess bears to all such Members' excesses to the extent of such excesses. Any remaining net realized loss will be allocated among all Members in proportion to their Capital Accounts.

If a Unit has been assigned as permitted by the Operating Agreement, the above-described tax allocations will be made with respect to the Unit without regard to the assignment, except that in the year of assignment the tax allocations will be divided between the assignor and assignee based on the months (or partial months) each held the assigned Unit.

Upon liquidation and termination of the Company, the assets of the Company will be distributed to each Member in the ratio that such Member's Capital Account bears to the Capital Accounts of all Members (less any amount owing by such Member to the Company).

**Withdrawals**

Withdrawals generally will not be permitted until an investor has been a Member for at least 24 months. Thereafter, a Member may, upon written request (a "**Withdrawal Request**"), withdraw all or a portion of his Unit(s), as of March 31, June 30, September 30 and December 31

of each year (each, a "**Withdrawal Date**"), on at least 45 days' prior written notice to the Company. A partial withdrawal will not be permitted if less than $50,000 would remain in the Capital Account(s) of a Member's Unit(s) after the withdrawal. A Member may revoke his withdrawal request at least 30 days prior to the Withdrawal Date by written instructions to the Manager. The withdrawal of a Member will not cause the dissolution of the Company. The Manager may waive the withdrawal restrictions for hardship or other good cause shown.

The Manager as a Member may withdraw all or any part of its Capital Account, as set forth above.

Generally, withdrawal payments to a Member will be made within 30 days following the Withdrawal Date; however, the Manager has the right to withhold payment with respect to a withdrawing Member's pro rata share of any Designated Investment if sale or other liquidation of the Designated Investment is not possible or would be materially adverse to the interests of the Company (as determined in the sole discretion of the Manager), in which case withdrawal payments will be made without interest as soon as practicable after the Withdrawal Date (which may be a significant period of time with respect to such Designated Investment). Withdrawal payments will generally be made in cash, but may be made in cash or in kind, in whole or in part, using Securities (including Designated Investments) selected by the Manager.

Any Member withdrawing all or any part of his Unit(s) on a date prior to the sale or other disposition of any Designated Investment(s) in which such Member participates will have the option to elect, in lieu of receiving withdrawal proceeds in respect of his allocable portion of such Designated Investment(s), to continue to maintain his economic interest therein until the sale or other disposition of such Designated Investment(s) by the Company. In such event, for so long as the Company continues to own such Designated Investment(s), the withdrawing Member would (1) remain entitled to receive his allocable share of the gains, losses and expenses related thereto, and (2) remain a Member in the Company with respect to his pro rata interest in Designated Investment(s). Such withdrawing Member will have to make the foregoing election with respect to all Designated Investments in which he participates. A withdrawing Member may contact the Manager for information about those Designated Investments in which he has an interest.

**Mandatory Withdrawals**

The Manager may, in its sole discretion, require that a Member withdraw from the Company on at least 20 days' prior written notice.

Also, if the continued participation of a Member in the Company might cause the Company to violate any law or to be subject to adverse tax or regulatory treatment or if any litigation is commenced or threatened against the Company, the Manager or any Member arising out of, or relating to, the participation of a Member in the Company, the Manager may require the withdrawal of such Member on 5 days' prior written notice.



MJ 0007933
CONFIDENTIAL

**Distributions**

The Company does not currently intend to make any distributions. Distributions are at the discretion of the Manager. Profits will be reinvested, and no distributions are planned. To the extent that the Manager determines to make distributions, the Manager will make distributions in cash, in kind, or a combination thereof. No Member has the right to receive distributions in kind.

**Transfers**

A Member may not, without the prior written consent of the Manager, which consent can be given or withheld in the Manager's sole discretion, voluntarily or involuntarily, sell, assign or transfer such Member's Unit(s) in the Company (or any portion thereof).

**Reports to Members**

Members will receive annual reports containing audited financial statements, Forms K-1 and quarterly up-dates concerning their investments in the Company.

**Indemnification**

See "RISK FACTORS – Liability and Indemnification of the Manager."

**Amendment of Operating Agreement**

The Operating Agreement may be amended by the sole action of the Manager in any manner which does not adversely affect the pecuniary interest of any Member. Also, upon written notice to the Company, the Manager may amend the Operating Agreement to increase or decrease the Management Fee and/or Performance Allocation, without the consent of, but with prior written notice to, the Company and the Members, which notice will afford the Members who object to any increase in the Management Fee and/or Performance Allocation the opportunity to withdraw their Units at the next Withdrawal Date and not to have any such increase apply to their Units prior to such Withdrawal Date. Further, the Operating Agreement also may be amended by the vote or consent of both (1) the Manager and (2) Members holding at least 50% of the value of the Units (except Units held by the Manager and its affiliates) at the time of the amendment; provided that such amendment does not change the method of making amendments to the Operating Agreement.

**Dissolution, Liquidation and Termination**

The Company will be dissolved upon the happening of any of the following events:

(1) _ the bankruptcy, dissolution or withdrawal of the Manager or the occurrence of any other event which, under the Delaware Limited Liability Company Act, causes the Manager to cease to be the manager of the Company (each of the foregoing events, an "**Event of Withdrawal**");

(2) an election to terminate the Company by the Manager; or



MJ 0007934
CONFIDENTIAL

(3) a termination required by operation of law.

Dissolution of the Company will be effective on the day on which the event occurs giving rise to the dissolution, but the Company will not terminate until its Certificate of Formation has been cancelled and its assets have been distributed as provided in the Operating Agreement.

Upon dissolution of the Company, the Manager, or liquidating trustee if one is appointed, will wind up the affairs of the Company and liquidate such of the Company assets as it considers appropriate, determining in its discretion the time, manner and terms of any sale or other disposition thereof. The Manager or liquidating trustee will first apply and distribute the assets to the payment of all taxes, debts and other obligations and liabilities of the Company (or establish a reserve therefor), and then distribute any remaining proceeds of such liquidation to all Members in proportion and to the extent of the positive balances in their respective Capital Accounts.

**Calculation of Net Asset Value**

The Company's **"Net Asset Value"** means at any date the total assets of the Company including all cash and cash equivalents (valued at market) and the value of all Securities and other assets of the Company, less the amount of all liabilities of the Company, including accrued but unpaid Management Fees and other expenses of the Company, each determined in accordance with the following principles and, where no principle is specified, based upon the accrual method of accounting and in accordance with U.S. generally accepted accounting principles, with such adjustments as are necessary or advisable in the sole discretion of the Manager.

Securities that are listed on a national or foreign securities exchange or NASDAQ and are freely transferable will be valued at their last reported sales price on the primary market on which the Securities are traded on the date of determination or, in the case of listed securities options or, if no sales occurred on such day, at their reported bid price on the consolidated tape at the close of business on such day. Other Securities traded over-the-counter which are freely transferable will be valued at their last reported bid price. Notwithstanding the foregoing, if, in the judgment of the Manager, the reported market price for any Security held by the Company does not fairly reflect the value of such Security, the Manager may value such Security at fair value price determined by the Manager, which may be greater or less than the reported market price for such Security. Any Securities for which market quotations are not readily available and all other assets of the Company will be valued at their fair values, as determined by the Manager. In making its determinations, the Manager will consider such factors as it deems relevant and may rely on the advice of independent sources, Advisers or its own judgment.

A Designated Investment will be valued at cost until December 31 of the year in which it is acquired and at each December 31 thereafter at the fair value thereof as determined by the Manager, unless earlier sold or otherwise disposed of prior to December 31, in which case the Designated Investment will be valued at an amount equal to the net sale or disposition proceeds to the Company.



MJ 0007935
CONFIDENTIAL

## THE OFFERING

### Private Placement

The Company, which will operate as a private investment company under Section 3(c)(1) of the Investment Company Act of 1940 (the "**1940 Act**"), is offering its Class A limited liability company units ("**Units**") to qualified investors pursuant to a private placement exemption under the Securities Act of 1933 (the "**1933 Act**"). The Company may, as determined by the Manager, offer Units of different classes having different rights and obligations from the Class A Units offered hereby. It is currently offering its Class B Units to investors who qualify for them, pursuant to a Supplement to this Memorandum. Unless otherwise specified, "Units" refers to all classes of Units.

No sales charges are payable by the Company or the Members. Placement agents and finders may be used and compensated by the Manager. The initial offering period will commence on the date hereof and will continue until November 1, 1999, unless terminated earlier or extended by the Manager, in its sole discretion, for an additional 60 days (the "**Initial Offering Period**"; the last day of which, the "**Initial Subscription Acceptance Date**"). Once the Company commences operations, it may continue to accept subscriptions for Units at monthly closing (each, a "**Subscription Acceptance Date**"), to be held as of the close of business on the last Business Day of each month (effective as of the first day of the following month) or at such other times as the Manager may determine.

If at least $1,000,000 has been subscribed for and not rejected by the Company at any time during the Initial Offering Period, the Manager may elect to terminate the Initial Offering Period and commence operations or continue to offer Units until the conclusion or earlier termination of the Initial Offering Period. If for any reason the Initial Subscription Acceptance Date does not occur, the offering of Units will terminate and subscriptions will promptly be returned to subscribers, without interest or charges for the Organization Fee (as defined below).

A subscription received by the Manager will be deposited in the Company's name in an non-interest-bearing account at the bank set forth in the Subscription Instructions to the Subscription Agreements until the Manager either rejects such subscription or accepts such subscription at a Subscription Acceptance Date. Subscriptions are accepted by the Manager, subject to the satisfaction of certain conditions and the approval by counsel of certain legal matters.

The Company may continue to offer Units for sale for an indefinite period.



MJ 0007936
CONFIDENTIAL

| Minimum Subscription | Subscriber | Effective Date of All Subscriptions |
|---|---|---|
| $50,000 | New Subscriber | First Business Day of the month following the Subscription Acceptance Date (generally the close of business on the last Business Day of each month). |
| $ 10,000 | Existing Members | |

In general, (1) the Manager must receive a Subscription Agreement at its business office prior to 5:00 P.M. (Eastern Time) at least two full Business Days (counting the last Business Day as one day) prior to the Subscription Acceptance Date at which the subscription is intended to be accepted by the Company, and (2) subscription monies must be credited to the Company's subscription account by the close of business on the requested Subscription Acceptance Date to be accepted as of that date. If those two conditions are not met, absent a waiver by the Manager, a requested Subscription will be held until the next Subscription Acceptance Date that immediately follows the requested Subscription Acceptance Date, at which time such subscription will be considered for acceptance by the Company. In the event that a subscriber fails to fund a subscription as required, the subscriber will be liable for any and all losses or liabilities sustained by the Company. "**Business Day**" means a day (other than a Saturday or a Sunday) on which banks and relevant financial markets are open for business in New York, Washington and Georgia.

Any initial or additional subscriptions may be accepted or rejected, in whole or in part, in the sole discretion of the Manager.

**Organization Fee**

An Organization Fee of .75% of the amount of each subscription will be deducted from the amount paid to the Company by each subscriber in order to compensate the Company for its organization and offering costs, which were advanced by the Manager. The Manager will be reimbursed only to the extent of the Organization Fees received by the Company.

**Suitable Investors**

Each prospective purchaser of a Unit should consider whether the purchase of a Unit is suitable for him in light of his individual investment objectives, tolerance for risk and his present and expected future financial position, needs and tax situation.

Each subscriber must, among other things, represent and warrant in the Subscription Agreement that such subscriber has received and read this Memorandum and that such subscriber is purchasing his Unit for investment purposes only, can afford the loss of a substantial portion of his investment and has such knowledge and experience in financial and business matters, either alone or together with his purchaser representative, that he is capable of evaluating the merits and risks of the prospective investment. In order to be eligible to purchase a Unit, a Subscriber (1) generally must be an "**Accredited Investor**" as defined in Rule 501(a) of Regulation D under the 1933 Act, and (2) must have a pre-existing substantive relationship with

the Manager or its principals, employees, agents or representatives. Such investors (as more fully described in the Subscription Agreement) include individuals whose net worth, or joint net worth with their spouse, exceeds $1,000,000 or entities with total assets in excess of $5,000,000.

The Company may also offer Units to a limited number of non-Accredited Investors, as permitted under Rule 506 of Regulation D under the 1933 Act, each of whom either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of an investment in the Company.

The Company is limiting the value of Units held by Benefit Plan Investors to less than 25% of the value of outstanding Units in the Company at any time in order to avoid the underlying assets of the Company being deemed to be "plan assets" for purposes of the Employee Retirement Security Act of 1974, as amended ("**ERISA**").

**Subscription Procedure**

In order to purchase a Unit, a Subscriber must deliver to the Company: (1) a fully completed, dated and signed Subscription Agreement in the form annexed hereto as Exhibit B; and (2) payment in full of the purchase price by check or wire transfer in accordance with the instructions in the Subscription Agreement.

Any subscription which is submitted to the Manager without all applicable documents or which otherwise contains incomplete information will not be processed by the Manager until completed by the subscriber. Any such delay in processing a subscription could result in a subscription being held and a subscriber not being admitted to the Company until a subsequent Subscription Acceptance Date.

In the case of subscriptions by Employee Benefit Plans, merely subscribing for a Unit does not create a plan. Those considering the purchase of a Unit on behalf of an Employee Benefit Plan first must ensure that the plan has been properly established in accordance with the Internal Revenue Code of 1986, as amended (the "**Code**"), and the rules and regulations thereunder and existing interpretations thereof, and that the plan is adequately funded. After a plan has been properly established and adequately funded and if the purchase of a Unit is not prohibited under the governing documents of the plan, the trustee or custodian of the plan who decides to do so or who is instructed to do so can subscribe for a Unit.



MJ 0007938
CONFIDENTIAL

## DESCRIPTION OF CHARGES TO THE COMPANY

**Initial Offering Expenses**

The expenses of the Company's organization and initial offering of Units are being advanced by the Manager and will be reimbursed to the Manager by the Company to the extent of the Organization Fees charged by the Company.

**Management Fee**

The Manager will receive a quarterly "**Management Fee**" equal to .50% of the Company's quarter-end Net Asset Value (approximately 2% per annum). The payment of management fees to the Advisers will be the sole responsibility of the Manager. The amount of such management fees will be based upon a percentage of the Company's assets under the management of each of the Advisers and certain other factors.

The Manager will have the right to increase or decrease the Management Fee payable to the Manager, without the consent of, but with prior written notice to, the Members, which notice will afford Members who object to any increase in the Management Fee the opportunity to withdraw their Units at the next Withdrawal Date and not to have any increase apply to their Units prior to such Withdrawal Date.

**Performance Allocation**

At the end of each year, 20% of Net Capital Appreciation of each Unit in excess of a non-cumulative annual return of 8% (both realized and unrealized) (the "**Priority Return**") will be reallocated to the Manager's Capital Account on a Unit-by-Unit basis (the "**Performance Allocation**"). The Priority Return will be prorated for partial years and withdrawals. A Performance Allocation also will be assessed on the withdrawn portion of a Member's Unit(s) if a total or partial withdrawal occurs other than at the end of a year. Performance Allocations will not be made on the recoupement of any net losses allocated to any Unit in prior years.

**Other Fees and Expenses**

The Company will also have other on-going costs and expenses, including, without limitation, offering, legal, accounting, auditing, bookkeeping and tax return preparation expenses; administrative and other operating expenses, such as printing, postage, telephone and photocopying charges; and extraordinary expenses, if any. The Company estimates that its other on-going cost and expenses will be approximately 1.3% per annum of its assets.

## INCOME TAX ASPECTS

The following is a summary of certain U.S. income tax considerations that may be relevant to a prospective U.S. Member. This summary does not attempt to discuss all of the tax consequences that might be applicable to a particular investor and does not, except as set forth below, discuss the special income and withholding tax considerations (U.S. and foreign) applicable to non-U.S. persons. The discussion below is based on the Code, existing laws, judicial decisions and administrative regulations, rulings and practice, all of which are subject to change. Any such change could apply retroactively to the Company and/or its investments. See "Future Legislation," below. The Company is not seeking a ruling from the Internal Revenue Service (the "**IRS**") or an opinion of counsel as to any tax matters in connection with this offering. Each prospective Member must consult with, and rely solely on the advice of, their personal tax advisors as to the tax consequences to them of this investment. This investment is not intended to generate tax losses or credits and will not be registered as a "tax shelter" under the applicable provision of the Code.

**Treatment as a Partnership**

Under present U.S. Treasury Regulations, the Company will be treated as a partnership for federal income tax purposes, not as an association taxable as a corporation. The Manager has concluded that the Company will satisfy a safe harbor for avoiding "publicly traded partnership" status set forth in Treas. Reg. §1.7704-1(h), because Units will not be registered under the 1933 Act and the Company will not at any time have more than 100 Members (none of which, if pass-through entities, will have invested with a principal purpose of enabling the Company to satisfy this limitation); therefore, under current law, the Company should not be treated as a "publicly traded partnership" (which generally would be taxed as a corporation). As indicated, however, the Company has not obtained any IRS ruling as to its tax status, and there can be no assurance, therefore, that the IRS or other taxing authority will agree with the Manager's conclusions.

If the Company were treated for federal income tax purposes as a corporation (as a result of changes in tax law, changes in fact or otherwise), income and losses of the Company would be reflected only on its tax return rather than being passed through to the Members. In such event, the Company would be required to pay income tax at corporate tax rates (with a current maximum tax rate of 35%) on its net ordinary income and capital gains, thereby substantially reducing the amount of cash available to be distributed to the Members. Furthermore, all or a portion of any distributions made to Members could be treated as ordinary dividend income, regardless of the source from which they were generated. The Members, however, generally would not be subject to tax on any undistributed income of the Company. See "Other Tax Factors," below.



MJ 0007940
CONFIDENTIAL

THE DISCUSSION BELOW ASSUMES THAT THE COMPANY WILL BE TREATED AS A PARTNERSHIP FOR FEDERAL INCOME TAX PURPOSES.

**Members, Not Company, Subject To Tax**

The Company will report its operations for tax purposes on the accrual method for each year and will file a partnership information income tax return, but will not itself be subject to federal income tax. Each Member will be required to report on his personal income tax return his allocable share of the Company income, gain, loss, deduction and items of tax preference.

Each Member will be required to report and determine his tax liability, if any, with respect to his allocable share of the Company's taxable income, whether or not he has received or will receive any cash distributions from the Company, but, as a result of various limitations imposed by the tax laws, may be unable to deduct his share of certain losses and expenses of the Company. Further, the Company's primary investment objective is capital appreciation rather than the current distribution of profits. For these reasons, a Member's tax liability with respect to his share of the Company's taxable income will likely exceed the cash, if any, actually distributed to such Member in a given year.

Under the Operating Agreement, accounting (i.e., book) profits and losses of the Company are allocated among the Members for purposes of determining, among other things, the price payable on redemption of a Member's Unit. Because gain or loss for tax purposes generally is not recognized until there is an actual sale or disposition of the underlying asset, discrepancies may result between a Member's economic gain or loss and his share of the gain or loss reported by the Company for tax purposes. The tax allocation provisions of the Operating Agreement attempt to allocate the income or loss of the Company for each year so as to eliminate, to the extent possible, any disparity between a Member's Book Capital Account (reflecting the economic results of the Company's operations) and his Tax Capital Account (reflecting the tax consequences of the Company's operations). Although the Manager believes that such allocations should be respected for tax purposes, the IRS may successfully challenge the Company's method of allocations, in which event a Member's share of taxable income and loss of the Company might be other than as provided in the Operating Agreement.

**Calculation of Members' "Adjusted Basis"**

A Member may deduct his share of any losses of the Company (whether ordinary or capital) only up to the amount of his adjusted basis in his Unit. (In addition, under Section 465 of the Code, a non-corporate Member cannot deduct losses from the Company in excess of his amount "at risk" in the Company, which would include his cash invested but would not include any amounts borrowed by the Company with respect to its transactions.) Losses in excess of a Member's adjusted basis may be carried forward and deducted in succeeding years subject to this limitation. Each Member's adjusted basis in his Unit will be equal to his purchase price therefor, increased by the amount of his share of items of income (including tax-exempt interest income) and gain of the Company and reduced, but not below zero, by (1) the amount of his share of losses and deductions of the Company, (2) expenditures that are neither properly deductible nor

capitalized as part of its Company's basis in its assets and (3) the amount of any distributions received by such Member.

The IRS has ruled that a partner has one basis for his entire interest in a partnership. If a Member makes additional investments in the Company subsequent to his initial investment, his additional investments will be added to his basis for his Unit. Such aggregate basis would be used by the Member to determine his tax consequences on a sale or redemption of his Unit or on a cash distribution (see below).

**Treatment of Cash Distributions from the Company**

Cash distributions (including distributions in redemption of Units or upon a liquidation of the Company) made to a Member will represent a return of capital up to the amount of such Member's basis in his Unit. A return of capital generally does not result in taxable income to such Member, but reduces (not below zero) a Member's adjusted tax basis in his Unit. Cash distributions in excess of a Member's adjusted basis in his Unit immediately prior thereto (**"Excess Distributions"**) will result in the recognition of gain to the extent of such excess.

**Treatment of Gain or Loss on Sale or Redemption of a Unit and Allocations**

Any gain or loss recognized by a Member upon the sale or exchange of a Unit (provided that the Member is not deemed to be a "dealer" in such Units) and any gain recognized by him upon an Excess Distribution in connection with a redemption or liquidation will generally be treated as capital gain or loss, except for the portion of any gain which is attributable to (1) his distributive share of Company income up to the date of sale, exchange or redemption, which will be taxed as otherwise described below, and (2) certain accrued interest items. Whether such capital gain or loss is short-term or long-term and, if a gain, whether and to what extent such gain is eligible for reduced tax rates, will depend on the Member's holding period for such Unit. On the sale of a portion of a Member's Unit, such Member would be required to allocate his aggregate tax basis pro rata between his Unit sold and his Unit retained. Thus, a Member owning a Unit, portions of which were purchased at different prices, cannot control the timing of his recognition of the inherent gain or loss in his particular Unit by selecting a portion of a Unit for sale or redemption.

A Member who redeems part of his Unit at an economic profit will recognize gain for tax purposes, under the foregoing rules, only if the redemption price exceeds his total basis in all of his Unit, including the portion of the Unit he continues to hold. (Proceeds in excess of his tax basis in the portion of the Unit redeemed would first be applied to reduce his tax basis in the Unit he continues to own). A Member who sustains an economic loss on the redemption of part (but not all) of his Unit will be required to add his unrecovered tax basis in the redeemed Unit to his tax basis in the Unit he continues to own, and, therefore, will not recognize a loss for tax purposes unless and until he disposes of his remaining Unit for less than his tax basis, as so adjusted. Consequently, the tax consequences to a Member of a partial redemption may be more or less favorable to him than the economic consequences to him of such a redemption.

**Gains and Losses From Trading**

(1) **In general.** If the Company were to derive interest income (in the form of interest payments, original issue discount and market discount) from its Securities transactions, such income would be taxable to the Members as ordinary income. As discussed below, ordinary income earned by the Company generally could not be offset for income tax purposes by any capital losses sustained by the Company, even if such losses offset such income as an economic matter.

The Company's capital gains and losses from sales or dispositions of Securities generally will be long-term if the Securities disposed of were held by the Company for more than 12 months or short-term if the Securities disposed of were held by the Company for 12 months or less. The Company's trading policies are not designed or intended to generate income of any particular type or character for income tax purposes.

Under current tax law, a maximum marginal tax rate of 39.6% applies to ordinary income and short-term capital gains of non-corporate taxpayers and a top tax rate of 20% applies to long-term capital gain of such taxpayers. The excess of Company capital losses over capital gains is deductible by a non-corporate taxpayer against capital gains from other sources, plus up to $3,000 of ordinary income each year. Unused capital losses may be carried forward indefinitely, but except as described below, may not be carried back. **AS A RESULT OF THESE LIMITATIONS, A NON-CORPORATE MEMBER SHOULD ANTICIPATE THAT HIS SHARE OF THE COMPANY'S CAPITAL LOSSES WILL NOT MATERIALLY REDUCE HIS FEDERAL INCOME TAX ARISING FROM HIS ORDINARY INCOME FROM THIS AND OTHER SOURCES.**

In the case of a corporate Member, all capital gains are taxed at the same corporate income tax rates (with a current maximum tax rate of 35%) as other income. Capital losses may be offset only against capital gains, but unused capital losses may be carried back three years or forward five years. The amount that can be carried back is limited to an amount that does not cause or increase a net operating loss in a carryback year.

(2) **Anti-straddle and "constructive sale" rules.** In the event that the Company engages in spread trading involving assets other than solely section 1256 contracts, the Company's ability to deduct losses, if any, realized on such transactions will be subject to the limitations imposed by special loss disallowance rules provided in the Code. Under these rules, which are applicable to "offsetting" (i.e., balanced) positions in actively traded personal property (other than certain stock options and stock interests), the Company will be unable to recognize losses from transactions involving "offsetting" positions except to the extent that such losses exceed the Company's unrecognized gains from such positions as of the close of the relevant taxable year. Under other Code provisions, certain transactions, involving short sales of or offsetting notional principal contracts, forwards or futures or futures with respect to Securities owned by the Company or acquired before such offsetting positions are closed, must now be treated as constructive sales of such Securities resulting in the Company's recognition of gain (but not loss). It is currently unclear to what extent these rules might apply to offsetting

positions consisting of transactions entered into by the Company in the ordinary course and those entered into by a Member in his individual capacity.

The Code contains a so-called "wash sale" rule under which losses incurred by the Company from the sale or other disposition of Securities will not be deductible, if, within 30 days either before or after the date of such sale or exchange, the Company acquires, or enters into a contract or option to acquire, substantially identical Securities. The wash sale rules could become applicable to various of the Company's transactions, in which event a Member would be precluded from deducting all or a significant portion of his share of the Company's losses, if any, from such transactions.

**Deductibility of Investment Expenses**

Under current law, individual taxpayers who itemize deductions are permitted to deduct for regular income tax purposes only the portion, if any, of their investment expenses in excess of 2% of their adjusted gross income, and such items are not deductible at all for alternative minimum tax purposes. Further, the deductible portion of such expenses, other than investment interest and certain other itemized deductions, is reduced by an amount equal to the lesser of 3% of an individual's adjusted gross income in excess of $100,000 (indexed for inflation), and 80% of the individual's itemized deductions otherwise allowable for that year.

The Treasury Department has issued regulations prohibiting the indirect deduction of investment expenses by individuals through the use of partnerships or other "pass-through entities." Under such regulations, a Member's share of Company expenses would be subject to this limitation unless the expenses were incurred by the Company in connection with the conduct of a trade or business. If the Company itself invests in other entities, the Company's share of that entity's expenses also would be subject to this limitation to the extent allocable to individual Members; however, such limitation does not apply to expenses of publicly-offered mutual funds.

It is possible that the Company will be considered to be engaged in a trade or business for this purpose. However, this issue is primarily dependent on the facts and circumstances of the Company's yearly trading activities, including the level of activity and the types of investments, which may vary from year to year. In addition, the Company might be unable, as a result of subsequent developments in this area of the tax law, to take the position that it is engaged in a trade or business on its tax returns. Accordingly, while the Manager currently intends to take the position that the Company is engaged in a trade or business based on the anticipated trading activities of the Company, individual Members should not assume, in deciding whether or not to invest in the Company, that they will not be subject to these limitations in determining the deductibility of their allocable share of Company expenses. The application of these limitations to Company expenses could result in an individual Member's having to report taxable income from the Company in excess of his economic profits therefrom to the extent that he is unable to deduct his allocable share of Company expenses. Whether or not deductible, the entire amount of such fees and expenses will reduce the Net Asset Value of an individual Member's Unit, as well as the amount of cash available for distribution from the Company.

**Limitation on Deduction of Losses From Passive Activities**

Under Section 469 of the Code, subject to certain transitional rules, non-corporate taxpayers and certain closely-held corporations deriving net losses from "passive activities" may deduct such losses only to the extent of their income from passive and rental activities. Passive activities are defined generally as any trade or business activity in which the taxpayer does not materially participate (for example, a trade or business activity conducted by a partnership in which the taxpayer is a limited partner). Passive activity income (against which passive activity losses may be offset) does not include salaries or other compensation for personal services, nor does it include "portfolio income," defined as interest, dividends, annuities, royalties and capital gains not derived in the ordinary course of a trade or business. Any losses which are not currently deductible under this provision may be carried forward and deducted in subsequent years to the extent of the taxpayer's passive and rental income in such years.

Temporary Treasury Regulation §1.469-1T(e)(6) provides that, whether or not such activity is a trade or business for other purposes, trading in commodities, stocks, securities, options and other similar instruments (other than as a market-maker or dealer) is not to be treated as a passive activity for purposes of the passive loss limitations. Accordingly, for Members who are subject to the passive activity loss limitations, taxable income generated by the Company's transactions will not be permitted to be offset by passive activity losses from other investments, and tax losses generated by the Company's transactions will not be affected by these limitations.

**Alternative Minimum Tax**

The Code provides for an alternative minimum tax (at rates of, generally, 26% and 28% for individuals, except that the regular 20% rate applicable to long-term capital gains applies, and 20% for corporations) applicable to taxpayers only if and to the extent such tax exceeds a taxpayer's regular federal income tax liability. The alternative minimum tax is not imposed on the Company as such, but each Member must include in the computation of his own alternative minimum tax liability, if any, his allocable share of the Company's net capital gain and any other relevant items. Individuals should be aware that they may be unable to deduct certain Company expenses for these purposes. The effect of the alternative minimum tax provisions on an investor in the Company will depend upon the investor's own individual tax situation.

**Tax-exempt Members and Unrelated Business Taxable Income**

Tax-exempt entities, e.g., Individual Retirement Funds and ERISA Plans, are generally exempt from taxation except to the extent that their "unrelated business taxable income" (**"UBTI"**), determined in accordance with Sections 511-514 of the Code, exceeds $1,000 during any taxable year. (In addition, such entities must file certain tax returns if their gross unrelated business income exceeds $1,000 in any year.) The tax is imposed at such income tax rates as would be applicable to the organization if it were not otherwise exempt from taxation. If an exempt organization is a Member, the organization is required to include in its computation of its UBTI its pro rata share of the portion, if any, of the Company's taxable income that would be taxable to the organization as UBTI if earned directly by the organization.

UBTI, as defined in Section 512 of the Code, generally means the taxable income (with certain modifications) derived by a tax-exempt organization from a trade or business, or from "debt-financed" assets, that is not substantially related to such organization's performance of its exempt function. Dividends, interest and capital gains generally are not taxable to an exempt organization as UBTI except to the extent that such income is derived from or attributable to "debt-financed property," as defined in Section 514(b) of the Code. The Company is prohibited from incurring any indebtedness in connection with its transactions. Therefore, the Company does not expect to generate UBTI.

Each prospective tax-exempt investor is urged to consult with its own professional tax advisors to determine the effect of this investment on its own circumstances.

**Future Legislation**

Legislation may be enacted or interpretive Treasury Regulations may be issued in the future that could be retroactive with respect to transactions entered into prior to the effective date thereof or that could affect the Company and the Members generally. Hence, there can be no assurance that future legislation will not affect, perhaps adversely, the tax treatment of gains, losses and expenses arising from past or future activities of the Company.

**Offering and Organization Expenses**

Neither the Company nor any Member will be entitled to any deduction for syndication expenses; that is, amounts paid or incurred in connection with the private placement of Units.

**Taxation of Foreign Investors**

A Member that is a foreign person, e.g., a foreign corporation or an individual who is not a citizen or resident of the United States, is not subject to taxation by the United States on capital gains from the Company's Securities transactions, provided that such Member is not engaged in a U.S. trade or business during the year and, in the case of an individual, does not spend more than 182 days in the U.S. or its possessions or territories during his tax year.

Provided that the Company does not acquire equity interests in any flow-through entity that is engaged in a U.S. trade or business (which the Manager does not intend to do), a foreign Member is not anticipated to be subject to U.S. income tax on Company taxable income, but will be subject to 30% withholding tax (unless reduced or exempted by treaty) on his or its allocable share of the Company's dividends (and, in limited circumstances, any interest income). Any taxes so withheld will be reimbursed to the Company (if not requested to be paid by the Member) out of the proceeds of any distribution to or withdrawal of the Unit owned by the Member. In addition, foreign Members may be subject to state tax in certain circumstances and, in the case of foreign individuals who acquire Units, U.S. estate tax.

**Mark-to-Market Election**

The Manager may, if considered advantageous, determine to make for the Company an election pursuant to Code Section 475 (a "mark-to-market election"). If the Company makes a

mark-to-market election, it will be treated as if it has sold its Securities for their fair market value at the close of is taxable year and will be required to recognize any gain or loss on the deemed sales as ordinary income or loss. Gain or loss recognized as a result of a mark-to-market election will affect the amount of income that a Member is required to recognize in a particular year with respect to his Unit, and may cause a Member's tax liability to exceed the amount of cash distributed to such Member for such taxable year. Once made, the mark-to-market election cannot be revoked without the consent of the IRS.

**Charitable Contributions**

The deductibility of a Member's allocable share of charitable contributions against taxable income is subject to various limitations and may not be deductible at all if the contributions are not made to an IRS-approved charity. Zakah and other charitable contributions will be made regardless of whether the Member will be entitled to deduct it against the Member's taxable income.

**Tax Audits**

The income tax returns of the Company may be audited, and such an audit could lead to an audit of the returns of the Members. Such audits could result in the determination of tax deficiencies unrelated to the Company. Audit changes made to the Company's returns would result in corresponding changes to the Members' returns. Such Company-level changes, under the tax law rules providing for administrative and judicial proceedings at the unincorporated entity level, would be binding on the Members under most circumstances. Furthermore, interest paid on tax deficiencies is non-deductible by non-corporate and certain corporate Members.

**State and Local Taxes; Foreign Taxes**

In addition to the federal income tax considerations summarized above, the Company and the Members may be subject to various state and local taxes. Any state and local taxes payable by the Company would reduce the Net Asset Value of the Company. Furthermore, state and local tax laws may not reflect, or may be inconsistent with, the federal income tax treatment of Company items, or may impose additional limitations on the deductibility of certain expenses, such as miscellaneous itemized deductions. Accordingly, each prospective Member should consult with his own tax advisor concerning the applicability of state and local taxes with respect to his investment in the Company.

The Company may be subject to foreign income or withholding taxes on its foreign source income. Such taxes may be deductible or creditable in whole or in part by Members, subject to the limitations imposed by applicable tax laws, but would not be deductible or creditable by tax-exempt Members unless the related income is taxable to them.

The foregoing summary is not exhaustive nor is it intended as a substitute for careful tax planning. In addition, the foregoing does not discuss estate tax, gift tax or other estate planning aspects of this investment, nor does it discuss the special U.S. income and estate tax rules

applicable to foreign investors. Accordingly, prospective Members are urged to consult their own tax advisors with respect to the effects of this investment on their own tax situation.

---

## ERISA CONSIDERATIONS

---

The Manager will, subject to the limitation below, accept subscriptions from IRAs and Keogh Plans which cover only self-employed persons and their spouses and no employees, from employee benefit plans covering only the sole owner of a business and/or his or her spouse (collectively, "**Individual Retirement Funds**"), from Employee Benefit Plans ("**Plans**") subject to Title I of ERISA (defined below), and from government plans, church plans, and foreign employee benefit plans, etc. (collectively, "**non-ERISA Plans**").

Section 404(a)(1) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and the regulations promulgated thereunder by the United States Department of Labor (the "**DOL**"), provide as a general rule that a fiduciary with respect to a Plan must discharge his duties with respect to the Plan in a prudent manner and must consider several factors in determining whether to enter into an investment or engage in an investment course of action. If a fiduciary with respect to any such Plan acts imprudently with regard to selecting an investment or an investment course of action for such Plan, the fiduciary may be held personally liable for losses incurred by the Plan as a result of such imprudence. Among the factors that should be considered are (1) the diversification and liquidity of the Plan's portfolio; (2) the potential return on the proposed investment and the effect on that return of any portion of the Company's income which constitutes "unrelated business taxable income" (see "INCOME TAX ASPECTS – Tax-Exempt Members and Unrelated Business Taxable Income"); and (3) the place the proposed investment would occupy in the Plan's portfolio taken as a whole.

The acceptance of a subscription by the Manager from an Individual Retirement Fund or a Plan does not constitute a representation or judgment by the Manager that an investment in the Company is an appropriate investment for that entity or that such an investment meets the legal requirements applicable to such entity. Those considering the purchase of a Unit on behalf of a Plan or an Individual Retirement Fund first must ensure that the Plan or Individual Retirement Fund has been properly established in accordance with the Code and the rules, regulations and existing interpretations thereunder and that the Plan or Individual Retirement Fund is adequately funded. After a Plan or Individual Retirement Fund has been properly established and adequately funded and if the purchase of a Unit is not prohibited under the governing documents of the Plan or Individual Retirement Fund, the trustee or custodian of the Plan or Individual Retirement Fund who decides to do so or who is instructed to do so can subscribe for a Unit.

Depending upon the percentage of Units purchased by Plans, Individual Retirement Funds and non-ERISA Plans relative to purchases by other permitted investors, the underlying assets of the Company may be considered to be assets of the Plans investing in the Company.

Under a regulation of the DOL, when a Plan acquires an equity interest in an entity such as the Company, which interest is not a publicly offered security, as is the case with the Units, the underlying assets of the Company will not be deemed Plan assets, if, in the aggregate, less than 25% of the Units (excluding any Units issued to the Manager or its affiliates) are held by "benefit plan investors" (which includes Plans, Individual Retirement Funds and non-ERISA Plans). If such benefit plan investors own 25% or more of the Units, the underlying assets of the Company will constitute Plan assets. The DOL regulation provides that the 25% ownership test is applied only when a person acquires Units. However, an advisory opinion of the DOL takes the position that a redemption of an equity interest by an investor also constitutes the acquisition of an equity interest by the remaining investors (through an increase in their percentage ownership of the remaining Units), thus triggering an application of the 25% test at the time of the redemption. **Accordingly, in no event will the Manager accept a subscription from any prospective investor, if after accepting such subscription an aggregate of 25% or more of the equity interests (excluding Units issued to the Manager or any of its affiliates) in the Company would be held by Plans, Individual Retirement Funds and non-ERISA Plans (the "25% Ownership Limitation"). Moreover, if following any withdrawal of Units by Members, 25% or more of the remaining equity interests in the Company would be held by Plans, Individual Retirement Funds, and non-ERISA Plans, the Manager intends to exercise its mandatory withdrawal right to cause the withdrawal of a sufficient number of Units held by Plans, Individual Retirement Funds and non-ERISA Plans to bring the Company into compliance with the 25% Ownership Limitation.**

Certain prospective Plan and Individual Retirement Fund investors may currently maintain relationships with the Manager or its affiliates under which the Manager or its affiliates provide investment advisory and/or management services to such entity. These relationships may cause the Manager or its affiliates to be deemed to be fiduciaries with respect to such Plan or Individual Retirement Fund. The DOL has issued regulations defining the term "fiduciary" which provide that an investment adviser who renders investment advice to a Plan or Individual Retirement Fund for a fee pursuant to an understanding that such advice will serve as a primary basis for such entity's investment decisions or who has discretionary control over the assets of such entity will be deemed a fiduciary, but only with respect to that portion of the entity's assets with respect to which the investment adviser renders such advice or has such discretion.

Under ERISA, investment in the Company by a Plan or Individual Retirement Fund for which the Manager or any of its affiliates provide investment advisory and/or management services could possibly be interpreted to constitute a prohibited use of the plan assets of such entity because it has the effect of benefiting one or more parties in interest. The Manager has determined that neither it nor any affiliate will recommend investment of any Plan or Individual Retirement Fund assets in Units with respect to which assets the Manager or any affiliate may be a fiduciary nor will the Manager or any affiliate allocate any such assets over which they have discretionary control to the Company. The Manager believes that with respect to the assets of a Plan or Individual Retirement Fund, as to which the Manager or any affiliate has a non-fiduciary, party in interest relationship, any investment in the Company which is undertaken on behalf of such Plan or Individual Retirement Fund by an independent plan fiduciary who possesses the requisite experience and acumen to understand the operation of the Company and who determines that the investment is appropriate and in the best interests of the Plan or Individual

Retirement Fund and which is made under arm's length conditions, should not be viewed as a prohibited transaction. Plan or Individual Retirement Fund investors should pay particular attention to the section of this Confidential Offering Memorandum entitled "INCOME TAX ASPECTS" – Tax Exempt Members and Unrelated Business Taxable Income."

**FIDUCIARIES OF EMPLOYEE BENEFIT PLAN INVESTORS THAT ARE PROSPECTIVE INVESTORS SHOULD CONSULT WITH THEIR OWN LEGAL COUNSEL CONCERNING THE CONSEQUENCES UNDER ERISA OF AN INVESTMENT IN THE COMPANY, INCLUDING ALL COMPENSATION ARRANGEMENTS.**

---

## ADDITIONAL INFORMATION FACTORS

---

Prospective Members are invited to meet with the Manager for a further explanation of the terms and conditions of this offering of Units and to obtain any additional information necessary to verify the information contained herein, to the extent the Manager possesses such information or can acquire it without unreasonable effort or expense. Also, Part II of Form ADV for any federal or state registered Adviser will be made available, if requested. Requests for such information should be directed to Dr. M. Yaqub Mirza at 1020 Aviation Blvd., Gainesville, GA 30501, phone (770) 539-9539.

---

## COUNSEL AND AUDITORS

---

Rosenman & Colin LLP, New York, New York, act as legal counsel to the Company and the Manager, in connection with this offering of Units.

The certified public accounting firm of Tait, Weller & Baker will act as the Company's independent auditor.



MJ 0007950
CONFIDENTIAL

**EXHIBIT A**

# STERLING STOCK INVESTMENTS, LLC

# LIMITED LIABILITY COMPANY AGREEMENT

## TABLE OF CONTENTS


Page

1. General Provisions ........ 1
   - 1.1 Formation ........ 1
   - 1.2 Name ........ 1
   - 1.3 Purpose ........ 1
   - 1.4 Principal Place of Business and Registered Offices ........ 2
   - 1.5 Term ........ 2
2. Certain Definitions ........ 2
3. Members, Capital Contributions, Additional Capital Contributions, Capital Accounts, Allocations, Withdrawal Rights and Distributions ........ 8
   - 3.1 Members ........ 8
   - 3.2 Capital Contributions. ........ 8
   - 3.3 Additional Capital Contributions ........ 8
   - 3.4 No Additional Contributions Required ........ 8
   - 3.5 Capital Accounts ........ 8
   - 3.6 Adjustments to Book Capital Accounts ........ 9
   - 3.7 Adjustments to Tax Capital Accounts ........ 10
   - 3.8 Determination and Allocation of Profits, Losses and Certain Deductions ........ 10
   - 3.9 Determination and Allocation of Capital Gain and Capital Loss ........ 10
   - 3.10 Admission of Members; Transfers ........ 11
   - 3.11 Liability for Certain Taxes ........ 11
   - 3.12 Designation of Special Members ........ 11
   - 3.13 Withdrawals by Members ........ 12
   - 3.14 Distributions ........ 13
4. Fees and Expenses ........ 14
   - 4.1 Fees and Expenses of the Company ........ 14
   - 4.2 Manager Obligations ........ 14
5. Management ........ 15
   - 5.1 Management of Company Business ........ 15
   - 5.2 Powers of the Manager ........ 15
   - 5.3 Restrictions on Manager's Authority ........ 18
   - 5.4 Other Businesses of Members ........ 18
   - 5.5 Liability and Indemnification ........ 19
   - 5.6 Determination by Manager of Certain Matters ........ 20
   - 5.7 Valuation Determinations by Independent Third Party ........ 20
6. Rights and Obligations of Members ........ 20
   - 6.1 Limitations on Members ........ 20
   - 6.2 Liability of Members ........ 20
   - 6.3 Meetings; Consents ........ 21

7. Books, Records and Reports ....21

7.1 Books and Records ....21
7.2 Accounting Basis ....21
7.3 Reports. ....22
7.4 Tax Information ....22

8. Admission of New Members ....22

8.1 Additional Members ....22
8.2 Additional Manager ....22

9. Transferability, Assignment and Substitution ....23

9.1 Restrictions on Transfers of Units ....23
9.2 Assignees ....23
9.3 Substituted Members. ....24
9.4 Transfer of Interests in Manager ....24

10. Dissolution, Liquidation and Termination of the Company ....25

10.1 Dissolution ....25
10.2 Liquidation ....25

11. Amendments ....26

11.1 Permitted Amendments ....26
11.2 Amendment of Certificate of Formation ....27

12. Power of Attorney ....27

12.1 Appointment ....27
12.2 Coupled with an Interest ....27
12.3 Execution and Delivery ....28

13. Representations, Warranties, Covenants and Understandings of Members ....28

14. Miscellaneous ....28

14.1 Notice ....28
14.2 Governing Law ....28
14.3 Arbitration ....28
14.4 Entire Agreement ....29
14.5 Headings ....29
14.6 Binding Effect ....29
14.7 Legends ....29
14.8 No Third Party Beneficiaries ....29
14.9 Counterparts ....29
14.10 Creditors ....29
14.11 Severability. ....29

Certificate of Formation .... Attachment A

# AMENDED AND RESTATED OPERATING AGREEMENT OF STERLING STOCK INVESTMENTS, LLC

This Limited Liability Company Agreement dated as of October 1, 1999, between Sterling Advisory Services, Inc., a Georgia corporation (the "**Manager**"), and such other person or persons as may become parties to this Agreement by executing a counterpart hereof, as Members (each a "**Member**," and collectively with the Manager, the "Members").

WHEREAS, Sterling Stock Investments, LLC (the "**Company**") was formed pursuant to the Operating Agreement dated October 13, 1998 (the "**Operating Agreement**") as a limited liability company under the Delaware Limited Liability Company Law, 6 Del. C. § 18-101 et seq. (the "**Act**"); and

WHEREAS, the Manager desires to admit additional Members to the Company; and

WHEREAS, the Members desire to detail their respective rights and duties relating to the Company and to amend and restate the Operating Agreement as hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members hereby agree as follows:

## 1. General Provisions

**1.1 Formation**. The Members hereto do hereby form a limited liability company under the provisions of the Act and this Agreement. The Members also ratify, confirm, and approve the execution, delivery and filing with the Secretary of State of the Certificate of Formation in the form of Exhibit A hereto. The rights and liabilities of the Members shall be as provided in the Act except as herein otherwise expressly provided. The Members shall cause to be executed and filed such further certificates, notices, statements or other instruments required by law for the operation of a limited liability company in all jurisdictions where the Company is required to qualify or be authorized to do business as a foreign limited liability company, or as otherwise necessary to carry out the purpose of this Agreement and the business of the Company.

**1.2 Name**. The name of the Company shall be "Sterling Stock Investments, LLC"

**1.3 Purpose.**

1.3.1 The Company is formed to engage in any lawful act or activity for which limited liability companies may be organized under the laws of the State of Delaware, including, but not limited to, the trading, on margin and otherwise, of Securities and to engage in all other

activities and transactions as are necessary, incidental or ancillary to the foregoing. The objective of the Company's business is the appreciation of its assets.

1.3.2 All purchases and sales of permitted investments shall be for the account and at the risk of the Company.

**1.4 Principal Place of Business and Registered Offices.** The principal place of business of the Company is 1020 Aviation Blvd., Gainesville, GA 30501. The Manager may from time to time change the principal place of business of the Company and may establish additional places of business for the Company when and where required by the business of the Company . The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, City of Wilmington, County of New Castle, State of Delaware 19720 or such other locations as the Manager may designate from time to time. The name and address of the registered agent for service of process on the Company in the State of Delaware shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, City of Wilmington, County of New Castle, State of Delaware 19720 or such other agent as may be designated from time to time by the Manager.

**1.5 Term.** The term of the Company shall commence on the date the Certificate of Formation is filed with the Delaware Secretary of State and shall continue until terminated as provided in this Agreement.

**2. Certain Definitions**

**2.1 "Accounting Period"** means, in the case of the Company's first Accounting Period, the period beginning on the date on which the Company commences trading activity and ending on the next following Allocation Date (as hereinafter defined), and thereafter, the period beginning on the next day after the last Allocation Date and ending on the next following Allocation Date.

**2.2 "Additional Contributions Date"** has the meaning set forth in Section 3.3 hereof.

**2.3 "Advisers"** has the meaning set forth in Section 5.2.2(iii) hereof.

**2.4 "Agreement"** means this Limited Liability Company Agreement as amended or restated from time to time.

**2.5 "Allocation Date"** means whichever is applicable of the last day of each calendar quarter, the day immediately preceding the date on which a Member is admitted to the Company or makes an additional Capital Contribution if that date is not the first day of a calendar quarter, any Withdrawal Date that is not the last day of a calendar month, or the date of liquidation and dissolution of the Company.

**2.6 "Allocation Formula"** has the meaning set forth in Section 3.5 hereof.

**2.7 "Assignee"** has the meaning set forth in Section 9.2.1 hereof.

**2.8 "Assignor"** has the meaning set forth in Section 9.2.1 hereof.

**2.9 "Benefit Plan Investors"** shall have the meaning set forth in the regulations promulgated by the U.S. Department of Labor under ERISA at 29 Federal Register 2510.3-1(f)(2).

**2.10 "Book Capital Account"** has the meaning set forth in Section 3.5 hereof.

**2.11 "Business Day"** means a day (other than a Saturday or Sunday) on which banks and relevant financial markets are open for business in New York, Washington and Georgia.

**2.12 "Capital Appreciation"** exists with respect to a Unit if the balance of such Unit's Book Capital Account at the end of any Measurement Period (after making the adjustments required by Sections 3.6(i) to (iv) hereof after adding back all amounts withdrawn or distributed during such Measurement Period with respect to such Unit, is greater than the sum of the Book Capital Account balance of such Unit at the beginning of such Measurement Period (after deducting Zakah and any Performance Allocation or other performance fee or allocation applicable to such Unit for the immediately preceding Measurement Period).

**2.13 "Capital Contribution"** means the total amount of cash and other property contributed to the Company by each Member, from time to time, in accordance with the terms hereof. Each Member's Capital Contribution shall be in cash, provided that, in the discretion of the Manager, a Member's Capital Contribution may consist, in whole or in part, of marketable securities if deemed acceptable to the Manager and when securities are free and clear of all claims, liens, charges and encumbrances.

**2.14 "Capital Gain"** means, for each Fiscal Year of the Company, the Company's net income or gain resulting from all sales or other dispositions (including any deemed dispositions under the Code) of capital assets during such Fiscal Year with respect to which income, gain or loss is recognized for Federal income tax purposes, taking into account in the computation thereof, all capital gains reportable by the Company for such Fiscal Year.

**2.15 "Capital Investment"** with respect to any Unit for any Measurement Period means (i) the balance of the Capital Account of such Unit at the beginning of the Measurement Period less (ii) (A) the product of (x) any distribution or withdrawal from the Capital Account during the Measurement Period up to and including the last day of such Measurement Period and (y) a fraction, the numerator of which shall be twelve (12) minus the number of months in such Measurement Period up to the time of the distribution or withdrawal and the denominator of which shall be twelve (12) and (B) in respect of each Withdrawal Date with respect to such distributions or withdrawals, if any, the product of (x) any net loss allocated to such Capital Account during the Measurement Period up to and including such Withdrawal Date and (y) a fraction, the numerator of which shall be the amount of capital distributed or withdrawn and the denominator of which shall be the Capital Account immediately prior to the distribution or withdrawal.

**2.16 "Capital Loss"** means, for each Fiscal Year of the Company, the Company's net loss resulting from all sales or other dispositions (including any deemed dispositions under the Code) of capital assets during such Fiscal Year with respect to which income, gain or loss is recognized for Federal income tax purposes, taking into account in the computation thereof, all capital losses reportable by the Company for such Fiscal Year.

**2.17 "Class A Units"** means Units offered pursuant to the Memorandum without regard to any Supplements thereto.

**2.18 "Code"** means the Internal Revenue Code of 1986, as amended.

**2.19 "Designated Investments"** means investments designated by the Manager that it expects to be relatively illiquid or to lack a public market for more than one year.

**2.20 "ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**2.21 "Exempt Unit"** means a Unit which is owned by a Special Member.

**2.22 "Fiscal Quarter"** means, generally, each period of three months ending on March 31, June 30, September 30, and December 31, respectively, of each Fiscal Year. The first Fiscal Quarter of the Company shall begin on the date on which the Company commences trading activity and end on whichever date is the first to occur of March 31, June 30, September 30 and December 31.

**2.23 "Fiscal Year"** has the meaning set forth in Section 7.2 hereof.

**2.24 "Hardships"** has the meaning set forth in Section 3.13.2 hereof.

**2.25 "IRS"** means the Internal Revenue Service.

**2.26 "Losses"** means, for each Fiscal Year of the Company, losses of the Company as determined for Federal income tax purposes, and each item of income, gain, loss or deduction entering into the computation thereof, except that any deductions for Management Fees charged against the Book Capital Account of any Unit pursuant to Section 3.6.1(iv) hereof and any income, gain or loss taken into account in determining the Capital Gain or the Capital Loss of the Company for such Fiscal Year shall not enter into such computations.

**2.27 "Makeup Amount"** means, with respect to a Unit, the amount by which the cumulative charges to the Book Capital Account of a Unit pursuant to Sections 3.6.1(ii) and 3.6.1(iv) hereof and related to any Performance Allocation or other performance fee or allocation applicable to such Unit through the close of a Measurement Period (on account of decreases in the Net Asset Value of the Company and any Management Fees charged to such Unit) exceed the cumulative credits to the Book Capital Account balance of such Unit pursuant to Section 3.6.1(ii) hereof over the same period (on account of increases in the Net Asset Value of the Company). If part of a Unit is withdrawn, the Makeup Amount with respect to such Unit shall be reduced in proportion to the amount withdrawn relative

to the Book Capital Account of the Unit as of the Withdrawal Date (prior to giving effect to such withdrawal).

**2.28 "Management Fee"** has the meanings set forth in Section 4.1.2 hereof.

**2.29 "Manager"** has the meaning set forth in the Preamble to this Agreement.

**2.30 "Measurement Period"** with respect to a Unit shall mean, in the case of the first Measurement Period, the period beginning with the date on which a Book Capital Account was opened for the Unit and ending on the last day of the same Fiscal Year, and in the case of subsequent Measurement Periods, each period of twelve months ending on the last day of the Fiscal Year; provided, that in the case of a Unit (or part thereof) redeemed on a Withdrawal Date, the final Measurement Period with respect to the Unit (or part thereof) shall end on the applicable Withdrawal Date; and provided further that in the event the Company is terminated, the final Measurement Period with respect to all Units shall end on the date of such termination.

**2.31 "Member"** means any person who becomes a Member of the Company and who is listed as such on the books and records of the Company, and may include the Manager with respect to Units purchased by it.

**2.32 "Members"** means the Manager and Members where no distinction is required by the context in which the term is used.

**2.33 "Memorandum"** means the Confidential Offering Memorandum of the Company dated September 1, 1999, including any Supplements thereto, as amended from time to time.

**2.34 "Net Asset Value"** means at any date the total assets of the Company including all cash and cash equivalents (valued at market) and the value of all Securities and other assets of the Company, less the amount of all liabilities of the Company, including accrued but unpaid Management Fees and other expenses of the Company, each determined in accordance with the following principles and, where no principle is specified, based upon the accrual method of accounting and in accordance with U.S. generally accepted accounting principles, with such adjustments as are necessary or advisable in the sole discretion of the Manager.

Securities that are listed on a national or foreign securities exchange or NASDAQ and are freely transferable shall be valued at their last reported sales price on the primary market on which the Securities are traded on the date of determination or, in the case of listed securities options or, if no sales occurred on such day, at their reported bid price on the consolidated tape at the close of business on such day. Other Securities traded over-the-counter which are freely transferable shall be valued at their last reported bid price. Notwithstanding the foregoing, if, in the judgement of the Manager, the reported market price for any Security held by the Company does not fairly reflect the value of such Security, the Manager may value such Security at fair value price determined by the Manager, which may be greater or less than the reported market price for such Security. Any Securities for which market quotations are not readily available and all other assets of

the Company will be valued at their fair values, as determined by the Manager. In making its determinations, the Manager shall consider such factors as it deems relevant and may rely on the advice of independent sources, Advisers or its own judgment.

Except as provided in Section 5.7, a Designated Investment shall be valued at cost until December 31 of the year in which it is acquired and at each December 31 thereafter at the fair value thereof as determined by the Manager, unless earlier sold or otherwise disposed of prior to December 31, in which case the Designated Investment will be valued at an amount equal to the net sale or disposition proceeds to the Company.

**2.35 "Net Capital Appreciation"** exists with respect to a Unit if the balance of such Unit's Book Capital Account at the end of any Measurement Period (after making the adjustments required by Sections 3.6.1(i) to (iv) hereof after adding back all amounts withdrawn or distributed during such Measurement Period with respect to such Unit, is greater than the sum of (i) the Book Capital Account balance of such Unit at the beginning of such Measurement Period (after deducting Zakah and any Performance Allocation or other performance fee or allocation applicable to such Unit for the immediately preceding Measurement Period), plus (ii) the Makeup Amount (if any) as of the end of the immediately preceding Measurement Period.

**2.36 "1940 Act"** has the meaning set forth in Section 5.2.2 (xvix) hereof.

**2.37 "Organization Fee"** has the meaning set forth in Section 4.1.3 hereof.

**2.38 "Performance Allocation"** has the meaning set forth in Section 3.6.1(v) hereof.

**2.39 "Priority Return"** means, for any Measurement Period, the product of (x) 8% and (y) the Capital Investment applicable to such Measurement Period; provided, however, that with respect to a Measurement Period ending or beginning on a date other than the end or the beginning of a Fiscal Year, the Priority Return shall mean the product of (x) the product of (A) 8% and (B) the Capital Investment applicable to such Measurement Period and (y) a fraction, the numerator of which shall be the number of months comprising such Measurement Period and the denominator of which shall be twelve (12).

**2.40 "Profits"** means, for each Fiscal Year of the Company, profits of the Company as determined for Federal income tax purposes, and each item of income, gain, loss or deduction entering into the computation thereof, excluding from such computation the items described as being excluded from the computation of Losses in the definition thereof.

**2.41 "Reconstituted Company"** has the meaning set forth in Section 10.1(ii) hereof.

**2.42 "Regulations"** means the income tax regulations promulgated under the Code, as such regulations may be amended from time to time.



MJ 0007959
CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 11

# Part 3

2.43 **"Securities"** includes, without limitation, publicly-traded and restricted common stocks, warrants and preferred stocks of U.S. and foreign issuers and U.S. equity mutual funds.

2.44 **"Special Members"** has the meaning set forth in Section 3.12 hereof.

2.45 **"Subscription Acceptance Date"** has the meaning set forth in Section 3.2.1 hereof.

2.46 **"Subscription Agreement"** means the agreement included as an exhibit to the Memorandum pursuant to which subscribers may subscribe for Units in the Company.

2.47 **"Tax Capital Account"** has the meaning set forth in Section 3.5 hereof.

2.48 **"Transfer"** has the meaning set forth in Section 9.1.1 hereof.

2.49 **"Unit"** means an interest (obtained in consideration of each Capital Contribution) in the profits, losses, distributions, capital and assets of the Company equal to the percentage obtained by dividing (as of the date of determination) the Book Capital Account balance of such Unit by the total Book Capital Account balances of all Units then outstanding. Each Member shall have a separate Unit in respect of each Capital Contributions made from time to time by such Member. Units acquired after the Company's acquisition of a Designated Investment will not be entitled to participate in the profit, losses, distributions, capital and assets associated therewith. Units shall not be evidenced by certificates. The Manager may, without limitation, cause the Company to issue Units having different terms from Class A Units or other existing Units (collectively, together with the Class A Units, **"Class Units"**) including, without limitation, with respect to the Management Fee, Organization Fee, Performance Allocation, redemption rights, other fees, performance fees or allocations and expenses; provided, however, the Manager may not thereby reduce the capital accounts of any existing Members. Such terms shall be set forth in Appendices to this Agreement which shall be part hereof. Units shall, unless the context expressly requires otherwise, include all Class Units.

2.50 **"Withdrawal Date"** has the meaning set forth in Section 3.13.1 hereof.

2.51 **"Withdrawal Request"** has the meaning set forth in Section 3.13.1.

2.52 **"Zakah"** (as described in the Memorandum), if any, will be deducted from each Member's Unit as provided in Section 3.6.1(vi), unless such Member indicates otherwise in his Subscription Agreement or in a written notice to the Company.

2.53 **"Zakah Exempt Unit"** means a Unit owned by a Member that has indicated in his Subscription Agreement or a written notice to the Company that Zakah should not be deducted from his Unit.

## 3. Members, Capital Contributions, Additional Capital Contributions, Capital Accounts, Allocations, Withdrawal Rights and Distributions

**3.1 Members**. The names, residence addresses and Capital Contributions of the Members shall be maintained by the Manager with the records of the Company.

**3.2 Capital Contributions.**

3.2.1 The terms of the offering of the Units, the investor suitability requirements and the minimum investment for Members shall be determined by the Manager in its sole discretion. Unless otherwise determined by the Manager in its sole discretion, each new Member shall be admitted to the Company as of the first day following the end of the Fiscal Quarter in which the Manager received such person's Capital Contribution and executed Subscription Agreement and such other documents or agreements as the Manager may require (a "**Subscription Acceptance Date**").

3.2.2 The Manager shall contribute such amount(s) as it shall determine and shall receive in return a Unit. The Manager shall, with respect to any Unit owned by it, enjoy all of the rights and privileges, and be subject to all of the obligations and duties of, a Member, in addition to its rights, privileges and obligations as Manager.

3.2.3 No Member shall be paid interest on any Capital Contribution.

3.2.4 The Manager shall not be personally liable for the return or repayment of all or any portion of the capital (or appreciation thereof) of any Member, it being expressly agreed that any such return of capital or appreciation made pursuant to this Agreement shall be made solely from the assets of the Company without any right of contribution from the Manager.

**3.3 Additional Capital Contributions**. The Manager is authorized, without the consent of the other Members, to permit any existing Member to make an additional Capital Contribution on the first day of any month or at such other times as the Manager in its sole discretion shall determine (an "**Additional Contributions Date**") upon such terms and conditions as the Manager shall determine in its sole discretion. The terms and conditions under which any existing Member may increase its Capital Contribution shall be subject to all the provisions of this Agreement.

**3.4 No Additional Contributions Required**. No Member shall be required to make any contributions to the capital of the Company beyond the Capital Contributions referred to in Section 3.2.1 or 3.2.2, except as provided in Section 3.11, and except for the payment and discharge of liabilities of the Company attributable to any period during which he is or was a Member to the extent of his Book Capital Account.

**3.5 Capital Accounts**. There shall be established for each outstanding Unit a book capital account (the "**Book Capital Account**") and a tax capital account (the "**Tax Capital Account**") for each Capital Contribution made by a Member. The balance of the Book Capital Account for each Unit initially shall equal the Capital Contribution made by a Member to the Company for such Unit in accordance with Section 3.2. The balance of the Tax Capital Account for each Unit initially shall equal the Capital Contribution, if cash, or the tax basis to be used by

the Company with respect to the securities contributed. Thereafter, the Book and Tax Capital Accounts for a Unit shall each be reduced by the amount of any withdrawals or distributions made with respect to such Unit pursuant to Section 3.14 hereof, and shall be further adjusted as hereinafter provided in Section 3.6 (in the case of Book Capital Accounts) and Section 3.7 (in the case of Tax Capital Accounts). Increases or decreases in Book and Tax Capital Accounts shall be made in accordance with the following formula (the "**Allocation Formula**"): Unless otherwise provided in Sections 3.6, 3.8 or 3.9 with respect to each category or class of Unit, all Profits, Losses, Capital Gain and Capital Loss for each Accounting Period shall be allocated among all Units in a class in proportion to their respective Book Capital Account balances as of the close of business on the applicable Allocation Date (prior to making any allocations for such Accounting Period).

**3.6 Adjustments to Book Capital Accounts.** As of the close of business on each Allocation Date during each Fiscal Year, prior to making the allocations described in Sections 3.8 and 3.9 for such Fiscal Year, the following determinations and adjustments shall be made:

(i) The Net Asset Value of the Company (before deduction of the Management Fee, Performance Allocation or any other performance fees or allocations applicable to any Class Units) shall be determined.

(ii) The difference between the Net Asset Value at such Allocation Date and the Net Asset Value at the end of the preceding Accounting Period (or, in the case of the Company's first Accounting Period, the Net Asset Value as of the beginning of such Accounting Period) shall be credited or charged to Book Capital Accounts in accordance with the Allocation Formula set forth in Section 3.5.

(iii) Payments made or to be made in respect of any Unit withdrawn shall be charged against the Book Capital Account maintained for such Unit as of the close of the applicable Withdrawal Date.

(iv) In the case of a Unit other than an Exempt Unit or any applicable Class Unit, the Management Fee accrued with respect to such Unit shall be calculated in accordance with the terms of Section 4.1.2 hereof, and such amounts shall be charged against such Unit's Book Capital Account.

(v) At the close of each Measurement Period, 20% of Net Capital Appreciation of each Unit for such Measurement Period in excess of the Priority Return will be reallocated to the Manager's Book Capital Account on a Unit-by-Unit basis (the "**Performance Allocation**").

(vi) At the close of each Measurement Period, Zakah, if any, payable with respect to Units other than Zakah Exempt Units, shall be calculated as follows and the following adjustments to the Book Capital Account of such Units shall be made:

If there is Capital Appreciation with respect to a Member's Unit or, in the aggregate, with respect to a Member's Units, for a Measurement Period, then Zakah in an

amount equal to 10.3% of the amount of such Capital Appreciation shall be charged against such Unit's Book Capital Account or pro rata against such Units' Book Capital Accounts.

3.6.2 Notwithstanding anything to the contrary, if the Manager determines that for legal, tax or regulatory reasons, including in order to comply with the National Association of Securities Dealers, Inc.'s ("**NASD**") "Hot Issues" rules and interpretations concerning investments in Securities of a public offering which trade at a premium in the secondary market whenever such trading commences, a Member cannot participate in the Profit or Loss, if any, attributable to such "Hot Issues" or other investments, the Manager shall allocate such Profit or Loss, and related expenses, only to the Capital Accounts of Members who are permitted to invest in such "Hot Issues" or other investments. Interests in any such Securities shall be set forth in a separate memorandum account and any Profit or Loss, and related expenses, for such memorandum account shall be separately calculated.

**3.7 Adjustments to Tax Capital Accounts**. As of the close of each Fiscal Year, the Tax Capital Account maintained for each Unit shall be adjusted as follows:

(i) Each Tax Capital Account shall be increased by the amount of Profits, and decreased by the amount of Losses and deductions, allocated to such Unit pursuant to Section 3.8.

(ii) Each Tax Capital Account shall be decreased by the amount of any withdrawals or distributions made in respect of such Unit during or with respect to such Fiscal Year in accordance with Sections 3.13, 3.14 or 10.2 hereof.

(iii) Each Tax Capital Account shall be increased by the amount of Capital Gain and decreased by the by the amount of Capital Loss allocated to such Unit pursuant to Section 3.9.

(iv) The Tax Capital Account maintained for any Unit that is completely withdrawn during a Fiscal Year shall be eliminated as of the first day of the following Fiscal Year.

**3.8 Determination and Allocation of Profits, Losses and Certain Deductions**. As of the close of each Fiscal Year, the Profits and Losses of the Company shall be determined for each Accounting Period during such Fiscal Year. For all purposes, including allocations for federal, state and local income tax purposes, the Profits and Losses for each Accounting Period shall be allocated in accordance with the Allocation Formula set forth in Section 3.5, and the Company's deductions for Management Fees accrued during such Accounting Period shall be allocated among the Units (other than Exempt Units) in accordance with the charges made against Book Capital Accounts in respect thereof pursuant to Section 3.6.1(iv).

**3.9 Determination and Allocation of Capital Gain and Capital Loss**. As of the close of each Fiscal Year, the Capital Gain and Capital Loss of the Company shall be determined for each Accounting Period during such Fiscal Year, and shall be allocated so as to eliminate, to the extent possible, any disparity between the Book Capital Account and the Tax Capital Account for each Unit, consistent with the principles set forth in Section 704(c) of the Code. To the extent permitted by the Treasury Regulations (or successor regulations) in effect under Code

Sections 704(b) and 704(c), allocations of Capital Gain that has been realized up to the time a Unit was completely withdrawn may be allocated first to each Unit that was completely withdrawn during the applicable Fiscal Year to the extent that the Book Capital Account of such Unit as of the Withdrawal Date exceeded the Tax Capital Account of such Unit at that time, and allocations of Capital Loss that has been realized up to the time a Unit was completely withdrawn may be allocated first to each Unit that was completely withdrawn during the applicable Fiscal Year to the extent that the Tax Capital Account of such Unit as of the Withdrawal Date exceeded the Book Capital Account of such Unit at that time. Notwithstanding anything herein to the contrary, Capital Gain or Capital Loss recognized with respect to securities contributed to the Company shall be specifically allocated to the contributing Member in the amount and manner required by Section 704(c) and the regulations thereunder, and, to the extent so allocated, shall be excluded from the computation of the Company's Capital Gain or Capital Loss, as applicable, for the relevant Accounting Period.

**3.10 Admission of Members; Transfers.** Members shall be deemed admitted, additional Capital Contributions from existing Members shall be accepted, and Tax and Book Capital Accounts shall be established, with respect to the Units established for each of the foregoing, as of each Subscription Acceptance Date or Additional Contributions Date, as appropriate, or as of the date on which a transfer of Units from a Member to another permitted person is recognized, or as of the date of admission of a new Manager. Any person to whom a Unit has been transferred shall succeed to the Tax and Book Capital Accounts with respect to the Unit transferred.

**3.11 Liability for Certain Taxes.** In the event that the Company shall be deemed to be an entity separately subject to the state or local income tax laws of any jurisdiction or taxing authority, and in the event that such tax is payable by the Company or has been paid by the Manager, each Member shall be liable for and shall pay the Company or the Manager, as appropriate, for any income taxes due and payable or paid to such jurisdiction within ten days after the Manager's request therefor, in accordance with the Allocation Formula set forth in Section 3.5.

**3.12 Designation of Special Members.** The Manager shall have the authority to designate certain Members as "**Special Members**". A Special Member shall have the same rights and obligations as a Member, except that the Unit held by a Special Member will, in the discretion of the Manager, (i) not be charged the same Management Fee or Organization Fee, Performance Allocation or other performance fee or allocation applicable to any Class Units and/or (ii) not be subject to the same withdrawal restrictions, as other Members. A Special Member shall include, but not be limited to, (a) the Manager or any director, officer, employee or shareholder of the Manager, (b) an Individual Retirement Account of any person enumerated in (a), (c) an employee benefit plan within the meaning of Section 3(3) of ERISA maintained or sponsored by any person enumerated in (a), and (d) such other persons as the Manager in its sole discretion may designate. Each Special Member shall be designated as a Special Member in the books and records of the Company. A Special Member may lose his/its designation as a Special Member, at the sole discretion of the Manager.

**3.13 Withdrawals by Members**

3.13.1 The Members recognize that the profitability of the Company depends upon long-term and uninterrupted investment of capital. It is agreed, therefore, that Company profits may be automatically reinvested and that distributions of capital and profits, if any, to the Members shall be on a limited basis, if at all. Nevertheless, the Members contemplate the possibility that one or more of the Members may elect to withdraw capital and/or profits prior to the termination or dissolution of the Company. Subject to the terms of this Section 3.13.1, after a Member has been a Member for a period of at least 24 months, such Member shall have the right to make a withdrawal, in whole or in part, from any one or more or all of its Book Capital Accounts at the end of each Fiscal Quarter (each, a "**Withdrawal Date**"). If any Withdrawal Date falls on a day other than a Business Day, the Withdrawal Request will be honored on the next succeeding Business Day. A partial withdrawal from a Member's Book Capital Account will not be permitted if immediately following such withdrawal the remaining balance in the Book Capital Accounts of all of the Member's Units is less than the applicable minimum dollar amount provided in the Memorandum or such lower amount as may be determined by the Manager. The Book Capital Accounts of the Units of the withdrawing Member will be reduced by the withdrawing Member's share of all expenses set forth in Section 4 (including the Management Fee ), any Performance Allocation or other performance fee or allocation, any Zakah and any applicable redemption fees. Written notice of a withdrawal in proper form (a "**Withdrawal Request**"), specifying the Unit(s) involved, must be received by the Manager at least 45 days prior to each Withdrawal Date. A withdrawal, shall be effective as of the close of business on the applicable Withdrawal Date occurring after a timely Withdrawal Request in proper form has been received and accepted by the Manager. A partial withdrawal will not be permitted if less than $50,000 would remain in the Capital Account(s) of a Member's Unit(s) after the withdrawal. A Member may revoke his withdrawal request at least 30 days prior to the Withdrawal Date by written instructions to the Manager. The withdrawal of a Member will not cause the dissolution of the Company. The Manager may waive the withdrawal restrictions for hardship or other good cause shown. The Manager, as a Member, may withdraw any part of its Capital Account, as set forth above.

3.13.2 Generally, withdrawal payments to a Member will be made within 30 days following the Withdrawal Date; however, the Manager has the right to withhold payment with respect to a withdrawing Member's pro rata share of any Designated Investments if sale or other liquidation of the Designated Investments is not possible or would be materially adverse to the interests of the Company (as determined in the sole discretion of the Manager), in which case withdrawal payments will be made as soon as practicable after the Withdrawal Date (which may be a significant period of time with respect to such Designated Investments). Withdrawal payments will be made generally in cash, but may be made in cash or in kind, in whole or in part, using Securities (including Designated Investments) selected by the Manager.

3.13.3 In addition, any Member withdrawing all or any part of his Unit on a date prior to the sale or other disposition of any Designated Investment(s) in which such Member participates will have the option to elect, in lieu of receiving withdrawal proceeds in respect of his allocable portion of such Designated Investment(s), to continue to maintain his economic interest therein until the sale or other disposition of such Designated Investment(s) by the Company. In such event, for so long as the Company continues to own such Designated

Investment(s), the withdrawing Member would (i) remain entitled to receive his allocable share of the gains, losses and expenses related thereto and (ii) remain a Member in the Company with respect to his pro rata interest in Designated Investment(s). Such withdrawing Member must make the foregoing election with respect to all Designated Investments in which he participates. A withdrawing Member may contact the Manager for information about those Designated Investments in which he has an interest.

3.13.4 The Manager may suspend withdrawals by the Members in any Fiscal Year in which the Company (at any time during such Fiscal Year) has more than 100 Members (as determined under IRS Regulation §1.7704-1(h)(1)(ii)), if the Manager determines that (i) such suspension is necessary in order to assure that the Company will not be treated as a publicly-traded partnership under Code §7704, and (ii) treatment as a publicly-traded partnership would be adverse to the Members. The Manager's good faith determinations pursuant to the preceding sentence shall be final and conclusive as to all the Members.

3.13.5 The Manager shall have the right to withdraw any portion of its Capital Account as set forth herein.

3.13.6 The Manager may, in its sole discretion, require a Member to make a mandatory withdrawal, in whole or in part, from its Book Capital Account upon at least 20 days prior written notice to such Member for any reason. The timing of such mandatory withdrawal shall be determined by the Manager in its discretion.

3.13.7 The Manager may, in its sole discretion, expressly waive or amend any of the restrictions, notice requirements, limitations or provisos regarding withdrawals contained in this Agreement.

**3.14 Distributions**

3.14.1 The Manager shall have the right to make distributions (i) in connection with the withdrawal of funds from the Company by a Member and (ii) from time to time as hereinafter provided.

3.14.2 The Manager will distribute cash to the extent reasonably practicable, but may, in its sole discretion, distribute assets in-kind in lieu of cash. No Member shall, however, have the right to receive distributions in property other than cash.

3.14.3 The Manager may withhold from any amount payable to any Member, any taxes required to be paid or withheld by the Company on behalf of or for the account of such Member. Any such taxes shall be deemed to be a distribution or payment to such Member, reducing the amount otherwise distributable to such Member pursuant to this Agreement and reducing the Book Capital Account of such Member.

- 3.14.4 No distribution shall be made in respect of any Unit to the extent that, after giving effect to the distribution, all liabilities of the Company, other than liabilities to the Members on account of their Units, exceed the fair market value of the Company assets. The aggregate distributions made (other than constructive distributions described in Sections 3.14.3 or 3.14.5 hereof and distributions on termination, which shall be made in the manner described in

Section 10.2 hereof) shall be made in accordance with the Allocation Formula set forth in Section 3.5 and paid to the holders of record of such Units.

3.14.5 The amount of any custodial fees paid by the Company on behalf of a Member which is an Individual Retirement Account shall not be treated as an advance or loan to such Member, but shall instead be treated as a cash distribution made to such Member, and shall reduce such Member's Book Capital Account balance when paid.

**4. Fees and Expenses**

**4.1 Fees and Expenses of the Company**

4.1.1 The Company will bear all (i) expenses in connection with the organization of the Company and the offering of Units, which, at the option of the Manager, may be advanced by the Manager, in which event, the Company will reimburse or otherwise compensate the Manager for these expenses over such period as the Manager shall determine, (ii) legal, bookkeeping, accounting, auditing, tax preparation charges, and related charges, (iii) expenses associated with the continued offering of Units, which include but are not limited to marketing, travel and other solicitation expenses, (iv) investment related expenses, (v) all operational and overhead expenses of the Company including but not limited to photocopying, postage, and telephone expenses, (vi) extraordinary expenses, and (vii) Management Fees.

4.1.2 The Manager shall receive a "**Management Fee**" from the Company as compensation for its services to the Company. The Manager shall receive the Management Fee in an amount equal to .5% of the Net Asset Value of the Company at the end of each Fiscal Quarter, after reduction from the Net Asset Value of all Exempt Units and any other Units that do not bear the Management Fee, but before reduction for any amounts which may be withdrawn pursuant to Section 3.13, the Management Fees for the current Fiscal Quarter or any Performance Allocation, or other performance fees or allocations through such date. The Management Fees will be payable in arrears as soon as practicable following the Fiscal Quarter to which it relates. If additional Capital Contributions are made other than at the beginning of a month, the Management Fees on the amount of capital added will be appropriately prorated.

4.1.3 An "**Organization Fee**" of 0.75% of the amount of each subscription will be deducted from the amount paid to the Company by each subscriber in order to compensate the Company for its organization and offering costs, which were advanced by the Manager. The Manager will be reimbursed only to the extent of the Organization Fees received by the Company.

**4.2 Manager Obligations**. The Manager will be responsible for all of its own operational and administration expenses, including the salaries of its personnel, rent expenses, utility expenses and other items coming under the category of overhead. The Manager will not be responsible for the payment of any expenses enumerated in Sections 4.1.1 or 4.1.2. The Manager also will be responsible for the payment of any solicitation or finder's fees, if any, incurred in connection with the sale of Units.

5. **Management**

5.1 **Management of Company Business**. The Company shall be managed, and the conduct of the Company's business shall be controlled and conducted solely by, the Manager in accordance with this Agreement. The Manager shall be required to devote to the conduct of the business of the Company such time and attention as it determines to be necessary to accomplish the purposes and to conduct the business of the Company. Notwithstanding the foregoing, the Manager and its directors, officers and employees shall not be precluded from engaging in other activities or business ventures of any kind. In addition, the Manager shall oversee the safekeeping and use of all funds and assets of the Company, whether or not in the Manager's immediate possession or control, and the Manager shall not employ or permit another to employ such funds or assets in any manner, except for the benefit of the Company.

5.2 **Powers of the Manager**

5.2.1 The Manager shall have and may exercise, on behalf of the Company, all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company and as permitted under the Act; provided, however, that the Manager may delegate its administrative responsibilities, and the costs and expenses related thereto, to an appropriate designee. As a condition to trading and investing the Company's assets, the Manager shall, at all times that it is performing services for the Company, if it is then required to do so, be registered as an investment adviser under applicable federal and/or state law. In addition, in the event that the Company shall be managing "Plan Assets" (as defined under ERISA and the regulations promulgated thereunder), the Manager shall acknowledge in writing to each Member which is an employee benefit plan within the meaning of Section 3(3) of ERISA and the regulations promulgated thereunder its status as a fiduciary within the meaning of Section 3(21) of ERISA with respect to such Member and its status as an investment manager (within the meaning of Section 3(38) of ERISA) with respect to such Member and shall be precluded from utilizing securities margin in trading on behalf of the Company with any affiliate of the Manager.

5.2.2 Subject to any and all limitations expressly set forth in this Agreement, the Manager shall perform or cause to be performed, the coordination of all management and operational functions relating to the business of the Company. Without limiting the generality of the foregoing, the Manager, subject to such limitations, is expressly authorized on behalf of the Company to:

(i) expend the capital and revenues of the Company in furtherance of the Company's business;

(ii) open, maintain and close, in the name of the Company, Securities and other trading accounts, bank accounts, and to draw checks or other orders for the payment of money;

(iii) make, or designate and appoint other persons (**"Advisers"**), to make, directly or indirectly, all or any portion of the Company's trading and investment decisions including affiliates of the Manager, for the purposes set forth in this

Agreement; provided, however, that any Advisers shall at all times that they are performing services for the Company, if they are required to do so, be registered as investment advisers under applicable federal and/or state law and, if the Company is managing "Plan Assets" (as defined under ERISA and the regulations promulgated thereunder), each Adviser shall acknowledge in writing to each Member which is an employee benefit plan within the meaning of Section 3(3) of ERISA and the regulations promulgated thereunder its status as a fiduciary within the meaning of Section 3(21) of ERISA with respect to such Member and its status as an investment manager (within the meaning of Section 3(38) of ERISA) with respect to such Member and such employee benefit plan shall appoint the Manager as a "named fiduciary" of such plan for the limited purpose of effecting the power of designation above;

(iv) enter into agreements and contracts with third parties, terminate such agreements and institute, defend and settle litigation arising therefrom and give receipts, releases and discharges with respect to all of the foregoing and any matters incident thereto;

(v) maintain adequate records and accounts of all operations and expenditures and furnish the Members with the reports required hereunder;

(vi) take and hold all property of the Company, real, personal and mixed, in the name of the Company, or in the name of a nominee for the Company authorized by the Manager;

(vii) enter into (and/or delegate to one or more Advisers the power to enter into) one or more customer agreements with one or more dealers or brokers, including dealers or brokers who are affiliates of the Manager (or any Adviser) ("**Brokers**"), and subject to applicable federal securities laws, enter into principal and agency cross transactions with one or more Brokers. In selecting Brokers for the execution of the Company's portfolio transactions, the Manager (or any such Adviser) may consider whatever factors it deems relevant and proper under the circumstances, including the value of any or all of the following provided by the Broker or paid for by the Broker (either by direct or reimbursement cash payments or by commissions, or any other means) and provided by others: brokerage or research (within or without the contemplation of Section 28(e) under the Securities Exchange Act of 1934), other products and services, subject to applicable federal securities laws and investor referrals; provided, however, that, notwithstanding the foregoing, in selecting Brokers, the Manager (and/or any Adviser) shall conform its conduct to any more limiting written disclosures concerning its brokerage practices made by the Company to investors, as such disclosures may be modified from time to time;

(viii) execute for and on behalf of the Company any filing, notice, form or other document under any federal or state securities law and to take any additional action as it shall deem necessary or desirable to effectuate the offering of Units;

(ix) sell, lease, exchange or otherwise dispose of all or any portion of the property of the Company;

(x) employ consultants, experts, professionals, accountants, auditors, attorneys, brokers, engineers, custodians, escrow agents, administrators, Advisers and any other third parties, including affiliated entities of the Manager, deemed necessary by the Manager, and terminate such employment;

(xi) pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend or compromise, upon such terms as it may determine and upon such evidence as it may deem sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Company;

(xii) except as provided in Section 4.2, pay any and all reasonable fees and to make any and all reasonable expenditures which it, in its sole discretion, deems necessary or appropriate in connection with the organization of the Company, the offering and sale of the Units, the management of the affairs of the Company, the investment and maintenance of the assets of the Company, and the carrying out of its obligations and responsibilities under this Agreement;

(xiii) pay any and all reasonable fees and to make any and all reasonable expenditures to an affiliated entity which it, in its sole discretion, deems necessary or appropriate in connection with the administration of the Company;

(xiv) pay Zakah and any interest earned by the Company to such charities which it, in its sole discretion, deems appropriate;

(xv) admit an assignee of a Member's Unit to be a substituted Member in the Company, pursuant to and subject to the terms of Section 9 hereof, without the consent of any Member;

(xvi) determine the accounting methods and conventions to be used in the preparation of the tax returns referred to in Section 7.2, and make such elections under the tax laws of the United States, the several states and other relevant jurisdictions as to the treatment of items of income, gain, loss, deduction and credit of the Company, or any other method or procedure related to the preparation of such returns;

(xvii) be designated and to act as the Tax Matters Member in accordance with Section 6231(a)(7) of the Code, to which designation each Member hereby consents as an express condition of being admitted to the Company, and, in such capacity, to participate in an audit of the Company's return of income and consent to assessments by the auditing agent that may be adverse to the Members or the Company and, in connection therewith, to negotiate, settle and make agreements and adjustments with respect to the Company's tax returns binding upon the Members;

(xviii) make (and if made, to revoke) the elections referred to in Sections 475, 754 or other provisions of the Code. Each of the Members will, upon request, supply the information necessary to properly give effect to such election;

(xix) make application for the Company's registration as a broker-dealer under the Securities Exchange Act of 1934 or as an investment company under the Investment Company Act of 1940 (**"1940 Act"**);

(xx) prior to the termination of the Company, form a new LLC whose investment policies are substantially the same as the Company;

(xxi) pay or authorize the payment of distributions to the Members; and

(xxii) prosecute, defend, settle or compromise actions or claims at law or in equity at the Company's expense as may be necessary or proper to enforce or protect the Company's interests, and shall satisfy any judgment, decree or decision of any court, board or authority having jurisdiction or any settlement of any suit or claim prior to judgment or final decision thereon, first, out of any insurance proceeds available therefor, and then, out of the Company's assets.

**5.3 Restrictions on Manager's Authority**

5.3.1 Notwithstanding anything in this Agreement to the contrary, the Manager may not, without the consent or ratification of the specific act by all the Members, do any of the following:

(i) do any act in contravention of this Agreement or the Company's Certificate of Formation;

(ii) do any act which would make it impossible to carry on the ordinary business of the Company; or

(iii) admit a person as a Member of the Company, except in accordance with Sections 8 and 9.

5.3.2 The foregoing Section 5.3.1 notwithstanding, the Manager may, without the consent or ratification of Members, confess a judgment against the Company.

**5.4 Other Businesses of Members.** Any Member, or any stockholder, officer, director, affiliate or agent of any Member, may engage in or possess any interest in other business ventures of any kind, nature or description, independently or with others, including but not limited to investments in, and financing, acquiring and disposing of, Securities, investments and management counseling, brokerage services, or serving as officers, directors, advisers or agents of other companies, whether such ventures are competitive with the Company or otherwise, and neither the Company nor any Members shall have any rights or obligations by virtue of this Agreement or the Company relationship created hereby in or to such independent ventures or the income or profits or losses derived therefrom. The Manager shall have the right in its sole discretion to decide on behalf of the Company whether and to what extent the

Company will participate in a particular investment, and this decision shall be regardless of the decision made by the Manager and its related or affiliated entities for their own account, or as trustee, fiduciary or adviser for others.

**5.5 Liability and Indemnification**

5.5.1 Neither the Manager nor any of its officers, directors, employees, shareholders, other affiliates, representatives or agents or any Adviser will be liable, responsible or accountable, in damages or otherwise, to the Company or any of the Members successors, assignees or transferees for any act performed or omitted to be performed by them on behalf of the Company in good faith and in a manner they reasonably believed to be within the scope of their authority granted to them by this Agreement except when such action or failure to act constitutes gross negligence, fraud or willful misconduct. Moreover, neither the Manager nor any of its officers, directors, employees, shareholders, other affiliates or representatives will have any such liability for any losses suffered due to the action or inaction of any Adviser or other person retained by or for the Company or the Manager, whether through negligence, dishonesty or otherwise, provided that the Adviser or other person was selected by the Manager with reasonable care. The Manager may consult with counsel and accountants in respect of the Company's affairs and be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such persons, provided that they were selected with reasonable care.

5.5.2 The Company shall indemnify and hold harmless the Manager and each of its officers, directors, employees, shareholders, other affiliates, representatives and agents and any Adviser, from and against any and all claims, losses, damages or expenses, suffered or sustained by them as a result of or in connection with any act performed by them under this Agreement or otherwise on behalf of the Company, including without limitation any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding; provided, however, that such indemnity shall be payable only if the indemnified party or parties in good faith, acted or failed to act in a manner it reasonably believed to be in, or not opposed to, the best interests of the Company. The Manager may, in its sole discretion and out of the Company's assets, advance to any person entitled to indemnification hereunder reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding which arise out of such conduct, provided that all such advances will be promptly repaid if it is subsequently determined that the person receiving such advance was not entitled to indemnification hereunder. No indemnification may be made and each indemnified party shall reimburse the Company to the extent of any indemnification previously made in respect of any claim, issue or matter as to which the indemnified party shall have been adjudged to be liable for gross negligence, fraud, or willful misconduct in the performance of its duties to the Company unless, and only to the extent that, the court in which such action or suit was brought determines that in view of all the circumstances of the case, despite the adjudication of liability the indemnified party is fairly and reasonably entitled to indemnity for those expenses which the court deems proper. Any indemnity under this Section 5.5 shall be paid from, and only to the extent of, Company assets, and no Member shall have any personal liability on account thereof.



MJ 0007972
CONFIDENTIAL

5.5.3 All rights to indemnification permitted in this Agreement and payment of associated expenses shall not be affected by the termination and dissolution of the Company or the removal, withdrawal, insolvency, bankruptcy, termination, or dissolution of the Manager.

**5.6 Determination by Manager of Certain Matters.** All matters concerning the determination of the Net Asset Value, valuation of Securities (except to the extent specifically set forth in Section 5.7), the allocation of profits, losses, Capital Gains and Capital Losses among the Members including the taxes thereon and accounting procedures shall be determined by the Manager, in its sole discretion, the determination of which shall be final and conclusive as to all the Members. In addition to the foregoing, the Manager shall be authorized, without the need to obtain the consent of the Members, to make such allocations of tax items of the Company, and such adjustments to the Members' Capital Accounts maintained in accordance with Section 3 hereof, as the Manager deems necessary or desirable to enable the Company's allocations and maintenance of capital accounts for the Members pursuant to this Agreement to comply with the provisions of Sections 704(b) and 704(c) of the Code and any Treasury Regulations promulgated thereunder. The Manager shall be entitled to consult with, and rely upon the advice of, the Company's accountants or attorneys with respect to the matters referred to in this Section 5.6 and shall incur no liability in connection with any such allocations or adjustments made in reliance thereon, and no such allocations or adjustments shall give rise to any claim or cause of action by any Member. In the event of any inconsistency between the provisions of this Section 5.6 and any other provision hereof, the provisions of this Section 5.6 shall control.

**5.7 Valuation Determinations by Independent Third Party.** If the Company is managing "Plan Assets" (as defined under ERISA and the regulations promulgated thereunder), then for as long as and to the extent required under applicable U.S. Department of Labor regulations and interpretations, any Designated Investment will be valued, at the expense of the Manager, by a qualified third party independent of the Manager and the Company, whose retention by the Company for this purpose will be subject to the approval, and termination, by vote of Members holding a majority-in-interest of the Units of the Company. Valuation determinations by such independent third party in such cases will be final and binding on the Company and all Members.

## 6. Rights and Obligations of Members

**6.1 Limitations on Members.** No Member shall: (i) be permitted to take part in the management or control of the business or affairs of the Company, including, without limitation, voting to remove the Manager involuntarily, unless expressly permitted in other provisions of this Agreement, and then only to the limited extent provided, (ii) have any voice in the management or operation of any Company property, or (iii) except as otherwise provided in this Agreement, have the authority or power in his capacity as a Member to act as agent for or on behalf of the Company or any other Member, to do any act which would be binding on the Company or any other Member, or to incur any expenditures on behalf of or with respect to the Company.

**6.2 Liability of Members.** The liability of each Member for the losses, debts and obligations of the Company shall, except as set forth in Section 3 and Section 9, be limited to such Member's Capital Contribution and share of any undistributed assets of the Company,

except to the extent a Member may be liable under applicable law for previous distributions made to such Member where the Company does not have sufficient assets to discharge its liabilities, or where such liability is founded upon misstatements or misrepresentations contained in such Member's Subscription Agreement or a breach of this Agreement. The foregoing notwithstanding, the Members shall each be liable to the Company for the payment and discharge of liabilities of the Company attributable to any Fiscal Year during which he is or was a Member to the extent of his Capital Account balance at the beginning of such Fiscal Year.

**6.3 Meetings; Consents.** A meeting of the Members for the purpose of acting upon any matter upon which the Members are entitled to vote may be called at any time by the Manager. The Manager shall give written notice of any such meeting to all Members and such meeting shall be held not less than 10 and not more than 60 days after the Manager sends notice to the Members. The Manager may submit any matter upon which the Members are entitled to vote to the Members for a vote by written consent without a meeting. Such written consents shall be treated for all purposes as votes at a meeting. If the vote or consent of any Member to any action of the Company or any Member, as contemplated by this Agreement, is solicited by the Manager, the solicitation shall be effected by notice to each Member given in the manner provided in Section 14.1. The vote or consent of each Member so solicited shall be deemed conclusively to have been cast or granted as requested in the notice of solicitation, whether or not the notice of solicitation is actually received by that Member, unless the Member expresses written objection to the vote or consent by notice given in the manner provided in Section 14.1 and actually received by the Company within 20 days after the notice of solicitation is effected. The Manager and all persons dealing with the Company shall be entitled to act in reliance on any vote or consent which is deemed cast or granted pursuant to this Section 6.3 and shall be fully indemnified by the Company in so doing. Any action taken or omitted in reliance on any such deemed vote or consent of one or more Members shall not be void or voidable by reason of timely communication made by or on behalf of all or any of such Members in any manner other than as expressly provided in Section 14.1.

## 7. Books, Records and Reports

**7.1 Books and Records.** The Manager shall cause the Company to keep complete and accurate books of the accounts with respect to the Company's operations. The Members shall have the right during normal business hours to request access to and copy such books and records, upon at least 10 Business Days' prior written notice to the Manager, in person or by their authorized attorney or agent, but only if the request to access and/or copy (i) is for a purpose reasonably related to the Company's business and the Member's Unit in the Company (as determined by the Manager), and not for any commercial purpose, (ii) only if the Member agrees (in form and substance satisfactory to the Manager) to use such information only for Company purposes and to maintain such information in strict confidence, and (iii) only if reasonable reproduction and distribution costs are paid by such Member.

**7.2 Accounting Basis.** The Fiscal Year of the Company shall begin on the 1st day of January and end on the 31st day of December of each year (the "**Fiscal Year**"). The first Fiscal Year of the Company shall commence on the date on which the Company commences trading and shall end on December 31, 1999. The Fiscal Year in which the Company shall terminate shall begin on January 1 and end on the date of termination of the Company. Company books

shall be kept in accordance with the accounting methods followed by the Company for federal income tax purposes, which accounting methods shall be selected by the Manager by the time of filing of the Company's federal income tax return for its Fiscal Year. Financial reports shall be on an accrual basis and shall be prepared in accordance with generally accepted accounting principles with such adjustments deemed necessary or advisable by the Manager. The books of account and records of the Company shall be audited as of the end of each Fiscal Year of the Company by an independent certified public accountant selected by the Manager.

**7.3 Reports.**

7.3.1 The Manager shall cause to be provided to each Member each year an annual report with respect to the prior Fiscal Year as soon as practical following the end of the Fiscal Year to which it relates.

7.3.2 A quarterly report on the Company will be provided to each Member as soon as practical after the end of each of the first three quarters in the Fiscal Year.

**7.4 Tax Information.** As soon as practicable after the close of each Fiscal Year, the Manager shall cause to be delivered to each Member such information as shall be necessary for preparation of the Member's income tax returns, including a statement showing each Member's share of income, gain and losses for such year for income tax purposes, and the amount of any distributions made to such Member pursuant to this Agreement.

**8. Admission of New Members**

**8.1 Additional Members.** The Manager shall have the authority to cause the Company to offer an unlimited number of Units for sale by means of offerings or otherwise on such terms and at such times as the Manager shall determine in its sole discretion. Members may, with the consent of the Manager and with no consent required from any Member, be admitted as set forth in Section 3.2.1, or add capital as set forth in Section 3.3. In determining whether to admit a new Member or whether to permit an existing Member to add capital, the Manager shall, among other things, consider whether (i) admission or addition would cause twenty-five percent (25%) or more of the Units to be owned by Benefit Plan Investors (excluding any Units owned by the Manager or any of its affiliates), and (ii) under the 1940 Act or IRS Regulation §1.7704-1(h), the Company has or will have more than 100 Members (including the Manager) after such admission, or such greater number as may then be permissible under the 1940 Act for avoiding registration as an investment company, and applicable safe harbors under the Code for avoiding treatment as a publicly-traded partnership, respectively. Each new Member will be required to execute an agreement pursuant to which it will become bound by the terms of this Agreement. Admission of a new Member shall not be a cause for dissolution of the Company.

**8.2 Additional Manager.** Additional Managers may be admitted to the Company in accordance with and to the extent permissible under the Act, but only (i) with the consent of the Manager and more than 50% in value of the Units then owned by Members, or (ii) with the consent of the all the Members, or (iii) in the sole discretion of the Manager, if such Manager(s)



MJ 0007975
CONFIDENTIAL

are affiliates (as such term is defined in Regulation S-X under the Securities Act of 1933, as amended) of the Manager.

## 9. Transferability, Assignment and Substitution

### 9.1 Restrictions on Transfers of Units

9.1.1 No sale, transfer, assignment, pledge of, grant of a security interest in, or imposition of a lien on all or any part of a Member's Unit(s), whether voluntary or involuntary, (each, a "**Transfer**") may be made without the prior written consent of the Manager, which consent may be granted or withheld in the sole discretion of the Manager. Any act by a Member in violation of this Section 9 shall not be binding upon or recognized by the Company (regardless of whether the Manager has knowledge thereof), unless approved or consented to in writing by the Manager.

9.1.2 No Transfer of a Member's Unit(s) may be made unless the Manager has been satisfied that:

(i) when added to the total of all other Transfers of Units within the preceding twelve months, it would not result in the Company being considered to have terminated for federal income tax purposes;

(ii) it would not violate any federal or state securities; and

(iii) it would not cause the Company to lose its status as a partnership for federal income tax purposes.

9.1.3 No Transfer by a Member of all or any part of his Unit(s) may be made to any person who does not meet the investor suitability requirements established by the Manager in its sole discretion.

9.1.4 Each Member requesting a Transfer of his Unit(s) agrees to pay all reasonable expenses, including attorneys' fees, incurred by the Company in connection with such Transfer.

### 9.2 Assignees

9.2.1 The Company shall not recognize for any purpose any purported Transfer of a Unit of a Member unless all the provisions of this Agreement shall have been complied with and there shall have been filed with the Company a notification of such Transfer, in form satisfactory to the Manager, executed and acknowledged by both the seller, assignor or transferor (each, an "**Assignor**") and the purchaser, transferee or assignee, (each, an "**Assignee**") and such notification (i) contains the acceptance by the purchaser, assignee or transferee of all of the terms and provisions of this Agreement and of the Company's subscription agreement accompanying its confidential offering memorandum and (ii) represents that such Transfer was made in accordance with all applicable laws and regulations. Any Transfer shall be recognized by the Company as effective only as of such date as shall be designated by the Company as reasonably convenient for it.

9.2.2 An Assignee, unless and until admitted as a substituted Member in such Member's stead in the sole discretion of the Manager, shall not have any statutory or other rights of the Assignor under the Act or this Agreement other than the right to receive distributions with respect to the transferred Unit. Anything herein to the contrary notwithstanding, both the Company and the Manager shall be entitled to treat the Assignor of a Unit as the absolute owner thereof in all respects, and shall incur no liability for distributions made in good faith to him, until such time as the requirements of this Section 9 have been fulfilled.

**9.3 Substituted Members.**

9.3.1 No Member shall have the right to substitute an Assignee, donee, heir, legatee, distributee or other recipient of such Member's Unit as a Member in his place. Any such Assignee, donee, heir, legatee, distributee or other recipient of a Unit (whether pursuant to a voluntary or involuntary transfer) shall be admitted to the Company as a **"Substituted Member"** only (i) with the prior written consent of the Manager, which consent may be granted or withheld in the absolute discretion of the Manager, (ii) by satisfying the other requirements of this Section 9, and (iii) upon any required amendment to this Agreement and the Company's Certificate of Formation recorded in the proper records of each jurisdiction in which such recordation is necessary to qualify the Company to conduct business or to preserve the limited liability of the Members. Any such consent by the Manager may be evidenced by the execution by the Manager of such an amendment to this Agreement evidencing the admission of such person as a Member. The Members hereby consent and agree to such admission of a Substituted Member by the Manager, and agree that the Manager may, on behalf of each Member and on behalf of the Company, cause the Certificate of Formation of the Company to be appropriately amended, and recorded as so amended, and the books and records of the Company to appropriately reflect such admission, in the event of such admission.

9.3.2 Each Substituted Member, as a condition to his admission as a Member, shall execute and acknowledge such instruments, in form and substance satisfactory to the Manager, as the Manager deems necessary or desirable to effectuate such admission and to confirm the agreement of the substituted Member to be bound by all the terms and provisions of this Agreement. Further, each Member agrees, upon the request of the Manager, to execute such certificates or other documents and perform such acts as the Manager deems appropriate to preserve the limited liability status of the Company after the completion of any assignment of a Unit. For purposes of this section, any transfer of a Unit, whether voluntary or by operation of law, shall be considered an assignment.

9.3.3 Each Member hereby indemnifies the Company and each other Member against any loss, damage, cost or expense (including without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or proposed transfer by such Member in violation of this Section 9.

**9.4 Transfer of Interests in Manager.** Nothing in this Agreement shall be deemed to prevent the merger of the Manager with another entity, the reorganization of the Manager into or with any other entity, or the transfer of all the capital stock of the Manager or the assumption of the rights, duties and liabilities of the Manager by, in the case of a merger, reorganization or consolidation, the surviving entity by operation of law.

## 10. Dissolution, Liquidation and Termination of the Company

**10.1 Dissolution.** The Company shall be dissolved upon the happening of any of the following events:

(i) the insolvency, bankruptcy, dissolution or withdrawal of the Manager or the occurrence of any other event which under the Act causes the Manager to cease to be the manager of the Company (each of the foregoing events, an "**Event of Withdrawal**") unless (a) at the time there is at least one remaining Manager and that remaining Manager carries on the business of the Company, or (b) within 90 days of such Event of Withdrawal all the remaining Members agree in writing to continue the business of the Company and to select, effective as of the date of such event, one or more successor Managers. If the Company is dissolved as the result of an Event of Withdrawal of a Manager and a failure of the Members to continue the business of the Company and appoint a successor Manager as provided in (b) above, within 120 days of such Event of Withdrawal, Members holding a majority in interest (over 50%) of the aggregate Book Capital Accounts of the outstanding Units (not including Units held by the Manager and its affiliates) may elect to reconstitute and continue the business of the Company by forming a new limited liability company (the "**Reconstituted Company**") on the same terms and provisions as set forth in this Agreement. Any such election must also provide for the election of a Manager to the Reconstituted Company. If such an election is made, all Members of the Company shall be bound thereby and continue as Members of the Reconstituted Company;

(ii) an election by the Manager in its sole discretion to terminate the Company; or

(iii) a termination required by operation of law.

Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Certificate of Formation of the Company has been cancelled and the assets of the Company have been distributed as provided herein.

**10.2 Liquidation**

10.2.1 Upon dissolution of the Company, the Manager, or liquidating trustee if one is appointed, shall:

(i) wind up the affairs of the Company and subject to the provisions of Section 10.2.2 liquidate such of the Company assets as it considers appropriate, determining in its discretion the time, manner and terms of any sale or other disposition thereof;

(ii) apply and distribute the assets to the payment of all taxes, debts and other obligations and liabilities of the Company, and the necessary expenses of liquidation; provided, however, that all debts, obligations and other liabilities of

the Company as to which personal liability exists with respect to any Member shall be satisfied, or a reserve shall be established therefor, prior to the satisfaction of any debt, obligation or other liability of the Company as to which no such personal liability exists; and, provided, further, that where a contingent debt, obligation or liability exists, a reserve, in such amount as the Manager deems reasonable and appropriate, shall be established to satisfy such contingent debt, obligation or liability, which reserve shall be distributed as provided in this Section 10.2.2 only upon the termination of such contingency;

(iii) make the allocations and adjustments to Book and Tax Capital Accounts provided in Section 3; and

(iv) apply and distribute the remaining proceeds of such liquidation to all Members in proportion to and to the extent of the positive balances in their respective Book Capital Accounts.

10.2.2 Notwithstanding the provisions of Section 10.2.1 above, if, on dissolution of the Company, the Manager or the liquidating trustee shall determine that an immediate sale of part or all of the Company's assets would cause undue loss to the Company, the Manager or the liquidating trustee may, in order to avoid such losses, either:

(i) defer the liquidation of, and withhold from distribution for a reasonable time, any assets of the Company except those necessary to satisfy debts and liabilities of the Company;

(ii) distribute to the Members, in lieu of cash, as tenants-in-common and in accordance with the provisions of Section 10.2.1 above, undivided interests in any Company assets and liquidate only such assets as are necessary in order to pay the debts and liabilities of the Company; and

(iii) distribute to the Members, in lieu of cash and in accordance with the provisions of Section 10.2.1 above, Company assets and liquidate only such assets as are necessary in order to pay the debts and liabilities of the Company (for this purpose a distribution of property other than cash shall be treated as a distribution in cash of an amount equal to the fair market value of the property (net of any liability subject to which the property is distributed) as of the date of distribution).

10.2.3 When the Manager or liquidating trustee has complied with the foregoing, the Members shall execute, acknowledge and cause to be filed an instrument evidencing the cancellation of the Certificate of Formation of the Company.

**11. Amendments**

**11.1– Permitted Amendments**. The Manager, in its sole discretion, shall have the right to amend this Agreement (other than with respect to this Section 11.1), provided that no amendment may:

(i) modify the limited liability of a Member without the consent of each such affected Member;

(ii) reduce the Capital Account of any existing Member without that Member's consent; or

(iii) adversely affect the interest (pecuniary or otherwise) of any Member without at least sufficient prior notice to permit that Member to withdraw from the Company without being affected by any such amendment.

Also, upon written notice to the Company, the Manager may amend this Agreement to increase or decrease the Management Fee, Performance Allocation and/or impose a different performance fee or allocation, without the consent of, but with prior written notice to the Company or the Members, which notice shall afford the Members who object to any increase in the Management Fee, Performance Allocation or the imposition of a different performance fee or allocation the opportunity to withdraw their Units at the next Withdrawal Date and not to have any such increase apply to their Units prior to such Withdrawal Date.

**11.2 Amendment of Certificate of Formation**. Upon amendment of this Agreement, the Certificate of Formation shall also be amended, if required, by the Act, to reflect such change.

**12. Power of Attorney**

**12.1 Appointment**. Each Member, by his execution hereof, hereby makes, constitutes and appoints the Manager as his true and lawful agent and attorney-in-fact, with full power of substitution and full power and authority in his name, place and stead, to make, execute, sign, acknowledge, swear to, record and file (i) this Agreement and any amendment to this Agreement; (ii) the original Certificate of Formation and all amendments thereto required or permitted by law or the provisions of this Agreement; (iii) all certificates and other instruments deemed advisable by the Manager to carry out the provisions of this Agreement and applicable law or to permit the Company to become or to continue as a limited liability company wherein the Members have limited liability in a jurisdiction where the Company may be doing business; (iv) all instruments that the Manager deems appropriate to reflect a change or modification of this Agreement or the Company in accordance with this Agreement, including without limitation the substitution of assignees as Members pursuant to Section 9.2 and amendments to this Agreement; (v) all conveyances and other instruments or papers deemed advisable by the Manager to effect the dissolution and termination of the Company; (vi) all fictitious or assumed name certificates required or permitted to be filed on behalf of the Company; and (vii) all other instruments or papers which may be required or permitted by law to be filed on behalf of the Company.

**12.2 Coupled with an Interest**. The foregoing power of attorney:

(i) is coupled with an interest and shall be irrevocable and survive the incompetency or bankruptcy of the Member granting the same;



MJ 0007980
CONFIDENTIAL

(ii) may be exercised by the Manager either by signing separately as attorney-in-fact for each Member or, after listing all of the Members executing an instrument, by a single signature of the Manager acting as attorney-in-fact for all of them;

(iii) shall survive the delivery of an assignment by a Member of the whole or any part of his Unit; except that, where the assignee of the whole of such Member's Unit has been approved by the Manager for admission to the Company as a substituted Member, the power of attorney of the assignor shall survive the delivery of such assignment for the sole purpose of enabling a Manager to execute, swear to, acknowledge and file any instrument necessary or appropriate to effect such substitution; and

(iv) will terminate upon the substitution of another Member in such Member's Unit in the Company or upon the complete withdrawal of such Member from the Company.

**12.3 Execution and Delivery**. Each Member shall execute and deliver to the Manager, within 5 days after receipt of the Manager's request therefor, such further designations, powers-of-attorney and other instruments as the Manager deems necessary or appropriate to carry out the terms of this Agreement.

## 13. Representations, Warranties, Covenants and Understandings of Members

The representations, warranties, covenants, and understandings of each Member, as set forth in the subscription agreement completed and signed by each Member prior to his/its admission to the Company or the making of an additional capital contribution are incorporated herein by reference and made a part hereof as if originally contained herein.

## 14. Miscellaneous

**14.1 Notice**. Notice to any Member shall be sent to such Member at his address, as such Member shall designate in writing to the Manager. Any notice to the Company or the Manager shall be sent to the address of the Manager as set forth in Section 1.4 hereto or to such other address as the Manager shall designate in writing to the Members. Each consent, notice, order and other communication required or permitted to be given under this Agreement shall be in writing, shall be effective upon the sending thereof by the Manager or, in the case of notices to the Manager, upon receipt by the Manager, and shall be delivered personally or sent by registered or certified mail, return receipt requested, or by facsimile transmission with electronic or other confirmation of receipt.

**14.2 Governing Law**. It is the intention of the Members that the internal laws of the State of Delaware, as the same may be amended from time to time, shall govern the validity of this Agreement, the construction of its terms and interpretation of the rights and duties of the Members.

**14.3 Arbitration**. In the event of any claim or controversy involving any two or more or all of the parties in connection with this Agreement, such parties shall within 45 days after

notices to all of such parties enter into good faith negotiations concerning an amicable resolsution to such claim or controversy; provided, however, if no resolution is achieved within 30 days thereafter, any claim for money damages involving any two or more or all of the parties in connection with this Agreement shall be resolved by binding arbitration on an expedited basis in Atlanta, Georgia in accordance with the then prevailing rules of the American Arbitration Association, and judgment upon any award may be entered in any court having jurisdiction thereof. There shall be three arbitrators selected within 10 days of notification to the other party or parties of the dispute being referred to arbitration; each side to any controversy, dispute, disagreement, or claim shall select an arbitrator and the two arbitrators so selected shall select the third arbitrator; provided that (i) the arbitrators shall be practicing attorneys who are members of the Georgia Bar, (ii) the arbitrators shall be knowledgeable in applicable industry standards and practices, (iii) the authority of the arbitrators shall be limited to construing and enforcing the express terms of this Agreement, and (iv) the arbitrators shall state the reasons for the award in a written opinion.

**14.4 Entire Agreement**. This Agreement, plus any other agreement referred to in Section 3.2.1 hereof which may be required to be signed by the Manager prior to a Subscription Acceptance Date, shall constitute the entire agreement between the Members with respect to the subject matter hereof, and shall supersede any prior agreement or understanding between them, oral or written, relating to the Company.

**14.5 Headings**. The headings in this Agreement are inserted for convenience of reference only and shall not be considered part of or affect this Agreement's interpretation.

**14.6 Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the respective Members hereto. For purposes of determining the rights of any Member or assignee hereunder, the Company and the Manager may rely on the Company records as to who are Members and permitted assignees, and all Members and assignees agree that the Company and the Manager, in determining such rights, shall rely on such records and that Members and assignees shall be bound by such determinations.

**14.7 Legends**. If certificates are issued evidencing a Member's Unit, each such certificate shall bear such legends as may be required by applicable federal and state laws, or as may be deemed necessary or appropriate by the Manager to reflect restrictions upon transfer contemplated herein.

**14.8 No Third Party Beneficiaries**. This Agreement is not intended and shall not convey any rights to persons not party to this Agreement.

**14.9 Counterparts**. This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**14.10 Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

**14.11 Severability.** In the event that any provision of this Agreement shall be declared invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or

enforceability of the other provisions of this Agreement, it being hereby agreed that such provisions are severable and that this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

IN WITNESS WHEREOF, the Members have executed this Agreement as of the date first written above.

Manager:

STERLING ADVISORY SERVICES, INC.

By: /s/ M. Yaqub Mirza
Name: Dr. M. Yaqub Mirza
Title: President

Additional Members:

/s/ M. Yaqub Mirza
Dr. M. Yaqub Mirza
As Authorized Agent and Attorney-In-Fact

**APPENDIX I**
**to the**
**Amended and Restated Operating Agreement**
**of**
**Sterling Stock Investments, LLC**

**Dated as of October 1, 1999**

**CLASS B UNITS**

The following additional terms shall apply to Members holding Class B Units of the Company:

**A. Additional Definitions**

(1) **"Incentive Fee"** has the meaning set forth in paragraph C of this Appendix.

(2) **"Class B Performance Allocation"** has the meaning set forth in paragraph B of this Appendix.

**B. Adjustments to Book Capital Accounts**

Class B Units shall not be subject to the Performance Allocation set forth in Section 3.6.1(v) of the Operating Agreement. Instead, the following shall apply:

At the close of each Measurement Period, 11% of the amount of the Net Capital Appreciation of each Class B Unit for such Measurement Period will be reallocated to the Manager's Book Capital Account on a Unit-by-Unit basis (**"Class B Performance Allocation"**).

**C. Fees and Expenses**

(1) The Class B Units shall not be subject to the Management Fee or any other management fee.

(2) The Manager and each Adviser will be paid an annual **"Incentive Fee"** payable as of December 31 of each Fiscal Year in an amount equal to 10% of the net profit of the Company for such fiscal year or portion thereof allocable to the Class B Units, and related to the assets of the Company which each of them manages.

**D. Withdrawals**

Notwithstanding Section 3.13.1 of the Operating Agreement to the contrary, a partial withdrawal will not be permitted if less than $200,000 would remain in the Capital Account(s) of a Member's Class B Units after the withdrawal.

**EXHIBIT B**

**SUBSCRIPTION INSTRUCTIONS**

A. ***Completion of Subscription Agreement.***

(1) **Understandings, Covenants, Representations, and Warranties**. Please read carefully pages B-1 to B-4.

(2) **Accredited Investor Certification**. Complete page B-5.

(3) **Hot Issues Questionnaire**. Complete pages B-6 to B-9.

(4) **Zakah**. Please indicate if you do not want to contribute Zakah. See page B-9.

(5) **Questionnaire(s)**:

- Individuals. Complete pages B-10 and B-11.
- Corporations, Partnerships, LLCs, Trusts or other Entities (other than Employee Benefit Plans). Complete pages B-12 and B-13.
- Employee Benefit Plans: IRAs of all types (including Roth and Conversion IRAs, SEP-IRAs, SARSEPs, and SIMPLE IRAs), Keogh Plans and ERISA covered Plans. Complete pages B-14 to B-17.

(6) **Registration Information.** Complete all information on pages B-18 and B-19.

(7) **Signature Page.** Complete and sign page B-20.

(8) **Existing Members Only**. If you are an existing Member adding to your investment you only have to complete the one page form entitled "Additional Subscription Request" (on page B-21) instead of this Subscription Agreement, if all information previously provided remains accurate.

(9) **Purchaser Representative Questionnaire**. If you are a non-Accredited Investor and have an Purchaser Representative, the Purchaser Representative must complete and execute the Purchaser Representative Questionnaire attached as Exhibit C to the Memorandum.

B. ***Payment.*** After you have completed and signed all required pages, you must decide how you will pay for your investment:

- If by check, payable to "Sterling Stock Investments, LLC"
- If by wire transfer:

The Chase Manhattan Bank
ABA# 0210-0002-1
For the account of Investec Ernst & Company
A/C #140-080-524
FBO: Sterling Stock Investments LLC
Acct# 315-20270-1-1

**SUBSCRIPTIONS SHOULD BE AT LEAST $50,000**

C. ***Delivery of Subscription Agreement and Payment.*** All documents and checks should be returned to Sterling Stock Investments, LLC c/o Saturna Capital Corporation 1300 N. State Street, Bellinghorn, WA 98225.

D. ***Questions.*** All questions should be directed to Omar Ashraf, at Sterling Advisory Services, Inc., 1020 Aviation Blvd., Gainesville, GA 30501, (770) 539-9539

## SUBSCRIPTION AGREEMENT

**Recognizing that the Company and the Manager rely on the information set forth herein, and that all such information shall be continuing and shall survive the execution of this Subscription Agreement, Subscriber makes the following declarations, covenants, representations, and warranties, and further agrees to notify the Company and the Manager if any such statement becomes incomplete or inaccurate. The Appendices attached hereto constitute a part of the Subscription Agreement.**

### APPLICATION AND DECLARATIONS

1. The undersigned subscriber ("**Subscriber**") hereby applies for a limited liability company interest ("**Unit**") in Sterling Stock Investments, LLC, a Delaware limited liability company (the "**Company**"), to reflect the subscription amount set forth below upon the terms of the Confidential Offering Memorandum dated October 1, 1999 (the "**Memorandum**"). Funds in the amount of the subscription accompany this Subscription Agreement or will be provided in a form and at a time acceptable to Sterling Advisory Services, Inc. (the "**Manager**").

2. Subscriber declares that he has carefully read, understands, and agrees to abide by the terms set forth in the Memorandum and the Amended and Restated Operating Agreement attached thereto as Exhibit A (the "**Operating Agreement**"), including without limitation, (i) the compensation arrangements, (ii) all other terms of the offering, including all risk factors, tax factors, ERISA considerations, withdrawal, transfer, and other rights, and (iii) the Manager's powers, duties and obligations. Subscriber confirms that the Company has made available to Subscriber the opportunity to ask questions of, and receive answers from, the Company concerning the Company and the terms and conditions of this offering, and to obtain any additional information which the Company had in its possession or was able to acquire without unreasonable effort or expense that was necessary to verify the accuracy of the information in the Memorandum. Terms used in this Subscription Agreement but not defined herein shall have the meanings assigned to them in the Memorandum or Operating Agreement.

3. Subscriber declares that all legal requirements necessary or appropriate in connection with the purchase of the Units have been complied with and that each person signing this Subscription Agreement has full legal authority, capacity and power to do so.

### UNDERSTANDINGS, COVENANTS, REPRESENTATIONS AND WARRANTIES.

1. Subscriber understands that this subscription, once made, is irrevocable by Subscriber, and that the Manager will advise Subscriber as soon as practicable whether this Subscription Agreement, together with all or a portion of the subscription, has been accepted or rejected and that any subscriptions may be rejected in whole or in part by the Manager in its sole and absolute discretion.

2. Subscriber understands that any checks sent to Subscriber's registered address or to any other address directed by Subscriber, or any wire transfers of the proceeds of any distributions or redemptions sent to the financial institution indicated below, will constitute payment to Subscriber and relieve the Company of any further obligation to Subscriber with respect to the amounts so paid and the Unit or portion thereof thereby redeemed, and Subscriber releases the Company from any further obligation with respect thereto. Subscriber understands that the Company may impose such procedures as it deems appropriate before it will accept any change in the registered address, the address designated herein, or the account designated below.

3. In deciding to invest in the Company, Subscriber has relied solely upon the information in the Memorandum and has not relied on oral representations or warranties, nor have any been made. Subscriber has been advised that no person is authorized to give any information or to make

any statement not contained in the Memorandum, and that any information or statement not contained therein must not be relied upon as having been authorized by the Company.

4. Subscriber understands that the offering and sale of Units are intended to be exempt from registration or qualification under the Securities Act of 1933, as amended (the **"1933 Act"**) and any applicable state securities (**"Blue Sky"**) laws and that the Company and the offering of the Units have not been approved, disapproved, or passed on by any federal or state agency or commission or by any exchange or other self-regulatory organization. Subscriber has a pre-existing substantive relationship with the Manager, its principals, employees, agents or representatives.

5. Subscriber understands and agrees that the Company is intended to be exempt from registration, and will not register, under the Investment Company Act of 1940, as amended (the **"1940 Act"**). Accordingly, Subscriber represents and warrants, except to the extent otherwise previously specifically disclosed to the Manager in writing by the Subscriber, that (i) Subscriber is, and the Unit to be held by it in the Company, will be considered to be beneficially owned by, "one person" for purposes of Section 3(c)(1) of the 1940 Act; and (ii) if an entity, Subscriber further represents and warrants that: (a) Subscriber was not formed for the purpose of investing in the Company or to permit the Company to avoid classification as an investment company under the 1940 Act; (b) Subscriber is not an "investment company" within the meaning of the 1940 Act and would not be an investment company but for the exceptions to the definitions of investment company provided by Sections 3(c)(1) or 3(c)(7) thereof; (c) the holders of equity or other beneficial interests in the Subscriber are not able to decide individually whether to participate, or the extent of their participation, in the Subscriber's investment in the Company; (d) the Subscriber is not a defined contribution plan which allows participants to determine whether or how much will be invested in investments on their behalf; (e) to the best of the Subscriber's knowledge, the Subscriber does not control, is not under common control with, or controlled by, any other investor in the Company; and (f) no persons other than the Subscriber will have a beneficial interest in the Unit to be acquired hereunder (other than as a shareholder, partner or other beneficial owner of an equity interest in the Subscriber).

6. Subscriber understands and agrees that the Units may not be offered for sale, sold, pledged, hypothecated, transferred, assigned, or otherwise disposed of (collectively **"Dispose"**), and will not Dispose or attempt to Dispose of his Unit without the prior written consent of the Manager, which consent may be granted or withheld in its sole and absolute discretion. Subscriber also understands that the Units may not be resold unless subsequently registered or unless an exemption from registration is available, and that Subscriber does not have the right to require such registration. Subscriber further understands that Rule 144 under the 1933 Act will not be available to permit resales of Units and that there is and will be no public market for the Units.

7. Subscriber affirms that (i) it meets the suitability requirements set forth in the Memorandum, (ii) the purchase of Units represents risk capital, (iii) Subscriber is able to afford an interest in a speculative venture having the risks and objectives of the Company and can sustain a loss of his entire investment, (iv) Subscriber is not precluded by law, contract or otherwise from purchasing the Units, (v) except to the extent described in item 8, the Units are being purchased by the Subscriber as principal for investment and not for resale, distribution or fractionalization in whole or in part, and (vi) Subscriber, either alone or with its financial adviser(s), is experienced in investments of this kind, is capable of evaluating the merits and risks of this investment, and, unless Subscriber has indicated otherwise on the bottom of the Accredited Investor Certifications, has not relied upon a Purchaser Representative in determining whether to invest in the Company.

8. If Subscriber is purchasing an Unit in a fiduciary capacity, all statements made herein relate to the person or entity for whom Subscriber is acting.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 11

# Part 4

9. The information provided by Subscriber on the Registration Information and each required Certification and Questionnaire is true and correct.

10. Subscriber understands that the Company may require other documentation in addition to this Subscription Agreement prior to deciding whether to accept this subscription, and Subscriber agrees to provide it, if reasonably requested.

11. Taxpayer Certification, as applicable.

(i) U.S. Citizens and Residents. Subscriber, if a U.S. citizen or resident, certifies under penalties of perjury, that: (a) the number provided by Subscriber on the Company Registration Information section of this Subscription Agreement is Subscriber's correct Social Security or taxpayer identification number (or Subscriber is waiting for a number to be issued), and (b) Subscriber is not subject to backup withholding because (x) Subscriber is exempt from backup withholding; or (y) Subscriber has not been notified by the Internal Revenue Service (**"IRS"**) that Subscriber is subject to backup withholding as a result of a failure to report all interest or dividends; or (z) the IRS has notified Subscriber that Subscriber is no longer subject to backup withholding.

(ii) Non-U.S. Citizens and Residents. Subscriber certifies under penalties of perjury that Subscriber is not a U.S. citizen or resident. Subscribers (a) who are not U.S. citizens or residents and have so indicated on the Company Registration Information section of this Subscription Agreement, and (b) who are U.S. citizens or residents and who fail to provide their correct Social Security or taxpayer identification numbers could be subject to United States withholding tax on a portion of their distributive shares of the Company's income.

12. Acceptance of Operating Agreement. Subscriber agrees that Subscriber (i) shall become a Member as of the date of entry of Subscriber's name as a Member on the books and records of the Company, and (ii) shall be bound by each and every term of the Operating Agreement.

13. Powers of Attorney

(i) Appointment.

(a) In connection with the Unit of Subscriber in the Company to be acquired pursuant to this Agreement, Subscriber hereby irrevocably constitutes and appoints the Manager the true and lawful attorney-in-fact of Subscriber in Subscriber's name, place and stead to make, execute, acknowledge, deliver and file any of the following documents: (1) the Operating Agreement and all documents permitted to be executed thereunder, and (2) to the extent consistent with the provisions of the Operating Agreement (A) all amendments and/or restatements of the Operating Agreement adopted in accordance with the provisions thereof, (B) all documents that may be required to effect the dissolution and termination of the Company pursuant to the Operating Agreement and the cancellation of the Certificate of Formation, and (C) otherwise to take any such further action as may be necessary in connection with any aspect of the operations of the Company by giving the Manager full power and authority to do and perform each and every act and thing whatever requisite and necessary to be done in and about the foregoing as fully as the undersigned might or could do if personally present, and by hereby ratifying and confirming all that the Manager shall lawfully do or cause to be done by virtue thereof.

(b) In connection with the Unit of Subscriber in the Company to be acquired pursuant to this Subscription Agreement, Subscriber hereby authorizes and appoints the Manager as its true and lawful agent and attorney-in-fact, with full power and discretionary authority in act in the Company's name, place and stead, to buy, sell, hold and trade in Securities, to enter into repurchase and reverse repurchase transactions, and to make all or any portion of the Company's trading and investment decisions, for the Company's account and risk.

(c) This foregoing powers of attorney are coupled with an interest, are irrevocable and shall survive and be unaffected by any subsequent disability, or incapacity of Subscriber (or if Subscriber is a corporation, company, trust, association, limited liability company or other legal entity, by the dissolution or termination thereof).

14. Indemnification. Subscriber agrees that it will indemnify and hold harmless the Company, the Manager and its Members, and each of their respective affiliates and their respective officers, directors and employees from and against any and all direct and consequential loss, damage, liability, cost or expense (including reasonable attorneys' and accountants' fees, whether incurred in an action between the parties hereto or otherwise) which the Company or any one of them may incur by reason of or in connection with any misrepresentation made by Subscriber or any of Subscriber's agents, any breach of any representation or warranty of Subscriber or the failure by Subscriber to fulfill any covenants or agreements under this Subscription Agreement.

15. Miscellaneous.

(i) This Subscription Agreement and the Operating Agreement represent the entire agreement of the parties with respect to the subject matter hereof and may not be changed or terminated, except in a writing signed by Subscriber and the Manager, or in the case of the Operating Agreement, in accordance with procedures for amendments as set forth therein.

(ii) No waiver by any party of any breach of any term of this Subscription Agreement shall be construed as a waiver of any subsequent breach of that term or any other term of the same or of a different nature.

(iii) This Subscription Agreement and the rights, powers, and duties set forth herein shall bind and inure to the benefit of the heirs, executors, administrators, legal representatives, successors, and assigns of the parties hereto.

(iv) This Subscription Agreement may be executed in one or more counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument.

(v) This Subscription Agreement shall be deemed to have been made under, and shall be governed by, and construed in accordance with, the internal laws of the State of New York (excluding the law thereof which requires the application of or reference to the law of any other jurisdiction).

(vi) Any claim for money damages between the parties in connection with this Subscription Agreement shall be resolved by binding arbitration on an expedited basis in Atlanta, Georgia in accordance with the then prevailing rules of the American Arbitration Association, and judgment upon any award may be entered in any court having jurisdiction thereof.

(vii) Each person signing this Subscription Agreement has the legal capacity to do so. If more than one person is signing this Subscription Agreement as Subscriber, each undertaking herein shall be a joint and several undertaking of all such persons, and the foregoing grant of power of attorney and trading and investment authorization to the Manager shall be a joint and several grant by all such persons. Actions of any one joint Subscriber pursuant to this Subscription Agreement shall bind all Subscribers. A subscription in joint names creates a joint tenancy with right of survivorship.

**ACCREDITED INVESTOR CERTIFICATION**

Subscriber hereby represents and warrants that Subscriber is an Accredited Investor because Subscriber is **[Check Applicable Sections]**:

1. ☐ An individual Subscriber whose net worth, or joint net worth with that person's spouse at the time of his purchase, exceeds $1,000,000 (including any individual participant of an IRA Subscriber or a Keogh Plan covering only self-employed individuals or a sole proprietor).
2. ☐ An individual Subscriber who had an income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and who reasonably expects an income in excess of the same income level in the current year (including any individual participant of an IRA Subscriber or a Keogh Plan covering only self-employed individuals or a sole proprietor).
3. ☐ A corporation, Massachusetts or similar business trust, a company, an LLC or an organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of making this investment, with total assets in excess of $5,000,000.
4. ☐ An entity in which all of the equity owners are Accredited Investors under Rule 501 of Regulation D under the 1933 Act ("Regulation D").
5. ☐ An employee benefit plan if the investment decision is made by a Plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, insurance company, or registered investment adviser.
6. ☐ An employee benefit plan covered by ERISA or established and maintained by a state or its political subdivisions for the benefit of its employees, in each case with total assets over $5,000,000.
7. ☐ An employee benefit plan which is completely self-directed and whose investment decisions are made by a person who is an "Accredited Investor" under Regulation D.
8. ☐ A trust with total assets in excess of $5,000,000, not formed for the specific purpose of making this investment, whose investments are directed by a person with knowledge and financial expertise in financial and business matters, as described in Rule 506(b)(2)(ii) of Regulation D.
9. ☐ A bank, savings and loan association, broker, dealer, insurance company, investment company, business development company, licensed small business investment company or private business development company (as such terms are defined under applicable sections of the 1933 Act, Securities Exchange Act of 1934, 1940 Act, Investment Advisers Act of 1940, or Small Business Investment Act of 1958).
10. ☐ The Manager or an executive officer of the Manager.
11. ☐ Other (please explain). ______________________________

______________________________

If you have not checked any of the above sections and, therefore, are not an Accredited Investor, do you have an Purchaser Representative? ☐ YES ☐ NO

If you have an Purchaser Representative, please have same complete and execute the Purchaser Representative Questionnaire attached as Exhibit C to the Memorandum.

## HOT ISSUES QUESTIONNAIRE FOR ALL SUBSCRIBERS

### Instructions

If Subscriber is an individual, all of the following questions should be answered for that person and for all persons that will have a Beneficial Interest in that person's Unit. If Subscriber is a corporation, trust, partnership, LLC or other entity, all of the following questions should be answered with respect to that entity and all individuals having a Beneficial Interest in that entity.

### Definitions

**"Account of Bona Fide Public Customers"** includes insurance company general, separate and investment accounts, and bank trust accounts.

**"Applicable Entity"** means a U.S. or non-U.S. bank, savings and loan institution, insurance company, investment company or investment adviser, and any other institutional account (including, but not limited to, hedge funds, investment partnerships, investment corporations, or investment clubs).

**"Associated Person"** means (a) a sole proprietor, limited partner, partner, officer, director, branch manager, employee or agent of a Broker-Dealer, (b) any natural person occupying a similar status or performing similar function(s) to such person, or (c) any natural person engaged in the investment banking or securities business who is, directly or indirectly, controlling or controlled by a Broker-Dealer, whether or not such person is registered with the National Association of Securities Dealers, Inc. (**"NASD"**).

**"Beneficial Interest"** includes not only direct and indirect ownership interests, but every type of direct financial interest.

**"Broker-Dealer"** means a broker or dealer as defined in the NASD's By-Laws other than a broker or dealer engaged solely in the purchase or sale of either investment company/variable contracts securities or direct participation program securities. Please note that hedge funds, investment partnerships, investment corporations, and investment clubs may be Broker-Dealers.

**"Hot Issues"** means securities of a public offering which trade at a premium in the secondary market whenever such secondary market begins.

**"Immediate Family"** includes parents, mother-in-law or father-in-law, husband or wife, brother or sister, brother-in-law or sister-in-law, son-in-law or daughter-in-law, and children. In addition, the term "Immediate Family" includes any other person who is supported, directly or indirectly, to a material extent, by a Broker-Dealer or an Associated Person.

### Questions:

1. Are you a Broker-Dealer?

☐ YES ☐ NO

2. Are you an Associated Person?

☐ YES ☐ NO

3. (a) Are you a member of the Immediate Family of an Associated Person?

☐ YES ☐ NO

IF YOUR ANSWER IS NO, PLEASE SKIP THE REST OF THIS QUESTION 3.

(b) Does such Associated Person support you directly or indirectly to a material extent?

☐ YES ☐ NO

IF YOUR ANSWER IS YES, PLEASE SKIP THE REST OF THIS QUESTION 3.

(c) Please indicate whether:

(i) any sale of Hot Issues has been or may in the future be made to the Company by an employer of such Associated Person:

☐ YES ☐ NO

(ii) such Associated Person has the ability to control the allocation of any Hot Issues that have been or may in the future be sold to the Company:

☐ YES ☐ NO

4. Are you:

(a) a senior officer of an Applicable Entity: ☐ YES ☐ NO

(b) a person in the securities department of an Applicable Entity: ☐ YES ☐ NO

(c) an employee or a person who may influence or whose activities directly or indirectly involve or are related to the function of buying or selling securities for an Applicable Entity:

☐ YES ☐ NO

(d) supported directly or indirectly, to a material extent, by any person described in clauses (a), (b), or (c) above:

☐ YES ☐ NO

5. Are you either:

(a) a finder in respect of public offerings of securities or a person acting in a fiduciary capacity to managing underwriters of public offerings of securities, including, among others, attorneys, accountants and financial consultants:

☐ YES ☐ NO

(b) supported directly or indirectly, to a material extent, by any person described in clause (a)?

☐ YES ☐ NO

6. **Additional Instructions for Question 6**:

If Subscriber is an individual, Question 6 also should be answered for any member of Subscriber's Immediate Family who supports Subscriber, directly or indirectly, to a material extent.

(a) Do you own or have you contributed capital to a Broker-Dealer, directly or indirectly?

☐ YES ☐ NO

IF YOUR ANSWER IS NO, PLEASE SKIP THE REST OF THIS QUESTION 6.

(b) Is your purchase of an Unit in the Company solely for the benefit of the Account(s) of Bona Fide Public Customers?

☐ YES ☐ NO

IF YOUR ANSWER YES, PLEASE SKIP THE REST OF THIS QUESTION 6.

(c) Is your investment in a Broker-Dealer active?

☐ YES ☐ NO

IF YOUR ANSWER IS YES, PLEASE SKIP THE REST OF THIS QUESTION 6.

(d) Does your investment in a Broker-Dealer constitute 10% or more of the equity or capital of such Broker-Dealer?

☐ YES ☐ NO

IF YOUR ANSWER IS YES, PLEASE SKIP THE REST OF THIS QUESTION 6.

(e) Are shares of the Broker-Dealer in which you have such investment, or shares of a parent of such Broker-Dealer, publicly-traded on an exchange or NASDAQ?

☐ YES ☐ NO

IF YOUR ANSWER IS YES, PLEASE SKIP THE REST OF THIS QUESTION 6.

(f) Have sales of Hot Issues been made to the Company, or may sales of Hot Issues in the future be made to the Company, by the Broker-Dealer in which you have an investment?

☐ YES ☐ NO

(g) Are you in a position by virtue of your passive ownership interest in a Broker-Dealer to direct the allocation of Hot Issues?

☐ YES ☐ NO

7. (a) Are you an employee benefits plan qualified under ERISA?

☐ YES ☐ NO

IF YOUR ANSWER IS NO, PLEASE SKIP THE REST OF THIS QUESTION 7.

(b) Are you sponsored by a Broker-Dealer?

☐ YES ☐ NO

IF YOUR ANSWER IS YES, PLEASE SKIP THE REST OF THIS QUESTION 7.

(c) Are you sponsored by a broker or dealer engaged solely in the purchase or sale of either investment company/variable contracts securities or direct participation program securities?

☐ YES ☐ NO

(d) Are you sponsored by an entity that is engaged in financial services activities, including, but not limited to, banks, insurance companies, investment advisers, or other money managers?

☐ YES ☐ NO

IF YOUR ANSWER IS NO, PLEASE SKIP THE REST OF THIS QUESTION 7.

(e) Do you permit participation by a broad class of participants and are not designed primarily for the benefit of persons restricted from purchasing Hot Issues under the NASD's conduct rules?

☐ YES ☐ NO

**SOLELY BASED ON SUBSCRIBER'S ANSWERS TO THE ABOVE QUESTIONS, THE MANAGER WILL DETERMINE WHETHER SUBSCRIBER IS A "RESTRICTED PERSON" UNDER THE CONDUCT RULES OF THE NASD CONCERNING HOT ISSUES, AND THEREFORE WILL NOT BE ALLOCATED SUBSCRIBER'S SHARE OF GAINS, LOSSES AND EXPENSES WITH RESPECT TO HOT ISSUES.**

**SUBSCRIBER AGREES TO NOTIFY THE MANAGER IMMEDIATELY IN WRITING IF THE INFORMATION CONTAINED IN THIS HOT ISSUES QUESTIONNAIRE NO LONGER IS ACCURATE.**

**ZAKAH**

Unless you check the following box, 10% of the lunar year profits (i.e., 10.3% of the annual aggregate Capital Appreciation) of Subscriber's Unit(s) will be deducted and distributed to charity as described in the Memorandum. **DO NOT DEDUCT ZAKAH** ☐

If you do not want to have Zakah distributed through ISNA, the Islamic Society of North America, please specify a qualifying charity in respect of which any Zakah related to your Unit(s) will be contributed? ☐ YES ☐ NO

If yes, please specify ____________________________________________

____________________________________________________________

## QUESTIONNAIRE FOR INDIVIDUAL SUBSCRIBERS

1. Name of Subscriber: ______________________ 2. Date of Birth: ______________

3. Occupation: ______________________________________________

4. Check below the types of investments made by you during the past 5 years for your own account, or for the account of your spouse, for any relative who has the same principal residence, or any trust, estate, corporation or organization in which you, your spouse or such relative own a majority of the beneficial or equity interests.

- ☐ U.S. government and federal agency securities
- ☐ State and local government securities
- ☐ Corporate stocks or options on corporate stocks
- ☐ Corporate bonds, debentures and notes
- ☐ Interests in mutual funds (including money market funds), unit investment trusts and closed-end investment companies
- ☐ Interests in real estate (land, buildings, cooperative apartments, condominium units)
- ☐ Interests in REITs or other real estate investment entities
- ☐ Interests in limited partnerships or LLCs
- ☐ Commodities, commodity futures contracts and/or commodity options
- ☐ Annuities
- ☐ Other investments (describe below)





MJ 0007996
CONFIDENTIAL

5. Do you make your own investment decisions?

☐ YES ☐ NO

If not, who does: ______________________________

6. Do you have prior experience in investing in private placements of restricted securities involving the payment of performance based compensation?

☐ YES ☐ NO

7. Is the aggregate investment in the Units over 10% of your net worth (exclusive of home, home furnishings and automobiles)?

☐ YES ☐ NO

If "Yes," state the approximate percentage: ______%

8. Are you subject to any civil, criminal, or other constraint or are you aware of any impediment or other reasons which may preclude or limit your participation in any Company investment?

☐ YES ☐ NO

If "Yes," please explain.

9. If you are **NOT an Accredited Investor**, please answer the following questions:

(a) What is your income (with spouse) from all sources (check appropriate range):

| | Current Year | Prior Year | Two Years Prior |
|---|---|---|---|
| Under $50,000 | ____ | ____ | ____ |
| $50,000 to $100,000 | ____ | ____ | ____ |
| $100,000 to $200,000 | ____ | ____ | ____ |
| Over $200,000 | ____ | ____ | ____ |

(b) What is your net worth as of the date of this Agreement (check appropriate range):

☐ Under $200,000 ☐ $200,001-$500,000 ☐ $500,001-$1,000,000 ☐ Over $1,000,000

**PLEASE TURN TO PAGE B-18**

**QUESTIONNAIRE FOR CORPORATIONS, PARTNERSHIPS, LIMITED LIABILITY COMPANIES, TRUSTS OR OTHER ENTITIES (EXCLUDING EMPLOYEE BENEFIT PLANS)**

1. Name of Subscriber: ____________________

2. Subscriber is (check appropriate type and provide requested information):

   ☐ Corporation (State where formed and date of incorporation): ____________________

   ____________________

   ☐ Partnership or Limited Liability Company ("LLC") (State where formed and date of Partnership or LLC Agreement):

   ____________________

   ☐ Trust (Other than an employee benefit trust) (State where formed and date of trust agreement):

   ____________________

   ☐ Other (Describe): ____________________

3. Is Subscriber's principal place of business located in the state of its formation? ☐ YES ☐ NO

If no, please identify the state in which Subscriber's principal place of business is located: ____________________

4. Do "employee benefit plan investors" (see "ERISA CONSIDERATIONS" in the Memorandum for definition) constitute 25% or more of Subscriber's net assets?

   ☐ YES ☐ NO

5. Is Subscriber subject to any regulatory or other constraints not otherwise described herein, or is the individual executing this Questionnaire on behalf of Subscriber aware of any other impediment which may preclude or limit Subscriber's participation in any potential Company investment?

   ☐ YES ☐ NO

If yes, give details. ____________________

6. Provide any additional information not specifically given in the answers to prior questions which would be helpful to the Company in evaluating whether Subscriber has sufficient knowledge and experience in financial and business matters to evaluate the merits and risks of an investment in the Units.

____________________________________________________________

____________________________________________________________

7. Does Subscriber have prior experience in investing in private placements of restricted securities involving the payment of performance based compensation?

☐ YES ☐ NO

8. Does this investment constitute over 40% of Subscriber's assets or committed capital?

☐ YES ☐ NO

9. If Subscriber is not an Accredited Investor, please provide approximate amount of Subscriber's assets as of the date of this Subscription Agreement: $__________________.

**PLEASE TURN TO PAGE B-18**

**QUESTIONNAIRE FOR EMPLOYEE BENEFIT PLANS**
**(IRAs OF ALL TYPES, KEOGH PLANS AND ERISA COVERED PLANS)**

1. Name of Subscriber ______________________________

2. Does the Subscriber have assets equal to or in excess of $5,000,000?

   ☐ YES ☐ NO

   If "No," fill in approximate amount: $____________________.

3. Does this investment exceed 10% of the Subscriber's assets?

   ☐ YES ☐ NO

4. (a) Is Subscriber an "employee benefit plan" within the meaning of Title I of ERISA (an "ERISA Plan") with a fiduciary as defined in Section 3(21) of ERISA which is a bank, insurance company or registered investment adviser (other than an affiliate of the Manager), which fiduciary will decide whether to purchase Units?

   ☐ YES ☐ NO

   If yes, give details.

   (b) Is Subscriber an employee benefit plan other than an ERISA Plan?

   ☐ YES ☐ NO

   If yes, give details concerning nature of the plan (e.g., IRA or Keogh Plans covering only self-employed individuals or a sole proprietor), whether the individual participant is an "Accredited Investor" and the identity of the person or persons making investment decisions on behalf of such plan.

   ______________________________

   ______________________________

   (c) Is Subscriber an employee benefit plan that permits participants to direct the investment of contributions made to the plan on their behalf?

   ☐ YES ☐ NO

5. Does Subscriber, or the individual participant of a self-directed plan or IRA, have prior experience in investing in private placements of restricted securities involving the payment of performance based compensation?

☐ YES ☐ NO

6. Provide any additional information which would be helpful in evaluating whether Subscriber has sufficient knowledge and experience in financial and business matters to evaluate the merits and risks of an investment in the Units.

____________________________________________

____________________________________________

7. The Investment Director of Subscriber (i.e., the Trustee(s), Custodian or Plan Investment Committee, or in the case of IRAs and other self-directed plans, the individual participant), hereby represents and warrants on behalf of the Subscriber, that the answers to the following are true. **(Please check the appropriate box in response to Items (a) - (d).)**

(a) Does the Manager or any of its employees or affiliates manage any part of Subscriber's investment portfolio on a discretionary basis?

☐ YES ☐ NO

(b) Does the Manager or any of its employees or affiliates regularly give investment advice with respect to the assets of Subscriber?

☐ YES ☐ NO

(c) Does the Manager or any of its employees or affiliates have an agreement or understanding, written or unwritten, with the Investment Director under which the latter receives information, recommendations and advice concerning investments which are used as a primary basis for Subscriber's investment decisions?

☐ YES ☐ NO

(d) Does the Manager or any of its employees or affiliates have an agreement or understanding, written or unwritten, with the Investment Director under which the latter receives individualized investment advice concerning Subscriber's assets?

☐ YES ☐ NO

**IF THE ANSWER TO ANY SECTION OF QUESTION 7 IS "YES," THE SUBSCRIPTION WILL NOT BE ACCEPTED UNLESS ALL THE REPRESENTATIONS AND WARRANTIES IN QUESTION 8 ARE TRUE AND CORRECT.**

8. The Investment Director of Subscriber hereby represents and warrants the following on behalf of Subscriber:

(a) Though a representative of the Manager may have provided Subscriber's Investment Director with a copy of the Memorandum, the Investment Director, who is independent of the Manager and its affiliates, has studied the Memorandum and has made an independent decision to purchase Unit(s) solely on the basis of such Memorandum and without reliance on any other information or statements as to the appropriateness of this investment for Subscriber.

(b) All the obligations and requirements of ERISA, including prudence and diversification, with respect to the investment of "plan assets" have been considered.

(c) Subscriber understands that neither the Manager nor any of its directors, officers, employees or other affiliates: (i) have exercised any investment discretion or control with respect to Subscriber's purchase of any Units; (ii) have authority, responsibility to give, or have given individualized investment advice with respect to Subscriber's purchase of any Unit; or (iii) are employers maintaining or contributing to such Plan.

(d) This investment conforms in all respects to the governing documents of Subscriber.

(e) The person executing this Subscription Agreement on behalf of Subscriber is a "fiduciary" of such Plan and trust and/or custodial account (within the meaning of Section 3(21)(A) of ERISA and/or Section 4975(e)(3) of the Code) and is authorized to execute this Subscription Agreement; the execution and delivery of this Subscription Agreement with respect to Subscriber and trust and/or custodial account have been duly authorized in accordance with the provisions of Subscriber's governing documents; this investment conforms in all respects to laws applicable to Subscriber and conforms to, and is permitted by, Subscriber's governing documents; and, in making this investment, Subscriber is aware of, and has taken into consideration, among other things, risk return factors and the anticipated effect of this investment on the diversification, liquidity and cash flow needs of Subscriber and the projected effect of the investment in meeting Subscriber's funding objectives and has concluded that this investment is a prudent one.

(f) Subscriber has carefully read the section of the Memorandum entitled "ERISA CONSIDERATIONS" and "INCOME TAX ASPECTS" and fully understands the tax considerations and risks discussed therein.

(g) Subscriber understands that the Manager is a fiduciary only with respect to Subscriber's investment in the Company and any other investment advisory account of Subscriber managed by the Manager and that the Manager does not have any responsibilities with respect to any other assets of Subscriber. Except as may otherwise be specifically required by ERISA, the Manager shall not be responsible for any loss incurred by reason of any act or omission of any dealer or broker, or the undersigned, Subscriber or any custodian, or any other fiduciary of Subscriber. Except as otherwise required by ERISA or any other applicable law, neither the Manager nor any of its directors, officers, employees or other affiliates shall be liable for any action taken or omitted by them in good faith. In addition, the Manager shall be entitled to acquire insurance against any liability relating to the Manager's activities with respect to the Company and the cost of such insurance shall be borne by the Company. Subscriber further agrees to cause the Manager to be covered while Subscriber owns an interest in the Company under Subscriber's ERISA Section 412 fidelity bond.

(h) Subscriber's governing documents do not prohibit the Company from investing in specific securities or issues, including, but not limited to, securities which would be deemed to be "employer securities" with respect to Subscriber as defined in Section 407 of ERISA.

(i) Subscriber's proxy voting guidelines do not apply to securities held by the Company. Subscriber acknowledges that guidelines for proxy voting for Subscriber will be governed by the Operating Agreement.

**PLEASE TURN TO PAGE B-18**

## REGISTRATION INFORMATION

| (Subscriber Name(s)) | (Class of Units) | $ (Subscription Amount) |
|---|---|---|
| (Street Address) | (City) | (State/Country) |
| (Telephone and Facsimile Numbers) | | (e-mail – Optional) |

The full address to which any ☐ communications, ☐ distribution checks, ☐ redemption checks, **[check applicable boxes]**, should be sent (if different from registered address furnished in response to the preceding requirement) is:

**(Name(s))**

| (Street Address) | (City) | (State/Country) |
|---|---|---|
| (Telephone and Facsimile Numbers) | | (e-mail – Optional) |

If the proceeds of distributions or redemptions, if any, are to be wired rather than sent by check, the account to which such proceeds should be wired is:

**(Name of Financial Institution)**

**(Routing ABA Number—if a Bank)**

**(Address of Financial Institution)**

**(Financial Institution Account Name and Number)**

**U.S. Citizen or Resident** ☐YES ☐NO

Social Security No./EIN (Entity)

**Existing Member** ☐YES ☐NO

Plan Number (if applicable)

**(Copy Number of Confidential Offering Memorandum)**

**REGISTRATION INFORMATION (CONT'D)**

**ATTORNEY INFORMATION:**

______________________________________________
**(Subscriber's Attorney's Name)** **(Attention:)**

______________________________________________
**(Street Address)** **(City)** **(State/Country)**

______________________________________________
**(Telephone and Facsimile Numbers)** **(e-mail – Optional)**

**May the Company contact your attorney?** ☐YES ☐NO

**Upon your attorney's direct request, may the Company provide information to your attorney?** ☐YES ☐NO

**ACCOUNTANT INFORMATION:**

______________________________________________
**(Subscriber's Accountant's Name)** **(Attention:)**

______________________________________________
**(Street Address)** **(City)** **(State/Country)**

______________________________________________
**(Telephone and Facsimile Numbers)** **(e-mail – Optional)**

**May the Company contact your accountant?** ☐YES ☐NO

**Upon your accountant's direct request, may the Company provide information to your accountant?** ☐YES ☐NO



MJ 0008005
CONFIDENTIAL

## SIGNATURE PAGE

**INDIVIDUAL(S):**

________________________________________
(Print Name of Subscriber)

________________________________________ Dated: ________________
(Signature of Subscriber)

________________________________________
(Print Name of Co-Subscriber)

________________________________________ Dated: ________________
(Signature of Co-Subscriber)

**ENTITIES (other than Plans) :**

________________________________________
(Print Name of Subscriber)

By: ______________________________________ Dated: ________________
(Signature of Authorized Signatory)

________________________________________
(Print Name and Title of Signatory)

By: ______________________________________ Dated: ________________
(Signature of Required Authorized Co-Signatory)

________________________________________
(Print Name and Title of Co-Signatory)

**EMPLOYEE BENEFIT PLANS:**

________________________________________ Dated: ________________
(Print Name of Subscriber) (Print Name)

________________________________________ Dated: ________________
(Signature of Individual Plan Participant) (Print Name)

________________________________________ Dated: ________________
(Signature of Custodian or Trustee) (Print Name)

________________________________________ Dated: ________________
(Signature of Other Authorized Signatory) (Print Name)

---

**FOR USE BY COMPANY ONLY**

Subscription has been: ☐ Accepted ☐ Accepted in Part ☐ Rejected ☐ Other

Subscription Amount: $________________________________________

Dated: ________________________________________

**EXHIBIT BB**

**STERLING STOCK INVESTMENTS, LLC**
**CLASS B UNIT SUPPLEMENT TO**
**SUBSCRIBTION AGREMEENT**

**Instructions**

**Completion And Execution**.This Supplement constitutes a part of the Subsciption Agrrement to Sterling Stock Investments, LLC and must be completed and signed.

**Delivery**. This Supplement along with the Subscription Agreement, must be delivered to:

Sterling Stock Investments, LLC
c/o Saturna Capital Corporation
1300 N. State Street
Bellinghorn, WA 98225
Tel: (360) 734-9900
Fax: (360) 734-0755

## QUALIFIED CLIENT CERTIFICATION

1. Subscriber hereby represents and warrants that it is (check one—if the Subscriber does not fall within any of (a), (b) or (c) of this Question 1, please explain why in the space provided at the bottom of this page):

☐ (a) a natural person;

☐ (b) a corporation, partnership, association, joint-stock company, trust, or any organized group of persons, whether incorporated or not, which does not rely on Section 3(c)(1) of the 1940 Act to avoid being deemed an investment company, is not a small business development company as defined in Section 202(a)(22) of the Advisers Act, and is not registered or required to be registered as an investment company under the 1940 Act;

☐ (c) not a resident of the United States.

IF YOU CHECKED BOX (a) TO QUESTION 1, PLEASE COMPLETE QUESTION 2 BELOW. IF YOU CHECKED BOX (b) IN QUESTION 1, PLEASE COMPLETE QUESTION 3 BELOW.

2. COMPLETE ONLY IF YOU CHECKED BOX (a) OR (b) OF QUESTION 1 ABOVE. Subscriber hereby represents and warrants that (check applicable boxes):

☐ (a) its net worth (which, for a natural person, can include assets held jointly with a spouse) exceeds $1,500,000; or

☐ (b) it is a qualified purchaser within the meaning of Section 2(a)(51)(A) of the 1940 Act (see page BB-3-4 for the definition); or

☐ (c) it has invested, or is obligating itself hereby to invest, at least $750,000 in the Company.

3. COMPLETE ONLY IF YOU CHECKED BOX (b) OF QUESTION 1 ABOVE. Subscriber hereby represents and warrants that (check one):

☐ (a) each of its equity owners (i) has a net worth (which, for a natural person, can include assets held jointly with a spouse) which exceeds $1,500,000; or (ii) has an investment of at least $750,000 in the Company; or (iii) is a qualified purchaser within the meaning of Section 2(a)(51)(A) of the 1940 Act (see page BB-3-4 for definition); or

☐ (b) it has the ability to, and does, allocate charges for performance fees so that its equity owners which do not meet 3(a)(i), (ii) or (iii) above are not charged a performance fee.

Exceptions or further explanations to 1, 2 or 3 above:______________________________________________

________________________________________________________________________________

**A Qualified Purchaser means:**

(a) A natural person who owns at least $5,000,000 in investments, including investments (i) held in an IRA or similar account, the investments of which are directed by and held for the benefit of such person, (ii) held jointly with a spouse, or (iii) in which such person shares a community property or similar shared ownership interest with a spouse. (Spouses who subscribe jointly for Units may combine their investments for purposes of meeting the $5,000,000 threshold, whether or not the investments are held jointly or individually);

(b) An entity directly or indirectly owned entirely by two or more closely-related natural persons, their estates or foundations, charities or trusts formed by or for their benefit (a "Family Company") that owns at least $5,000,000 in investments;

(c) Trust not formed for the specific purpose of acquiring the Units, so long as both the persons with decision-making power for the trust and each of the contributors to the trust is a "Qualified Purchaser"; or

(d) Any other person acting for his own account or the accounts of other "Qualified Purchasers" that in the aggregate owns and invests on a discretionary basis at least $25,000,000 in investments, <u>excluding</u> (i) a private investment fund in existence on April 30, 1996, unless each beneficial owner in the fund on April 30, 1996 that is currently a beneficial owner has consented to the fund's status as a "Qualified Purchaser" permitted to invest in a category of investment pools that would include the Company, (ii) an entity formed for the purpose of acquiring the Units, unless each beneficial owner in the entity is a "Qualified Purchaser," and (iii) a pension or other employee benefit plan which allows its beneficiaries to direct the investments of the plan.

**Definition of "Investments" for Qualified Purchaser:**

(a) <u>Securities</u> (as defined in Section 2(1) of the 1933 Act) other than the securities of an issuer that controls, is controlled by, or is under common control with, the person that owns such securities, unless the issuer is: (i) a private investment company or a commodity pool, or (ii) a public company that complies with reporting obligations under U.S. securities laws or that has a class of securities listed on a securities exchange outside of the U.S., or (iii) a company with shareholders' equity of $50,000,000 or more (as reflected on financial statements determined in accordance with U.S. GAAP that are prepared within 16 months of the date the Units are acquired).

(b) <u>Real Estate held for investment purposes</u>. Real estate is not considered to be held for investment purposes if it is used as a place of business or in connection with the conduct of a trade or business of such person or a Related Person of the owner, or if it is used for personal or residential purposes unless deductible under section 280A of the Internal Revenue Code. "Related Person" means a person who is related to another person as a sibling, spouse, or former spouse, or is a direct lineal descendant or ancestor by birth or adoption of such person, or is a spouse of such descendant, provided that in the case of a Family Company, a Related Person includes any owner of the Family Company and any person who is a Related Person of such owner.

(c) Commodity Interests, Physical Commodities, and Financial Contracts held for investment purposes. (e.g., as futures, forwards and options thereon, physical gold, silver, etc. and swap agreements).

(d) Cash and Cash Equivalents (including foreign currencies) held for investment purposes. (such as bank deposits, certificates of deposit, bankers acceptances and the net cash surrender value of an insurance policy).

**Assets Excluded from the Definition of "Investments":**

Specifically excluded from the definition of "investments" are other assets which may be held for investment purposes, such as jewelry, artwork, antiques or other collectibles.

**How To Value Investments:**

Investments may be valued at their fair market value on the most recent practicable date or at their cost. In either case, the value of "Investments" is reduced by the amounts specified below in (a) and (b).

(a) Deductions: General. The value of a person's investments must be reduced by the amount of any outstanding indebtedness incurred to acquire the investments.

(b) Deductions: Family Companies. There shall also be deducted from the value of a Family Company's investments any outstanding indebtedness incurred by an owner of the Family Company to acquire such investments.

**Special Valuation Considerations:**

(a) Corporate Investments. For purposes of determining the amount of investments owned by a corporation ("Corporation"), there may be included investments owned by majority-owned subsidiaries of the Corporation ("Subsidiaries") and investments owned by a company ("Parent Company") of which the Corporation is a majority-owned subsidiary, or by a majority-owned subsidiary of the Corporation and other majority-owned subsidiaries of the Parent Company.

(b) Commodity Interests. The value of Commodity Interests shall be the value of the initial margin or option premium deposited in connection with each Commodity Interest.

(c) Private Investment Companies and Commodity Pools. Amounts of unfunded capital commitments to these entities are included in such entities' investments.

## SIGNATURE PAGE

**INDIVIDUAL(S):**

______________________________
(Print Name of Subscriber)

______________________________ Dated: ______________
(Signature of Subscriber)

______________________________
(Print Name of Co-Subscriber)

______________________________ Dated: ______________
(Signature of Co-Subscriber)

**ENTITIES:**

______________________________
(Print Name of Subscriber)

By: ______________________________ Dated: ______________
(Signature of Authorized Signatory)

______________________________
(Print Name and Title of Signatory)

By: ______________________________ Dated: ______________
(Signature of Required Authorized Co-Signatory)

______________________________
(Print Name and Title of Co-Signatory)

**EMPLOYEE BENEFIT PLANS:**

______________________________ Dated: ______________
(Print Name of Subscriber) (Print Name)

______________________________ Dated: ______________
(Signature of Individual Plan Participant) (Print Name)

______________________________ Dated: ______________
(Signature of Custodian or Trustee) (Print Name)

______________________________ Dated: ______________
(Signature of Other Authorized Signatory) (Print Name)

**EXHIBIT C**

(Subscribers do not fill out this form)

**STERLING STOCK INVESTMENTS, LLC**

**PURCHASER REPRESENTATIVE QUESTIONNAIRE**

INSTRUCTIONS: This Questionnaire must be completed by each person who has been designated as a Purchaser Representative by a Subscriber to Sterling Stock Investments, LLC (the "**Company**") in Subscriber's Subscription Agreement. The limited liability company units (the "**Units**") being offered will not be registered under the Securities Act of 1933 (the "**1933 Act**"), in reliance upon the exemption from registration provided in Section 4(2) of the 1933 Act. The Company must be reasonably satisfied that a Purchaser Representative meets certain standards in order that Subscriber meets the requirements of such exemption. Purchaser Representatives should not be an affiliate, manager, officer or other employee of the Company or any of its affiliates, or the beneficial owner of 10% or more of any equity interest in the Company, except under certain specified circumstances, and the Purchaser Representative should have such knowledge and experience in financial and business matters that he, either alone, or together with other Purchaser Representatives, or Subscriber, is capable of evaluating the merits and risks of the prospective investment. The purpose of this Questionnaire is to assure the Company that you meet the standards applicable to Purchaser Representatives.

Your answers will at all times be kept strictly confidential. However, it may be necessary for the Company to investigate the information contained in this Questionnaire to establish your qualifications. Furthermore, the Company may present the Questionnaire to certain parties, such as legal counsel, to establish, under the 1933 Act, the availability of an exemption from registration of the Units. By signing this Questionnaire, you agree to and authorize such investigation and procedures.

Terms used in this Purchaser Representative Questionnaire but not defined herein shall have the meanings given to them in the Company's Confidential Offering Memorandum.

Relating to ______________________________ ______________________________

Name of Offeree                    Memorandum No.

If the answer to any question is "None" or "Not Applicable", please so state. Please complete, sign, date and return one copy of this Questionnaire to Sterling Advisory Services, Inc, as soon as possible. If you have any questions about any of the items in this form, please contact Mr. Omar Ashraf at Sterling Advisory Services, Inc., 1020 Aviation Blvd., Gainesville, GA 30501, (770) 539-9539.

______________________________________________________________________

(Please Print or Type)

Name of Prospective Subscriber(s):

______________________________________________________________________

Address:______________________________________________________________

______________________________________________________________________

1. Name of Purchaser Representative:___________________________________

   Business Address:_______________________________________________

   Phone:_________________________________________________________

2. Present occupation or position, indicating period of such practice or employment and field of professional specialization, if any:______________________________

______________________________________________________________________

______________________________________________________________________

3. Describe briefly all positions held during the past ten years related to business and financial matters:__________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

4. List any college, business or professional education, indicating degrees received, if any:

________________________________________

________________________________________

5. List any professional licenses or registrations (including bar admissions, accounting certifications, SEC or state broker/dealer registrations) held by you:

________________________________________

________________________________________

6. Have you had prior experience in advising clients with respect to investments of this type?

☐ YES ☐ NO Explain:______________________________

________________________________________

________________________________________

7. A Purchaser Representative is required to have such knowledge and experience in financial and business matters that he is capable, either alone or together with other Purchaser Representatives or the prospective subscriber (the "Prospective Subscriber") who has named you as his Purchaser Representative, of evaluating the merits and risks of the prospective investment. Please provide below all information which demonstrates your ability to meet this requirement. This should include a detailed description of any professional, business, financial or investment experience which enables you to evaluate the merits and risks of an investment in the Company. (You may refer to answers to other questions as part of your response to this question):

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

8. State how long you have know the Prospective Subscriber and in what capacity:

______________________________________________

______________________________________________

9. For purposes of this Questionnaire, the term "affiliate" of a person means a person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such person. For the purposes of this Questionnaire, the term "material" when used to modify "relationship" means any relationship that a reasonable person might consider important in the making of the decision whether to acknowledge a person as his Purchaser Representative. Except as set forth in subparagraph (a) below, neither I nor any of my affiliates have any material relationship with the Company, its officers and manager, or any of their affiliates; no such material relationship has existed at any time during the previous two years, and no such material relationship is mutually understood to be contemplated:

(a)______________________________________________

______________________________________________

______________________________________________

(b) If a material relationship is disclosed in subparagraph (a) above, indicate the amount of compensation received or to be received as a result of such relationship:__________

______________________________________________

______________________________________________

10. (a) Please state whether you are an affiliate, manager, officer or other employee of the Company or of any of the Company's affiliates, or the beneficial owner of 10% or more of any class of equity securities or 10% or more of the equity interest in any of the Company's affiliates:

☐ YES ☐ NO If "Yes", state the relationship:

______________________________________________

______________________________________________

(b) Is the Prospective Subscriber (i) any person related to you by blood, marriage or adoption, not more remote than a first cousin; or (ii) any trust or estate in which you or anyone related to you pursuant to (i) or (iii) hereof collectively have more than 50% of the beneficial interest (excluding contingent interest) or of which you serve as trustee, executor or in any similar capacity; or (iii) a corporation or other entity of which you or anyone related to you pursuant to (i) or (ii) hereof collectively are the beneficial owners of more than 50% of the equity securities (excluding directors' qualifying shares) or equity interests?

☐ YES ☐ NO If "Yes", state the relationship:

____________________________________________________________

____________________________________________________________

11. In advising the Prospective Subscriber in connection with his prospective investment in the Company, I will be relying in part on the Prospective Subscriber's own expertise in certain areas.

☐ YES ☐ NO Explain:________________________________________

____________________________________________________________

____________________________________________________________

12. In advising the Prospective Subscriber in connection with his prospective investment in the Company, I will be relying in part on the expertise of an additional Purchase Representative or Representatives.

☐ YES ☐ NO

If "Yes", explain and give the name and address of such additional representative or representatives:____________________________________________

____________________________________________________________

____________________________________________________________

In furnishing the above information I acknowledge that the Company will be relying thereon in determining, among other things, whether there are reasonable grounds to believe that I qualify as a Purchaser Representative for the purpose of the investment to which this Questionnaire relates.

I therefore represent and warrant to the Company as follows:

(1) I am acting as Purchaser Representative for the Prospective Subscriber in connection with his prospective investment in the Company;

(2) I will notify the Company immediately of any material change in any statement made herein occurring prior to the time of closing of the purchase of the Company's Units by the Prospective Subscriber;

(3) I have disclosed (or will disclose) to the Prospective Subscriber in writing prior to the Prospective Subscriber's acknowledgment of me as his Purchaser Representative, any material relationship with the Company, or its affiliates, and any compensation therefor, as disclosed in my answer to question number 9 above; and

(4) The information supplied by me in this Questionnaire is true and correct in its entirety.

IN WITNESS WHEREOF, I have executed this Questionnaire on date below written.

Dated: ____________

______________________________
(Signature of Purchaser Representative)

______________________________
(Name of Purchaser Representative)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 12

OPTION AGREEMENT

THIS OPTION AGREEMENT (the "Agreement") is dated as of this 15th day of October, 1990 and is between Mar Jac Investments, Inc., a Delaware corporation, or its assigns, as grantee ("Grantee"), and Mar-Jac, Inc., a Delaware corporation, as grantor ("Grantor").

The parties hereto agree as follows:

1. In consideration for the payment by Grantee to Grantor of the option price of One Thousand Dollars ($1,000) on even date herewith by cashier's or certified check or wire transfer of funds, and subject to the terms and conditions set forth in this Agreement, Grantor hereby grants to Grantee an option (the "Option") to purchase from Grantor one thousand (1,000) shares of common stock (hereinafter the "Stock") of Grove Corporate Plaza, Inc., a Delaware corporation (the "Corporation"), such number of shares being one hundred percent (100%) of the total number of issued and outstanding shares of common stock in the Corporation.

2. The term of this Option (the "Term") shall be two (2) years from the date hereof; provided, however, that Grantee may extend the Term as herein provided and the extended term shall be deemed the Term for all purposes herein. To extend the Term, Grantee must notify Grantor in writing of its desire to extend the Term and must tender payment by certified or cashier's check or wire transfer of funds of One Thousand Dollars ($1,000) (the "Extension Price") to Grantor in consideration of Grantor's agreement to extend the Term. Such notice and Extension Price

must be received by the end of the Term to be effective. Upon proper exercise of the extension right described above (the "Extension Right"), the first two (2) year Term (hereinafter sometimes the "Initial Term") shall be extended for two (2) additional consecutive years commencing on the day after the last day of the Initial Term. Grantee shall have four (4) such consecutive Extension Rights; provided, however, that should Grantee fail to exercise its Extension Right by payment of the Extension Price and written notice given by the end of the Initial Term or by the end of any extension thereof, this Option shall automatically terminate and the parties shall have no further obligations to each other under this Agreement.

3. In order to exercise the Option, Grantee must notify Grantor in writing during the Term hereof of its election to acquire the Stock pursuant to the Option and of the date on which it will consummate the acquisition, which date (the "Settlement Date") must occur within the year following the date of the notice. Should Grantee not give Grantor written notice of its election to exercise the Option designating a Settlement Date by the end of the Term, the Option shall automatically terminate and the parties shall have no further obligations to each other under this Agreement.

4. The sale of the Stock shall be consummated on the Settlement Date by delivery from Grantor to Grantee of a stock power duly executed in proper form for transfer with the certificate(s) representing and evidencing the Stock attached

thereto. The purchase price to be paid by Grantee for the Stock (the "Purchase Price") is to be One Thousand Dollars ($1,000), to be paid by wire transfer of funds or by certified or cashier's check on the Settlement Date.

5. Grantor represents and warrants to Grantee that: (i) as of the date hereof Grantor owns the Stock free and clear of all liens and encumbrances of any kind, (ii) Grantor will not, without the prior written consent of Grantee, cause or permit any liens or encumbrances to be placed upon any of the Stock or transfer or dispose of any of the Stock during the Term of this Agreement, and (iii) Grantor will not, without the prior written consent of Grantee, issue any new stock or grant any rights to acquire stock in the Corporation during the Term.

6. Upon exercise of the Option and completion of the sale of the Stock pursuant to the Option, Grantor agrees to cooperate with Grantee in causing the Corporation to issue a new share certificate representing and evidencing Grantee's ownership of the Stock and in causing the Corporation to record the transfer of the Stock to Grantee on the books and records of the Corporation.

7. Subject to the terms and conditions hereof, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement is freely assignable by Grantee.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written.

GRANTOR:

ATTEST/WITNESS:

MAR-JAC, INC.

By: _______________
Name: JAMAL BARZINJI
Title: President

GRANTEE:

ATTEST/WITNESS:

MAR JAC INVESTMENTS, INC.

By: _______________
Name: M. YAQUB MIRZA
Title: Exe V. P.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written.

GRANTOR:

ATTEST/WITNESS:

MAR-JAC, INC.

By: [signature]
Name: JAMAL BARZINJI
Title: President

GRANTEE:

ATTEST/WITNESS:

MAR JAC INVESTMENTS, INC.

By: [signature]
Name: M. YAQUB MIRZA
Title: Exe V. P.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 13

**Maryland Department of Assessments and Taxation**

**Taxpayer Services Division**
301 West Preston Street Baltimore, MD 21201 (2007 vw5.1)



**Taxpayer Services Division**

**Entity Name: MENA CORPORATION**
**Dept ID #: D01394444**

**General Information** **Amendments** **Personal Property** **Certificate of Status**

| | |
|---|---|
| **Principal Office (Current):** | FAKHRI M. AL-BARZINJI<br>6516 GREENFIELD CT.<br>LANHAM, MD 20706 |
| **Resident Agent (Current):** | FAKHRI M. AL-BARZINJI<br>6516 GREENFIELD CT.<br>LANHAM, MD 20706 |
| **Status:** | DISSOLVED |
| **Good Standing:** | No |
| **Business Code:** | Ordinary Business - Stock |
| **Date of Formation or Registration:** | 05/11/1982 |
| **State of Formation:** | MD |
| **Stock/Nonstock:** | Stock |
| **Close/Not Close:** | Unknown |

**Link Definition**

| | |
|---|---|
| **General Information** | General information about this entity |
| **Amendments** | Original and subsequent documents filed |
| **Personal Property** | Personal Property Return Filing Information and Property Assessments |
| **Certificate of Status** | Get a Certificate of Good Standing for this entity |

# CORPORATE CHARTER APPROVAL SHEET

**** KEEP WITH DOCUMENT ****

DOCUMENT CODE 19 BUSINESS CODE ______

# D01394444

Close ______ Stock ______ Nonstock ______

P.A. ______ Religious ______

Merging (Transferor) ______

1000361988679738

ID # D01394444 ACK # 1000361988679738
LIBER: B00546 FOLIO: 0066 PAGES: 0003
MENA CORPORATION

Surviving (Transferee) ______

07/18/2003 AT 02:45 P WO # 0000698917

New Name ______

FEES REMITTED

Base Fee: 50
Org. & Cap. Fee: ______
Expedite Fee: ______
Penalty: ______
State Recordation Tax: ______
State Transfer Tax: ______
______ Certified Copies
Copy Fee: ______
______ Certificates
Certificate of Status Fee: ______
Personal Property Filings: ______
Other: ______

TOTAL FEES: 50

______ Change of Name
______ Change of Principal Office
______ Change of Resident Agent
______ Change of Resident Agent Address
______ Resignation of Resident Agent
______ Designation of Resident Agent and Resident Agent's Address
______ Change of Business Code

______ Adoption of Assumed Name

______ Other Change(s)

Credit Card ______ Check X Cash ______

______ Documents on ______ Checks

Approved By: 6

Keyed By: ______

COMMENT(S): Accept w/ old fees, w/o Dec? ffff[illegible] due to earlier attempted filings

Code ______

Attention: ______

Mail to Address: Mena Corporation
555 Grove St Ste 114
Herndon, VA
20170

CUST ID:0001057005
WORK ORDER:0000698917
DATE:02-10-2003 03:21 PM
AMT. PAID:$50.00

ARTICLES OF DISSOLUTION
Of
MENA CORPORATION

2003 JUL 18 P 2:45

**FIRST:** The name of the corporation is MENA CORPORATION.

**SECOND:** The address of the principal office of the corporation is 6516 GREENFIELD CT., LANHAM, MD 20706.

**THIRD:** the resident agent of the corporation who shall serve for one year after dissolution and until the affairs of the corporation are wound up is FAKHRI AL-BARZINJI, whose address is 6516 GREENFIELD CT., LANHAM, MD 20706.

**FOURTH:** The name and address of each of the directors is as follows:

| | |
|---|---|
| JAMAL BARZINJI | 11919 SAFA COURT, HERNDON, VA 20170 |
| HISHAM ALTALIB | 11776 STRATFORD HOUSE PLACE, APT 1403 RESTON, VA 20190 |
| M. YAQUB MIRZA | 11922 SAFA COURT, HERNDON, VA 20170 |

**FIFTH:** The name, title and street address of each of the officers is as follows:

| | |
|---|---|
| JAMAL BARZINJI President | 11919 SAFA COURT HERNDON, VA 20170 |
| HISHAM ALTALIB Treasurer | 11776 STRATFORD HOUSE PLACE, APT 1403 RESTON, VA 20190 |
| M. YAQUB MIRZA Vice President/ Secretary | 11922 SAFA COURT, HERNDON, VA 20170 |

**SIXTH:** The dissolution of the corporation was approved in the manner and by the vote required by law and by the charter of the corporation. The dissolution of the corporation was duly authorized by unanimous written consent of the board of directors and stockholders of the corporation.

**SEVENTH:** The corporation has no known creditors.

**EIGHTH:** The corporation is dissolved.

The undersigned, President, certify under the penalties of perjury that to the best of my knowledge, information and belief, the matters and facts set forth in these Articles of Dissolution with respect to the approval thereof are true in all material respects.

**ATTEST:**

Secretary of Corporation

President of Corporation

I hereby consent to my designation in this document as resident agent for this corporation.

SIGNED:

FAKHRI AL-BARZINJI

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 14

MENA CORP.

**To:** Mr. Mahmoud Mohamed
Mar-Jac, Inc.

**From:** M. Yaqub Mirza

**Date:** October 8, 1996

---

We wish to inform you that as of September 19, 1996 Mena Corporation has sold its shares in Mar-Jac, Inc. and entire interest in the promissory note issued by Mar-Jac Poultry, Inc. on October 15, 1990 in the amount of $400,000 to Mena Investments, Inc.

Kindly make all payments due after September 19, 1996 to Mena Investments, Inc.

Thank you.

Sincerely,

M. Yaqub Mirza

4411 41st Street • Brentwood, Maryland 20722 • Tel: (301) 779-7774 / Fax: (301) 779-0570

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAR-JAC POULTRY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>RITA KATZ, et al.,<br><br>Defendants. | **TO BE FILED UNDER SEAL**<br><br>Case No. 03-2422 (RMC) |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 15

**SAFA TRUST, INC.**
555 GROVE STREET, SUITE 230
HERNDON, VA. 22070

1221

NOVEMBER 14, 1990

68-424/560 072

PAY TO THE ORDER OF MARJAC POULTRY INC.****************************************************** $ 500,000.00

FIVE HUNDRED THOUSAND DOLLARS ONLY***************************************************** DOLLARS

1ST AMERICAN
FIRST AMERICAN BANK OF VIRGINIA
McLEAN, VIRGINIA 22102

FOR LOAN

⑈0000 1221⑈ ⑆056004241⑆ 07128347⑈

---

**MENA CORPORATION**
(301) 779-7774
4411 41ST ST
BRENTWOOD MD 20722

201

Nov 10 19 90

7-16/520

PAY TO THE ORDER OF Mar Jac Poultry Inc $ 400,000.00

four hundred thousand ——— DOLLARS

THIS CHECK IS DELIVERED IN CONNECTION WITH THE FOLLOWING ACCOUNT(S)

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Loan

CHEVERLY OFFICE
MARYLAND NATIONAL BANK
HYATTSVILLE, MARYLAND 20781

⑈000201⑈ ⑆052000168⑆ 05352004 71⑈

RECEIVED
NOV 15 1990

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | TO BE FILED UNDER SEAL |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA

# EXHIBIT 16

97174825
05/16/1997

# 1997 ANNUAL REPORT

COMMONWEALTH OF VIRGINIA
STATE CORPORATION COMMISSION

1 CORPORATION NAME:
MENA INVESTMENTS, INC.

CORPORATION ID: 0471380-6

2 REGISTERED AGENT: DIR.
M YAQUB MIRZA
555 GROVE ST
HERNDON VA 20170-4705

3 CITY OR COUNTY OF VA REGISTERED OFFICE:
129 - FAIRFAX COUNTY

4 STATE OR COUNTRY OF INCORPORATION:
VA - VIRGINIA

5 STOCK INFORMATION:

| CLASS | AUTHORIZED |
|---|---|
| COMMON | 1,000 |

6 ADDRESS OF CORPORATION'S PRINCIPAL OFFICE:
,

**PLEASE READ THE INSTRUCTION SHEET CAREFULLY AND TYPE OR PRINT WITH BLACK INK ONLY. THIS REPORT MUST BE SIGNED BY AN OFFICER OR DIRECTOR.**

7 ADD / CHANGES TO PRINCIPAL OFFICE ADDRESS:

STREET 555 GROVE STREET

CITY HERNDON, STATE VA

CORP PHONE # 703-471-9494 ZIP 20170 4705

8 PRINCIPAL OFFICER OR DIRECTOR:

NO CHANGE CHANGE X REMOVE ENTIRE NAME/ADDRESS

Officer Director

CHANGES TO PRINCIPAL OFFICER OR DIRECTOR NAME/ADDRESS:

FIRST NAME JAMAL

MIDDLE NAME

LAST NAME BARZINJI

TITLE PRESIDENT/DIRECTOR OFFICER X DIRECTOR X

STREET 11919 SAFA COURT

CITY HERNDON STATE VA

ZIP 20170 2324

I AFFIRM THAT THE INFORMATION CONTAINED IN THIS REPORT IS ACCURATE AND THAT NONE OF IT IS FALSE IN ANY MATERIAL RESPECT.

SIGNATURE [signature] PRINTED TITLE Vice President DATE 3/17/97

B001N0026005

ADDITIONS SHEET

# 1997 ANNUAL REPORT

COMMONWEALTH OF VIRGINIA
STATE CORPORATION COMMISSION

CORPORATION NAME:
MENA INVESTMENTS, INC.

CORPORATION ID: 0471380-6

USE THIS PAGE FOR ADDITIONAL OFFICERS AND DIRECTORS.

8 ADDITIONAL PRINCIPAL OFFICER OR DIRECTOR:

FIRST NAME HISHAM
MIDDLE NAME Y.
LAST NAME ALTALIB
TITLE TREASURER/DIRECTOR — OFFICER X DIRECTOR X
STREET 11926 SAFA COURT
CITY HERNDON STATE V A
ZIP 20170 2324

ADDITIONAL PRINCIPAL OFFICER OR DIRECTOR:

FIRST NAME M.
MIDDLE NAME YAQUB
LAST NAME MIRZA
TITLE VICE PRESIDENT/SECRETARY/DIRECTOR — OFFICER X DIRECTOR X
STREET 11922 SAFA COURT
CITY HERNDON STATE V A
ZIP 20170 2324

[redacted]

# 2001 ANNUAL REPORT

COMMONWEALTH OF VIRGINIA
STATE CORPORATION COMMISSION

201691946
09/24/2001

(1) CORPORATION NAME:
MENA INVESTMENTS, INC.

(2) REGISTERED AGENT NAME AND OFFICE ADDRESS: DIR.

M YAGUB MIRZA
555 GROVE STREET
HERNDON, VA 20170

(3) CITY OR COUNTY OF VA REGISTERED OFFICE:
129-FAIRFAX COUNTY

(4) STATE OR COUNTRY OF INCORPORATION:
VA-VIRGINIA

DUE DATE: 09/28/01

CORPORATION ID: 0471380-6

(5) STOCK INFORMATION:

| CLASS | AUTHORIZED |
|---|---|
| COMMON | 1,000 |

Carefully read the attached instruction sheet. Type or print in black only. If item (6) is blank, you must add the principal office address. If item (7) is blank, you must add the director and officer information (see Section 13.1-775 A 3 or Section 13.1-936 A 3 of the Code of Virginia).

## (6) PRINCIPAL OFFICE ADDRESS

| [X] NO CHANGE | [ ] ADDITIONS/CHANGES ONLY |
|---|---|
| ADDRESS: 555 GROVE STREET | ADDRESS: |
| CITY/ST/ZIP: HERNDON, VA 20170-4705 | CITY/ST/ZIP: |

## (7) DIRECTORS AND PRINCIPAL OFFICERS

All directors and principal officers must be listed.
One individual may be a director and an officer.

| [X] NO CHANGE [ ] REMOVE | [ ] ADDITIONS/CHANGES ONLY |
|---|---|
| OFFICER [X] DIRECTOR [X] | OFFICER [ ] DIRECTOR [ ] |
| NAME: JAMAL BARZINJI | NAME: |
| TITLE: PRESIDENT/DIREC | TITLE: |
| ADDRESS: 11919 SAFA COURT | ADDRESS: |
| CITY/ST/ZIP: HERNDON, VA 20170-2324 | CITY/ST/ZIP: |

I AFFIRM THAT THE INFORMATION CONTAINED IN THIS REPORT IS ACCURATE AND COMPLETE.

SIGNATURE OF DIRECTOR/ OFFICER LISTED IN THIS REPORT

M. YAQUB MIRZA, VICE PRESIDENT
PRINTED NAME/TITLE

9/21/01
DATE

It is a Class 1 misdemeanor for any person to sign a document he knows is false in any material respect with intent that the document be delivered to the Commission for filing.

B7702

# 2001 ANNUAL REPORT CONTINUED

**CORPORATE ID:** 0471380-6

| | |
|---|---|
| [X] NO CHANGE [ ] REMOVE | [ ] ADDITIONS/CHANGES ONLY |
| OFFICER [X] DIRECTOR [X] | OFFICER [ ] DIRECTOR [ ] |
| NAME: M YAQUB MIRZA | NAME: |
| TITLE: VP/SECY/DIRECT | TITLE: |
| ADDRESS: 11922 SAFA COURT | ADDRESS: |
| CITY/ST/ZIP: HERNDON, VA 20170-2324 | CITY/ST/ZIP: |

| | |
|---|---|
| [X] NO CHANGE [ ] REMOVE | [ ] ADDITIONS/CHANGES ONLY |
| OFFICER [X] DIRECTOR [X] | OFFICER [ ] DIRECTOR [ ] |
| NAME: HISHAM Y ALTALIB | NAME: |
| TITLE: TREASURER/DIR | TITLE: |
| ADDRESS: 11926 SAFA COURT | ADDRESS: |
| CITY/ST/ZIP: HERNDON, VA 20170-2324 | CITY/ST/ZIP: |

| | |
|---|---|
| [ ] NO CHANGE [ ] REMOVE | [ ] ADDITIONS/CHANGES ONLY |
| OFFICER [ ] DIRECTOR [ ] | OFFICER [ ] DIRECTOR [ ] |
| NAME: | NAME: |
| TITLE: | TITLE: |
| ADDRESS: | ADDRESS: |
| CITY/ST/ZIP: | CITY/ST/ZIP: |

| | |
|---|---|
| [ ] NO CHANGE [ ] REMOVE | [ ] ADDITIONS/CHANGES ONLY |
| OFFICER [ ] DIRECTOR [ ] | OFFICER [ ] DIRECTOR [ ] |
| NAME: | NAME: |
| TITLE: | TITLE: |
| ADDRESS: | ADDRESS: |
| CITY/ST/ZIP: | CITY/ST/ZIP: |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 17

Mar-Jac

**POULTRY, INC.**

*Quality Every Step Of The Way*

May 2, 1997

O fully paid

Aradi, Inc.
C/o Mar-Jac Investments, Inc.
555 Grove Street
Herndon, Va. 22070

Re: Mar-Jac Holdings, Inc.

Gentlemen:

In connection with the audit of our financial statements, please furnish to our auditors, Moore Stephens Frost, CPA's, A Professional Association, 425 Capitol, Suite 3300, Little Rock, Arkansas 72201, the following information with respect to our indebtedness to you as of May 2, 1997:

Unpaid balance
Principal payment date or terms
Interest rate
Date to which interest paid
Nature of mortgage and description of property mortgaged
Nature of defaults, if any

Your prompt attention to this request will be appreciated. An envelope is enclosed for your reply.

Sincerely,

M. D. Mohamed

Mahmoud D. Mohamed
Vice President of Finance

P.O. Box 1017 • Gainesville, Georgia 30503 • (770) 536-0561 • FAX (770) 531-5015

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 18




EXHIBIT Barzinji 3

Date: 7/14/04

Reporter: David A. Kasdan, *RDR, CRR*

FEB. 24. 2004 6:22PM NO. 4575 P. 2/25

# About SMG

***Headquarters***

SMG is headquartered near the nation's capital, in Herndon, Virginia.

***Principals***

Principals of SMG have combined experience of over a century in developing and managing business enterprises and investments in many countries.

***Services***

SMG offers business development and management consulting services.

FEB. 24. 2004 6:23PM NO. 4575 P. 3/25

## Selected SMG Services

- ***Real Estate Development and Property Management***

  Residential and Commercial

- ***Agro-Industrial and Food Processing***

  Poultry, fruit juices, yeast, dairy, beef and sheep

- ***Investment in Stocks***

  Private and Public companies
  Technology and Bio-technology
  Private placements and secondary offerings

## Management of Large Commercial Enterprises

- ***MAR-JAC POULTRY, INC., Gainesville, GA***
  Produces and processes 1.65 million chickens/week
  Among top 5 poultry companies in U.S.A.

- ***JUCOSA, Chile***
  Processes over 114,000 tons of fruit per year
  Produces juice concentrates - 3 million gallons/year
  Most diversified among all producers in Chile

- ***ANCHOR YEAST, Zimbabwe*** (SOLD)
  Produces and supplies good quality, low cost yeast to Zimbabwe, Malawi and Zambia

FEB. 24. 2004 6:23PM NO. 4575 P. 5/25

# Management, Finance & Accounting Services

***Charitable Organizations***

- ✓ African Muslim Agency
- ✓ Graduate School Of Islamic & Social Sciences
- ✓ Heritage Education Trust
- ✓ Horizons Education Foundation
- ✓ Humana Charitable Trust
- ✓ International Islamic Charitable Organization
- ✓ Safa Trust
- ✓ Sanabel Alkheer
- ✓ York Foundation
- ✓ York International Trust



***For-Profit Corporations***

- ✓ Aradi, Inc.
- ✓ Grove Corporate, Inc.
- ✓ HFC Feed Mill, LLC
- ✓ Jucosa USA, Inc.
- ✓ MarJac Investments, Inc.
- ✓ Mena Estates, Inc.
- ✓ Mena Investments, Inc.
- ✓ Reston Investments, Inc.
- ✓ Silicon Valley Venture Fund, LLC I & II
- ✓ Sterling Investment Group LLC
- ✓ Sterling PFG, LLC

# Sterling Charitable Gift Fund
## (Section 501(c)(3) charity)

- ✓ Donor makes charitable contributions to the Fund (completed gift) and takes deduction now
- ✓ Donor decides when to give and has the option to recommend recipients



FEB. 24. 2004 6:24PM NO. 4575 P. 7/25

# Investment Projects

- ***Sterling Investment Group, LLC*** (CLOSED)
  Syndicated $12 million to own Jucosa and Sterling fruit farm in Chile.

- ***Sterling InfoGain Fund, LLC*** (CLOSED)
  Invested in InfoGain Corporation, an IT company. InfoGain has been profitable for the last 50 quarters, with growth rate of 46% per year.

# Investment Projects

**(more to come)**

- ***Sterling Technology Fund, LLC*** (CLOSED)
  To fund "technology incubators" - PocketPass.Com, ProductSuccess.Com, Buckaroo.Com, etc.

- ***Sterling LynuxWorks, LLC*** (CLOSED)
  Alongwith Intel and Motorola, participated in private placement of $35 million for LYNUX WORKS, INC., the first and only established Real Time Operating System company to embrace LINUX.

FEB. 24. 2004 6:25PM NO. 4575 P. 9/25

## Sterling Stock Investments, LLC (OPEN)

**Long-Term Capital Growth Consistent with Islamic principles**

Funds are allocated among:

- ***Saturna Capital Corporation, Inc.*** (70%)
  Value-oriented; large companies
- ***Atlantic Capital Management, LLC*** (25%)
  Long-term capital appreciation;
  Small to mid-cap companies
- ***Sterling Advisory Services, Inc.*** (5%)
  Private placements in small public and non-public companies, including start-up companies



## Sterling Stock Investments, LLC

- ✓ Date Started — November 1, 1999
- ✓ Assets as of July 2001 — Over $7.0 million
- ✓ Open to selected individuals, corporations and retirement accounts
- ✓ Minimum investment of $50,000
- ✓ Fees based on profit sharing
- ✓ Two year lockup (unless hardship, etc.)
- ✓ Can withdraw profits annually
- ✓ Deduct Zakah (pay to charity of your choice)

**Please carefully read the Confidential Offering Memorandum before investing**

# Projects in Progress

**Investments:**

- ***Sterling Stock Investments (Series)***
  ***Sale thru broker-dealer***
- ***Sector Funds:***
  - ***Bio-technology***
  - ***Global***
  - ***Pharmaceutical***
  - ***Technology***
  - ***Income***

FEB. 24. 2004 6:22PM NO. 4575 P. 12/25

## Projects in Progress (Contd)

**Insurance:** ***(Takaful)***

- ***Variable annuities***
- ***Single payment annuities***
- ***Conversion of retirement accounts to annuities***

***(maybe property/casualty insurance)***

## Projects in Progress (Contd)

- *Sterling PacketStream Fund LLC*
  *Using Synchronous Packet Streaming, deliver all services over IP (voice, video and multi-media)*

*. . . . and more to come*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 19

ARTICLES OF INCORPORATION
OF

THE SANA - BELL, INC.

To: The Department of Consumer and Regulatory Affairs of the District of Columbia

We, the undersigned natural persons of the age of eighteen years or more, acting as incorporators of a nonstock corporation as a private foundation, adopt the following Articles of Incorporation for such corporation ("Corporation") pursuant to the District of Columbia Non-Profit Corporation Act.

ARTICLE I

Name

The name of the Corporation is "The SANA - BELL, Inc."

ARTICLE II

Term

The period during which the Corporation shall continue is perpetual.

ARTICLE III

Registered Agent and Office

The post office address of the initial registered office of the Corporation is:

c/o Foley, Hoag & Eliot
1615 L Street, N.W., Suite 950
Washington, D.C. 20036

and the name of the initial registered agent for the Corporation at such address is:

Richard A. Gross

ARTICLE IV

Purposes

The Corporation is organized to promote the well-being of mankind throughout the world and for charitable, religious, educational, and scientific purposes, including without limitation for such purposes, the making of distributions to organizations that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or

FILED
JUL 28 1989

BY: [signature]

corresponding section of any future Federal tax code. To that end, such purposes shall, without limitation to the foregoing, specifically include:

<u>Section 1</u>. To engage in, establish and promote, and contribute to exclusively religious, cultural, educational, charitable and scientific activities, programs, projects, organizations, institutions and funds.

<u>Section 2</u>. To receive, maintain and administer funds for religious, cultural, scientific, educational and charitable purposes, and to that end, to take and hold by bequest, trust, devise, gift, grant, purchase, lease or otherwise, either absolutely or jointly with any other person, persons, or corporation, any property, real, personal, tangible or intangible, or any undivided interest therein, without limitation as to amount or value; to sell, convey, or otherwise dispose of any such property and to invest, reinvest, or deal with the principal or the income thereof in such manner as, in the judgment of the Board of Trustees, will best promote the purposes of the Corporation without limitation, except such limitations, if any, as may be contained in the instrument under which such property is received, these Articles of Incorporation, the By-Laws of the Corporation, or any laws applicable thereto.

<u>Section 3</u>. To hold and continue to hold as an investment, property which may be received by the Corporation so long as it deems proper, and to invest and reinvest in any securities or property, whether or not income-producing, deemed by it to be for the best interests of the Corporation, without and notwithstanding that the same may constitute leaseholds, royalty interests, patents, interest in mines, oil and gas wells, or timber lands, or other wasting assets, and without any responsibility for any depreciation or loss by or on account of such investments.

<u>Section 4</u>. To rent or lease any property of the Corporation for such time and upon such terms and for such price or prices as in its discretion and judgment may seem just and proper and for the best interest of the Corporation, irrespective of the provisions of any statute or of the termination of any trust.

<u>Section 5</u>. To sell and convey any of the property of the Corporation or any interest therein, or to exchange the same for other property for such price or prices and upon such terms as in its discretion and judgment may be deemed for the best interest of the Corporation and to execute and deliver any deed or deeds, receipts, releases, contracts or other instruments necessary in connection therewith.

Section 6. To make all repairs and improvements at any time deemed necessary and proper to and upon real property owned by the Corporation, and to build, construct, and complete any building or buildings upon such property which in its discretion and judgment may be deemed advisable and proper and for the best interests of the Corporation, and to determine the extent to which the cost of such repairs and improvements shall be apportioned as between corpus and income.

Section 7. To deduct, retain, expend, and pay out of any money belonging to the Corporation any and all necessary and proper expenses in connection with the operation and conduct of the Corporation, and to pay all taxes, insurance premiums, and other legal assessments, debts, claims or charges which at any time may be due and owing by, or which may exist against the Corporation.

Section 8. To vote upon all securities belonging to the Corporation, and to become a party to any stockholders agreements deemed advisable by them in connection with such securities.

Section 9. To consent to the reorganization, consolidation, merger, liquidation, readjustment of or other change in any corporation, company or association, or to the sale or lease of the property thereof or any party thereof, any of the securities or other property of which may at the time be held by them hereunder, and to do any act or exercise any power with reference hereto that may be legally exercised by any persons owning similar property in their own right, including the exercise of conversion, subscription, purchase, or other options, the deposit, surrender, or exchange of securities, the entrance into voting trusts, and the making of agreements or subscriptions which they may deem necessary or advisable in connection therewith, all without applying to any court for permission so to do, and to hold and redeem or sell or otherwise dispose of any securities or other property which they may so acquire.

Section 10. To compromise, settle, arbitrate, or defend any claim or demand in favor of or against the Corporation; to enforce any security agreements, or other obligations or liens held hereunder; and to enter upon such contracts and agreements and to make such compromise or settlements of debts, claims or controversies as they may deem necessary or advisable. To incur and pay the ordinary and necessary expense of administration of the Corporation or its Board of Trustees acting in such capacity, including (but not by way of limitation) reasonable attorney's fees, accountants' fees, investment counsel fees and the like.

Section 11. To act hereunder through an agent or attorney-in-fact in carrying out any of the powers and duties herein authorized.

Section 12. To borrow money for any purposes of the Corporation or incidental to the administration thereof and to secure the repayment thereof by granting a security interest in, or pledging or otherwise encumbering any part or all of the Corporation's property, or as part of the consideration given therefor, to assume a liability of the transferor or to acquire such property subject to a liability.

Section 13. To lend money to any person or persons upon such terms and in such ways and with such security as the Board of Trustees may deem advisable for the best interest of the Corporation.

Section 14. In general, to do any and all acts and things, and to exercise any and all powers which it may now or hereinafter be lawful for the Corporation to do or exercise under and pursuant to the laws of the District of Columbia and for the purpose of accomplishing any of the purposes of the Corporation, whether inside or outside the United States of America.

ARTICLE V

Investment

No part of the net earnings of the Corporation shall inure to the benefit of or be distributable to its trustees, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in this Article. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate in, or intervene in, including the publishing or distribution of statements, any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of these Articles, the Corporation shall not carry on any other activities not permitted to be carried on: (a) by a corporation exempt from Federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States Internal Revenue Law; or (b) by a corporation, contributions to which are deductible under Section 170 of the Internal Revenue Code of 1986, as amended, or the corresponding provisions of any future United States Internal Revenue Law.

ARTICLE VI

Dissolution

Upon the dissolution of the Corporation, the Board of Trustees shall, after paying or making provision for the payment of all of the liabilities of the Corporation, dispose of all of the assets of the Corporation exclusively for the purposes of the Corporation in such manner to the Islamic Society of North America, or in its absence, to The SAFA Trust, Inc., or in its absence, to the North American Islamic Trust, Inc., or, in its absence, to such Islamic organization or organizations organized and operated exclusively for religious, cultural, charitable, educational or scientific purposes as shall at the time qualify as an exempt organization or organizations under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States Internal Revenue Law, as the Board of Trustees shall determine. Any of such assets not so disposed of shall be disposed of by the Court of Common Pleas of the county in which the principal office of the Corporation is then located, exclusively for such purposes or to such Islamic organization or organizations, as said Court shall determine, which are organized and operated exclusively for such purposes.

ARTICLE VII

Members

The Corporation shall have no members.

ARTICLE VIII

Trustees

Section 1. Number of Trustees. The Corporation shall operate through a Board of Trustees, which shall function, operate and be considered for all purposes as the Corporation's Board of Directors. The minimum number of Trustees constituting the Board of Trustees shall be five (5) and the maximum number shall be eleven (11). Except as provided herein, the exact number of Trustees shall be as prescribed from time-to-time in the By-Laws of the Corporation.

Section 2. Election and Term of Office.

(A) The term of office of each Trustee shall be five (5) years except that members of the initial Board of Trustees will be assigned staggered terms of office of five, six, seven, eight and nine years, as set forth in Section 3 of this Article VIII.

(B) In case of a resignation, expulsion, expired term or any other termination of a regular board member or members, the board, by a majority vote of the Board of Trustees at any meeting, shall appoint the member or members required to fill the existing vacancy or vacancies within two months from the date of such vacancy or vacancies, and such appointee(s) or his or their successor(s) shall serve the remaining term of the departing Trustee(s).

(C) The qualifications to be a Trustee, which shall be determined by its Board of Trustees in the Board of Trustee's sole discretion, shall include sound character, honesty, trust, serious interest in charitable work and commitment to the objectives and policies of the Corporation.

(D) Any Trustee may be removed from office with or without cause by two-thirds (2/3) of the entire board members.

Section 3. The names, addresses and terms of the initial Board of Trustees, who shall serve as initial Trustees until their successors be elected and qualify, are as follows:

| Name | Address | Term |
|---|---|---|
| Dr. M. Yaqub Mirza | 11922 Safa Court<br>Herndon, VA 22070 | 5 |
| Dr. Abdulrahim Al Saati | 11924 Safa Court<br>Herndon, VA 22070 | 5 |
| Dr. Farid Yasin Qurashi | 1101 Safa Street<br>Herndon, VA 22070 | 5 |
| Solayman Alsalih Alragihi | 596 Grant Street<br>Herndon, VA 22070 | 6 |
| Ibrahim Afandi | Box 14843 Andulus Street<br>Jeddah, Kingdom of<br>Saudi Arabia | 7 |
| Dr. Mohammed Abdu Yamani | Box 14843 Andulus Street<br>Jeddah, Kingdom of<br>Saudi Arabia | 8 |
| Salih Kamel | Box 14843 Andulus Street<br>Jeddah, Kingdom of<br>Saudi Arabia | 9 |

ARTICLE IX

Incorporators

The names and address, including street and number, of each incorporator is:

| | |
|---|---|
| Sandra Y. R. Loder | 1615 L Street, N.W., #950<br>Washington, D.C. 20036 |
| James M. Towarnicky | 1615 L Street, N.W., #950<br>Washington, D.C. 20036 |
| James T. Montgomery, Jr. | 1615 L Street, N.W., #950<br>Washington, D.C. 20036 |

ARTICLE X

Amendment

An amendment to these Article of Incorporation shall require the approval of two-thirds (2/3) of the votes entitled to be cast by board members present or represented by proxy at a meeting of the Board of Trustees.

ARTICLE XI

Regulation and Conduct of the Corporation

Other provisions, consistent with the laws of the District of Columia, for the regulation and conduct of the affairs of the Corporation, and creating, defining, limiting or regulating the powers of the Corporation, shall be provided in the By-Laws of the Corporation.

ARTICLE XII

Indemnification

The Corporation shall indemnify any person who is serving or has served as a director or officer of this Corporation, at its request, as a director or officer of another corporation in which this Corporation owns shares of stock or in relation to which it is a creditor, against expenses actually and necessarily incurred by such person in connection with the defense of any action, suit or proceeding in which he is made a party by reason of being or having been a director or officer of this Corporation or of which he is adjudged therein to be liable for negligence or misconduct in the performance of duty. Such indemnification shall not be deemed exclusive of any other rights to which any person may be entitled under any By-Law, agreement, vote of stockholders or otherwise.

In witness whereof, we have hereunto subscribed our names this 28th day of July, 1989.

WITNESS:

Carol B. Levine — Sandra Y. K. Loder

Carol B. Levine — James M. Towarnicky

Carol B. Levine — James T. Montgomery, Jr.

I, Eleanor H. Pobletta, a Notary Public, hereby certify that on the 28th day of July, 1989, Sandra Y.K. Loder, James M. Towarnicky, and James T. Montgomery, Jr. appeared before me and signed the foregoing document as incorporators, and have averred that the statements therein contained are true.

(NOTARY SEAL)

Notary Public

My Commission Expires August 31, 1991

STATEMENT OF PERMISSION

I, Richard A. Gross, a resident of the District of Columbia, hereby agree to serve as the registered agent for SANA-BELL, Inc. My address as registered agent shall be c/o Foley, Hoag & Eliot, 1615 L Street, N. W., Suite 950, Washington, D. C. 20036.

Richard A. Gross

July 28, 1989
Date

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **<u>TO BE FILED UNDER SEAL</u>** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 2

# D&B Reports - Business Information Report

**Duns Number: 156939969**
**Requested: 08/11/2003 6:08:03 PM**
**Reference: NONE ENTERED**

156939969

030725
MAR-JAC HOLDINGS INC

COPYRIGHT 2003 DUN & BRADSTREET INC. - PROVIDED UNDER CONTRACT
FOR THE EXCLUSIVE USE OF SUBSCRIBER XXXXXXXXXL.

*IN DATE* Statement Date: MAY 02 2003

DO NOT CONFUSE WITH AFFILIATE OF SIMILAR NAME.

| | | |
|---|---|---|
| DUNS: 15-693-9969 | DATE PRINTED | SUMMARY |
| MAR-JAC HOLDINGS INC | AUG 11 2003 | RATING 4A1 |
| PO BOX 1017 | HOLDING COMPANY | STARTED 1996 |
| GAINESVILLE GA 30503 | SIC NO. | SALES F $156,094,159 |
| 1020 AVIATION BLVD | 20 15 | WORTH F $23,900,775 |
| AND BRANCH(ES) OR DIVISION(S) | | EMPLOYS 1,200 |
| GAINESVILLE GA 30501 | | (1,200 HERE) |
| TEL: 770 531-5000 | | HISTORY CLEAR |
| | | FINANCING SECURED |
| IIEF EXECUTIVE: JAMAL AL-BARANZINJI, PRES | | FINANCIAL |
| | | CONDITION STRONG |

===============================================================================
* * * CUSTOMER SERVICE * * *
===============================================================================

If you have questions about this report, please call our Customer Resource Center at 1-800-234-3867 from anywhere within the U.S. If you are outside the U.S., contact your local D&B office.

*** Additional Decision Support Available ***

Additional D&B products, monitoring services and specialized investigations are available to help you evaluate this company or its industry.
Call Dun & Bradstreet's Customer Resource Center at 1-800-234-3867 from anywhere within the U.S. or visit our website at www.dnb.com.

===============================================================================
* * * SUMMARY ANALYSIS * * *
===============================================================================

The Summary Analysis section reflects information in D&B's file as of August 11, 2003.

RATING SUMMARY . . . .

The Rating was changed on March 3, 2003 because D&B's file shows an improvement in the company's payment record. The "4A" portion of the Rating (the Rating Classification) indicates that the company has a worth from $10 million to $50 million. The "1" on the right (Composite

Credit Appraisal) indicates an overall "strong" credit appraisal. This credit appraisal was assigned because the payment information in D&B's file indicates that this company's obligations are retired satisfactorily and because of D&B's "strong" assessment of the company's May 2, 2003, fiscal financial statement.

Below is an overview of the company's D&B Rating(s) since 09/04/97:

| RATING | DATE APPLIED |
|---|---|
| 4A1 | 03/03/03 |
| 4A2 | 08/27/01 |
| 1R3 | 09/14/98 |
| -- | 09/04/97 |

* * * PAYMENT SUMMARY * * *

The Payment Summary section reflects payment information in D&B's file as of the date of this report.

The PAYDEX for this company is 84.

This PAYDEX score indicates that payments to suppliers average 8 days sooner than terms, weighted by dollar amounts. When dollar amounts are not considered, approximately 90% of the company's payments are within terms.

Below is an overview of the company's dollar-weighted payments, segmented by its suppliers' primary industries:

| | TOTAL RCV'D | TOTAL DOLLAR AMOUNTS | LARGEST HIGH CREDIT | % W/IN TERMS | DAYS SLOW <31 | 31-60 | 61-90 | 91+ |
|---|---|---|---|---|---|---|---|---|
| | # | $ | $ | % | % | % | % | % |
| Total in D&B's file | 12 | 57,150 | 25,000 | | | | | |
| Top 10 Industries: | | | | | | | | |
| 1 Paper mill | 1 | 25,000 | 25,000 | 100 | - | - | - | - |
| 2 Whol electrical equip | 1 | 15,000 | 15,000 | 100 | - | - | - | - |
| 3 Short-trm busn credit | 1 | 7,500 | 7,500 | 100 | - | - | - | - |
| 4 Nonclassified | 1 | 5,000 | 5,000 | 100 | - | - | - | - |
| 5 Misc business credit | 1 | 1,000 | 1,000 | 100 | - | - | - | - |
| 6 Help supply service | 1 | 1,000 | 1,000 | 100 | - | - | - | - |
| 7 Mfg cleaning products | 1 | 750 | 750 | 100 | - | - | - | - |
| 8 Whol service paper | 1 | 500 | 500 | 100 | - | - | - | - |
| 9 Whol appliances | 1 | 250 | 250 | 100 | - | - | - | - |
| 10 Medical laboratory | 1 | 100 | 100 | 50 | - | 50 | - | - |
| 11 OTHER INDUSTRIES | 1 | 50 | 50 | 50 | 50 | - | - | - |
| Other Payment Categories: | | | | | | | | |
| Cash experiences | 0 | 0 | 0 | | | | | |
| Payment record unknown | 1 | 1,000 | 1,000 | | | | | |
| Unfavorable comments | 0 | 0 | 0 | | | | | |
| Placed for collection with D&B | 0 | 0 | | | | | | |

other 0 N/A

The highest "Now Owes" on file is $7,500
'he highest "Past Due" on file is $ 0

D&B receives nearly 400 million payment experiences each year. We enter these new and updated experiences into D&B Reports as this information is received.

================================================================================

PAYMENTS (Amounts may be rounded to nearest figure in prescribed ranges)

Antic - Anticipated (Payments received prior to date of invoice)
Disc - Discounted (Payments received within trade discount period)
Ppt - Prompt (Payments received within terms granted)

| REPORTED | PAYING RECORD | HIGH CREDIT | NOW OWES | PAST DUE | SELLING TERMS | LAST SALE WITHIN |
|---|---|---|---|---|---|---|
| 08/03 | Ppt | 1000 | -0- | -0- | | 6-12 Mos |
| 07/03 | Disc | 750 | 250 | -0- | 1/2 10 N30 | 1 Mo |
| | Ppt | 7500 | 7500 | -0- | | |
| 06/03 | Ppt | 15000 | 2500 | -0- | N30 | 1 Mo |
| | Ppt | 5000 | 2500 | -0- | | 1 Mo |
| | Ppt | 1000 | 1000 | -0- | N10 | 1 Mo |
| | Ppt | 250 | -0- | -0- | N30 | 6-12 Mos |
| 04/03 | Ppt-Slow 30 | 50 | -0- | -0- | | 2-3 Mos |
| 10/02 | Disc | 25000 | -0- | -0- | Regular terms | 6-12 Mos |
| 07/02 | Ppt | 500 | -0- | -0- | N30 | 6-12 Mos |
| ^6/02 | (011) | 1000 | -0- | -0- | N30 | 6-12 Mos |
| /02 | Ppt-Slow 60 | 100 | -0- | -0- | N15 | 2-3 Mos |

* Payment experiences reflect how bills are met in relation to the terms granted. In some instances payment beyond terms can be the result of disputes over merchandise, skipped invoices etc.

* Each experience shown represents a separate account reported by a supplier. Updated trade experiences replace those previously reported.

================================================================================

STATEMENT UPDATE

07/25/03 Fiscal Consolidated statement dated MAY 02 2003:

| | | | |
|---|---|---|---|
| Cash | $ 10,966,339 | Accts Pay | $ 3,948,886 |
| Accts Rec | 7,763,426 | Accrued Expenses & Other Curr Liabs | 2,758,120 |
| Inventory | 11,807,174 | | |
| Mktble Securities | 2,470,760 | | |
| Other Curr Assets | 381,546 | Taxes | 331,534 |
| | | L.T. Liab-(1yr) | 2,850,163 |
| | | Current Deferred Income | 1,625,000 |
| | --------------- | | --------------- |
| Curr Assets | 33,389,245 | Curr Liabs | 11,513,703 |
| Fixt & Equip | 23,225,625 | Long-Term Debt-Net | 11,868,991 |
| Other Assets | 92,521 | Subordinated Debt | 5,100,000 |
| | | L.T. Liab-Other | 4,323,922 |
| | | COMMON STOCK | 100,000 |
| | | ADDIT. PD.-IN CAP | 6,900,000 |
| | | ACCUM OTHER COMPREHENSIVE | |

| | | | |
|---|---|---|---|
| | | LOSS | (400,164) |
| | | RETAINED EARNINGS | 17,300,939 |
| Total Assets | 56,707,391 | Total | 56,707,391 |

From MAY 03 2002 to MAY 02 2003 annual sales $156,094,159; cost of goods sold $133,921,487. Gross profit $22,172,672; operating expenses $8,132,845. Operating income $14,039,827; net income before taxes $14,039,827; Federal income tax $5,258,642; net income $8,781,185.

JUN 12 2003 Prepared from statement(s) by Accountant: Moore Stephens Frost, Little Rock, Arkansas.

ACCOUNTANTS OPINION: "A Review Of The Accountant's Opinion Indicated That The Financial Statement Meets Generally Accepted Accounting Principles And The Audit Contains No Qualifications.".

--0--

Accounts receivable shown net less $78,000 allowance. Fixed assets shown net less $18,325,824 depreciation.

================================================================================

FINANCE
07/24/03

| | Fiscal Apr 26 2002 |
|---|---|
| Curr Assets | 30,152,395 |
| Curr Liabs | 10,894,240 |
| Current Ratio | 2.77 |
| Working Capital | 19,258,155 |
| Other Assets | 22,940,998 |
| Worth | 20,240,853 |
| Sales | 159,128,075 |
| Long Term Liab | 21,958,300 |
| Net Profit (Loss) | 13,467,340 |

Fiscal statement dated APR 26 2002:

| | | | |
|---|---|---|---|
| Cash | $ 6,650,169 | Accts Pay | $ 4,479,217 |
| Accts Rec | 7,295,606 | Current maturities long term debt | 2,514,108 |
| Inventory | 11,756,113 | Accruals | 2,441,415 |
| Investments | 2,823,247 | L.T. Liab-(1yr) | 1,459,500 |
| Taxes | 1,086,052 | | |
| Other Curr Assets | 541,208 | | |
| Curr Assets | 30,152,395 | Curr Liabs | 10,894,240 |
| Fixt & Equip | 22,848,477 | Subordinated debt | 5,100,000 |
| Other Assets | 92,521 | L.T. Liab-Other | 13,348,549 |
| | | Def. Credits/Income | 3,509,751 |
| | | COMMON STOCK | 100,000 |
| | | ADDIT. PD.-IN CAP | 6,900,000 |
| | | Accumulated income | (178,901) |
| | | RETAINED EARNINGS | 13,419,754 |
| Total Assets | 53,093,393 | Total | 53,093,393 |

From MAY 01 2001 to APR 26 2002 annual sales $159,128,075. Gross profit $159,128,075; operating expenses $137,585,225. Operating income $21,542,850; net income before taxes $21,542,850; Federal income tax $8,075,510. Net income $13,467,340.

Accountant: Moore Stephens Frost, CPA, Little Rock, AR. Extent of audit, if any, not indicated.

--0--

Fixed assets shown net less $12,957,270 depreciation.

On July 21, 2003, Randy Bruce, Controller, confirmed company name, address, principals, annual sales and operational information using Dun & Bradstreet's Internet-based update method (eUpdate) at www.dnb.com.

================================================================================

PUBLIC FILINGS

The following data is for information purposes only and is not the official record. Certified copies can only be obtained from the official source.

---

* * * UCC FILING(S) * * *

---

COLLATERAL: Leased Equipment
FILING NO: 0718194
TYPE: Amendment
SEC. PARTY: NCNB LEASING CORP, CHARLOTTE, NC
DEBTOR: MAR-JAC INC/PIEDMONT POULTRY CO INC

DATE FILED: 09/26/1990
LATEST INFO RECEIVED: 10/29/1990
ORIG. UCC FILED: 08/31/1990
ORIG. FILING NO: 0711155
FILED WITH: SECRETARY OF STATE/UCC DIVISION, NC

This data is for information purposes only. Certification can only be obtained through the Department of the North Carolina Secretary of State.

---

COLLATERAL: Leased Equipment
FILING NO: 0692629
TYPE: Original
SEC. PARTY: LEASE PLAN USA INC, ATLANTA, GA
DEBTOR: MAR JAC INC

DATE FILED: 06/28/1990
LATEST INFO RECEIVED: 07/20/1990
FILED WITH: SECRETARY OF STATE/UCC DIVISION, NC

This data is for information purposes only. Certification can only be obtained through the Department of the North Carolina Secretary of State.

---

COLLATERAL: Leased Equipment
FILING NO: 122866
TYPE: Original
SEC. PARTY: LEASE PLAN USA INC, ATLANTA, GA
DEBTOR: MAR-JAC INC

DATE FILED: 06/27/1990
LATEST INFO RECEIVED: 08/02/1990
FILED WITH: HALL COUNTY SUPERIOR COURT CLERKS OFFICE, HALL, GA

---

COLLATERAL: Specified Equipment
FILING NO: 121505
TYPE: Original
SEC. PARTY: LEASE PLAN USA INC, ATLANTA, GA
DEBTOR: MAR-JAC INC

DATE FILED: 04/18/1990
LATEST INFO RECEIVED: 08/02/1990
FILED WITH: HALL COUNTY SUPERIOR COURT CLERKS OFFICE, HALL, GA

---

COLLATERAL: Specified Industrial equipment/machinery - Specified Construction equipment/machinery
FILING NO: 119946
TYPE: Original
SEC. PARTY: CROWN CREDIT COMPANY (INC), NEW BREMEN, OH
DEBTOR: MAR-JAC INC

DATE FILED: 01/26/1990
LATEST INFO RECEIVED: 02/26/1990
FILED WITH: HALL COUNTY SUPERIOR COURT CLERKS OFFICE, HALL, GA

---

COLLATERAL: Leased Equipment
FILING NO: 119299 DATE FILED: 12/18/1989
TYPE: Original FILED WITH: HALL COUNTY SUPERIOR COURT CLERKS OFFICE, HALL, GA
SEC. PARTY: NCNB LEASING CORPORATION, CHARLOTTE, NC
DEBTOR: MAR-JAC INC

---

COLLATERAL: Specified Equipment
FILING NO: 107103 DATE FILED: 10/28/1987
TYPE: Original FILED WITH: HALL COUNTY SUPERIOR COURT CLERKS OFFICE, HALL, GA
SEC. PARTY: LEASE PLAN USA INC, ATLANTA, GA
DEBTOR: MAR-JAC INC

---

COLLATERAL: Specified Equipment
FILING NO: 106720 DATE FILED: 09/23/1987
TYPE: Original FILED WITH: HALL COUNTY SUPERIOR COURT CLERKS OFFICE, HALL, GA
SEC. PARTY: LEASE PLAN USA INC, ATLANTA, GA
DEBTOR: MAR-JAC INC

---

COLLATERAL: Leased Equipment
FILING NO: 105583 DATE FILED: 06/17/1987
TYPE: Original FILED WITH: HALL COUNTY SUPERIOR COURT CLERKS OFFICE, HALL, GA
SEC. PARTY: LEASE PLAN USA INC, ATLANTA, GA
DEBTOR: MAR-JAC INC

---

COLLATERAL: Specified Equipment
FILING NO: 105357 DATE FILED: 06/01/1987
TYPE: Original FILED WITH: HALL COUNTY SUPERIOR COURT CLERKS OFFICE, HALL, GA
SEC. PARTY: CROWN CREDIT CO, NEW BREMEN, OH
DEBTOR: MAR-JAC INC

---

There are additional UCC's in D&B's file on this company available by contacting 1-800-234-3867.

The public record items contained in this report may have been paid, terminated, vacated or released prior to the date this report was printed.

===

HISTORY
07/24/03

JAMAL AL-BARANZINJI, PRESIDENT
DR HISHAM AL-TALIB, TREASURER
DR YAQUB MIRZA, SECRETARY
MAHMOND D MOHAMED, V PRES-FINANCE
DOUG CARNES, V PRES-POULTRY OPERATIONS
DIRECTOR(S): THE OFFICER(S) and Pete Martin, Complex Manager.

---

* * * CORPORATE AND BUSINESS REGISTRATIONS * * *
PROVIDED BY MANAGEMENT OR OTHER SOURCE

---

The Corporate Details provided below may have been submitted by the management of the subject business and may not have been verified with the government agency which records such data.

REGISTERED NAME: MAR-JAC INC

CORPORATION TYPE: PROFIT

BUSINESS TYPE: CORPORATION

STATE OF ORGANIZATION (INCORPORATION): DELAWARE
DATE OF ORGANIZATION (INCORPORATION) : 12/19/1985

WHERE FILED: SECRETARY OF STATE/CORPORATIONS DIVISION, DOVER, DE

---

COMMON STOCK:
AUTH SHARES - 300,000
PAR VALUE - $1.0000

---

Business started 1984 by officers. Present control succeeded Nov 1996. 50% of capital stock is owned by Mena Investments. 50% of capital stock is owned by Safa Tust.

JAMAL AL-BARANZINJI born 1939. Graduated from Louisiana State University, Baton Rouge, LA in 1974 with a PhD Degree in Chemical Engineering. 1974-1977 general manager for North American Trust, Ft Wayne, IN. 1977-1983 employed by Nada International, Lugano, Switzerland. 1983 to present employed by parent.

DR HISHAM AL-TALIB born 1941. Graduated from Purdue University, Lafayette, IN in 1974 with a PhD Degree in Electrical Engineering. 1974-1983 employed by Nada International, Lugano, Switzerland. 1983 to present employed by parent.

DR YAQUB MIRZA born 1946. Graduated from University of Texas, Austin, TX with a PhD Degree in Physics in 1974 and MAT in 1976. 1976-1981 employed by York University, Toronto, Canada as teacher. 1981-1983 employed by NAIT Inc, Indianapolis, IN. 1983 to present employed by parent.

MAHMOND D MOHAMED born 1940. Graduated from Long Island University, Brooklin, NY in 1977 with a MS Degree. 1963-1972 employed by Cairo Oil and Soup Company, Cairo, Egypt. 1972-1977 employed by Masters, Mates & Pilots, Plains, NY while attending college. 1977-1984 employed by Royspec, Baltimore, MD. 1984 to present employed by parent and subject.

DOUG CARNES born 1949. Graduated from University of Georgia, Athens, GA in 1971 with BBA Degree. 1971-1980 employed by Tyson Foods Inc, Cumming, GA. 1980-1986 employed by Crystal Lake Food Company, Decatur, AR as Vice President Poultry Operations. 1986 to present employed by subject.

===

OPERATION
07/24/03 Through its divisions, this company operates as a fully integrated poultry processor. The company grows, hauls and processes the product and operates a feed mill for its own use.
Terms are net 10 days. Has 400 account(s). Sells to manufacturers and wholesale.
Nonseasonal.

EMPLOYEES: 1,200 which includes officer(s). 1,200 employed here

FACILITIES: Owns 365,000 sq. ft. in 2 story concrete block building. Also owns a hatchery and feed mill totaling 300,000 square feet. Subject is adding an additional 30,000 square feet.

LOCATION: Industrial section on side street.

SUBSIDIARIES: Mar Jac Poultry Inc, Gainsville, GA. DUNS #60-123-1657 (100%). Operates as a poultry integrator.

08-11(1VD /001) 28115 040184184 H

FULL DISPLAY COMPLETE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 3

# MINUTES OF BOARD OF DIRECTORS' MEETING
# OF
# MAR-JAC, INC.

A special meeting of the Board of Directors of Mar-Jac, Inc. (the "Corporation"), was held via conference call at 555 Grove Street, Herndon, Virginia 20170 on October 7, 1996 at 10:15 A.M.

Dr. Jamal Barzinji, Dr. Hisham Altalib and Dr. M. Yaqub Mirza, being all the directors of the Corporation, were present, and participating at the meeting.

Dr. Jamal Barzinji, Chairman of the Corporation chaired the meeting and Dr. M. Yaqub Mirza, Secretary of the Corporation, acted as Secretary of the meeting.

The Chairman asked if everyone could hear each other, that being so he announced that a quorum of the directors was present and that the meeting, having been duly convened, was ready to proceed with its business.

**WHEREAS,** the surplus cash becoming available to the Corporation from refinancing of its wholly owned subsidiary in sufficient amount warrants the declaration of dividend of $8.2 million upon the common stock of the Corporation; and,

**WHEREAS,** the Board of Directors have unanimously decided that Eight Million Two Hundred Thousand Dollars ($8.2 million) should be set aside from such funds for the purpose of declaring a cash dividend for the second quarter of 1996-97, to be distributed to the holders of outstanding common shares of the Capital Stock of this Corporation; be it,

**RESOLVED,** That a dividend of $27.3333 per share is hereby declared on the 300,000 outstanding capital stock of this Corporation, payable on or before November 15, 1996, to stockholders of record of such shares at the close of business on October 1, 1996 provided its subsidiary declares and pays a dividend in the sum of $8.2 million.

**RESOLVED FURTHER,** That the Secretary is hereby authorized and directed to notify said stockholders of the declaration of said dividend, and the Treasurer is hereby authorized and directed to cause said dividend to be paid as specified.

There being no further business before the meeting, on motion duly made, seconded, and carried, it was adjourned.

M. Y. Mirza

Dr. M. Yaqub Mirza, Secretary

MA02MJ05.RYA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAR-JAC POULTRY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>RITA KATZ, et al.,<br><br>Defendants. | **TO BE FILED UNDER SEAL**<br><br>Case No. 03-2422 (RMC) |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAR-JAC POULTRY, INC.,<br>Plaintiff,<br>v.<br>RITA KATZ, *et al.*,<br>Defendants. | Case No.: 1:03CV02422 (RMC) |

**PLAINTIFF MAR-JAC POULTRY, INC.'S ANSWERS AND OBJECTIONS TO DEFENDANTS RITA KATZ AND SITE INSTITUTE, INC.'S FIRST SET OF INTERROGATORIES**

COMES NOW, Mar-Jac Poultry, Inc., and files these, its Answers and Objections to Defendants Rita Katz and SITE Institute, Inc.'s, First Set of Interrogatories to Plaintiff Mar-Jac Poultry, Inc., pursuant to Rule 33 of the Federal Rules of Civil Procedure.

## I. DEFINITIONS

Throughout Plaintiff Mar-Jac Poultry, Inc.'s (hereinafter "Plaintiff Mar-Jac," or "Plaintiff") Responses to Defendants Rita Katz and SITE Institute, Inc.'s First Set of Interrogatories to Plaintiff Mar-Jac Poultry, Inc. (hereinafter "Interrogatories"):

A. the term "Defendants" shall mean Defendant Rita Katz and Defendant SITE Institute, Inc., collectively;

B. the terms "Interrogatories" or "Interrogatory" shall be construed as including any subpart(s) or portion(s) of Defendants' Interrogatories;

C. the terms "and" and "or" shall be construed as both conjunctive and disjunctive;

D. the term "any" shall be construed to also mean "all," and *vice versa*;

E. the use of a noun in its singular form shall also be construed as the use of the noun in its plural form; and

F. the use of a verb in any tense shall also be construed as the use of the verb in all other tenses.

## II. GENERAL OBJECTIONS TO DEFENDANTS' REQUESTS

Plaintiff Mar-Jac hereby sets forth its General Objections to Defendant's Interrogatories, which apply to all Defendants' Interrogatories as if fully incorporated by reference and set forth in answer to the Interrogatories. In setting forth these General Objections, Plaintiff Mar-Jac in no way waives any objection to any of Defendants' Interrogatories. Plaintiff Mar-Jac expressly reserves the right to modify, amend or supplement any or all of its General Objections to Defendants' Interrogatories.

GENERAL OBJECTION NO. 1: Plaintiff Mar-Jac objects to Defendants' Interrogatories to the extent that the Interrogatories seek information which is protected by the attorney-client privilege or attorney work-product doctrine, were prepared in anticipation of litigation, or which are protected by any other applicable privilege. Pursuant to the foregoing privileges or doctrines, Plaintiff Mar-Jac will not provide such information.

GENERAL OBJECTION NO. 2: Plaintiff Mar-Jac objects to Defendants' Interrogatories to the extent that the Interrogatories seek confidential, proprietary, commercially sensitive or strategic information or trade secrets. To the extent that Plaintiff Mar-Jac has possession, custody or control of documents or information within the foregoing categories, Plaintiff Mar-Jac will produce information subject to, and following, Defendants' execution of an agreement regarding the confidentiality of such information.

## III. SPECIFIC OBJECTIONS TO DEFENDANTS' INTERROGATORIES

Plaintiff Mar-Jac hereby sets forth the following Specific Objections to Defendants Interrogatories, which shall be referenced by number in response to Defendants' particular Interrogatories, as if fully incorporated by reference and set forth in response thereunder. In setting forth these Specific Objections, or in asserting the same, similar or additional objections in response to any of Defendants' Interrogatories, Plaintiff Mar-Jac in no way waives any objection to any of Defendants' Interrogatories. Plaintiff Mar-Jac expressly reserves the right to modify, amend or supplement any or all of its Specific Objections to Defendants' Interrogatories.

SPECIFIC OBJECTION NO. 1: Plaintiff Mar-Jac objects to Defendants' Interrogatory to the extent that the Interrogatory seeks information which is not relevant to the narrow issues in this case, or the claim or defense of any party. *See* Fed. R. Civ. P. 26, Advisory Committee Notes (2000 Amendment) ("The Committee intends that the parties and the court focus on the actual claims of the parties"); *Hardrick v. Legal Services Corp.*, 96 F.R.D. 617, 618 (D.D.C. 1983) ("... discovery should be tailored to the issues involved in the particular case"). Interrogatories "may inquire concerning any factual matter that is germane to any of the issues of the action." *Webster Motor Car Co. v. Packard Motor Car Co.*, 16 F.R.D. 350, 351 (D.D.C. 1954). Defendants must establish, and have failed to establish, good cause as to why such information should be provided. Plaintiff Mar-Jac further objects to Defendants' Interrogatory to the extent that the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.

SPECIFIC OBJECTION NO. 2: Plaintiff Mar-Jac objects to Defendants' Interrogatory to the extent that the Interrogatory is overbroad in any respect, including, but not limited to, the number of individuals or entities in relation to which documents or information are being sought, the volume documents or information sought or the time period covered by the Request.

SPECIFIC OBJECTION NO. 3: Plaintiff Mar-Jac objects to Defendants' Interrogatory to the extent that the Interrogatory is vague or ambiguous. An interrogatory "must be specific in order that it need not be necessary for the party that is being examined to exercise discretion or judgment in determining what is intended to be covered by the interrogatory." *Webster Motor Car Co.*, 16 F.R.D. at 351.

SPECIFIC OBJECTION NO. 4: Plaintiff Mar-Jac objects to Defendants' Interrogatory to the extent that the Interrogatory is unreasonably burdensome or oppressive, or would cause Plaintiff Mar-Jac unreasonable expense to attempt to substantially respond to. *See Riss & Co. v. Association of American Railroads*, 23 F.R.D. 211, 212 (D.D.C. 1959) ("[I]nterrogatories are not to be used in an oppressive manner. An adverse party should not be required to perform burdensome labors or to execute difficult and expensive tasks, in searching for facts and classifying and compiling data. A litigant may not compel his adversary to go to work for him") (quoting *Aktiebolaget Vargos v. Clark*, 8 F.R.D. 635, 636 (D.D.C. 1949)). An interrogated party should not be compelled to search its own records where the adversary has the right to inspect the records themselves. *Id.* at 213 (citing *H. K. Porter Co. v. Bremer*, 12 F.R.D. 187 (N.D.Ohio 1951)). The burden or expense which Plaintiff Mar-Jac would incur in responding to the Request outweighs any alleged benefit to the Defendants in the preparation of any of Defendants' claims or defenses.

SPECIFIC OBJECTION NO. 5: Plaintiff Mar-Jac objects to Defendants' Interrogatory to the extent that the Interrogatory is made for an improper purpose including, but not limited to, purposes of harassment, placing an unreasonable or oppressive burden on Plaintiff, or to obtain information for use in other proceedings.

<u>SPECIFIC OBJECTION NO. 6</u>: Plaintiff Mar-Jac objects to Defendants' Interrogatory to the extent that the Interrogatory seeks information relating to, or in the possession, custody or control of, nonparties. Rule 33 limits use of interrogatories to a "party" to the litigation. *Founding Church of Scientology of Washington, D. C., Inc. v. Kelley*, 77 F.R.D. 378, 379 (D.D.C. 1977). "Interrogatories may not require the party being examined to make inquiries or investigations of persons not connected with its own organization, or into files belonging to other persons or organizations." *Webster Motor Car Co.*, 16 F.R.D. at 351. No interrogatories may be propounded "which would require the searching of the records of other persons, that is, persons other than the examined party itself, its officers or employees." *Id.* at 352. "An interrogatory may not inquire into the activities of persons other than officers or employees of the party being examined, except such activities as are participated in by the party under examination." *Id.* at 351.

<u>SPECIFIC OBJECTION NO. 7</u>: Plaintiff Mar-Jac objects to Defendants' Interrogatory to the extent that the Interrogatory seeks information which has been provided to Defendants pursuant to Defendants Rita Katz and SITE Institute, Inc.'s Request for Production of Documents and Things to Plaintiff Mar-Jac Poultry, Inc., or is available from public sources, and which information is available to, or may be obtained by, Defendants from such production with substantially the same burden as the burden Plaintiff Mar-Jac would incur in attempting to derive or ascertain an answer to the Interrogatory.

<u>SPECIFIC OBJECTION NO. 8</u>: Plaintiff Mar-Jac objects to Defendants' Interrogatory to the extent that the Interrogatory seeks to impose on Plaintiff Mar-Jac any obligation beyond the scope of Rules 26 or 34 of the Federal Rules of Civil Procedure.

## IV. OBJECTIONS TO DEFENDANTS' "INSTRUCTIONS"

Plaintiff Mar-Jac asserts the following Objections to Defendants' "Instructions" contained in their Interrogatories. In setting forth these Objections to Defendants' Instructions, Plaintiff Mar-Jac in no way waives any objection to any of Defendants' Interrogatories. Plaintiff Mar-Jac expressly reserves the right to modify, amend and/or supplement any or all of its Objections to Defendants' "Instructions".

OBJECTIONS TO INSTRUCTION NO. 4: Plaintiff Mar-Jac objects to Defendants' Instruction No. 4 on the grounds that Plaintiff Mar-Jac's answers to Defendants' Interrogatories consist of Plaintiff's answers and objections as set forth herein, and any and all documents, records, exhibits, attachments, summaries, outlines, compilations, or any other thing, in any medium, containing information, which Plaintiff may refer to in response to any of Defendants' Interrogatories, including any Exhibits attached hereto or any documents or information produced by Plaintiff in response to Defendants Rita Katz and SITE Institute, Inc.'s Request for Production of Documents and Things to Plaintiff Mar-Jac Poultry, Inc. (hereinafter "Requests"). Rule 33(d) provides that, in answering an interrogatory, it is sufficient for the answering party to specify the records from which an answer to the interrogatory may be derived or ascertained, or to provide copies, compilations, abstracts or summaries. Fed. R. Civ. P. 33(d).

OBJECTIONS TO INSTRUCTION NO. 5: Plaintiff Mar-Jac objects to Defendants' Instruction No. 5 to the extent that the Instruction causes Defendant's Interrogatories to include within their matters which are irrelevant to any of the narrow issues in this action; to be overbroad, vague or ambiguous; to be not reasonably calculated to lead to the discovery of admissible evidence; to be unreasonably burdensome or expensive to respond to; or to be outside the scope of Rules 26 or 33.

## V. OBJECTIONS TO DEFENDANTS' "DEFINITIONS"

Plaintiff Mar-Jac asserts the following Objections to Defendants' "Definitions" contained in Defendants' Interrogatories. In setting forth these Objections to Defendants' Definitions, Plaintiff Mar-Jac in no way waives any objection to any of Defendants' Interrogatories. Plaintiff Mar-Jac expressly reserves the right to modify, amend or supplement any or all of its Objections to Defendants' "Definitions".

OBJECTIONS TO DEFINITION NO. 2: Plaintiff Mar-Jac objects to Defendants' Definition No. 2 to the extent that the Definition refers to approximately four (4) entities and an undetermined number of unnamed directors, officers, employees, agents and representatives of such entities; any past and present subsidiaries or affiliates of the entities; and any directors, officers, employees, agents and representatives of such subsidiaries or affiliates; all of which named and unnamed entities or individuals are nonparties to this action, with no demonstrated relevance or logical connection to this action, or to any of the issues, claims or defenses of any of the parties thereto. Plaintiff further shows that it has no relationship to Mar-Jac Investments. Plaintiff Mar-Jac objects to Defendants' Instruction No. 5 to the extent that the Instruction causes Defendant's Interrogatories to include within their matters which are irrelevant to any of the narrow issues in this action; to be overbroad, vague or ambiguous; to be not reasonably calculated to lead to the discovery of admissible evidence; to be unreasonably burdensome or expensive to respond to; or to be outside the scope of Rules 26 or 33 of the Federal Rules of Civil Procedure. Plaintiff Mar-Jac also objects that the Definition causes Defendant's Interrogatories to include within their scope documents and/or information which are irrelevant to any issues, claims or defenses in this action; which are in the possession, custody or control of

nonparties; or which are subject the attorney-client privilege or attorney work-product doctrine, were prepared in anticipation of litigation, or are protected by any other applicable privilege.

OBJECTIONS TO DEFINITION NO. 5: Plaintiff Mar-Jac objects to Defendants' Definition No. 5 to the extent that the Definition causes Defendants' Interrogatories to include within their scope matters which are irrelevant to any of the narrow issues in this action; to be overbroad; to be not reasonably calculated to lead to the discovery of admissible evidence; to be unreasonably burdensome or expensive to respond to; or to be outside the scope of Rules 26 or 33. Plaintiff Mar-Jac also objects that, other than as Plaintiff has provided answers and objections as set forth herein, or any documents or other thing which Plaintiff may refer to in its answers to any of Defendants' Interrogatories, Plaintiff will not provide the names, residential or business addresses, residential or business telephone numbers, email addresses, employer or business affiliations, occupations or positions for any persons identified or referred to in its answers, as instructed by Defendants' Instruction No. 5. Plaintiff Mar-Jac further objects that, other than as Plaintiff has provided or referred to in its answers to any of Defendants' Interrogatories, Plaintiff will not provide the type of document, date(s) of preparation, author(s), recipient(s), subject matter, location of each copy, identity of present custodian, or identity of the person(s) who can authenticate the document for any document identified or referred to in its answers. Should Defendants require additional information relating to Defendants' Definition No. 5, Plaintiff is willing provide such information to Defendants upon receipt of an express request by Defendants, referencing particular persons or documents, and providing for a reasonable time in which to answer.

## VI. RESPONSES AND OBJECTIONS TO DEFENDANTS' INTERROGATORIES

Plaintiff Mar-Jac hereby responds and objects to Defendants' numbered Interrogatories as follows:

INTERROGATORY NO. 1: For each of the Mar-Jac Entities, identify all past and present parents, subsidiaries and affiliates, all companies in which the Mar-Jac entity owns stock, and any partnerships or limited partnerships in which the Mar-Jac entity and such entity, and the percentage of the Mar-Jac entity's stock ownership.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 6 & 8 in objection to Defendants' Interrogatory No. 1. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit A in answer to Interrogatory No. 1, which information Plaintiff fully incorporates by reference herein.

INTERROGATORY NO. 2: For each of the Mar-Jac Entities, identify all past and present directors and officers.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 4, 6 & 8 in objection to Defendants' Interrogatory No. 2. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit B in answer to Interrogatory No. 2, which information Plaintiff fully incorporates by reference herein. Plaintiff Mar-Jac further answers that some of the residential or business addresses, residential or business telephone numbers and/or occupations or positions for the persons identified in answer to this Interrogatory may be found in Exhibit C, attached hereto.

INTERROGATORY NO. 3: For each of the Mar-Jac Entities, identify all past and present employees (paid and unpaid).

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 4, 6 & 8 in objection to Defendants' Interrogatory No. 3. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit C in answer to Interrogatory No. 3, which information Plaintiff fully incorporates by reference herein.

INTERROGATORY NO. 4: For each of the Mar-Jac Entities, identify any and all past and present directors, officers, employees, agents or representatives who have knowledge of each such entity's financial records during the pertinent time period.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 4, 6 & 8 in objection to Defendants' Interrogatory No. 4. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit D in answer to Interrogatory No. 4, which information Plaintiff fully incorporates by reference herein.

INTERROGATORY NO. 5: For each of the Mar-Jac Entities, identify all individuals who have, or have had, signatory authority over bank accounts held, or otherwise controlled by, such entity.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 4, 6 & 8 in objection to Defendants' Interrogatory No. 5. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit E in answer to Interrogatory No. 5, which information Plaintiff fully incorporates by reference herein.

INTERROGATORY NO. 6: Identify the sources of all contributions, gifts, grants, loans and allocations received by each of the Mar-Jac Entities during the pertinent time period, including the source and amount of such income and the date such income was made.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 3, 4, 6 & 8 in objection to Defendants' Interrogatory No. 6. Subject to, and without waiving, the foregoing objections,

Plaintiff Mar-Jac provides the information attached hereto as Exhibit F in answer to Interrogatory No. 6, which information Plaintiff fully incorporates by reference herein.

INTERROGATORY NO. 7: Identify the recipients of all contributions, gifts, grants, loans and allocations received by each of the Mar-Jac Entities during the pertinent time period, including the recipient and amount of such payment and the date such payment was made.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 3, 4, 6 & 8 in objection to Defendants' Interrogatory No. 7. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit G in answer to Interrogatory No. 7, which information Plaintiff fully incorporates by reference herein.

INTERROGATORY NO. 8: Identify all lawsuits in which any of the Mar-Jac Entities, and/or its directors, officers or employees, have appeared as a party or witness, including the case name, case number, jurisdiction of each suit, the date each suit was brought, the name of all of the parties to each such action and the name of the Mar-Jac-related entity or individual who was a party and/or witness in such suit.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 4, 5, 6 & 8 in objection to Defendants' Interrogatory No. 8. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit H in answer to Interrogatory No. 8. Plaintiff Mar-Jac further answers that it was a party to the suit of *Hassan A. Gaffar, et. al. v. Piedmont Poultry Company, Inc., et al.*, Case No. 96 CVS 630, in the General Court of Justice of North Carolina.

INTERROGATORY NO. 9: Identify all indictments that have been issued against any of the Mar-Jac Entities, and/or its directors, officers or employees, including the case name, case number, jurisdiction of each such indictment, and the date each such indictment was issued.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 4, 5, 6 & 8 in objection to Defendants' Interrogatory No. 9. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac answers that, to the best of its knowledge, no indictments have been issued against any of the Mar-Jac Entities or its directors or officers. Plaintiff Mar-Jac will not provide any of the information requested in regard to Plaintiff's employees.

INTERROGATORY NO. 10: Identify all grand jury subpoenas issued to any of the Mar-Jac Entities, and/or its directors, officers or employees, including the case name, case number, and jurisdiction of each such grand jury and the date each such subpoena was issued.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 4, 5, 6 & 8 in objection to Defendants' Interrogatory No. 10.

INTERROGATORY NO. 11: Identify any federal, state or local governmental investigation of any of the Mar-Jac Entities and/or its past and/or present directors, officers or employees, including the name of the governmental agency that conducted the investigation, the approximate time period in which such investigation was conducted and the outcome, if any, of such investigation.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 4, 5, 6 & 8 in objection to Defendants' Interrogatory No. 11. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac answers that the only investigation of which it has knowledge is the investigation by the United States Attorney's Office for the Eastern District of Virginia.

INTERROGATORY NO. 12: Identify any administrative action taken against any of the Mar-Jac Entities and/or such entity's past and/or present directors, officers or employees by any federal, state or local governmental agency, including the name of the governmental agency involved and the nature of the action taken.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 4, 5, 6 & 8 in objection to Defendants' Interrogatory No. 12. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac answers that it has been subject, on occasion over the past two (2) decades, to audits, reviews or investigations by the following federal, state or local governmental agencies: the Internal Revenue Service in the late 1980s and early 1990s; the United States Department of Agriculture (hereinafter "USDA"); the Occupational Safety and Health Administration; the Department of Transportation; the Georgia Environmental Protection Division; and the City of Gainesville. Plaintiff Mar-Jac further shows that inspectors for the USDA inspect Plaintiff's poultry products on a daily basis at Plaintiff's processing plant.

INTERROGATORY NO. 13: For each of the Mar-Jac Entities, identify all individuals for whom the Mar-Jac entity and/or its officers, directors or employees have sponsored, or otherwise aided, in obtaining a U.S. visa.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 6 & 8 in objection to Defendants' Interrogatory No. 13. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac answers that it has sponsored Hatem Selim, an employee of Plaintiff, in obtaining a green card. Plaintiff Mar-Jac shows that Mr. Selim's address and telephone number can be found in Exhibit C, attached hereto. Plaintiff Mar-Jac further answers that Plaintiff has also aided Matthew Charles Hendricks Lyn, whose addresses are 2 Manor Park Close, Kingston 8 Jamaica, and 1809 Hastings Court, Gainesville, Georgia 30504-2674, in obtaining a work Visa.

INTERROGATORY NO. 14: Identify all awards, commendations or honors received by any of the Mar-Jac Entities and/or its officers, directors or employees, including the name of each such award, commendation or honor and the organization that sponsored it.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 4, 6 & 8 in objection to Defendants' Interrogatory No. 14. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit I in answer to Interrogatory No. 14, which information Plaintiff fully incorporates by reference herein.

INTERROGATORY NO. 15: Identify all books, articles, brochures or pamphlets published by any of the Mar-Jac Entities and/or its directors, officers or employees, including the name of each such publication and its author, the date on which it was published, and if an article, the name of the article and publication in which such article appeared.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 6, 7 & 8 in objection to Defendants' Interrogatory No. 15. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac answers that it has provided documents and information responsive to this Interrogatory in its production of documents pursuant to Defendants' Requests.

INTERROGATORY NO. 16: Identify all public speeches presented by any of the Mar-Jac Entities and/or such entity's directors, officers, employees, agents or representatives, including the date, title and forum in which each such speech was presented, and the name of the sponsors or hosts of the meeting or conference in which it was presented.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 4, 6 & 8 in objection to Defendants' Interrogatory No. 16. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit J in answer to Interrogatory No. 16, which information Plaintiff fully incorporates by reference herein. Plaintiff further shows that two of its officers or directors are also pastors who deliver sermons on a weekly basis, and that Plaintiff will not provide any information regarding such sermons.

INTERROGATORY NO. 17: Identify all individuals that communicated with Mar-Jac and/or its directors, officers, employees, agents or representatives about the Book and/or the 60 Minutes Segment.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections No. 8 in objection to Defendants' Interrogatory No. 17. Subject to, and without waiving, the foregoing objection, Plaintiff Mar-Jac provides the information attached hereto as Exhibit K in answer to Interrogatory No. 17, which information Plaintiff fully incorporates by reference herein.

INTERROGATORY NO. 18: For each of the Mar-Jac Entities identify all employees that have responsibility for public relations, communications and/or advertising.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 3, 6 & 8 in objection to Defendants' Interrogatory No. 18. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit L in answer to Interrogatory No. 18, which information Plaintiff fully incorporates by reference herein.

INTERROGATORY NO. 19: Identify all outside advisors and/or consultants hired by each of the Mar-Jac Entities, including but not limited to accountants, bookkeepers, tax return preparers, consultants, attorneys and/or public relations or advertising advisers during the pertinent time period.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 3, 6 & 8 in objection to Defendants' Interrogatory No. 19. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit M in answer to Interrogatory No. 19, which information Plaintiff fully incorporates by reference herein.

INTERROGATORY NO. 20: State the gross annual sales for Mar-Jac during the pertinent time period.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1 & 2 in objection to Defendants' Interrogatory No. 20. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit N in answer to Interrogatory No. 20, which information Plaintiff fully incorporates by reference herein.

INTERROGATORY NO. 21: State the annual budget for advertising and promotion for Mar-Jac during the pertinent time period.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1 & 2 in objection to Defendants' Interrogatory No. 21. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac answers that all Plaintiff's spending on advertising and promotion is done on an *ad hoc* basis.

INTERROGATORY NO. 22: Identify all contributions made by each of the Mar-Jac Entities and/or their officers and directors to political candidates, including the donor, recipient and amount of each such contribution.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 4, 5, 6 & 8 in objection to Defendants' Interrogatory No. 22. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit O in answer to Interrogatory No. 22, which information Plaintiff fully incorporates by reference herein.

INTERROGATORY NO. 23: Identify any and all damages suffered by Mar-Jac as a result of the 60 Minutes Broadcast or the Book, including harm to reputation and economic losses as alleged in the Complaint.

ANSWERS: Plaintiff Mar-Jac asserts its Specific Objections Nos. 1, 2, 4, 6 & 8 in objection to Defendants' Interrogatory No. 23. Subject to, and without waiving, the foregoing objections, Plaintiff Mar-Jac provides the information attached hereto as Exhibit P in answer to

Interrogatory No. 23, which information Plaintiff fully incorporates by reference herein. Plaintiff Mar-Jac further answers that it will need to retain an expert in order to reasonably estimate its damages relating to the 60 Minutes Broadcast, the promotion and publication of the Book, and Defendants' other actions. Plaintiff Mar-Jac shows that Defendant Katz's conduct and representations, through Defendant SITE Institute and otherwise, in assistance to the Government substantially contributed to the search of Plaintiff during Operation Green Quest, which was highly publicized and extremely damaging to Plaintiff.

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, the undersigned do hereby declare under oath that the foregoing answers to Defendants Rita Katz and SITE Institute, Inc.'s, First Set of Interrogatories to Plaintiff Mar-Jac Poultry, Inc., are true and correct to the best of their knowledge and belief.

This 9th day of July, 2004.

Wilmer Parker, Esq. (Georgia Bar No. 563550)
GILLEN PARKER & WITHERS LLC
One Securities Centre, Suite 1050
3490 Piedmont Road, N.E.
Atlanta, Georgia 30305
(404) 842-9700

Counsel for Plaintiff Mar-Jac Poultry, Inc.
Admitted *Pro Hac Vice*

Sworn and subscribed to before me this 9th day of July, 2004.

Notary Public District of Columbia

My commission expires: January 14, 2006

This 8th day of July, 2004.

Mr. Douglas Carnes
Mar-Jac Poultry, Inc.
1020 Aviation Boulevard
Gainesville, Georgia 30501

Vice President of Operations
for Mar-Jac Poultry, Inc.

Mr. Mahmoud Mohamed
Mar-Jac Poultry, Inc.
1020 Aviation Boulevard
Gainesville, Georgia 30501

Vice President of Finance
for Mar-Jac Poultry, Inc.

Mr. Randall Bruce
Mar-Jac Poultry, Inc.
1020 Aviation Boulevard
Gainesville, Georgia 30501

Controller for Mar-Jac Poultry, Inc.

Mr. Pete Martin By Doug Carnes
Mar-Jac Poultry, Inc.
1020 Aviation Boulevard
Gainesville, Georgia 30501

Complex Manager for Mar-Jac Poultry, Inc.

Sworn and subscribed to before me this 8th day of July, 2004.

Barbara Middlebrooks
Notary Public

My commission expires: Notary Public, Jackson County, Georgia My Commission Expires April 18, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:03CV02422 (RMC)** |
| | ) | |
| **RITA KATZ, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

The undersigned, counsel for Mar-Jac Poultry, Inc., hereby certifies that he has this day served copies of the foregoing **Plaintiff Mar-Jac Poultry, Inc.'s Answers and Objections to Defendants Rita Katz and SITE Institute, Inc.'s, First Set of Interrogatories**, via hand delivery and mail on the following:

Laura R. Handman, Esq.
Richard L. Cys, Esq.
DAVIS WRIGHT TREMAINE LLP
1500 K Street, NW, Suite 450
Washington, D.C. 20005-1272

Lee Levine, Esq.
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
1050 Seventeenth Street, NW, Suite 800
Washington, D.C. 20036

This 9th day of July, 2004.

Wilmer Parker, Esq. (Georgia Bar No. 563550)
GILLEN PARKER & WITHERS LLC
One Securities Centre, Suite 1050
3490 Piedmont Road, N.E.
Atlanta, Georgia 30305
(404) 842-9700

Counsel for Plaintiff Mar-Jac Poultry, Inc.
Admitted *Pro Hac Vice*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 4

# Tab A

**ANSWER TO INTERROGATORY NO. 1**

Hall Hatchery, Inc.
Silver City Hatchery, Inc.
Queen City Hatchery, Inc.
Mar-Jac Growout/ B & W Limited
Mar-Jac Inc.
Grove Corporate Plaza, Inc.
Lanier Sales Co., Inc.
Mar-Jac Poultry, Inc.
Mar-Jac Farms, Inc.
Mar-Jac Processing, Inc.
H.F.C. Feeds, Inc.
Mar-Jac Holdings, Inc.
H.F.C. Feed Mill, L.L.C.
Waterford Place Associates LP (60%) Investment
SAAR Foundation
H & F Transport, Inc.

# MAR-JAC COMPLEX
## ORGANIZATION CHART
## 1984



# MAR-JAC COMPLEX
## REORGANIZATION CHART
## 1985



FROST & COMPANY
CERTIFIED PUBLIC ACCOUNTANTS
WORTHEN BANK BUILDING
LITTLE ROCK, ARKANSAS
72201

A PROFESSIONAL ASSOCIATION

501-376-9241

# Mar-Jac Group
# Plan of Reorganization
# October 1985

## Objectives:

The objectives of the plan of reorganization should be to:

1) Simplify the corporate structure;
2) Simplify the accounting structure;
3) Allow the filing of consolidated U. S. and Georgia corporate tax returns;
4) Permit the use of more favorable tax accounting methods for farming operations.

## Present Structure:

The organization chart of the present Mar-Jac Group is as follows:




For tax purposes, the three hatchery companies use an April 30 fiscal year. The incorporated operating companies use an October 30 fiscal year. The grow-out partnership uses a December 31 year. Audited financial statements are prepared on the combined companies as of April 30. Because of the present structure, each entity is required to file separate U. S. and Georgia income tax returns.

Proposed Structure:

Our proposal for the reorganized Mar-Jac Group is as follows:




For tax purposes, the reorganized companies would all use an April 30 fiscal for both tax and audit purposes. All companies would be consolidated in single U. S. and Georgia corporate income tax returns.

From a business operating perspective, each reorganized company would contain the following operations:

1) Mar-Jac Poultry, Inc. - Would serve as a holding company with no operations. It would hold all the outside debt except for the present industrial revenue bonds. It could also operate the corporate office and incur some of the corporate overhead such as legal, audit, directors fees and other corporate general and administrative expenses. The interest and general and administrative expenses would be charged to the operating subsidiary companies as management fees.

2) Mar-Jac Poultry Processing, Inc. - Would operate the processing plant and the feed mill. It would be responsible for processed poultry sales. It would purchase live broilers from Mar-Jac Farms, Inc. and would sell finished feed.

3) Lanier Sales Company, Inc. - Would remain the same as the present company and continue to conduct brokerage and bag feed sales activities.

4) Mar-Jac Farms, Inc. - Would operate the hatcheries, breeder flocks, broiler growout, broiler/breeder service departments, and live haul operation. It would sell broilers to Mar-Jac Poultry Processing, Inc. and purchase finished feed from it.

Tax Consequences of Reorganization:

The reorganization would result in several favorable tax consequences without any negative costs.

First - The companies would all join in filing a consolidated tax return for both U. S. and Georgia corporate income tax purposes.

# MAR-JAC COMPLEX
## ORGANIZATION CHART
## 1987



# MAR-JAC COMPLEX
## ORGANIZATION CHART
## 1988



# MAR-JAC COMPLEX

## ORGANIZATION CHART

## 1996



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 4

# Tab B

**ANSWER TO INTERROGATORY NO. 2**

Name of Director/Officers

Dr. Jamal Barzinji, Chairman of the Board, 11919 Safa Court, Herndon, VA 22070 (703) 471-9494
Dr. Hisham Altalib, Vice Chairman, 11926 Safa Court, Herndon, VA 22070 (703) 471-9494
Dr. M. Yaqub Mirza, Director,11922 Safa Court, Herndon, VA 22070 (703) 471-9494
Doug Carnes, Vice President, Operations, 7895 Lord's Way, Ball Ground, GA 30107 (770) 536-0561
Pete Martin, Complex Manager, 4755 Oak Grove Circle, Cumming, GA 30040
Mahmoud D. Mohamed, Vice President, Finance, 175 Thompson Place, Gainesville, GA 30506 (770) 536-0561
M. Omar Ashraf, Exec. Vice President, 12541 Brown Ferry Road, Herndon, VA 20170 (703) 471-9494
*Dr. Basil Al-Rawi, Last known address: Al-Watania, P. O. Box 1181, Buraydah, Al-Gassim, Saudi Arabia
*Abdul Rahman Al-Rajhi, Last known address: Al-Watania, P. O. Box 1181, Buraydah, Al-Gassim, Saudi Arabia

*For the period between November 1990 and November 1996 (never attended any Board meetings)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., Plaintiff, v. RITA KATZ, et al., Defendants. | ) ) ) ) ) ) ) ) ) | **TO BE FILED UNDER SEAL** Case No. 03-2422 (RMC) |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 4

# Tab C

# Part 1

| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| HERBERT | ABEE | RTE 2 BOX 1286 | DAHLONEGA | GA | 30533 | 0 | laborers-unskld |
| JOANIE | ABEL | 2174 WILDWOOD COURT | GAINESVILLE | GA | 30501 | 770 287-7266 | laborers-unskld |
| CHARLES | ABERNATHY | P.O. BOX 921 | BLAIRSVILLE | GA | 30528 | 0 | laborers-unskld |
| DAVID | ABERNATHY | 4005 C ROGERS ROAD | GAINESVILLE | GA | 30506 | 770 536-3005 | laborers-unskld |
| DAVID | ABERNATHY | P.O. BOX 497 | CLERMONT | GA | 30527 | 404 865-0948 | laborers-unskld |
| ADAM | ABEYTA | 2513 BROWN BRIDGE ROAD | GAINESVILLE | GA | 30501 | 770 503-7254 | laborers-unskld |
| RONALD | ABEYTA | 1195 BROAD ST | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JUAN | ABOYTES | 3523 AL MANGUM RD | TALMO | GA | 30575 | 770 503-7896 | laborers-unskld |
| CARLOS | ABRAHAM | 759 CLEVELAND STREET S 10 | GAINESVILLE | GA | 30501 | 770 718-1504 | laborers-unskld |
| JOSE | ABREGO | 1805 PLACEN CIRCLE | GAINESVILLE | GA | 30504 | 770 534-6706 | laborers-unskld |
| RODOLFO | ABREGO | 160 CARROLL CIRCLE | CHAMBLEE | GA | 30341 | 0 | laborers-unskld |
| JENNIFER | ABUNAW | 1075 COOLEY DR | GAINESVILLE | GA | 30501 | 770 536-8556 | laborers-unskld |
| ADRIAN | ABUNDIS | 628 LEVEL GROVE ROAD | CORNELIA | GA | 30531 | 706 778-8139 | laborers-unskld |
| EDNA | ABUNDIZ | 2800 RIDGEWAY LOT 2 | GAINESVILLE | GA | 30504 | 0 | laborers-unskld |
| ELIAZAR | ABUNDIZ | 1415 WESTSIDE DRIVE | GAINESVILLE | GA | 30501 | 770 718-9563 | laborers-unskld |
| JOSE | ABUNDIZ | 1421 HUDGINS DRIVE | GAINESVILLE | GA | 30504 | 770 531-9042 | laborers-unskld |
| MARIA | ABUNDIZ | 2285 LEE STREET | GAINESVILLE | GA | 30504 | 0 | laborers-unskld |
| HAROLD LUIS | ACEVEDO | 2256 BOY SCOUT CAMP RD. | GAINESVILLE | GA | 30506 | 770 535-5594 | laborers-unskld |
| JOSE | ACEVEDO | 1709 CROWN LANE | GAINESVILLE | GA | 30504 | 770 534-0641 | laborers-unskld |
| LUZ DELIA | ACEVEDO | 2212 MOUNTAINVIEW ROAD | GAINESVILLE | GA | 30504 | 770 297-0599 | laborers-unskld |
| VICTOR | ACEVEDO | 342 PRIOR STREET N | GAINESVILLE | GA | 30501 | 770 297-1142 | laborers-unskld |
| VICTOR | ACEVEDO | 10 AVENUE STREET | GAINESVILLE | GA | 30504 | 770 536-8716 | laborers-unskld |
| FRANCISCO | ACEVES | 4191 VALLEY GLEN ROAD | GAINESVILLE | GA | 30507 | 770 535-7552 | craf wrkers skl |
| PRIMITIVO | ACEVES | 205 SKYVIEW DRIVE | GAINESVILLE | GA | 30501 | 770 536-8595 | laborers-unskld |
| RAMONA | ACEVES | 682 AUBURN AVE. | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| DAVID | ACOSTA | WESTSIDE MOBILE HOME PK LOT 4 | GAINESVILLE | GA | 30501 | 770 503-1120 | operatives-s-sk |
| DINO | ACOSTA | 2354 PINE COVE CIRCLE SW | GAINESVILLE | GA | 30504 | 770 533-9296 | laborers-unskld |
| HILMER | ACOSTA | 267 GREENHILL CIRCLE | GAINESVILLE | GA | 30504 | 770 538-0637 | laborers-unskld |
| IRMA | ACOSTA | 1608 WESTSIDE DRIVE | GAINESVILLE | GA | 30501 | 770 718-9787 | laborers-unskld |
| JOSE | ACOSTA | 768 PARKWAY DRIVE | GAINESVILLE | GA | 30501 | 770 534-7102 | laborers-unskld |
| JUAN | ACOSTA | 4005 BELVEDERE DRIVE | GAINESVILLE | GA | 30506 | 770 531-7486 | laborers-unskld |
| JUAN | ACOSTA | 3343 EAST VALLEY CIRCLE | GAINESVILLE | GA | 30504 | 770 297-8260 | laborers-unskld |
| MARIA | ACOSTA | 3424 WILLOW RIDGE CIRCLE | GAINESVILLE | GA | 30504 | 770 534-8944 | laborers-unskld |
| PABLO | ACOSTA | 267 GREENHILL CR | GAINESVILLE | GA | 30504 | 770 538-0637 | laborers-unskld |

Interrogatory NO. 3.
Past and Present Employees



| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| PATRICIA | ACOSTA | 3424 WILLOW RIDGE SW | GAINESVILLE | GA | 30504 | 770 534-8944 | laborers-unskld |
| SANTOS | ACOSTA | 39 DEAN ST. | GAINESVILLE | GA | 30501 | 678 450-9577 | laborers-unskld |
| SILVERIO | ACOSTA | 267 GREENHILL CIRCLE | GAINESVILLE | GA | 30501 | 770 538-0637 | laborers-unskld |
| VALENTE | ACOSTA | 106 MCCONNELL DRIVE LOT 20 | GAINESVILLE | GA | 30501 | 770 297-7299 | laborers-unskld |
| WILLIAM | ACOSTA | 2013 MOUNTQAINVIEW RD | GAINESVILLE | GA | 30504 | 770 539-9653 | service workers |
| JOSE | ACOSTA-SANTC | 267 GREEN HILL CIR N W | GAINESVILLE | GA | 30504 | 770 538-0637 | laborers-unskld |
| MARIO | ACTUN | 2210 SPRING ROAD | GAINESVILLE | GA | 30507 | 770 535-0735 | laborers-unskld |
| LISA | ACUFF | 120 J D NORTON ROAD | ALTO | GA | 30510 | 770 535-5723 | laborers-unskld |
| MARIA | ACUNA | 1421 WESTSIDE DR. | GAINESVILLE | GA | 30501 | 770 297-5093 | laborers-unskld |
| TOMASA | ACUNA | 3515 TRIPLE CREEK BEND | GAINESVILLE | GA | 30507 | 770 536-7205 | laborers-unskld |
| FRANCISCO | ADAME | 3298 PARKER DRIVE | GAINESVILLE | GA | 30507 | 404 535-2874 | laborers-unskld |
| ALBERT | ADAMS | 1002 AVIATION BLVD | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| BRADLEY | ADAMS | 5425 W G ROBINON ROAD | GAINESVILLE | GA | 30506 | 770 287-9954 | laborers-unskld |
| CAROL | ADAMS | 3527 CASPER DR LOT 8 | GAINESVILLE | GA | 30506 | 770 532-5049 | laborers-unskld |
| DIANE | ADAMS | RT 2 BOX 6 N | ALTO | GA | 30510 | 0 | laborers-unskld |
| HERMAN | ADAMS | 5425 W. G. ROBINSON ROAD | GAINESVILLE | GA | 30506 | 0 | laborers-unskld |
| JOSEPH | ADAMS | P.O. BOX 981 | HOMER | GA | 30543 | 706 677-2505 | laborers-unskld |
| KENNETH | ADAMS | RTE 2 BOX 1280-A | TALMO | GA | 30575 | 0 | laborers-unskld |
| KIMBERLY | ADAMS | 208 SHERRY LANE | GAINESVILLE | GA | 30504 | 770 718-1114 | laborers-unskld |
| LADORA | ADAMS | 2368 PINE CIRCLE | GAINESVILLE | GA | 30501 | 770 536-2838 | laborers-unskld |
| LASHAUN | ADAMS | 4349 SPAINHILL CIRCLE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| MARY | ADAMS | 5351 WHITMIRE DR | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ORA | ADAMS | 4354 SPAIN HILL CIRCLE | GAINESVILLE | GA | 30504 | 0 | laborers-unskld |
| SONYA | ADAMS | 2031 WILLOW RD | GAINESVILLE | GA | 30507 | 770 287-3776 | laborers-unskld |
| TAMMY | ADAMS | 7090 ALLEN THOMAS ROAD | CUMMING | GA | 30130 | 770 844-4427 | laborers-unskld |
| TIMMY | ADAMS | RT 1 WHITEHALL RD | LULA | GA | 30554 | 0 | craf wrkers skl |
| WANDA | ADAMS | 5425 WG ROBINSON RD | GAINESVILLE | GA | 30506 | 0 | professionals |
| GARY | ADDISON | 2307 A BROWNSBRIDGE RD | GAINESVILLE | GA | 30501 | 0 | craf wrkers skl |
| MARK | ADERHOLDT | RTE 1 BOX 205 | EASTANOLLEE | GA | 30538 | 706 779-3255 | professionals |
| MARK | ADERHOLDT | RTE 1 BOX 205 | EASTANOLLEE | GA | 30538 | 706 779-3255 | professionals |
| BILLY | ADKINS | 5121 UNION CH RD | FLOWERY BRANCH | G/ | 30542 | 0 | laborers-unskld |
| BILLY | ADKINS | 3212 HILL TOP CIRCLE | GAINESVILLE | GA | 30506 | 770 287-0972 | operatives-s-sk |
| EDWARD | ADKINS | 3207 DIXIELAND RD | GAINESVILLE | GA | 30501 | 770 532-3718 | laborers-unskld |
| TERESA | ADKINS | 3212 HILLTOP CIRCLE | GAINESVILLE | GA | 30506 | 770 297-3576 | laborers-unskld |

Case No. 1:03CV02422 (RMC)

Interrogatory NO. 3.
Past and Present Employees



| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| CARLOS TOMAS | ADORNO | 1617 PARKHILL DRIVE NE APT G8 | GAINESVILLE | GA | 30501 | 678 450-0132 | laborers-unskld |
| ARMANDO | AFONSO | 4075 CRAIG PLACE | GAINESVILLE | GA | 30507 | 770 287-8534 | laborers-unskld |
| EULISE | AFONSO | 4075 CRAIG PLACE | GAINESVILLE | GA | 30507 | 770 987-8534 | laborers-unskld |
| RICARDO | AGOSTO | 1250 EAST RIDGE ROAD | GAINESVILLE | GA | 30501 | 770 531-0437 | laborers-unskld |
| FERNANDO | AGUERO | 32 GEORGIA AVENUE A | GAINESVILLE | GA | 30501 | 770 297-7712 | laborers-unskld |
| FERNANDO | AGUERO | 100 BENNETT STREET | GAINESVILLE | GA | 30501 | 678 450-6683 | laborers-unskld |
| MANUEL | AGUERO | P.O. BOX 908102 | GAINESVILLE | GA | 30501 | 770 297-8705 | laborers-unskld |
| ALBERTO | AGUILAR | LOT S-32 BROWNS BRIDGE ROAD | GAINESVILLE | GA | 30501 | 770 536-6754 | laborers-unskld |
| ALFREDO | AGUILAR | 3516 CASPER DRIVE | GAINESVILLE | GA | 30506 | 770 718-9617 | laborers-unskld |
| ALONZO | AGUILAR | 1810 HANCOCK AVENUE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ARACELI | AGUILAR | 148 MCCONNELL DR. | GAINESVILLE | GA | 30501 | 770 531-0412 | laborers-unskld |
| CLAUDIA | AGUILAR | 3052 BARRETT ROAD | GAINESVILLE | GA | 30507 | 770 503-0880 | laborers-unskld |
| EDDY | AGUILAR | 2212 MEMORIAL PARK PLACE | GAINESVILLE | GA | 30504 | 770 531-6165 | laborers-unskld |
| ELPIDIO | AGUILAR | 629 HILL CREST AVENUE | GAINESVILLE | GA | 30501 | 770 535-1935 | laborers-unskld |
| ERNESTO | AGUILAR | P.O. BOX 734 | GAINESVILLE | GA | 30501 | 770 531-9020 | laborers-unskld |
| FRANCISCO | AGUILAR | 3618 VALLEY CREEK DRIVE | FLOWERY BRAN | H G, | 30542 | 770 287-7746 | laborers-unskld |
| FRANCISCO | AGUILAR | 1335 RICHARD STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| FRANCISCO | AGUILAR | 974 DAVIS ST | GAINESVILLE | GA | 30501 | 770 287-9857 | operatives-s-sk |
| FRANCISCO | AGUILAR | 1750 NORTON DRIVE | GAINESVILLE | GA | 30501 | 770 287-0529 | laborers-unskld |
| FRANCISCO | AGUILAR | 300 HIGHLAND TERRACE | GAINESVILLE | GA | 30504 | 770 531-1584 | laborers-unskld |
| GABRIEL | AGUILAR | 2216 GREGORY AVE | BROWNSVILLE | TX | 78521 | 0 | laborers-unskld |
| GEORGE | AGUILAR | 2115 BOWMAN DRIVE | GAINESVILLE | GA | 30501 | 770 297-0821 | laborers-unskld |
| GERARDO | AGUILAR | 1211 HOLLAND AVENUE | GAINESVILLE | GA | 30501 | 770 532-5055 | laborers-unskld |
| HECTOR | AGUILAR | 39 DUNLAP ST | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JAVIER | AGUILAR | 240 ATLANTA STREET APT D 4 | GAINESVILLE | GA | 30501 | 770 539-9439 | laborers-unskld |
| JOSE | AGUILAR | 1019 LENOX PARK PLACE | GAINESVILLE | GA | 30507 | 770 531-1369 | laborers-unskld |
| JOSE | AGUILAR | 103 CRONIC DRIVE | GAINESVILLE | GA | 30501 | 770 534-6666 | laborers-unskld |
| JOSE | AGUILAR | 1750 NORTON DR APT D7 | GAINESVILLE | GA | 30501 | 770 718-9641 | laborers-unskld |
| JUAN | AGUILAR | 912 MYRTLE STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JUVENTINO | AGUILAR | 1687 PARKHILL DRIVE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| MANUEL | AGUILAR | P O BOX 77 | NOCATEE | FL | 34268 | 0 | laborers-unskld |
| MANUEL | AGUILAR | 649 DORSEY ST APT. E | GAINESVILLE | GA | 30501 | 770 532-0651 | laborers-unskld |
| MARCO | AGUILAR | 1545 PARKHILL D-4 | GAINESVILLE | GA | 30501 | 770 297-8615 | laborers-unskld |
| MARIA | AGUILAR | 4319 SPAINHILL CIRCLE | GAINESVILLE | GA | 30504 | 770 531-0979 | operatives-s-sk |

Interrogatory NO. 3.
Past and Present Employees



| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| MARTIN | AGUILAR | P.O. BOX 491 | BALDWIN | GA | 30511 | 0 | laborers-unskld |
| ROMAN | AGUILAR | 769 CLEVELAND STREET | GAINESVILLE | GA | 30501 | 770 297-5285 | laborers-unskld |
| FRANCISCO | AGUILAR-ORAN | 1687 PARKHILL DRIVE APT K1 | GAINESVILLE | GA | 30501 | 678 450-4669 | laborers-unskld |
| ALEJANDRO | AGUILERA | 2422 5TH STREET | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| ALEJANDRO | AGUILERA | 415 ATLANTA HWY | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| BENJAMIN | AGUILERA | 1750 LATHEM DR. | GAINESVILLE | GA | 30504 | 770 533-5994 | laborers-unskld |
| FILEMON | AGUILERA | 512 BANKS STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JAIME | AGUILERA | 2677 LENOX DRIVE | GAINESVILLE | GA | 30507 | 770 654-2193 | laborers-unskld |
| KRISTINA | AGUILERA | 1433 LYMAN STREET | GAINESVILLE | GA | 30501 | 770 535-2194 | laborers-unskld |
| MARTIN | AGUILERA | 2124 LYNX LANE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| PAMELA | AGUILERA | 3302 HOLLYSPRINGS RD | GAINESVILLE | GA | 30507 | 770 718-1093 | operatives-s-sk |
| SALOMON | AGUILERA | 512 BANKS STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ADAN | AGUIRRE | P.O. BOX 5772 | GAINESVILLE | GA | 30501 | 770 536-1910 | operatives-s-sk |
| ADAN | AGUIRRE | 4119 VALLEY GLENN | GAINESVILLE | GA | 30507 | 770 534-3385 | laborers-unskld |
| ANGEL | AGUIRRE | 320 CRONIC STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ARMANDO | AGUIRRE | 652 CENTRAL AVENUE | GAINESVILLE | GA | 30501 | 770 287-3290 | laborers-unskld |
| GUILLERMINA | AGUIRRE | 15 HILLTOP STREET | GAINESVILLE | GA | 30501 | 770 532-7905 | operatives-s-sk |
| HUMBERTO | AGUIRRE | 652 CENTRAL AVENUE | GAINESVILLE | GA | 30501 | 770 287-3290 | laborers-unskld |
| JESUS | AGUIRRE | 3538 WEST GATE | GAINESVILLE | GA | 30504 | 770 297-1490 | laborers-unskld |
| JOSE | AGUIRRE | 1780 CROW LANE | GAINESVILLE | GA | 30504 | 770 539-9194 | laborers-unskld |
| JOSE | AGUIRRE | 1780 CROW LANE | GAINESVILLE | GA | 30504 | 770 539-9184 | laborers-unskld |
| MARGARITA | AGUIRRE | 652 CENTRAL AVENUE | GAINESVILLE | GA | 30501 | 770 287-3290 | laborers-unskld |
| NARCISO | AGUIRRE | 115 SECOND ST | GAINESVILLE | GA | 30501 | 770 287-1018 | laborers-unskld |
| OSCAR | AGUIRRE | 11 RIDERS ROAD | GAINESVILLE | GA | 30501 | 770 534-4133 | laborers-unskld |
| PEDRO | AGUIRRE | 35 A STALLWORTH DRIVE | GAINESVILLE | GA | 30501 | 678 450-9295 | laborers-unskld |
| ROBERTO | AGUIRRE | 3011 BUICE LANE | GAINESVILLE | GA | 30504 | 770 535-6661 | laborers-unskld |
| ROGELIO | AGUIRRE | 1919 WILMONT LANE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| RUBEN | AGUIRRE | 3298 JOE PARKER ROAD | GAINESVILLE | GA | 30507 | 770 297-0626 | laborers-unskld |
| RUBEN | AGUIRRE | 3505 COCHRAN ROAD LOT 4 | GAINESVILLE | GA | 30506 | 770 297-8228 | laborers-unskld |
| SERGIO | AGUIRRE | 49 QUARRY STREET | GAINESVILLE | GA | 30501 | 678 989-0372 | laborers-unskld |
| ABDELLA | AHMED | 2490B HIDDEN CRT | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| GISELE | AKAMBA | P.O. BOX 5688 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| FIRAS | AL-BARZINJI | 11919 SAFA COURT | HERNDON | VA | 20170 | 703 404-4422 | laborers-unskld |
| CESAR | ALANIS | 755 WEST AVENUE APT 3 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |

Interrogatory NO. 3.
Past and Present Employees



| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| ESEQUIEL | ALANIS | 106 MCCONNELL DR | GAINESVILLE | GA | 30501 | 770 532-7972 | laborers-unskld |
| GERARDO | ALANIS | 105 A HICKORY STREET | GAINESVILLE | GA | 30501 | 770 538-0853 | laborers-unskld |
| JUAN | ALANIS | 1206 MYRTLE STREET | GAINESVILLE | GA | 30501 | 770 534-1619 | laborers-unskld |
| NORA | ALANIS | 2252 CANDLER ROAD | GAINESVILLE | GA | 30507 | 770 297-9544 | laborers-unskld |
| ARMANDO | ALANIZ | 41 OPHELIA DRIVE | GAINESVILLE | GA | 30506 | 770 297-5303 | laborers-unskld |
| GILBERT | ALANIZ | 2607 BROWNS BRIDGE ROAD | GAINESVILLE | GA | 30504 | 770 297-0978 | laborers-unskld |
| MANUEL | ALANIZ | 306 STRINGER AVENUE | GAINESVILLE | GA | 30501 | 770 531-0757 | laborers-unskld |
| MANUEL | ALANIZ | 306 STRINGER AVENUE | GAINESVILLE | GA | 30501 | 770 531-0757 | laborers-unskld |
| OSCAR | ALANIZ | 10 A AVENUE | GAINESVILLE | GA | 30504 | 770 297-9976 | laborers-unskld |
| RICARDO | ALANIZ-SALAZAI | 5403 ATLANTA STREET | GAINESVILLE | GA | 30501 | 770 287-0824 | operatives-s-sk |
| ARNULFO | ALARCON | 2017 CROW ROAD | GAINESVILLE | GA | 30501 | 770 490-6225 | laborers-unskld |
| EDGAR | ALARCON | 2120 CHICOPEE STREET | GAINESVILLE | GA | 30504 | 770 503-9423 | laborers-unskld |
| EFREN | ALARCON | 682 AUBURN AVE | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| JOSE | ALARCON | 1104 HAZEL STREET | GAINESVILLE | GA | 30501 | 770 287-0498 | laborers-unskld |
| JOSE | ALARCON | 758 MELODY LN | GAINESVILLE | GA | 30501 | 770 536-6592 | laborers-unskld |
| JOSE GENARO | ALARCON | 1631 LAKEVIEW CIRCLE | GAINESVILLE | GA | 30501 | 678 450-0957 | laborers-unskld |
| JUAN | ALARCON | 2202 MT VIEW | GAINESVILLE | GA | 30501 | 770 503-1126 | laborers-unskld |
| LUIS | ALARCON | 2120 CHICOPEE STREET | GAINESVILLE | GA | 30504 | 770 503-9423 | laborers-unskld |
| MARIA | ALARCON | 4024 TWIN SPRINGS ROAD | GAINESVILLE | GA | 30507 | 770 538-0719 | laborers-unskld |
| MARIO | ALARCON | 2202 MOUNTIAN VIEW DRIVE | GAINESVILLE | GA | 30501 | 770 503-1126 | laborers-unskld |
| TIBURCIO | ALARCON | 178 CRESCENT CIRCLE | GAINESVILLE | GA | 30507 | 770 718-9442 | laborers-unskld |
| RUBEN | ALATORRE | 2185 ATHENS HWY | GAINESVILLE | GA | 30507 | 770 531-9990 | laborers-unskld |
| ERNESTO | ALBA | 14 A AVENUE | GAINESVILLE | GA | 30504 | 770 873-0362 | laborers-unskld |
| FIDEL | ALBA | P.O. BOX 907212 | GAINESVILLE | GA | 30501 | 770 718-0666 | laborers-unskld |
| JOSE | ALBALLERO | 1545 PARKHILL DRIVE E-11 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| DOMINGA | ALBERTO | 1687 PARKHILL DRIVE | GAINESVILLE | GA | 30501 | 770 967-7027 | laborers-unskld |
| LETICIA | ALBERTO | 3056 BROWNS BRIDGE | GAINESVILLE | GA | 30501 | 678 450-1711 | laborers-unskld |
| NIEVES | ALBERTO | 200 FORREST AVENUE | GAINESVILLE | GA | 30501 | 770 718-1325 | laborers-unskld |
| MARANGELLY | ALBIZU | 2782 BUENA VISTA CIRCLE | GAINESVILLE | GA | 30504 | 770 297-8824 | laborers-unskld |
| NORMA | ALCALA | 2520 CHICOPEE DRIVE | GAINESVILLE | GA | 30504 | 770 287-7195 | laborers-unskld |
| ISIDRO | ALCANTAR | 1416 LYMAN ST | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ISIDRO | ALCANTAR | 1416 LYMAN STREET | GAINESVILLE | GA | 30501 | 770 532-7741 | laborers-unskld |
| JORGE | ALCANTAR | 2221 SAILORS AVENUE LOT A | GAINESVILLE | GA | 30504 | 678 450-5685 | laborers-unskld |
| PEDRO | ALCANTAR | 1416 LYMAN STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |

| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| MARCO | ALCAZAR | 1310 ALMOND TREE WAY | DELANO | CA | 93215 | 0 | laborers-unskld |
| ROSALINDA | ALCORTA | 1134 W. RIDGE ROAD | GAINESVILLE | GA | 30501 | 770 536-2348 | laborers-unskld |
| SIMEON | ALDACO | 2307A BROWNS BRIDGE ROAD | GAINESVILLE | GA | 30501 | 770 503-9762 | laborers-unskld |
| TRANCITO | ALDACO | 2291 BROWNS BRIDGE RD BOX 173 | GAINESVILLE | GA | 30501 | 770 965-6910 | laborers-unskld |
| TRANCITO | ALDACO | 2291 BROWNS BR RD BOX 173 | GAINESVILLE | GA | 30501 | 770 531-0513 | laborers-unskld |
| FRANCISCO | ALDACO-BARBC | 2272 BOYSCOUT ROAD | GAINESVILLE | GA | 30501 | 770 535-1208 | laborers-unskld |
| ERIKA | ALEJANDRE | 1250 MARLOW DRIVE | GAINESVILLE | GA | 30501 | 770 297-0465 | laborers-unskld |
| FELIPE | ALEJANDRO | 230 HIGHLAND TERRACE 4 | GAINESVILLE | GA | 30501 | 770 533-9767 | laborers-unskld |
| LAURA | ALEJANDRO | 773 CLEVELAND STREET | GAINESVILLE | GA | 30501 | 770 535-1967 | laborers-unskld |
| NOEL | ALEJANDRO | 2343 SMALLWOOD DRIVE | GAINESVILLE | GA | 30501 | 770 534-8961 | laborers-unskld |
| J. GUADALUPE | ALEJO | 1610 WESTSIDE DRIVE | GAINESVILLE | GA | 30501 | 936 524-3515 | laborers-unskld |
| SILVIA | ALEJOS | 32 DEAN STREET | GAINESVILLE | GA | 30501 | 770 536-7566 | laborers-unskld |
| JULIO | ALEMAN | 2283 SPRING ROAD | GAINESVILLE | GA | 30504 | 770 287-1866 | laborers-unskld |
| LETICIA | ALEMAN | 400 PIEDMONT ROAD | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| NIDIA | ALEMAN | 2700 SMITH CIRCLE | GAINESVILLE | GA | 30504 | 770 534-7408 | laborers-unskld |
| DEBBIE | ALEXANDER | RT 1 BOX 334 | CLEVELAND | GA | 30528 | 0 | laborers-unskld |
| ANA | ALFARO | 403 LAURA LANE | GAINESVILLE | GA | 30503 | 678 450-1426 | laborers-unskld |
| EDGAR | ALFARO | 2740 BARKER ROAD LOT 2 | GAINESVILLE | GA | 30501 | 770 503-7593 | laborers-unskld |
| JESUS | ALFARO | 2402 SKELTON ROAD | GAINESVILLE | GA | 30504 | 770 718-0697 | laborers-unskld |
| JOSEFINA | ALFARO | 9 MERCK STREET | GAINESVILLE | GA | 30501 | 770 535-7063 | laborers-unskld |
| JUAN | ALFARO | 1529 CARTER STREET | GAINESVILLE | GA | 30501 | 678 450-9298 | laborers-unskld |
| LUIS | ALFARO | 1415 WESTSIDE DRIVE | GAINESVILLE | GA | 30501 | 678 450-9081 | laborers-unskld |
| MARIA | ALFARO | 106 MCCONNELL DRIVE LOT 212 | GAINESVILLE | GA | 30501 | 770 538-0991 | laborers-unskld |
| MARIO | ALFARO | 2150 NORTHWEST 9TH ST. APT 414 | MIAMI | FL | 33125 | 770 534-2875 | laborers-unskld |
| ROBERTO | ALFARO | 3540 GILLELAND EXT.C3 | GAINESVILLE | GA | 30507 | 770 297-0589 | laborers-unskld |
| ROBERTO | ALFARO | 1215 MARTIN LUTHER KING JR BLV | GAINESVILLE | GA | 30501 | 770 287-0643 | laborers-unskld |
| ROSALIO | ALFARO | P.O. BOX 5952 WSB | GAINESVILLE | GA | 30504 | 770 718-0697 | laborers-unskld |
| JORGE | ALICANO | 1002 AIRPORT DRIVE | GAINESVILLE | GA | 30501 | 770 538-0088 | laborers-unskld |
| NADYA MARIEL | ALICEA | 3238 ROPER LANE | GAINESVILLE | GA | 30504 | 678 450-1937 | laborers-unskld |
| RAUL | ALICEA | 200 PIEDMONT AVENUE | GAINESVILLE | GA | 30501 | 770 310-0798 | laborers-unskld |
| CLIFFORD | ALLEN | 673 A.T. MOORE RD. | DAWSONVILLE | GA | 30534 | 706 889-1339 | laborers-unskld |
| ELLA | ALLEN | 2110B WILDWOOD DR | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| EUGENE | ALLEN | 125 BORDERRS ST | JEFFERSON | GA | 30549 | 706 367-9465 | laborers-unskld |
| EUGENE | ALLEN | 2045 OLD CLARKS BR RD | GAINESVILLE | GA | 30501 | 770 536-8344 | laborers-unskld |

Interrogatory NO. 3.
Past and Present Employees



| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| JERRY | ALLEN | 1195 BROAD ST | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| MARTHA | ALLEN | 1720 MOON DRIVE | GAINESVILLE | GA | 30501 | 770 536-1614 | laborers-unskld |
| MATTHEW | ALLEN | 220 HARRISON DRIVE | ALTO | GA | 30510 | 706 778-2441 | craf wrkers skl |
| ROSA | ALLEN | 5731 COOL SPRINGS RD. | GAINESVILLE | GA | 30506 | 770 534-5041 | operatives-s-sk |
| SHARON | ALLEN | 220 HARRISON TRAILS | ALTO | GA | 30510 | 706 778-2441 | laborers-unskld |
| SHELIA | ALLEN | 1049 TRAVIS DR | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| TIMOTHY | ALLEN | 2740 BARKER RD | GAINESVILLE | GA | 30506 | 770 287-9967 | operatives-s-sk |
| WILLIE | ALLEN | RT 2 BOX 52 | LULA | GA | 30554 | 0 | laborers-unskld |
| DENNIS | ALLISON | RTE 7 BOX 361 | GAINESVILLE | GA | 30506 | 0 | |
| DENNIS | ALLISON | ROUTE 7 BOX 361 | GAINESVILLE | GA | 30506 | 0 | operatives-s-sk |
| DENNIS | ALLISON | 3090 FORK RD | GAINESVILLE | GA | 30506 | 770 532-3482 | operatives-s-sk |
| DIANE | ALLISON | 2335 ATHENS HWY | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JOHNNY | ALLISON | 5945 CLEVELAND HWY | CLERMONT | GA | 30527 | 770 983-3461 | laborers-unskld |
| MARVIN | ALLISON | 3216 FORK ROAD | GAINESVILLE | GA | 30506 | 770 532-3482 | operatives-s-sk |
| MONROE | ALLISON | 2319 ATHENS HWY | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| MONROE | ALLISON | 2319 ATHENS HWY | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| THERESA | ALLISON | 3351 LADD DRIVE | GAINESVILLE | GA | 30506 | 770 539-9644 | laborers-unskld |
| JERRY | ALLSHOUSE | 5908 WALL STREET | LULA | GA | 30554 | 770 869-7160 | laborers-unskld |
| RAMON | ALMAGUER | 1880 PLEASANT CIRCLE | GAINESVILLE | GA | 30504 | 770 531-7981 | laborers-unskld |
| DANIEL | ALMANZA | 3859 AMBER GLEN LANE | GAINESVILLE | GA | 30507 | 678 450-0406 | laborers-unskld |
| JORGE | ALMANZA-MERC | 2477 BROADWAY PLACE | GAINESVILLE | GA | 30501 | 770 532-4324 | laborers-unskld |
| ANGEL | ALMARAZ | 2104 DIXIE DR. | GAINESVILLE | GA | 30504 | 770 287-7061 | laborers-unskld |
| EDUARDO | ALMARAZ | 35 BRANCH STREET | GAINESVILLE | GA | 30501 | 770 561-1635 | laborers-unskld |
| FRED | ALMARAZ | 885 SUNSET STREET | GAINESVILLE | GA | 30501 | 770 533-9540 | laborers-unskld |
| JORGE | ALMARAZ | 3016 ATHENS HWY | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| MARIA | ALMAREZ | 1125 HAZEL STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| BRUNO | ALMAZAN | 1545 PARKHILL DRIVE B13 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ANGELA | ALMEIDA | 3656 BROWNS BRIDGE ROAD F 205 | GAINESVILLE | GA | 30504 | 770 287-1118 | laborers-unskld |
| ESMERALDA | ALMEIDA | 828 WEST AVENUE | GAINESVILLE | GA | 30501 | 770 503-9733 | laborers-unskld |
| SANTOS | ALMENDAREZ | 1664 PARKHILL DRIVE | GAINESVILLE | GA | 30501 | 770 535-7956 | laborers-unskld |
| SABINO | ALONSO | 684 CENTRAL AVE | GAINESVILLE | GA | 30501 | 770 718-0894 | operatives-s-sk |
| JASON | ALONZO | 240 ATLANTA STREET S 4 | GAINESVILLE | GA | 30501 | 770 533-9524 | laborers-unskld |
| LORENZO | ALONZO | 641 DORSEY ST | GAINESVILLE | GA | 30501 | 770 535-6679 | laborers-unskld |
| MONICA | ALONZO | 2404 CHICOPEE STREET | GAINESVILLE | GA | 30501 | 770 532-6778 | laborers-unskld |

| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| ANASTSIA KARLA | ALSTON | 2533 WESTGATE | GAINESVILLE | GA | 30504 | 678 450-8378 | laborers-unskld |
| AMER | ALTALIB | 6094 DAFFODIL DRIVE | FLOWERY BRANCH | G, | 30542 | 770 967-4908 | professionals |
| HASAN | ALTALIB | P.O. BOX 1017 | GAINESVILLE | GA | 30503 | 0 | laborers-unskld |
| NOHA | ALTALIB | 11926 SAFA COURT | HERNDON | VA | 20170 | 0 | laborers-unskld |
| MELANIE | ALVA | 106 MCCONNELL DRIVE LOT 22 | GAINESVILLE | GA | 30501 | 770 718-0461 | laborers-unskld |
| ECTOR | ALVARADO | 1987 PARKHILL DRIVE APT G 8 | GAINESVILLE | GA | 30501 | 770 534-0794 | laborers-unskld |
| EDMUNDO | ALVARADO | 3656 BROWNS BRIDGE RD D 201 | GAINESVILLE | GA | 30504 | 770 287-8152 | laborers-unskld |
| EMILIA | ALVARADO | 2698 MARLETTE ROAD B 15 | GAINESVILLE | GA | 30507 | 770 535-7869 | laborers-unskld |
| EMMA | ALVARADO | 5292 TRUDY CIRCLE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ENRIQUE | ALVARADO | 661 DORSEY STREET APT A | GAINESVILLE | GA | 30501 | 770 534-8207 | laborers-unskld |
| ENRIQUE | ALVARADO | 661 DORSEY STREET APT A | GAINESVILLE | GA | 30501 | 770 534-8207 | laborers-unskld |
| ERNESTO | ALVARADO | P.O. BOX 5643 | GAINESVILLE | GA | 30501 | 770 535-2505 | laborers-unskld |
| ERNESTO | ALVARADO | P.O. BOX 5082 | GAINESVILLE | GA | 30504 | 770 534-6715 | laborers-unskld |
| ESPITIA | ALVARADO | 1420 LYMAN STREET | GAINESVILLE | GA | 30501 | 770 287-8754 | laborers-unskld |
| GUILLERMO | ALVARADO | 2601 THOMPSON BR RD 14E | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| INDRA | ALVARADO | 815 HARRISON SQUARE D 3 | GAINESVILLE | GA | 30507 | 770 535-8807 | laborers-unskld |
| JOSE | ALVARADO | P.O. BOX 1084 | OAKWOOD | GA | 30566 | 770 532-4648 | laborers-unskld |
| JOSE | ALVARADO | 206 KEITH CR | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JOSE | ALVARADO | 611 DORSEY STREET | GAINESVILLE | GA | 30501 | 770 287-2571 | laborers-unskld |
| JOSE | ALVARADO | 3092 BARRETT ROAD | GAINESVILLE | GA | 30507 | 0 | laborers-unskld |
| JOSE | ALVARADO | 3092 BARRETT ST. | GAINESVILLE | GA | 30501 | 770 503-9075 | laborers-unskld |
| JOSE | ALVARADO | 3092 BARRETT ROAD | GAINESVILLE | GA | 30507 | 770 503-9075 | laborers-unskld |
| JOSEFINA | ALVARADO | 794 DORSEY ST | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| JUAN | ALVARADO | 2368 CANNON RIDGE ST | GAINESVILLE | GA | 30507 | 678 450-4228 | laborers-unskld |
| JUAN | ALVARADO | P.O. BOX 224 | TALMO | GA | 30575 | 0 | laborers-unskld |
| JUAN | ALVARADO | 3131 BUICE CIRCLE | GAINESVILLE | GA | 30504 | 770 297-6425 | laborers-unskld |
| JUAN | ALVARADO | 2809 WILLOW RIDGE RD. | GAINESVILLE | GA | 30504 | 0 | laborers-unskld |
| LUCIO | ALVARADO | 2734 BUENA VISTA CIRCLE | GAINESVILLE | GA | 30501 | 678 450-9289 | laborers-unskld |
| MARIA | ALVARADO | 1164 S. ENOTA DRIVE | GAINESVILLE | GA | 30501 | 770 287-3596 | laborers-unskld |
| MIGUEL | ALVARADO | 854 DAVIS STREET APT. 02 | GAINESVILLE | GA | 30501 | 770 531-1425 | laborers-unskld |
| NABOR | ALVARADO | 1350 MARLOW RD | GAINESVILLE | GA | 30501 | 770 536-4750 | laborers-unskld |
| NOE | ALVARADO | 2513 BROWNS BRIDGE ROAD | GAINESVILLE | GA | 30504 | 770 297-9976 | laborers-unskld |
| PAUL | ALVARADO | 20 STALLWORTH STREET | GAINESVILLE | GA | 30501 | 678 450-7348 | laborers-unskld |
| POMPEYO | ALVARADO | P.O. BOX 5553 | GAINESVILLE | GA | 30501 | 770 535-1248 | laborers-unskld |

Interrogatory NO. 3.
Past and Present Employees



| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| SILVESTRE | ALVARADO | 2025 MTN VIEW ROAD LOT 4 | GAINESVILLE | GA | 30504 | 770 531-1696 | laborers-unskld |
| RAMON | ALVARADO-ZEP | 306 DOGWOOD STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| SAMMY | ALVAREEZ | 4014 GLEN RIDGE ROAD | GAINESVILLE | GA | 30507 | 770 654-6015 | laborers-unskld |
| JOSE | ALVARENGA | 12 A AVENUE | GAINESVILLE | GA | 30504 | 678 895-9313 | laborers-unskld |
| ALEJANDRO | ALVAREZ | 1843 GAINES DRIVE | GAINESVILLE | GA | 30504 | 770 297-6541 | laborers-unskld |
| ANGEL | ALVAREZ | 512 CRESCENT DRIVE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ANNETTE | ALVAREZ | 42 STALLWORTH STREET | GAINESVILLE | GA | 30501 | 770 503-9123 | laborers-unskld |
| ARTURO | ALVAREZ | P.O. BOX 5428 | GAINESVILLE | GA | 30504 | 770 534-3595 | laborers-unskld |
| AVELIA | ALVAREZ | 1545 RICHARD STREET | GAINESVILLE | GA | 30501 | 770 718-0611 | laborers-unskld |
| BALTAZAR | ALVAREZ | 1418 WESTSIDE DRIVE | GAINESVILLE | GA | 30501 | 770 297-9253 | laborers-unskld |
| DELIA | ALVAREZ | 2252 CANDLER ROAD | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| EDDIE | ALVAREZ | 5114 TWIN OAKS LANE | MURRAYVILLE | GA | 30564 | 770 532-2787 | laborers-unskld |
| FACUNDO | ALVAREZ | 1750 NORTON DR. | GAINESVILLE | GA | 30501 | 770 503-9001 | laborers-unskld |
| JOSE | ALVAREZ | 1005 WEST RIDGE RD. | GAINESVILLE | GA | 30501 | 770 297-1250 | laborers-unskld |
| JOSE | ALVAREZ | 3378 APACHE CIRCLE | OAKWOOD | GA | 30566 | 0 | laborers-unskld |
| JOSE | ALVAREZ | 703 WEST AVENUE E 7 | GAINESVILLE | GA | 30501 | 678 450-2849 | laborers-unskld |
| JOSE | ALVAREZ | 723 WASHINGTON ST | GAINESVILLE | GA | 30501 | 770 531-7580 | laborers-unskld |
| JUAN | ALVAREZ | 3631 DELRIO DRIVE | GAINESVILLE | GA | 30504 | 770 532-7201 | laborers-unskld |
| JUAN | ALVAREZ | 300 SKYVIEW DRIVE APT A1 | GAINESVILLE | GA | 30504 | 770 718-9398 | laborers-unskld |
| JUAN | ALVAREZ | 1260 ATLANTA HWY | GAINESVILLE | GA | 30501 | 770 718-9448 | laborers-unskld |
| JUAN DE | ALVAREZ | P.O. BOX 5463 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| LISSETH | ALVAREZ | 2104 DIXIE DRIVE | GAINESVILLE | GA | 30504 | 770 287-7061 | laborers-unskld |
| MARCO | ALVAREZ | 2503 GILLSVILLE HWY | GAINESVILLE | GA | 30501 | 770 262-0293 | laborers-unskld |
| MARGIE | ALVAREZ | 1230 MARLOW DRIVE | GAINESVILLE | GA | 30501 | 770 287-7690 | laborers-unskld |
| MIGUEL | ALVAREZ | 1304 MARLOW DR | GAINESVILLE | GA | 30501 | 770 718-1374 | laborers-unskld |
| MIGUEL | ALVAREZ | 401 HIGHLAND TERRACE | GAINESVILLE | GA | 30501 | 678 989-0881 | laborers-unskld |
| RAMIRO | ALVAREZ | 1211 HOLLAND AVENUE | GAINESVILLE | GA | 30501 | 770 718-9036 | laborers-unskld |
| REFUGIO | ALVAREZ | 3644 WINDY HILL CIRCLE | GAINESVILLE | GA | 30504 | 770 531-9712 | laborers-unskld |
| REYNALDO | ALVAREZ | 724 CLEVELAND ST. | GAINESVILLE | GA | 30501 | 770 531-0156 | laborers-unskld |
| ROSALINDA | ALVAREZ | 2660 MARLETTE | GAINESVILLE | GA | 30507 | 770 536-5472 | laborers-unskld |
| RUBEN | ALVAREZ | 3619 WHISPER WOOD WAY | GAINESVILLE | GA | 30507 | 770 531-7659 | laborers-unskld |
| SAUL | ALVAREZ | 2246 HENDERSON DR. | GAINESVILLE | GA | 30504 | 770 534-8505 | laborers-unskld |
| TERESA | ALVAREZ | LONGBRANCH RD | DAHLONEGA | GA | 30533 | 0 | laborers-unskld |
| PEGGY | ALVIAR | 425 PINE TREE CIRCLE | MAYSVILLE | GA | 30558 | 706 652-2933 | laborers-unskld |

| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| ANDRES | AMADOR | 5152 HOPEWELL LANE | GAINESVILLE | GA | 30507 | 0 | laborers-unskld |
| HECTOR | AMARO | 43 HIGHLAND AVENUE | GAINESVILLE | GA | 30501 | 770 718-9368 | laborers-unskld |
| ALEX | AMAYA | 424 ATLANTA HWY | GAINESVILLE | GA | 30501 | 770 539-9464 | laborers-unskld |
| LUIS | AMAYA | 424 ATLANTA HWY | GAINESVILLE | GA | 30504 | 770 532-8382 | laborers-unskld |
| ERIKA | AMBRIZ | 2138 BROADWAY | GAINESVILLE | GA | 30504 | 770 294-0981 | laborers-unskld |
| JOSE | AMBRIZ | 1416 LYMAN STREET | GAINESVILLE | GA | 30507 | 0 | laborers-unskld |
| BETTY | AMBROSE | P.O. BOX 664 | CLEVELAND | GA | 30528 | 0 | laborers-unskld |
| FERNANDO | AMEZCUA | 100 BENNET DRIVE | GAINESVILLE | GA | 30501 | 678 450-0970 | laborers-unskld |
| OMAR | AMEZCUA | 1285 TYNER DRIVE LOT 2 | GAINESVILLE | GA | 30501 | 770 503-7077 | laborers-unskld |
| MIGUEL | AMEZOLA | 162 ENOTA AVENUE N.W. APT C | GAINESVILLE | GA | 30501 | 770 287-9268 | laborers-unskld |
| ALFREDO | AMEZQUITA | P.O. BOX 734 | GAINESVILLE | GA | 30501 | 770 534-3204 | laborers-unskld |
| JUAN | AMEZQUITA | 2805 WILLOW RIDGE DRIVE | GAINESVILLE | GA | 30504 | 678 450-0909 | laborers-unskld |
| MAURICIO | AMEZQUITA | 45 MILL STREET | GAINESVILLE | GA | 30501 | 770 503-1237 | laborers-unskld |
| RUBEN | AMEZQUITA | 300 HIGHLAND TERRACE LOT 6 | GAINESVILLE | GA | 30501 | 770 532-6398 | laborers-unskld |
| ALFREDO | ANAYA | 4002 GLEN RIDGE ROAD | GAINESVILLE | GA | 30507 | 770 532-9422 | laborers-unskld |
| FABIOLA | ANAYA | 2905 BURTON CIRCLE | GAINESVILLE | GA | 30507 | 770 539-9620 | laborers-unskld |
| RUBEN | ANAYA | 2851 BARRETT ROAD | GAINESVILLE | GA | 30507 | 770 531-1065 | laborers-unskld |
| VICTOR | ANAYA | 32 GEORGIA AVENUE APT A | GAINESVILLE | GA | 30501 | 770 287-9124 | laborers-unskld |
| LUIS | ANCHONDO | 4366 SPAINHILL CIRCLE | GAINESVILLE | GA | 30504 | 0 | laborers-unskld |
| ANTHONY | ANCIRA | 1147 E RIDGE ROAD | GAINESVILLE | GA | 30501 | 678 450-1929 | laborers-unskld |
| REYNALDO | ANCISO | 2460 SPRING ROAD APT J 95 | GAINESVILLE | GA | 30504 | 0 | laborers-unskld |
| BILLY | ANDERSON | RT 2 BOX 2277 | BLAIRSVILLE | GA | 30512 | 0 | laborers-unskld |
| CHARLES | ANDERSON | P.O. BOX 1644 | CLEVELAND | GA | 30528 | 706 865-3243 | laborers-unskld |
| JAMES | ANDERSON | 2816 OAK HILL CIRCLE | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| JAMES | ANDERSON | 240 ATLANTA ST APT R5 | GAINESVILLE | GA | 30501 | 770 531-9780 | laborers-unskld |
| JOHN | ANDERSON | 548 FAIR ST | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| LORETTA | ANDERSON | 3321 TREE TOP PLACE | GAINESVILLE | GA | 30501 | 770 536-7951 | laborers-unskld |
| MARIA | ANDERSON | 2210 SPRING ROAD | GAINESVILLE | GA | 30504 | 0 | laborers-unskld |
| MARY | ANDERSON | 2145 BOWMAN DR | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| PEYTON | ANDERSON | 5421 MARLOW RD | MURRAYVILLE | GA | 30564 | 770 536-6001 | laborers-unskld |
| PHILLIP | ANDERSON | 1195 JESSE JEWELL PARKWAY | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| T | ANDERSON | 1409 JESS GRIZZLE RD. | DAHLONEGA | GA | 30533 | 706 867-8571 | laborers-unskld |
| TAMMY | ANDERSON | 2601 THOMPSON BRIDGE ROAD | GAINESVILLE | GA | 30501 | 770 536-1100 | laborers-unskld |
| THOMAS | ANDERSON | ROUTE 1 BOX 252 | MURRAYVILLE | GA | 30564 | 0 | operatives-s-sk |

| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| THOMAS | ANDERSON | RT 1 BOX 252 | MURRAYVILLE | GA | 30564 | 0 | |
| THOMAS | ANDERSON | 914 MT. ZION CHURCH ROAD | MURRAYVILLE | GA | 30564 | 706 864-2051 | operatives-s-sk |
| TRACY | ANDERSON | PO BOX 5103 WSB | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| WALLACE | ANDERSON | A1 BUTLER APTS | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| WENDY | ANDERSON | 211 MINCEY AVE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ALEXANDER | ANDINO | 225 CRONIC | GAINESVILLE | GA | 30501 | 770 532-5055 | laborers-unskld |
| LUIS | ANDINO | 31 STALLWORTH STREET | GAINESVILLE | GA | 30501 | 678 450-6651 | laborers-unskld |
| LUIS | ANDINO | 1031 AIRPORT DRIVE | GAINESVILLE | GA | 30501 | 770 287-0397 | laborers-unskld |
| ADAN | ANDRADE | 1914 DRISKELL DRIVE | GAINESVILLE | GA | 30504 | 770 536-5677 | laborers-unskld |
| EDUARDO | ANDRADE | 1260 ATLANTA HWY | GAINESVILLE | GA | 30501 | 770 297-6664 | laborers-unskld |
| ESTEBAN | ANDRADE | 3462 TRIPLE CREEK BEND | GAINESVILLE | GA | 30507 | 770 534-1341 | laborers-unskld |
| EZEQUIEL | ANDRADE | 209 MINCEY ST | GAINESVILLE | GA | 30501 | 770 287-9318 | operatives-s-sk |
| FERNANDO | ANDRADE | 1214 INDUSTRIL BLVD | GAINESVILLE | GA | 30501 | 770 718-1710 | laborers-unskld |
| GILBERTO | ANDRADE | P.O. BOX 1837 | GAINESVILLE | GA | 30501 | 770 718-1438 | laborers-unskld |
| JOSE | ANDRADE | 815 HARRISON SQ APT Q 2 | GAINESVILLE | GA | 30507 | 678 450-4921 | laborers-unskld |
| LAZARA | ANDRADE | 1134 HAZEL STREET | GAINESVILLE | GA | 30501 | 770 287-8745 | laborers-unskld |
| LORENZO | ANDRADE | 647 DORSEY STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| LUIS | ANDRADE | 11 PEACHTRE PL. | GAINESVILLE | GA | 30501 | 770 297-0028 | laborers-unskld |
| MARIA | ANDRADE | 1711 BROWNS BR RD LOT K8 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| MARIE | ANDRADE | 2358 SPORTSMAN RD | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| SERGIO | ANDRADE | 4440 HOLIDAY HEIGHTS DR. | OAKWOOD | GA | 30566 | 678 450-4984 | laborers-unskld |
| EDGARDO B | ANDRADES | 23 PARKHILL DRIVE APT F 3 | GAINESVILLE | GA | 30501 | 770 503-0575 | laborers-unskld |
| MARBIN | ANDRADES | P.O. BOX 1056 | OAKWOOD | GA | 30566 | 770 287-0285 | laborers-unskld |
| EDUARDO | ANDRES | 1785 HANCOCK AVE EXT | GAINESVILLE | GA | 30507 | 770 536-8884 | laborers-unskld |
| MANUEL | ANDRES | P.O. BOX 1673 | CORNELIA | GA | 30531 | 404 776-0320 | operatives-s-sk |
| EARNESTINE | ANDREWS | 638 BANKS STREET | GAINESVILLE | GA | 30501 | 770 534-4313 | laborers-unskld |
| LYNDELL | ANDREWS | 890 PINE ST | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| MIGUEL | ANDUJAR | 771 CHESTNUT ST. | GAINESVILLE | GA | 30501 | 678 450-8853 | laborers-unskld |
| MELINDA | ANGEL | 1875 MARTIN FORD ROAD | DAHLONEGA | GA | 30533 | 770 534-2151 | laborers-unskld |
| GUMESINDO | ANGELES | 2626 LENOX DR. | GAINESVILLE | GA | 30507 | 770 287-7497 | laborers-unskld |
| MARIA | ANGELES-REYE | 3303 INDIAN TRAIL LOT A 25 | GAINESVILLE | GA | 30506 | 770 532-2489 | laborers-unskld |
| ENRIQUETA | ANGUIANO | 1085 LONGVIEW DRIVE | GAINESVILLE | GA | 30501 | 770 531-9694 | laborers-unskld |
| ROGELIO | ANGUIANO | 1113 HAZEL STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JOSE | ANICETO | 1164 S. ENOTA AVE. NE. | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |

| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| LORENZO | ANICETO | 854 DAVIS STREET APT L5 | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| LUISA | ANICETO | TOWN AND COUNTRY MHP LOT 2 | TIFTON | GA | 31794 | 0 | operatives-s-sk |
| TIMOTHY | ANSLEY | 574 WALDEN STREET | BALDWIN | GA | 30511 | 706 499-0437 | laborers-unskld |
| OCIE | ANTHONY | 4003 PEBBLE CREEK | OAKWOOD | GA | 30566 | 0 | laborers-unskld |
| FREDY | ANTONIO | 1862 PLEASANT CR | GAINESVILLE | GA | 30504 | 770 536-2164 | laborers-unskld |
| JOSE SOTERO | ANTUNA | 1509 HANCOCK AVENUE EXT | GAINESVILLE | GA | 30501 | 770 536-2488 | laborers-unskld |
| GUADALUPE | ANTUNEZ | 300 HIGHLAND TR | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| EDUARDO | ANZALDUA | 2530 GOULD DRIVE | GAINESVILLE | GA | 30504 | 770 534-1767 | laborers-unskld |
| MANUEL | APALATEQUI | 2212 MEMORIAL PARK ROAD | GAINESVILLE | GA | 30501 | 770 287-9391 | laborers-unskld |
| CARMEN | APODACA | 404 LAURA AVENUE | GAINESVILLE | GA | 30501 | 770 297-7744 | laborers-unskld |
| BENJAMIN | APONTE | 3420 CAROLYN STREET | GAINESVILLE | GA | 30504 | 770 297-5179 | laborers-unskld |
| GINETTE | APONTE | 1350 MARLOW DRIVE | GAINESVILLE | GA | 30501 | 770 536-0686 | laborers-unskld |
| HERIBERTO | AQUINO | 3084 BARRETT ROAD | GAINESVILLE | GA | 30507 | 770 718-9139 | laborers-unskld |
| LAURA | AQUINO | 3806 RHONDA LANE | GAINESVILLE | GA | 30507 | 770 533-4397 | laborers-unskld |
| PEDRO | AQUINO | 1250 MARLOW DRIVE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ROMAN ANTONIC | AQUINO | 2420 LENOX ROAD | GAINESVILLE | GA | 30507 | 678 450-9718 | laborers-unskld |
| PATRICIA | ARAGON | 720 PINE STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| MARTIN | ARAGUZ | 690 HILLCREST AVENUE | GAINESVILLE | GA | 30501 | 770 503-9869 | laborers-unskld |
| MARIA | ARAMBUL | P.O. BOX 5275 WSB | GAINESVILLE | GA | 30504 | 770 297-0469 | laborers-unskld |
| LUIS | ARAMBULA | 8 A AVENUE | GAINESVILLE | GA | 30504 | 770 503-7464 | laborers-unskld |
| MAXINE | ARAMBULA | 1279 SWAN DRIVE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| CARLOS | ARCADIO | 1711 BROWNS BRIDGE RD | GAINESVILLE | GA | 30501 | 770 534-6031 | laborers-unskld |
| CARLOS | ARCADIO | 2158 BROADWAY PLACE | GAINESVILLE | GA | 30504 | 770 503-0753 | laborers-unskld |
| BRADIE J. | ARCE | 1117 MYRTLE STREET | GAINESVILLE | GA | 30501 | 770 287-8839 | laborers-unskld |
| BARBARA | ARCHER | 5729 HUBERT STPHS | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| CONNIE | ARCHER | 3585 BAKER ROAD | GAINESVILLE | GA | 30501 | 770 535-2478 | laborers-unskld |
| CURTIS | ARCHER | RT 17 BOX 92 BAKER MHP | GAINESVILLE | GA | 30506 | 0 | laborers-unskld |
| RICKY | ARCHER | 2208 ATHENS HWY | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| VIRGINIA | ARCHER | 1320 CANDLER RD | GAINESVILLE | GA | 30501 | 770 535-0440 | operatives-s-sk |
| CARLOS | ARDON | 5104 ALLEN ROAD | OAKWOOD | GA | 30566 | 770 287-3226 | laborers-unskld |
| ALEJANDRO | ARELLANO | 2144 NEWTON DRIVE | GAINESVILLE | GA | 30501 | 770 503-0980 | laborers-unskld |
| ANTONIO | ARELLANO | 1117 MYRTLE STREET | GAINESVILLE | GA | 30501 | 770 287-8839 | laborers-unskld |
| BLANCA | ARELLANO | 694 AUBURN AVE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| CESAR | ARELLANO | 1350 MARLOW ROAD LOT 26 | GAINESVILLE | GA | 30501 | 770 718-9190 | laborers-unskld |

Interrogatory NO. 3.
Past and Present Employees



| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| CONCEPCION | ARELLANO | 698 HILLCREST | GAINESVILLE | GA | 30503 | 770 503-1153 | operatives-s-sk |
| EFREN | ARELLANO | 214 MINCEY AVENUE | GAINESVILLE | GA | 30501 | 770 718-1169 | laborers-unskld |
| FIDENCIO | ARELLANO | TERRASO 2 | GAINESVILLE | GA | 30501 | 678 793-5553 | laborers-unskld |
| JAVIER | ARELLANO | 1711 BROWNS BRIDGE ROAD S12 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JORGE | ARELLANO | 2601 THOMPSON BRIDGE RD | GAINESVILLE | GA | 30501 | 770 503-0253 | operatives-s-sk |
| LIDIA | ARELLANO | 2025 MOUNTAIN VIEW ROAD LOT 12 | GAINESVILLE | GA | 30504 | 770 297-8959 | laborers-unskld |
| MARIA | ARELLANO | 3034 MEADOW RIDGE DRIVE | GAINESVILLE | GA | 30507 | 770 535-9009 | laborers-unskld |
| MIGUEL | ARELLANO | 2601 THOMPSON BRIDGE RD 14 D | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| SANTIAGO | ARELLANO | 116 MCCONNELL DRIVE | GAINESVILLE | GA | 30501 | 770 287-0157 | laborers-unskld |
| MARQUIS | ARENDER | 300 MAPLE RIDGE DR. | DEMOREST | GA | 30535 | 706 776-8222 | craf wrkers skl |
| EDUARDO | AREREGUIN | 210 SHALLOWFORD DRIVE | GAINESVILLE | GA | 30504 | 678 450-4995 | laborers-unskld |
| ADELA | AREVALO | 5 FRANCES AVE | GAINESVILLE | GA | 30501 | 770 536-7848 | operatives-s-sk |
| ELIAS | AREVALO | 219 CRESCENT DRIVE | GAINESVILLE | GA | 30501 | 770 532-6213 | laborers-unskld |
| ELIAS | AREVALO | P.O. BOX 6247 | GAINESVILLE | GA | 30504 | 770 532-2299 | laborers-unskld |
| EVELYN | AREVALO | 5 FRANCIS AVE | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| MARIA | AREVALO | 729 PINE STREET | GAINESVILLE | GA | 30501 | 770 540-9118 | laborers-unskld |
| SHARON | AREVALO | P.O. BOX 2272 | GAINESVILLE | GA | 30501 | 770 531-3424 | operatives-s-sk |
| ENOEMYS | ARGUETA | 2650 BUENAVISTA CIRCLE | GAINESVILLE | GA | 30504 | 770 536-3199 | laborers-unskld |
| JORGE | ARGUETA | 826 IBERIAN ROAD | DAHLONEGA | GA | 30533 | 706 864-7160 | laborers-unskld |
| JOSE | ARGUETA | 2342 BALDWIN FARM DRIVE | GAINESVILLE | GA | 30507 | 770 532-1434 | laborers-unskld |
| JOSE | ARGUETA | 2342 BALDWIN FARMS DRIVE | GAINESVILLE | GA | 30507 | 770 532-9090 | laborers-unskld |
| OSCAR | ARGUETA | 3470 TRIPLE CREEK BEND | GAINESVILLE | GA | 30507 | 770 287-7147 | laborers-unskld |
| ROSIBEL | ARGUETA | 981 CARDINAL DRIVE | GAINESVILLE | GA | 30501 | 770 503-0060 | laborers-unskld |
| FLORENCIO | ARIAS | 2313 PINE CIRCLE | GAINESVILLE | GA | 30504 | 770 535-0212 | laborers-unskld |
| FREDIS | ARIAS | 2505 GILLSVILLE HWY. LOT 12-A | GAINESVILLE | GA | 30507 | 678 450-4799 | laborers-unskld |
| JESUS | ARIAS | 985 RAINEY STREET | GAINESVILLE | GA | 30501 | 770 534-6978 | laborers-unskld |
| JUAN | ARIAS | 463 WAVERLY-WAY | OAKWOOD | GA | 30566 | 770 503-0188 | laborers-unskld |
| LEONOR | ARIAS | 2621 SILVERWOOD DRIVE | GAINESVILLE | GA | 30507 | 770 536-2926 | laborers-unskld |
| SANDRA | ARIAS | 2549 SILVERWOOD DRIVE | GAINESVILLE | GA | 30507 | 770 297-9731 | laborers-unskld |
| DAVID | ARIZMENDI | 189 TOWER HEIGHTS DRIVE | GAINESVILLE | GA | 30501 | 678 895-6801 | laborers-unskld |
| DAVID | ARIZMENDI | 1915 DRISKELL DR | GAINESVILLE | GA | 30501 | 770 536-1522 | operatives-s-sk |
| MOISES | ARJONA | 105 A HICKORY STREET | GAINESVILLE | GA | 30501 | 770 534-7441 | laborers-unskld |
| CHRISTINA | ARMENDARIZ | 342 PRIOR STREET APT 2 | GAINESVILLE | GA | 30504 | 770 287-7533 | laborers-unskld |
| CARMEN | ARMENTA | 854 DAVIS ST APT P6 | GAINESVILLE | GA | 30501 | 770 287-1956 | laborers-unskld |

| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| SHAUN | ARMITAGE | BAKERS MHP LOT 73 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| GREGORY | ARMOUR | 1141 YONAH HOMER ROAD | MAYSVILLE | GA | 30558 | 706 677-1929 | laborers-unskld |
| JIMMY | ARMOUR | RTE 1 BOX 36 ARMOUR STREET | ALTO | GA | 30510 | 706 778-3266 | laborers-unskld |
| JOYCE | ARMOUR | P. O. BOX 91 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| TIMOTHY | ARMOUR | 2221 SAILORS AVE. LOT 20 | GAINESVILLE | GA | 30501 | 770 536-4567 | laborers-unskld |
| BEVERLY | ARMSTRONG | RTE 2 BOX 612-H | DAHLONEGA | GA | 30533 | 0 | laborers-unskld |
| DOROTHY | ARMSTRONG | RT 2 BOX 420-A19 | ALTO | GA | 30510 | 0 | laborers-unskld |
| KENNETH | ARMSTRONG | 112 CHINABERRY LN | DAHLONEGA | GA | 30533 | 770 287-0693 | professionals |
| TERESA | ARMSTRONG | RT 2 BOX 614 | MURRAYVILLE | GA | 30564 | 0 | laborers-unskld |
| BURLEY | ARNOLD | 5311 REDWOOD CIRCLE | GAINESVILLE | GA | 30506 | 0 | laborers-unskld |
| ARTEMIO | ARREDONDO | 2358 RIDGEWAY DR | GAINESVILLE | GA | 30501 | 770 536-4122 | laborers-unskld |
| DAVID | ARREDONDO | 1750 NORTON DRIVE | GAINESVILLE | GA | 30501 | 770 297-9586 | laborers-unskld |
| FRANCISCO | ARREDONDO | 2221 SAILORS AVENUE LOT 1 | GAINESVILLE | GA | 30501 | 770 532-8677 | laborers-unskld |
| JAVIER | ARREDONDO | 815 B WASHINGTON STREET | GAINESVILLE | GA | 30501 | 678 450-9576 | laborers-unskld |
| LAURA | ARREDONDO | 649 DORSEY STREET APT E | GAINESVILLE | GA | 30501 | 770 532-0651 | laborers-unskld |
| MARIA | ARREDONDO | 1709 MEADOWVIEW DR | GAINESVILLE | GA | 30501 | 678 886-2418 | laborers-unskld |
| MIGUEL | ARREDONDO | 3116 BUICE CIRCLE | GAINESVILLE | GA | 30504 | 770 297-9818 | laborers-unskld |
| SALVADOR | ARREDONDO | 2221 SAILOR AVENUE LOT 1 | GAINESVILLE | GA | 30501 | 770 532-8677 | laborers-unskld |
| JOSE | ARREOLA | 2851 BURTON CR RD | GAINESVILLE | GA | 30507 | 770 531-1065 | craf wrkers skl |
| JOSE | ARREOLA | 2851 BARRETT ROAD | GAINESVILLE | GA | 30507 | 678 450-0842 | laborers-unskld |
| JOSE | ARREOLA | 2905 BURTON CIRCLE ROAD | GAINESVILLE | GA | 30501 | 770 531-1065 | laborers-unskld |
| TEREZA | ARREOLA | 764 DORSEY ST. | GAINESVILLE | GA | 30501 | 770 287-0061 | laborers-unskld |
| FRANCISCO | ARRIAGA | P.O. BOX 5711 | GAINESVILLE | GA | 30504 | 706 864-1343 | laborers-unskld |
| JOSE | ARRIAGA | 1687 PARKHILL DR APT H11 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| PABLO | ARRIAGA | 2358 RIDGEWAY DRIVE | GAINESVILLE | GA | 30504 | 770 536-4122 | laborers-unskld |
| ROBERT | ARRIAGA | 3312 APACHE CIRCLE | OAKWOOD | GA | 30566 | 770 297-8973 | laborers-unskld |
| ZEFERINO | ARRIAGA | 1750 NORTON DRIVE A 6 | GAINESVILLE | GA | 30501 | 770 297-0785 | laborers-unskld |
| PATRICIA | ARRINGTON | 4596 OLD CORNELIA HWY. B-10 | GAINESVILLE | GA | 30507 | 770 536-3832 | laborers-unskld |
| CINDY | ARROWAY | 7 LIBERTY ST | GAINESVILLE | GA | 30501 | 770 503-1812 | operatives-s-sk |
| RICHARD | ARROWAY | 19 CAROLINA ST | GAINESVILLE | GA | 30501 | 770 287-1116 | laborers-unskld |
| RICHARD | ARROWAY | 19 CAROLINA ST | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| DONALD | ARROWOOD | RT. 1 BOX 1302 | CLEVELAND | GA | 30528 | 770 532-8801 | laborers-unskld |
| EARL | ARROWOOD | 589 HMER STEPHENS ROAD | CORNELIA | GA | 30531 | 706 778-5211 | laborers-unskld |
| JIMMY | ARROWOOD | 3700 NEW BRIDGE ROAD | CLEVELAND | GA | 30528 | 706 348-7718 | laborers-unskld |

Interrogatory NO. 3.
Past and Present Employees



| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| ARTAGNAN | ARROYO | 1687 PARKHILL DR APT H8 | GAINESVILLE | GA | 30501 | 770 531-0864 | laborers-unskld |
| ARTURO | ARROYO | 1132 ERSKIN AVENUE APT B | GAINESVILLE | GA | 30501 | 770 718-1537 | laborers-unskld |
| ARTURO | ARROYO | 649 DORSEY ST APT C | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| CLEMENTE | ARROYO | 102 STRINGER AVE APT 2 | GAINESVILLE | GA | 30501 | 770 287-1282 | operatives-s-sk |
| DOROTEO | ARROYO | P.O. BOX 907569 | GAINESVILLE | GA | 30501 | 770 534-9804 | laborers-unskld |
| EPIFANIO | ARROYO | 860 PINE ST | GAINESVILLE | GA | 30501 | 770 287-0779 | laborers-unskld |
| FRANCISCO | ARROYO | 49 S W HIGHLAND AVE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| FRANCISCO | ARROYO | 1214 INDUSTRIAL BLVD. LOT 9 | GAINESVILLE | GA | 30501 | 770 297-6239 | laborers-unskld |
| JEOVAN | ARROYO | 2344 SPRINGHAVEN DRIVE | GAINESVILLE | GA | 30501 | 770 297-8753 | laborers-unskld |
| JESUS | ARROYO | 2344 SPRING HAVEN DR | GAINESVILLE | GA | 30504 | 770 297-8753 | laborers-unskld |
| JESUS | ARROYO | 2344 SPRINGHAVEN DRIVE | GAINESVILLE | GA | 30504 | 770 297-8753 | laborers-unskld |
| JOSE | ARROYO | 1217 HAZEL STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JOSE | ARROYO | 267 GREENHILL CR | GAINESVILLE | GA | 30504 | 770 535-6636 | laborers-unskld |
| JOSE | ARROYO | 2607 BROWNS BR RD | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JOSE | ARROYO | 694 AUBURN AVE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| MAGDALENA | ARROYO | 742 PINE STREET | GAINESVILLE | GA | 30501 | 770 503-0751 | laborers-unskld |
| MARIA | ARROYO | 420 NORTH AVE N W | GAINESVILLE | GA | 30501 | 770 534-3243 | laborers-unskld |
| MARIA | ARROYO | 854 DAVIS STREET APT D 4 | GAINESVILLE | GA | 30501 | 770 535-2034 | laborers-unskld |
| ROBERT | ARROYO | 627 CRESTWOOD LANE | CORNELIA | GA | 30531 | 706 778-1067 | laborers-unskld |
| ROGELIO | ARROYO | 2607 BROWNS BR RD | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| VICTOR | ARROYO | 1132 HOLLAND AVENUE | GAINESVILLE | GA | 30503 | 678 450-6994 | laborers-unskld |
| CONSUELO | ARTEAGA | 3232 HARMONY CH ROAD | GAINESVILLE | GA | 30507 | 770 538-0844 | laborers-unskld |
| GUADALUPE | ARTEAGA | 31 ELITA DR | GAINESVILLE | GA | 30504 | 770 532-3397 | laborers-unskld |
| YOLANDA | ARTEAGA | 178 CRESCENT CIRCLE | GAINESVILLE | GA | 30507 | 770 532-9020 | laborers-unskld |
| ERIC | ARTHUR | 1195 JESSE JEWELL PARKWAY | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| JAMES | ARTHUR | 64 DEAN ST. | GAINESVILLE | GA | 30501 | 770 534-0269 | laborers-unskld |
| KELLY | ARTHUR | 4106 JUDD COURT | GAINESVILLE | GA | 30506 | 770 503-7908 | laborers-unskld |
| KELLY | ARTHUR | 4106 JUDD COURT | GAINESVILLE | GA | 30506 | 770 503-7908 | laborers-unskld |
| JUAN | ARTIAGA | P. O. BOX 5833 | GAINESVILLE | GA | 30503 | 0 | laborers-unskld |
| OROZCO | ARTURO | P. O. BOX 677 | CORNELIA | GA | 30531 | 404 776-2321 | laborers-unskld |
| MARIO | ARZATE-RUIZ | 5326 SHERRY DRIVE | GAINESVILLE | GA | 30504 | 770 503-0121 | laborers-unskld |
| MANUEL | ARZOLA | 802 DORSEY STREET | GAINESVILLE | GA | 30501 | 770 287-8854 | laborers-unskld |
| ADIEL | ASCENCIO | PO BOX 65171 | LOS ANGELES | CA | 90065 | 770 287-7939 | laborers-unskld |
| ROBERT | ASHLEY | 128 REBECCA COURT | DAHLONEGA | GA | 30533 | 706 867-0954 | laborers-unskld |

| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| GEORGE | ASHMORE | HWY 129 BOX 3406 | GAINESVILLE | GA | 30501 | 0 | |
| ARTURO | ASPEITIA | 3533 WESTGATE | GAINESVILLE | GA | 30504 | 770 535-7996 | laborers-unskld |
| DONALD | ATKINS | 6748 TALENT DRIVE | LULA | GA | 30554 | 770 869-1192 | craf wrkers skl |
| JESSE | ATKINS | 2446 BASIN CT | GAINESVILLE | GA | 30506 | 0 | |
| SABRINA | ATKINS | 2455 FLOYD RD TRAILER 2R | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| DEAN | AUSTIN | 674 ARMOUR STREET | GAINESVILLE | GA | 30501 | 770 287-1021 | laborers-unskld |
| PATTY | AUSTIN | 815 HARRISON SQ APT A3 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JINA | AUTRY | 1216 HARMONY HALL | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| EDUARDO | AVALOS | 527 M BUENAVISTA ST | BURBANK | CA | 91505 | 0 | laborers-unskld |
| ENRIQUE | AVALOS | 1304 HARRISON DRIVE | GAINESVILLE | GA | 30501 | 770 535-7471 | laborers-unskld |
| ENRIQUE | AVALOS | 1114 WADE DR. | GAINESVILLE | GA | 30501 | 770 532-3212 | laborers-unskld |
| FRANCISCO | AVALOS | 1711 BROWNS BRIDGE ROAD | GAINESVILLE | GA | 30501 | 770 535-6591 | laborers-unskld |
| JUAN | AVALOS | 1415 WESTSIDE DRIVE | GAINESVILLE | GA | 30504 | 770 531-0567 | laborers-unskld |
| JUAN | AVALOS | 1001 AIRPORT ST | GAINESVILLE | GA | 30501 | 770 531-9275 | laborers-unskld |
| MIGUEL | AVALOS | P. O. BOX 5811 WSB | GAINESVILLE | GA | 30504 | 770 534-5331 | laborers-unskld |
| MONICA | AVALOS | P.O. BOX 5752 WSB | GAINESVILLE | GA | 30504 | 0 | laborers-unskld |
| ZENAIDA | AVALOS | 1961 LELAND RD | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JOSE | AVELAR | 2446 ASHWOOD WAY | GAINESVILLE | GA | 30507 | 770 287-1612 | laborers-unskld |
| FAITH | AVELLANEDA | 760 RIDGEWOOD AVENUE | GAINESVILLE | GA | 30501 | 770 535-0291 | laborers-unskld |
| JOSE | AVENDANO | 108 MACORMICK DRIVE | GAINESVILLE | GA | 30501 | 770 297-8127 | laborers-unskld |
| PAUL | AVERETT | 3336 DONNA WAY | GAINESVILLE | GA | 30501 | 770 536-7311 | laborers-unskld |
| GUADALUPE | AVILA | B-28 DUNLAP STREET | GAINESVILLE | GA | 30501 | 770 535-1957 | operatives-s-sk |
| ISRAEL | AVILA | 629 HILLCREST DRIVE | GAINESVILLE | GA | 30501 | 770 535-1935 | laborers-unskld |
| JOSE | AVILA | 340 CHRISTOPHER DR. | GAINESVILLE | GA | 30504 | 770 287-0847 | laborers-unskld |
| MARIA | AVILA | 3036 BARRETT ROAD | GAINESVILLE | GA | 30504 | 770 297-1860 | laborers-unskld |
| MARIA | AVILA | 2263 SPRING STREET | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| MARIA | AVILA | 240 ATLANTA STREET R 6 | GAINESVILLE | GA | 30501 | 770 535-1522 | laborers-unskld |
| MISAEL | AVILA | 340 CHRISTOPHER DRIVE | GAINESVILLE | GA | 30501 | 770 531-9506 | laborers-unskld |
| RAFAEL | AVILA | 320 HIGHLAND TERRACE LOT 14 | GAINESVILLE | GA | 30501 | 678 450-0135 | laborers-unskld |
| SAMUEL | AVILA | 36A STALLWORTH ST | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| STEPHAN | AVILA | 2313 EAST SHILDER DR. APT.111 | BROWNSVILLE | TX | 78520 | 770 536-5587 | laborers-unskld |
| VERONICA | AVILA | 2267 CAMEO STREET | GAINESVILLE | GA | 30501 | 770 535-7997 | laborers-unskld |
| ANGEL | AVILES | 325 HIGHLAND TERRACE LOT 18 | GAINESVILLE | GA | 30501 | 678 450-1069 | laborers-unskld |
| FRANCISCO | AVILES | 2743 KELLEY BRIDGE ROAD | DAWSONVILLE | GA | 30543 | 678 936-6906 | laborers-unskld |

Interrogatory NO. 3.
Past and Present Employees



| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| JOSE | AVILES | 19 AIRPORT DR | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| MIOSOTIS ENID | AVILES | 2336 BUENAVISTA CIRCLE | GAINESVILLE | GA | 30504 | 770 536-5934 | laborers-unskld |
| DIONICIO | AVINA | 1421 WESTSIDE DRIVE | GAINESVILLE | GA | 30501 | 770 297-1748 | laborers-unskld |
| ABEL | AYALA | 3225 BRACKETT DRIVE | GAINESVILLE | GA | 30506 | 0 | laborers-unskld |
| ADELAIDO | AYALA | 1195 SOUTH ENOTA DRIVE | GAINESVILLE | GA | 30501 | 770 503-0751 | laborers-unskld |
| ALFONSO | AYALA | 1211 HOLLAND AVENUE | GAINESVILLE | GA | 30501 | 770 532-5055 | laborers-unskld |
| ALFREDO | AYALA | 3925 OAKWOOD RD | OAKWOOD | GA | 30566 | 770 535-0756 | operatives-s-sk |
| ANTONIO | AYALA | 104 MCCONNELL DRIVE | GAINESVILLE | GA | 30504 | 770 534-7364 | laborers-unskld |
| ARTURO | AYALA | 320 HIGHLAND TERRACE LOT 27 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ASENSION | AYALA | 698 DORSEY STREET | GAINESVILLE | GA | 30501 | 770 503-1097 | laborers-unskld |
| CARMELA | AYALA | 2525 GOULD DR. | GAINESVILLE | GA | 30504 | 770 297-6641 | laborers-unskld |
| ELSY | AYALA | 2341 BALDWIN FARMS DRIVE | GAINESVILLE | GA | 30507 | 770 503-7829 | service workers |
| EMIDIO | AYALA | 1415 WESTSIDE DRIVE | GAINESVILLE | GA | 30501 | 770 718-9939 | laborers-unskld |
| FILIBERTO | AYALA | 1711B BROWNS BR RD | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| GABINO | AYALA | 854 DAVIS ST.APT N4 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| GERARDO | AYALA | 2272 BOY SCOUT CAMP ROAD | GAINESVILLE | GA | 30501 | 770 535-1208 | laborers-unskld |
| GUADALUPE | AYALA | 320 HIGHLAND TERRACE LOT 27 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| GUADALUPE | AYALA | 1195 SOUTH ENOTA DRIVE | GAINESVILLE | GA | 30501 | 770 503-0751 | laborers-unskld |
| ISIDRO | AYALA | SUBURBAN MHP E-12 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ISMAEL | AYALA | 756 WEST AVENUE APT A | GAINESVILLE | GA | 30501 | 770 536-5206 | laborers-unskld |
| JESUS | AYALA | 632 DORSEY STREET | GAINESVILLE | GA | 30501 | 770 536-5369 | laborers-unskld |
| JOSE | AYALA | 2073 CROW ROAD | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JUAN | AYALA | 4 1/2 CHERRY CIRCLE | GAINESVILLE | GA | 30504 | 770 532-6793 | laborers-unskld |
| JUVENAL | AYALA | 1209 HAZEL STREET | GAINESVILLE | GA | 30501 | 770 287-0381 | laborers-unskld |
| LOURDES | AYALA | 106 MCCONNELL DRIVE LOT 13 | GAINESVILLE | GA | 30501 | 770 536-6143 | laborers-unskld |
| LUIS | AYALA | 854 DAVIS STREET APT L6 | GAINESVILLE | GA | 30501 | 0 | operatives-s-sk |
| LUZ I. | AYALA | 4173 HEATHERSTONE DR. | GAINESVILLE | GA | 30543 | 770 718-0560 | laborers-unskld |
| MARIA | AYALA | 1647 WHITING DRIVE | GAINESVILLE | GA | 30504 | 770 535-2344 | laborers-unskld |
| MARIA | AYALA | 32 RIDER STREET | GAINESVILLE | GA | 30501 | 770 287-7927 | laborers-unskld |
| MARIA | AYALA | 632 DORSEY STREET | GAINESVILLE | GA | 30501 | 770 536-5369 | laborers-unskld |
| MIGUEL | AYALA | 1250 SUNRISE DRIVE | GAINESVILLE | GA | 30501 | 770 287-3059 | laborers-unskld |
| NANCY | AYALA | 1030 SUMMIT STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| NORMA | AYALA | 4062 GLENRIDGE ROAD | GAINESVILLE | GA | 30507 | 770 540-6831 | laborers-unskld |
| RAUL | AYALA | 240 ATLANTA STREET R 6 | GAINESVILLE | GA | 30501 | 678 450-8025 | laborers-unskld |

Interrogatory NO. 3.
Past and Present Employees



| First Name | Last Name | Address | City | ST | Zip Code | Phone | EEOC Description |
|---|---|---|---|---|---|---|---|
| RODOLFO | AYALA | 516 SHAW DR | GAINESVILLE | GA | 30501 | 770 503-1523 | operatives-s-sk |
| RODOLFO | AYALA | 882 PINE STREET | GAINESVILLE | GA | 30501 | 770 533-9356 | laborers-unskld |
| ROSA | AYALA | 583 DORSEY STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ROSALBA | AYALA | 1195 S ENOTA DRIVE | GAINESVILLE | GA | 30501 | 770 503-0751 | laborers-unskld |
| TERESA | AYALA | 695 SCOTLAND AVENUE APT. B | GAINESVILLE | GA | 30501 | 770 534-7214 | laborers-unskld |
| VALENTIN | AYALA | 2809 WILLOW RIDGE ROAD | GAINESVILLE | GA | 30504 | 770 287-9232 | laborers-unskld |
| VALENTIN | AYALA | 708 CHESTNUT STREET | GAINESVILLE | GA | 30501 | 678 316-0748 | laborers-unskld |
| VICTOR | AYALA | 3400 GAINES MILL RD. | GAINESVILLE | GA | 30507 | 770 533-6835 | laborers-unskld |
| FILBERTO | AYALA-GALVAN | 891 WILLS STREET | GAINESVILLE | GA | 30501 | 770 533-9185 | laborers-unskld |
| FAUSTO | AYALA-SOTO | 621 DORSEY STREET | GAINESVILLE | GA | 30501 | 770 535-0805 | laborers-unskld |
| JONATHAN | AYERS | 380 PINE VALLEY DR. | ROYSTON | GA | 30662 | 706 356-0359 | craf wrkers skl |
| LOURDES | AZAURA | 2647 CLENDALE DRIVE | GAINESVILLE | GA | 30507 | 770 297-8604 | laborers-unskld |
| LORING | BACON | 1002 AVIATION BLVD | GAINESVILLE | GA | 30501 | 770 535-6914 | laborers-unskld |
| GUADALUPE | BADILLO | 1827 ATHENS STREET | GAINESVILLE | GA | 30501 | 770 287-9250 | laborers-unskld |
| REBECCA | BADILLO | 733 CLEVELAND STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ALEX | BAEZ | 9 CHERRY LANE | GAINESVILLE | GA | 30504 | 770 539-9770 | laborers-unskld |
| JULIAN | BAEZ | 2673 MARLETTE ROAD | GAINESVILLE | GA | 30507 | 770 561-3169 | laborers-unskld |
| JOSE | BAEZA | 2126 WESTHAVEN DR | GAINESVILLE | GA | 30501 | 770 503-7029 | operatives-s-sk |
| SERGIO | BAEZA | P.O. BOX 1732 | GAINESVILLE | GA | 30503 | 770 287-0649 | operatives-s-sk |
| GREGORY | BAFILE | P.O. BOX 352 | DAHLONEGA | GA | 30533 | 706 864-7753 | operatives-s-sk |
| ANGELA | BAGBY | RT. 5 BOX 5668 | DAWSONVILLE | GA | 30534 | 706 216-6872 | laborers-unskld |
| FRANCES | BAGWELL | P. O. BOX 1081 | DAHLONEGA | GA | 30533 | 706 864-1228 | laborers-unskld |
| H. | BAGWELL | 4308 MTN VIEW RD | OAKWOOD | GA | 30566 | 770 534-1431 | |
| SONIA | BAIDERRAMA | 1415 WESTSIDE DRIVE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| ARNOLD | BAILEY | 1099A CLOVERDALE | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| BARBARA | BAILEY | 1099 CLOVERDALE ST APT A | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| DARRELL | BAILEY | 2335 ATHENS HWY | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| DENNIS | BAILEY | 611 DORSEY STREET | GAINESVILLE | GA | 30501 | 770 287-9094 | operatives-s-sk |
| DONALD | BAILEY | 2471 FLOYD ROAD | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| EDWARD | BAILEY | P.O. BOX 5572 WSB | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| EVA | BAILEY | 2467 FLOYD ROAD | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| HARVEY | BAILEY | 809 MILL STREET | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| J. | BAILEY | 1675 AZELIA DR | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |
| JAMES | BAILEY | RTE 11 BOX 358 | GAINESVILLE | GA | 30501 | 0 | laborers-unskld |