**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 86

Chart No. 6

# Assignment of Mar-Jac Loan Payments due to SAAR Foundation to Amtrax Holdings



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 100

# PROMISSORY NOTE

**$350,000.00** **November 1, 1997**

**FOR VALUE RECEIVED,** MarJac Holdings, Inc., hereinafter described as "Maker" hereby promises to pay on DEMAND to the order of Mena Investments, Inc. the principal sum of Three Hundred Fifty Thousand Dollars ($350,000.00) with Ten percent (10%) interest per annum.

Principal shall be payable at the office of Mena Investments, Inc. 555 Grove Street, Herndon, VA 20170, or at such other place as the payee may designate in writing.

It is expressly understood and agreed that if an installment herein provided for, if any, is not paid within fifteen (15) business days when due, or should there be any failure to comply with any one of the covenants, agreements or stipulations set forth herein which continues for more than fifteen (15) days after receipt by Maker of written notice thereof, then and in that event, the unpaid balance of the aforesaid principal sum, shall, at the option of the payee, immediately become due and payable. Failure to exercise this option in any one or more instances shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In the event of default in the payment of this Note, Maker hereby agrees to pay all cost of collection, including reasonable attorneys' fees.

Privilege is hereby reserved to make prepayment of this Note in whole or in part at any time without penalty.

Maker hereby waives presentment, protest and demand, notice of protest and dishonor, or any nonpayment of this Note.

MARJAC HOLDINGS, INC.

By: [signature]
V.P. Finance

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 101

**MINUTES OF DIRECTORS' MEETING**
**OF**
**MAR-JAC HOLDINGS, INC.**
**October 21, 1997**

A regular meeting of the Board of Directors of Mar-Jac Holdings, Inc. (the "Corporation"), was held in Herndon, Virginia, on October 21, 1997. Drs. Jamal Barzinji, Hisham Altalib and M. Yaqub Mirza, they being all the directors of the Corporation, were present and participating throughout the meeting.

The Chairman announced that the meeting having been duly convened, was ready to proceed with its business.

The item of business that came before the meeting was declaration of dividend. After discussions and upon due deliberations, the Board of Directors of the Corporation adopted the following preambles and resolutions:

**WHEREAS**, the surplus net earnings of the Corporation are sufficient in amount to warrant the declaration of dividend of $1,000,000 upon the common stock of the Corporation; and

**WHEREAS**, the Board of Directors deems advisable to set aside from the undistributed surplus funds for the purpose of declaring a cash dividend for the 3rd quarter of 1997, to be distributed to the holders of outstanding common shares of the Capital Stock of the Corporation;

> **NOW, THEREFORE, RESOLVED**, that the Corporation hereby declares and shall pay a dividend of $1,000,000 to Safa Trust, Inc. and Mena Investments, Inc., its stockholders of record on the date hereof.
>
> **RESOLVED FURTHER**, that the Secretary is hereby authorized and directed to notify said stockholders of record of the declaration of said dividend, and the Vice President, Finance is hereby authorized and directed to pay said dividend in the amount of One Million Dollars ($1,000,000) on or before October 31, 1997.

Upon adoption of the foregoing preambles and resolutions, on motion duly made and seconded, the meeting was adjourned.

[signature]
Secretary

MA95MH11.MFK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 102

# MENA INVESTMENTS, INC.

**555 Grove Street, Suite 114**
**Herndon, VA 20170**
**Phone: (703) 471-9494**
**Fax: (703) 471-1211**

**To:** Mr. Mahmoud D. Mohamed
MarJac Holdings, Inc.
**From:** M. Yaqub Mirza
**Subject:** Promissory Note
**Date:** February 10, 1998

---

Kindly re-issue as of December 31, 1997 the enclosed promissory note of $350,000 as $200,000 payable to Safa Trust and $150,000 payable to us.

Thanks and regards.

Sincerely yours,

M. Yaqub Mirza

**Pages:** Total __2__ including this page.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 103

# PROMISSORY NOTE

**$350,000.00**

**November 1, 1997**

**FOR VALUE RECEIVED,** MarJac Holdings, Inc., hereinafter described as "Maker" hereby promises to pay on DEMAND to the order of Mena Investments, Inc. the principal sum of Three Hundred Fifty Thousand Dollars ($350,000.00) with Ten percent (10%) interest per annum.

Principal shall be payable at the office of Mena Investments, Inc. 555 Grove Street, Herndon, VA 20170, or at such other place as the payee may designate in writing.

It is expressly understood and agreed that if an installment herein provided for, if any, is not paid within fifteen (15) business days when due, or should there be any failure to comply with any one of the covenants, agreements or stipulations set forth herein which continues for more than fifteen (15) days after receipt by Maker of written notice thereof, then and in that event, the unpaid balance of the aforesaid principal sum, shall, at the option of the payee, immediately become due and payable. Failure to exercise this option in any one or more instances shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In the event of default in the payment of this Note, Maker hereby agrees to pay all cost of collection, including reasonable attorneys' fees.

Privilege is hereby reserved to make prepayment of this Note in whole or in part at any time without penalty.

Maker hereby waives presentment, protest and demand, notice of protest and dishonor, or any nonpayment of this Note.

Cancelled

MARJAC HOLDINGS, INC.

By: G. D. Mahoney
V.P. Finance

MJ 0004975
CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | <u>TO BE FILED UNDER SEAL</u> |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA</u>

# EXHIBIT 104

# PROMISSORY NOTE

**$200,000.00**

**December 31, 1997**

**FOR VALUE RECEIVED,** MarJac Holdings, Inc., hereinafter described as "Maker" hereby promises to pay on DEMAND to the order of Safa Trust, Inc. the principal sum of Two Hundred Thousand Dollars ($200,000.00) with Ten percent (10%) interest per annum.

Principal shall be payable at the office of Safa Trust, Inc. 555 Grove Street, Herndon, VA 20170, or at such other place as the payee may designate in writing.

It is expressly understood and agreed that if an installment herein provided for, if any, is not paid within fifteen (15) business days when due, or should there be any failure to comply with any one of the covenants, agreements or stipulations set forth herein which continues for more than fifteen (15) days after receipt by Maker of written notice thereof, then and in that event, the unpaid balance of the aforesaid principal sum, shall, at the option of the payee, immediately become due and payable. Failure to exercise this option in any one or more instances shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In the event of default in the payment of this Note, Maker hereby agrees to pay all cost of collection, including reasonable attorneys' fees.

Privilege is hereby reserved to make prepayment of this Note in whole or in part at any time without penalty.

Maker hereby waives presentment, protest and demand, notice of protest and dishonor, or any nonpayment of this Note.

MARJAC HOLDINGS, INC.

By: [signature]
Name: MAHMOUD D. MOHAMED
Title: V. P. Finance

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 105

# PROMISSORY NOTE

**$150,000.00** **December 31, 1997**

**FOR VALUE RECEIVED,** MarJac Holdings, Inc., hereinafter described as "Maker" hereby promises to pay on DEMAND to the order of Mena Investments, Inc. the principal sum of One Hundred Fifty Thousand Dollars ($150,000.00) with Ten percent (10%) interest per annum.

Principal shall be payable at the office of Mena Investments, Inc. 555 Grove Street, Herndon, VA 20170, or at such other place as the payee may designate in writing.

It is expressly understood and agreed that if an installment herein provided for, if any, is not paid within fifteen (15) business days when due, or should there be any failure to comply with any one of the covenants, agreements or stipulations set forth herein which continues for more than fifteen (15) days after receipt by Maker of written notice thereof, then and in that event, the unpaid balance of the aforesaid principal sum, shall, at the option of the payee, immediately become due and payable. Failure to exercise this option in any one or more instances shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In the event of default in the payment of this Note, Maker hereby agrees to pay all cost of collection, including reasonable attorneys' fees.

Privilege is hereby reserved to make prepayment of this Note in whole or in part at any time without penalty.

Maker hereby waives presentment, protest and demand, notice of protest and dishonor, or any nonpayment of this Note.

MARJAC HOLDINGS, INC.

By: M. D. Mohamed
Name: MAHMOUD D. MOHAMED
Title: V. P. Finance

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 106

Chart No. 8

# Mar-Jac Stock Dividend Payment Converted to Promissory Note and Assigned to Safa Trust

11/1/1997
**$350,000** demand loan to Mar-Jac Holdings
(MJ 0005284)

2/10/1998
**$200,000** note assigned to Safa Trust with remaining **$150,000** note to Mena. Request by Dr. Mirza and backdated to December 31, 1997 (MJ 0004972)



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 107


al-Rajhi Family
Saudi Businessmen
SAAR Network
555 Grove St.
▪SAAR Foundation
▪International Institute of Islamic Thought (IIIT)
▪Mar-Jac Poultry
▪Muslim World League
▪Safa Trust
Nada International
Bank al-Taqwa
Rabita Trust
Holy Land Foundation
ICP/WISE
Youssef Nada
Benevolence International Foundation
IIRO
al-Aqsa Educational Fund
Sami al-Arian
al-Qaeda
HAMAS
Palestine Islamic Jihad
Designated Terrorist
Under U.S. Investigation

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 108

Summer Scoops Live with THE WALL STREET JOURNAL.
Join WSJ writers for dazzling events! July 1 thru August 18.
Tickets on sale now!

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format. Order a reprint of this article now

THE WALL STREET JOURNAL.
WSJ.com

LEADER (U.S.) | JULY 26, 2007

TERROR FINANCE

# U.S. Tracks Saudi Bank Favored by Extremists

*Officials Debated What To Do About Al Rajhi, Intelligence Files Show*

By GLENN R. SIMPSON

JIDDA, Saudi Arabia -- In the 1940s, two Bedouin farm boys from the desert began changing money for the trickle of traders and religious pilgrims in this then-remote and barren kingdom. It was a business built on faith and trust, Sulaiman Al Rajhi once told an interviewer, and for many years he would hand gold bars to strangers boarding flights in Jidda and ask them to give the gold to his brother on their arrival in Riyadh.

Today, Mr. Al Rajhi is a reclusive octogenarian whose fortune is estimated at $12 billion. And Al Rajhi Bank grew into the kingdom's largest Islamic bank, with 500 branches in Saudi Arabia and more spread across the Muslim world.

Following the Sept. 11, 2001, attacks, the bank also set off an intense debate within the U.S. government over whether to take strong action against its alleged role in extremist finance. Confidential reports by the Central Intelligence Agency and other U.S. agencies, reviewed by The Wall Street Journal, detail for the first time how much the U.S. learned about the use of Al Rajhi Bank by alleged extremists, and how U.S. officials agonized over what to do about it.

After 9/11, the Saudi monarchy pledged its full support in the fight against global terrorism. And following violent attacks inside the kingdom in the next two years, the Saudis did launch major strikes against militants operating on their soil. But the Saudi government has been far been less willing to tackle the financial infrastructure essential to terrorism. U.S. intelligence reports state that Islamic banks, while mostly doing ordinary commerce, also are institutions that extremism relies upon in its global spread.

As a result, the Bush administration repeatedly debated proposals for taking strong action itself against Al Rajhi Bank, in particular, according to former U.S. officials and previously undisclosed government documents. Ultimately, the U.S. always chose instead to lobby Saudi officialdom quietly about its concerns.

The U.S. intelligence reports, heretofore secret, describe how Al Rajhi Bank has maintained accounts and accepted donations for Saudi charities that the U.S. and other nations have formally designated as fronts for al Qaeda or other terrorist groups.

In addition, Mr. Al Rajhi and family members have been major donors to Islamic charities that are suspected by Western intelligence agencies of funding terrorism, according to CIA reports and federal-court filings by the Justice Department.

A 2003 CIA report claims that a year after Sept. 11, with a spotlight on Islamic charities, Mr. Al Rajhi ordered Al Rajhi Bank's board "to explore financial instruments that would allow the bank's charitable contributions to avoid official Saudi scrutiny."

A few weeks earlier, the report says, Mr. Al Rajhi "transferred $1.1 billion to offshore accounts -- using commodity swaps and

two Lebanese banks -- citing a concern that U.S. and Saudi authorities might freeze his assets." The report was titled "Al Rajhi Bank: Conduit for Extremist Finance."

Al Rajhi Bank and the Al Rajhi family deny any role in financing extremists. They have denounced terrorist acts as un-Islamic. The bank declined to address specific allegations made in American intelligence and law-enforcement records, citing client confidentiality.

In 2002, the bank sued The Wall Street Journal Europe after an article said Saudi authorities were monitoring some Al Rajhi Bank accounts at U.S. request, in a bid to prevent them from being used, wittingly or unwittingly, for funneling money to terrorist groups. The bank dropped the suit in 2005 and the Journal published a statement saying its article hadn't reported any allegation that the bank supported or financed terrorism.

Also in 2005, a U.S. judge dismissed Al Rajhi Bank from a lawsuit filed by relatives of Sept. 11 victims. The ruling said banks couldn't be held liable for providing routine services to people who turned out to be terrorists. In a statement in response to questions about suspected terrorists among its clients, the bank noted that "Al Rajhi Bank has a very large branch network, and a very large retail customer base."

U.S. law-enforcement and intelligence agencies acknowledge it is possible that extremists use the bank's far-flung branches and money-transfer services without bank officials' knowledge. The U.S. has never obtained proof that the bank or its owners knowingly facilitate terrorism, according to documents and former officials, despite what they describe as extensive circumstantial evidence that some executives are aware the bank is used by extremists. The 2003 CIA report concluded: "Senior Al Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."

Most major banks around the world are bound by a patchwork of treaties and agreements that, in effect, require them to know their customers and report any suspicious activities to regulators. The rules are designed to fight terrorism, money laundering and narcotics trafficking. It's generally acknowledged that Saudi banks are bound by these rules, although experts differ on when compliance became mandatory.

The top counterterrorism official at the U.S. Treasury Department, while declining to comment on Al Rajhi Bank specifically, says Saudi officials haven't met a promise to create a commission to oversee Saudi charities, many of which bank with Al Rajhi. "They are also not holding people responsible for sending money abroad for jihad," says the Treasury official, Stuart Levey. "It just doesn't happen."

The Saudi government maintains it has been working diligently with the U.S. and others to counter terrorism. It cites its arrests of several alleged terrorist fund-raisers in recent years. The Saudis didn't respond to specific questions about their efforts to counter terrorist finance or oversee banks.

A White House statement said that "the Saudis continue to be a strong partner in the War on Terror....We have made significant progress on numerous fronts -- including the freezing of assets and the shutdown of known conduits of [terrorist] funding." A CIA spokesman said "publishing details of how our government seeks to track extremist financing" could undermine those efforts.

For the ruling Saud family, any confrontation with the Al Rajhis could be politically treacherous. To stay in power, the Sauds rely on the tolerance of clerical and business elites, many of whom view the royal family as corrupt. The wealthy Al Rajhis are a clan long at odds with the royal family. And U.S. intelligence files show the Al Rajhis also have close ties to another group critical of the royals: Saudi Arabia's conservative clerics.

The Al Rajhi empire includes hotels, housing developments, commodities trading, shipping, aviation leasing and poultry. Its core is the bank, with more than 500 branches in Saudi Arabia and other offices abroad, from Pakistan to Malaysia. For 2006, the publicly held institution reported $1.9 billion in profit and $28 billion in assets.

Sulaiman Al Rajhi grew up in the Nejd desert, the birthplace of a severe form of Islam, called Wahhabism, that forbids birthday parties, musical instruments and photographing people. In the 1940s, he and a brother, Saleh, went to the Saudi capital city. "From literally nothing -- making change on what were then the dirt streets of Riyadh -- Sulaiman and Saleh al Rajhi built the Al Rajhi Bank," Sulaiman's lawyers told a U.S. court in New York in 2005.

Sulaiman described the business in a rare interview with Euromoney magazine in 1983. With two other brothers, he and Saleh began changing money for pilgrims taking camel caravans across the desert to the holy cities of Mecca and Medina. When throngs of migrant workers came to Saudi Arabia during the 1970s oil boom, the Al Rajhis helped them send their earnings home to places like Indonesia and Pakistan.

In 1983, the brothers won permission to open Saudi Arabia's first Islamic bank, one that would observe religious tenets such as a ban on interest.

But relations with the ruling family frayed. The government-controlled press in 1992 publicized Al Rajhi Bank's tangential role in an international scandal of that era, that of the bank called BCCI, U.S. diplomats reported. Then in 1994, an infant relative of the Al Rajhis died in a kidnapping. Official press accounts said the kidnappers slit the child's throat, but Saudi dissidents claimed police shot the child. Mr. Al Rajhi blamed the royal family, the CIA report says.

Although Al Rajhi Bank continued to make a show of support for the Sauds -- annual reports had flowery tributes to the royal family -- the bank began refusing to make loans to the Sauds or to finance their projects, U.S. diplomats said at the time.

With its Islamic procedures, the bank was a magnet for the clerical establishment, which grew rich from alms amid the oil boom. As the clerics' charities spread, they became entwined with Al Rajhi Bank and the conservative Al Rajhi family's own extensive financial support for Islamic causes.

There is no reliable estimate of how much the Al Rajhis have given to promote Islam over the years, but an endowment holding much of Saleh Al Rajhi's wealth gives an indication of the scale. Its Web site details nearly $50 million in direct donations within the kingdom to Islamic causes and at least $12 million in donations abroad. The overseas money went to aid embattled Muslims in Kosovo, Chechnya and the Palestinian territories and to finance Islamic instruction.

There are indications not all the giving was for such purposes. The Al Rajhi name appeared on a list of regular financial contributors to al Qaeda that was discovered in Sarajevo, Bosnia, in 2002. The list was authenticated for the Federal Bureau of Investigation that year by America's top judicial witness against al Qaeda, a onetime al Qaeda business manager named Jamal Al Fadl, who is in the federal witness-protection program. He called the contributor list the "golden chain."

A 2003 German police report said Sulaiman Al Rajhi and other family members had contributed more than $200,000 in 1993 to a charity that financed weapons for Islamic militants in Bosnia, in addition to providing humanitarian aid.

The 2003 CIA report tells of efforts by two Al Rajhi brothers to keep some giving secret. It says that Sulaiman and Saleh transferred $4 million to parties in Germany and Pakistan in December 1998 using "a unique computer code to send funds at regular intervals to unspecified recipients, suggesting they were trying to conceal the transactions and that the money may have been intended for illegitimate ends."

The report says extremists "ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen" to use Al Rajhi Bank. Mamduh Mahmud Salim, convicted mastermind of the 1998 embassy bombings in Kenya and Tanzania, was carrying records of an Al Rajhi account (number 001424/4) when arrested in Germany in 1998, German police found.

In 2000, the CIA report says, Al Rajhi Bank couriers "delivered money to the Indonesian insurgent group Kompak to fund weapons purchases and bomb-making activities."

A U.S. intelligence memo dated Nov. 16, 2001, says a money courier for Osama bin Laden's second-in-command, Ayman al-Zawahri, traveled on a visa that the bank had obtained for him. The memo adds, however: "Reporting does not indicate whether bank management was witting" of the courier's terrorist connections.

Al Rajhi Bank maintained at least 24 accounts and handled unusual transactions for Al-Haramain foundation -- a charity that Treasury officials say has acted as a front for al Qaeda in 13 countries -- until the Saudi government ordered the charity shut down in late 2004, according to intelligence and law-enforcement reports. The United Nations has designated top officials of Al-Haramain foundation as terrorists, and most of its offices now are closed.

According to a federal indictment in Oregon, a top Al-Haramain official in 2000 carried $130,000 in $1,000 traveler's checks from Portland to Riyadh and deposited them with Al Rajhi -- funds the indictment says were for the ultimate benefit of al Qaeda fighters in Chechnya. The indicted official, Soliman Al-Buthe, now works for the city of Riyadh. In an interview, he confirmed carrying the checks and depositing them with Al Rajhi Bank but said that they weren't for al Qaeda and that he did nothing wrong.

A Jidda-based charity called the International Islamic Relief Organization, or IIRO, arranges for donors to send their donations directly to the Al Rajhi Bank. The IIRO's chairman, Adnan Khalil Basha, says the charity is "absolutely apolitical" and has elaborate spending controls to prevent illicit diversions. The charity says it works with Al Rajhi Bank simply because its fees are low and its service is best.

However, the U.N. has labeled two of the IIRO's branches and some of its officials as al Qaeda supporters. In 2004, the IIRO solicited donations through Al Rajhi Bank for the Iraqi city of Fallujah, then largely under the control of insurgents and the base of the late Abu Musab al Zarqawi, who led al Qaeda in Mesopotamia. The IIRO's workers oversaw construction of a trauma clinic in an insurgent-controlled area of Fallujah. The U.S. saw the clinic as a haven for insurgent fighters, and Marines destroyed it in November 2004. That was "a big tragedy for us," says the IIRO's chairman, Mr. Basha.

He denies the charity had any involvement with the Iraqi insurgency. Charity officials complain that the U.S. has produced no evidence of their alleged ties to terrorism.

Two years earlier, federal agents raided the Virginia offices of a network of charities funded by Sulaiman Al Rajhi that worked closely with the IIRO and that -- according to Justice Department court filings -- provided funds to Palestinian terrorists. No charges have been filed.

A year after the 9/11 attacks, U.S. authorities began to lament the lack of Saudi action in taking down terrorists' financial infrastructure. A November 2002 CIA report said the Saudi government "has made little independent effort to uncover terrorist financiers, investigate individual donors, and tighten the regulation of Islamic charities," largely because of "domestic political considerations."

The report advised against a noisy confrontation: "A key factor for continued successful counterterrorism initiatives with the Saudis, whose society is by tradition private, closed, and conservative, will be to ensure that their cooperation with the United States is handled discreetly and kept as much as possible out of the public eye."

The U.S. began to rethink that approach after an al Qaeda attack in Riyadh in May 2003 that killed 26 people, including nine Americans. Deputies from the National Security Council, CIA, Treasury and State departments debated a proposal for legal and political action against Al Rajhi Bank, including the possibility of covert operations such as interfering with the bank's internal operations, according to Bush administration documents and former U.S. officials.

One idea kicked around was "listing or threatening to list" Al Rajhi Bank as a supporter of terrorism. Such a listing can be done if recommended by a committee representing the Treasury, State and Defense departments and the CIA and NSC, and signed by the president. The designation bars U.S. companies from doing business with the named entity. A U.S. designation

also normally is forwarded to the U.N., and if that body puts the name on its own terrorist-supporter list, all member states are obliged to freeze the entity's assets.

Other ideas U.S. officials discussed included enlisting friendly countries to step up scrutiny and regulatory action against the Al Rajhis. The CIA report said that "a successful effort against the Al Rajhis would encourage efforts against other donors, or at a minimum, would discourage private funding of Al Qaeda."

Ultimately, the Bush administration again chose merely to continue privately exerting pressure on the Saudis to stiffen their oversight.

**Write to** Glenn R. Simpson at glenn.simpson@wsj.com

Printed in The Wall Street Journal, page A1

Copyright 2009 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. Fo non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 109

# EXHIBIT / ATTACHMENT

68

(To be scanned in place of tab)

FILED ENTERED
LODGED RECEIVED

JAN 21 2000

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
NIGHT DROP BOX

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| THE SANA-BELL, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 98-CV-4177 (PJM) |
| BMI REAL ESTATE DEVELOPMENT, INC., | ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

William F. Krebs, D. Md. No. 10293
GALLAND, KHARASCH, GREENBERG,
FELLMAN & SWIRSKY, P.C.
1054 Thirty-First Street, N.W.
Washington, D.C. 20007
Telephone: (202) 342-5200
Facsimile: (202) 342-5219

Attorneys for Plaintiffs/Creditors

Dated: January 21, 2000

## TABLE OF CONTENTS

Page

STATEMENT OF FACTS . . . . . . . . . . 1

I. THE BMI DEFENDANTS . . . . . . . . . . 1

II. SULEIMAN BIN ALI ALALI . . . . . . . . . . 2

III. PLAINTIFF SANA-BELL, INC. . . . . . . . . . . 3

IV. PLAINTIFF'S INVESTMENTS IN THE BMI LIMITED PARTNERSHIPS . . . . . . . . . . 8

V. 1995 EXCHANGE OF PARTNERSHIP INTERESTS IN THE LIMITED PARTNERSHIPS FOR EQUITY . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . 13

I. THIS COURT CANNOT GRANT SUMMARY JUDGMENT TO THE EXTENT THAT THERE ARE MATERIAL FACTS AS TO WHICH GENUINE ISSUES EXIST . . . . . . . . . . 13

II. THERE ARE MATERIAL FACTS IN DISPUTE AS TO WHETHER PLAINTIFF CLOAKED ALALI WITH THE APPARENT AUTHORITY TO ACT ON ITS BEHALF . . . . . . . . . . 13

III. EVEN IF THIS COURT WERE TO FIND THAT THE 1996 EQUITY CONVERSION TRANSACTION WAS UNAUTHORIZED, IT IS UNCLEAR TO WHAT REMEDY PLAINTIFF IS ENTITLED . . . . . 21

IV. PLAINTIFF FAILS TO ALLEGE OR PROVIDE ANY BASIS FOR THIS COURT TO GRANT SUMMARY JUDGMENT WITH RESPECT TO COUNTS 1 THROUGH 4 OF THE COMPLAINT . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . 24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| THE SANA-BELL, INC., Plaintiff, v. BMI REAL ESTATE DEVELOPMENT, INC., Defendants. | ) | Case No. 98-CV-4177 (PJM) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The Defendants BMI Real Estate Development, Inc., BMI Leasing, Inc. and Soliman Bihieri[1] hereby oppose plaintiff Sana-Bell, Inc.'s Motion for Summary Judgment on the following grounds.

**STATEMENT OF FACTS**

**I. THE BMI DEFENDANTS**

This action arises from the investment relationship between plaintiff, a District of Columbia non-profit corporation, and two New Jersey limited partnerships in which plaintiff became a limited partner. The BMI corporate defendants were the managing partners in those limited partnerships. Defendant Bihieri is currently the president of the corporate

[1] In addition to the BMI corporate entities and Soliman Bihieri, plaintiff has also filed suit against Suleiman Bin Ali Alali. However, plaintiff has never served Alali with process in this matter and Alali has never filed an answer or entered any other appearance in this case. Accordingly, the term "defendants" as used herein refers only to the BMI entities and Bihieri, unless otherwise noted.

defendants and their sole shareholder.

Bihieri is an Egyptian citizen and a permanent resident of the United States. (Bihieri Depo. at 5.)[2] In the 1980s, Bihieri formed a consulting business known as BMI Investment Services, Inc. (*Id.* at 8-10.) By the late 1980s and early 1990s, Bihieri, through BMI Leasing, Inc., a New Jersey corporation and BMI Leasing Limited Partnership, a New Jersey limited partnership in which BMI Leasing, Inc. is the general partner, was involved in developing limited partnerships for the purpose of leasing automobiles, medical equipment and business equipment to primarily Islamic businessmen and physicians. During this period, he also was involved in establishing a limited partnership to purchase residential building lots, construct houses on those lots and sell the newly constructed houses through BMI Real Estate Development, Inc. ("BMI REDI"), a New Jersey corporation and BMI Construction Fund Limited Partnership, a New Jersey limited partnership in which BMI REDI is the managing general partner. (*Id.* at 57, 61-62, 76-77.)

## II SULEIMAN BIN ALI ALALI

In the Summer of 1985, Bihieri first met Dr. Suleiman Bin Ali Alali ("Alali"). They developed both a personal and business relationship. Alali frequently acted as a consultant to BMI Investment Services, especially with respect to helping it develop business leads in Saudi Arabia. (*Id.* at 57, 61-62, 76-77.)

At the beginning of 1989, during a visit to the United States, Alali told Bihieri of his plans to move permanently to the United States and establish a non-profit organization,

---

[2] Biheiri was deposed on October 27, 1999. Excerpts from his deposition transcript appear in Exhibit Volume II at Exhibit P. Reference to "Bihieri Depo" refer to this transcript.

to be named the International Relief Organization ("IRO") which would be headquartered in Virginia. He further told him that he was also involved in forming a District of Columbia nonprofit corporation to be named The Sana-Bell, Inc., (hereinafter referred to as "Sana-Bell, U. S.") which would act as a funding source for IRO. According to Dr. Ali Alali, he was or would be a founding member of the Board of Directors of Sana-Bell, U. S. (*Id.* at 72-74.)

In the Summer of 1991, Alali moved to the United States and established IRO. He told Bihieri that he, through Sana-Bell, U.S. was in the midst of receiving a $10,000,000.00 donation from an entity named the International Islamic Relief Organization ("IIRO"), located in Jeddah, Saudi Arabia. According to Alali, he was to invest that money, through Sana-Bell, U. S. and then use the return of the income generated from these investments to cover the costs of IRO's operations. (*Id.* at 75.)

## III. PLAINTIFF SANA-BELL, INC.

One of the unexplained mysteries in this case is exactly who or what the plaintiff is. It is clear that the plaintiff presents itself as a District of Columbia nonprofit corporation. However, the circumstances surrounding its formation and operations are much less clear. It appears that, rather than being a nonmember, nonprofit corporation, plaintiff is, in actuality, merely an investment vehicle for one or more Saudi Arabian entities.

As reflected above, there is an entity in Saudi Arabia known as the International Islamic Relief Organization (hereinafter referred to as "IIRO"). (Merza Depo. at 15.)[3] That

---

[3] M. Yaqub Merza was deposed as plaintiff's corporate representative on October 25, 1999. Excerpts of his deposition transcript appear in Exhibit Volume II, Exhibit Q thereto.

entity owns or controls a Saudi corporation also known as Sana-Bell (hereinafter "Sana-Bell, S. A.") which, in some documents, is also referred to as "Sana-Bell Al-Kheer." (See, Exhibits A-1 and A-2, respectively an Arabic letter an English translation of a letter dated July 28, 1998; See Mirza Depo. at 81 - 82) According to plaintiff's representative, Sana-Bell, S. A., is the investment arm of IIRO. (Mirza Depo. at 82) All of plaintiff Sana-Bell, U. S.'s funds for its investments were transferred to it by either IIRO or Sana-Bell, S. A.

Plaintiff has supplied what purports to consist of corporate minutes for the plaintiff's organizational meeting. (Exhibit B) Those minutes reflect that there was meeting on July 30, 1989 at the Marriott Hotel on 22nd Street, N. W. in Washington D. C., at which time the seven members of the initial Board of Trustees, as named in the corporation's Articles of Incorporation (Exhibit C) were "present." During this meeting, the bylaws were adopted, officers were elected, committees were established, and other organizational business was accomplished. Those minutes were signed by Dr. Merza, as the corporate Secretary and by Dr. Abdulrahim Al Saati ("Saati"), as the newly elected President.

However, Dr. Merza testified, as the plaintiff's corporate representative, that no such meeting ever occurred. Although he signed those minutes, he was not present in any such meeting, he neither participated in any discussions as reflected in those minutes nor voted on any of the resolutions contained therein. In fact, Saati was the only attendee present in the Marriott hotel that day. While Dr, Merza testified that Dr. Saati told him that each of the other directors had agreed by telephone to the matters set forth in the minutes, Dr. Merza did not even know whether the "meeting" was a conference telephone call with all of the other directors or was a series of one-on-one conversations between Saati and the

other Trustees. Merza was unconcerned by the fact that he was not party to any meeting as reflected in the minutes that said he was present and which he signed because he does not speak Arabic and would not have understood the events in the meeting had he actually been present at such a meeting, as the minutes reflected he was. Mirza's only knowledge with respect to the matters reflected in the minutes, including that Saati was elected president of Sana-Bell, D. C., came from Saati, himself. (Mirza Depo at 72-3) Of the other six founding Trustees, Mirza, as of the date of his deposition, had never met two. Additionally, he has only met a third some time after Sana-Bell, D. C.'s formation. (*Id.* at 74-5)

In addition to serving plaintiff as its Secretary/Treasurer, Mirza also was, according to the minutes of the Organizational "Meeting," a member of Sana-Bell, D. C.'s "Investment Committee," along with Saati and Alali. (Exhibit B at 2) Yet, the Investment Committee never met. (Mirza Depo. at 21)

To date, plaintiff has made a total of four investments: it purchased a building in Fall Church, Virginia where Alali established IRO's office; it purchased 200 limited partnership units in BMI Leasing Limited Partnership ("BMI Leasing"); it purchased 20 limited partnership units in BMI Construction Fund Limited Partnership ("BMI Construction"); and it purchased some acreage in Prince Georges County, Maryland on which BMI REDI acted as a general contractor for the construction of houses. (*Id.* at 33)

Yet there was never a meeting of either the Investment Committee nor the board of trustees to discuss or formally approve any of these investments. As with the organizational meeting minutes, plaintiff has provided a "Corporate Resolution" signed by

Mirza approving the purchase of the Fall Church building for a purchase price of $580,000.00. (Exhibit C) Yet, there was never a formal trustee meeting approving this investment. (Mirza Depo. at 25). There was no notice of meeting, waiver of notice of meeting or consent by the Trustees approving the purchase. (*Id.*) Instead, Mirza signed the purchase documents based solely on Saati's instructions and representations. (*Id.* at 24). Similarly, with respect to the decision to invest in the BMI limited partnerships at issue in this case, there was no trustees meeting to approve this investment. Mirza testified that he, a Trustee and a member of the Investment Committee, had serious reservations concerning these investments both as to the structure of the investments and the advisability of the investment. (*Id.* at 30). Yet, he never discussed those reservations with the trustees. (*Id.* at 31) Rather Saati simply informed Mirza to proceed with the transaction and Mirza deferred to Saati's determination. (*Id.* at 31)

Although Sana-Bell, D. C. is incorporated as a District of Columbia nonprofit corporation, there was never a trustee meeting to discuss how the corporation would use the proceeds of its investments. (*Id.* at 32) Moreover, plaintiff never qualified as a tax exempt charitable organization because it could not satisfy the Internal Revenue Service's concerns about the treatment of the IIRO funds which were used to purchase plaintiff's investments. The I.R.S. wanted the IIRO funds to be treated as contributions rather than as loans. When Mirza conveyed that position to the IIRO people in Jeddah, he never received a response, and accordingly Sana-Bell, D. C. never qualified for tax exempt treatment. (*Id.* at 34-5)

For a number of years, Alali and IRO managed the Falls Church building. Alali signed leases on behalf of Sana-Bell, D. C., and collected the rent. (*Id.* at 36 -7, 41) IRO and Alali occupied the third floor of the building for only "nominal rent," resulting in the Sana-Bell, D. C.'s inability to cover the building's caring costs with its rental income.[4] (*Id.* at 37) Again, the decision to charge IRO only a nominal rent, insufficient to permit plaintiff to cover its costs through the building's rental income, was never the subject of a trustee meeting, an Investment Committee meeting, or even a discussion between Mirza and Saati. (*Id.* at 38-9)

In actuality, plaintiff operated just as Alali had told Bihieri that it would. It was a mere conduit to move IIRO funds from Saudi Arabia to IRO's use in Virginia. Although plaintiff's Bylaws required it to maintain its principal office in the District of Columbia (Exhibit D, Art. I, ¶ A), it has never maintained a business office there. All of defendants' dealings with respect to plaintiff were through Alali at the IRO Falls Church office. All the tax matters were sent to Mirza at his office in Herndon, Virginia. The building purchase was designed to benefit IRO, not Sana-Bell, D. C. As shown below, Alali located, negotiated and decided what investments plaintiff would make because the benefit of those investments were designed to go to IRO, and not to plaintiff.

---

[4] The inability of the building's rental income to cover the building's carrying costs is even more remarkable in light of the fact that Sana-Bell, D. C., paid cash for the building and, therefore, had no mortgage expense associated with the building. Its only carrying costs were real estate taxes, utilities and maintenance. (*Id.* at 39)

## IV. PLAINTIFF'S INVESTMENTS IN THE BMI LIMITED PARTNERSHIPS

Alali approached Bihieri with the idea of Sana-Bell investing a total of approximately $2,000,000.00 in two of the BMI sponsored limited partnerships. Alali introduced Bihieri to Dr. Abdulrahim Saati, who discussed the prospective investments with Bihieri, as well as a number of other individuals Alali brought to Bihieri's offices from time to time. (Bihieri Depo at 91, 93-96, 103-113.) Bihieri believed that many of these people were introduced to Bihieri by Alali with the idea of their potentially investing in the limited partnerships. (Bihieri depo. at 112-113.) In fact, Saati invested over $520,000.00 in his own name in the BMI Leasing Limited Partnership. (See, Saati K-1s from BMI Leasing Limited Partnership for the years 1994 through 1997, attached hereto as Exhibits E-1 through E-4) During the period 1994 through 1997, Saati's share of income from this limited partnership equaled $91,671, and he received distributions from the limited partnership in the amount of $123,789. (*Id.*)

After discussions primarily through Alali, Sana-Bell, D. C. invested (a) $1,000,000.00 in BMI Leasing Limited Partnership; and (2) $1,100,000.00 in BMI Construction Fund. (BMI Construction L. P. Subscription Agreement and BMI Leasing L. P. Subscription Agreement, Exhibits F & G, respectively)

So far as Bihieri was aware, Alali directed and handled the transfer to these funds to the BMI entities. For the next nearly six years, Alali was Bihieri's sole contact with respect to the management, performance and income distribution of Sana-Bell's investments in the limited partnerships. Bihieri discussed all business issues relating to the BMI limited partnerships and plaintiff with Alali, who served as plaintiff's only

representative relating to those investments. (*Id.* at 140-141) At Alali's instructions, Sana-Bell's annual Schedule K-1s with respect to both partnerships were sent to Mirza, with copies sent to Alali. Mirza acknowledged that he received the K-1s for each partnership through 1995 (*Id.* at 42)

Those K-1s revealed that, during those periods, the partnerships made large distributions to, or on behalf of, Sana-Bell, D. C. For instance, during the period 1993 through 1995, BMI Leasing L. P. reflected on its K-1s to plaintiff that it had distributed $228,333 on behalf of plaintiff. (Exhibits H-1 through H-3) Similarly, BMI Construction L. P.'s K-1s to plaintiff reflected that during 1993 through1995, it made distributions on plaintiff's behalf equaling $343,322. (Exhibits I-1 and I-2) Although over $570,000 was purportedly distributed to, or on behalf of, Sana-Bell, D. C. during that three year period, Merza does not remember raising any question concerning those K-1s. (Merza Depo at 42) Although his office at his foundation reviewed the K-1s, reconciled them and prepared tax returns based on them, (*Id.* at 114-5) Mirza never questioned the amounts of distributions reflected on the K-1s. Yet, the only person on plaintiff's behalf who authorized the distributions from the limited partnerships was Alali. Over a three year period, Alali requested and received distributions of well in excess of half a million dollars, which were duly reported to Sana-Bell, D. C.'s Secretary/Treasurer and never once did anyone on behalf of plaintiff indicate that Alali was not authorized to make those decisions, that the distributions were unauthorized or that IRO was an improper recipient of Sana-Bell, D. C.'s distributions.

In addition, the limited partnerships sent periodic status reports to all of their limited partners. Sana-Bell's reports went to Alali, and, on occasion, to other individuals, including Dr. Saati in Jeddah, at Alali's directions. (Interrogatory Response No. 7, Exhibit 10 to Plaintiff's Motion for Summary Judgment.) Bihieri never received any communication from Dr. Saati or any one else questioning or challenging Alali's authority to manage these investments on behalf of plaintiff. In fact, Bihieri never received any instructions or communications regarding the more than $2,000,000.00 Sana-Bell had invested in these limited partnerships from anyone other than Alali during the period December 1992 through approximately August 1998.

In approximately mid 1993, Sana-Bell purchased 15 developed residential building lots in Prince Georges County, Maryland. At Alali's suggestion, plaintiff entered into a management agreement with BMI Real Estate Development, Inc. to build, market and sell those houses for Sana-Bell's account. While this investment is not at issue in this case, as with the limited partnerships, Alali was Sana-Bell's only point of contact with BMI with respect to all matters relating to Sana-Bell's role in the project.

## V. 1995 EXCHANGE OF PARTNERSHIP INTERESTS IN THE LIMITED PARTNERSHIPS FOR EQUITY.

During 1995, BMI Leasing, Inc. was attempting to raise capital through a private offering. In December 1995, Alali contacted Bihieri and inquired as to whether Sana-Bell could purchase the entire proposed offering in BMIL in exchange for Sana-Bell's entire equity ownership interests in both BMIL LP and BMI CF. (Bihieri Depo. at 199-200.) BMIL agreed to this exchange, refunded the funds it had received pursuant to that offering from

other potential investors, canceled the offering, and, in January 1996, Alali signed the Shareholder's Agreement, Withdrawal Agreements with respect to the Limited partnerships, and related documents, all on behalf of plaintiff.

Alali kept himself advised of the status of the plaintiff's investment in BMI Leasing, Inc. through the end of 1997 when he returned to Jeddah. At some point in the Summer of 1998, IRO was liquidated and its office was closed.

All payments from the BMI entities on behalf of plaintiff were transferred pursuant to the express instructions of Alali. Although Dr. Saati was advised of the status of plaintiff's investments in the limited partnerships and, defendants believe, the exchange of those limited partnership interests for the BMIL stock, BMI never received any indication, objection or information that would indicate that Alali was not who he said he was with respect to plaintiff or that he lacked the authority to act in plaintiff's name and on its behalf with respect to its investments in and dealings with the BMI entities.

It was only in August 1998 that anyone purporting to act on behalf of Sana-Bell first claimed that Alali did not possess the authority to act for it with respect to the BMI investments. Even then, the inquiries came from IIRO, Sana-Bell, S. A. or the Muslim League. (*See* Exhibits J-I, a Arabic letter to Blhierl from Dr. Hassan Bahfzallah, Secretary of the IIRO Investment Committee, and J-2 an English translation thereof)

It appears that this communication came during a period of uncertainty and dissension in the IIRO's relationship with plaintiff. In March 1998, Mirza wrote to Alali as a member of the Investment Committee, and expressed his frustration at the inability to get any instructions or information from Saudi Arabia with respect to the plaintiff. In that

telefax, Mirza stated that he believed that a Board meeting ought to be called and that Alali should be appointed to conduct the plaintiff's business pursuant to the Board's instructions. (Exhibit K) In April 1998, plaintiff's Chairman sent Mirza a notice that there had been a meeting of the Board of Trustees and that had been named. This Board included Alali, who was named as "Board Coordinator" to effectuate the this action. (Exhibit L) Later that month, the President of the "SanaBel Committee," [sic] writing on the letterhead of the Office of the Secretary General of the Muslem World League wrote to Mirza to tell him that Alali "rejoin[ed]" the Sana Bell Al Kheir Committee and that Alali would be "responsible for Sanabel in U. S. A." (Exhibit M)

In July 1998, Dr. Al-Obaid, the Secretary General of the World Muslem League and the Chairman of IIRO, wrote to Mirza and indicated that Alali was a "member of the Executive Committee" of Sanabell S. A. of IIRO, and that he had assisted in the review of its investments. Al-Obaid noted that part of these investments were used to establish plaintiff. (Exhibits A-1 & A-2)

Shortly afterwards, Bihieri received the instructions which, for the first time, told him to "cancel the validity of [Alali's] signature in regard to all of our accounts with your firm." (Exhibits J-1 & J-2) Significantly, these instructions do not indicate that Alali never had authority to sign or act on behalf of the plaintiff. Instead, it merely indicated he no longer could do so.

## ARGUMENT

### I. THIS COURT CANNOT GRANT SUMMARY JUDGMENT TO THE EXTENT THAT THERE ARE MATERIAL FACTS AS TO WHICH GENUINE ISSUES EXIST

Defendants recognize that virtually every motion for summary judgment presented to this Court contains an extensive list of citations with respect to the standard with which this Court must examine motions for summary judgment. Accordingly, defendants will not repeat or extensively discuss this issues. As the Court is well aware, summary judgment may only be granted where there is no genuine dispute as to any material fact and where the moving party is entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Furthermore, the nonmovant is entitled to all justifiable inferences to be drawn in his or her favor from those facts. *Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156, 164 (4th Cir. 1997). If the opposing party does present evidence as to specific facts from which the finder of facts could reasonably find for him, then the Court must deny the motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### II. THERE ARE MATERIAL FACTS IN DISPUTE AS TO WHETHER PLAINTIFF CLOAKED ALALI WITH THE APPARENT AUTHORITY TO ACT ON ITS BEHALF

It appears that plaintiff's primary focus in this action is in seeking to unravel the 1996 transaction in which plaintiff, through Alali, purported to surrender its limited partnership interest in the two BMI limited partnerships in return for stock interests in BMI Leasing, Inc. In presenting that argument, plaintiff contends that defendants were unjustified in replying upon Alali's assertions that he possessed sufficient authority to

execute this transaction on behalf of plaintiff.

This action lies in this Court because, for a short period of time in 1998 and early 1999, the BMI entities had relocated their principal place of business to the State of Maryland. In early 1998, they again relocated their principal place of business to Fairfax County, Virginia. However, the facts surrounding the business relationship between the BMI entities and plaintiff occurred during a time when BMI was headquartered in the State of New Jersey and the transactions at issue herein, the initial investment by Sana-Bell, D.C., in the BMI New Jersey limited partnerships, the distributions and treatment of those investments during the next few years, and the transaction exchanging the limited partnership interests for BMI Leasing equity all occurred in New Jersey and not Maryland. Defendants respectfully submit that New Jersey law applies in this case and not that of Maryland.[5]

The general standard for determining whether apparent authority exists has been described by the Superior Court of New Jersey as follows:

> Authority can be shown by express agreements between principal and agent. But it can also be inferred from the course of dealing between the two. All authority must be traced to the principal and may be found in his adoption of, or acquiesence in, similar acts done on other occasions by the agent.

Restatement, Agency 2d § 43, at 133-134 (1958). *Kugler v. Romain*, 266 A.2d 144, 149 (N.J. Supp. 1970), *aff'd as modified and remanded*, 279 A.2d 640 (N.J. 1970). Whether

---

[5] Defendants acknowledge that the doctrine of apparent authority is primarily one of common law origin, and its modern application is set forth in the Restatement of Agency 2d § 43, at 133-134 (1958). Accordingly, Maryland and New Jersey approach the issue of apparent authority in primarily the same manner.

apparent authority exists is ordinarily to be resolved by the trier of fact. *State v. Zeta Chi Fraternity*, 696 A.2d 530, 536 (N.H. 1997), *citing Cohen v. Frank Developers, Inc.*, 389 A.2d 933, 936 (N.H. 1978). The test of apparent authority is one which involves an examination of the entire factual interplay between the purported agent, the principal, and the persons which whom the agent are dealing.

> In deciding issues of apparent authority '[t]he factual question is whether the principal has, by his voluntary act, placed the agent in such a situation that a person of ordinary prudence, conversant with businesses uses ... is justified in presuming that such agent has the authority to perform the particular act in question.' [Citation omitted.]
>
> Apparent authority imposes liability, not as a result of an actual contractual relationship, but because of actions by a principal which have misled a third-party into believing that a relationship of authority does in fact exist.

*Alicea v. New Brunswick Theological Seminary*, 581 A.2d 900, 905 (N.J. Super. A.D. 1990), *aff'd* 608 A.2d 218 (N.J. 1992) (ellipses in original), *citing Wilzig v. Sisselman*, 506 A.2d 1238 (N.J. Super. A.D. 1986).

Furthermore, the principal may passively establish apparent authority by allowing the agent, with his knowledge, to perform acts consistent with the grant of such authority without taking any action to correct the impression of agency or to affirmatively destroy the appearance of agency. A "principal is bound by the acts of the agent within the apparent authority which he knowingly permits the agent to assume or which he holds the agent out to the public as possessing." *Id.*

In the case at bar, it is clear that if plaintiff did not affirmatively hold Alali out as its agent to handle all of its investment in America, it certainly knowingly permitted Alali to

conduct plaintiff's affairs in such a manner.

Sana-Bell, D.C. was formed ostensibly as a nonprofit, non-member District of Columbia corporation. In reality, it was merely a conduit for the transfer of IIRO Saudi Arabian funds to IRO for IRO's use and benefit in the United States. During Sana-Bell, D.C.'s existence, it has only made four investments: the purchase of the building, the purchase of the partnership units in the two BMI limited partnerships, and the purchase of the Prince Georges County acreage upon which BMI REDI has constructed houses as plaintiff's general contractor. Each of those investments were located by Alali, determined by Alali, negotiated by Alali, and supervised by Alali. Bihieri testified that with respect to his dealings with Sana-Bell, all investment-related matters were determined by or done at the instruction of Alali. Mirza testified that, at least, for some period of time, Alali was authorized to not only collect the rents for and maintain Sana-Bell's building in Falls Church, but also to sign leases with tenants on Sana-Bell's behalf. At the very least, a genuine issue of fact exists with respect to the apparent ability by Alali to negotiate and enter into investment vehicles on behalf of plaintiff.

However, the record is even clearer that plaintiff intentionally permitted Alali to have total control over the BMI investments. Between 1992 and 1995, Alali authorized the disbursement of hundreds of thousands of dollars of Sana-Bell, D.C.'s capital account in the BMI limited partnerships. Mirza, plaintiff's secretary/treasurer, received annual K-1s each year for each partnership which reflected these disbursements. Mirza's office, at his direction and instructions, filed tax returns reflecting those transactions as they appeared on the K-1s. However, at no time did Mirza ever raise a question with BMI or any other

Sana-Bell, D.C. representative concerning the authority or basis upon which those disbursements were made, nor did he ever challenge the recipient of those disbursements.

Apparent authority can result when the principal "fails to disapprove of the agent's act or course of action so as to lead the public to believe that its agent possesses authority to act in the name of the principal." *State v. Zeta Chi Fraternity*, 696 A.2d 530, 536 (N.H. 1997).

Regardless of whether, in the final analysis, Alali was a loyal and faithful servant to Sana-Bell, D.C. or a rogue agent, the simple fact is that he was the only agent on behalf of Sana-Bell, D.C. who dealt with, managed, and supervised its investments.

Although plaintiff's by-laws place responsibility for that management in the hands of the board of trustees (Exhibit D at 4) during the entire time at issue, plaintiff's board of trustees never actually met. Mirza, a founding trustee as well as the secretary/treasurer of the organization, never attended a meeting, never received notice of a meeting, and never received written consent from other trustees as to any corporate actions. There is no documentation provided or existing in this case indicating that Sana-Bell, D.C. was actually authorized to purchase the limited partnership interests at issue. However, negotiations concerning the terms of the investments were conducted by Alali, and the subscription agreements were actually signed by Mirza and Saati. Mirza signed his subscription agreement on the basis of Saati's instructions to him that Saati decided that this was an appropriate investment vehicle and he merely represented to Mirza that he had obtained sufficient consent or approval. At that time, Mirza must have been aware that there had never been a board meeting to approve this investment, because he had never

received notice of such a meeting and had never attended such a meeting.

Similarly, although there purports to be a corporate resolution authorizing the purchase of a Falls Church building by Sana-Bell, D.C., and that resolution is signed by Mirza as corporate secretary, his own testimony was that there was no meeting, proceeding, or written evidence of consent to authorize that purchase.

In fact, under plaintiff's theory, Sana-Bell, D.C. was no more than a rudderless ship for the entire 1990s. Mirza exercised no discretion and took no initiative with respect to the management of plaintiff's investments. He merely signed those things to which he was instructed by Saati and instructed his office to prepare the tax returns reflecting the transactions as set forth on the K-1s and other financial information supplied to him. The only other representative of plaintiff located in America was Alali, who took all action with respect to the oversight, management and supervision of plaintiff's investments. Yet, according to plaintiff, he had no authority to do so.

The reason for Alali's ability to so manage plaintiff's investments is clear. He was a member of the Executive Committee of IIRO, the actual owners of the funds. He was the president and sole decision-maker for IRO, the United States-based arm of IIRO. IRO's sole funding came from the investments IRO made on its own behalf through Sana-Bell, D.C. using IIRO's funds. If IRO's activities required funds, Alali would contact BMI and instruct BMI to disburse funds pursuant to his instructions. BMI would do so and dutifully report those disbursements on the partnership's K-1s. Mirza received the K-1s and never challenged the nearly $600,000 of disbursements between 1992 and 1995. He did not object because these funds were, in reality, IIRO's monies to be used by IRO as

determined by Alali, a member of IIRO's executive committee and the chief executive officer of IRO.

The undisputed testimony in this case is that Alali approached Bihieri with a proposal that Sana-Bell, D.C. exchange its limited partnership interests in the BMI limited partnerships for stock in BMI Leasing, Inc. At that time, BMI Leasing, Inc. was in the midst of attempting to raise funds for a stock offering pursuant to a private placement memorandum. It was Alali who suggested that BMI Leasing not only cancel that offering, and that, in return for Sana-Bell, D.C. taking the entire stock offering, BMI Leasing refund subscriptions already paid in pursuant to the offering.

Through this transaction, Sana-Bell, D.C. would be the equitable owner of almost 50% of BMI Leasing, participating in all of its business activities, and BMI Leasing, Inc. would succeed to the limited partnership interests in both of those partnerships and be entitled to the income generated by those interests.

Plaintiff asserts that Bihieri was unreasonable in relying upon Alali's representations that he was authorized to propose and execute this transaction. However, Bihieri acted not only on Alali's representations that he was authorized to do this on behalf of plaintiff, but also on the basis of plaintiff's acquiescence over the previous three years of Alali's sole management of those investments.

Plaintiff does not dispute that the purchase of the limited partnership interests was, in fact, a valid ratified act by the corporation. Yet, plaintiff never supplied BMI with a corporate resolution authorizing the investment. Rather, Alali indicated that the funds would be forthcoming and the subscription agreement would be received, the subscription

agreements were received and the funds were transferred as Alali had instructed. During the next three years, Alali authorized the disbursement of hundreds of thousands of dollars from these investments. At no time did Alali provide a counter-signature, a corporate resolution, or any other document from the corporation formally approving or empowering Alali to make those instructions or receive those funds. Yet, during that entire three year period, plaintiff never once challenged any disbursement pursuant to Alali's instructions, even though the total of those disbursements on a yearly basis was provided to plaintiff's treasurer on its K-1. In fact, according to Mirza, in 1996 IIRO audited these investments. (Exhibit K.) Yet, even after that audit, there was no contention that Alali lacked the authority to order the disbursement of these funds.

Plaintiff allowed a situation to exist in which it neglected its obligations to conduct regular or special board of trustees meetings in order to conduct and oversee the business of the corporation. It allowed and tolerated conditions to exist in which none of the "authorized" agents of plaintiff oversaw, supervised or managed the investments of plaintiff. This failure is all the more remarkable because plaintiff's only business activity was the making, management and supervision of its investments and the disbursal of any returns therefrom.

Despite Mirza's protestations concerning the lack of Alali's authority and involvement with respect to plaintiff's affairs, it is clear that when he became frustrated with the lack of communications from Saudi Arabia with respect to fundamental corporate issues, such as the proposed reclassification of IIRO loans to contributions in order to obtain federal tax exempt status, it was to Alali that Mirza turned. When the chairman of Sana-

Bell in 1998 attempted to reconstruct a new board of trustees, Alali was named as one of the trustees. When the corporation attempted to obtain new oversight with respect to its activities, Alali was to be named the corporation's "coordinator" and IIRO's representative with respect to all Sana-Bell, D.C. activities.

There clearly exists a factual dispute with respect to whether Sana-Bell, D.C. knowingly permitted Alali to assume the authority to act with BMI with respect to all facets of plaintiff's investment in BMI.

## III. EVEN IF THIS COURT WERE TO FIND THAT THE 1996 EQUITY CONVERSION TRANSACTION WAS UNAUTHORIZED, IT IS UNCLEAR TO WHAT REMEDY PLAINTIFF IS ENTITLED

In its Motion for Summary Judgment, plaintiff attacks the validity of the 1996 transaction by which BMI Leasing, Inc. exchanged equitable stock ownership to Sana-Bell, D.C. for Sana-Bell, D.C.'s limited partnership interests in the two BMI limited partnerships. Even if this Court were to determine that Alali did not possess the authority to consummate that transaction on behalf of plaintiff, it is, at best, unclear as to what remedy plaintiff would be entitled.

Plaintiff does not challenge the fact that it entered into the 1992 transactions to purchase limited partnership shares in BMI L.P. and BMI Construction, L.P. Accordingly, if this Court were to void the equity exchange, plaintiff simply would return to its status as a limited partner in each of the limited partnerships. As such, its rights and obligations are largely determined by the terms of the limited partnership agreements. Under Section 2, ¶ (f) of the BMI Leasing Limited Partnership, "a partner shall not be entitled to withdraw any of his or its capital account or receive any distributions from the partnership except as

specifically provided for in this agreement ...." As is standard with limited partnerships, under Section 7, ¶ (d), "the limited partner shall take no part in the conduct or control of the partnership business and shall have no right or authority to act for or to bind in the partnership." Under Section 11 of the BMI Leasing Limited Partnership Agreement, any partner has the right to inspection of the books and records of the partnership (¶ (a)) and "... each partner or its agent may fully examine and audit the partnership books, records, accounts and assets, including bank balances, and to these ends may cause such examinations or audits to be made only by any certified public accountant employed by him at the partner's expense." (¶ (d).) Similar provisions are contained in the BMI construction fund limited partnership agreement. Yet, plaintiff never asked for those rights specifically provided to it under the partnership agreements.

While a general partner owes the limited partners in a limited partnership a fiduciary obligation of good faith and fair dealing, the general partner is not a trustee as to the corpus of the limited partners' investments. Rather, once the limited partner subscribes to the limited partnership, it ceases to have any ownership interest in its contribution. It merely possesses a percentage interest in the entire partnership. As the Court of Special Appeals noted:

> [P]artnership property, regardless of how it is titled, is owned by the partnership; what the partners own is an interest in the partnership. [Citations omitted.] Maryland Code (1975) 1993 Relp. Vol.), § 10-101(L) of the Corporations and Association Article defines "partnership interest" to mean a "partner's share of the profits and losses of a limited partnership and the right to receive distributions of partnership assets." A limited partnership is a partnership comprising one or more general partners and one or more limited partners [citation omitted] and is an entity separate and apart from its members, *i.e.*, as general partners and limited partners.

*Provident Bank v. DeChiaro Limited Partnership*, 98 Md. App. 596, 634 A.2d 973, 979 (1993).

Accordingly, plaintiff is not entitled to and cannot receive an "accounting" for its initial investment. Those funds, upon receipt, became the funds of the partnership itself to be used for partnership purposes, including organizational expenses, compensation to the general partnership, and acquisition of equipment, or expenditures in the construction of houses, depending upon the partnership. Since the limited partner does not have the right to demand the repayment of its capital contributions, it is unclear what individual harm plaintiff alleges it has suffered. If plaintiff asserts that the partnerships as a whole were in some way defrauded or deprived of funds through the general partner's wrongful actions, then that injury is a partnership injury and not one belonging to an individual partner. Accordingly, any remedy sought for a generalized injury to the partnership may only be brought through a derivative action. *See Abeloff v. Barth*, 119 F.R.D. 332 (D. Mass. 1988); *Allright Missouri, Inc. v. Billeter*, 829 F.2d 631 (8th Cir. 1987). Thus, even if this Court were to void the 1996 limited partnership exchange for BMI Leasing, Inc. equity, summary judgment as to all counts and for all claims for relief would still not be appropriate. At most, this Court could enter partial summary judgment as to that narrow issue and order that transaction to be unwound.

## IV. PLAINTIFF FAILS TO ALLEGE OR PROVIDE ANY BASIS FOR THIS COURT TO GRANT SUMMARY JUDGMENT WITH RESPECT TO COUNTS 1 THROUGH 4 OF THE COMPLAINT

In its Complaint, plaintiff alleges: the corporate defendants breached the partnership agreements (count 1); the corporate defendants breached their fiduciary duties

to plaintiff (count 2); the right to an equitable accounting against the corporate defendants (count 3); and asserts that all defendants entered into a civil conspiracy against it (count 4). While in its prayer for relief to its Motion for Summary Judgment, plaintiff seeks judgment as to all counts, in fact, plaintiff never addressed the issues of breach of contract, breach of fiduciary duty, equitable accounting or conspiracy in its memorandum in support of its Motion. For instance, plaintiff does not point to what portion of the partnership agreements it alleges the corporate defendants breached; it does not allege specifically what aspect of their fiduciary duties they allegedly breached; it does not state as to what it wishes to have an accounting ordered by the Court; and it does not allege any of the elements of a civil conspiracy by any of the defendants.

At the very most, plaintiff's Motion is in reality only a motion for partial summary judgment as to the defendants' claim that they relied upon Alali's apparent authority at the time that they entered into the 1996 stock for a limited partnership interests exchange. Plaintiff provides no other authority, and makes no other argument. Accordingly, even if this Court were to be inclined to agree with plaintiff with respect to the apparent authority issue, any remedy that it could grant would only be partial and as to that particular defense.

**CONCLUSION**

On the basis of the foregoing, defendants respectfully request that this Court deny plaintiff's Motion for Summary Judgment.

Respectfully submitted,

GALLAND, KHARASCH, GREENBERG,
FELLMAN & SWIRSKY, P.C.

By: [signature]
William F. Krebs, D. Md. No. 10293
1054 Thirty-First Street, N.W.
Washington, D.C. 20007
Telephone: (202) 342-5200
Facsimile: (202) 342-5219

Attorneys for Plaintiffs/Creditors

Dated: January 21, 2000

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 110

DEPARTMENT OF THE TREASURY
WASHINGTON

GENERAL COUNSEL

January 4, 2002

M. Claude Nicati
Substitut du Procureur General
Taubenstrasse 16
3003 Berne
SWITZERLAND

**BY TELECOPIER**
**011-41-31-322-4507**

Re: Al Taqwa/Nada Management Organization

Dear Mr. Nicati:

This letter is provided to you pursuant to your request under the mutual legal assistance treaty between the United States and Switzerland in connection with the action taken by the Government of Switzerland to block assets of Youssef (also spelled "Yusuf") M. Nada and Nada Management Organization. Although some of the information concerning Nada comes from sensitive sources that we cannot disclose, we have agreed to provide you with an unclassified summary of certain information concerning Nada. We believe that this information is generally reliable and, taken as a whole, supports the decision to block the assets of Nada and Nada Management Organization. This summary may be disclosed publicly in legal proceedings.

Based upon information available to the United States Government, we have a reasonable basis to believe that Nada and his affiliated companies have a history of financing and facilitating the activities of terrorists and terrorist-related organizations.

Bank Al Taqwa (occasionally misspelled as "Taqua" in some press reports) was established in 1988 with significant backing from the Egyptian Muslim Brotherhood,[1] and it has long been thought to be involved in financing radical groups like the Palestinian HAMAS, Algeria's Islamic Salvation Front and Armed Islamic Group, and Tunisia's An-Nahda. Bank Al Taqwa was founded in the Bahamas and is a close affiliate

[1] Although the Muslim Brotherhood has not been designated by the United States Government, the organization is outlawed in Egypt and authorities there have long argued, according to press reports, that it is a front for terrorists. The Islamic Jihad is a splinter of the Muslim Brotherhood and, with the Gema'a al-Islamiya, were responsible for the assassination of Anwar Sadat, according to press accounts.

of Al Taqwa Management Organization. The organization changed its name to Nada Management Organization in the spring of 2000.

In 1997, it was reported that the $60 million collected annually for HAMAS from all parts of the world were moved to accounts with Al Taqwa. As shown below, this close association with the financing of terrorists has continued unchecked.

The Malta and Lugano, Switzerland branch offices of the Al Taqwa Management Organization receive money that "pours in" from Kuwait and the United Arab Emirates for Usama bin Laden. Jordan has accused Bank Al Taqwa in the Bahamas of having financed a network linked to bin Laden and of plotting terror attacks against Western and tourist targets during the millennium celebrations.

As of late September 2001, bin Laden and his Al Qa'ida organization received financial assistance from Youssef M. Nada and Ali bin Mussalim. Nada has a controlling interest in, and is chairman of, Bank Al Taqwa, and Mussalim is involved in Bank Al Taqwa operations. Since the 1980s, following the pullout of the Soviet army from Afghanistan, Mussalim, assisted by Nada, has been providing indirect investment services for Al Qa'ida, investing funds for bin Laden, and making cash deliveries on request to the Al Qa'ida organization.

As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit for a close associate of Usama bin Laden. This bin Laden lieutenant had a line of credit with a Middle East financial institution that drew on an identical account number at Bank Al Taqwa. Unlike other accounts – even accounts of private banking customers – this account was blocked by the computer system and special privileges were required to access it. No identifiable names were associated with the account. These circumstances are highly unusual, and may have been done to conceal the association of the bin Laden organization with Bank Al Taqwa.

Youssef Nada confirmed in an interview with the Al-Jazeera television station that he is a member of the Muslim Brotherhood. He denied that he had ever met or had contact with Usama bin Laden, although Nada acknowledged that members of the bin Laden family, other than Usama bin Laden, had invested in the bank. Press accounts, however, have linked Nada with Usama bin Laden. Nada also acknowledged having personal ties with Saddam Hussein. According to Syrian political analyst Sami Moubayed, Nada was implicated in a failed assassination attempt on the late Egyptian president Gamal Abdul Nasser in 1954. Nada fled Egypt and has been a fugitive from that country for many decades.

One of the Al Taqwa board members, Ahmed Huber, confirmed that he had met with members of bin Laden's organization in Beirut. Huber has defended the bombing of the World Trade Center buildings and the Pentagon. He is well known for his extreme anti-Israel views. In 1989, he supported the "fatwa" calling for the death of author Salman Rushdie.

Bank Al Taqwa and a founder and director, Ahmed Idris Nasreddin, have been supporters of an Islamic center in Milan, Italy which may be Al Qa'ida's most important base in Europe. The ICI and its members have been linked to several terrorist plots, including the 1993 World Trade Center bombing and a failed scheme to bomb the U.S. embassy in Rome.

An investigation of the ICI following the arrest in Italy of Egyptian and Jordanian extremists, revealed that these individuals carried out their work at the ICI. In addition, the investigation uncovered links between the ICI and organizations controlled by Nasreddin in the Bahamas. Some ICI members were directly in contact with Bank Al Taqwa.

As noted previously, this is a summary of information concerning Nada and his companies that we can release at this time. If we are able to release additional information in the future we will notify you.

Sincerely,

George B. Wolfe
Deputy General Counsel

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 111

FEDERAL BUREAU OF INVESTIGATION
DALLAS



# Department of Justice Press Release

**For Immediate Release**
May 27, 2009

**United States Attorney's Office**
**Northern District of Texas**
**Contact: (214) 659-8600**

**Federal Judge Hands Downs Sentences in Holy Land Foundation Case**
***Holy Land Foundation and Leaders Convicted on Providing Material Support to Hamas Terrorist Organization***

WASHINGTON—Today, in federal court in Dallas, U.S. District Judge Jorge A. Solis sentenced the Holy Land Foundation for Relief and Development (HLF) and five of its leaders following their convictions by a federal jury in November 2008 on charges of providing material support to Hamas, a designated foreign terrorist organization, announced acting U.S. Attorney James T. Jacks of the Northern District of Texas, and David Kris, Assistant Attorney General for National Security. All defendants are presently in federal custody.

"Today's sentences mark the culmination of many years of painstaking investigative and prosecutorial work at the federal, state and local levels. All those involved in this landmark case deserve our thanks," said David Kris, Assistant Attorney General for National Security. "These sentences should serve as a strong warning to anyone who knowingly provides financial support to terrorists under the guise of humanitarian relief."

HLF was incorporated by Shukri Abu Baker, Mohammad El-Mezain, and Ghassan Elashi. Mufid Abdulqader and Abdulrahman Odeh worked as fund raisers. Together, with others, they provided material support to the Hamas movement.

- Shukri Abu Baker, 50, of Garland, Texas, was sentenced to a total of 65 years in prison. He was convicted of 10 counts of conspiracy to provide, and the provision of, material support to a designated foreign terrorist organization; 11 counts of conspiracy to provide, and the provision of, funds, goods and services to a Specially Designated Terrorist; 10 counts of conspiracy to commit, and the commission of, money laundering; one count of conspiracy to impede and impair the Internal Revenue Service (IRS); and one count of filing a false tax return.
- Mohammad El-Mezain, 55, of San Diego, California, was sentenced to the statutory maximum of 15 years in prison. He was convicted on one count of conspiracy to provide material support to a designated foreign terrorist organization.
- Ghassan Elashi, 55, of Richardson, Texas, was sentenced to a total of 65 years in prison. He was convicted on the same counts as Abu Baker, and one additional count of filing a false tax return.
- Mufid Abdulqader, 49, of Richardson, Texas, was sentenced to a total of 20 years in prison. He was convicted on one count of conspiracy to provide material support to a designated foreign terrorist organization, one count of conspiracy to provide goods, funds, and services to a specially designated terrorist, and one count of conspiracy to commit money laundering.
- Abdulrahman Odeh, 49, of Patterson, New Jersey, was sentenced to 15 years in prison. He was convicted on the same counts as Abdulqader.
- HLF, now defunct, was convicted on10 counts of conspiracy to provide, and the provision of, material support to a designated foreign terrorist organization; 11 counts of conspiracy to provide, and the provision of, funds, goods and services to a Specially Designated Terrorist; and 10 counts of conspiracy to commit, and the commission of, money laundering.

The Court reaffirmed the jury's $12.4 million money judgment against all the defendants, with the exception of El Mezain, who was not convicted of money laundering.

From its inception, HLF existed to support Hamas. Before HLF was designed as a Specially Designated Terrorist by the Treasury Department and shut down in December 2001, it was the

largest U.S. Muslim charity. It was based in Richardson, Texas, a Dallas suburb. The "material support statute," as it is commonly referred to, was enacted in 1996 as part of the Antiterrorism and Effective Death Penalty Act. That statute recognizes that money is fungible, and that money in the hands of a terrorist organization—even if for so called charitable purposes—supports that organization's overall terrorist objectives.

The government presented evidence at trial that, as the U.S. began to scrutinize individuals and entities in the U.S. who were raising funds for terrorist groups in the mid-1990s, the HLF intentionally hid its financial support for Hamas behind the guise of charitable donations. HLF and these five defendants provided approximately $12.4 million in support to Hamas and its goal of creating an Islamic Palestinian state by eliminating the State of Israel through violent jihad.

The government's case included testimony that in the early 1990's, Hamas' parent organization, the Muslim Brotherhood, planned to establish a network of organizations in the U.S. to spread a militant Islamist message and raise money for Hamas. The government's case also included testimony about Hamas material found in zakat committees. The defendants sent HLF-raised funds to Hamas-controlled zakat committees and charitable societies in the West Bank and Gaza. Zakat is an Arabic word referring to the religious obligation to give alms.

HLF became the chief fundraising arm for the Palestine Committee in the U.S. created by the Muslim Brotherhood to support Hamas. According to a wiretap of a 1993 Palestine Committee meeting in Philadelphia, former HLF President and CEO Shukri Abu Baker, spoke about playing down their Hamas ties in order to keep raising money in the U.S. Another wiretapped phone call included Abdulrahman Odeh, HLF's New Jersey representative, referring to a suicide bombing as "a beautiful operation."

The government also presented evidence that several HLF defendants have family members who are Hamas leaders, including Hamas' political chief, Mousa Abu Marzook, who is married to a cousin of Ghassan Elashi, HLF's former Chairman of the Board. Ghassan Elashi, who also served as the vice-president of marketing for Infocom Corporation, is currently serving an 80-month sentence following his conviction on several charges related to export violations. Mohammed El-Mezain was HLF's Director of Endowments and Mufid Abdulqater was a major HLF fundraiser. Two named defendants, Akram Mishal and Haitham Maghawri are fugitives.

The defendants provided financial support to the families of Hamas martyrs, detainees, and activists knowing and intending that such assistance would support the Hamas terrorist organization. Since 1995, when it first became illegal to provide financial support to Hamas, HLF provided approximately $12.4 million in funding to Hamas through various Hamas-affiliated committees and organizations located in Palestinian-controlled areas and elsewhere.

During trial, the government also presented evidence that HLF was so concerned about investigators uncovering the group's intentions that they kept a manual entitled "The Foundation's Policies and Procedures." HLF followed various security procedures outlined in the manual to include hiring a security company to search the HLF for listening devices, ordering defendant Haitham Maghawri, a fugitive, to take training on advanced methods in detecting wiretaps, shredding documents after board meetings, and maintaining incriminating documents in off-site locations.

The case was investigated by the Joint Terrorism Task Force, involving agents from federal, state, and local agencies including: FBI, IRS - Criminal Investigation, U.S. Immigration and Customs Enforcement (ICE), Department of State, U.S. Secret Service, U.S. Army Criminal Investigation Division, the Texas Department of Public Safety, and the Dallas, Plano, Garland and Richardson, Texas, Police Departments. In addition, the Department of Justice Criminal Division's Asset Forfeiture and Money Laundering Section provided assistance.

The case was prosecuted by James T. Jacks, acting U.S. Attorney; Barry Jonas, Trial Attorney for the Department of Justice Counter-terrorism Section; and Elizabeth J. Shapiro, Deputy Director, Federal Programs Branch, Department of Justice, serving as a Special Assistant U.S. Attorney.

Press Releases | Dallas Home

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links
Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 87

MARJAC

# MARJAC INVESTMENTS, INC.

555 GROVE STREET, HERNDON, VA 22070 U.S.A.

## TELEFAX MESSAGE

| | | |
|---|---|---|
| TO | Randy Bruce<br>Controller, Mar-Jac Poultry, Inc. | TELEFAX :<br>TELEPHONE: |
| FROM | M. Yaqub Mirza | TELEPHONE: (703) 471-9494<br>TELEFAX : (703) 471-1211<br>TELEX : 901153 SAAR WASH |
| SUBJECT | Solmagic | |
| DATE | July 5, 1994 | |
| PAGES | TOTAL 1 INCLUDING THIS PAGE. | |

Did you get a chance to do the calculation for Solmagic as of 6/30/94?

When do you plan to wire out funds? Wiring instructions for Solmagic are to

Transfer funds to:

Chemical Bank
New York
ABA # 021000128

for credit to Acct # 400-057794 of
Al Rajhi Banking & Investment Corp.
Riyadh, Saudi Arabia

for further credit to Acct # 7/4700 of
Abdullah Abdul Aziz Ali Al-Direibi
with their Al-Rabwa Branch No 341

on account of sum due to Solmagic.

REQUEST to CHEMICAL BANK to PLEASE
NOTIFY SOLMAGIC.

MJ 0011532
CONFIDENTIAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 88

11% INTEREST SOLMAJIC INC 1-212-08

| DAYS | DATES | 1-212-08 ACCRUED INTEREST | ACCRUED INTEREST TO DATE | INTEREST PAYMENT | 1-211-38 Payment to A/P MJ Poultry | 11/19/90 BALANCE |
|---|---|---|---|---|---|---|
| | | | | | | 400000000 |
| 13 | 11/19/90 - 12/02/90 | 1588886 | | | | |
| 28 | 12/03/90 - 12/30/90 | 3422216 | 5011102 | 4/25/91 5011102 | | |
| 35 | 12/31/90 - 02/03/91 | 4277770 | 4277770 | | | |
| 28 | 02/04/91 - 03/03/91 | 3422216 | 7699986 | | | |
| 28 | 03/04/91 - 03/31/91 | 3422216 | 11122202 | | | |
| 28 | 04/01/91 - 04/28/91 | 3422216 | 14544418 | | | |
| 35 | 04/29/91 - 06/02/91 | 4277770 | 18822188 | | | |
| 28 | 06/03/91 - 06/30/91 | 3422216 | 22244404 | | | |
| | 07/02/91 W.T. | | 11122202 | 11122202 | | |
| 35 | 07/01/91 - 08/04/91 | 4277770 | 15399972 | | | |
| | 8/09/91 W.T. | | 4277770 | 11122202 | | |
| 28 | 08/05/91 - 09/01/91 | 3422216 | 7699986 | | | |
| 28 | 09/02/91 - 09/29/91 | 3422216 | 11122202 | | | |
| | 10/11/91 | | -0- | 11122202 | | |
| 35 | 09/30/91 - 11/03/91 | 4277770 | 4277770 | | | |
| 28 | 11/04/91 - 12/01/91 | 3422216 | 7699986 | | | |
| [illegible] | 12/02/91 - 12/29/91 | 3422216 | 11122202 | | | |
| 35 | 12/30/91 - 2/02/92 | 4277770 | 15399972 | | | |
| 28 | 02/03/92 - 03/01/92 | 3422216 | 18822188 | | | |
| 28 | 03/02/92 - 03/29/92 | 3422216 | 22244404 | | | |
| 35 | 03/30/92 - 05/03/92 | 4277770 | 26522174 | | | |
| 28 | 05/04/92 - 05/31/92 | 3422216 | 29944390 | | | |
| | 06/08/92 W.T. | | 7699986 | 22244404 | | |
| 28 | 06/01/92 - 06/28/92 | 3422216 | 11122202 | | | |
| 35 | 06/29/92 - 08/02/92 | 4277770 | 15399972 | | | |
| | 8/20/92 W.T. 2ND QTR | | 4277770 | 11122202 | | |
| 28 | 08/03/92 - 08/30/92 | 3422216 | 7699986 | | | |
| 35 | 08/31/92 - 10/04/92 | 4277770 | 11977756 | | | |
| | 10/21/92 W.T. | | -0- | 11977756 | | |
| 28 | 10/05/92 - 11/01/92 | 3422216 | 3422216 | | | |
| | 11/09/92 W.T. | | | 11122202 | | |
| 28 | 11/02/92 - 11/29/92 | 3422216 | < 4277770 > | | | |
| 35 | 11/30/92 - 01/03/93 | 4277770 | -0- | | | |
| 28 | 01/04/93 - 01/31/93 | 3422216 | 3422216 | | | |
| 28 | 02/01/93 - 02/28/93 | 3422216 | 6844432 | | | |
| 28 | 03/01/93 - 03/28/93 | 3422216 | 10266648 | | | |
| 35 | 03/29/93 - 05/02/93 | 4277770 | 14544418 | | | |

11% INTEREST SOLMAJIC INC. 1-212-08

4 WKS 33,846.16
5 WKS 42,307.70

| Days | Dates | 1-212-08 Accrued Interest | Accrued Interest To Date | Interest Payment | 1-211-38 Payment to AIPMJ Poultry | 11/19/90 Balance |
|---|---|---|---|---|---|---|
| | Bal. Fwd't | | 14544418 | | | 400000000 |
| 28 | 05/03/93 - 05/30/93 | 3422216 | 17966634 | | | |
| 28 | 05/31/93 - 06/27/93 | 3422216 | 21388850 | | | |
| 35 | 06/28/93 - 08/01/93 | 4277770 | 25666620 | | | |
| 28 | 08/02/93 - 08/29/93 | 3422216 | 29088836 | | | |
| 35 | 08/30/93 - 10/03/93 | 4277770 | 33366606 | | | |
| 28 | 10/04/93 - 10/31/93 | 3422216 | 36788822 | | | |
| 28 | 11/01/93 - 11/28/93 | 3422216 | 40211038 | | | |
| 35 | 11/29/93 - 01/02/94 | 4277770 | 44488808 | | | |
| 28 | 01/03/94 - 01/30/94 | 3422216 | 47911024 | | | |
| 28 | 01/31/94 - 02/27/94 | 3422216 | 51333240 | | | |
| 35 | 02/28/94 - 04/03/94 | 4277770 | 55611010 | | | |
| 28 | 04/04/94 - 05/01/94 | 3422216 | 59033226 | | | |
| | | 44488808 | | | | |
| 28 | 05/02/94 - 05/29/94 | 3422216 | 62455442 | | | |
| | 5/31/94 W.T. | | 6844432 | 55611010 | | |
| 35 | 05/30/94 - 07/03/94 | 4155570 | 11000002 | | To Adj to 4 wk 5 wk Period | |
| | 7/15/94 W.T. | | -0- | 11000002 | | |
| 28 | 07/04/94 - 07/31/94 | 3384616 | 3384616 | | | |
| 35 | 08/01/94 - 09/04/94 | 4230770 | 7615386 | | | |
| 28 | 09/05/94 - 10/02/94 | 3384616 | 11000002 | | | |
| | W.T. 10/05/94 | | -0- | 11000002 | | |
| 28 | 10/03/94 - 10/30/94 | 3384616 | 3384616 | | | |
| 28 | 10/31/94 - 11/27/94 | 3384616 | 6769232 | | | |
| | W.T. 11/22/94 | | <4230770> | 11000002 | | |
| 35 | 11/28/94 - 01/01/95 | 4230770 | -0- | | | |
| 28 | 01/02/95 - 01/29/95 | 3384616 | 3384616 | | | |
| 28 | 01/30/95 - 02/26/95 | 3384616 | 6769232 | | | |
| 35 | 02/27/95 - 04/02/95 | 4230770 | 11000002 | | | |
| | W.T. 3/22/95 | | -0- | 11000002 | | |
| 28 | 4/03/95 - 4/30/95 | 3384616 | | | | |
| | | 43962408 | | 99611018 | | |

MJ 0011304
CONFIDENTIAL

11% INTEREST
WIRE TRANSFER

SOLMAJIC INC. 1-212-08

4WKS 33,846.16
5WKS 42,307.70

| Days | Dates | 1-212-08 Accrued Interest | Accrued Interest To Date | Interest Payment | 1-211-38 Payment to A/P MJ Poultry | 11/19/90 Balance 1-221-13 |
|---|---|---|---|---|---|---|
| 4 95 | Bal Fwd | | 3384616 | | | 400000000 |
| 28 | 5/01/95 - 5/28/95 | 3384616 | 6769232 | | | |
| 35 | 5/29/95 - 7/02/95 | 4230770 | 11000002 | | | |
| | W.T. 6/12/95 2nd Qtr | | -0- | 11000002 | | |
| 28 | 7/03/95 - 7/30/95 | 3384616 | 3384616 | | | |
| 28 | 7/31/95 - 8/27/95 | 3384616 | 6769232 | | | |
| 35 | 8/28/95 - 10/01/95 | 4230770 | 11000002 | | | |
| | W.T. 9/25/95 3rd Qtr | | -0- | 11000002 | | |
| 28 | 10/02/95 - 10/29/95 | 3384616 | 3384616 | | | |
| 28 | 10/30/95 - 11/26/95 | 3384616 | 6769232 | | | |
| 35 | 11/27/95 - 12/31/95 | 4230764 | 10999996 | | | |
| | W.T. 1/3/96 4th Qtr | | -0- | 10999996 | | |
| 28 | 1/01/96 - 1/28/96 | 3384616 | 3384616 | | | |
| 35 | 1/29/96 - 3/03/96 | 4230770 | 7615386 | | | |
| 28 | 3/04/96 - 3/31/96 | 3384614 | 11000000 | | | |
| | 4/03/96 W.T. | | -0- | 11000000 | | |
| 28 | 4/01/96 - 4/28/96 | 3384616 | 3384616 | | | |
| 35 | 4/29/96 - 6/02/96 | 4230770 | 7615386 | | | |
| 28 | 6/03/96 - 6/30/96 | 3384614 | 11000000 | | | |
| | W.T. 7/15/96 1st Qtr | | -0- | 11000000 | | |
| 28 | 7/01/96 - 7/28/96 | 3384616 | 3384616 | | | |
| 35 | 7/29/96 - 9/01/96 | 4230770 | 7615386 | | | |
| 28 | 9/02/96 - 9/29/96 | 3384614 | 11000000 | | | |
| | W.T. 10/03/96 3rd Qtr | | -0- | 11000000 | | |
| 35 | 9/30/96 - 11/03/96 | 4230770 | 4230770 | | | |
| | 11/27/96 Paid off | | -0- | 4230770 | | <400000000> |

= 3,642,970.50

Exp 1-711-51

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 89

United States District Court ★ Northern District of Georgia ★

# EXHIBIT / ATTACHMENT

45

(To be scanned in place of tab)

COMMERCE BANK
REQUEST FOR WIRE TRANSFER

G:\SCANNED DOCUMENTS\TIFF IMG\S0108000000014

Date Dec 8, 98 REF #

AMOUNT: 6,800,000.00 (PLUS APPLICABLE CHARGES)
(U.S. Dollars)
($ six million eight hundred thousand)

BANK TO RECEIVE WIRE

ABA/Routing No. ____ - ____ - ____

Bank Short Name ____

Bank Name CHASE MANHATTAN PRIVATE BANK

Address

St Hellier, Jersey JE4 8QH

FOR CREDIT TO

Name(s) SHAIKH SULAIMAN A. AL RAJHI

Account Number 7922635383

Special Instr.

Payment of loan

CUSTOMER INFORMATION VALUE DATE: Dec 14, 98

Account Name(s) Humana Charitable Trust

Address P. O. Box 1297
Herndon, VA 20170

Telephone Number 703-471-9494 Account Number 00110424

I hereby authorize Commerce Bank (the Bank) to charge my account as listed above. I understand that the Bank is not responsible for any loss which may be sustained by acting upon my wire transfer instructions, except for a loss caused by the Bank's error or omission.

[signature]
Customer's Signature

Customer's Identification

BRANCH MANAGER APPROVAL ____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 03-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 90

United States District Court ★ Northern District of Georgia ★

# EXHIBIT / ATTACHMENT

43

(To be scanned in place of tab)

G:\SCANNED DOCUMENTS\TIFF IMG\S0108000000003

**To:** Mr. Bushra Ahmed
Office of Mr. Abdullah S. Al Rajhi

**From:** M. Yaqub Mirza

**Subject:** Payment of loan

**Date:** April 1, 1998

---

Assalamu 'Alaikum and Eid Mubarak

Reference my discussion with Mr. Abdullah Al Rajhi and your fax, we wish to inform you that we have made the following transfers yesterday:

| | | |
|---|---|---|
| 1. | Commerce Bank, Maryland | $5.8 m. |
| 2. | Credit Agricole Indosuez Zurich | 12.2 m. |
| 3. | Bank Leu, Geneva | 6.0 m |
| | | $24.0 m. |

to Chase (New York) for further credit to Chase (Jersey), Channel Islands, Acct. # 7922635383 of Shaikh Sulaiman.

Value Date: April 2

Please acknowledge receipt of funds.

Thanks.

Wassalaam.

TRANSACTION REPORT

APR-01-98 08:36 AM

FOR: SAFINC INVESTMENTS. INC. 703 471 1211

SEND

| DATE | START | RECEIVER | PAGES | TIME | NOTE |
|---|---|---|---|---|---|
| APR-01 | 08:35 AM | A.S.RAJHI | 1 | 46" | OK |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 91

# PROMISSORY NOTE

**$650,000.00** **November 1, 1997**

**FOR VALUE RECEIVED,** MarJac Holdings, Inc., hereinafter described as "Maker" hereby promises to pay on DEMAND to the order of Safa Trust, Inc. the principal sum of Six Hundred Fifty Thousand Dollars ($650,000.00) with Ten percent (10%) interest per annum.

Principal shall be payable at the office of Safa Trust, Inc. 555 Grove Street, Herndon, VA 20170, or at such other place as the payee may designate in writing.

It is expressly understood and agreed that if an installment herein provided for, if any, is not paid within fifteen (15) business days when due, or should there be any failure to comply with any one of the covenants, agreements or stipulations set forth herein which continues for more than fifteen (15) days after receipt by Maker of written notice thereof, then and in that event, the unpaid balance of the aforesaid principal sum, shall, at the option of the payee, immediately become due and payable. Failure to exercise this option in any one or more instances shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In the event of default in the payment of this Note, Maker hereby agrees to pay all cost of collection, including reasonable attorneys' fees.

Privilege is hereby reserved to make prepayment of this Note in whole or in part at any time without penalty.

Maker hereby waives presentment, protest and demand, notice of protest and dishonor, or any nonpayment of this Note.

MARJAC HOLDINGS, INC.

By: [signature]
V.P. Finance

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 92

safa
TRUST INC.

555 Grove St. Herndon, VA 22070 • (703) 471-6466 • Telex: 901153 SAIIT WASH • Fax: (703) 471-3922

'97 NOV 20 AM 10 38

November 13, 1997

Mar-Jac Holdings, Inc.
P. O. Box 1017
Gainsville, GA 30503

Attn.: Mahmoud Mohamed

Please note that Safa Trust has assigned all its rights under that certain promissory note dated November 1, 1997 for $650,000 (Six Hundred Fifty Thousand Dollars) to York International Trust.

Kindly cancel the attached note and reissue it in the name of York International Trust.

Yours Sincerely,

M. Yaqub Mirza
Vice President.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 93

Cancelled 11/13/97

# PROMISSORY NOTE

$650,000.00

November 1, 1997

**FOR VALUE RECEIVED,** MarJac Holdings, Inc., hereinafter described as "Maker" hereby promises to pay on DEMAND to the order of Safa Trust, Inc. the principal sum of Six Hundred Fifty Thousand Dollars ($650,000.00) with Ten percent (10%) interest per annum.

Principal shall be payable at the office of Safa Trust, Inc. 555 Grove Street, Herndon, VA 20170, or at such other place as the payee may designate in writing.

It is expressly understood and agreed that if an installment herein provided for, if any, is not paid within fifteen (15) business days when due, or should there be any failure to comply with any one of the covenants, agreements or stipulations set forth herein which continues for more than fifteen (15) days after receipt by Maker of written notice thereof, then and in that event, the unpaid balance of the aforesaid principal sum, shall, at the option of the payee, immediately become due and payable. Failure to exercise this option in any one or more instances shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In the event of default in the payment of this Note, Maker hereby agrees to pay all cost of collection, including reasonable attorneys' fees.

Privilege is hereby reserved to make prepayment of this Note in whole or in part at any time without penalty.

Maker hereby waives presentment, protest and demand, notice of protest and dishonor, or any nonpayment of this Note.

MARJAC HOLDINGS, INC.

By: [signature]
V.P. Finance

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 94

# PROMISSORY NOTE

**$650,000.00**

**As of November 1, 1997**

**FOR VALUE RECEIVED,** MarJac Holdings, Inc., hereinafter described as "Maker" hereby promises to pay on DEMAND to the order of York International Trust the principal sum of Six Hundred Fifty Thousand Dollars ($650,000.00) with Ten percent (10%) interest per annum.

Principal shall be payable at the office of York International Trust, c/o Reston Investments, Inc. 555 Grove Street, Suite 114, Herndon, VA 20170, or at such other place as the payee may designate in writing.

It is expressly understood and agreed that if an installment herein provided for, if any, is not paid within fifteen (15) business days when due, or should there be any failure to comply with any one of the covenants, agreements or stipulations set forth herein which continues for more than fifteen (15) days after receipt by Maker of written notice thereof, then and in that event, the unpaid balance of the aforesaid principal sum, shall, at the option of the payee, immediately become due and payable. Failure to exercise this option in any one or more instances shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In the event of default in the payment of this Note, Maker hereby agrees to pay all cost of collection, including reasonable attorneys' fees.

Privilege is hereby reserved to make prepayment of this Note in whole or in part at any time without penalty.

Maker hereby waives presentment, protest and demand, notice of protest and dishonor, or any nonpayment of this Note.

MARJAC HOLDINGS, INC.

By: [signature]
V.P. Finance

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **<u>TO BE FILED UNDER SEAL</u>** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA</u>**

# EXHIBIT 95

| | Safa | Mena | York | Total |
|---|---|---|---|---|
| Principal | 17,500.00 | 150,000.00 | 525,000.00 | 692,500.00 |
| Int. to 9-25-98 | 7,629.80 | 16,634.62 | 53,701.92 | 77,966.34 |
| to 10-15-98 | 67.31 | 576.92 | 2,019.23 | 2,663.46 |
| | 25,197.11 ✓ | 167,211.54 ✓ | 580,721.15 | 773,129.80 |

```
000
                734· T
MENA  167,211·54 +
SAFA   25,197·11 +
002
      192,408·65 S
pyt to 753,263·52 +
HUMANA (SAAR)
003
      945,672·17 S
    1,000,000·00 -
002
To YORK 54,327·83-T ✓
Interest
```

Pls Pay
Per Dr. MIRZA
on 10/16/98

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 96

# MAR-JAC, INC.
# CHECK REQUEST

PAY TO: York International Trust

ADDRESS:

CITY, STATE: ZIP CODE

DATE CHECK NEEDED:

☐ MAIL CHECK ☐ GIVE CHECK TO:

PURPOSE OF EXPENDITURE: Payment of interest On Note to 10-15-98

REQUESTED BY:

APPROVED BY: Mahmud S. Mohamad

DATE: 10-16-98

| Account | Code | | Amount | |
|---|---|---|---|---|
| 8 | 213 | 04 | 54,327 | 83 |
| | | | | |
| | | | | |
| | | | | |

| Check No. | Total Amount | 54,327 | 83 |
|---|---|---|---|
| | | Reference Number | |

| Vendor No. | Invoice No. | Inv. Date |
|---|---|---|
| | | |

| Disc % | Days | P.O. No. | Due Date |
|---|---|---|---|
| | | | |

MJ 0004937
CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAR-JAC POULTRY, INC., Plaintiff, v. RITA KATZ, et al., Defendants. | **TO BE FILED UNDER SEAL** Case No. 03-2422 (RMC) |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 97

3016

**MAR-JAC HOLDINGS, INC.**
P O BOX 1017
GAINESVILLE, GA 30503-1017

64-5/610
01415

REGISTERED

OCTOBER 16 19 98

PAY TO THE ORDER OF YORK INTERNATIONAL TRUST $ 54,327.83

INSURED
8N132226 54327 DOLS 83 CTS 12 2161 00 10-20-98

DOLLARS

220042700 009 1213 1007 24 22

**NationsBank**
NationsBank, N.A. (South)
Georgia

FOR Payment on o/s note (accrued interest only)

⑈003016⑈ ⑆061000052⑆ 325 180 9259⑈ ⑈0005432783⑈

MJ 0005068
CONFIDENTIAL

00910000 1STFED
220042700 0510-0003-3
220042700 10-20-98
220042700 009 1213 1007 24 22

FRB-VA 10/19/98
RICHMOND, VA
051400549

OCT 19 98

ENDORSE HERE:

Pay to [illegible] Investment Group
TTEE, [illegible]

DO NOT SIGN / WRITE / STAMP BELOW THIS LINE
FOR FINANCIAL INSTITUTION USAGE ONLY

FEDERAL RESERVE BANK REGUL...

MJ 0005069
CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| Plaintiff, | ) | **TO BE FILED UNDER SEAL** |
| v. | ) | Case No. 03-2422 (RMC) |
| RITA KATZ, et al., | ) | |
| Defendants. | ) | |

**WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA**

# EXHIBIT 98

# YORK INTERNATIONAL TRUST

**c/o Reston Investments, Inc.**
**555 Grove Street, Suite 114**
**Herndon, VA 20170**

**To:** Mr. Randy Bruce
Mar-Jac Poultry, Inc.
**From:** M. Omar Ashraf
**Subject:** Wire Transfer
**Date:** April 30, 1998

---

Dear Randy:

I have discussed the following transfer with Mahmoud and I assume that he has already talked to you. Please make the following transfer from Mar-Jac Holdings, Inc.

Amount: $125,000.00

To: First Union National Bank of Virginia
Herndon, VA
ABA # 051400549
for further credit to Sterling Investment Group, L.L.C.
A/C # 2000001052673

This payment is for a partial payment of the $650,000 promissory note of York International Trust.

Best Regards,

M. Omar Ashraf

**Pages:** Total_1_including this page.

| Post-it™ brand fax transmittal memo 7671 | # of pages ▸ 7 |
|---|---|
| To Dr. YAQUB | From MAHMOUD |
| Co. | Co. |
| Dept. | Phone # |
| Fax # | Fax # |

555 Grove Street, Suite 114, Herndon, VA 20170 Phone: (703) 471-6274 Fax: (703) 471-1211

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **<u>TO BE FILED UNDER SEAL</u>** |
| | ) | |
| **v.** | ) | **Case No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>WRITTEN DEPOSITION QUESTIONS TO DR. M. YAQUB MIRZA</u>**

# EXHIBIT 99

Chart No. 7

# Mar-Jac Stock Dividend Payment Converted to Promissory Note and Assigned to York International Trust

