**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 03-2422(RMC)** |
| **v.** | ) | |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Defendants' Joint Motion for Summary Judgment (Doc. 194-1, hereinafter "Joint Mem.") is a calculated attempt to obscure the pertinent facts, to inject irrelevant and immaterial matters wherever possible, and to confuse and distort the legal and factual issues presented by Plaintiff Mar-Jac Poultry, Inc.'s claims. Despite Defendants' best efforts, having utilized seven years of unilateral discovery to conjure support for the defamatory accusations they leveled at Mar-Jac in the May 4, 2003 edition of the national news magazine program, *60 Minutes*, they are unable to point to a scintilla of evidence that Mar-Jac was a "cover for money laundering" or that Mar-Jac ever laundered money, much less in the fashion they claimed or for the purpose of financing terrorism.

Nor have Defendants supported even one financial transaction between Mar-Jac and any of the purported terrorists and terrorist organizations which were depicted on Defendant Katz's "Chart" that was featured so prominently in the broadcast, the only defamatory accusation they even attempt to address in the Joint Motion for Summary Judgment.

And although they devote considerable effort to describing—often inaccurately, incompletely, and out of context—transactions involving people and organizations not depicted

on the "Chart," Defendants do not describe even one transaction between any entity or organization that may have ever, at any point, received funds from Mar-Jac—whether through dividends, loan payments, donations, or in any other form—and a person or entity that, at that time, had been identified and listed by the Department of Treasury's Office of Foreign Assets Control ("OFAC") as a Specifically Designated Terrorist Organization.

Defendants boldly seek summary judgment based upon their having addressed only one of the false claims featured in the broadcast (*i.e.*, that "money flowed to terrorists") despite that they do not bother to address the many others. They do not argue that Mar-Jac in fact laundered money, or overstated its number of dead chickens, or even transfered money to terrorists or terrorist organizations. Nor do they argue that Mar-Jac can prove the material falsity of such accusations. Instead, Defendants contend that they really did not say and did not intend to suggest that ***Mar-Jac*** was laundering money, or manipulating chicken mortality records, or financing Osama bin Laden, but merely intended to "theorize" that it was possible that some amount of money that at some point passed through Mar-Jac's books and/or accounts may have, by virtue of some indeterminate number of downstream transactions, ultimately been received by some faceless terrorist or terrorist organization (or someone Defendants claim is a terrorist or terrorist organization). Defendants have parsed the broadcast in service of their strained argument that because Mar-Jac cannot possibly prove that this ***did not*** happen their motion must be granted.

Putting aside whether such rank speculation would have been worthy of a nationally televised broadcast—even if that was all that Defendants had said—Defendants cannot avoid liability for their recklessly false and, under circumstances that exist to this day, extremely damaging and defamatory statements by so drastically walking back their allegations. Just as a

plaintiff cannot reformulate a defendant's statements to add defamatory meaning where none was apparent from the publication itself, *Tavoulareas v. Washington Post Co.*, 817 F.2d 762, 779-83 (D.C. Cir. 1987), neither can a defendant reformulate his published statements to cleanse them of defamatory meaning by selectively recasting them and arguing that the publication communicated something far more narrower than what a reasonable viewer or reader would have understood. "A publication claimed to be defamatory must be read and construed in the sense in which the reader to whom it is addressed would ordinarily understand it." *Washington Post v. Chaloner*, 250 U.S. 290, 293 (1919).

Defendants seek summary judgment based principally upon the argument that Mar-Jac cannot prove the material falsity of rather drawn out and nebulous accusation, *i.e.*, that some third party vendor, shareholder, or non-profit organization to which Mar-Jac transferred money, or some other individual or entity to which such vendor, shareholder, or non-profit organization in turn transferred money, or any other individual or entity at any point down the line of commerce did not ultimately provide money to a terrorist or terrorist organization. Despite that this allegation is several degrees of severity and specificity removed from what Defendants actually said in the *60 Minutes* broadcast, Mar-Jac ***can prove*** that it never laundered any money for any purpose and that neither it nor any of its shareholders ever gave money to an organization listed by the Department of Treasury's OFAC as a Specifically Designated Terrorist Organization ("SDTO"), thus defeating any suggestion of criminal conduct.

Defendants also indiscriminately reach for a multitude of First Amendment legal precepts irrespective of their application to the facts and circumstances in this case in the apparent hope of escaping liability. But neither the importance of First Amendment freedoms nor the seriousness of the threat posed to our nation by terrorism immunizes Defendants' conduct. As central and

important as the First Amendment may be, "there is also another side to the equation," *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 22 (1990), namely society's "pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966). The First Amendment did not and does not privilege Defendant Katz to go on national television with pictures of Mar-Jac juxtaposed with pictures of Osama bin Laden and level wholly false accusations of criminal conduct at a respected, multimillion dollar business. "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Id.* at 92-93.

For the reasons set forth herein, Defendants' Joint Motion for Summary Judgment is not only unmeritorious, but built upon a seven-year-old pattern of scurrilous allegations, accusations, and innuendo that have no basis in fact. Accordingly, it should be denied forthwith and Mar-Jac should be permitted to proceed with its effort to vindicate itself and its reputation from Defendants' reckless, unsubstantiated, and unsubstantiatable accusations.

## SUMMARY OF FACTS AND ISSUES

In light of the parties' differing views as to what was said or otherwise communicated during the May 4, 2003 broadcast and what a reasonable person would have understood after viewing it, it is important to consider the statements and images from the broadcast—not piecemeal or selectively—but as a whole. After beginning with an extended discussion of Defendant Katz's background and personal history, the broadcast turns to the matters at issue in this case:

> The mosques started Sarah on a trail that ended in her biggest investigation. The most radical mosques, she says were all owned by a single organization, whose founders now have offices in a Washington suburb. The address was 555 Grove Street, Herndon, Va.

"It's my biggest lead to the government," says Sarah.

Because, Sarah discovered, this one building, 555 Grove housed nearly a hundred organizations owned by Muslims. Most of them owned and run by the same small group of people. Sarah was convinced she had stumbled upon the heart of a terrorist-financing ring.

Late one night, Sarah came to 555 with some colleagues, and collected the trash from the dumpsters.

"I found one important letter that actually gave me the lead to understand that the money comes from Saudi Arabia," says Sarah.[1]

Came from members of an extremely wealthy Saudi family, the al-Rajhi's, who Sarah claims, funded many of the organizations in 555 Grove.

"So we have here just a very simple chart of how the money flows from Saudi Arabia," says Sarah.

*[At this point, a disguised Defendant Katz is shown standing next to a chart or diagram which purports to show a flow of money from Saudi Arabian interests through various American businesses—including "Mar-Jac Poultry" listed within a box labeled "SAAR Network"—and non-profit organizations and then to al-Qaeda, Osama bin Laden, Hamas, and Islamic Jihad.]*

But in fact, it's not simple at all. Sarah mapped out how, she says, the money flowed from Saudi Arabia to a web of charities, think tanks, and businesses at 555 Grove - then to offshore banks and ultimately, she says, to terrorist groups. It's not simple because, Sarah says, it's not meant to be. It's designed to make it difficult to follow the money. And one especially inventive idea the Saudis came up with, according to Sarah, was chickens. They bought a chicken farm in Georgia.

*[As Mr. Simon's narration begins to discuss "chickens," the video focuses on the name portion of Defendant Katz's chart where "Mar-Jac Poultry" appears. Following Mr. Simon's statement, video footage is shown of a truck clearly bearing the name "Mar-Jac Poultry, Inc." and Mar-Jac's logo and a sign reading "Mar-Jac Poultry."]*

"I see it as the best cover for money laundering," says Sarah. "Because chicken is one the things that no one can really track it down. If you say in one year that you lost 10 million chickens, no one can prove it. They just died. You can't trace money with chickens."

Does the money lost go down the line to Hamas, Islamic Jihad or al Qaeda?

"That's what we're trying to find out," says Sarah.

With Sarah's help, U.S. officials had found out enough to get a Customs Department task force to raid 555 Grove and 28 other locations in March of 2002,

[1] Defendant Katz does not describe the "letter" to which she refers or explain why it led her to believe anything.

carting away seven truckloads of evidence. It was one of the biggest terrorism related raids in U.S. history. And, yes, they raided the chicken farm, too.

We paid a visit to 555 Grove.[2] Sarah says her efforts stopped the flow of funds from here to terrorists but the Muslims who work here say there never was a flow. And they point out that today, more than a year after the raids, no criminal charges have been brought against anyone. They are so incensed about the raids, that they kicked us out of their offices minutes after we got there.

A Muslim center across the street called the cops. And then, a young man who identified himself as Suhaib Jamal·came by to express his outrage. His father office and home had been raided.

*[The camera is positioned so as to capture the young man speaking while also showing Defendant Katz, disguised in a burqa, pacing nervously beside a tree.]*

"You don't go around attacking innocent Americans, you know, just because they have a Muslim or an Arab background," says Jamal. "And these are people, some of the most law abiding, you know, patriotic Americans you'll ever meet. The people who were raided. And it's such a shame."

Did some of the money that was given to legitimate charities here wind up in the hands of the families of martyrs on the West Bank? Apparently, there is suspicion that it did.

"Whose suspicion though," asks Jamal. "Who is tipping off the federal government? Who are these people in the shadows, in the backgrounds, you know, what is their agenda?"

"I'm not after Muslims, I'm after hunting terrorist Muslims. Muslim terrorists," says Sarah. "I'm not after Islam, I'm after Islamic terrorism. It's just a small group of people that are trying to destroy our life. Are doing all this damage, and we must stop it."

But does she think it can happen? That they can be stopped?

"I know I stopped them, I know I stopped them," says Sarah.

She stopped them for a day, but she says, "I'm only one person. Give me the credit."

(Doc. 188, Exhs. C [transcript of broadcast], D [video recording of broadcast].)

A reasonable person viewing the broadcast would understand Defendants to be communicating that:

- There is a terrorist-financing ring.
- The money that funds the ring comes from Saudi Arabia, specifically "an extremely wealthy Saudi family, the al-Rajhi's.

---

[2] That is, in front of the offices of Safa Trust, Mar-Jac's beneficial owner.

- The ring operates by moving money from Saudi Arabia to "a web" of charities, think tanks, and businesses and then to offshore banks and ultimately to terrorists.
- A part of the terrorist-financing ring is a chicken farm in Georgia, Mar-Jac Poultry.
- The chickens and/or the chicken farm are "the best cover for money laundering."
- The chickens and/or the chicken farms are the best cover for money laundering because chickens cannot really be tracked down or money traced in connection with them. If a chicken farm says 10 million chickens died one year, no one can prove that was not true.
- Money was lost or disappeared as a result of the money laundered by the chicken farm.
- "Sarah" is trying to find out whether the "money lost" went specifically to Hamas, Islamic Jihad, or al Qaeda.
- But "Sarah's" chart is certain that money is moving among the listed companies and organizations, including Mar-Jac Poultry.
- "Sarah" knows that her efforts stopped the flow of funds from the ring to terrorists.

These statements clearly and inescapably were conveyed, they were of and concerning Mar-Jac in substantial part, and they were capable of being understood—and were, in fact, understood—as accusing Mar-Jac of being involved in money laundering to finance terrorists and/or terrorism by falsifying the numbers of its chickens it claimed died. Further, the video depicted Mar-Jac being discussed by a disguised and anonymous Defendant Katz, who later changed to a burqa, point to a chart depicting the name and photograph of Osama bin Laden.

As detailed herein and in Mar-Jac's previously-filed Motion for Partial Summary Judgment (Doc. 188), these statements were and can be proven to be materially false. At the very least, there is a genuine dispute of material fact as to whether they were materially false. Accordingly, Defendants' Joint Motion for Summary Judgment should be denied.

## ARGUMENT

### I. Because Mar-Jac Easily Can Carry—and Has Carried—Its Burden of Proving Material Falsity, It—Not Defendants—Is Entitled to Summary Judgment

Defendants first argue that Mar-Jac cannot prove "the material falsity of the assertion that money flowed through it to terrorists." (Joint Mem. at 18.) As detailed *infra*, Mar-Jac ***can prove***

***the falsity of the claim that "money flowed through it to terrorists,"*** but make no mistake: this ***is not*** the defamatory accusation that was made in the *60 Minutes* broadcast or alleged in Mar-Jac's Amended Complaint. Rather, the broadcast asserted that Mar-Jac engaged in money laundering activities, specifically by taking advantage of the asserted "fact" that chicken "is the best cover for money laundering" because a claim that a given number of chickens died in a year cannot be proven, and that those activities were engaged in by Mar-Jac as part of a knowing effort to support terrorists and/or terrorist organizations, including al-Qaeda, Hamas, and Islamic Jihad (each of which was identified by name). (Doc. 188, Exhs. C [transcript of broadcast], D [video recording of broadcast].)

The broadcast did identify certain other companies or entities—Microsoft, American Express, Home Depot, and the federal government—through which money supposedly flowed to terrorists and/or terrorist organizations in the form of matching dollars for charitable contributions made by employees. (*See* Doc. 188, Exh. D.) But the broadcast made clear that these companies did so "innocently and unknowingly." (Doc. 188, Exh. C at 2.) This is not the same claim that was made about Mar-Jac. Instead, Defendants made very clear statements accusing Mar-Jac of a specific type of unlawful activity, namely money laundering, a crime which requires an underlying specified unlawful activity, namely financial support for terrorism, purportedly conducted in a specific fashion, namely by overstating or otherwise manipulating the number of its chickens that died each year. Defendants never stated or implied that Mar-Jac did these things "innocently and unknowingly."

As such, Defendants' principal argument is based upon revisionist history. Having revised and recast their defamatory statements, Defendants seek to defend themselves with a series of 250 seemingly detailed, but ultimately irrelevant and unsubstantiated allegations

designed to demonstrate the "truth" of its after-the-fact, more generalized proposition that money which flowed through Mar-Jac ultimately made its way to some individual or entity Defendants cast as a terrorist or terrorist-affiliated. Most of Defendants' 250 purported statements of "Undisputed Material Fact" ***are, disputed in whole or in part*** and nearly all of them are not even material to the issues at the heart of Mar-Jac's claims.[3]

Moreover, the type and quantity of factual assertions and purported "evidence" proffered by Defendants make clear that what Defendants are actually attempting to do is to advance ***an affirmative defense*** based upon the alleged "substantial truth" of their refashioned and generalized accusation against Mar-Jac while also seeking to shift the burden of proof on that defense to Mar-Jac. Defendants hope to shift the burden of proving the truth of Defendant Katz's statements—which they never could carry—to Mar-Jac by arguing these "facts" to challenge Mar-Jac's ability to meet its burden of proving material falsity.

But Mar-Jac's only burden is to prove the material falsity of that which Defendants actually said. If Defendants believe they have mustered evidence sufficient to show that while their statements about Mar-Jac technically may have been inaccurate, other similar or related facts would show those statements, or their general "gist," to have been substantially true, then it is their burden to prove such matters as an affirmative defense. What Defendants cannot do is compile allegations and evidence of a different accusation and then contend that Mar-Jac cannot meet its burden of proving material falsity because it cannot disprove that new accusation—one that Mar-Jac did not claim as false in the first instance.

In essence, Defendants' motion does not seek to demonstrate that Mar-Jac cannot prove

---

[3] Many are not even statements of fact, but instead are recitations of rank speculation, conjecture, and hearsay. For example, Defendants recite as purportedly undisputed fact the content of documents based solely upon piecemeal allegations made by Customs Agent David Kane in a 2002 affidavit. (*See, e.g.*, SUMF ¶ 171.)

the material falsity of that which Defendant Katz actually said in the *60 Minutes* broadcast, but instead seeks affirmatively to prove that what she said was in some recharacterized and diminished form or fashion substantially true. Defendants are free to pursue this line of argument, but as an affirmative defense as to which the burden of proof is theirs; it is not an element of Mar-Jac's claim.

Despite Defendants' evasive unwillingness to even repeat what they said in 2003 without modifying or qualifying it, Mar-Jac can prove that neither it nor any of its "beneficial owners" engaged in any criminal conduct and that Defendants' accusations were, therefore, materially false.

**A. The Assertions Underlying Defendants' Statements Are Materially False**

The *60 Minutes* broadcast makes two preliminary assertions of fact that, while not defamatory in and of themselves, set the stage for the defamatory statements that ultimately were made and should therefore be addressed as a preface to those statements.

First, Mar-Jac is not, as Mr. Simon states in the broadcast, a "chicken farm." It is a fully integrated poultry operation that owns and operates a poultry processing plant, but contracts with independent farmers to raise its chicken flocks. (*See generally* Docs. 188-3 [Decl. of Randall A. Bruce], 188-8 [Decl. of Joel Williams]; *see also* Doc. 188-2 ¶¶ 1, 13-48.) Mar-Jac itself only has actual possession of its chickens for the brief periods of time during which the broiler eggs are in its hatchery and the mature broilers are present at its processing plant before slaughter. (*See* Doc. 188-2 ¶¶ 13-48.)

Though it is not defamatory to inaccurately describe Mar-Jac as a "chicken farm," this inaccuracy is the foundation for Defendant Katz's later statements that Mar-Jac laundered money by manipulating the number of its chickens that were recorded as dying. A true "chicken farm"

would at least have direct control of its flock and the documents recording its size and history such that it could, at least in theory, manipulate those numbers. In Mar-Jac's case though, its flocks are maintained entirely by third party independent contract farms who themselves create much of the documentation for Mar-Jac's chickens (*see* 188-2 ¶¶ 18, 32, 37, 42-43, 47.), making the type of money laundering and record falsification alleged by Defendant Katz very difficult to accomplish, if not completely impossible.

Second, Mar-Jac is not owned by and was never, at any point, "bought" by the al-Rajhi family or any other "Saudis." Mar-Jac was purchased in 1984 by the SAAR Foundation, a Virginia non-profit organization recognized and regulated by the Internal Revenue Code pursuant to 26 U.S.C. § 501(c). (Exh. A hereto, Decl. of M. Yaqub Mirza ¶ 6.) SAAR Foundation was assisted and advised in its operations by one of the preeminent authorities on the law relating to § 501(c) organizations, Bruce Hopkins. (*Id.* ¶ 10.) No Saudi Arabians were among SAAR Foundation's directors, officers, or management; in fact, its directors consisted ***largely of Iraqis***, most of whom were American citizens. Its general purpose was to aid development and educational efforts in impoverished areas of Africa and South Asia.

Inaccurately asserting that a company is owned or was "bought" by Saudi Arabians is not defamatory, but once again this inaccuracy fed and appeared to support the defamatory statements that followed. Defendant Katz claimed that the money that was laundered by Mar-Jac came from Saudi Arabia, but as Mar-Jac was not "bought" or owned by any Saudis it did not even have money coming in from another country which it could launder as Defendant Katz claimed.[4]

[4] Furthermore, why a wealthy Saudi Arabian family desiring to financially support terrorists would need or even want to do so by funneling money through corporate entities located in the United States—much less businesses operating in highly regulated industries such as poultry and non-profit organizations subject to the detailed reporting and monitoring requirements of the Internal Revenue Service—is unclear.

Mar-Jac did, on two occasions, ***borrow*** money from entities owned or operated in some fashion by Saudi Arabians, but those funds were not laundered in any way and are fully accounted for. In connection with the 1990 corporate reorganization, Mar-Jac borrowed a total of $9.1 million from two Panamanian corporations with Saudi Arabian affiliations, $5.1 million from Key Overseas, Inc. and $4 million from Solmagic, S.A. (Exh. F, [Excerpts of Ashraf Dep.] at 364:9-365:4.) Both loans were secured by real and personal property located in the State of Georgia. (*Id.*) The proceeds from these and two smaller loans from Safa Trust and Mena Corporation immediately were used to pay off a prior loan from Maryland National Bank (not a terrorist organization) in the amount of $5 million and to declare a $5 million dividend paid to Mar-Jac's shareholders (none of which are or were terrorist organizations). (*Id.* at 364:9-366:11, 385:5-10.)

The loan from Solmagic (along with the smaller loans from Safa Trust and Mena Corporation) were all repaid by 1996. (*Id.* at 366:16-367:11.) Obviously, repaying a loan is an act inconsistent with the notion that the loan was really a transfer of funds which were then laundered and sent elsewhere for some illicit purpose. The loan from Key Overseas was later assigned to Humana Charitable Trust and, as of July 2004, had not been paid off completely by Mar-Jac. (*Id.* at 363:3-14, 367:12-18.)

Since June 1990, Mar-Jac has not received any money, whether by way of loans or investments, from any person or entity in Saudi Arabia. (*Id.* at 370:19-371:8, 385:1-4.)

Accordingly, Defendant Katz's starting premise—*i.e.*, that Mar-Jac somehow received funds from Saudi Arabia which it had available to launder—was incorrect.

**B. Mar-Jac Did Not Launder Money by Overstating Its Dead Chickens**

No one—other than Defendant Katz—"came up with" the idea of laundering money

using chickens as a cover. As previously detailed in Mar-Jac's Motion for Partial Summary Judgment (Doc. 188-1), which is incorporated herein by reference, Mar-Jac did not overstate or otherwise manipulate its records of losses from "dead chickens" in any way or for any purpose. Further, even if such a scheme were possible in light of the highly regulated nature of the poultry industry and the extensive (and in many instances exclusive) control over Mar-Jac's flocks and mortality records exercised by third party independent contract farms, a cursory examination of Mar-Jac's records indisputably demonstrates that Mar-Jac did not inflate or overstate its chicken mortality numbers. In fact, Mar-Jac's recorded mortality rates for its flocks were exceedingly low—the lowest in the country for both 2000 and 2001 and the second lowest for 2003. (Doc. 188-2 ¶ 55.) There is no evidence whatsoever—none—that Mar-Jac employed its chicken operation as a "cover for money laundering" or that it claimed high numbers of "lost" chickens that no one could prove. Defendant Katz's accusations that Mar-Jac had done so were thus patently absurd and wholly untrue, not to mention materially false.

Further, Mar-Jac has never engaged in money laundering of any type or for any purpose. (*See* Exh. A [Mirza Decl.] ¶¶ 1-4; Exh. B [Declaration of M. Omar Ashraf] ¶ 1; Exh. C [Declaration of Mahmoud D. Mohamed] ¶ 2; Exh. D [Declaration of Doug Carnes] ¶ 1; Exh. E [Decl. of J. Pete Martin] ¶ 1; Exh. G [Declaration of Jamal Barzinji] ¶1; Exh. H [Declaration of Hisham al-Talib] ¶ 1; *see also* Docs. 188-3 [Bruce Decl.] ¶ 45; 188-8 [Williams Decl.] ¶ 36.) As the statute and case law make abundantly clear, one cannot violate 18 U.S.C. §§ 1956 and 1957 (the statutes of the Money Laundering Control Act of 1986) unless the funds involved in the financial transactions are "proceeds [from a] specified unlawful activity" (§ 1956), "criminally derived property [from a] specified unlawful activity" (§ 1957), or transferred from within the United States to outside the United States "***with the intent to promote*** the carrying on of

specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A) (emphasis added).[5] There is no evidence whatsoever that Mar-Jac ever engaged in any financial transactions with "proceeds" from any "specified unlawful activity," nor was that the gist of Defendants' accusations.

Rather, the gist of Defendants' money laundering accusations was that Mar-Jac was manipulating its chicken mortality figures so as to conceal funds that it was then sending outside the United States with the intent of promoting terrorism. As detailed above and in its Motion for Partial Summary Judgment, Mar-Jac did not manipulate its chicken mortality figures or conceal the source or destination of any of its funds and Defendants have not pointed to a single piece of evidence indicating that it did. Further, Mar-Jac certainly never made any financial transaction of any type with the intention of promoting terrorism. (*See* Exh. A [Mirza Decl.] ¶¶ 1-4; Exh. B [Ashraf Decl.] ¶ 1; Exh. C [Mohamed Decl.] ¶ 1; Exh. D [Carnes Decl.] ¶ 1; Exh. E [Martin Decl.] ¶ 1; Exh. G [Barzinji Decl. ¶¶ 1-3] ¶1; Exh. H [al-Talib Decl.] ¶¶ 1-2; *see also* Docs. 188-3 [Bruce Decl.] ¶ 45.) The Record also fails to demonstrate that Mar-Jac engaged in *any* financial transaction with *any* entity *with the intent to promote terrorism*, or with any entity which in turn *with intent to promote terrorism* engaged in any international financial transaction with any entity or individual supporting terrorism.

There is no evidence to the contrary, and Defendants do not point to any in their Joint Motion or in their Statement of [Purportedly] Undisputed Material Facts.

**C. Mar-Jac Never Funded Any Terrorist or Terrorist Organization**

Mar-Jac has never provided any funding to terrorists or terrorist organizations. Thus, even if it had ever laundered money (which it did not), it never "laundered" for or otherwise

[5] "Specified unlawful activity is defined to include, *inter alia*, violations of 18 U.S.C. §§ 2339A and 2339B (relating to providing material support to terrorists) and § 2339C (relating to financing terrorism). *See* 18 U.S.C. § 1956(c)(7).

provided funds to terrorists or terrorist organizations. Because Defendants know that this is true from the discovery they have received, they take pains elsewhere in their brief to claim that neither the broadcast "nor any statements made in it by Katz can reasonably be construed to imply that *Mar-Jac* knowingly provided funding to terrorists" (Joint Mem. at 30 (emphasis in original)), and that Defendant Katz "makes no claim that the 'chicken farm in Georgia, *i.e.*, Mar-Jac, was itself engaged in a 'knowing effort to support terrorists.'" (Joint Mem. at 32.)

Despite their voluminous (and regularly inaccurate) Statement of [Purportedly] Undisputed Material Facts, at no point therein do Defendants identify any transaction between Mar-Jac and any individual or entity that has been designated by a terrorist or terrorist organization by the United States Department of Treasury's OFAC. Nor do Defendants identify even a single transaction between Mar-Jac and any individual or entity they allege or speculate is or may be a terrorist or terrorist organization.

Accordingly, even presupposing Mar-Jac did or even could launder money in the manner Defendants' claimed, it never provided any funds to any person or entity that is even alleged to be a terrorist or terrorist organization and Defendants have made a point of affirmatively arguing that they never said or intimated that Mar-Jac did such a thing.

### D. Mar-Jac Did Not Serve as "a Conduit for Financial Transactions that Ultimately Aided Terrorist Organizations"

Because (1) no unaccounted for funds came into Mar-Jac from Saudi Arabia or Saudi Arabians, (2) Mar-Jac did not overstate or otherwise manipulate its chicken mortality records, (3) Mar-Jac did not otherwise launder money, and (4) Mar-Jac never provided any money—laundered or otherwise—to terrorists or terrorist organizations, Defendants are forced to recast their accusations so as to change their meaning but expand their reach. These accusations made in hopes of finding some connection—however remote—between funds that passed through

Mar-Jac ***at some point*** and ended up with some ***unrelated individual or organization*** down that line that Defendants can claim but not prove promoted terrorism. Further, they are made without regard to whether, at the time the funds passed from Mar-Jac to their unknown destination, that ultimate but unknown destination was even prohibited. (*See* Joint Mem. at 21-22.)

But even Defendants' irrelevant, tortured venture through their own subjective characterizations of the financial dealings of individuals and entities other than Mar-Jac fails to show that one cent that can be traced back to Mar-Jac was ever received by an individual or entity that was, at the time, listed by the Department of Treasury's OFAC as a Specifically Designated Terrorist Organization ("SDTO").

Instead, Defendants attempt to justify their accusation that Mar-Jac was engaged in money laundering by overstating its numbers of chickens that died for the purpose of financing terrorists by asserting that "Mar-Jac was, in fact, a conduit for financial transactions that ultimately aided terrorist organizations." (Joint Mem. at 21-22.)

**1. Supposed Contributions to Specifically Designated Terrorist Organizations by Entities Other than Mar-Jac**

Defendants first claim that "it is undisputed that hundreds of thousands of dollars of Mar-Jac funds have collectively flowed – either directly or indirectly – to at least four organizations that the U.S. government has formally designated to be sponsors of terrorism because of their support of al-Qaeda and/or Hamas: [the Holy Land Foundation], Nada International, Al-Haramyen, and the IARA-USA." (Joint Mem. at 22.) This conclusory assertion is very much disputed and certainly is not supported by the evidence on which Defendants purport to rely.

First, despite Defendants use of the misleading phrase "Mar-Jac funds," Mar-Jac was not a party to any of the transactions on which they base this statement.

Second, only one of the transactions referenced by Defendants involved even one of Mar-

Jac's "beneficial owners."

Third, many of the transactions took place at times and under circumstances making clear that no funds ever received from Mar-Jac were involved in them.

Fourth, all of the referenced transactions took place ***multiple years before*** the entity receiving the funds was designated as an SDTO, if it ever was.

Defendants concede that none of these donations were illegal (Joint Mem. at 22), but seek to infer or imply some sort of malicious intent on the part of Mar-Jac and/or the entities that actually made the contributions from the mere fact that the organizations who received the contributions were, ***years after the fact***, designated as SDTOs.

Each of these transactions is addressed in detail below.

***a. Holy Land Foundation***

Defendants claim that, in 1997, Safa Trust "donated more than $200,000, and perhaps as much as $325,000," to the Holy Land Foundation for Relief and Development. (SUMF ¶ 195.) The donation referenced by Defendants, however, was a dedicated gift specifically designated for the construction of a library. (Response to SUMF ¶ 195.) The library was a project in which one of Safa Trust's trustees who had no personal connection to Mar-Jac was ***personally*** involved. He received reports regarding the progress of the construction project as well as a videotape confirming that the library had been built, and one of the trustees visited the library. (*See* Doc. 194-3, Eastburg Decl., Exh. 3 [Mirza Dep.] at 249:21-250:9, 250:19-24.)

The donation was not made by Mar-Jac and there is no evidence whatsoever that the donation was made with funds received by Safa Trust from Mar-Jac. Further, Safa Trust made the donation ***four years before*** the government designated Holy Land Foundation for Relief and Development as an SDTO and more than eleven years before the organization was convicted of

providing funding to Hamas. (*See* SUMF ¶¶ 196, 198.) Accordingly, the transaction did not fund terrorism and was not illegal, irrespective of whether it utilized, either in whole or in part, any "Mar-Jac funds."

### *b. Nada International*

Defendants claim that, in 1998, the York International Trust "transferred more than $50,000 to Nada International." (SUMF ¶ 211.) This transfer is not alleged to have been made by Mar-Jac and there is no evidence whatsoever that the donation was made with funds the York International Trust received from Mar-Jac. In fact, the transfer was charged to the account of Mena Estates as it was made in payment of expenses that company had incurred. (Exh. A [Mirza Decl.] ¶ 25.)

Defendants generally describe the York International Trust as a "Mar-Jac beneficiary" (SUMF ¶ 211), but do not identify let alone factually support any instance of Mar-Jac ever making any donations to York International Trust or otherwise transferring funds to its accounts.

Nevertheless, in their Statement of [Purportedly] Undisputed Facts Defendants claim that York International Trust "received nearly $180,000 in 1998 from Mar-Jac." (SUMF ¶ 154.) This is incorrect. The referenced transfers are payments made in April and October 1998 by Mar-Jac Holdings, Inc. pursuant to a loan obligation that had been assigned to York International Trust. The two payments were for $125,000 and $54,327.83, respectively. However, ***neither payment was made to York International Trust***, but instead to Sterling Investment Group, LLC as an investment by York International Trust. (*See* SUMF ¶ 154 and referenced exhibits.) York International Trust's 1998 donation to Nada International ***could not have been made with Mar-Jac funds*** as Mar-Jac never transferred any funds into York International Trust's accounts, and any payments that Mar-Jac made for the benefit of York International Trust were loan payments

Mar-Jac was contractually obligated to pay.

Lacking a direct connection between Mar-Jac and York International Trust's 1998 transfer to Nada International, Defendants attempt to establish an indirect connection by claiming that various other entities—*i.e.*, not Mar-Jac—that received money from Mar-Jac at some point in time also transferred money to York International Trust at some other time. But almost all of these contributions occurred ***after*** York International Trust made the October 31, 1998 transfer to Nada International. (*See generally* SUMF ¶¶ 116, 155, 157, 211 and referenced exhibits.)

Accordingly, Defendants' attempt to draw a connection between York International Trust's October 31, 1998 transfer to Nada International is completely unavailing factually and, in any event, is of no legal consequence as Nada International was not designated an SDTO until four years later, in 2002.

***c. Al-Haramyen***

The purported transfer to "Al-Haramyen" was a $175,000 donation Defendants claim was made to "Al-Haramyen Establishment Indonesia" in 1999 by a grant program to which Humana Charitable Trust contributed. (SUMF ¶ 181.) First, the donation to which Defendants refer was only in the amount of $17,333. (Response to SUMF ¶ 181.) Second, it was made to "Al Haramyen Establishment, Indonesia" on July 31, 1999. (*See* Doc. 188-3, Eastburg Decl., Ex. 81.) Assuming that "Al Haramyen Establishment, Indonesia" is the same entity as the "Al-Haramain Foundation (Indonesia)" that was later designated by the federal government as an SDTO (a fact as to which Mar-Jac has no knowledge and would require discovery to determine), that designation did not occur until 2004. (*See* Doc. 194-3, Eastburg Decl., Exh. 101.)

At any rate though, this donation was part of a large group of donations made by the

grant program to a multitude of charitable and educational organizations around the world totaling nearly $11 million. (*Id.*) Humana made a contribution toward these grants, but did not fund all of them. (*See* SUMF ¶ 150.) The only money Mar-Jac or its parent holding company ever transferred to Humana was a 1998 payment of $753,263.52 made on a loan that had been assigned to Humana. (*See* SUMF ¶ 145.)

***d. IARA-USA***

Defendants claim that "Mar-Jac beneficiary the York Foundation contributed more than $1,000 in 2002 to" the Islamic American Relief Agency ("IARA-USA"). (SUMF ¶ 199.) The referenced contribution was in the amount of $1,080. (Doc. 194-3, Eastburg Decl., Exh. 109.) This contribution, however, was made specifically to sponsor three orphans in Somalia and Bangladesh, none of whom were or are terrorists. The amount is a production of $1 per day for 360 days for each orphan. (Doc. 194-3, Eastburg Decl., Exh. 3 [Mirza Dep. at 169-72].)

**2. WISE and Sami al-Arian**

Defendants also claim that "millions of dollars of Mar-Jac funds supported organizations … which in turn provided financial support to WISE and [Sami] al-Arian." (Joint Mem. at 23.) Despite this lofty claim, Defendants do not identify ***any*** "Mar-Jac funds" provided to either WISE or Dr. al-Arian.

WISE refers to the World Islamic Studies Enterprise, which was disbanded in 1995. WISE has never been charged with any crime or designated an SDTO. At any rate, Mar-Jac never donated or otherwise transferred any funds to WISE. The SAAR Foundation did make a contribution of $10,000 to WISE in October 1994 (Resp. SUMF ¶ 174) and Safa Trust made a donation of $15,000 to WISE in February 1995 (SUMF ¶ 173). The Safa Trust contribution was made for the specific purpose of a conference or publishing a journal. (Resp. SUMF ¶ 173.) In

any event, these contributions were in no way illegal or suspicious and, in fact, preceded any charges being made against Dr. al-Arian—but not WISE—by nearly a decade and were designated for a specific purpose that was in no way associated with terrorism.[6]

Dr. al-Arian is a former college professor at the University of South Florida who was associated with WISE. In 2003, he was charged with certain crimes alleging material support for terrorism, charges of which he was acquitted. Nevertheless, in 2006, Dr. al-Arian pled guilty to one count of providing immigration-related services (but not monetary support) to Palestinian Islamic Jihad beginning in 1995, which organization had been designated an SDTO. (*See* Resp. SUMF ¶¶ 170, 176, 178.)[7]

Defendants can only identify one transaction between any person or entity associated with Mar-Jac and Dr. al-Arian personally. In 1984 (nearly two decades before the 2003 charges against him), SAAR Foundation made a housing loan of $48,581 to Dr. al-Arian, which he paid back. (Resp. SUMF ¶ 174.) It is unclear whether this loan was made after SAAR had even acquired Mar-Jac.

**3. AMC and AMF**

Defendants claim that "[t]ens of thousands of dollars from Mar-Jac and its beneficial owners also unquestionably went to two organizations, AMC and AMF, headed by a former employee of … Saar who publicly proclaimed his support for Hamas and is now serving a twenty-three-year prison sentence after being arrested transporting $340,000 in cash to Libya in connection with a terrorist plot." (Joint Mem. at 23.) The referenced entities are the American

---

[6] Moreover, the financial records relied upon by Defendants to document this donation (*see* Doc. 194-3, Eastburg Decl., Exh. 96) also show a check to WISE from Emory University in Atlanta, Georgia. It is unclear whether Defendants also believe Emory University to have been involved in the supposed "terrorist-financing ring."

[7] Defendants overstate the nature of Dr. al-Arian's relationship with PIJ. Contrary to their claim that Mr. al-Arian was in 1991 "and at all relevant times thereafter, an agent of [PIJ]" (SUMF ¶ 170), Dr. al-Arian has never admitted to being a general agent of PIJ at any time, and he only admitted to performing certain immigration-related services for PIJ "***in 1995*** and thereafter." (Doc. 194-3, Eastburg Decl., Exh. 95 at 11 (emphasis added).)

Muslim Council (AMC) and the American Muslim Foundation (AMF).

What Defendants describe expansively as “tens of thousands of dollars” of contributions “between 1989 and 2004” (SUMF ¶ 124) were, in fact, a mere two donations, one in the amount of $10,000 made on December 21, 1992 (Doc. 194-3, Eastburg Decl., Exh. 31 at G, p. 7) and the second in the amount of $2,500 made on January 11, 1994 (*id.* at p. 10). Both contributions were made to AMC. Mar-Jac did not make any donations to AMF.

Defendants also point to a $40,000 donation to AMF made by SAAR Foundation in 1994 and a $10,000 donation by Safa Trust in 2000. (SUMF ¶¶ 184-185.)[8] But neither AMC nor AMF have ever been designated SDTOs, whether at the time of any of the aforementioned contributions or at any point since. Defendants’ reference to statements and actions taken by the “head” of AMC and AMF refer to events that occurred in 2000 or later. (*See* SUMF ¶¶ 127-133.)

**4. Extended and Innocuous Connections to Unindicted Co-Conspirators**

Defendants claim “additional funds unquestionably made their way from Mar-Jac … to groups and persons who were deemed to be ‘unindicted co-conspirators’ in the federal terrorism prosecutions of HLF and al-Arian … and from Mar-Jac’s beneficial owner to an unindicted co-conspirator in the first World Trade Center bombing.” (Joint Mem. at 23.) Defendants’ use of the word “unquestionably” is vague, wholly unsubstantiated, and certainly disputed. Generally speaking, the mere fact of one’s inclusion on a list of purportedly unindicted co-conspirators does not establish that such an individual or organization was, in fact, involved in any criminal activity. These individuals and entities were not charged with any crime and had no opportunity to defend themselves against the suggestion of involvement in a conspiracy. In any event, the

[8] In addition, Defendants claim that Safa Trust loaned AMC $25,000 in 2001. (SUMF ¶ 185.)

particular individuals and entities on which Defendants base these assertions have especially fleeting connections to Mar-Jac.

Defendants reference four individuals and/or entities as the basis for this claim. The two organizations, the Islamic Society of North America ("ISNA") and the North American Islamic Trust ("NAIT"), were among the 306 persons and entities included in the list of unindicted co-conspirators in the case against the Holy Land Foundation, which was filed in May 2007. (Doc. 194-3, Eastburg Decl., Exh. 63.) These two organizations have been among the most prominent Muslim organizations in America for decades. Neither has ever been designated an SDTO. A large number of American companies donated to these organizations over the years and the mere fact of such a donation signifies absolutely nothing.

Moreover, Defendants attempt to make Mar-Jac's donations to these organizations appear more recent by stating them collectively over the entire period of Mar-Jac's financial records (*e.g.*, "X received $X in donations from Mar-Jac between 1989 and 2004"). In truth, Mar-Jac made but a single $150,000 contribution to NAIT on April 23, 1990, which was designated for a series of schools and cultural centers. (Resp. SUMF ¶ 137.) Mar-Jac made only seven donations to ISNA totaling $91,500, all but $2,000 of which was donated on or before November 18, 1991. (*See* Resp. SUMF ¶ 139.) These donations were designated specifically for the construction of a gymnasium and associated restroom facilities. (*Id.*) In any event, these donations were made more than 15 years before the list in the Holy Land Foundation case was filed.

Moreover, ISNA remains to this day one of the most prominent and widely respected organizations of Muslim-Americans. Earlier this month, ISNA representatives were invited to the White House for a dinner and meeting with the President. (Exh. A, Mirza Decl. ¶ 12.)

Defendants also reference Dr. Taha Jabir al-Alwani, the president of IIIT, who was

named as an unindicted co-conspirator in the al-Arian case discussed *supra*. (*See* SUMF ¶ 177.) As detailed previously, those events took place in 2003 through 2006. However, Mar-Jac's only contributions to IIIT were made almost two decades before, in 1987, and were specifically designated for particular projects. (*See* Resp. SUMF ¶ 119.) Mar-Jac never paid or contributed any money to Dr. al-Alwani personally.

Finally, Defendants point to the inclusion of Shaikh Mohammed Hanooti on a list of advisors of the Sterling Charitable Gift Fund, a donor-advised charitable fund to which Mar-Jac contributed funds over the years. (*See* Resp. SUMF ¶ 123.) Shaikh Hanooti was formerly imam of the Dar al Hijrah mosque in Falls Church, Virginia. As a local imam, he was included on a list of potential advisors Sterling Charitable Gift Fund prepared at one point. (Doc. 194-3, Eastburg Decl., Exh. 1 [Ashraf Dep. at 101:6-22].) However, the list of advisors was ultimately never utilized and Sterling Charitable Gift Fund did not consult with him or seek his advice regarding its operation and, in any event, did not pay Shaikh Hanooti any compensation. In addition, one of SAAR Foundation's housing loans was made to Shaikh Hanooti in1985, when he was living in New Jersey. (Resp. SUMF ¶ 189.)

#### 5. The Balance of Defendants' Claims Are Sheer Unsubstantiated Speculation

Defendants claim that it is "undisputed that millions more were routed from Mar-Jac … to trusts and bank accounts located in offshore centers reputed to be havens for money laundering, where the ultimate disposition of the funds became, if not effectively untraceable, at least very difficult to ascertain." (Joint Mem. at 23-24.) This is sheer, unadulterated and false conjecture apparently derived from the now-debunked Kane Affidavit.

First, it is an overstatement of Kane's hearsay opinion that "[d]ue to bank secrecy laws in such tax havens [referring to the Isle of Man], it is very difficult for investigators to have access

to bank account information." (Doc. 194-3, Eastburg Decl., Exh. 16 at 53.) The difficulty referenced by Agent Kane is the inability to use a mere grand jury subpoena to obtain such information. The banks on the Isle of Man and Channel Islands, as British Crown Dependencies, are subject to the Mutual Legal Assistant Treaty ("MLAT") between the United States of America and the United Kingdom—perhaps its greatest ally—which allows U.S. law enforcement to obtain bank account and other information from institutions in the U.K.

While it may be more "difficult" to obtain than is information from American banks, it certainly would not be impossible to obtain from the United States' greatest ally (*i.e.*, the United Kingdom). Once the information was obtained through the MLAT, the monies can easily be traced. There is no support for Defendants' assertion that funds located in Isle of Man bank accounts are "effectively untraceable." (*See* Resp. SUMF ¶ 142.) But that would be relevant only if there ever were any accounts associated with Mar-Jac or any of the other organizations with which Defendants have associated it.

But Defendants' attempt to inject suspicion by this scandal-tinged reference to "offshore" or "foreign" bank accounts is primarily made in reference to the dissolution of the SAAR Foundation and the transfer of its assets to Humana Charitable Trust in the late 1990s. Defendants' clear intention is to suggest—without any factual or evidentiary support—that the SAAR Foundation's assets were "routed" "offshore" never to be heard from—or traced—again and were ultimately distributed to terrorist organizations. However, Defendants' attempt to cast suspicion fails because ***none of SAAR Foundation's assets were transferred to any Humana accounts outside the United States***. All of the asset transfers were made to Humana's bank accounts within this country.

**E. Defendants Can Show No Provision of Material Support or Resources—Knowing or Unknowing—to any Designated Foreign Terrorist Organization**

**by Either Mar-Jac or Any of Its "Beneficial Owners"**

As detailed in the preceding sections, neither Mar-Jac nor any of its "beneficial owners" ever made a payment, contribution, or other monetary transfer to any individual or entity that had been designated an SDTO. As such, contrary to Defendants' assertions in 2003 and their continued arguments today, neither Mar-Jac or any of its "beneficial owners" have ever committed the crime of providing material support to terrorism, whether with Mar-Jac funds" or funds from any other source. A violation of 18 U.S.C. § 2339B requires that one provide "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), which is defined by statute as "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act." 18 U.S.C. § 2339B(g)(6). At the very least there is a genuine dispute of material fact as to whether Mar-Jac or any of its "beneficial owners" ever engaged in such conduct. Mar-Jac denies that any such transaction ever took place; Defendants' have yet to identify a single such transaction and Mar-Jac has refuted each and every attempt by Defendants to do so.

In an attempt to establish knowledge on the part of Mar-Jac's "beneficial owners"—though still not Mar-Jac itself—Defendants provide a misleading and intentionally incomplete description of work performed by Kroll Associates in 1996 for the SAAR Foundation. Defendants claim that SAAR "commissioned and received reports from … the respected Kroll Associates … identifying at least five groups to which [SAAR Foundation] had previously donated money that were suspected of 'involvement in supporting terroristic activity." (Joint Mem. at 25-26.) In their Statement of [Purportedly] Undisputed Facts Defendants more specifically claim that SAAR Foundation "hired" Kroll "to 'conduct due diligence' review of the foundation's charitable giving" and refers to "reports" that it claims Kroll provided to SAAR Foundation. (*See* SUMF ¶¶ 99-102.)

Defendants omit a number of material facts. First, Kroll was hired not to perform a "due diligence review" of the entities to which SAAR Foundation contributed money, but to perform "a due diligence ***on the SAAR Foundation*** and determine the public's perception of the organization." (Doc. 194-3, Eastburg Decl., Exh. 44 at YM-023728 (emphasis added).) This was not, as Defendants intimate, to be a general audit, investigation, or due diligence of any of the particular entities which had in the past been recipients of the foundation's charitable giving. (Resp. SUMF ¶ 99.) In connection with that task, Kroll compiled and summarized various newspaper articles and congressional testimony by controversial and widely-discredited author/journalists Steve Emerson and Daniel Pipes that mentioned a mere five of the more than 30 entities to which the SAAR Foundation had contributed money in the past. (*See id.* at YM-023729-733; Resp. SUMF ¶ 100.)

Contrary to Defendants' claim (Joint Mem. at 26; SUMF ¶ 101), neither SAAR nor Dr. Mirza "casually dismissed" these compiled articles and public (albeit less than credible) allegations as "speculation and rumors"—though they were. Instead, Dr. Mirza and SAAR Foundation went directly to the federal government to understand what, if any, truth there were to these rumors and what they should do about them. They contacted then-President Clinton's Deputy National Security Adviser, Sandy Berger, through their attorney Rick Gross, who happened to attend the same temple as Mr. Berger. The National Security Adviser referred Mr. Gross to FBI Special Agent John O'Neill, the Chief of the FBI's Counterterrorism Section and the head of all of its U.S.-based terrorism investigations at the time. Special Agent O'Neill spoke with Mr. Gross and in turn referred him and his clients to David Williams, the Assistant Special Agent in Charge of the FBI's National Security Division.

Mr. Gross, Dr. Mirza, and Dr. al-Talib met with ASAC Williams, who explained that if a

charity was not a Special Designated Terrorist Organization ("SDTO"), then a contribution to the charity was "ok." (Resp. SUMF ¶ 101; Exh. A [Mirza Decl.] ¶ 23; Exh. H [al-Talib Decl.] ¶ 3.) They relied on this guidance going forward. The entirety of SAAR Foundation and Dr. Mirza's actions in this instance—from asking Kroll to conduct a due diligence of the foundation to giving consideration to its compilation of hearsay rumors and allegations to addressing its concerns to knowledgeable governmental officials—indicate, if anything, a sincere desire ***to avoid*** giving funds to any entity that might be associated with terrorists or terrorist organizations.

## II. Defendants' Statements Are Actionable

Having realized that Defendant Katz's accusations of criminal conduct by Mar-Jac were completely false and that they will not be able to defend based upon either the truth of those allegations or the adverse inferences they hoped to draw from individuals' invocations of the Fifth Amendment, Defendants now seek to disclaim the plain and obvious meaning conveyed by their words. They now suggest, *inter alia*, that they were not really speaking of Mar-Jac, that there comments were not even capable of a defamatory meaning, that they were merely expressing subjective opinions. These arguments entirely inconsistent with any objective viewing of the broadcast and as a result are unavailing.

### A. Defendant Katz's Statements Were Obviously "Of and Concerning" Mar-Jac

Defendants argue that their statements were not "of and concerning" Mar-Jac. (Joint Mem. at 27-33) They claim that when Defendant Katz asserted that "a chicken farm in Georgia" was using its chicken inventories, specifically falsifying the numbers of chickens claimed to have died, as a cover for money laundering, she did not intend her comments to refer to Mar-Jac. Defendants' argument, premised upon a selective and tortured reading of the statements made during the broadcast and a gross overgeneralization of the law, is not only not credible but also is

remarkable in light of the record.

In determining to whom it refers "[a] publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it." *Ledger-Enquirer Co. v. Brown*, 105 S.E.2d 229, 231 (Ga. 1958) (quoting *Commercial Pub. Co. v. Smith*, 149 F. 704, 706 (6th Cir. 1907)); Restatement (Second) Torts § 564 (Supp. 2010) ("A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer."). "To satisfy the 'of and concerning' element, it suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed." *Croixland Properties Ltd P'ship v. Corcoran*, 174 F.3d 213, 216 (D.C. Cir. 1999).

Here, of course, ***Mar-Jac was specifically identified by name***. While Defendant Katz and Mr. Simon referred to Mar-Jac as the "chicken farm," video footage was shown depicting Mar-Jac's name as it appeared on Defendant Katz's "Chart," the sign outside Mar-Jac's facility, and the side of a Mar-Jac truck bearing the company name and logo. There were no other poultry operations discussed or identified. The cases cited by Defendants all involve situations where there was no reasonable basis for concluding the defamatory statements referred specifically to the plaintiff either because the plaintiff was never mentioned by name or position, or because some other person was identified as the specific subject of the allegedly defamatory statement.[9] In all of these cases, the plaintiff attempted to prove by extrinsic evidence, inference,

---

[9] *See Rosenblatt v. Baer*, 383 U.S. 75, 82-83 (1966) (column not "of and concerning" plaintiff, a former supervisor of county-owned recreational facility, where it made no reference to him or to anyone else who had a part in prior administration of facility); *New York Times Co. v. Sullivan*, 376 U.S. 254, 257-58, 288-90 (1964) (publication not "of and concerning" individual city commissioner where statements "did not on their face make even an oblique reference" to him by either name or position but only referred to "police" and "they" generally); *AIDS Counseling & Testing Centers v. Group W Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir. 1990) (broadcast

or implication that the publication was referring to or making some comment about him, her, or it, but the court found it too much of a reach to connect the defamatory statement to the plaintiff. Here, by contrast, no interpretative analysis is necessary: the broadcast itself repeatedly and specifically identifies Mar-Jac.

Defendants also assert that the identification of who, if anyone, a statement is "of and concerning" is "an issue of law to be decided by the court." (Joint Mem. at 28.) This is incorrect.[10] Unless a statement is "so unambiguous as to reasonably bear but one interpretation," the question of whether a statement was "of and concerning" the plaintiff is an issue of fact for the jury to resolve. *Ledger-Enquirer*, 105 S.E.2d at 231 ("If upon the other hand, [the defamatory statement] is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read."); *see also Klein v. Victor*, 903 F. Supp. 1327, 1334 (E.D. Mo. 1995) ("If there is a question as to whether the words are 'of and concerning' the plaintiff, this is a fact dispute for the jury."); *Anyanwu v.*

---

not "of and concerning" individual plaintiffs where it "dealt exclusively" with company as a business organization and never even mentioned individual investors); *Service Parking Corp. v. Washington Times Co.*, 92 F.2d 502, 505-06 (D.C. Cir. 1937) (article not "of and concerning" plaintiff where it referred generally to entire class of downtown Washington, DC parking lots and their owners which was not so small as to implicitly defame plaintiff specifically even though not mentioned by name); *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 33 (D.D.C. 1995) (article's statements describing actions of another specifically identified individual—not plaintiff—were not "of and concerning" plaintiff).

[10] The only authority cited by Defendants are *Sullivan* and *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26 (D.D.C. 1995). *Sullivan* merely held that the evidence presented by the plaintiff in that case "was constitutionally insufficient to support a finding that the statements referred to [him]" where it relied entirely upon the proposition that general criticism of government operations, no matter how impersonal, is necessarily personal criticism and libel of the individual officials administering those operations. 376 U.S. at 291-92. The Supreme Court found that such a suggestion would turn the liberties protected by the First Amendment on their head, but nowhere in its opinion did the Court indicate that the "of and concerning" question would in all cases be a question of law for the court to decide. In *Coles*, the court granted summary judgment in favor of the defendant as to those of its statements that had pertained specifically to things that another named individual—not the plaintiff—had done. 881 F. Supp. at 33. The court ***did not*** hold, state, or even imply that "whether publication is 'of and concerning' plaintiff is for court to determine in first instance," as Defendants claim in the parenthetical provided following their citation of *Coles*. (Joint Mem. at 28.)

*Columbia Broadcasting System, Inc.*, 887 F. Supp. 690, 692 (S.D.N.Y. 1995) ("The 'of and concerning' requirement is generally a question of fact for the jury ….").

As detailed in Mar-Jac's Motion for Partial Summary Judgment (Doc. 188), the portion of the *60 Minutes* broadcast concerning a "chicken farm" involved in "money laundering" unambiguously and inescapably refers to Mar-Jac. The broadcast refers to "a chicken farm in Georgia" shortly after showing video footage lingering on the area of Defendant Katz's "chart" that reads "Mar-Jac Poultry" and while showing footage of a sign reading "Mar-Jac Poultry" and trucks bearing Mar-Jac's name and logo. (*See* Doc. 188, Exh. C (video of broadcast].) No other "chicken farm," chicken operation, chicken plant, or any other kind of chicken business is shown or referred to at any other time in the broadcast. No reasonable juror could possibly conclude that the "chicken farm" referred to and discussed in the broadcast is any other than Mar-Jac. No alternative conclusion is presented or permitted by the broadcast.

Having specifically identified Mar-Jac, Defendant Katz then unequivocally states that chickens are "the best cover for money laundering" and explains that "chicken is one of the things that no one can really track it down. If you say in one year that you lost 10 million chickens, no one can prove it. They just died. You can't trace money with chickens." (Doc. 188, Exh. C [video of broadcast], Exh. D [transcript of broadcast].) Her statements could be understood as referring only to Mar-Jac and its operations.

Further and on several occasions, Defendants have ***admitted*** the broadcast referred to Mar-Jac. In an August 28, 2003 declaration sworn and ascribed to by Defendant Katz and filed in this case in connection with Defendants' motion to transfer the case to this Court, she stated that her "statements ***about Mar-Jac*** in the *60 Minutes* program were based upon the information and documents I had gathered before writing my book." (Exh. I, [8/28/03 Decl. of Rita Katz] ¶

11 (emphasis added).) Even in their Joint Motion for Summary Judgment, Defendants admit that Defendant Katz's "Chart" "identifies" or "reference[s]," *inter alia*, "Mar-Jac Poultry" (Joint Mem. at 5, 31), admit that "Mar-Jac is referenced" in the broadcast (*id.* at 6), admit that the "chicken farm in Georgia" is a reference to Mar-Jac (*id.* at 31), and admit that the above-quoted exchange regarding chickens dying and money laundering is "concerning Mar-Jac" (*id.*).

Nevertheless and despite their previous statements, Defendants claim that the allegations of criminal conduct in the broadcast were directed "not at Mar-Jac itself, but rather at its beneficial owners, whether they be Safa …, the al-Rajhi family or the Saar Foundation …." (Joint Mem. at 30.) But these attempts to redirect the focus of Defendants' unfounded accusations away from Mar-Jac are unavailing not only because Mar-Jac's good name was used and the pictures that were shown were of Mar-Jac, but because it is Mar-Jac that would have had to "cook the books" to "cover" the money laundering.

First, Defendants' argument is expressly limited to the terrorism financing component of their accusations. (*See* Joint Mem. at 30 ("A review of the Broadcast itself demonstrates that neither it nor any statements made in it by Katz can reasonably be construed to imply that *Mar-Jac* knowingly provided funding to terrorists.") (emphasis in original).) Defendants completely fail to address that portion of their defamatory statements related specifically to management and bookkeeping with respect to chicken inventory. In the broadcast, Defendant Katz spoke specifically of using chickens as a "cover for money laundering" and explained in detail that this is an effective way to launder money because "[i]f you say in one year that you lost 10 million chickens, no one can prove it. They just died. You can't trace money with chickens." (Doc. 188, Exh. C [video of broadcast], Exh. D [transcript of broadcast].)

Even if one were to allow Defendants to backtrack so drastically from their prior

allegation that Mar-Jac knowingly supported terrorism by laundering money and confine that accusation to the al-Rajhis or other unnamed individuals or entities, Defendants do not—and cannot—explain how their accusations of money laundering by overstating losses from chickens that died were not "of and concerning" Mar-Jac. Defendants' arguments on the "of and concerning" issue do not even address the accusations of a specific crime (money laundering) committed in a specific way (overstating losses from dead chickens) that could only have been accomplished by Mar-Jac. Nobody in Saudi Arabia or Northern Virginia was identified as being involved in tabulating or reporting chicken inventories; the only person identified in the broadcast who would ever "say in one year that [he, she, or it] lost 10 million chickens" is Mar-Jac. Even if the broadcast did not accuse Mar-Jac of laundering money by manipulating its number of chickens that died in a knowing effort to support terrorism (which it did), the broadcast plainly accused Mar-Jac of at least laundering money by manipulating its dead chicken numbers.

Second, Defendants' argument that their accusations were not directed at Mar-Jac, but at Mar-Jac's "beneficial owners" is precluded by their own authority. Defendants prominently quote the following language from *Provisional Government of Rep. of New Afrika v. ABC*, 609 F. Supp. 104, 108 (D.D.C. 1985): "Allegations of defamation by an organization and its members are not interchangeable. Statements which refer to individual members of an organization do not implicate the organization. By the same reasoning, statements which refer to an organization do not implicate its members." (Joint Mem. at 29.)[11]

[11] The cases relied upon by Defendants in attempting to recast their defamatory statements as entirely of and concerning Mar-Jac's "beneficial owners," and not Mar-Jac itself, are inapposite. The *Provisional Gov't* case found that a news broadcast's statements were not "of and concerning" the individual plaintiffs (officers of an organization) as they were never mentioned, referenced, or implicated in any fashion, but the court did not find that the statements were not "of and concerning" the organization itself—even though never mentioned by name—as the broadcast pictured a streamer bearing the organization's name while making certain statements. *Willis v. United*

The broadcast identified Mar-Jac specifically—not its shareholders, not its officers or directors, and not its employees—as being engaged in money laundering using chickens (or, more specifically, dead chickens) as cover. Yet Defendants would have it that the defamatory statements in the broadcast were not directed at Mar-Jac—even though it was identified multiple times by name and general, albeit inaccurate, description as the "chicken farm"—but instead were directed at the company's "beneficial owners." Presupposing that a defamatory statement made about the owner of a company will not necessarily give rise to a defamation claim on behalf of the company, Defendants here are attempting to turn this proposition on its head by claiming that even though the broadcast spoke in terms of the company specifically, it was really referring to the actions of the company's "beneficial owners" and, therefore, the defamatory statements were not "of and concerning" the company. Defendants cite no authority supporting this sleight of hand.

This is yet another instance of Defendants attempting to refashion the sum and substance of what actually was communicated by the broadcast. Defendant Katz and Mr. Simon clearly spoke about Mar-Jac and its operations in particular when they discussed money laundering and

---

*Family Life Ins.*, 487 S.E.2d 376, 379 (Ga. Ct. App. 1997), involved letters that did not mention the plaintiff or his business by name and, for that matter, did not even allege wrongdoing on the part of any person. (The language quoted by Defendants is actually a general reference to another case included in the *Willis* court's opinion merely to highlight the lack of even a minimal facial connection between the statements and the plaintiff. The referenced case, *Stevens v. Morris Communications Corp.*, 317 S.E.2d 652 (Ga. Ct. App. 1984), involved a defamation claim filed by an attorney based on an article merely identifying him as counsel for a nursing home that was alleged to have poor conditions.) *CACI Premier Tech. Inc. v. Rhodes*, 536 F.3d 280, 302 (4th Cir. 2008), found statements about what individual foreign mercenary soldiers had done in earlier times not to amount to an accusation that the corporate plaintiff who later employed them supported or fought on behalf of those persons or causes. The assorted cases cited in footnote 14 of Defendants' brief are all similarly inapposite because they pertain to statements made about the activities of some person or entity that may have been connected to or affiliated with a plaintiff-corporation in some way, but which statements did not make any accusation about the conduct or operations of the corporation itself (and in several instances did not mention the corporation at all). Here, Mar-Jac itself was specifically and prominently mentioned and the allegation of criminal activity related directly and specifically to Mar-Jac's operations and financial dealings. Whoever Defendants may have intended to intimate was directing or guiding the conduct, the alleged conduct was Mar-Jac's; indeed, Mar-Jac was the only entity that reasonably could have been understood as having manipulated its chicken inventory records as it was the only company mentioned that would have such records.

the difficulty of "trac[ing] money with chickens." That the broadcast may have also accused the al-Rahjis or Safa Trust, SAAR Foundation, or any other specific entity (none of which were referenced by name as prominently as was Mar-Jac) of being involved in the purported "terrorist-financing ring" does not change the fact that Mar-Jac is clearly and explicitly included within the alleged illegal conduct.

Whether they are understood to refer to Mar-Jac or to its "beneficial owners," the nature of the defamatory statements in the *60 Minutes* broadcast pertain to the manner in which Mar-Jac's business operations were conducted. While a statement that a company's owner is in the mob or beats his wife might not be understood as defamatory of the company, a statement that a specifically identified and depicted company is used or managed in an illegal fashion or to accomplish an illegal purpose ***does*** convey a defamatory allegation of and concerning the company—even if phrased exclusively in terms of what its owners did or intended. Restatement (Second) Torts § 561 cmt. b (Supp. 2010) ("A corporation is not defamed by communications defamatory of its officers, agents or stockholders ***unless they also reflect discredit upon the method by which the corporation conducts its business***.") (emphasis added); *see also Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) (citing and quoting same approvingly).

Accordingly, summary judgment on this issue is warranted in ***Mar-Jac's*** favor. At a minimum though, whether Defendants' statements were "of and concerning" Mar-Jac is a disputed factual issue. There is no basis for granting summary judgment in ***Defendants'*** favor on this point.

**B. Defendants' Statements Were Reasonably Capable of Conveying—and Did Convey—Defamatory Meaning to the Ordinary, Reasonable Viewers in the *60 Minutes* Audience**

As detailed in Mar-Jac's Motion for Partial Summary Judgment, the statements made in

the *60 Minutes* broadcast were defamatory *per se* and no reasonable jury could conclude that the statements were not defamatory. (Doc. 188-1 at 11-13.) In their joint motion, Defendants contend that not only were the statements not defamatory, they were not even "***capable of*** a defamatory meaning" such that they are entitled to summary judgment. (Joint Mem. at 33-36 (emphasis added).)

"As a general rule, the question of whether a published statement is defamatory is a question for the jury." *Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1349 (N.D. Ga. 2003) (citing *Mead v. True Citizen, Inc.*, 417 S.E.2d 16, 17 (Ga. Ct. App. 1992)). Only when presented with a "statement [that] is not ambiguous and can reasonably have but one interpretation" does the issue become one of law for the judge. *Thomason v. Times-Journal*, 379 S.E.2d 551, 552 (Ga. Ct. App. 1989). In considering whether a writing is capable of defamatory meaning, the courts must "read and construe the publication as a whole," *id.*, and determine "what construction would be placed upon it by the average reader." *Macon Telegraph Publishing Co. v. Elliott*, 302 S.E.2d 692, 694 (Ga. Ct. App. 1983).

Defendants fail to acknowledge that "a court's power to hold as a matter of law that a statement is not defamatory is very limited." *McBride v. Merrell Dow & Pharmaceuticals Inc.*, 717 F.2d 1460, 1465 (D.C. Cir. 1983); *see also White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990) (same). "'It is only when the court can say that the publication is not reasonably capable of ***any*** defamatory meaning and cannot be reasonably understood in ***any*** defamatory sense that it can rule as a matter of law, that it was not libelous.'" *Id.* (quoting *Levy v. American Mutual Ins. Co.*, 196 A.2d 475, 476 (D.C. 1964) (emphasis added)).

Accordingly, the court may find Defendants' statements to be non-defamatory as a matter of law only if there is no reasonable possibility that a viewer would have understood those

statements as conveying a defamatory meaning. *McBride*, 717 F.2d at 1465 (reversing dismissal of defamation claim "[s]ince ***it is not beyond doubt*** that a reasonable person might read the article as conveying defamatory falsehoods") (emphasis added). To survive summary judgment, Mar-Jac need only demonstrate that Defendants' statements are "capable of" a defamatory meaning; Mar-Jac need not foreclose the possibility of some other, non-defamatory meaning. If a statement is capable of being understood by a reasonable viewer in multiple ways, only one of those need be defamatory in order for the issue of defamatory meaning to be one for the trier of fact.

Defendants attempt to equate the *60 Minutes* broadcast's discussion of and reference to Mar-Jac to the situation where a publication refers to a plaintiff only "in the context of a broader discussion of alleged wrongdoing" and there is, at the very most, an implication that the plaintiff engaged in the referenced misconduct. (*See* Joint Mem. at 34.) But that is not what occurred in this broadcast where Mar-Jac was identified specifically as part of the alleged wrongdoing. Its name was included on Defendant Katz's "chart" and the broadcast detailed a specific manner in which it participated in the wrongdoing, namely by committing money laundering by manipulating its numbers of dead chickens.

Defendants attempt to analogize this case to *Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305 (11th Cir. 2001). In that case, the plaintiff, the owner of a legitimate gold refinery, was interviewed in connection with a story about the attractiveness and susceptibility of the gold trade to money launderers, tax fraudsters, and drug traffickers. *Id.* at 1306-07. The plaintiff took issue with the manner in which his comments were presented, claiming that the article gave the impression that he and/or his company had participated in illegal activity or handled smuggled gold. *Id.* at 1307-08. The court, however, found the article to be sufficiently

clear that the plaintiff was not suspected or accused of any improper conduct and that he was merely "a knowledgeable gold refiner who has cooperated to be interviewed as a source of information on the industry." *Id.* at 1308.

This is not the scenario here. Had Defendants referenced Mar-Jac or sought comment from Mar-Jac solely as a knowledgeable participant in the poultry business to give support to Defendant Katz's claim that chicken "is the best cover for money laundering," *Rubin* might have some application. But that is not what happened. Mar-Jac was identified specifically as "a chicken farm" that laundered money to support terrorism by manipulating its records of chickens that died. Accordingly, Defendants' authorities are inapposite. Mar-Jac was not referenced merely as a knowledgeable authority in the industry as was the plaintiff in *Rubin*; as a witness or someone who was present as was the plaintiff in *Mitchell v. Random House, Inc.*, 703 F. Supp. 1250, 1257 (S.D. Miss. 1988); or as being "immoral" for disbelieving allegations of improper conduct engaged in by others as was the plaintiff in *Gast v. Brittain*, 589 S.E.2d 63, 64-65 (Ga. 2003). To the contrary, the *60 Minutes* broadcast specifically identifies Mar-Jac as a participant in the illegal conduct and details the particular manner in which it participated (*i.e.*, money laundering). Not only are assertions that someone engaged in illegal activity reasonably capable of conveying a defamatory meaning, they are defamatory *per se*. *See, e.g.*, *Harcrow v. Struhar*, 511 S.E.2d 545, 546 (Ga. Ct App. 1999).

Defendants seek to escape the defamatory meaning of their assertions about Mar-Jac's operations and practices by referencing Defendant Katz's statement "That's what we're trying to find out," describing this comment as a generalized acknowledgement of uncertainty. (Joint Mem. at 35.) But this statement was made only in response to the question, posed by Mr. Simon, "Does the money lost go down the line to Hamas, Islamic Jihad or al Qaeda?" (Doc. 188, Exh.

D [broadcast transcript].) Mr. Simon did not ask, and Defendant Katz did not say, whether they were "trying to find out" if Mar-Jac had laundered money or created false losses by overstating the number of chickens that had died. By referring specifically to "the money" Mr. Simon's question states as fact that money was laundered or concealed and leaves open for debate only the question of where it was directed.

### C. Defendants' Statements Are Not Protected as Unintended or Unendorsed Implications from Statements of True Facts

Defendants attempt to invoke the law of defamation by implication, but that body of law is not applicable to the statements made about Mar-Jac and, in any event, also is unavailing.

Defamation by implication refers to a situation where a defendant's statements are literally true but presented or communicated in a way that implies a defamatory meaning that is not stated explicitly. *See Southern Air Transport, Inc. v. Am. Broadcasting Cos., Inc.*, 877 F.2d 1010, 1014 (D.C. Cir. 1989) (explaining "District of Columbia law … clearly contemplates that a defamatory inference may be derived from a ***factually accurate*** news report") (emphasis added); *see also White*, 909 F.2d at 519 (explaining "[t]he core theory underlying [plaintiff's] defamation claims is that even ***concededly accurate information*** is capable of bearing a defamatory meaning") (emphasis added). While true that Mar-Jac was located in Georgia and that its business generally related to chickens, virtually every other assertion made about it in the *60 Minutes* broadcast was untrue. (*See supra*.) As noted, it was not a "chicken farm"; it had not been "bought" by the al-Rajhis or any other "Saudis"; chickens are not "the best cover for money laundering" or even a viable cover for money laundering because one can "really track … down" chickens. It actually is very simple to prove whether the number of chickens that died in a given year was accurately recorded, and one absolutely can "trace money with chickens."

But even if all of those assertions were true, as detailed *supra*, the implication that Mar-Jac in fact engaged in money laundering by using its numbers of dead chickens as a cover is inescapable. No reasonable viewer could understand Defendants' statements to have been intended to convey any other meaning. Implication or inference is hardly necessary to understand Defendants' meaning. Indeed, it is unclear in what, if any, other sense these statements possibly could have been intended or ever understood by anyone viewing the broadcast. Far less explicit implications have been found sufficient to permit a defamation claim even where the facts actually stated were undisputedly true. *See McBride*, 717 F.2d at 1465 (holding juxtaposition of true statement that expert received $5,000 a day for his testimony with equally true statement that opposing party "pays witnesses $250 to $500 a day, and the most it has ever paid is $1,000 a day" could support implied defamatory meaning that "plaintiff's case was so weak they had to pay that much to get any expert to testify, and hence that [expert's] testimony was for sale").

To the extent Defendants claim Defendant Katz did not intend "to communicate the defamatory 'impression' that Mar-Jac itself was 'engaged in money laundering activities in a knowing effort to support terrorists'" and that it was her intention to make clear "that she has *not* reached any such conclusion with respect to Mar-Jac" (Joint Mem. at 38-39 (emphasis in original)), the above-summarized statements do not reflect such an intention. Moreover, the following exchange concluded the broadcast:

> But does she think it can happen? That they can be stopped?
> "I know I stopped them, I know I stopped them," says Sarah.
> She stopped them for a day, but she says, "I'm only one person. Give me the credit."

(Doc. 188, Exh. D.) Accordingly, Defendant Katz clearly expressed her absolute certainty that Mar-Jac and the other entities she had identified were involved in laundering money and

financing terrorism, and that she had stopped them. "When one uses language, one is held to the construction placed on it by those who hear or read, if the construction is a reasonable one." *White*, 909 F.2d at 519 (quoting F. Harper, et al., *The Law of Torts* § 5.4 (1986)). "[I]t is immaterial for purposes of finding defamatory meaning whether the author or broadcaster *actually* intends or endorses the defamatory inference." *White*, 909 F.2d at 520 (emphasis in original). As detailed *infra*, her brief statement "[t]hat's what we're trying to find out" in reference to the ultimate destination of the funds laundered using Mar-Jac's chickens as cover does not, either explicitly or implicitly, reduce her prior detailed accusations and allegations of money laundering and manipulation of numbers of chickens that died to idle speculation or theorizing in the mind of a reasonable viewer, and her subsequently expressed conviction that she was right and that she had succeeded in stopping a "terrorist-financing ring" removed all possible doubt.

**D. Defendants' Statements Do Not Constitute Unverifiable Conjecture**

Defendants next contend that Defendant Katz's statements were "unverifiable speculation" concerning Mar-Jac's corporate state of mind" and therefore, according to Defendants, incapable of forming the basis of a defamation claim. (Joint Mem. at 39-42.)

Though Defendants now use words such as "theory" (Mem. at 5), "posits" (*id.* at 5-6), "view" (*id.* at 6), "theorizing" (*id.*), "contending" (*id.*), and "speculation" (*id.* at 18) to describe the statements made by Defendant Katz on the *60 Minutes* broadcast, there was no such qualification expressed in the broadcast. Nothing about Defendant Katz's statements or their general tenor in any way suggested the sort of "loose, figurative, or hyperbolic language which would negate the impression [she] was seriously maintaining that" Mar-Jac committed the crime of money laundering. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990). It was

abundantly and inescapably clear from the broadcast that Defendant Katz was very serious about her accusations.

At any rate, even if every statement in the broadcast had been prefaced by the qualification that Defendant Katz "thinks" or "believes," the broadcast would still be actionable. There is no "wholesale defamation exception for anything that might be labeled opinion." *Milkovich*, 497 U.S. at 18; *Gast v. Brittain*, 589 S.E.2d 63, 64 (Ga. 2003). "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 64 (2d Cir. 1980) (Friendly, J.) (quoted approvingly in *Milkovich*, 497 U.S. at 19). A statement which contains a "provably false factual connotation"—whether expressed as an opinion or as an affirmative statement of fact—is not privileged by the First Amendment or any other legal precept. *Milkovich*, 497 U.S. at 20. "[E]ven with a *per se* opinion, the question is whether the person has made an assertion that can reasonably be understood as implying provable facts." *White*, 909 F.2d at 522.

As previously detailed, the broadcast at the very least implies that Mar-Jac was engaged in money laundering by overstating or otherwise falsifying the number of its chickens that died. "[S]tatements that allege criminal wrongdoing … are capable of being proved false." *Adventure Outdoors, Inc. v. Bloomberg*, 519 F. Supp. 2d 1258, 1281 (N.D. Ga. 2007), *rev'd on other grounds*, 552 F.3d 1290 (11th Cir. 2008). It is an objectively verifiable fact whether Mar-Jac committed the crime of money laundering, whether it did so by overstating or manipulating the number of its chickens that died, whether it overstated or manipulated its chicken inventories for any reason, and whether it transferred any money to individuals or entities designated as terrorists. Whether Mar-Jac did so is imminently verifiable based upon a core of objective

evidence adduced from the records of Mar-Jac, its suppliers, and the hundreds of independent contract farms that maintained its flock, not to mention the multiple audits performed by Mar-Jac's own auditor and various government agencies.

Defendant Katz's statements were not a subjective assertion such as "I think Mar-Jac is evil" or "I think Mar-Jac is a bad company"; rather, Defendant Katz's assertions were an articulation of an objectively verifiable course of criminal conduct. Similarly, in *Adventure Outdoors, Inc. v. Bloomberg*, the defendants argued that their statements about various gun dealers, including the plaintiff, were non-actionable statements of opinion. The court agreed with respect to statements that plaintiff and others were "irresponsible," "immoral," "corrupt," and "a scourge on our society." *See* 519 F. Supp. 2d at 1281. But the court drew a distinction between these statements of subjective opinion and other statements made by the defendants that alleged criminal wrongdoing. *Id.* at 1281-82. The court held that statements alleging the plaintiff "sold guns in an illegal manner" or which implied that plaintiff "was not following the law in the running of [its] business" were actionable. *Id.* at 1282. These are precisely the type of allegations made by Defendants regarding Mar-Jac's business and operations.

To the extent Defendants intend to argue that their statements were not objectively verifiable because they attributed knowledge or a particular mental state to Mar-Jac actions and that Defendant Katz could not possibly know what was in the minds of Mar-Jac's principals, this contention is without merit. It is an assertion of objective fact to claim that someone did something knowingly or with any other particular mental state. Such is not a statement of mere subjective opinion that is not subject to being proven or disproven, but rather a verifiable, provable factual matter. In nearly every criminal case and a great many civil cases, the parties

are called upon to prove a specific *mens rea* or state of mind. Accordingly, the law regularly recognizes that a person's knowledge is susceptible to objective proof.

### III. Summary Judgment Is Not Appropriate on Any of Counts 3 through 7 of the Amended Complaint

Defendants argue that Mar-Jac is constitutionally barred from asserting any causes of action other than defamation that seek damages for reputational injury. (Joint Mem. at 43-44.) But *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988), on which Defendants rely, held only "that ***public figures and public officials*** may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without" satisfying the constitutional malice standard. *Id.* at 56 (emphasis added). As indicated by its own terms, the ruling in *Hustler* does not apply to private figures such as Mar-Jac. *See Merrell v. Renier*, 2006 WL 3337368, at *9-10 (W.D. Wash. Nov. 16, 2006) (rejecting argument premised upon *Hustler* where case involved private figure plaintiff); *Esposito-Hilder v. SFX Broadcasting, Inc.*, 171 Misc.2d 286, 291 (N.Y. Sup. Ct. 1996) ("By implication the rule [of *Hustler*] does not apply to private persons.").

The authorities cited by Defendants in claiming that *Hustler* applies to cases not involving private figure plaintiffs are either inapposite or unpersuasive. *Deupree v. Iliff*, 860 F.2d 300, 303-05 (8th Cir. 1988), involved the application of what that court understood to be an absolute constitutional prohibition on basing a defamation claim on a statement of opinion (*i.e.*, not the application of the constitutional malice standard). The *Deupree* court declined to draw a distinction between private and public figure plaintiffs with respect to the perceived opinion rule, but did not make any broader determinations about the application of other aspects of constitutional defamation law. In *Milkovich*, *supra*, the Supreme Court later recognized there

was no wholesale prohibition on defamation actions based upon statements of opinion in any event, so *Deupree*'s ruling is of little help to Defendants.

*Chaiken v. VV Publ'g Corp.*, 907 F. Supp. 689, 699 (S.D.N.Y. 1995) acknowledges that *Hustler*'s terms applied only to public figure and public official plaintiffs, but determined to apply it in a private figure case without citing any authority.

The other two cases do not even address the issue. *Talbert v. United States*, 932 F.2d 1064, 1066-67 (4th Cir. 1991), involves the libel and slander exception to the Federal Tort Claims Act and does not involve any discussion of *Hustler* or constitutional defamation standards, but merely interpretation of the scope of the FTCA exception. In *Abadian v. Lee*, 117 F. Supp. 2d 481, 489 (D. Md. 2000), the court dismissed the plaintiff's negligence claim on the same bases it dismissed her defamation claim, but made no reference to the private vs. public figure issue . Instead, the court had found the alleged defamatory statement not actionable because its "negative implication" was not apparent from the plain and natural meaning of the words and there was no indication such an implication was intended. *Id.* at 487-88.

Moreover, even if *Hustler* were applicable, no one can say at this stage of this case that Mar-Jac, which has been denied all discovery, will not be able to meet the substantive and evidentiary standards that the Supreme Court imposed. Accordingly, it would be premature for the Court to determine at this stage that Mar-Jac cannot satisfy whatever other burdens might apply to its non-defamation claims.

Defendants appear to acknowledge that its *Hustler* argument does not apply to Mar-Jac's product disparagement claim as that cause of action seeks to remedy a harm distinct from general reputational injury. (*See* Joint Mem. at 44 n.20.) Defendant Katz's statements about the particular manner by which Mar-Jac supposedly laundered money damaged not only Mar-Jac's

general reputation, but also disparaged its product. Defendant Katz stated that Mar-Jac was recording that millions upon millions—10 million specifically—of its chickens were dying each year. As detailed *infra*, this claim was false, but by making it Defendant Katz disparaged the quality and wholesomeness of Mar-Jac chicken products.

As to claims for vicarious liability, punitive damages, and attorney's fees, such claims may be asserted under Georgia law as separate causes of action. *See Trust Co. Bank of Augusta N.A. v. Henderson*, 364 S.E.2d 289, 293 (Ga. Ct. App. 1987) (attorney's fees); *Evans v. Willis*, 441 S.E.2d 770, 773 (Ga. Ct. App. 1994) (punitive damages). Moreover, even if the Court determined that these matters should not be plead as separate causes of action, such a determination would not preclude Mar-Jac from otherwise asserting them as remedies or legal theories. *International Kitchen Exhaust Cleaning Ass'n v. Power Washers of N. Am.*, 81 F. Supp. 2d 70, 74 (D.D.C. 2000) (holding punitive damages was remedy and not freestanding cause of action, but declining to foreclose plaintiff from proceeding with attempt to recover same); *Young v. 1st Am. Financial Services*, 977 F. Supp. 38, 41 (D.D.C. 1997) (same with respect to vicarious liability).

Defendants additionally appear to argue that Mar-Jac's claim for expenses of litigation should be dismissed because they lack a statutory basis. (Joint Mem. at 45 n.23.) However, O.C.G.A. § 13-6-11 provides that: "[t]he expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specifically pleaded and has made prayer therefore and where the defendant has acted in bad faith in making the contract, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." "This section may be applied to suits in both contract and tort." *Trust Company Bank of Augusta N.A. v. Henderson*, 364 S.E.2d 289, 293 (Ga. Ct. App. 1987). Under Georgia

law, "[e]very intentional tort invokes a species of bad faith that entitles a person wronged to recover the expenses of litigation including attorney fees." *Tyler v. Lincoln*, 527 S.E.2d 180, 183 (Ga. 2000). Moreover, the issue of whether attorney's fees are warranted under this statute is one for the jury. *Id.*; *Duffy Street S.R.O., Inc. v. Mobley*, 471 S.E.2d 507, 508 (Ga. 1996).

## CONCLUSION

For the reasons stated above and in Mar-Jac's own Motion for Partial Summary Judgment, the Court should deny Defendants' Joint Motion for Summary Judgment.

Respectfully submitted,

Dated: August 31, 2010

/s/Tillman Finley
Daniel Marino (DC Bar No. 416711)
Nancy Luque (D.C. Bar No. 419757)
Tillman Finley (D.C. Bar No. 477737)
LUQUE MARINO LLP
17th Street NW, Suite 800
Washington, DC 20006

Wilmer Parker (*pro hac vice*)
MALOY JENKINS PARKER
75 14th Street, Suite 2500
Atlanta, GA 30309

John J. Walsh (*pro hac vice*)
CARTER LEDYARD & MILBURN LLP
Two Wall Street
New York, NY 10005

*Counsel for the Plaintiff Mar-Jac Poultry, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2010, I caused a copy of the foregoing and all attachments thereto to be served on the following counsel via the Court's electronic filing system.

**Laura Rose Handman**
DAVIS WRIGHT TREMAINE, LLP
1919 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006-3402

**Lee Levine**
LEVINE SULLIVAN KOCH & SCHULZ LLP
1050 Seventeenth Street, NW
Suite 800
Washington, DC 20036

**John J. Walsh**
CARTER LEDYARD & MILBURN LLP
Two Wall Street
New York, NY 10005

**Wilmer Parker**
MALOY JENKINS PARKER
75 14th Street, Suite 2500
Atlanta, GA 30309

/s/Tillman Finley___
TILLMAN FINLEY