**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 03-2422(RMC)** |
| **v.** | ) | |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' "STATEMENT OF UNDISPUTED MATERIAL FACTS" AND STATEMENT OF FACTS GENUINELY IN DISPUTE**

Plaintiff Mar-Jac Poultry, Inc., by and through undersigned counsel and pursuant to Local Civil Rules 7(h), respectfully submits in opposition to the Defendants' filed motions for summary judgment (Docs. 186, 187, 194), the following Response to Defendants' "Statement of Undisputed Material Facts" and Statement of Facts Genuinely in Dispute.[1]

**Assertions 1-250.** Plaintiff objects generally to the entire array of Defendants' Statement of [Purportedly] Undisputed Material Facts as irrelevant to the issue raised by their Joint Motion for Summary Judgment which claims Plaintiff "cannot carry its burden of proving the material falsity of the assertion that money flowed through it to terrorists." By attempting to fill the Record on this motion with irrelevant, hearsay information, Defendants are, in effect, (1) asserting the defense of substantial truth while avoiding the assumption of the burden of proof which such defense entails, and (2) seeking to prove as substantial truth the premise which was the basis for an eight-year investigation by the federal government which resulted in no crimes

[1] Plaintiff identifies those disputed facts by reference to the Defendants' numbered assertion with the portion in italics signifying dispute followed by Plaintiff's rebuttal.

being alleged against any of the entities or individuals referenced by Defendants in their broadcast.

**Assertions 3-11.** Plaintiff objects generally based on relevance and materiality.

3. *From 1984* to 1996, *Mar-Jac was wholly owned by* Mar-Jac, Inc., which in turn was wholly or majority owned by the Saar Foundation ("Saar" or "SAAR"). Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 15, 19-21; Ex. 3 (Mirza Dep.) at 46:13-49:6.

RESPONSE: Objection. Defendants' statement is materially incomplete. In July 1984, SAAR, an organization organized and regulated by the Internal Revenue Service under 26 U.S.C. § 501(c)(3), acquired a group of poultry businesses located in Georgia. Following a series of reorganization and restructurings in the 1980s, these entities were consolidated into one operation under a holding company named Mar-Jac, Inc., which was wholly owned by SAAR. In connection with this acquisition, SAAR was assisted and advised by an attorney, Jim Roach.

In 1990, SAAR sold 40% of Mar-Jac, Inc. to Aradi Inc., gifted 5% of Mar-Jac, Inc. to Safa Trust ("Safa") and sold 4% of Mar-Jac, Inc. to Mena Corporation. The attorneys involved in these transactions were Rick Gross and Sandra Spalleta.

In late 1996, SAAR's entire interest in Mar-Jac, Inc. was sold resulting in a reorganization with Mar-Jac Holdings, Inc. owning 100% of Mar-Jac Poultry, Inc. Mar-Jac Holdings, Inc. in turn was owned 65% by Safa and 35% by Mena Investments, Inc. Financing for the Mar-Jac reorganization was provided by Bank of America, formerly Nations Bank, which loaned Mar-Jac approximately $12 million. The Atlanta law firm of Kilpatrick & Cody (now Kilpatrick Stockton) structured these transactions.

(Exh. A, Declaration of M. Yaqub Mirza ¶¶ 6-8; Doc. 194-3, Declaration of Rory Eastburg, Ex. 2[Mirza Resp. to Written Dep. Ques.] at 135, 159.)

5. Sulaiman Abdul Aziz Al Rajhi ("Shaikh Sulaiman") – *one of the wealthiest men in Saudi Arabia who is not a member of the country's royal family* – "was the greatest not only donor but also fundraiser for SAAR." Ex. 4 (Barzinji Dep.) at 140:12-14.

RESPONSE: Objection. The statement is not supported by record cite. The testimony does not indicate that Shaikh Sulaiman was "one of the wealthiest men in Saudi Arabia not a member of the royal family." (*See* Doc. 194-3, Eastburg Decl., Ex. 4 [Barzinji Dep.] at 140:12-14.) To the extent this purported fact is deemed material in any way, Mar-Jac would require discovery to determine the truth of Defendants' assertion.

6. *The Saudi Arabian government prevailed upon Shaikh Sulaiman to populate Saar's leadership with persons who shared the Saudi royal family's ultra-conservative "vision" of Islam, known as Wahhabism. Ex. 4 (Barzinji Dep.) at 135:22-146:9.*

RESPONSE: Objection. The assertion is a mischaracterization of Dr. Barzinji's testimony because it incorrectly implies that SAAR's initial leadership, circa 1984 to 1996, "shared the Saudi royal family's ultra-conservative 'vision' of Islam." It did not. SAAR's leadership was influenced instead by "American Islam" described by Dr. Barzinji as "liberal." (Doc. 194-3, Eastburg Decl., Ex. 4 [Barzinji Dep.] at 138:18-139:7 ("We had the vision that we could help the Third World Countries so much with industry, education, giving the hope, especially in Africa and South Asia and so on, desperate places and we built the schools and we made so many projects there is, and we changed the curriculum for many people."); *see also id.* at 136:16-22.)

It was only in 1995 that, according to Dr. Barzinji, the Saudi royal family exerted pressure on SAAR to remove the aggressive assertive American "Iraqis on the board." (*Id.* at 137:17-22.) Thereafter in 1996, following Drs. Barzinji and Al-Talib's resignations from SAAR's board, SAAR sold its interest in Mar-Jac and began winding down its U.S. based

activities, ultimately dissolving in 2000. (Exh. A, Mirza Dec. ¶¶ 8, 26; Doc. 194-3, Eastburg Decl., Ex. 16 at 52; *see also* ¶ 3, RESPONSE, *supra*.)

9. Mena Corp. *was, in turn,* a wholly owned subsidiary of Safa. Ex. 7 at 4; Ex. 8 at 24-25; Ex. 9 at 22; Ex. 10 at 27; Ex. 11 at 22.

RESPONSE: Objection: Defendants misstate the Record. Mena Corp. was not a wholly owned subsidiary of Safa until after 1996 and the reorganization of Mar-Jac following SAAR's sale of its interest in Mar-Jac. (Doc. 194-3, Eastburg Decl., Ex. 7 at 4.)

10. In 1996 – at a time when Saar was under scrutiny from U.S. journalists *and public officials* based on perceptions it was contributing money to organizations with "ties to radical Islamic groups" or otherwise "promoting certain radical Islamic causes in the United States" – Saar transferred its assets (totaling $22-23 million), over a period of three to four years, to Humana Charitable Trust ("Humana"), an offshore trust managed by a "corporate trustee," which in turn was controlled by two individuals: Mirza and an attorney who represented the al Rahji family.

RESPONSE: Objection. SAAR was not given any reason to believe that any public officials were investigating or were suspicious of its activities. To the contrary, in the fall of 1996, both Special Agent John O'Neill, who in 1996 was Chief of the Counterterrorism Section of the FBI, and Special Agent David Williams, Assistant Special Agent-In-Charge, National Security Division, FBI, assured SAAR that it was not under investigation and that it was "okay." (Exh. A, Mirza Decl. ¶¶ 14-23.)

16. *At all times relevant to this litigation, the beneficial owners of Mar-Jac maintained offices at 555 Grove Street in Herndon, Virginia. Ex. 3 (Mirza Dep.) at 76:2-7.*

RESPONSE: Objection: Defendants misstate the Record. 555 Grove Street was not constructed until 1987. Further, Mena Corporation, a Maryland corporation and a beneficial

owner of Mar-Jac from 1990 to 1996, was never located at 555 Grove. Defendants' Record cite does not prove otherwise.

28. *Ashraf was also, at all times relevant to this litigation*, an officer, director, trustee, or managing agent of each of the following entities: Humana, as director of its corporate trustee; *York Foundation*; and Sterling Charitable Gift Fund. Ex. 1 (Ashraf Dep.) at 86:17-87:16, 92:7-16, 319:2-4.

RESPONSE: Objection: Defendants misstate the Record. M. Omar Ashraf was not an officer, director, trustee or managing agent of York Foundation. (*Compare* address at Doc. 194-3, Eastburg Decl., Ex. 1 [Ashraf Dep.] at 15 *with id.* Ex. 56 at 2; *see also* Exh. B, Declaration of M. Omar Ashraf ¶ 2.)

33. Following the terrorist attacks of September 11, 2001, the United States launched "Operation Green Quest," a multi-agency law enforcement initiative that was *intended to investigate and cut off the sources of funding for terrorist organizations*. *Unus v. Kane*, 565 F.3d 103, 107-08 (4th Cir. 2009); Ex. 15.

RESPONSE: Objection. Defendants misstate the *Unus* decision. According to the Fourth Circuit Court of Appeals, 565 F.3d 103 (4th Cir. 2009) "Operation Green Quest" was established by the Treasury Department as "a multi-agency task force assigned with investigating domestic financial support of international terrorism…" *Id.* at 107-08. In a government press release "Operation Green Quest" is identified as being created by the Treasury Department on October 25, 2001 as "a multi-agency financial enforcement initiative intended to augment existing counter-terrorist efforts bringing the full scope of the government's financial expertise to bear against systems, individuals, and organizations that serve as sources of terrorist funding." (Doc. 194-3, Eastburgh Decl., Ex. 15.) The Defendants misstate the Record by claiming

Operation Green Quest was "intended to investigate and cut off the sources of funding for terrorist organizations."

**Assertions 34 through 47: Objection: hearsay, relevance.**

34. In connection with this initiative, *in March 2002*, David Kane, Senior Special Agent of the United States Customs Service, executed a 139-page Affidavit in Support of an Application for Search Warrant in the Matter of Searches Involving 555 Grove Street, Herndon, Virginia, and Related Locations ("Kane Affidavit"), which was submitted to the United States District Court for the Eastern District of Virginia. Ex. 16; Am. Compl. ¶ 20.

RESPONSE: Objection: hearsay – relevance. This assertion is misleading in that because the Kane Affidavit was sealed in March 2002 at the request of the government, and irrelevant because it was unavailable to the public and not known at the time Defendants made their statements. It was not unsealed until October 17, 2003. (Doc. 194-3, Eastburg Decl., Ex. 17 at 2.) Accordingly, all assertions numbered 34 through 47 are not relevant to this litigation because they were unknown prior to the Broadcast of defamatory statements about Mar-Jac. Further, Mar-Jac was identified by Agent Kane as "…a large poultry processor located at 1020 Aviation Boulevard, Gainesville, Georgia whose principal officers are Barzinji, Al-Talib, M. Omar Ashraf and Mirza." Agent Kane was incorrect as Mar-Jac's principal officers were not as described above.

42. The Kane Affidavit further detailed *what it characterized as a pattern of material omissions and misstatements in multiple tax return filings by charities in the Safa Group*. Ex. 16 at 60-69.

RESPONSE: Objection: irrelevant, argumentative and mis-describes the Affidavit which does not "characterize[ ] a pattern of material omissions and misstatements in multiple tax return filings by charities in the Safa Group." There is no such thing as a "Safa Group" and the

"fact" asserted is mere argument by the Defendants; not actual fact. Also, nowhere, except in ¶ 145 which is limited to Sterling Charitable Gift Fund and Mar-Jac Investments, Inc., did Agent Kane assert the failure to disclose a relationship to be "material." (Doc. 194-3, Eastburg Decl., Ex. 16 at 68-69.)

44. According to the Kane Affidavit, the investigation of the Safa Group had "traced millions of dollars through layers of related companies" *to charities that were based in and/or maintained bank accounts in foreign countries*. Ex. 16 at 8, 12.

RESPONSE: Objection: the Defendants misstate the Kane Affidavit which specifically states as to this assertion: "Indeed, the current investigation has traced millions of dollars through layers of related companies and to charities in the Isle of Man – from which point the trail cannot practicably be followed." (Doc. 194-3, Eastburg Decl., Ex. 16 at 8.) Agent Kane did not say the "trail" could not be followed.

45. Agent Kane asserted that "*there [did] not appear to be any innocent explanation*" as to "*why the labyrinth of organizations and charities that comprise the Safa Group was constructed," but he surmised that "the most likely reason [was] to conceal support for terrorism*." Ex. 16 at 41.

RESPONSE: Objection: speculation and argument by Agent Kane, which does not state facts and is misleading by omission. Agent Kane began by stating, *"While I don't know for sure why the labyrinth of organizations and charities that comprise the Safa Group was constructed, there does not appear to be an innocent explanation.*" (Doc. 194-3, Eastburg Decl., Ex. 16 at 41 (emphasis added).) Agent Kane never asked Mar-Jac or other so-called members of the *"Safa Group"* for any explanation, innocent or otherwise, of the transactions; all of which were for proper purposes, as the government's seven year investigation ultimately concluded. Operation Green Quest, the U.S. Attorney's Office for the Eastern District of Virginia, and Federal Grand

Juries investigated Mar-Jac and others for over seven years bringing no criminal charges of any nature; money laundering, material support of terrorism or tax. (Exh. C [Declaration of Mahmoud D. Mohamed] ¶ 2; Exh. D [Declaration of Doug Carnes] ¶ 2; Exh E [Declaration of J. Pete Martin] ¶ 2.)

46. Agent Kane averred that he "and the other agents involved in th[e] investigation *believe[d]* that some of the moneys that *move[d]* overseas *[we]re* destined to *the [Palestinian Islamic Jihad] and other terrorist organizations" or for uses "other than tax-exempt purposes*." Ex. 16 at 8.

RESPONSE: Objection. Speculation unsupported by fact. Agent Kane used the following language: "Accordingly, I and the other agents involved in this investigation *believe* that some of the moneys that move overseas are destined to the PIJ and other terrorist organizations; *at the least, the money is being used for other than tax-exempt purposes in violation of the tax laws."* (Doc. 194-3, Eastburg Decl. Ex. 16 at 8 (emphasis added).) By his own admission, in 2002, Agent Kane did not know what happened to "the money." After a seven-year and no doubt multiple million dollar investigation, Agent Kane and government officials concluded that the monies were not "destined" to terrorist organizations. (Exh. C [Declaration of Mahmoud D. Mohamed] ¶ 2; Exh. D [Declaration of Doug Carnes] ¶ 2; Exh E [Declaration of J. Pete Martin] ¶ 2.)

50. In seeking and securing these warrants, the United States *relied* upon information provided by Katz, who served as a confidential government informant, as well as information gathered by the various government agencies. Am. Compl. ¶¶ 21-22; *see supra* ¶ 39.

RESPONSE: Objection. The United States *did not rely* on information provided by Katz "in seeking and securing…[search] warrants." The Am. Compl. did not admit that the government *relied* on Mrs. Katz's information, but simply alleged claims made by Mrs. Katz in

her book. The citation to the Am. Compl. does not support the Defendants' assertion which is not fact, but argument and supposition.

62. The Broadcast reports that Katz began gathering information about the entities headquartered at 555 Grove Street *to provide to federal law enforcement authorities*, including by searching the trash at the building. Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.

RESPONSE: Objection. The Exhibits do not support that portion claiming that Katz "began gathering information [about 555 Grove Street] *to provide to federal law enforcement authorities*…" (emphasis added). No such statement is made in the Broadcast nor can any inference of any such purpose be made. This is not fact.

63. In the dumpster, Katz explains, *she located documents* from which *she concluded that substantial sums of money* "[came] from Saudi Arabia," specifically, the Broadcast reports, "from members of an extremely wealthy Saudi family, the al-Rajhis" and was used to "fund[ ] many of the organizations in 555 Grove." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.

RESPONSE: Objection: Defendants misstate the Exhibits. Ms. Katz actually said, "I found *one important letter* that actually *gave me the first lead to understand* that the money comes from Saudi Arabia." (emphasis added). Ex. 21 (Broadcast Tr.) at 18. Defendant Katz never said where the money went, let alone that it went to "fund[ ] many of the organizations in 555 Grove" and as written is a misstatement of Ex. 21.

**Assertions 66, 68, 69 and 74.** Objection: argumentative and not supported by the exhibits. Further, Defendants' use of the word "posits"—to suggest after-the-fact theories as facts—is argumentative. The exhibit speaks for itself. An accurate description would use a verb such as "identifies," as is used by the Defendants in assertion 67, or other equally appropriate descriptors such as "showed," "included," "listed," etc.

68. *A circular arrow on the Chart points that money passed between and among entities within the SAAR Network. Ex. 22.*

RESPONSE: Objection. This assertion is argument. The chart "speaks" for itself.

76. The Broadcast *describes Katz's view* that the circulation of funds through multiple layers of entities in this manner is "designed to make it difficult to follow the money." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.

RESPONSE: Objection. The assertion "describes Katz's view" is argumentative. The Broadcast speaks for itself. Mar-Jac contends that Katz's statements regarding "dead chickens" and not being able to "trace money with chicken" in the context of "[c]hicken – I see it as the best cover for money laundering" constitutes Defendants defaming of Mar-Jac. *See* Mar-Jac's Motion for Partial Summary Judgment [Doc. # 188].

77. The Broadcast notes that "one especially inventive idea *the Saudis came up with*, according to [Katz], was chickens. They bought a chicken farm in Georgia." As correspondent Simon delivers this narration, the Broadcast *briefly* depicts a large poultry transport truck bearing Mar-Jac's corporate logo. Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.

RESPONSE: Objection. There is no evidence, and none is cited, that "the Saudis came up with" the ideas of buying a "chicken farm." Further, what is a "brief" depiction of Mar-Jac's truck with Mar-Jac's logo is in the "eyes of the beholder." Mar-Jac does not agree that the depiction of its logo was "brief."

81. *"[W]ith [Katz's] help" – namely, the information gathered by Katz and provided by her and then pursued by federal law enforcement authorities – the Broadcast explains*, "U.S. officials had found out enough to get a Customs Department task force to raid 555 Grove and 28 other locations in March 2002, carrying away seven truckloads of evidence. It was one of the

biggest terrorism related raids in US history. *And yes, they raided a chicken farm, too*." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 19.

RESPONSE: Objection: Defendants misstate the Exhibits. There is no indication whatsoever in the Broadcast of what "help," if any, Katz provided to law enforcement. The assertion that "the information gathered by Katz and provided by her and then pursued by federal law enforcement authorities" – is supposition and argument; not fact. *See* Ex. 21. The Broadcast makes no claims of any corroboration from any government official or document (the Kane Affidavit was under seal) of and concerning money laundering by the "chicken farm" down "in Georgia." There was no attribution in the Broadcast to any government source regarding Mar-Jac engaging in money laundering. The Broadcast did report the government raided "the" chicken farm – referring to Mar-Jac which is not "a" chicken "farm." (*See* Doc. 188-3, Declaration of Randall A. Bruce ¶ 3; Doc. 188-8, Declaration of Joel Williams ¶ 1.) Actually, Mar-Jac's business office, not its processing plant, hatchery, feed mill or any other facility that was searched.

83. The Broadcast proceeds to present the views of Suhaib Jamal, *the son of Mar-Jac Chairman Jamal Barzinji and himself an indirect beneficial owner of Mar-Jac (through his family partnership's stake in Mena Investments, Inc.)*: "You don't go attacking innocent Americans, you know, just because they have a Muslim background or an Arab background. And these are people, some of the most law-abiding, you know, patriotic Americans you'll ever meet, the people who…were raided, and it's such a shame." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 19; Ex. 5 (Al-Talib Dep.) at 176:17-179:4; *see supra* ¶¶ 12, 15.

RESPONSE: Objection: It is irrelevant as to Mar-Jac and in any event Defendants misstate the Exhibits. There is no evidence that Suhaib Jamal is the son of Jamal Barzinji and *an indirect beneficial owner of Mar-Jac*. The Defendants assume that there is a family partnership

of which Suhaib Jamal is a member, and that this partnership has a "stake in Mena Investments, Inc." This assumption is not evidence, and the Record does not support the Defendants' claim.

Furthermore, these comments had nothing to do with Mar Jac as there is no evidence he was speaking of Mar Jac or even knew the program was of and concerning Mar-Jac because he was depicted in front of 555 Grove St., in Herndon, Virginia where Defendant Katz was standing in a burka, garb unknown to that neighborhood. It is clear from the Broadcast, Ex. 20 (DVD), and hearing the comments of Bob Simon that Suhaib Jamal's "confronting" CBS was pure happenstance from the Defendants' perspective ("We paid a visit to 555 Grove." "Sarah says her efforts stopped the flow of funds from here to terrorists, but the Muslims who work here said there never was a flow." "And they point out that today, more than a year after the raids, no criminal charges have been brought against anyone." "They're so incensed about the raid, that they kicked us out of their offices minutes after we got there." "A Muslim center across the street called the cops, *and then a young man, who identified himself as Suhaib Jamal, came to express his outrage*." "His father's office and home had been raided." Ex. 21 at 19. (emphasis added). The confrontation by Suhaib Jamal was an unplanned event occasioned by the appearance of CBS' camera crew and a reporter with a microphone. (Katz was depicted by CBS in "the shadows" wearing a burka.) Ex. 20 (DVD).

86. The Broadcast concludes *by summarizing the conflicting positions of the protagonists in the federal investigation*. First, Katz asserts, "I'm not after Muslims, I'm after hunting terrorist Muslims – Muslim terrorists. I'm not after Islam, I'm after Islamic terrorism. It's just a small group of people that are trying to destroy our life, are doing all this damage, and we must make sure that we stop it." Simon then reports that "[t]he al-Rajhi family from Saudi Arabia claims it never financed terrorists. So do the people who were raided in Virginia. So do

all the charities and foundations mentioned or shown in our story. Meanwhile, the U.S. Justice Department continues its investigation." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 19.

RESPONSE: Objection: wholly inaccurate and argumentative. The phrase "by summarizing the conflicting positions of the protagonists in the federal investigation" is unsupported by the exhibit, the Broadcast which speaks for itself. There is absolutely no evidence in the Broadcast or Record that "Suhaib Jamal" was a representative of Mar-Jac—the "chicken farm" "down in Georgia" that is the "best cover for money laundering." While the Broadcast reported that "The al-Rajhi family from Saudi Arabia claims it never financed terrorists," "[s]o do the people who were raided in Virginia," and "[s]o do all the charities and foundations mentioned or shown in our story," the Broadcast glaringly did not report that Mar-Jac denied financing terrorists as it reported with respect to the others mentioned. Despite that the Broadcast specifically identified Mar Jac, "[a]nd yes, they raided the chicken farm, too," Ex. 21 (Broadcast Tr.) at 18-19, it did not "summaraize" Mar-Jac's position. Mar-Jac is not a charity or a foundation and was not raided in Virginia

CBS never contacted Mar-Jac before its Broadcast seeking any comment let alone Mar-Jac's position with respect to its views on the search let alone with respect to a federal investigation. Am. Complaint, Doc. #127, ¶ 23 ("Prior to airing the *60 Minutes* Broadcast, neither Defendant Simon nor anyone else from Defendant CBS contacted Plaintiff Mar-Jac to give it an opportunity to respond to the allegations of the Broadcast."). Through this grave omission the Broadcast gave imprimatur and gravitas to *Katz's* defamatory statements about Mar-Jac "cooking its books" with false "dead chickens" to launder money to support terrorists – Osama bin Laden, Hamas and PIJ. Katz's credibility was enhanced by Simon's closing remarks, "And by the way at her request, we disguised the woman we called 'Sarah,'" Ex. 21 at 19,

clearly creating the impression that Mar-Jac and those at 555 Grove were dangerous, a threat to American security.

**MAR-JAC WAS A *CONDUIT* FOR FINANCIAL TRANSACTIONS *THAT ULTIMATELY AIDED TERRORIST ORGANIZATIONS***

**Money Flow Into Mar-Jac**

RESPONSE: As the evidence shows, Mar-Jac was no *conduit* for any purpose, particularly "aid[ing] terrorist organizations." (emphasis added). The financial transactions conducted by Mar-Jac throughout the years were for legitimate business purposes. Carnes, al-Talib, Mohamed, Martin, Ashraf, Barzinji, Mirza Declarations. Monies advanced to Mar-Jac as loans were used for the intended purposes; i.e. to assist in financing a multi-million dollar enterprise employing well over 1200 people in the processing and sales of chickens. Monies paid by Mar-Jac were for legitimate business purposes. A brief financial "picture" of Mar-Jac based on total revenue, net income and dividends paid for the years 1995-2004 may be found in Exhibit C, Mahmoud Mohamed's Declaration at page 3, reprinted below.

| Year | Total Revenue | Net Income | Total Dividends | 65% to SAFA | 35% to MENA |
|---|---|---|---|---|---|
| Ending April | | After TAX | Paid | | Investment, Inc. |
| | | | | | |
| 1995 | $135,319,518 | $495,241 | $1,000,000 | $650,000 | $350,000 |
| 1996 | $142,355,061 | $1,798,006 | $1,000,000 | $650,000 | $350,000 |
| 1997 | $102,387,758 | $3,749,009 | $8,250,000 | $5,362,500 | $2,887,500 |
| 1998 | $91,420,194 | $1,231,457 | $1,880,000 | $1,222,000 | $658,000 |
| 1999 | $117,240,641 | $7,792,138 | $4,600,000 | $2,990,000 | $1,610,000 |
| 2000 | $107,502,446 | $3,007,176 | $4,760,000 | $3,094,000 | $1,666,000 |
| 2001 | $118,660,690 | $4,011,504 | $1,500,000 | $975,000 | $525,000 |
| 2002 | $159,105,341 | $13,630,089 | $9,000,000 | $5,850,000 | $3,150,000 |
| 2003 | $156,089,683 | $8,927,808 | $3,600,000 | $2,340,000 | $1,260,000 |
| 2004 | $200,314,938 | $24,619,349 | $8,660,000 | $5,629,000 | $3,031,000 |

87. Mar-Jac and its holding companies received *approximately $18.5 million in loans from Saar between 1984 and 1997*. Ex. 31 at Ex. G; Ex. 32 at 4; Ex. 33 at 3; Ex. 34; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 199, 378.

RESPONSE: Objection. This is demonstrably inaccurate. SAAR never made $18.5 million in loans to Mar-Jac and its holding companies; it loaned Mar-Jac and its holding companies $1,650,000 in February 1988 and $1,785,000 in April 1997 *for a total of $3,435,000*. (emphasis added). *See* Ex. F to Mar-Jac's responses to written interrogatories – No. 6 – but omitted by Defendants in their Ex. 31 which erroneously only attached Ex. G, not Exs. F and G. *See also* Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 192, 199 and 202. SAAR did initially contribute as capital to Mar-Jac's predecessors $3 million which was used to pay the sellers. The balance of the purchase price, $10 million, was financed by the sellers. Mar-Jac later obtained in February 1986 a $5,490,657 loan from the Maryland National Bank to satisfy the balance of the debt owed to the sellers.

88. Mar-Jac and its holding companies received *approximately $1.2 million in loans* from Safa between 1990 and 1997. Ex. 6, Ex. 35; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 156, 507-519.

RESPONSE: Objection. Mar-Jac and its holding companies *did not* receive approximately $1.2 million in loans from Safa between 1990 and 1997. Mar-Jac received in June 1990 a $500,000 loan from Safa. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 156. Defendants cite Ex. 35 and Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 507-519 purportedly to support the assertion that Safa "loaned" Mar-Jac another $700,000. But, those Record cites do not support that assertion. Rather, they support the fact that in October 1997 Mar-Jac Holdings declared a dividend of $1 million to be paid jointly to Safa and Mena

Investments as "shareholders of record." *Id*. Safa only loaned $500,000 to Mar-Jac. Defendants misstate the cited Exhibits.

89. Mar-Jac's holding company received a $5.5 million loan in 1996 from Heritage which had itself *borrowed* $8.6 million from Safa *that same year*. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 569; Ex. 16 at 53.

RESPONSE: In 1996 Safa *contributed* (not loaned) Heritage $8.6 million. Ex. 16 at 53. Plaintiff objects to Defendants' misstating the Record.

90. Mar-Jac *received a $350,000 loan in 1997* from Mena Investments, Inc. Ex. 36; Ex. 37; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 507-513, 547-559.

RESPONSE: Objection: the Defendants misstate the cited Exhibits. As was explained in No. 88, Mar-Jac Holdings declared in October 1997 a dividend of $1 million payable jointly to Safa and Mena Investments. Ex. 37. The $350,000 note payable, Ex. 32, dated November 1, 1997 evidences Mar-Jac Holdings' obligation to pay the dividend. Mena Investments did not loan Mar-Jac and its holding companies $350,000. Defendants misstate the Record.

92. Mar-Jac's holding company received a $400,000 loan in 1990 *from Safa subsidiary Mena Corp*. Ex. 40; Ex. 41; Ex. 6; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 155.

RESPONSE: Objection. Mena Corp. was not a subsidiary of Safa. The Record cites provided by the Defendants do not support this assertion and it is incorrect. Defendants misstate the Record.

93. Mar-Jac received a $4 million loan *in 1993* from a Panamanian company called Solmagic, S.A. which was owned by a Saudi businessman names Abdul Aziz Ali Al-Direibi. Ex. 42; Ex. 6; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 91-92, 193; Ex. 3 (Mirza Dep.) at 266:20-267:15.

RESPONSE: Objection. The $4 million loan from Solmagic, S.A. was in 1990, not 1993. Ex. 42. Defendants misstate the cited Exhibits. .

94. In sum, from 1984 to 1997, Mar-Jac received *more than $35 million* in capital infusions (in the form of loans) directly and indirectly from Saar and Safa as well as from two offshore companies *funded, owned, and/or controlled by Saudis*. *See supra* ¶¶ 87-93.

RESPONSE: Objection: Defendants misstate the Exhibits. From 1984 to 1997, Mar-Jac *did not* receive *more* than $35 million in capital infusions (in the form of loans) directly and indirectly from SAAR and Safa as well as from two offshore companies funded, owned, and/or controlled by Saudis. As noted above, Mar-Jac received $3.435 million from SAAR, $500,000 from Safa in 1990, arguably $5.5 in 1997 from Safa via Heritage, $4 million in 1990 from Solmagic and $5.1 million in 1990 from Key Overseas, Inc. for a total of $18.535 million. Of that figure $11.750 million was received in 1990 or earlier. In 1997 $6.785 million was received ($5.5 million from Heritage and $1.785 million from SAAR) as loans after Mar-Jac's reorganization.

The funds received from SAAR were domestic, U.S. based. Safa and Heritage were § 501(c)(3) organizations and were not and never have been owned and/or controlled by Saudis. The Record does not support any such inference, much less assertion. The only incidents of any so-called Saudi "funding" of Safa came in 1990 and earlier when as part of a reorganization of Mar-Jac, SAAR gifted 5% of Mar-Jac stock, as well as an earlier occasion when stock was gifted to Safa.

98. *Mirza testified that the organizations he served, including Mar-Jac, faced a "difficulty" when it came to making charitable contributions because some groups that were mostly doing charitable work may also have had "violent" factions, and donors could not be*

*sure "with absolute certainty" that funds given to those charities would be put to the intended use. Ex. 3 (Mirza Dep.) at 232:3-18.*

RESPONSE: Objection. The Defendants have incorrectly reported Dr. Mirza's testimony on this matter which was: "Even David Williams of the FBI told me or told us, that I know your difficulty." "Hamas is 95 percent charitable activity and 5 percent violent and how could you tell." "Even he was recognizing the difficulty the charity may have had."

Q. You agree with his statement that nobody can ultimately determine that something happened to it, "it" being the charitable donation? [Referring to a previous alleged quote by Rick Gross, an attorney for SAAR, published in *U.S. News and World Report* to the effect "nobody can ultimately determine that something didn't happen to it," a reference to the fact that one cannot insure funds will not ultimately "end up in the hands of terrorists."]

A. It depends, if you know the person and you know the charity that contributed, you hope that never happens but with absolute certainty, I don't know. Ex. 3 (Mirza Dep.) at 231:16-232:18.

99. In 1996, after the U.S. government had executed search warrants and seized records maintained by WISE and al-Arian, Saar hired the respected private investigative firm Kroll Associates ("Kroll") *to "conduct a due diligence" review of the foundation's charitable* giving and *assess* the "credibility of…rumors" that Saar and its donees had "links to militant Islamic organizations." Ex. 3 (Mirza Dep.) at 89:14-17, 96:25-97:3, 99:25-100:5, 104:14-106:2, 129:22-130:2; Ex. 12; Ex. 44; Ex. 26.

RESPONSE: Objection. The Defendants misstate Dr. Mirza's testimony and the Exhibits. In 1996 SAAR hired Kroll *to conduct a due diligence on* SAAR. Ex. 3 (Mirza Dep.) at 90:15-19. And specifically, "Kroll Associates was retained to conduct a due diligence on the SAAR Foundation and determine the public's perception of the organization," *not* to review the

"foundation's charitable giving" Ex. 44 at YM-023728. "Specifically, Kroll was retained to [d]etermine which media outlets may be investigating the organization links to militant Islamic organizations; [and] [d]etermine the credibility of the rumors regarding those alleged connections to these organizations." *Id*.

100. In its resulting reports to Saar ("the Kroll reports") – which were based on Kroll's review of news stories and public records as well as interviews it conducted with journalists and with officials in Congress and various law enforcement agencies – Kroll *concluded that at least five* of the groups to which Saar had previously donated money were "suspected by journalistic and law enforcement officials of involvement in supporting terroristic activity": IIIT; the American Muslim Council/Foundation ("AMC" or "AMF"); the Dar al Hijrah mosque in Falls Church, Virginia; the Muslim Arab Youth Association ("MAYA"); and the Islamic Society of North America ("ISNA"). Ex. 3 (Mirza Dep.) at 88:14-108:17; Ex. 12; Ex. 44.

RESPONSE: Objection: hearsay and relevance. The Defendants err in describing the Exhibits—the so-called "Kroll Reports," Ex. 12 &44, are not "reports" with respect to charitable giving but compilations of rumors. These documents constitute triple hearsay, otherwise inadmissible. As to the Defendants' claim that the "reports" *identified at least five* entities out of 30 [to which SAAR contributed money] that "published reports and [C]ongressional testimony indicates…are linked with militant organizations and figures," Ex. 44, it should be noted that the Congressional testimony cited by Kroll was that of Steve Emerson, a journalist, and Daniel Pipes. *Id*. Steve Emerson, on information and belief, first hired Rita Katz shortly after she arrived in the United States. Further, "[t]here is *a strong perception held by the interested media* that SAAR may be promoting certain radical Islamic causes in the United States." (emphasis added). Again, a member of the "interested media" and the source of the "strong perception" as

cited in the Kroll documents was Steve Emerson. Ex. 44. The so-called "Kroll Reports" are simply not relevant as to whether Mar-Jac can prove the Defendants defamed it.

101. After receiving the Kroll Reports in 1996, Saar's *then-President Mirza dismissed its findings as "all suspicions and perceptions" and "speculations and rumors."* He testified that he had "no independent way of knowing" whether any of these suspicions, perceptions, speculations, or rumors about the terrorist affiliations of Saar donees had merit and that he formed no belief one way or the other about their validity. Ex. 3 (Mirza Dep.) at 90:4-108:17.

RESPONSE: Objection. The Defendants incorrectly characterize Dr. Mirza's testimony and completely omit material facts bearing on the issue. After receiving the Kroll documents in 1996, Dr. Mirza *did not dismiss* the information in them. However, prior to receiving them Dr. Mirza and other Mar-Jac directors through their attorney, Rick Gross, sought to contact with then President Clinton's Deputy National Security Advisor, Sandy Berger (who attended the same temple as Mr. Gross) concerning media reports they were aware of even before Kroll re-iterated them. (Exh. A, Mirza Dec. ¶¶ 14-16.) Berger referred Mr. Gross to FBI Special Agent John O'Neill, Chief, Counterterrorism Section and the FBI's head of all U.S. based terrorism investigations. (*Id.* ¶ 16.) S/A O'Neill advised Mr. Gross that neither SAAR nor his clients (including Drs. Mirza and Barzinji) were of concern to the FBI and assured him that so long as they did not donate to organizations on the government's announced list of specially designated terrorist organizations, they would not be in jeopardy. (*Id.* ¶¶ 20.)

S/A O'Neill also referred Mr. Gross to David Williams, Assistant Special Agent in Charge, National Security Division, with whom he, Dr. Mirza, and Dr. al-Talib met in September 1996. (*Id.* ¶ 23; Exh. H [Declaration of Hisham al-Talib] ¶¶ 3-4.) At this meeting, Agent Williams informed the visitors that if a charity was not a Special Designated Terrorist

organization, then the contribution to the charity was "ok." (*Id.* ¶ 23; Exh. H [Declaration of Hisham al-Talib] ¶¶ 3-4.)

The meetings with the FBI in 1996 were contemporaneous and *after* receiving the Kroll documents. Dr. Mirza did not dismiss the Kroll documents' "findings." There were no "findings," just a compilation of rumors. Nonetheless, Dr. Mirza acted as described above.

102. Safa, American Muslim Agency, York Foundation, and Sterling Charitable Gift Fund – each of which received Mar-Jac money and had Mirza as an officer and/or trustee – continued to send donations after 1996 to at least three of the groups referenced in the Kroll Reports (IIIT, *AMC/AMF*, and ISNA). Mirza testified that he was not aware of any decision to cease making contributions to any of the five groups based upon the Kroll Reports' findings. Ex. 3 (Mirza Dep.) at 96:7-20, 99:8-11, 101:21-102:4, 106:3-15; *see supra* ¶ 19; *see infra* ¶¶ 105-107, 109-111, 116, 122, 180, 187, 207.

RESPONSE: The Exhibit cites do not show that *after 1996* any monies contributed by Safa, 501(3)(c), American Muslim Agency, York Foundation, 501(3)(c) and Sterling Charitable Gift Fund, 501(3)(c) were to AMC/AMF. In 2001, Safa did make a $25,000 loan to AMC which was personally guaranteed by its trustees and was specifically to pay expenses that it had incurred in connection with a conference. Dr. Barzinji personally attended the conference, as did FBI Director, Robert Mueller. (Exh. A, Mirza Decl. ¶ 28.)

104. Saar also received a $125,000 donation from Mar-Jac in 1997 *and a $250,000 donation in 2001* from the Mar-Jac-funded Sterling Charitable Fund (*see infra* at ¶ 121). Ex. 31 at Ex. G; *Ex. 16 at 52*.

RESPONSE: Objection. SAAR was dissolved in 2000. (Exh. A, Mirza Decl. ¶ 26; Ex. 16 at 52.) SAAR, as a matter of law, did not receive in 2001 a $250,000 donation from Sterling Charitable Fund.

105. Safa, as the majority owner of Mar-Jac's holding company since 1996 and a minority owner of Mar-Jac's holding company from *1990 to 1996*, received *at least $27 million* in dividends from Mar-Jac's business operations *during that period*. Ex. 31 at Ex. G.

RESPONSE: Objection: the Defendants misstate the Exhibit. Safa received dividends from Mar-Jac from *1990 to 2004* (not 1990 to 1996) of at least $27 million. Defendants misstate the period by eight years. Between the years 1990 and 1996, Safa received $10,075,000. Between the years 1997 and 2004, Safa received $22,087,000. Ex. 31 at Ex. G.

115. At all times relevant to this litigation, York Foundation was a charity located at 555 Grove Street in Herndon, Virginia, and its leadership included at least two members of Mar-Jac's board: Mirza *and Ashraf*. Ex. 56 at 1, 4; Ex. 57 at 1, 4; *see supra* ¶¶ 18-19, 27-28.

RESPONSE: Objection: the Defendants misstate the Exhibits. The "Ashraf" is not M. Omar Ashraf, a member of Mar-Jac's board. Compare address on Ex. 56, p. 2 for "Mohamed Ashraf" with address identified by M. Omar Ashraf in his deposition, Ex. 1, p. 15.

119. In 1987, IIIT received a $400,000 donation from Mar-Jac's holding company. Ex. 59, Ex. 60; Ex. 2 (Mirza Resp. to Written Dep. Ques..) at Nos. 236-239.

RESPONSE: In 1987, Mar-Jac made four separate donations of $100,000 to IIIT in 1987. Each of those donations was specifically designated for a particular project (*i.e.*, an educational program for West Africa, an English-language educational program in Africa, a documentary film, and an educational institute in the Far East). None of those projects was associated in any way with WISE or Mr. al-Arian. (Ex. 59, Ex. 60.)

**Assertions 124-133 are not relevant and otherwise hearsay.** The conduct of Alamoudi is not relevant to whether Mar-Jac laundered money by overstating "dead chickens."

123. Sterling Charitable Gift Fund, *which is managed according to Islamic legal principals ("Sharia"), utilized an imam named Mohammed al-Hanooti as a Sharia advisor*. Al-

Hanooti was an unindicted co-conspirator both in the federal terrorism financing prosecution of the Holy Land Foundation for Relief and Development and in the federal prosecution of Omar Abdel Rahman for the 1993 World Trade Center bombing. Ex. 1 (Ashraf Dep.) at 98:7-101:10; Exh. 63 at 6; Exh. 64 at 4.)

RESPONSE: Sterling Gift is a donor-advised charitable fund, meaning that it accepts donations from individuals and organizations and follows their recommendations regarding when and to whom to direct the money. In some instances, Sterling Gift will match the funds donated by the individual. Sterling Gift is not necessarily operated or managed according to Sharia law. At one time, the trustees of Sterling Gift compiled a list of potential advisors to whom they might look for suggestions or guidance in managing the fund, but they ultimately did not utilize those advisors much, if at all. None of these individuals were paid any compensation or exercised any control over Sterling Gift. In particular, Shaikh Mohamed Hanooti was no consulted for any assistance or advice regarding the operation of Sterling Gift. (Exh. A, Mirza Decl. ¶ 13.)

130. Alamoudi *was arrested in August 2003, with $340,000 in cash in his possession,* en route to Syria. Ex. 67.

RESPONSE: Objection: relevance and the cited Exhibit does not support the assertion. The $340,000 in cash was seized by UK Customs in London. Mr. Alamoudi was not arrested until he arrived at Dallas airport without the cash.

**Assertions 134-136 are not relevant to whether Mar-Jac engaged in money laundering.** Plaintiff objects.

134. The Dar al Hijrah mosque in Falls Church, Virginia, *received a $50,000 donation from Mar-Jac, via the Islamic Society of North America*, in 1989; Mar-Jac's business records reflect a notation that this donation was made "as per Al-Amoudi." Ex. 70.

RESPONSE: Objection: hearsay, relevance and Defendants misstate the Exhibits. Exhibit 70, a letter dated December, 4, 1989 to Mr. Mahmoud Mohamed, Vice President of Finance at "Mar-Jack" requests a $50,000 contribution to Dar al-Hijrah. The handwritten notations indicate that the money has already been paid to ISNA. The Exhibit does not indicate that ISNA paid any money to Dar al-Hijrah.

135. According to the Kroll Reports commissioned by Saar, Dar al Hijrah *was perceived to be a "Hamas-oriented mosque" that also maintained "strong ties to Saudi radical, Usama bin Ladin." Ex. 44.*

RESPONSE: Objection: double hearsay. Defendants misrepresent the "Kroll Reports." Within the Kroll material Dar al Hijrah is "described by Daniel Pipes as 'a Hamas-oriented mosque in Virginia.'" Clearly an opinion with no supporting facts. Mr. Pipes is identified as the then (1996) editor of the Middle East Quarterly. Ex. 44. Also, SAAR did not "commission" Kroll; it retained Kroll. Ex. 3 (Mirza Dep.) at 96:21-97:3; ¶49.

136. *Dar al Hijrah has provided a pulpit to two radical Islamic clerics*: Mohamed al-Hanooti, who was an imam at Dar al Hijrah from 1995 until 2000 (*see supra* ¶ 123), and *Anwar al-Awlaki, who was al-Hanooti's successor at the mosque from 2000 to 2002* and – according to the U.S. government, which has designated al-Awlaki as "a key leader for al-Qa'ida in the Arabian Peninsula," a Yemen-based terrorist group – "has involved himself in every aspect of the supply chain of terrorism – fundraising for terrorist groups, recruiting and training operatives, and planning and ordering attacks on innocents." *Al-Awlaki, an American citizen now living as a fugitive in Yemen, reportedly has ties to two of the September 11 hijackers who prayed at Dar al Hijrah; corresponded with Maj. Nidal Hasan, the Army psychiatrist accused of killing thirteen people in a shooting rampage at Fort Hood, Texas, in November 2009; met with Umar Farouk Abdulmutallab, the Nigerian man charged with trying to detonate explosives on a Detroit-bound*

*airliner on Christmas Day in 2009; and has been cited as an inspiration by Faisal Shahzad, the Pakistani-American man who admitted to planting a car bomb in Times Square in May 2010.* Ex. 71; Ex. 72.

RESPONSE: Objection – Hearsay and relevance. It is utterly beyond the pale that the Defendants assert that Maj. Nidal Hasan, Umar Farouk Abdulmutallab and Faisal Shahzad have relevance to whether Mar-Jac Poultry engaged in money laundering. Such attenuated "facts," about events in 2009-2010, cannot possibly have any relevance to this case. This material, even if relevant, should be excluded under Rule 403, F.R.E. as prejudicial in the extreme. Lastly, the Exhibits as provided do not support the assertion that Anwar al-Awlaki was al-Hanooti's successor and/or was provided a pulpit by Dar al Hijrah.

**Assertions 137-138 are not relevant.** Plaintiff objects.

137. ISNA received *$99,000* in donations from Mar-Jac between 1989 and 2004 and a $25,000 donation from Mar-Jac's holding company in 1987. Ex. 59; Ex. 70; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 304-306.

RESPONSE: Object: misstatement of the Exhibits. Mar-Jac made the following donations on the following dates totaling $91,500. $89,500 contributed prior to Decmber 1991.

$10,000 on 4/27/89
$5,000 on 11/2/89
$50,000 on 12/4/89
$2,500 on 5/30/90
$10,000 on 10/1/91
$12,000 on 11/18/91
$2,000 on 7/25/00

(Ex. 31 at Ex. G.) Further, these contributions were to support ISNA's efforts to build a gymnasium and restroom facilities, which Dr. Mirza personally visited. Today, ISNA remains one of the most prominent and active Muslim-American organizations. I understand from media reports that the president of ISNA was invited to the 2009 presidential inauguration and that

earlier this month ISNA representatives attended a meeting and dinner with the President at the White House, who sat at the same table as the president of ISNA. (Exh. A, Mirza Decl. ¶ 12.)

**Assertions 139-140 are not relevant to this case.** Plaintiff objects.

139. The North American Islamic Trust ("NAIT"), an organization that Mar-Jac director Al-Talib co-founded *in 1983*, received $150,000 *on April 23, 1990* in donations from Mar-Jac between 1989 and 2004. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 316-319; Ex. 5 (Al-Talib Dep.) at 230:7-232:8; Ex. 31 at Ex. G.

RESPONSE: The italicized dates were added for clarity and content and to show that NAIT has not received any money from Mar-Jac since 1990. In 1990, Mar-Jac contributed a total of $150,000 to NAIT, which is an organization organized and regulated by the Internal Revenue Service under 26 U.S.C. § 501(c)(3) that generally supports schools and educational and cultural centers and produces Islamic literature. This contribution was broken down into specific amounts, each of which was allocated to support a specific school or center. (Exh. A, Mirza Decl. ¶ 11.)

142. Bank secrecy laws on these islands have made it difficult for U.S. law enforcement agencies *to trace funds that pass through accounts there*. Ex. 16 at 53; *See* Ex. 74 at 118-119, 126-127, 132-133 (noting that banking laws on the Isle of Man and Channel Islands, as of 2000, did not "provide[ ] sufficiently rigorous checks on the identity of clients" and in some cases did not require the beneficial owners of entities to be disclosed); Ex. 75 at 8-9 (text of proposed Stop Tax Haven Abuse Act, which includes Jersey and the Isle of Man on proposed initial list of "offshore secrecy jurisdictions" based on fact that each had "been previously and publicly identified by the Internal Revenue Service as [a] secrecy jurisdiction[ ] in Federal court proceedings").

RESPONSE: Objection: the Defendants misstate the Exhibits. The banks on the Isle of Man and Channel Islands, as British Crown Dependencies, are subject to the Mutual Legal Assistant Treaty ("MLAT") between the United States of America and the United Kingdom which allows law enforcement of other nations to obtain bank account and other information from institutions in the other nation. As such, and as stated by Agent Kane in his Affidavit, "[d]ue to bank secrecy laws in such tax havens, it is very difficult for investigators *to have access to bank account information*." Ex. 16 at 53. (emphasis added). The difficulty for Agent Kane was that he had to use an MLAT request, rather than a federal grand jury subpoena, to get access to bank account information in the Isle of Man or Channel Islands. However, once the information was obtained through the MLAT, the monies could easily be traced. No Record cite by the Defendants supports any assertion that the "bank secrecy laws on these islands make it difficult for U.S. law enforcement agencies *to trace funds that pass through accounts there*." (emphasis added). Further, no money ever was transferred to the Isle of Man as there were no bank accounts on the Isle of Man. The Defendants have misrepresented the Exhibits.

144. Humana is, effectively, a successor entity to Saar, which transferred the majority of its funds to Humana because the leaders of Saar had determinate that, "for ease of operation we would like to relocate to [the] Isle of Man." Ex. 3 (Mirza Dep.) at 217:4-11.

RESPONSE: In 2000, SAAR was dissolved. SAAR's assets were transferred to Humana bank accounts, specifically to Human's domestic bank with BB&T and to another Humana account in Switzerland. No SAAR funds were transferred to any bank account in the Isle of Man. In fact, Humana did not even have a bank account in the Isle of Man. (Exh. A, Mirza Decl. ¶ 26.)

Various attorneys provided legal advice in connection with the manner in which SAAR was dissolved and the assets were transferred to Humana, including Bruce Hopkins, who wrote an opinion letter, and Jerry Carter in the Isle of Man. (*Id.* ¶ 27.)

147. *The effect of this transfer was that subsequent distributions of funds by Humana became difficult for the United States government to trace. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 387.*

RESPONSE: Objection: argumentative. Defendants make an argument. It is not a fact as explained in #142 above. Plaintiff objects to this purported "fact."

150. In 1999, Humana sent the al-Rajhis another $6-7 million as a contribution to a program that had purportedly provided $10 million in grants to various groups and causes chosen by a committee in the al-Rajhis' charity office in Saudi Arabia. Ex. 81; Ex. 3 (Mirza Dep.) at 234:14-245:3.

RESPONSE: Objection: relevance. After the Mar-Jac reorganization in late 1996 with SAAR no longer being a share-holder, activities of SAAR and Humana just are neither relevant nor material to Mar-Jac's claim.

151. Humana contributed a similar amount to the al-Rajhi's grant program in 2000. Ex. 3 (Mirza Dep.) at 240:3-19.

RESPONSE: Objection: relevance. After the Mar-Jac reorganization in late 1996 with SAAR no longer being a share-holder, activities of SAAR and Humana just are neither relevant nor material to Mar-Jac's claim.

152. *Humana did not have any safeguards in place to ensure that its contributions were not used for terrorism purposes. Ex. 3 (Mirza Dep.) at 224:1-231:15.*

RESPONSE: Objection: relevance. After the Mar-Jac reorganization in late 1996 with SAAR no longer being a share-holder, activities of SAAR and Humana just are neither relevant nor material to Mar-Jac's claim.

153. *Mirza testified that Humana "cannot assume" that none of its funds were disbursed to groups involved in terrorist activities. Ex. 3 (Mirza Dep.) at 245:12-247:23.*

RESPONSE: Objection: relevance. After the Mar-Jac reorganization in late 1996 with SAAR no longer being a share-holder, activities of SAAR and Humana just are neither relevant nor material to Mar-Jac's claim.

160. The effect of this transfer was that subsequent distributions of the funds by Amtrax became *difficult for the United States government to trace*. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 460.

RESPONSE: Objection: relevance and argumentative. As per answers to #142, 147, 152 and 153. No support in the Record as to any "transfer" making "difficult for the United States government to trace." Defendants misstate the Record.

169. *IIIT contributed at least $40,000 and perhaps more in 1991* to WISE, the Florida based organization operated by al-Arian. Ex. 4 (Barzinji Dep.) at 342:13-22; Ex. 3 (Mirza Dep.) at 127:25-128:12; Ex. 5 (Al-Talib Dep.) at 105:8-107:2.

RESPONSE : Objection. The Defendants misstate the testimonies of Drs. Barzinji, Mirza and al-Talib which do not collectively or separately establish that in fact IIIT contributed $140,000 to WISE in 1991. Furthermore, had such an event occurred Agent Kane would have so stated in his Affidavit which he did not. Ex. 16.

170. *Al-Arian was at that time,* (referring to the previous assertion circa 1991) *and at all relevant times thereafter, an agent of Palestinian Islamic Jihad ("PIJ"),* which has been

designated by the United States government as a terrorist organization since 1995. Ex. 95 at 10-14.

RESPONSE: Object: relevance. The Defendants misstate the Exhibits. In 2003, Mr. al-Arian was charged with certain crimes alleging material support for terrorism, charges of which he was acquitted. Nonetheless, in 2006, Mr. al-Arian pled guilty to one count of providing immigration-related services (but not monetary support) to Palestinian Islamic Jihad beginning in 1995, which organization had been designated an SDTO. Mr. al-Arian has never admitted to being a general agent of PIJ at any time, and he only admitted to performing certain immigration-related services for PIJ "*in 1995* and thereafter." (Doc. 194-3, Eastburg Decl., Exh. 95 at 11 (emphasis added).)

172. IIIT also donated at least $10,000 in 2001 *to another organization founded by al-Arian*, the Tampa Bay Coalition for Justice and Peace. Ex. 4 (Barzinji Dep.) at 219:16-222:4; Ex. 5 (Al-Talib Dep.) at 105:8-107:2.

RESPONSE: Objection. Defendants misstate the Exhibits which do not show that al-Arian "founded" the Tampa Bay Coalition for Justice and Peace.

Further, this donation by IIIT was specifically designated to help pay for a poll that was conducted of Florida voters to show the significant (and election-turning) impact that Muslim-American votes had had on former President George W. Bush's victory in Florida in the 2000 presidential election. (Doc. 194-3, Eastburg Decl., Exh. 4 [Barzinji Dep.] at 219:21-220:15.)

174. Mar-Jac beneficial owner and done Saar provided direct financial support to al-Arian, in the form of a $41,000 loan in 1984 and through grants of $10,000 and $5,000 in 1994. Ex. 97 at MJ0002201; Ex. 3 (Mirza Dep.) at 128:13-129:1; Ex. 2 (Mirza Rep. to Written Dep. Ques.) at No. 253; Ex. 98; Ex. 16 at 39.

RESPONSE: In the 1980s, SAAR had a program to provide loans to individuals to be used for housing where people may or may not qualify for a traditional mortgage. SAAR charged interest of 10-12 percent on these loans. More than ten individuals received loans through these programs, including Sami al-Arian. The loan to Mr. al-Arian was for approximately $41,000. The loan was repaid. (Exh. A, Mirza Decl. ¶ 9.)

Further, no grants were made by SAAR to Mr. al-Arian individually. Its contributions were to WISE. Ex. 98.

178. *WISE and al-Arian have also been associated with the terrorist organization Hamas.* Ex. 3 (Mirza Dep.) at 105:2-106:2.

RESPONSE: Objection. Defendants again misstate the Exhibits. Dr. Mirza *did not* testify that *WISE and al-Arian* were *associated with the terrorist organization Hamas*. Ex. 3 (Mirza Dep.) at 105:2-106:2. The assertion is unsupported by the Exhibits.

179. Since at least 1996, the leader of Saar, including its then-President Mirza – who is also an officer, director, or trustee of Mar-Jac, Safa, African Muslim Agency, York Foundation, York International Trust, Sterling Charitable Gift Fund, and Humana's corporate trustee – were aware, based on the Kroll Reports they had commissioned, *of perceptions that IIIT was "closely aligned with figures surrounding [Palestinian] Islamic Jihad [and] Hamas" and was "the principal source of money for WISE," and that WISE and al-Arian were "known or suspected of active involvement with radical and even terrorist groups."* *See supra* ¶¶ 18-19; Ex. 12; Ex. 3 (Mirza Dep.) at 88:14-109:1.

RESPONSE: Objection. The Defendants incorrectly characterize the material cited and completely omit material facts bearing on the issue. *See* response to ¶ 101, incorporated herein.

180. *Despite this knowledge*, four organizations in which Mirza held leadership positions and which collectively received millions of dollars of donations and dividends from

Mar-Jac after 1996 – Safa, African Muslim Agency, York Foundation, and Sterling Charitable Gift Fund – subsequently contributed approximately $8 million to IIIT. *Mirza considered the findings of the Kroll Reports to be no more than "speculation and rumors" and did not believe the reports necessitated any change in or discontinuation of the donation practices of the entities with which he was affiliated. See supra* ¶¶ 18-19, 105-113, 115-116, 121-122, 161-165; Ex. 3 (Mirza Dep.) at 96:7-20, 99:8-11, 101:21-102:4, 106:3-15.

RESPONSE: Objection. The Defendants incorrectly characterize the Record and completely omit material facts bearing on the issue. *See* Response to ¶ 101, *supra*.

181. The $10 million al-Rajhi grant program that Humana contributed to in 1999 *included donations of more than $175,000 to Al-Haramyen Establishment Indonesia*, which since 2004 has been a U.S.-designated terror group based on its ties to al-Qaeda. *See supra* ¶¶ 150-153; Ex. 81; Ex. 100; Ex. 3 (Mirza Dep.) at 234:14-245:3.

RESPONSE: Objection: relevance. Also the Defendants misstate the Record. Only $17,333 was contributed, not $175,000. Ex. 81 at YM-016299.

182. *According to the U.S. Treasury Department, a senior al-Qaeda operative identified Al-Haramyen in Indonesia as "one of the primary sources of funding for al-Qaeda network activities" in Southeast Asia, and other evidence suggests that "money purportedly donated by [Al-Haramyen] for humanitarian purposes…was possibly diverted for weapons procurement with the full knowledge of [Al-Haramyen] in Indonesia."* Ex. 101.

RESPONSE: Objection: relevance.

185. Mar-Jac beneficial owner and donee Safa donated $10,000 to AMF in 2000, and *in 2001 Safa loaned $25,000 to AMC, a loan that was personally guaranteed, in part, by Alamoudi*. Ex. 8 at 18; Ex. 103; Ex. 104.

RESPONSE: Objection – hearsay, relevance. The Defendants misstate the Exhibits. While Exhibits 103 and 104 indicate that AMC requested a $25,000 loan from Safa to be personally guaranteed by five members of its board, $5,000 each, the Record does not reflect that in fact, the loan was made.

186. The 1996 Kroll Reports commissioned by Saar stated that "published reports and congressional testimony indicate[d] that [AMC and AMF were] linked with militant organizations and figures," *based upon Alamoudi's ties to Hamas leader Mousa Abu Marzook.* Ex. 44.

RESPONSE: Objection: the Defendants have misstated the Exhibits. The Kroll documents in recounting the rumors as to the American Muslim Council/Federation and Alamoudi's alleged ties to Hamas leader Mousa Abu Marzook specifically stated; "[t]he connection to Hamas is tenuous." "The organization was founded by Abdulrahman Alamoudi," [ ] "Alamoudi is described by Steve Emerson in Congressional testimony earlier this year as the chief spokesperson for Marzook." "Emerson describes Marzook as a Hamas chieftain." Thus, the source of this rumor was Steve Emerson. Ex. 44 at YM-023730. Also, SAAR did not "commission" Kroll; it retained Kroll. Ex. 3 (Mirza Dep.) at 96:21-97:3; ¶49.

187. *Despite Mirza's knowledge in 1996 of suspicions regarding AMC's and AMF's aid for terrorist supporters*, Mar-Jac beneficial owner Safa – for which Mirza served as vice president – continued to provide financial support to both organizations after 1996. *Mirza considered the findings of the Kroll Reports to be no more than "speculation and rumors" and did not believe the reports necessitated any change in or discontinuation of the donation practices of the entities with which he was affiliated. See supra* ¶¶ 18-19, 105-107, 180, 185; Ex. 3 (Mirza Dep.) at 101:21-103:20.

RESPONSE: Objection. The Defendants incorrectly characterize the Exhibits and completely omit material facts bearing on the issue. *See* Response to ¶ 101, *supra*.

189. Saar also loaned $90,000 to Dar al Hijrah's former imam, Mohamed al-Hanooti prior to his 1995 arrival at Dar al Hijrah. *See supra* ¶¶ 123, 136; Ex. 3 (Mirza Dep.) at 133:20-134:16.

RESPONSE: In the 1980s, SAAR had a program to provide loans to individuals to be used for housing where people may or may not qualify for a traditional mortgage. SAAR charged interest of 10-12 percent on these loans. More than ten individuals received loans through these programs, including Mohammed Hanooti. The loan to Hanooti was for approximately $90,000. It was repaid. (Exh. A, Mirza Decl. ¶ 9.)

192. *In 1989, Mirza*, Barzinji, and Al-Talib were on the Saar board. *See supra* ¶¶ 19, 23, 26.

RESPONSE: Objection: Defendants misstate the Record. Dr. Mirza was not on the SAAR board in 1989. Defendants cite to ¶ 19 which was written in the disjunctive. Dr. Mirza in 1989 was an officer of SAAR, not a board member. The Record does not support the Defendants' claim.

195. In 1997, Mar-Jac beneficial owner Safa donated more than $200,000, and perhaps as much as $325,000, to HLF. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 624-627; Ex. 3 (Mirza Dep.) at 249:21-251:7; Ex. 16 at 40.

RESPONSE: Objection. The Defendants omit that the monies were contributed for the construction of a library. (*See* Doc. 194-3, Eastburg Decl., Exh. 3 [Mirza Dep.] at 249:21-250:9, 250:19-24.)

201. *In 2007, the IARA-USA and five of its leaders were indicted by a federal grand jury on charges of money laundering and illegally transferring funds to Iraq in violation of U.S.*

*trade sanctions. Since then, a number of the indicted individuals have pleaded guilty. Ex. 111; USA v. Islamic American Relief Agency, 4:07-cr-00087-NKL (W.D. Mo.).*

RESPONSE: Objection – relevance.

206. *The 1996 Kroll Reports commissioned by Saar stated that ISNA had been "suspected…of involvement in supporting terroristic activity" and had "organized conferences to which 'extreme radicals' such as Osama bin Laden…have been invited of have attended." Ex. 12.*

RESPONSE: Objection: relevance. Defendants omit relevant and clarifying data from their assertion. Also, SAAR did not "commission" Kroll; it retained Kroll. Ex. 3 (Mirza Dep.) at 96:21-97:3; ¶49. An accurate quote from Ex. 12 is "suspected by journalistic and law enforcement officials of involvement in supporting terroristic activity are ISNA, Muslim Arab Youth Association, and Dar al Hijrah Mosque." "In Congressional testimony earlier this year, journalists pointed to both ISNA and MAYA as having organized conferences to which 'extreme-radicals' such as Osama bin Laden and Hasen Turbi have been invited or have attended." Ex. 12 at YM-015779.

207. *Despite Mirza's knowledge in 1996 of suspicions regarding ISNA's aid for terrorist supporters*, two organizations in which he held leadership positions and which received donations from Mar-Jac – York Foundation and Sterling Charitable Gift Fund – subsequently contributed thousands of dollars to ISNA. *Mirza considered the findings of the Kroll Reports to be no more than "speculation and rumors" and did not believe the reports necessitated any change in or discontinuation of donation practices of the entities with which he was affiliated. See supra* ¶¶ 18-19, 115-116, 121-122, 180, 203-204.

RESPONSE: Objection: relevance. The Defendants incorrectly characterize the Record and completely omit material facts bearing on the issue. *See* Response to ¶ 101, *supra*. The

Kroll documents actually represent the information reflected therein was "speculation and rumors."

210. *The 1996 Kroll Reports commissioned by Saar* identified MAYA as an "organization [that] is perceived to be led by radical Islamics with strong links to militant organizations, from Islamic Jihad to Hamas" and reported that its conferences are viewed by American counterterrorism experts as a forum for extremist figures in the Muslim community. Ex. 44 at YM-023732.

RESPONSE: Objection: Defendants misstate the Exhibits. SAAR did not "commission" Kroll; it retained Kroll. Ex. 3 (Mirza Dep.) at 96:21-97:3; ¶49.

211. Mar-Jac beneficiary the York International Trust transferred more than $50,000 to Nada International in 1998. Ex. 49 at YM11744-46; Ex. 3 (Mirza Dep.) at 153:1-154:18.

RESPONSE: In October 1998, York International Trust transferred $50,040 to an entity by the name of Nada International. This transfer was made on behalf of Mena Estates, a Virginia for-profit corporation. Accordingly, the funds which were transferred to Nada International were charged to Mena Estates' account. (Exh. A, Mirza Decl. ¶ 25.)

227. *The district court denied Mar-Jac's motion for return of its property and expressly rejected Mar-Jac's request that it "issue an order stating the government had insufficient evidence of ties between Mar-Jac Poultry, Inc. and any terrorist organizations to justify a search warrant."* Ex. 118 at 9.

RESPONSE: Objection. The Defendants misstate the Courts findings, noted on page 2 of Judge O'Kelley's order, "[t]he court held a hearing on April 23, 2004, at which point Plaintiff conceded that all original documents the government seized on March 20 have been returned." [ ] "Accordingly, the only issue remaining in [the] matter [was] whether Plaintiff [was] entitled to the return of whatever copies were made of that evidence." The Court stated "[t]he reason why

the Plaintiff failed to carry his burden in *In re Brown, and the reason why Mar-Jac Poultry* is not entitled to relief in this case, is because there has been no showing of irreparable harm related to the government's continued possession of copies of the documents." *Id*. at 9. That was the Court's finding.

231. The Court rejected both arguments and noted that Mar-Jac's claim that Agent Kane's alleged deliberate misrepresentation of the details of certain purportedly domestic financial transactions, even if true, *would not have been sufficient to alter the probable cause determination* because "there would still be the evidence of transfers to the Channel Islands, which would have been sufficient to establish the existence of an international transfer," and thus support the finding of probable cause for issuance of the warrant. Ex. 121 at 16 n.6.

RESPONSE: Objection: relevance. The Defendants misstate the facts. The phrase "would not have been sufficient to alter the probable cause determination" is argumentative; not fact. Plaintiff objects. The Court in footnote 6 made no such ruling ("Even if the information regarding the Isle of Man was set aside, there would still be the evidence of transfers to the Channel Islands, *which would be sufficient to establish the existence of an international transfer*." (emphasis added). Ex. 121 at 9, fn 6. The Court made no ruling regarding probable cause.

232. In 2004, Iqbal Unus – an employee of IIIT whose Herndon, Virginia, home was among those searched pursuant to the warrants issued on March 13, 2002 – filed suit in the United States District Court for the Eastern District of Virginia (*represented by Mar-Jac's lead counsel*) against Katz, Agent Kane, and eleven other federal agents, alleging various constitutional and common law torts arising from the execution of the search warrant at the Unus home. *Unus*, 565 F.3d at 107, 109-112.

RESPONSE: Objection. Mar-Jac's lead counsel did not represent Dr. Unus.

236. The district court's rulings with respect to the dismissal of claims against Agent Kane and Katz were affirmed by the United States Court of Appeals for the Fourth Circuit, *which agree[d] that the Affidavit established probable cause."* *Unus*, 565 F.3d at 125-26.

RESPONSE: Objection: relevance. The Defendants mis-represent the Fourth Circuit's "findings." Nowhere in the Court's opinion does the Court "agree that the Affidavit established probable cause." *Unus v. Kane*, 565 F.3d 103 (4th Cir, 2009).

**<u>Plaintiff's Additional Undisputed Material Facts</u>**

251. Mar-Jac, at all relevant times to this litigation, did not engage in money laundering. Dec. Martin at 1; Dec. Carnes at 1; Dec. Mohamed at 1; Dec. Ashraf at 1; Dec. Barzinji at 1; Dec. al-Talib at 1; Dec. Mirza at 1.

KATZ

252. Katz has held various jobs since moving to the United States, including gift shop sales ("Terrorist Hunter," p. 68) and an administrative position at a "Middle East Research Institute" ("Terrorist Hunter," p. 77). These are not government positions.

253. In 2002, Katz started a private consulting company named the SITE Institute.

254. Katz describes herself as a "Terrorist Hunter" and her book features that title, as did the CBS Broadcast. Ex. 21 (Broadcast Tr.) at 14.

255. Katz published her first and only book, "Terrorist Hunter," anonymously.

256. Katz has never worked as a government employee or official.

THE BROADCAST

257. The Broadcast begins with Simon speaking in front of a graphic image with the title "Terrorist Hunter" emblazoned across the top. Next to the title was a photograph of a woman in a burka with only eyeholes, thus unidentifiable, but obviously intended to depict the

subject of the *60 Minutes* broadcast, "Sarah," in reality Katz. Ex. 21 (Broadcast Tr.) at 14 (*i.e.*, this image was displayed during the portion of the Broadcast transcribed on page 14).

258. Simon describes Katz as "a tipster" who "just wrote a book." Broadcast Trans. at 14.

259. Simon introduces the subject of the *60 Minutes* broadcast, also entitled "Terrorist Hunter," by stating that "[i]t [*i.e.*, the book "Terrorist Hunter"] details how groups in America have been providing significant support to terrorist outfits and how she helped track them down." Ex. 21 (Broadcast Tr.) at 14.

260. Simon later refers to Katz as "quite simply a terrorist hunter." Ex. 21 (Broadcast Tr.) at 16.

261. The total time of the segment is approximately 13:09. Of that time, approximately 12:14 is dedicated to Simon talking to and about Katz concerning her book, her life history, and various events in her career. Of that footage, 6:45 constitutes direct shots of Katz on screen or her voice over other images. Only 19 seconds are devoted to the government investigation involving Mar-Jac and others.

262. Katz's book is not a government report.

263. At her request, CBS did not reveal Katz's identity during the Broadcast, disguising her with a wig, eye glasses, and a fake nose, or completely hidden in a burka. Throughout the Broadcast Simon referred to Katz as "Sarah."

264. During the Broadcast Simon does not interview, quote or otherwise refer to any government sources.

265. During the Broadcast Simon does not interview, quote, or otherwise refer to any representatives of Mar-Jac.

266. The sole discussion Simon has with someone other than Katz is with a young man, Suhaib Jamal, who has no relationship to Mar-Jac or its business affiliates.

267. CBS did not attempt to obtain any information, comment or response from Mar-Jac prior to the Broadcast.

268. During an interview at her office, Katz displayed a chart created by her or her colleagues at SITE. The chart describes a flow of money from "Saudi Businessmen" to, among others, "Mar-Jac Poultry," and then either directly or indirectly to al-Qaeda (as represented by a photograph of Osama Bin Laden), Hamas, and Palestinian Jihad.

269. While the chart was displayed on screen, the CBS camera zoomed in on and prominently displayed "Mar-Jac Poultry" in a box of a graphic depiction of a money flow to terrorists. Simon stated that, "[Katz] mapped out how, she says, the money flowed from Saudi Arabia to a web of charities, think tanks and business at 555 Grove, then to offshore banks and ultimately, she says, to terrorist groups." Ex. 21 (Broadcast Tr.) at 18.

270. The Broadcast includes images obtained by CBS of Plaintiff's trucks and plant sign, each bearing Mar-Jac's name, which identified it to the viewing audience as the "chicken farm" earlier referenced by Simon. Ex. 21 (Broadcast Tr.) at 18.

271. Katz does not utter the name Mar-Jac in the broadcast, although she speaks of the "chicken farm" referenced by Simon and "dead chickens" as the basis for "money laundering." CBS added the specific identification of Mar-Jac by displaying Katz's chart, which referenced Mar-Jac, and the footage it broadcast showing the processing plant, with Mar-Jac's name clearly visible on a sign.

272. The Broadcast does not contain a single reference to any government reports, affidavits, or other court documents or court proceedings.

273. The Broadcast does not identify or speak of a single government official associated with any action of the United States Government for which Katz claimed credit.

274. The records of the government investigation referred to in the program, including the Kane Affidavit, were under seal and not available to the public, including CBS, at the time of the Broadcast was produced and aired.

Dated: August 31, 2010

Respectfully submitted,

**MALOY JENKINS PARKER**

By: **/s/ Wilmer Parker**
Wilmer Parker (Admitted Pro Hac Vice)
Twenty-fifth Floor
75 Fourteenth Street
Atlanta, Georgia 30309
Tel: (404) 875-2700
Fax: (404) 875-8757

and

**LUQUE MARINO LLP**

By: **/s/ Nancy Luque**
Nancy Luque (D.C. Bar No. 419757)
Dan Marino
Tillman Finley
910 17th Street, N.W., Suite 800
Washington, D.C. 20006
Tel: (202) 223-8888
Fax: (202) 223-8677

and

**CARTER LEDYARD & MILBURN LLP**

By: **/s/ John J. Walsh**
John J. Walsh (Admitted Pro Hac Vice)
2 Wall Street
New York, New York 10005
Tel: (212) 732-3200
Fax: (212) 732-3232