# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MAR-JAC POULTRY, INC., <br> Plaintiff, <br> vs. <br> RITA KATZ, et al., <br> Defendants. | Case No. 03-2422 (RMC) |

**DECLARATION OF Dr. M. YAQUB MIRZA**

I, Dr. M. Yaqub Mirza, am a member of the Board of Directors of Mar-Jac Poultry, Inc. ("Mar-Jac"). I have 26 years experience in the poultry business, all with Mar-Jac. I submit this Declaration in support of Mar-Jac's Opposition to Defendants' Motion for Summary Judgment. The facts stated herein apply to the the entire time period during which I have been associated with Mar-Jac.

1. Throughout all of my years of service with Mar-Jac, in all discussions with the board of directors and management, there has never been any discussion of donating money to any person who promoted or supported terrorism or to any entity the purpose of which was to promote or support terrorism. Mar-Jac did not conduct any financial transaction the purpose of which was to support or promote terrorism. Mar-Jac did not provide material support to a terrorist or terrorist organization. Mar-Jac also did not conduct any financial transaction, or engage in any conduct, with any entity then listed by the Department of Treasury, Office of Foreign Assets Control, as a Specially Designated Terrorist Organization.

2. Throughout all of my years of service with Mar-Jac, in all discussions with the board of directors and management, there has never been any discussion of laundering money

from or to any person or entity for any purpose whatsoever. Mar-Jac did not launder money for any purpose.

3. I personally have never knowingly donated money to any person who promoted or supported terrorism or to any entity the purpose of which was to promote or support terrorism. I have never knowingly conducted or participated in any financial transaction the purpose of which was to support or promote terrorism. I have not knowingly provided material support to a terrorist or terrorist organization. I also did not conduct any financial transaction, or engage in any conduct, with any entity then listed by the Department of Treasury, Office of Foreign Assets Control, as a Specially Designated Terrorist Organization.

4. I have never knowingly laundered money or participated in any transaction the purpose of which was to launder money from or to any person or entity for any purpose whatsoever.

5. Since 1984, I have been—in various capacities such as officer, director, trustee, and managing agent—associated with the SAAR Foundation ("SAAR"), Safa Trust ("Safa"), African Muslim Agency, Humana Charitable Trust ("Humana"), and Sterling Charitable Gift Fund ("Sterling Gift") in addition to my association with Mar-Jac. At no time did I or any other person participate in causing any financial transactions by any of those entities to be conducted with any person or entity the purpose of which was to support or promote terrorism. At no time did any entity conduct a financial transaction with a then Specially Designated Terrorist Organization or any person then listed as a Specially Designated Terrorist.

6. In July 1984, SAAR, an organization organized and regulated by the Internal Revenue Service under 26 U.S.C. § 501(c)(3), acquired a group of poultry businesses located in Georgia. Following a series of reorganization and restructurings in the 1980s, these entities were consolidated into one operation under a holding company named Mar-Jac, Inc., which was

wholly owned by SAAR. In connection with this acquisition, SAAR was assisted and advised by an attorney, Jim Roach.

7. In 1990, SAAR sold 40% of Mar-Jac, Inc. to Aradi Inc., gifted 5% of Mar-Jac, Inc. to Safa Trust ("Safa") and sold 4% of Mar-Jac, Inc. to Mena Corporation. The attorneys involved in these transactions were Rick Gross and Sandra Spalleta.

8. In late 1996, SAAR's entire interest in Mar-Jac, Inc. was sold resulting in a reorganization with Mar-Jac Holdings, Inc. owning 100% of Mar-Jac Poultry, Inc. Mar-Jac Holdings, Inc. in turn was owned 65% by Safa and 35% by Mena Investments, Inc. Financing for the Mar-Jac reorganization was provided by Bank of America, formerly Nations Bank, which loaned Mar-Jac approximately $12 million. The Atlanta law firm of Kilpatrick & Cody (now Kilpatrick Stockton) structured these transactions.

9. In the 1980s, SAAR had a program to provide loans to individuals to be used for housing where people may or may not qualify for a traditional mortgage. I recall that SAAR charged interest of 10-12 percent on these loans. More than ten individuals received loans through these programs, including Sami al-Arian and Mohammed Hanooti. The loan to Mr. al-Arian was for approximately $41,000 and the loan to Hamooti was for approximately $90,000. To the best of my recollection, these loans were repaid.

10. All of the entities and organizations with which I have been involved have had a practice of regularly donating funds and other property to charitable and non-profit organizations. Dating back to the early 1980s, I and all of the organizations with which I have been associated have been advised on various occasions by various attorneys, including Bruce Hopkins, that if an organization is identified by the Internal Revenue Service as being an approved § 501(c)(3) organization (the IRS formerly maintained a two-volume book that could be consulted and the list is now provided on its website), then we may presume that the

organization is so-recognized and that it is subject to the IRS's monitoring and regulation and that we may donate to the organization without fear of prosecution or illegality.

11. In 1990, Mar-Jac contributed a total of $150,000 to the North American Islamic Trust ("NAIT"), which is an organization organized and regulated by the Internal Revenue Service under 26 U.S.C. § 501(c)(3) that generally supports schools and educational and cultural centers and produces Islamic literature. I recall that this contribution was broken down into specific amounts, each of which was allocated to support a specific school or center.

12. In 1990 and 1991, Mar-Jac made a series of contributions to the Islamic Society of North America ("ISNA") to support ISNA's efforts to build a gymnasium and restroom facilities. I have myself personally visited the gymnasium that was constructed using these funds. Today, ISNA remains one of the most prominent and active Muslim-American organizations. I understand from media reports that the president of ISNA was invited to the 2009 presidential inauguration and that earlier this month ISNA representatives attended a meeting and dinner with the President at the White House, who sat at the same table as the president of ISNA.

13. Sterling Gift is a donor-advised charitable fund, meaning that it accepts donations from individuals and organizations and follows their recommendations regarding when and to whom to direct the money. In some instances, Sterling Gift will match the funds donated by the individual. Sterling Gift is not necessarily operated or managed according to Sharia law. At one time, myself and the other trustees of Sterling Gift compiled a list of potential advisors to whom we might look for suggestions or guidance in managing the fund, but we ultimately did not utilize those advisors much, if at all. None of these individuals were paid any compensation or exercised any control over Sterling Gift. In particular, I do not recall that we asked Shaikh Mohamed Hanooti for any assistance or advice regarding the operation of Sterling Gift.

14. In or about June 1996, Rick Gross, counsel for SAAR, wrote to Sandy Berger then Deputy National Security Advisor, regarding SAAR's concerns, based on media reports, that donations by domestic Islamic charities potentially were being "re-routed" to terrorist organizations.

15. It was SAAR's intent and desire to seek advice about how to avoid making any donations that might, unbeknownst to us, end up with a terrorist organization.

16. Mr. Berger directed Mr. Gross and us to contact Special Agent John O'Neill, who in 1996 was Chief of the Counterterrorism Section of the FBI.

17. On or about August 1996, Mr. Gross again on behalf of SAAR and in response to Mr. Berger's direction, wrote to Special Agent O'Neill to follow-up on SAAR's concerns.

18. Later that month, Mr. Gross met with Special Agent O'Neill and several other government agents. Mr. Gross discussed SAAR's concerns as well as the concerns of others of his clients, including myself and Dr. Jamal Barzinji, that SAAR either may have inadvertently contributed to organizations associated with terrorism, or were thought to have done so by law enforcement.

19. Mr. Gross reported this meeting to Dr. Barzinji, Dr. Hisham al-Talib, and myself and told me that Special Agent O'Neill had stated that neither SAAR nor any of us were believed by the government to have supported terrorism or participated in terrorism financing, and that we *were not of concern to the FBI.*

20. Mr. Gross also reported that Special Agent O'Neill and the other federal agents present at the meeting had advised him and us not to donate to any of the organizations on the government's "list of specially designated terrorist organizations" announced in 1995, and that if we did so we would not be in any jeopardy.

21. Following the meeting, Mr. Gross received a facsimile from Special Agent O'Neill sending a copy of the Department of Treasury's "List of Specially Designated Terrorists Who Threaten to Disrupt the Middle East Peace Process."

22. Contemporaneously with contacting the FBI in August 1996, Mr. Gross also contacted Kroll and Associates ("Kroll") to determine the cost of Kroll's conducting "due diligence" on SAAR.

23. In September 1996, Mr. Gross, Dr. al-Talib and I met Special Agent David Williams, Assistant Special Agent-In-Charge, National Security Division, FBI. We offered our full cooperation in any investigation by the FBI. Special Agent Williams reiterated that neither SAAR nor any of us was under investigation and said, among other things, that we would be "OK" as long as we did not contribute to any entity or person on the designated terrorist list.

24. On or about September 10, Mr. Gross received the Kroll proposal and on or about September 12, 1996, the Kroll engagement letter was authorized.

25. In October 1998, York International Trust, of which I was one of the trustees, transferred $50,040 to an entity by the name of Nada International. My recollection is that this transfer was made on behalf of Mena Estates, a Virginia for-profit corporation. Accordingly, the funds which were transferred to Nada International were charged to Mena Estates' account.

26. In 2000, SAAR was dissolved. SAAR's assets were transferred to Humana bank accounts, specifically to Human's domestic bank with BB&T and to another Humana account in Switzerland. No SAAR funds were transferred to any bank account in the Isle of Man. In fact, Humana did not even have a bank account in the Isle of Man.

27. In connection with the dissolution of SAAR, we were advised by various attorneys including Bruce Hopkins, who wrote an opinion letter, and Jerry Carter in the Isle of Man.

28. In 2001, the American Muslim Council requested and received a $25,000 loan from Safa. I recall that AMC needed the loan to help it to pay expenses that it had incurred in connection with a conference it had held recently. We were familiar with the conference, as it had been attended by Dr. Barzinji and the FBI Director, Robert Mueller, had spoken at the event. Safa required that the loan be personally guaranteed by each of AMC's trustees.

I have personal knowledge of the facts recited herein and declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Dr. M. Yaqub Mirza

Dated: