IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAR-JAC POULTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03-CV-2422 (RMC) |
| | ) | |
| RITA KATZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' JOINT
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Lee Levine (D.C. Bar No. 343095)
Gayle C. Sproul (D.C. Bar No. 495965)
Thomas Curley (D.C. Bar No. 473798)
John B. O'Keefe (D.C. Bar No. 974892)
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
1050 Seventeenth Street, NW, Suite 800
Washington, D.C. 20036-5514
(202) 508-1100
(202) 861-9888 fax

*Attorneys for Defendant
CBS Broadcasting Inc.*


Laura R. Handman (D.C. Bar No. 444386)
Robert Scott (D.C. Bar No. 419559)
John Rory Eastburg (D.C. Bar No. 984434)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, D.C. 20006-3402
(202) 973-4200
(202) 973-4499 fax

*Attorneys for Defendants Rita Katz, the
SITE Institute, and IG, LLC*

Dated:  September 17, 2010

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 6

I.      MAR-JAC'S RECITATION OF FACTS CANNOT BE CREDITED. ............................ 6

II.     MAR-JAC HAS NOT CARRIED IS BURDEN OF ESTABLISHING
        THE MATERIAL FALSITY OF THE ONLY DEFAMATORY
        MEANING THAT REASONABLY COULD BE ATTRIBUTED TO
        KATZ'S STATEMENTS. ............................................................................... 11

III.    MAR-JAC'S PROFFERED ALTERANTIVE DEFAMTORY MEANING
        – THAT IT *KNOWINGLY* FUNDED TERRORISTS IN VIOLATION OF
        FEDERAL LAW – IS NOT ACTIONABLE AS A MATTER OF LAW. ..................... 23

        A.      To the Extent Mar-Jac Relies on Katz's Statements about Others to
                Ground its Proffered Alternative Meaning, It Is Neither "Of and
                Concerning" Mar-Jac Nor Reasonably Capable of that Defamatory
                Meaning with Respect to Mar-Jac. .......................................................... 24

        B.      To the Extent Mar-Jac Now Relies on the "Lost … Chickens"
                Exchange to Grounds Its Proffered Alternative Meaning, That
                Meaning Is Not Actionable Because, Construed in Context, the
                Exchange Constitutes Conjecture and Speculation and Does Not
                Give Rise to the Alleged Implication as a Matter of Law. .................... 26

IV.     MAR-JAC IS NOT ENTITLED TO "PARTIAL SUMMARY JUDGMENT." ............... 33

        A.      Rule 56 Does Not Permit Entry of "Judgment" Against Defendants
                on the Issues of Falsity, Defamatory Meaning, or "Of and
                Concerning." ........................................................................................... 34

        B.      The "Subsidiary Meaning" Doctrine Precludes Mar-Jac from
                Maintaining a Defamation Claim Based on Allegedly False Facts
                That Lead to a Defamatory Meaning That Is Otherwise
                Substantially True. ................................................................................... 35

        C.      Even if the Subsidiary Meaning Were Independently Actionable,
                Summary Judgment Should Be Denied Under Rule 56(f) ...................... 38

V.      MAR-JAC'S TAG-ALONG CLAIMS MUST FAIL IF ITS
        DEFAMATION CLAIMS FAIL. ....................................................................... 42

CONCLUSION ...................................................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*Abadian v. Lee*, 117 F. Supp. 2d 481 (D. Md. 2000) ...................................................................43

*Adventure Outdoors, Inc. v. Bloomberg*, 519 F. Supp. 2d 1258 (N.D. Ga. 2007) ........................29

*Adventure Outdoors, Inc. v. Bloomberg*, 552 F.3d 1290 (11th Cir. 2008) ...................................29

*Anderson v. Dunbar Armored, Inc.*, 678 F. Supp. 2d 1280 (N.D. Ga. 2009) ...............................44

*Aviation Charter, Inc. v. Aviation Research Group/US*, 416 F.3d 864 (8th Cir. 2005) ...............30

*Beard v. District of Columbia Housing Authority*, 584 F. Supp. 2d 139 (D.D.C. 2008)...............34

*Biggins v. Oltmer Iron Works*, 154 F.2d 214 (7th Cir. 1946) ........................................................34

*Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir. 1998) ...................................................30

*Brennan v. Kadner*, 814 N.E.2d 951 (Ill. Ct. App. 2004) .............................................................31

*Brown v.  Baker*, 398 S.E.2d 797 (Ga. App. 1990)................................................................. 44-45

*Brown v. Hearst Corp.*, 862 F. Supp. 622 (D. Mass. 1994).........................................................31

*Byrne v. Nezhat*, 261 F.3d 1075 (11th Cir. 2001) .......................................................................44

*Carpenter v. Federal National Mortgage Association*, 174 F.3d 231 (D.C. Cir. 1999)...............39

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................................3, 33

*Chaiken v. VV Publishing Corp.*, 119 F.3d 1018 (2d Cir. 1997) ...................................................42

*Chaiken v. VV Publishing Corp.*, 907 F. Supp. 689 (S.D.N.Y. 1995) ...........................................42

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993)................................... 12-13, 27, 32

*Church of Scientology International v. Time Warner, Inc.*, 932 F. Supp. 589
    (S.D.N.Y. 1996) ....................................................................................................................36

*Church of Scientology International v. Behar*, 238 F.3d 168 (2d Cir. 2001)................................36

*Coffman v. Federal Laboratories*, 171 F.2d 94 (3d Cir. 1949) ....................................................34

*Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26 (D.D.C. 1995)...............................24, 25

*Commonwealth Insurance Co. of N.Y. v. O. Henry Tent & Awning*, 266 F.2d 200
    (7th Cir. 1959)........................................................................................................................34

*Cox Enterprises, Inc. v. Bakin*, 426 S.E.2d 651 (Ga. App. 1992)................................................26

*Deupree v. Iliff*, 860 F.2d 300 (8th Cir. 1988) ........................................................................42

*Esposito-Hilder v. SFX Broadcasting, Inc.*, 665 N.Y.S.2d 697, 236 A.D.2d 186
(3d Dep't 1997) ........................................................................................................43

*Evans v. Willis*, 441 S.E.2d 770 (Ga. Ct. App. 1994) ..................................................45

*Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir. 1986)................................................33

*Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099 (D.D.C. 1991)....................42

*Franklin-Mason v. Penn*, 259 F.R.D. 9 (D.D.C. 2009) ................................................34

*Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029 (D.C. Cir. 1988) ........................................3

*Gardner v. Martino*, 563 F.3d 981 (9th Cir. 2009)........................................................30

*Global Relief Foundation, Inc. v. New York Times Co.*, 390 F.3d 973
(7th Cir. 2004)..............................................................................................4, 32, 33

*In re Grand Jury Investigation*, 352 F. App'x 805 (4th Cir. 2009) ........................................7

*Gray v. St. Martin's Press, Inc.*, 221 F.3d 243 (1st Cir. 2000)........................................30

*Green v. CBS, Inc.*, 286 F.3d 281 (5th Cir. 2002) ........................................................33

*Hatfill v. New York Times Co.*, 488 F. Supp. 2d 522 (E.D. Va. 2007) ........................................36

*Hawkinson v. Montoya*, 2007 WL 776674 (D. Colo. Mar. 12, 2007) ........................................35

*Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993) ....................................4, 27, 30, 32

*Herbert v. Lando*, 781 F.2d 298, 312 (2d Cir. 1986)................................................36, 37

*Hoffmann-Pugh v. Ramsey*, 193 F. Supp. 2d 1295 (N.D. Ga. 2002) ........................................31

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) ....................................5, 17, 21, 22

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988)........................................................42, 43, 44

*Idema v. Wager*, 120 F. Supp. 2d 361 (S.D.N.Y. 2000) ................................................43

*Janklow v. Newsweek*, 759 F.2d 644 (8th Cir. 1985)................................................33

*Jefferson County School District No. R-1 v. Moody's Investor's Services*, 175 F.3d 848
(10th Cir. 1999)........................................................................................................42

*Kendall McGaw Laboratoriess, Inc. v. Community Memorial Hospital*, 125 F.R.D. 420 (D.N.J. 1989)..................................................................................................34

*Khan v. Parsons Global Services, Ltd.*, 428 F.3d 1079 (D.C. Cir. 2005)....................................38

*Klein v. Victor*, 903 F. Supp. 1327 (E.D. Mo. 1995) ................................................................24, 25

*LaPrade v. Abramson*, 2006 WL 3469532 (D.D.C. Nov. 29, 2006) ............................................34

*Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995)....................................................31

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988) ......................13, 18, 19

*Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947 (D.D.C. 1976) ........................................................................................................................5

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991)...........................................13, 18, 20

*Merrell v. Renier*, 2006 WL 3337368 (W.D. Wash. Nov. 16, 2006) ...........................................43

*Mesnick v. General Electric Co.*, 950 F.2d 816 (1st Cir. 1991) ..................................................33

*Metal Coating Corp. v. Baker Manufacturing Co.*, 227 F. Supp. 529 (D. Wis. 1964)................34

*Mid-South Grizzlies v. NFL*, 720 F.2d 772  (3d Cir. 1983) ....................................................39, 42

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)..............................................................12, 30

*Moldea v. New York Times Co.*, 15 F.3d 1137 (D.C. Cir. 1994) ..................................................43

*Moldea v. New York Times Co.*, 22 F.3d 310 (D.C. Cir. 1994) ..............................................30, 42

*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) .......................................................................10

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) .............................................12, 13

*Powers-Bunce v. District of Columbia*, 576 F. Supp. 2d 67 (D.D.C. 2008)................................39

*Price v. Viking Penguin, Inc.*, 881 F.2d 1426 (8th Cir. 1989) .....................................................27

*Riley v. Harr*, 292 F.3d 282 (1st Cir. 2002)................................................................................30

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ........................................................................................5

*Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305 (11th Cir. 2001) ...............................25

*SFM Corp. v. Sundstrand Corp.*, 102 F.R.D. 555 (D. Ill. 1984) ................................................34

*Seidl v. Greentree Mortgage Co.*, 30 F. Supp. 2d 1292 (D. Colo. 1998) ...................................31

*Snyder v. Phelps*, 580  F.3d 206 (4th Cir. 2009).......................................................................42-43

*Southern Air Transport, Inc. v. ABC*, 877 F.2d 1010 (D.C. Cir. 1989)..................................27, 30

*Talbert v. United States*, 932 F.2d 1064 (4th Cir. 1991) ...........................................................43-44

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1988) ...............................................................*Passim*

*Tierney v. Vahle*, 304 F.3d 734 (7th Cir. 2002) ...........................................................................42

*Trust Co. Bank of Augusta N.A. v. Henderson*, 364 S.E.2d 289 (Ga. Ct. App. 1987).................45

*Unus v. Kane*, 565 F.3d 103 (4th Cir. 2009)................................................................................11

*Weinberg v. Whatcom County*, 241 F.3d 746 (9th  Cir. 2001)......................................................39

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ...................................................13

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ...........................................27

## STATUTES AND RULES

18 U.S.C. § 2339B ......................................................................................................................21

FED. R. CIV. P. 56(f) ..............................................................................................................*Passim*

FED. R. EVID. 801(c)....................................................................................................................6

LOCAL CIV. R. 7 .........................................................................................................................1, 6

## MISCELLANIOUS

Hon. Robert D. Sack, SACK ON DEFAMATION § 3:7 (4th ed. 2010) .............................................12

Hon. Robert D. Sack, SACK ON DEFAMATION § 7:3.5 (4th ed. 2010) ..........................................33

10B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2737 (2d ed. 1998).....................35

Pursuant to Local Civil Rule 7(a) and Rule 56 of the Federal Rules of Civil Procedure, defendant CBS Broadcasting Inc. ("CBS"), together with defendants Rita Katz, the SITE Institute, and IG, LLC ("SITE Defendants"), (collectively, "Defendants") respectfully submit this memorandum in further support of their joint motion for summary judgment and in opposition to plaintiff Mar-Jac Poultry, Inc.'s ("Mar-Jac") motion for summary judgment.[1]

## INTRODUCTION

Mar-Jac, a Georgia-based poultry processor, commenced this action seven years ago because, it claimed in its Complaint, Katz's statements and references to a chart she prepared on the CBS news program *60 Minutes* ("the Broadcast") had conveyed to a national television audience that Mar-Jac was "'one of the entities'" involved in "'a purported flow of money from Saudi Arabia through various businesses and/or charities to . . . al-Qaeda, Hamas and Islamic Jihad,'" and further implied that Mar-Jac had, through its business and charitable relationships, engaged in "'a knowing effort to support terrorists.'"  Comp. SUMF ¶¶ 249-50 (quoting Am. Compl. ¶¶ 13, 23, 26).[2]  From the outset, Mar-Jac has claimed that these twin implications were reasonably derived from Katz's statements and that both of them were demonstrably false.  *Id.*

---

[1] Defendants' brief in support of their Joint Motion for Summary Judgment [Dkt. No. 186 (sealed); Dkt. No. 194-1 (public)] is cited herein as "Joint S.J. Br."; Mar-Jac's brief in opposition thereto [Dkt. No. 196] is cited as "Mar-Jac Joint Opp'n."; Mar-Jac's brief in support of its Motion for Partial Summary Judgment [Dkt. No. 188-1] is cited as "Mar-Jac S.J. Br."  CBS has separately filed a brief in support of its own motion for summary judgment ("CBS S.J. Br.") [Dkt. No. 187 (sealed); Dkt. No. 194-2 (public)], to be considered in the event the Court denies Defendants' joint motion, in whole or in part.  Mar-Jac has separately opposed that motion ("Mar-Jac CBS Opp'n" [Dkt. No. 195]), and CBS has filed a reply brief ("CBS S.J. Reply").

[2] Because, as explained at pp. 6-11 *infra*, Mar-Jac's opposition brief and its Response to Defendants Statement of Undisputed Material Fact ("Resp. SUMF") so seriously distort the record evidence and attempt to manufacture genuine disputes of material fact where there are none, Defendants have filed herewith a Composite Statement of Undisputed Material Facts ("Comp. SUMF") further demonstrating that Defendants' proffered statements are accurate in all material respects and that the evidence submitted by Defendants in support of their motions is both uncontroverted and admissible.

Since then, Mar-Jac has repeatedly forecast that, if only given the opportunity, it would prove the material falsity of, *in its words*, the "claims that Defendant Katz made and Defendant CBS aired," and that the U.S. government had "spent years investigating" – namely, that "monies that 'flowed through Plaintiff . . . ended up supporting terrorism,' as depicted in the chart on which Defendant Katz repeated her defamatory claims and which Defendant CBS televised nationally." Dkt. No. 156 at 7 & n.5.  Indeed, as recently as last year, one of Mar-Jac's counsel declared to the Court that "we intend at trial to be able to prove what happened to the money [Mar-Jac transferred to other entities,] and it did not go to the terrorist organizations that CBS broadcast that Ms. Katz claimed it went to."  Dkt. No. 122-3 at 14.

So much for that.  Confronted with uncontroverted documentary evidence that it, its beneficial owners, and its closely aligned charitable donees in fact provided substantial sums to groups that had, *inter alia*, unabashedly proclaimed their causes to include "aid[ing] the families of . . . martyrs" in the "Occupied Land," been led by self-confessed agents and promoters of Middle East militias, or later been unmasked as financiers of terrorism by the U.S. government, Mar-Jac has now pivoted and seeks to focus this litigation on something besides that undisputed chain of transactions – specifically, how well it counted its chickens.

The issues placed before the Court by Defendants' Joint Motion are straightforward:  (1) what are the *reasonable implications*, defamatory *of Mar-Jac*, that a viewer could derive from the factual assertions made by Katz in the Broadcast and (2) has Mar-Jac come forward with evidence that any such implication is materially false?  Although Mar-Jac pretends otherwise, the Joint Motion nowhere contends that Mar-Jac is not identifiable in the Broadcast, *see* Mar-Jac Joint Opp'n at 29, or that Katz's statements are incapable of conveying *any* defamatory meaning, *see id.* at 36, or, for that matter, that Katz expressed any uncertainty about the accuracy of the information

2

she brought to the government's attention regarding a terrorist financing enterprise centered in

Herndon, Virginia, *see id.* at 40.  Rather, Defendants' motion demonstrates that the only

*reasonable* defamatory meaning "of and concerning" Mar-Jac that a viewer could conceivably take

away from Katz's statements is *one* of the two implications Mar-Jac advances in its Complaint:

that is, that it was a conduit through which money flowed, via related entities and offshore banks,

to terrorist supporters.  *See* Comp. SUMF ¶ 249.  Simply put, Mar-Jac has failed to proffer

evidence from which a reasonable jury could find this alleged implication to be false in any

material respect – and, although not their burden to do so[3] (and despite only limited discovery[4]),

Defendants have proffered abundant and *undisputed* evidence that it is substantially true.

Mar-Jac purports to fulfill its constitutional burden of proving material falsity by

submitting declarations that (i) attest to the thoroughness of Mar-Jac's – and, purportedly, the

government's – procedures for tracking chicken mortality and (ii) summarily deny that Mar-Jac

and its leadership violated federal money laundering and anti-terrorism statutes.  Neither

proposition, even if undisputed,[5] undercuts the unrebutted fact that substantial sums *were*

---

[3] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden . . . on the party moving for summary judgment [is not] to *produce evidence* showing the absence of a genuine issue of material fact, even with respect to an issue on which the *nonmoving* party bears the burden of proof," but rather "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (emphasis added); *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1032 (D.C. Cir. 1988) ("The Supreme Court made clear in [*Celotex*] that the movant has no burden of introducing evidence negating the nonmovant's claim.").  *See also* pp. 11-13 *infra* (addressing Mar-Jac's mischaracterization of the allocation of burdens with respect to proof of material falsity).

[4] Contrary to Mar-Jac's suggestion, Defendants have not had "seven years of unilateral discovery."  Mar-Jac Joint Opp'n at 1.  This litigation has been largely stayed since 2004 and, as a result, Defendants' discovery has been limited to a preliminary round of four depositions, designed to test whether the case could proceed, accompanied by the production of only a fraction of the documents Defendants have requested.  *See* Decl. of Laura R. Handman ¶¶ 5-9.

[5] *But see* pp. 33-42 *infra* (explaining that the facts about chickens proffered by Mar-Jac are immaterial, genuinely disputed by Defendants and, at the very least, require discovery).

funneled through Mar-Jac and its affiliated entities to terrorist supporters.  *At best*, Mar-Jac's

evidentiary proffer is probative of the truth or falsity of its second alleged defamatory

implication – that Mar-Jac itself was "engaged in money laundering activities in a *knowing effort*

to support terrorists." Comp. SUMF ¶ 250 (emphasis added).  But, as Defendants have

demonstrated, Katz's actual statements do not convey that implication *about Mar-Jac*, as a

matter of law.  Indeed, Katz's observation in the Broadcast that "lost . . . chickens" may be "the

best cover for money laundering" – on which Mar-Jac now attempts to hang its entire case – was

not only unambiguously speculative but also expressly qualified by Katz's acknowledgment that

"*we're trying to find out*" what role, if any, "chicken" may have played in the suspected

Virginia-based, Saudi-controlled "terrorist financing ring" then under federal investigation.

Comp. SUMF ¶¶ 63-65 (emphasis added).  Courts have repeatedly held that, where, as here, "it

is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or

surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is

not actionable."  *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (Posner,

C.J.); *see* pp. 26-33 *infra* (citing cases).[6]

    In the last analysis, Mar-Jac misperceives not only the nature of its evidentiary burden

and the legal principles that govern its claims, but the proper function of defamation litigation.  A

defamation lawsuit is not the appropriate forum to litigate yet again the propriety of the

government's investigation of Mar-Jac, its affiliates, or their overlapping officers and directors –

---

[6] Moreover, it is undisputedly *true* that Mar-Jac was one of several entities then under investigation by federal authorities who, together with Katz, were "trying to find out" what role, if any, Mar-Jac played in the suspected terrorist financing ring.  *See* Comp. SUMF ¶¶ 33-50, 60-64, 77-81; *see also* pp. 32-33 *infra* (reports accurately disclosing the existence and nature of governmental investigations are substantially true, and therefore non-actionable, whether or not the target of the probe actually engaged in the investigated conduct); *Global Relief Found., Inc. v. New York Times Co.*, 390 F.3d 973, 989 (7th Cir. 2004)).

something Mar-Jac and its associates have repeatedly attempted and failed to accomplish in other proceedings.  Comp. SUMF ¶¶ 224-236.  Nor is it a venue in which to challenge the correctness of determinations made by the executive branch that certain persons or entities to which Mar-Jac provided funding have promoted terrorist activities or conspired with others to do so.  *See, e.g.*, *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2727-28 (2010).

Nor is *this* defamation action – brought by a self-described "multimillion dollar business" – a proper forum for vindicating society's interest in preserving "'the essential dignity and worth of . . . human being[s].'"  Mar-Jac Joint Opp'n at 4 (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring)).  As this Court has recognized, *corporate* libel plaintiffs such as Mar-Jac lack standing to invoke this societal value as a constitutional counterweight in defamation cases and, "[c]onsequently, a corporate libel action . . . need not force the first amendment to yield as far as it would . . . in a private libel action."  *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947, 955 (D.D.C. 1976).  At bottom, the only balancing here is between, on the one hand, the decidedly non-constitutional interest of a corporation in recovering for alleged economic losses and, on the other, the public's constitutional right to a robust discussion of a matter of great concern:  the financing in the United States of international terrorism.  Where, as in this case, the corporate plaintiff cannot overcome its most fundamental burden – to *prove false* the implications concerning it that can fairly be attributed to the alleged defamation – there is no constitutional latitude for any result other than judgment for the defendants.  Accordingly, and for all the reasons that follow, Defendants respectfully request that summary judgment be entered in their favor and that Mar-Jac's motion for summary judgment be denied.

## ARGUMENT

### I.   MAR-JAC'S RECITATION OF FACTS CANNOT BE CREDITED.

Notwithstanding Mar-Jac's assertion that "[m]ost of Defendants' 250 purported statements

of 'Undisputed Material Fact' are, disputed in whole or in part," Mar-Jac Joint Opp'n at 9, it in fact

has offered *no response whatsoever* (apart from a blanket objection to relevance) to more than 170

of those statements, each of which is therefore properly deemed "admitted."  *See* LOCAL CIV. R.

7(h)(1).[7]  As for the remaining statements, Mar-Jac splits hairs and parses language, but makes no

genuine effort to demonstrate disputes of material fact.  *See, e.g.*, Comp. SUMF ¶¶ 33, 66, 76, 77,

100, 130, 135, 210.[8]  And, where Mar-Jac purports to find a factual "misstate[ment]" by

---

[7] This is not the only assertion in Mar-Jac's opposition brief that is demonstrably at odds with its other filings in this case (including filings made contemporaneously with that brief).  For example, Mar-Jac contends that it "would require discovery to determine" whether the "Al-Haramyen Establishment" to which Mar-Jac beneficiary Humana donated in 1999 is the same entity that was designated by the U.S. Treasury Department as a terrorist group.  Mar-Jac Joint Opp'n at 19.  Yet, in its formal response to Defendants' proffered statement that "[t]he $10 million al-Rajhi grant program that Humana contributed to in 1999 included donations of more than $175,000 to Al-Haramyen Establishment Indonesia, which since 2004 has been a U.S.-designated terror group based on its ties to al-Qaeda," Mar-Jac purports to dispute (albeit wrongly, *see* note 16 *infra*) only the *amount* donated to Al-Haramyen, not the fact of Al-Haramyen's designation.  *See* Resp. SUMF ¶ 181; Comp. SUMF ¶ 181.  Nor does Mar-Jac submit a Rule 56(f) affidavit with respect to the few instances in which it professes to need discovery.  *See* Resp. SUMF ¶ 5 (asserting need for discovery to ascertain the wealth of Shaikh Sulaiman Abdul Aziz Al Rajhi ("Shaikh Sulaiman")); *but see* Comp. SUMF ¶ 5.  Having failed to comply with Rule 56(f), Mar-Jac may not be heard to complain that it cannot present evidence of facts necessary to justify its opposition to the entry of summary judgment.

[8] Mar-Jac's Response to Defendants' Statement of Undisputed Material Facts also advances plainly unfounded evidentiary objections.  For example, Mar-Jac labels as "hearsay" statements recounting the contents of the Kane Affidavit, Resp. SUMF ¶ 34, and Kroll Reports, *id.* at ¶ 100, even though neither is "offered in evidence to prove the truth of the matters asserted" in them.  FED. R. EVID. 801(c).  Rather, the contents of the Kane Affidavit simply establish what the government said it was investigating when it searched Mar-Jac's offices, and the Kroll Reports are offered to demonstrate that the information contained in them, whether accurate or not, had been provided contemporaneously to Mar-Jac's owner and at least one of its directors.  Mar-Jac also objects on hearsay grounds to a notation in its own business records that it made a $50,000 donation to Dar al Hijrah mosque "as per [Abdurahman] Al-Amoudi" (an employee of Mar-Jac's

Defendants, its own characterization of the facts is, almost uniformly, either demonstrably incorrect[9] or otherwise unsupported by admissible evidence.[10]  *See, e.g.*, Comp. SUMF ¶¶ 28, 50, 83, 88, 90, 102, 105, 142, 170, 178, 181, 185, 236.  This, however, is only the tip of the iceberg.[11]

Mar-Jac's entire argument is premised on its contention that Defendants have strategically reformulated the defamatory meanings Mar-Jac attributes to the statements made by Katz in the Broadcast.  *See, e.g.*, Mar-Jac Joint Opp'n at 9 (Defendants "contend that Mar-Jac . . . cannot disprove [a] new accusation . . . that Mar-Jac did not claim as false in the first instance"); *id.* at 15 ("Defendants are forced to recast their accusations so as to change their meaning but expand their reach."); *id.* at 34 ("Defendants [are] attempting to refashion the sum

---

then-owner and an assistant to one of Mar-Jac's directors), Resp. SUMF ¶ 134, which is properly admissible pursuant to the exception to the hearsay rule codified in Rule 803(6).

[9] *Compare, e.g.*, Mar-Jac Joint Opp'n at 11 ("Mar-Jac . . . did not even have money coming in from another country") *with* Comp. SUMF ¶¶ 87-94 (detailing $18.5 million Mar-Jac received from entities that were funded, owned, and/or controlled, in whole or in part, by Saudis); *id.* at ¶¶ 4-7, 11-13 (describing Shaikh Sulaiman's role in funding Mar-Jac's owners, the Saar Foundation ("Saar") and Safa Trust ("Safa"), and in selecting Saar's leaders).

[10] For example, Mar-Jac contends that its onetime owner Saar was "regulated by the Internal Revenue Service," apparently on the theory that, like every other person or entity in the United States with income, it was required to adhere to the federal tax code and IRS regulations and was potentially subject to audit.  Resp. SUMF ¶ 3.  Likewise, Mar-Jac contends that Saar "was assisted and advised in its operations by one of the preeminent authorities on the law relating to § 501(c) organizations, Bruce Hopkins," Mar-Jac Joint Opp'n at 11, but neglects to mention the Fourth Circuit's recent holding that Mr. Hopkins's communications with Saar were subject to the crime-fraud exception to the attorney-client privilege because they bore a "close relationship" to an evident scheme by Saar "to defraud the United States Government . . . both by concealing the ultimate disposition of [its] funds through the transfer of assets overseas and by using [its] tax-exempt status to circumvent the collection of taxes on the profits of individuals." *In re Grand Jury Investigation*, 352 F. App'x 805, 809-10 (4th Cir. 2009).

[11] Defendants acknowledge that their Statement of Material Facts misstated the total amount of loans that Mar-Jac and its holding companies received from Saar.  *See* Comp. SUMF ¶ 87.  Specifically, Defendants proffered that the record reflected "approximately $18.5 million in loans from Saar between 1984 and 1997," SUMF ¶ 87; in fact, the amount during that period was approximately $3.5 million.  The $15 million overstatement was the result of a misreading of one of Saar's tax returns, which reports a $15 million loan by Saar to "MARJAC INV," apparently a reference to another Saar subsidiary, Mar-Jac *Investments*, rather than to Mar-Jac, *Inc.*, which was then Mar-Jac's holding company.  The error was both inadvertent and immaterial.

7

and substance of what actually was communicated").  But the alleged reformulations about

which Mar-Jac complains are in fact verbatim repetitions of Mar-Jac's *own words*, including

most significantly the words it used *in its own Complaint*.  *See* Am. Comp. ¶ 13 ("'The chart'

showed a purported flow of money from Saudi Arabia through various businesses and/or

charities to al-Qaeda, Hamas and Islamic Jihad.  Plaintiff Mar-Jac was clearly identified and

depicted on [the] chart as being one of the entities."); *id.* at ¶ 23 ("Defendants clearly intended

that the millions of viewers of the broadcast would interpret the false statements and depictions

in the broadcast to mean that Plaintiff Mar-Jac knowingly laundered money to fund terrorist

activities."); *id.* at ¶ 26 ("Defendants published oral and/or written statements and/or images, and

performed other acts, which . . . directly, indirectly or by innuendo created the impression that

Plaintiff Mar-Jac engaged in money laundering activities in a knowing effort to support terrorists

and/or terrorist organizations, such as al-Qaeda, Hamas and Islamic Jihad.").  If anyone is

belatedly reconstructing its allegations, it is Mar-Jac, whose Complaint makes *no reference*

*whatsoever* to the company's practices for tracking poultry mortality, which has nevertheless

now become the basis for Mar-Jac's own motion for partial summary judgment.

    More troubling, however, is Mar-Jac's effort to distort both the *content* and the *context* of

Katz's statements in material ways by quoting from a CBSNews.com article that summarizes but

does not purport to transcribe the *60 Minutes* Broadcast at issue (and actually conflicts with the *in*

*haec verba* pleading of Mar-Jac's Complaint, which *is* consistent with the Broadcast), *see* Mar-Jac

Joint Opp'n at 4-6 (quoting from Dkt. No. 188-6), while suggesting that it is quoting from the

transcript of the Broadcast itself, *see* Ex. 21.[12]  Among other things, the online article *entirely omits*

both the introduction and the conclusion to the Broadcast by CBS correspondent Bob Simon:

> Ever since 9/11, Washington's been trying to trace and shut down
> terrorist financing.  It's been relying on tips from all sorts of
> shadowy figures in shadowy places.  But one tipster government
> officials say has been especially valuable is a professional
> researcher who's spent more than five years investigating links to
> Muslim terrorism here in the United States.  She just wrote a book
> called "Terrorist Hunter."  It details how groups in America have
> been providing significant support to terrorist outfits and how she
> helped track them down.  Because she's written the book
> anonymously, we're calling her "Sarah."
>
> . . .
>
> The al-Rajhi family from Saudi Arabia claims it never financed
> terrorists.  So do the people who were raided in Virginia.  So do all
> the charities and foundations mentioned or shown in our story.
> Meanwhile, the U.S. Justice Department continues its
> investigations.  And by the way, at her request, we disguised the
> woman we called "Sarah."

Ex. 21 (Broadcast Tr.) at 14.  The purported "transcript" on which Mar-Jac now relies also alters

and/or omits significant portions of the exchange between Simon and Katz (dubbed "Sarah" in

the Broadcast) that Mar-Jac contends is central to the defamatory meanings it alleges:

> **SIMON:**  In fact, it's not simple at all.  Sarah mapped out how,
> she says, the money flowed from Saudi Arabia to a web of
> charities, think tanks and businesses at 555 Grove, then to offshore
> banks and ultimately, she says, to terrorist groups.  It's not simple
> because, Sarah says, it's not meant to be.  It's designed to make it
> difficult to follow the money.  And one especially inventive idea
> the Saudis came up with according to Sarah was chickens.  They
> bought a chicken farm in Georgia.

---

[12] Although Mar-Jac references the CBSNews.com article in its Complaint, the article is *not* the subject of Mar-Jac's defamation claim.  *See* Am. Compl. ¶ 8; *see also id.* at ¶ 26 (alleging how "oral and/or written statements and/or images, and . . . other acts, which were heard and seen by millions of people in *60 Minutes'* audience" would have been "understood . . . by *60 Minutes'* viewers").  Nor *could* Mar-Jac have sued over the website publication, which does not identify Mar-Jac in any way and includes neither the chart shown on the Broadcast or any video or other images of either Mar-Jac's premises or its trucks.  *See* Dkt. No. 188-6.

SARAH:  **Chicken –** I see it as the best cover for money laundering.

SIMON:  **Chicken is the best cover for money laundering?**

SARAH:  **Why?  Because…**

SIMON:  **Yes.**

SARAH:  chicken is one of the things that no one really can track it down.  If you say in one year that you lost 10 million chickens, no one can prove it.  They just died.  You can't trace money with chickens.

SIMON:  **And that** [Does the] money lost **has gone** [go] down the line to Hamas or Islamic Jihad or al-Qaida?

SARAH:  That's what we're trying to find out.

*Id.* at 18 (bolded language omitted from website report and from Mar-Jac's brief but appears in the Broadcast; bracketed language appears in website report only).[13]  Because "consideration of the totality of the circumstances that provide the context in which the [allegedly defamatory] statement occurs" is essential to determine "the extent to which making it actionable would burden freedom of speech or press," *Ollman v. Evans*, 750 F.2d 970, 997 (D.C. Cir. 1984) (Bork, J., concurring), these distortions of the record cannot be overlooked.  Rather, in adjudicating this motion, it is imperative that the entire, unaltered Broadcast be considered.  *See* Ex. 20.

Finally, Mar-Jac's submission is riddled with factual assertions that either have no evidentiary support or are grounded in statements by persons who lack the requisite personal knowledge.  *See, e.g.*, Mar-Jac Joint Opp'n at 27-28 *and* Decl. of M.Y. Mirza ¶¶ 14-22 (purporting to describe conversations and meetings between attorney and government officials to which declarant was not privy); Mar-Jac Joint Opp'n at 24 (characterizing Kane Affidavit as

---

[13] Mar-Jac similarly attempts to create a misimpression about what Katz actually said in the Broadcast when it puts the phrase "cook the books" in quotes, as if Katz had used those words in the Broadcast.  *See* Mar-Jac Joint Opp'n at 32; Comp. SUMF ¶ 86.  She did not.

"now-debunked");[14] *id.* at 25 (purporting to describe Mutual Legal Assistance Treaty between United States and Great Britain applicable to Isle of Man and Channel Islands).  Many of the averments by Mar-Jac's declarants, moreover, are nothing more than formulaic, conclusory, and ultimately immaterial assertions that Mar-Jac did not break the law.  *See, e.g.*, Decl. of M.Y. Mirza ¶ 1; Decl. of M.O. Ashraf ¶ 1; Decl. of M. Mohamed ¶ 1; Decl. of D. Carnes ¶ 1; Decl. of J.P. Martin ¶ 1; Decl. of J. Barzinji ¶ 1; Decl. of H. Al-Talib ¶ 1.

As should be apparent from even this non-comprehensive review of Mar-Jac's submission, its recitation of the record evidence cannot withstand reasonable scrutiny.  Stripped of its reliance on inadmissible testimony, along with its discussion of immaterial details about poultry production, Mar-Jac's evidentiary proffer is, if nothing else, of little consequence for the adjudication of Defendants' motion.

## II.   MAR-JAC HAS NOT CARRIED ITS BURDEN OF ESTABLISHING THE MATERIAL FALSITY OF THE ONLY DEFAMATORY MEANING THAT REASONABLY COULD BE ATTRIBUTED TO KATZ'S STATEMENTS.

Beyond the liberties it takes with the record evidence, Mar-Jac also badly mischaracterizes the law – specifically, the allocation of the burden of proof with respect to the issue of falsity.  According to Mar-Jac, it has no obligation to come forward with evidence to disprove the defamatory "'*gist*'" allegedly conveyed by the statements made by Katz on the Broadcast because its "only burden is to prove the material falsity of that which Defendants

---

[14] Simply proffering this assessment of the Kane Affidavit does not make it so.  In fact, the Fourth Circuit has recently reviewed the Kane Affidavit in the context of other litigation and "agree[d]" not only that there was *no evidence* of "any factual misrepresentations in the [Kane] Affidavit," *Unus v. Kane*, 565 F.3d 103, 126 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1137 (2010), but that "the Affidavit established probable cause" for the warrants subsequently issued based on its contents, *id.* at 129.

*actually said.*"  Mar-Jac Joint Opp'n at 9 (emphasis added).[15]  In Mar-Jac's view, "[i]f

Defendants believe they have mustered evidence sufficient to show that while their statements

about Mar-Jac technically may have been inaccurate, other similar or related facts would show

those statements, or their general 'gist,' to have been substantially true, then it is their burden to

prove such matters as an affirmative defense."  *Id.*

That representation, however, is not the law and, as a result, Mar-Jac fails to cite a single

case even suggesting that it is.  Where, as here, a plaintiff seeks to base defamation liability on

expression that concededly addresses a matter of public concern, the First Amendment requires

that plaintiff shoulder the burden of proving material falsity – even if marshaling such proof is

difficult.  *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775-76, 778 (1986).  In

cases where speech "may be provable as false on [multiple] levels," the only "level of falsity"

that is relevant to defamation liability is that which bears on the speech's allegedly defamatory

character.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 n.7 (1990).  *Accord* Hon. Robert D.

Sack, SACK ON DEFAMATION § 3:7 (4th ed. 2010) ("Sack") ("The proof of truth or falsity must

go to the 'gist' or 'sting' of the defamation."); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087,

---

[15] Apparently, this formulation is designed to permit Mar-Jac to avoid acknowledging
that it is suing over the *implications* that it claims arise from Katz's statements.  Once again,
however, both its Complaint and its prior representations to this Court demonstrate the contrary.
*See* pp. 1-2 *supra*.  Indeed, the only things "actually said" *about Mar-Jac* in the Broadcast that
may be reasonably construed as statements of fact – *see* Joint S.J. Br. at 27-33; pp. 24-26 *infra* –
are that it operated "a chicken farm," which had been "bought" by the same "Saudis" who
financed the organizations at 555 Grove Street, and that its premises were searched by federal
law enforcement authorities a year earlier in connection with a then-ongoing investigation of
terrorism financing.  *See* Ex. 21 (Broadcast Tr.) at 18-19.  All of these statements are, of course,
substantially accurate, *see* Comp. SUMF ¶¶ 3-5, 12-13, 34-38, 48-49, 77, and any defamatory
meaning that may be attributed to them necessarily arises by implication.  Even the chart Katz
displayed on the Broadcast, which consists entirely of the names of people and organizations
(including Mar-Jac) connected by arrows, *see* Ex. 22, makes no "statements" on its own; its
alleged defamatory meaning – that Mar-Jac was part of "the money flow[ ] from Saudi Arabia"
to terrorist supporters – similarly arises only by implication.  *See* Ex. 21 (Broadcast Tr.) at 18.

1092 (4th Cir. 1993) ("The falsity of a statement and the defamatory 'sting' of the publication

must coincide . . . ."). Thus "[t]he essence of [the falsity] inquiry" is whether "'the substance,

the gist, the sting, of the libelous charge [is] justified,'" not whether a particular statement can be

shown to be false in some immaterial way. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496,

517 (1991) (citation omitted). There can be no legitimate dispute that, in *Hepps*, the Supreme

Court placed the burden of proving falsity squarely on the plaintiff and that, in *Masson*, it held

that the plaintiff must prove *material* falsity – *i.e.*, proof of factual errors "effect[ing] no material

change in meaning" are insufficient as a matter of law. *Id.* at 516. *See, e.g.*, *Weyrich v. New

Republic, Inc.*, 235 F.3d 617, 628 (D.C. Cir. 2001); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838

F.2d 1287, 1294-96 (D.C. Cir. 1988); *Tavoulareas v. Piro*, 817 F.2d 762, 783-84 (D.C. Cir.

1988).

Ultimately, this effort to shift the burden of proof is a red herring because, as Defendants'

Composite Statement of Undisputed Material Facts demonstrates, Mar-Jac does not seriously

challenge the record evidence proffered by Defendants, which substantially establishes that Mar-

Jac *was* in fact "'one of the entities'" involved in a circuitous "'flow of money from Saudi

Arabia through various businesses and/or charities to . . . al-Qaeda, Hamas and Islamic Jihad.'"

Comp. SUMF ¶ 249 (quoting Am. Compl. ¶ 13). The following dispositive facts – among many

others – have now been *conceded*:

- Mar-Jac received at least $18.5 million between 1988 and 1997 from four charities and businesses that were funded, owned, and/or controlled, in whole or in part, by the al-Rajhi family or other Saudis – namely, Saar, Safa, Solmagic, S.A., and Key Overseas, Inc. Comp. SUMF ¶¶ 87-94.

- Mar-Jac cumulatively transferred tens of millions of dollars – in the form of direct donations, dividends, and loan repayments – between 1984 and 2004 to eight entities with which it shared common officers, directors, and/or trustees: Saar, Safa, African

13

Muslim Agency ("AMA"), York Foundation, the International
Institute of Islamic Thought ("IIIT"), Sterling Charitable Gift
Fund, Humana Charitable Trust ("Humana"), and York
International Trust.  Comp. SUMF ¶¶ 18-28, 103-123, 154, 158.

- Mar-Jac's holding company distributed $750,000 in 1998 to
  Humana, a Saar-funded offshore trust operating on the Isle of Man
  that kept funds in a Swiss bank account.  Comp. SUMF ¶¶ 141-153.

- Al-Haramyen Establishment Indonesia, which since 2004 has been
  a U.S.-designated terrorist organization based on its ties to al-
  Qaeda, received more than $175,000 in donations in 1999 through
  a Humana-funded grant program administered by the al-Rajhi
  family.  Comp. SUMF ¶¶ 181-182.[16]

- York International Trust, also organized in the Isle of Man,
  received nearly $180,000 directly from Mar-Jac in 1998 and nearly
  $3 million from Mar-Jac donees Safa, AMA, and York Foundation
  between 1998 and 2002.  Comp. SUMF ¶¶ 154-158.

- In 1998, York International Trust transferred more than $50,000 to
  Nada International, a foreign company that previously employed
  two of Mar-Jac's directors and that, since 2002, has been
  designated by the U.S. government as a sponsor of terrorism based
  on evidence that the company's principal, Youssef Nada, provided
  financial assistance to al-Qaeda and Hamas through his controlling
  interest in Bank al Taqwa.  Comp. SUMF ¶¶ 211-217.

- IIIT received direct donations in 1987 from Mar-Jac totaling
  $400,000 and also received nearly $8 million between 1998 and
  2003 from Mar-Jac donees Safa, AMA, York Foundation, and
  Sterling Charitable Gift Fund, which had themselves received
  more than $40 million from Mar-Jac during or prior to that same
  period.  Comp. SUMF ¶¶ 105-106, 109, 116, 119, 122 161-165.

- Between 1991 and 2001, IIIT gave at least $50,000 to
  organizations associated with Sami al-Arian, who has admitted to
  operating as an agent of Palestinian Islamic Jihad ("PIJ") in the
  United States and to using one of his organizations, the World
  Islamic Studies Enterprise ("WISE"), in furtherance of a
  conspiracy to aid PIJ, and is presently facing criminal contempt

---

[16] Mar-Jac is simply wrong when it asserts that the record only supports a finding that
$17,333 went to Al-Haramyen in 1999.  *See* Mar-Jac Joint Opp'n at 19.  That is the amount of
*one* of two donations made by Humana that year; the second, which appears on a separate page
of the same document, was for an additional $160,427.  *See* Ex. 81 at YM-016299, YM-016300.

charges for refusing to testify before a federal grand jury investigating IIIT.  Comp. SUMF ¶¶ 169-172, 244.[17]

- Mar-Jac beneficial owners Saar and Safa collectively donated $30,000 to WISE in 1994 and 1995, shortly before the federal government began investigating al-Arian's and WISE's relationship with PIJ.  Comp. SUMF ¶¶ 72, 173-174.

- Mar-Jac beneficial owner Saar loaned $41,000 in 1984 to al-Arian, the admitted PIJ operative, and $90,000 sometime prior to 1995 to Mohamed al-Hanooti, the former imam at Dar al Hijrah mosque who has been named as an unindicted co-conspirator in two federal terrorism prosecutions.  Comp. SUMF ¶¶ 123, 174, 189

- Mar-Jac beneficial owner Saar and at least one of Mar-Jac's directors (Dr. Mirza) were aware by 1996 that several groups Saar had financially supported – IIIT; the American Muslim Council/ Foundation ("AMC/AMF"); Dar al Hijrah; the Muslim Arab Youth Association ("MAYA"); and the Islamic Society of North America ("ISNA") – were "suspected by journalistic and law enforcement officials of involvement in supporting terroristic activity," yet at least three of those groups continued to receive financial support after 1996 from Mar-Jac-funded charities for which Mirza served as an officer or trustee.  Comp. SUMF ¶¶ 100, 102.

- AMC and AMF – which together received $12,500 in donations from Mar-Jac and $75,000 in donations and loans (as recently as 2001) from Mar-Jac beneficial owners Saar and Safa – were both founded by Abdurahman Alamoudi, a one-time employee of Mar-Jac parent Saar and Saar subsidiary Mar-Jac Investments. Alamoudi publicly proclaimed in 2000 that he was a supporter of Hamas (a U.S.-designated terrorist group since 1995) and is now serving a twenty-three-year federal prison sentence after being arrested transporting $340,000 in cash to Libya in connection with a terrorist plot.  Comp. SUMF ¶¶ 75, 124-133, 183-185.

- Mar-Jac beneficial owners Saar and Safa provided financial support to a putative charity originally known as the Occupied

---

[17] Mar-Jac's representation that al-Arian pleaded guilty only to "performing certain immigration-related services for PIJ," Mar-Jac Joint Opp'n at 21 n.7, is, if nothing else, illustrative of its efforts to explain away the undisputed conduct of the persons and entities funded by it and its affiliated entities.  In fact, al-Arian expressly confessed to creating a front organization through which PIJ operatives could (and did) gain entry into the United States, as part of a "[c]onspiracy to make or receive contributions of funds, goods or services to or for the benefit of [PIJ]," Ex. 95 at 1, 11-14.

Land Fund and later re-branded the Holy Land Foundation for Relief and Development ("HLF"), including as much as $325,000 in 1997. As early as 1989, Saar's officers and directors – including three of Mar-Jac's directors – were made aware that HLF's stated purpose was "*to aide the families of the imprisoned, the exiled, and those of the martyrs*" in the West Bank and Gaza, and nevertheless chose to fund the group. In 2001, the U.S. government designated HLF as a terrorism sponsor based on its support for Hamas suicide bombings, and in 2008 the group was convicted of transmitting more than $12 million to Hamas, including aid for the families of the so-called "martyrs." Comp. SUMF ¶¶ 191-198.

- Mar-Jac beneficiary the York Foundation contributed more than $1,000 in 2002 to the Islamic American Relief Agency ("IARA-USA"), which in 2004 was designated by the U.S. government as a terrorism sponsor based on evidence indicating that the group had "provided direct financial support for [Osama bin Laden]," had "cooperated closely [with bin Laden and his associates] in the raising and expenditure of funds," and had "serv[ed] as a conduit [for transferring money] to Hamas." Comp. SUMF ¶¶ 199-200.

- Mar-Jac beneficial owner and donee Saar donated more than $1,000 in 1995 to the International Islamic Relief Organization ("IIRO"), an organization with overseas branches that were designated by the U.S. government as terrorism supporters in 2006. The IIRO's successor organization, the Success Foundation, received $10,000 in donations from Mar-Jac beneficial owner Safa and the Mar-Jac-funded York Foundation between 1999 and 2001. Comp. SUMF ¶¶ 73, 220-222.

- When Mar-Jac and/or its holding company or beneficial owners distributed money to charities that were eligible for tax-exempt status under U.S. law, they typically neither imposed restrictions on the use of the donated funds nor required donees to produce audits or other proof regarding the expenditures made with those funds, disclaiming any responsibility to "ensure[ ]" the funds were not used to support terrorist activities. Comp. SUMF ¶¶ 95-96.

In other words, the undisputed record reveals to be true precisely what Katz allegedly implied in the Broadcast through her statements and chart: that Mar-Jac received funds, directly and indirectly, from the al-Rajhi family and other Saudi businessmen; that Mar-Jac participated in financial transactions with entities at 555 Grove Street whose overseers were also officers and/or directors of Mar-Jac; and that proceeds from some of those transactions can be traced – either

16

directly or through entities with close ties to Mar-Jac – to offshore banks and to organizations and

individuals who have been conclusively linked (through U.S. government designations,

admissions, and/or convictions[18]) to the financing and support of terrorist groups, specifically al-

Qaeda, Hamas, and Palestinian Islamic Jihad.  *See* Comp. SUMF ¶ 65.  Indeed, if Katz were to re-

create today the "very simple chart" she displayed during the Broadcast – *based solely on the facts*

*Mar-Jac has failed to contest in the context of this motion* – it could fairly look like this:



_____

[18] This litigation is not a proper vehicle through which to determine whether entities
designated by the executive branch as terrorist organizations or named by it as "unindicted co-
conspirators" in criminal prosecutions are in fact blameless.  *See* Joint S.J. Br. at 22 n.11 (citing
*Holder*, 130 S. Ct. at 2727-28).  Mar-Jac argues, for example, that "the mere fact of one's
inclusion on a list of purportedly unindicted co-conspirators does not establish that such an
individual or organization was, in fact, involved in any criminal activity," Mar-Jac Joint Opp'n at
22, and objects to Defendants' proffer that the government designated the Islamic Society of
North America ("ISNA") and the North American Islamic Trust ("NAIT") as unindicted co-
conspirators in the prosecution of HLF.  But when ISNA and NAIT objected to that designation,
prosecutors filed a brief outlining how both groups were "intimately connected with the HLF and
its assigned task of providing financial support to Hamas."  Ex. 73 at 13.

*See* Ex. 21 (Broadcast Tr.) at 18; Ex. 22 (chart from Broadcast); Am. Compl. ¶ 13 ("'The chart' showed a purported flow of money from Saudi Arabia through various businesses and/or charities to al-Qaeda, Hamas and Islamic Jihad.").[19]  Accordingly, any implication from Katz's statements that Mar-Jac served as a conduit for the transfer of money to terrorism supporters cannot possibly be "considered false" because that implication produces no "different effect on the mind of the reader from that which the . . . truth would have produced."  *Masson*¸ 501 U.S. at 517 (citation and internal quotations omitted).

Not surprisingly, therefore, Mar-Jac does not even attempt to distinguish these circumstances from those encountered in *Tavoulareas v. Piro*, where the Court of Appeals rejected a claim of falsity as a matter of law because the impression created by the challenged publication (that there was a "direct link" between a company run by the plaintiff and another company that employed the plaintiff's son) was not materially different from the practical reality of very close ties between the two businesses.  817 F.2d 762, 787 (D.C. Cir. 1987).  Nor does Mar-Jac address the D.C. Circuit's decision in *Liberty Lobby, Inc. v. Dow Jones & Co.*, a defamation action in which the plaintiff challenged a newspaper's assertion that the plaintiff "had published [books and a magazine containing] theories of racial supremacy and genetic selection."  838 F.2d 1287, 1294 (D.C. Cir. 1988).  There, the Court of Appeals held that, given the undisputed evidence of extensive connections between the plaintiff's founder and the entity that published the books and magazine at issue, the plaintiff could not prove material falsity merely by demonstrating that it was false to imply a formal corporate relationship between the

---

[19] To the extent the record as it now stands lacks details about transactions involving four entities depicted on the original chart – Muslim World League, Rabita Trust, Benevolence International Trust, and al-Aqsa Educational Fund – those groups could be replaced by, *inter alia*, York Foundation (and/or York International Trust or Humana Charitable Trust), Al-Haramyen Establishment, IARA-USA, and AMC/AMF, respectively.

two. *Id.* at 1294-95. The rationale employed in these two cases, which are controlling authority in this Circuit, together with the unrebutted evidence proffered by Defendants, compel the Court to reject the contention that Mar-Jac can carry its burden of proving it was materially false for Katz to imply that it was a conduit through which funding made its way to terrorists.

Mar-Jac's only response to this undisputed record evidence is to attempt a legal sleight of hand by refuting a very different – and carefully parsed – proposition: that Mar-Jac transferred money to "a person or entity that, *at that time*, had been identified and listed by the Department of Treasury's Office of Foreign Assets Control ('OFAC') as a Specially Designated Terrorist Organization." Mar-Jac Joint Opp'n at 2 (emphasis added); *accord* Decl. of M.Y. Mirza ¶ 1 ("Mar-Jac also did not conduct any financial transaction, or engage in any conduct, with any entity *then* listed by the Department of Treasury, Office of Foreign Assets Control, as a Specially Designated Terrorist Organization.") (emphasis added); Decl. of M.O. Ashraf ¶ 1 (same); Decl. of M. Mohamed ¶ 1 (same); Decl. of D. Carnes ¶ 1 (same); Decl. of J.P. Martin ¶ 1 (same); Decl. of J. Barzinji ¶ 1 (same); Decl. of H. Al-Talib ¶ 1 (same). The problem for Mar-Jac is that it is trying to prove false something far different than any implication that could reasonably be gleaned from Katz's statements in the Broadcast (or that it pleaded in its own Complaint).

It is simply untenable to claim that Katz was accusing Mar-Jac of sending money to an OFAC-designated terrorist *after the person or entity had been so designated*. No reasonable viewer could possibly infer that from her statements, the chart, or the two combined. Indeed, such an inference would be completely at odds with the stated premise of Katz's entire discussion of the "SAAR Network" – that it was purposefully "*designed to make it difficult to follow the money.*"

19

Ex. 21 (Broadcast Tr.) at 18 (emphasis added).[20]  There would, of course, be nothing particularly "difficult to follow" about transactions between Mar-Jac and a person or entity that was then included on a U.S. government list of known terrorist sponsors.

Moreover, for purposes of a defamation claim such as this, which necessarily focuses on whether an allegedly false assertion would have a "different effect on the mind" of a reasonable viewer than the undisputed truth, *Masson*, 501 U.S. at 517 – as opposed to a criminal prosecution, which focuses on specified unlawful acts undertaken with the requisite criminal intent – it is immaterial whether money was sent to an identified terrorism sponsor *before* or *after* its formal designation.  *See, e.g.*, Mar-Jac Joint Opp'n at 17-18.  OFAC designations are not anticipatory – they are based on factual findings that the designees have *already provided* support to terrorists, often dating back many years.  Terrorism sponsors, in other words, must by definition be terrorism sponsors *before* they are designated.  Thus, OFAC did not designate HLF as a terrorism sponsor until 2001, yet the organization's subsequent criminal trial conclusively established that the group had been illegally providing millions of dollars to Hamas since *at least 1995*, when U.S. law first formally prohibited contributions to that terrorist organization.  *See* Exs. 107 & 108; Comp. SUMF ¶ 75.  Accordingly, even though it was not necessarily *illegal* to donate to HLF in 1997, when Mar-Jac's beneficial owner Safa undisputedly gave it hundreds of thousands of dollars, it cannot be denied that contributions made at that time in fact *provided*

---

[20] The "design[ ]" of the network, moreover, is attributed to "the Saudis," and to the "small group of people" at 555 Grove Street who represented their interests, not to Mar-Jac, the "chicken farm" in Gainesville, Georgia.  *See* Comp. SUMF ¶ 61; *see also* id. at ¶ 77 ("[O]ne especially inventive idea *the Saudis came up with*, according to [Katz], was chickens. They bought a chicken farm in Georgia.") (emphasis added).

*support to a terrorist organization* – namely, Hamas.[21]  And, in any event, Mar-Jac can hardly

claim ignorance in 1997 that support for Hamas was a principal objective of HLF's fundraising

given that, in 1989, Mar-Jac's then-owner Saar prepared for its board a report of its own

"charitable" activities that expressly declared that the purpose of its donations to HLF was "to

aide the families of the imprisoned, the exiled, and those of the martyrs" in the "Occupied Land."

Comp. SUMF ¶ 191.  Three board members of Mar-Jac and Safa in 1997 served as officers or

directors of Saar at the time of the 1989 report.  *Id.* at ¶¶ 18-26, 192.[22]

Likewise, it would not materially change the defamatory gist of the alleged defamation –

*i.e.*, that substantial funds flowing through Mar-Jac made their way to sponsors of terrorism – if

in fact the contributions made by Mar-Jac, its beneficial owners, and their affiliated entities were

intended for benign activities, such as construction of a "library."  *See* Mar-Jac Joint Opp'n at 17

(explaining that its owner's donations to HLF in 1997 were earmarked for a library project, not

terrorism, and that it "received reports regarding the progress of the construction project as well

as a videotape confirming that the library had been built").  This is because a reasonable person's

concept of supporting terrorism is not limited to writing checks to pay for bombs and other

weaponry, but rather includes (as Congress, the Executive branch, and the Supreme Court have

all recognized) "even seemingly benign support" to groups with terrorist aims.  *See Holder*, 130

S. Ct. at 2728.

---

[21] If a donor in 1997 had knowledge that HLF contributions were unlawfully being funneled to Hamas, a then-designated terrorist group, such donations may have been illegal even at that time.  *See, e.g.*, 18 U.S.C. § 2339B.

[22] Mar-Jac does not address, much less dispute, that the Saar board received this report. Comp. SUMF ¶ 191.  Moreover, if any "malicious intent" can be inferred from this undisputed record evidence, it most certainly is not derived, as Mar-Jac suggests, from "the mere fact that [HLF was], *years [later]*, designated as [a terrorist supporter]."  *See* Mar-Jac Joint Opp'n at 17. At the very least, what assuredly cannot be inferred is that Mar-Jac's owners exhibited "a sincere desire *to avoid* giving funds to any entity that might be associated with terrorists."  *Id.* at 28.

As Mar-Jac itself has conceded, precisely because "money is 'fungible,' a Mar-Jac donee's subsequent expenditure of funds may be attributable, at least in part, to Mar-Jac's donation(s), and it is typically not possible to determine the precise uses to which Mar-Jac's donated funds were later put."  Comp. SUMF ¶ 97.  *Accord Holder*, 130 S. Ct. at 2725-26 (noting that terrorist organizations "'do not maintain legitimate *financial* firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations.'") (citation omitted).  Accordingly, evidence demonstrating the undisputed movement of funds to terrorist support groups for any purported purpose, as there is here, precludes a finding that those funds did *not* enable acts of terrorism.

Particularly in this case – given the overlapping leadership of Mar-Jac and its many investors, lenders, and donees, as well as the fungibility of money (all of which is undisputed) – there is no meaningful distinction to be made between, on the one hand, "Mar-Jac funds" that take the form of transfers directly from a Mar-Jac account and, on the other, funds from Mar-Jac that arrive at their destination only after effectively passing through the hands of closely related charitable or business entities.  *See* Mar-Jac Joint Opp'n at 16-17; *id.* at 17 (asserting that "there is no evidence that the [Safa] donation [to HLF] was made with funds received by Safa Trust from Mar-Jac").  For example, it is simply neither accurate nor material for Mar-Jac to assert, as it does, that its "only contributions to IIIT were made . . . in 1987," Mar-Jac Joint Opp'n at 24, a contention that ignores an undisputed trail of nearly $8 million in donations from Mar-Jac to IIIT between 1998 and 2003 via four entities that had two or three officers or directors in common with Mar-Jac and had received tens of millions of dollars from Mar-Jac during that same period.  *See* Comp. SUMF ¶¶ 18-28, 105-106, 109, 116, 119, 122 161-165.  Similarly, Mar-Jac's contention that a $50,000 payment from York International Trust to Nada International on

22

October 19, 1998, *see* Ex. 49 at YM-11744, "*could not have been made with Mar-Jac funds*," Mar-Jac Joint Opp'n at 18, does not survive serious scrutiny when Mar-Jac undisputedly made a $54,000 payment to "York International Trust" just three days earlier and a $125,000 payment earlier that year, *see* Exs. 85-88.[23]

In short, Mar-Jac cannot (and does not) dispute that it was in fact a conduit for the transfer of funds to terrorist supporters – or, indeed, that the transfers occurred in essentially the manner outlined in Katz's chart.  As a result, it cannot carry its burden of demonstrating the material falsity of that alleged defamatory meaning.

## III.   MAR-JAC'S PROFFERED ALTERNATIVE DEFAMATORY MEANING – THAT IT *KNOWINGLY* FUNDED TERRORISTS IN VIOLATION OF FEDERAL LAW – IS NOT ACTIONABLE AS A MATTER OF LAW.

Left to defend the reasonableness of the alternative defamatory implication it attributes to Katz's statements – that they "'directly, indirectly or by innuendo created the impression that *Plaintiff Mar-Jac* engaged in *money laundering* activities in a *knowing effort* to support terrorists,'" Comp. SUMF ¶ 250 (quoting Am. Compl. ¶ 26) (emphasis added) – Mar-Jac's effort fails for two overarching reasons:  (1) Katz's statements cannot reasonably be understood to make any such assertion about *Mar-Jac* and (2) the speculative, hypothetical, and uncertain nature of Katz's comments about the relationship between "money laundering" and "chickens" forecloses any finding that those remarks give rise to an actionable defamatory implication.

---

[23] Mar-Jac's assertion that "*neither payment was made to York International Trust*," Mar-Jac Joint Opp'n at 18, is false.  The $54,000 payment by Mar-Jac on October 16, 1998, was made by check payable to "York International Trust"; it was subsequently endorsed by Dr. Mirza, as trustee of York International Trust (who also authorized Mar-Jac to make the interest payment in the first instance), and then paid to Sterling Investment Group.  *See* Exs. 85 & 87.

A.   **To the Extent Mar-Jac Relies on Katz's Statements about Others to Ground Its Proffered Alternative Meaning, It Is Neither "Of and Concerning" Mar-Jac Nor Reasonably Capable of that Defamatory Meaning with Respect to Mar-Jac.**

To begin with, Mar-Jac erects a strawman – *i.e.*, that Defendants' motion claims Mar-Jac was not the "chicken farm" referred to in the Broadcast, *see* Mar-Jac Joint Opp'n at 28-31 – and proceeds to knock it down.  Defendants have never contended that Katz's statements were not "of and concerning" Mar-Jac in the way Mar-Jac suggests – *i.e.*, that Mar-Jac is not identifiable in the Broadcast (it no doubt was).  Rather, as Defendants' motion makes clear, their "of and concerning" challenge to Mar-Jac's claim relates to whether the plaintiff, though plainly referenced in an identifiable manner in the Broadcast, was nonetheless *the subject* of the particular defamatory charge on which it seeks to ground its lawsuit.  *See* Joint S.J. Br. at 27 ("[The 'of and concerning' doctrine'] applies with equal force when the plaintiff is referenced in the publication but the alleged defamatory meaning attributed to that publication is not 'of and concerning' him.") (citing *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 33 (D.D.C. 1995)).

Indeed, one of the cases relied on by Mar-Jac makes this distinction quite plain.  *Klein v. Victor*, 903 F. Supp. 1327 (E.D. Mo. 1995) (cited in Mar-Jac Joint Opp'n at 30), involved a book that "purport[ed] to be an exposé of the claims made by persons who believe they have been victimized by Satanic cults" and identified plaintiff Pamala Klein as being "involved in [the] investigation and treatment of ritual abuse."  *Id.* at 1329.  The book's thesis, the court said, was "that Satanic ritual abuse does not in reality occur (or at least not in large scale), . . . that accusations of such abuse are largely unfounded, having been influenced by [*inter alia*] improper and suggestive investigative techniques," *id.* at 1332, and that "persons such as Klein improperly influenced children and others to make false accusations of ritual abuse," *id.* at 1333.  But the court held, as a matter of law, that Klein's allegation that a particular passage of the book

24

accused *her* of "'fomenting unsubstantiated child abuse accusations'" was not actionable because, although Klein was named in the passage – which reported that a California social worker was behind "a rising number of complaints from parents about unsubstantiated child abuse accusations" and that "[m]uch of the social worker's information had come from training videotapes, featuring . . . Pamala Klein" – the alleged defamatory implication was not "'of and concerning'" her. *Id.* at 1334-35. Rather, "[i]f the passage implies that anyone provoked unsubstantiated child abuse accusations, it implicates an apparently nameless social worker." *Id.*

The point here is straightforward: just because Katz suggests that Mar-Jac was a conduit for terrorist financing – as it demonstrably was – and that the elaborate "ring" that included Mar-Jac had been designed for that very purpose, does not mean her allegations of willful conduct were directed at Mar-Jac specifically; those allegations were "of and concerning" persons and entities (some, as in *Klein*, "nameless") who are not plaintiffs. *See Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305, 1309 (11th Cir. 2001) (read in context, article about money laundering – which identified plaintiff by name and photo as gold refiner who "may" have handled smuggled gold and "concedes" there are two sets of books – not "defamatory to [ ] plaintiff").[24] Katz was

---

[24] With respect to the issue of the Court's role in resolving the "of and concerning" question at this juncture of the litigation, the positions of Mar-Jac and Defendants are not at odds. *Compare* Joint S.J. Br. at 28 ("whether an allegedly defamatory statement is reasonably capable of being construed as 'of and concerning' the plaintiff is an issue of law to be decided by the court *in the first instance*") (emphasis added) *with* Mar-Jac Joint Opp'n at 30-31 ("'*If there is a question as to whether the words are 'of and concerning' the plaintiff*, this is a fact dispute for the jury.") (quoting *Klein v. Victor*, 903 F. Supp. 1327, 1334 (E.D. Mo. 1995)) (emphasis added). Like all mixed questions of fact and law, there may be cases where the "of and concerning" issue is sufficiently ambiguous that a jury must resolve it as a factual matter, but the court nevertheless retains its gatekeeper function and must decide, "*in the first instance*," Joint S.J. Opp'n Br. at 28 (Mar-Jac omits this phrase when it quotes Defendants' brief), whether a reasonable viewer could conclude that the defamatory charge was directed *at the plaintiff*. *See, e.g., Klein*, 903 F. Supp. at 1334 ("[I]f the words are unambiguous as to whom they refer [or do not refer], the issue may be one of law."); *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 33 (D.D.C. 1995) (alleged implication not "of and concerning" plaintiff, as a matter of law, though he was

unambiguous that the individuals whom she believes set up the "terrorist financing ring" with "money [that] comes from Saudi Arabia" and purposefully "designed [it] to make it difficult to follow the money" were part of a "small group of people" in Saudi Arabia and Virginia, not on a chicken farm in Georgia. *See* Ex. 21 (Broadcast Tr.) at 18. Even the subsequent, speculative exchange between Katz and Simon about how "lost . . . chickens" might be "the best cover for money laundering" follows immediately after the explicit statement that it was "*the Saudis*," not Mar-Jac, who "came up with" the "especially inventive idea" of incorporating a chicken farm into its network of businesses, charities, and think tanks. *Id.* Simply put, Mar-Jac may not litigate the grievances of others simply because the Broadcast accurately described it as serving as a conduit for *their* financial support of terrorists.

**B.     To the Extent Mar-Jac Now Relies on the "Lost . . . Chickens" Exchange to Ground Its Proffered Alternative Meaning, That Meaning Is Not Actionable Because, Construed in Context, the Exchange Constitutes Conjecture and Speculation and Does Not Give Rise to the Alleged Implication as a Matter of Law.**

Once the putative claims of others have been stripped away, Mar-Jac's proffered alternative meaning is reduced to the contention that the exchange between Katz and Simon in the Broadcast about "lost . . . chickens" accuses Mar-Jac of knowing participation in the financing of terrorism. This contention must be rejected for at least two independent, but related reasons: First, in this Circuit, when a plaintiff advances a defamation-by-implication claim in the context of statements addressing a matter of public concern, the First Amendment requires that the plaintiff demonstrate

---

identified in publication); *Cox Enters., Inc. v. Bakin*, 426 S.E.2d 651, 654 (Ga. App. 1992) (same, with respect to 29 articles of 31 sued on; remaining two articles were "essentially true"). It is on *that issue – i.e.*, whether a reasonable viewer could have understood Katz to accuse *Mar-Jac* itself, rather than "the Saudis," of engaging in "'*a knowing effort* to support terrorists,'" Comp. SUMF ¶ 250 – that the parties part company, not on the general principle of the Court's role. Indeed, in Mar-Jac's own motion for partial summary judgment, *it argues* that the Court can and should resolve the "of and concerning" issue *as a matter of law*. *See* Mar-Jac. S.J. Br. at 9-11.

26

not simply that the asserted implication is reasonably derived from the challenged statement, but also that a reasonable person would conclude, *from the face of the statement considered in context in which it was made*, that the implication was intended or endorsed by the defendant.  *See White v. Fraternal Order of Police*, 909 F.2d 512, 519 (D.C. Cir. 1990); Joint S.J. Br. at 36-39.  *Accord Chapin*, 993 F.2d at 1092-93.  Second, considered in the context in which they were made, Katz's statements about "lost. . . chickens" constitute unverifiable conjecture and speculation that is not actionable in defamation as a matter of law.  *See, e.g.*, *Haynes*, 8 F.3d at 1227; *Southern Air Transport, Inc. v. ABC*, 877 F.2d 1010, 1016 (D.C. Cir. 1989); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1429-30 (8th Cir. 1989); Joint S.J. Br. at 39-42.[25]

Considering these issues in turn, Mar-Jac first fails to come to grips with the Court of Appeals' holding in *White*, despite the fact that its Complaint expressly asserts a libel-by-implication claim arising from a news report about a subject of palpable public interest.  *See* note 15 *supra*.  Defendants have elsewhere demonstrated the dispositive legal significance of *White* and related authorities and need not repeat those arguments here.  *See* Joint S.J. Br. at 36-39; CBS S.J. Br. at 11-24; CBS S.J. Reply at 1-9.  It bears reiteration, however, that Katz not only makes no statement in the Broadcast that the "chicken farm in Georgia" was itself engaged in a "knowing effort to support terrorists," SUMF ¶ 250, but she expressly alerts viewers that she has

---

[25] Mar-Jac advances the curious proposition that there is little or no role for this Court to play in addressing the issue of defamatory meaning in the first instance, *see* Mar-Jac Joint Opp'n at 36-37, despite having moved for summary judgment *itself* on this same issue, *see* Mar-Jac S.J. Br. at 11-13.  As the decisions of the Court of Appeals make plain, judges play a critical role in determining whether an alleged defamatory implication is actionable as a matter of law.  *See White*, 909 F.2d at 520 ("The court must first examine what defamatory inferences might reasonably be drawn . . . and then evaluate whether the . . . broadcaster has done something beyond the mere reporting of true facts to suggest that the . . . broadcaster intends or endorses the inference."); *Tavoulareas*, 817 F.2d at 782 n.23 (rejecting "the remarkable proposition that courts must always . . . embrace the most sweeping defamatory meaning in the challenged statement").

*not* reached any such conclusion with respect to Mar-Jac when she says, referencing the chicken

farm: "That's what we're *trying* to find out." Ex. 21 (Broadcast Tr.) at 18 (emphasis added).

In this regard, Mar-Jac not only fails to acknowledge what Katz actually says in the

Broadcast, it affirmatively recasts and thereby mischaracterizes her statements as unequivocal.

*See, e.g.*, Mar-Jac S.J. Opp'n at 28 ("Defendant Katz asserted that 'a chicken farm in Georgia'

was using its chicken inventories, specifically falsifying the numbers of chickens claimed to have

died") (citation omitted); *id.* at 46 ("Defendant Katz stated that Mar-Jac was recording that

millions upon millions – 10 million specifically – of its chickens were dying each year."). In

fact, however, Katz said something quite different and far less definitive. *See* Ex. 21 (Broadcast

Tr.) at 18 (Katz: "Chicken – *I see it* as the best cover for money laundering.") (emphasis added);

*id.* (Katz: "*If you say* in one year that you lost 10 million chickens, no one can prove it. . . . You

can't trace money with chickens.") (emphasis added); *id.* (Simon: "And that money lost has

gone down the line to Hamas or Islamic Jihad or al-Qaeda?" Katz: "*That's what we're trying to*

*find out*."). Mar-Jac cannot wish away the speculative nature of these statements by ignoring

their context. Katz's conditional language and express disclaimers, especially in the absence of

other statements in the Broadcast directed at Mar-Jac, preclude any reasonable contention that

her statements can be construed to suggest that she intended to endorse the implication that Mar-

Jac had knowingly engaged in terrorist financing.[26]

---

[26] Mar-Jac asserts that Katz's statement – including her use of the present tense ("we're trying") means that she had reached a definitive conclusion that it had laundered money and left "open for debate only the question of where it was directed," *i.e.*, whether it went to organizations supporting terrorism or elsewhere. Mar-Jac S.J. Opp'n at 39. But taken in the context of the Broadcast as a whole, the subject matter of which is terrorism funding, and in the specific context of Katz's chart – to which Mar-Jac's defamation claims are inextricably bound – this interpretation of Katz's statements is untenable. In a similar vein, Mar-Jac points to a statement near the end of the Broadcast in which Katz says, "I know I stopped them." Mar-Jac Joint Opp'n at 40. Mar-Jac asserts that this statement "clearly expressed her [Katz's] absolute certainty that Mar-Jac and other

28

By the same token, Mar-Jac's proffered alternative meaning is not actionable because it is necessarily premised on Katz's speculation concerning events about which she expressly concedes she had not yet reached a conclusion.  Once again, rather than address what Katz actually says in the Broadcast, Mar-Jac recasts her statements as unequivocal pronouncements that "the chicken farm" had engaged in conduct for which the government could successfully prosecute it under a specific federal criminal statute.  *See, e.g.*, Mar-Jac Joint Opp'n at 26 ("neither Mar-Jac [n]or any of its 'beneficial owners' have ever committed the crime of providing material support to terrorism"); *id.* at 13-14 (asserting that Mar-Jac did not commit the elements of various federal crimes).[27]  Katz, of course, not only made no such statements, but the Broadcast itself expressly reported that *no one*, including Mar-Jac, had been so much as charged with a crime in the wake of the referenced searches.  Ex. 21 (Broadcast Tr.) at 19.[28]

---

entities were involved in money laundering and financing terrorism."  *Id*. at 40-41.  Mar-Jac, however, omits the context of this exchange, which is not connected, temporally or otherwise, to the earlier discussion of the "chicken farm":  "Katz:  'I'm not after Muslims, I'm after hunting terrorist Muslims . . . .  I'm after Islamic terrorism.  It's just a small group of people that are trying to destroy our life . . . and we must make sure that we stop it.'  Simon:  . . . 'Do you think this small group of people, as you put it can be stopped?'  Katz:  'I know I stopped them. . . .'"  Ex. 21 (Broadcast Tr.) at 19.  This exchange, in which neither Mar-Jac nor "the chicken farm" is referenced, adds nothing to Katz's earlier remarks concerning Mar-Jac itself, nor does it otherwise indicate she "stopped" Mar-Jac, particularly since Katz elsewhere identifies the perpetrators of the financial machinations that she "stopped" as "the Saudis."  *Id*. at 18.

[27] Plaintiff's reliance, *see* Mar-Jac Joint Opp'n at 42-43, on *Adventure Outdoors, Inc. v. Bloomberg*, 519 F. Supp. 2d 1258 (N.D. Ga. 2007), a decision later reversed and the litigation remanded to state court, *see* 552 F.3d 1290 (11th Cir. 2008), is misplaced.  In *Adventure Outdoors*, the defamation defendants included certain New York City officials who had previously sued the plaintiff, a Georgia gun dealer, for selling handguns in a manner that "intentionally violates federal law."  519 F. Supp. 2d at 1262.  In announcing their prior suit, the New York officials stated that the plaintiff had been "caught . . . breaking the Federal laws regulating gun sales."  *Id.* at 1279.  Taken in the context of an announcement of a lawsuit explicitly accusing plaintiff of violating the law, the District Court not surprisingly held that certain of the statements at issue could reasonably be viewed as alleging plaintiff was engaged in criminal wrongdoing.  *Id.* at 1282.

[28] Mar-Jac further contends that the Broadcast, by referencing other American corporations that, "as part of matching funds programs, innocently and unknowingly donated money to Islamic charities which supported terrorism," Ex. 21 (Broadcast Tr.) at 17, suggests, by

Defendants have no quarrel with the truism that "[t]here is no 'wholesale defamation exception for anything that might be labeled opinion,'" Mar-Jac Opp'n at 42 (quoting *Milkovich*, 497 U.S. at 18), and they have never contended otherwise. What they do contend is that where, as here, the context in which the allegedly defamatory statements were published makes "plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable" in defamation. *Haynes*, 8 F.3d at 1227. Judge Posner's recitation of applicable law in *Haynes* has not only been embraced by courts throughout the country,[29] it also is entirely consistent with the Supreme Court's decision in *Milkovich*, which in no sense purported to "abandon[ ] the principle of looking to the context in which speech appears" to determine whether it is actionable, *Moldea v. New York Times Co.*, 22 F.3d 310, 314 (D.C. Cir. 1994).

In *Southern Air Transport*, for example, the Court of Appeals was confronted with an ABC news report which suggested that the plaintiff air transport company had participated in an "arms supply operation [characterized by ABC as] illegal." 877 F.2d at 1012. Construing the allegedly defamatory statements in the "larger context" of the entire broadcast – which examined a controversy surrounding the disputed legality of efforts to provide weapons to anti-Communists in Nicaragua – the Court of Appeals concluded that viewers would have understood that "any implication that Southern Air was involved in an illegal operation was an expression of opinion." *Id*. at 1017. *See also, e.g.*, *Riley v. Harr*, 292 F.3d 282, 292 (1st Cir. 2002) (holding

---

contradistinction, that Mar-Jac had knowingly funded terrorist groups. *See* Mar-Jac Joint Opp'n at 8. Nothing about that statement suggests anything, one way or the other, about Mar-Jac's own charitable donations, especially since it is undisputed that Mar-Jac's donations were not part of any "matching funds program[ ]" in which employee donations were automatically matched.

[29] *See, e.g.*, *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000); *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998); *Aviation Charter, Inc. v. Aviation Research Group/US*, 416 F.3d 864, 871 (8th Cir. 2005); *Gardner v. Martino*, 563 F.3d 981, 988-89 (9th Cir. 2009).

not actionable as speculation statement that factory owner "*must* have known" about toxic waste dumping on his property being blamed for cancer deaths); *Hoffmann-Pugh v. Ramsey*, 193 F. Supp. 2d 1295, 1301-02 (N.D. Ga. 2002) (statement speculating that plaintiff's financial difficulties provided a motive for plaintiff's possible involvement in child murder held not actionable where publication did not state that plaintiff had in fact committed a crime), *aff'd*, 312 F.3d 1222 (11th Cir. 2002); *Brown v. Hearst Corp.*, 862 F. Supp. 622, 628-29 (D. Mass. 1994) (holding not actionable statement in television news report that "I feel like if [plaintiff's wife is] dead, [plaintiff] killed her.  Or had her killed" because statements were "based on conjecture and speculation" concerning whereabouts of plaintiff's missing wife), *aff'd on other grounds*, 54 F.3d 21 (1st Cir. 1995); *Brennan v. Kadner*, 814 N.E.2d 951, 957 (Ill. Ct. App. 2004) (statement by columnist that source told him Election Board "could" refer plaintiff's case to the U.S. Attorney's office for mail fraud was conjecture about possible crime and not defamatory); *Seidl v. Greentree Mortgage Co.*, 30 F. Supp. 2d 1292, 1318 (D. Colo. 1998) (use of word "may" and phrase "we are continuing our investigation" in letter accusing plaintiff of fraud indicated statements were speculative and not defamatory).[30]

Mar-Jac fails to address this dispositive body of case law, *see also* Joint S.J. Br. at 39-42, not to mention either the actual statements made by Katz in the Broadcast or the context in which

---

[30] Mar-Jac's observation that, "[i]n nearly every criminal case and a great many civil cases, the parties are called upon to prove a specific *mens rea* or state of mind," Mar-Jac Joint Opp'n at 44, may well be true, but it is of dubious relevance to this defamation action, where the threshold issue is whether the statements at issue can reasonably be construed to charge the plaintiff with having committed a crime in the first place.  *See, e.g., Lane v. Random House, Inc.*, 985 F. Supp. 141, 151 (D.D.C. 1995) (statement that book author is "guilty of misleading the American public" held not actionable expression of opinion notwithstanding author's contention that "his veracity, integrity, intellectual honesty and candor can all be plumbed in a trial as a matter of fact"); *Southern Air Transport*, 877 F.2d at 1016 (observing that accusation that air transport company participated in "illegal operation" was not actionable precisely because the accusation "was not subject to ready verification short of recourse to a court of law").

those statements appeared.[31]  Simply put, her hyperbolic references to "10 million" lost chickens,

considered in the context of her "expressions of uncertainty," *Chapin*, 993 F.2d at 1098, about

what role, if any, "chicken" may have played in the terrorism financing scheme she otherwise

claimed to have uncovered, are self-evidently conjecture.  *See, e.g.*, Ex. 21 at 18 ("*If you say* in one

year that you lost *10 million chickens*, no one can prove it.") (emphasis added); *id* ("Chicken – *I*

*see it* as the best cover for money laundering.") (emphasis added).  And, when she tells Simon (and

the viewing audience) that "we're trying to find out" whether her speculations about "chicken" and

whether they are "the best cover for money laundering" have any basis in fact, she places her

statements squarely within the protections from defamation liability afforded to "interpretation,

. . . theory, conjecture, [and] surmise." *Haynes*, 8 F.3d at 1227.

        Indeed, construed in the context of the Broadcast's broader discussion of the ongoing

federal investigation, when Katz says, "[t]hat's what *we're* trying to find out," the "we" is plainly

a reference to federal law enforcement authorities who, with her "help," are "trying to find out"

whether "money laundering" had, in fact, taken place.  Ex. 21 (Broadcast Tr.) at 18.

Immediately following this statement, Simon refers to the ongoing federal investigation saying,

"But with Sarah's help, U.S. officials had found out enough to get a customs department task

force to raid 555 Grove and 28 other locations in March of 2002 . . . .  And, yes, they raided a

chicken farm, too." *Id.* at 18-19; *see* Ex. 22 (accompanying video showing federal agents

executing the search warrants).  Accordingly, "the 'gist' or 'sting'" of Katz's statements about

chickens as a potential "cover for money laundering" are, like the news reports at issue in *Global*

*Relief Foundation v. New York Times Co.*, 390 F.3d 973, 989 (7th Cir. 2004), at best an assertion

---

[31] Instead, Mar-Jac opts to quote, not from the Broadcast itself, but rather from a summary of it that both distorts Katz's actual statements and necessarily takes them out of context. *See* pp. 8-10 *supra.*

"that the government *was investigating* an organization for funding terrorism, not that the organization actually *was* funding terrorism."  Mar-Jac CBS Opp'n at 10 (emphasis in the original) (discussing *Global Relief*).  Since Mar-Jac does not dispute that the government was, in fact, investigating it and related entities for, *inter alia*, money laundering and terrorism funding, *see* Comp. SUMF ¶¶ 35-41, Katz's statements are not substantially false as a matter of law.  *See Global Relief*, 390 F.3d at 989.[32]

## IV.  MAR-JAC IS NOT ENTITLED TO "PARTIAL SUMMARY JUDGMENT."

Mar-Jac's own motion for "partial summary judgment" must fail for three independently sufficient reasons:  (a) the Federal Rules of Civil Procedure prohibit motions for summary judgment on *non-dispositive issues*;[33] (b) even if otherwise permitted, the relief Mar-Jac seeks would be unavailable because its evidence of falsity addresses a fact that is "subsidiary" to the alleged defamatory meaning Mar-Jac attributes to Katz's statements and such subsidiary issues are not separately actionable; and (c) to the extent the details of Mar-Jac's poultry processing operations are in any sense material, Mar-Jac's assertions regarding those operations give rise to

---

[32] *See also, e.g.*, Sack § 3:7 (a "statement that a person or entity is being investigated has been held to be substantially true if the description of the investigation is substantially true even though the implication that the plaintiff did commit or may have committed the acts for which he, she or it is being investigated is false"); *id.* § 7:3.5[c]; *Green v. CBS, Inc.*, 286 F.3d 281, 284-85 (5th Cir. 2002); *Janklow v. Newsweek*, 759 F.2d 644, 649 (8th Cir. 1985).

[33] That the issues of falsity, defamatory meaning, and "of and concerning" *are* dispositive for purposes of *Defendants'* motion yet non-dispositive for purposes of *Mar-Jac's* motion is simply a consequence of the fact that a plaintiff must prove *all* of the essential elements of its claim – including, in this case, fault – to obtain a judgment, whereas a defendant is entitled to judgment if it can show that the plaintiff cannot prove one or more of those elements.  *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991) (where *defendant* moves for summary judgment, "plaintiff must establish at least a genuine issue of material fact on every element essential to his case in chief" to prevail) (citing *Celotex*, 477 U.S. at 323); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (where *plaintiff* moves for summary judgment, "he must establish beyond peradventure all of the essential elements of the claim" to prevail).

genuine disputes of fact and, at a minimum, additional discovery pursuant to Rule 56(f) would be warranted before Mar-Jac's motion could be ripe for judicial consideration.

A.      **Rule 56 Does Not Permit Entry of "Judgment" Against Defendants on the Issues of Falsity, Defamatory Meaning, or "Of and Concerning."**

Mar-Jac's motion requesting partial summary judgment on three *issues* – none of which is dispositive – must be denied because it is prohibited by the Federal Rules of Civil Procedure. Under Rule 56, "a party *may not file* a motion for partial summary judgment on a fact or an element of a claim." *Franklin-Mason v. Penn*, 259 F.R.D. 9, 11 (D.D.C. 2009) (emphasis added); *see also Beard v. District of Columbia Housing Auth.*, 584 F. Supp. 2d 139, 140 n.1 (D.D.C. 2008) (summary judgment "may not be entered as to a fact or an element of a claim"); *LaPrade v. Abramson*, 2006 WL 3469532, at *8 (D.D.C. Nov. 29, 2006) (same).  This is because neither Rule 56 nor "any other rule of the Rules of Civil Procedure" contemplates "a summary judgment for a portion of a single claim in suit."  *Coffman v. Federal Labs.*, 171 F.2d 94, 98 (3d Cir. 1949) (quoting *Biggins v. Oltmer Iron Works*, 154 F.2d 214, 216 (7th Cir. 1946)); *Commonwealth Ins. Co. of N.Y. v. O. Henry Tent & Awning*, 266 F.2d 200, 201 (7th Cir. 1959) (same).  Indeed, even where Rule 56 "permits 'partial' summary judgments, such judgment or order can be granted only when the judgment is to the whole of one of several claims joined in an action."  *Metal Coating Corp. v. Baker Mfg. Co.*, 227 F. Supp. 529, 530 (D. Wis. 1964); *see also Kendall McGaw Labs., Inc. v. Community Mem'l Hosp.*, 125 F.R.D. 420, 421 (D.N.J. 1989) ("Summary judgment may be had as to one claim among many, but it is well settled that neither subsection allows such a judgment as to one portion [of] a claim.").[34]

---

[34] The *Court* has the power, in the wake of a motion for summary judgment as to a claim as a whole, to issue a pretrial order pursuant to Rule 56(d) "specifying the facts that appear without substantial controversy."  *LaPrade*, 2006 WL 3469532, at *8.  But "[t]here is no such thing as an independent motion" for such an order.  *Id.* (citation omitted); *see also SFM Corp. v. Sundstrand Corp.*, 102 F.R.D. 555, 558 (D. Ill. 1984).  Rather, it can be made "only in the wake

In short, the Federal Rules provide no mechanism by which a plaintiff can seek a "judgment" that particular elements of a claim have been satisfied.  Mar-Jac does not even *claim* to be entitled to judgment on its defamation cause of action, instead requesting "*partial* summary judgment in its favor and against Defendants on the following *issues*:  (1) Defendants' statements were 'of and concerning' Mar-Jac; (2) Defendants' statements conveyed a defamatory meaning about Mar-Jac; and (3) Defendants' statements were false."  Mar-Jac S.J. Br. at 2 (emphasis added).  Thus, even if Mar-Jac were successful, the litigation would continue because, *inter alia*¸ the issue of fault would remain to be litigated; by contrast, if Defendants succeed on their joint motion, the litigation would come to an end, and if CBS succeeds on its separate motion, the claims against it would be dismissed in their entirety.  Mar-Jac's purported summary judgment motion is therefore improper.

### B.      The "Subsidiary Meaning" Doctrine Precludes Mar-Jac from Maintaining a Defamation Claim Based on Allegedly False Facts That Lead to a Defamatory Meaning That Is Otherwise Substantially True.

Even if Mar-Jac's motion were permitted by the Federal Rules (and assuming *arguendo* that Katz's statements in the Broadcast about "lost . . . chickens" could be understood by a reasonable viewer as an assertion of fact), the relief Mar-Jac seeks would be precluded because it focuses exclusively on a factual issue – whether Mar-Jac overstated its chicken mortality statistics – that is at best "subsidiary" to the defamatory meaning it has alleged.  Put somewhat differently, even if this accusation were made by Katz in the Broadcast (and it was not, *see* pp. 26-33 *supra*), it would be an outgrowth of, and subsidiary to, the central allegation already shown to be

---

of a full-blown motion under either Rule 56(a) or Rule 56(b)."  *Hawkinson v. Montoya*, 2007 WL 776674, at *1 (D. Colo. Mar. 12, 2007) (quoting *Kendall McGaw Labs.*, 125 F.R.D. at 421).  Even then, the rule "does not authorize the entry of a judgment on part of a claim or the granting of partial relief," but simply a non-final pretrial order specifying facts not controverted by the parties.  *LaPrade*, 2006 WL 3469532, at *8 (quoting 10B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2737, at 316 (2d ed. 1998)).

substantially true – *i.e.*, that Mar-Jac was a conduit used by Saudi interests to fund terrorist

organizations.  As the Court of Appeals has explained, to permit recovery on a subsidiary issue of

this kind, when the overarching defamatory meaning alleged in the case is not actionable, "would

be a classic case of the tail wagging the dog."  *Tavoulareas*, 817 F.2d at 788 (quoting *Herbert v.*

*Lando*, 781 F.2d 298, 312 (2d Cir. 1986)).

        The "subsidiary meaning" doctrine recognized in *Tavoulareas*, *Herbert*, and other cases

provides that, "when a publication as a whole is not actionable for defamation, 'other statements

. . . should not be actionable if they merely imply the same view, and are simply an outgrowth of

and subsidiary to those claims upon which it has been held there can be no recovery.'"  *Hatfill v.*

*New York Times Co.*, 488 F. Supp. 2d 522, 532 (E.D. Va. 2007) (citing *Herbert*, 781 F.2d at 312),

*aff'd*, 532 F.3d 312 (4th Cir. 2008).  The doctrine obliges courts to focus on the "ultimate

conclusion" of the entire publication.  *Church of Scientology Int'l v. Time Warner, Inc.*, 932 F.

Supp. 589, 594 (S.D.N.Y. 1996), *aff'd sub nom. Church of Scientology Int'l v. Behar*, 238 F.3d

168, 176 (2d Cir. 2001).  If the challenged statement implies the same conclusion as – *i.e.*, is

"subsidiary" to – the publication considered as a whole, and that conclusion is not materially false,

summary judgment should be granted for the defendant.  *Id.*  Subsidiary meaning is "a question of

federal constitutional law, not state law."  *Behar*, 238 F.3d at 176.

        The Court of Appeals employed this reasoning in *Tavoulareas* which, as explained in

Defendants' opening brief, *see* Joint S.J. Br. at 21, arose from a series of *Washington Post* articles

about the president of an oil company and his alleged "nepotism" in structuring business deals for the

benefit of his son, *see* 817 F.2d at 766.  In particular, the Court noted that "[t]he potentially

defamatory inference that . . . Tavoulareas had not recused himself . . . despite a possible conflict of

interest" with respect to issues involving his son was subsidiary to and thus not actionable in light of

the substantial truth of the "central thrust" of the articles:  "Tavoulareas' personal, continual, and active involvement in . . . matters in ways that uncontestably redounded directly to [his son's] benefit."  *Id.* at 787-88.  Because the plaintiff could not carry his burden of proving the material falsity of this "central thrust of the story," he could not sustain a defamation claim by proof that other statements were false and published with constitutional malice.  *Id.*

Similarly, in *Herbert*, the Second Circuit addressed a contention that statements in a *60 Minutes* report conveyed the defamatory implications that plaintiff had lied about reporting war crimes to his superiors and invented a story to explain why he had been relieved of his command.  *See* 781 F.2d at 308 n.5.  The plaintiff's inability to carry his burden of proving constitutional malice with respect to the broadcast's "overall impact" precluded him from surviving summary judgment with respect to specific, allegedly false statements contained in the broadcast, precisely because they communicated the same defamatory meaning.  "Examining each of the specific statements Herbert claims was made with actual malice," the court ruled, "we do not find a distinction between the defamatory meaning a viewer would derive from the particular statements, and the supposedly larger defamatory 'impact' Herbert insists is conveyed by the publication as a whole."  *Id.* at 307-08.  Because the statements alleged to be false were "merely a subsidiary matter to the primary, non-actionable issue – whether [plaintiff] lied about reporting war crimes" – the court's determination that plaintiff could not carry his burden of proving constitutional malice with respect to the "overall implication" required that summary judgment be entered with respect to the claims raising the discrete, allegedly false facts as well.  *Id.* at 311-12.

The *only* reasonable defamatory meaning at issue in this case is that Mar-Jac was a conduit through which money flowed to terrorist supporters.  *See* pp. 24-26 *supra*.  This is the defamatory meaning that Mar-Jac pleaded in its Complaint.  It was only when volumes of

evidence submitted by Defendants in support of their Joint Motion demonstrated that Mar-Jac *was* used as a conduit to fund terrorist organizations that it shifted gears, arguing that the sting of Katz's statements was actually that Mar-Jac was unable to account properly for its chickens. Thus, as courts in this Circuit and others have explained, Mar-Jac cannot maintain a cause of action based on allegedly erroneous subsidiary facts that carry the same defamatory sting as the "overarching" meaning about which it complains. The purported facts asserted by Mar-Jac about its meticulous chicken counting are, therefore, demonstrably beside the point.

### C. Even if the Subsidiary Meaning Were Independently Actionable, Summary Judgment Should Be Denied Under Rule 56(f).

As the Court knows, Defendants have not had an opportunity to take discovery with respect to Mar-Jac's poultry processing operations, and its self-serving assertions of fact regarding its operations are therefore anything but undisputed. For this additional reason, Mar-Jac's cross-motion must fail.

The Court of Appeals "has long recognized that a party opposing summary judgment needs a 'reasonable opportunity' to complete discovery before responding to a summary judgment motion and that 'insufficient time or opportunity to engage in discovery' is cause to defer decision on the motion.'" *Khan v. Parsons Global Servs., Ltd.*, 428 F.3d 1079, 1087 (D.C. Cir. 2005) (citation omitted). Where a party has not had the necessary opportunity to discover relevant facts, the court may grant additional time for discovery pursuant to Rule 56(f).[35]

---

[35] Rule 56(f) came up at the Court's last status conference in this action, during which CBS's counsel made the point that, should Mar-Jac believe it needs discovery to resist a summary judgment motion by Defendants on the issue of falsity, its "proper recourse [would be] to invoke Rule [56(f)] in response to our motion and argue to the Court that it's properly entitled to take specific discovery before the motion can be properly adjudicated." 6/3/10 Conf. Tr. at 7:24-8:2. Mar-Jac has made no such demand, much less supplied the affidavit mandated by the rule. *See* FED. R. CIV. P. 56(f) (requiring "party opposing the motion [to show] by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition").

Rule 56(f) states that, "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:  (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order."  FED. R. CIV. P. 56(f).  The rule "provides a mechanism whereby a party opposing a motion for summary judgment may, by affidavit, state valid reasons why he is temporarily unable to present 'facts essential to justify the party's opposition' to such motion."  *Weinberg v. Whatcom County*, 241 F.3d 746, 750-51 (9th Cir. 2001).  To obtain relief under this provision, parties opposing summary judgment must indicate what specific facts they intend to discover and how those facts would create a triable issue sufficient to defeat the motion.  *See Carpenter v. Federal Nat'l Mortgage Ass'n*, 174 F.3d 231, 237 (D.C. Cir. 1999).  Rule 56(f) motions are favored when facts necessary for the adequate preparation of an opposition to a motion for summary judgment "are in the possession of the moving party."  *Mid-South Grizzlies v. NFL*, 720 F.2d 772, 779 (3d Cir. 1983).  In such cases, "a continuance of the motion for purposes of discovery should be granted almost as a matter of course."  *Id.*; *see also Powers-Bunce v. District of Columbia*, 576 F. Supp. 2d 67, 71 (D.D.C. 2008) (Collyer, J.) ("Discovery is required before summary judgment can be entered when a factual dispute exists or the facts are inaccessible to the non-moving party.").

In this case, as the accompanying Rule 56(f) Declaration of Laura R. Handman recounts, the Court has to date permitted only limited discovery directed at Mar-Jac's sources of funding and its expenditures, subjects about which Mar-Jac has unfettered access to information. Handman Decl. ¶¶ 5-8.  Mar-Jac, however, had now moved for summary judgment with respect to issues related to its own internal poultry accounting practices – information uniquely within

Mar-Jac's control, about which there has been *no* discovery.  There is no way to defend against

such a motion without taking discovery from Mar-Jac and its employees.  *Id.* at ¶ 3-5.

 Moreover, even without discovery, the self-serving assertions on which Mar-Jac bases its

motion are, in significant respects, anything but undisputed.  Indeed, many of Mar-Jac's

contentions are incorrect on their face.  For example, Mar-Jac claims that its counts are "verified

by on-site government officials generating their own paper work which must match up with Mar-

Jac's,"  Mar-Jac SUMF ¶ 15; that "[e]very bird processed at Mar-Jac's plant is accounted for and

verified by the USDA's Federal Slaughter Inspection Service ('FSIS')," *id.* at ¶ 44; and that

"[t]he Georgia Department of Agriculture regulates and inspects the mortality records, disposal

procedures, and disposal facilities of Mar-Jac and all of its independent contract pullet farms, hen

farms, and broiler farms," *id.* at ¶ 51.  But, as the attached Declaration of Dr. Darrel Suderman

demonstrates, those claims are very much in dispute.  Dr. Suderman, who has worked in the

poultry industry for more than two decades, has testified that, while state and federal inspectors

monitor poultry processing facilities, they are responsible only for the health and safety of the

product, *not* for keeping track of the number of chickens processed in a particular facility.

Suderman Decl. ¶¶ 6-7.  Indeed, contrary to Mar-Jac's contention, there is not only no competent

evidence that any government authority verifies the number of chickens lost by a particular farm

or processor, there *is* evidence that such data is self-reported and not independently verified by

either state or federal inspectors.  *Id.*

 Similarly, Mar-Jac claims that "[t]he loss of any substantial number of chickens would

immediately be detected through documentation, independent growers who are only paid for live

birds, outside auditors, and government regulators."  Mar-Jac SUMF ¶ 57.  But, again, neither

third parties nor government regulators independently evaluate the mortality numbers submitted

by poultry processors like Mar-Jac to Agri Stats.  Suderman Decl. ¶ 9.  While it may be *possible*

to contact every related third party, obtain its internal counts (if kept), tabulate them, and match

them against Mar-Jac's reported numbers, Mar-Jac has not provided information from third-party

growers sufficient to demonstrate their reliability.  Even if it had, the Court would have to take

on faith Mar-Jac's assertion that every single third party with whom Mar-Jac contracts kept

accurate records.  *Id.*.  In addition, Mar-Jac claims to have unusually low "mortality" rates

compared with its peers in the poultry industry.  *See, e.g.*, Mar-Jac S.J. Br. at 6, 8, 15, 16.  The

vague term "mortality," however, is nowhere defined by Mar-Jac and, as Dr. Suderman has

testified, it may refer to one of several measures.  Suderman Decl. ¶ 10.  The truth of Mar-Jac's

claims of industry-leading mortality rates is anything but self-evident based on the limited

evidence Mar-Jac has provided.  *Id.*

      Finally, even if Mar-Jac were correct in suggesting that it "consistently had at or near the

lowest mortality rates from among all of the poultry businesses reporting to Agri Stats" for every

year and for every measure, it does not follow that Mar-Jac never "manipulated, overstated, or

otherwise altered its records of chickens that die prior to slaughter."  Mar-Jac S.J. Br. at 8.  The

record evidence confirms that mortality numbers include huge variations from year to year and

from facility to facility – with some reported losses two or three times higher than others – and

Mar-Jac's losses in a particular year could be below average and yet still be "manipulated,

overstated, or otherwise altered."  Suderman Decl. ¶ 11.  It is simply impossible to know whether

this is the case based on the limited, self-serving information provided by Mar-Jac.  *Id.*

      These are just some of the areas that must be explored before Mar-Jac's motion can

properly be opposed and adjudicated.  Nearly all this information is in Mar-Jac's possession,

meaning that additional discovery pursuant to Rule 56(f) is both necessary and appropriate.  *See*

*Mid-South Grizzlies*, 720 F.2d at 779.  And, needless to say, this lengthy detour into chicken accounting would only become necessary if the Court otherwise concludes that the Broadcast is actually about counting chickens rather than funding terrorism.

## V.  MAR-JAC'S TAG-ALONG CLAIMS MUST FAIL IF ITS DEFAMATION CLAIMS FAIL.

As this Court has previously recognized, a plaintiff may not, through creative pleading, invoke other torts as a vehicle for "end-running other requirements of defamation law." *Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099, 1104 (D.D.C. 1991).  This rule is consistently applied to cut off such claims at an early stage where, as here, the defendants are entitled to judgment as a matter of law with respect to plaintiff's defamation cause of action.[36]

Mar-Jac attempts to circumvent this rule, claiming that *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988), bars the kind of "tag along" claims asserted here only when the plaintiff is a public figure.  *See* Mar-Jac Joint Opp'n at 44.  But Mar-Jac admits, as it must, that *Chaiken v. VV Publ'g Corp.*, 907 F. Supp. 689, 699 (S.D.N.Y. 1995), expressly applied *Falwell*'s holding to a private figure plaintiff.  Mar-Jac Joint Opp'n at 45.  While Mar-Jac casts the ruling as an outlier, it was *affirmed* by a unanimous panel of the Second Circuit, which again relied on *Falwell* in ruling that "[w]e agree with the district court that the Chaikens cannot avoid the obstacles involved in a defamation claim by simply relabeling it as a claim for intentional infliction of emotional distress."  *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1034 (2d Cir. 1997).  Mar-Jac likewise admits that *Deupree v. Iliff*, 860 F.2d 300, 304-05 (8th Cir. 1988), expressly applied *Falwell*'s holding to a private figure plaintiff, complaining only that it applied the holding under different facts.  Mar-Jac Joint Opp'n at 44.  Nor is *Deupree* an outlier.  *See Snyder v. Phelps*, 580

---

[36] *See, e.g.*, *Moldea v. New York Times Co.* ("*Moldea II*"), 22 F.3d 310, 319-20 (D.C. Cir. 1994); *Tierney v. Vahle*, 304 F.3d 734, 743 (7th Cir. 2002); *Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Servs.*, 175 F.3d 848, 857 (10th Cir. 1999).

F.3d 206, 218 (4th Cir. 2009), *cert. granted*, 130 S. Ct. 1737 (Mar. 8, 2010) (No. 09-751) (following *Deupree*'s application of *Falwell* to private plaintiff).

But the point is not simply that courts apply *Falwell* itself to private plaintiffs – though several circuits have done so.[37]  Instead, the more general point is that courts do not permit *public or private* figure plaintiffs to avoid the requirements of defamation law by relabeling their claims.  Thus, the D.C. Circuit in *Moldea I* noted that it was undecided whether the plaintiff was a public figure, acknowledging that the applicable standard of care would depend "on whether he were found to be a public figure," but nevertheless held that, under *Falwell*, the plaintiff "may not avoid the strictures of the burdens of proof associated with defamation by resorting" to a different claim.  *Moldea v. New York Times Co.* ("*Moldea I*"), 15 F.3d 1137, 1147, 1151 (D.C. Cir. 1994).  Likewise, the court in *Abadian v. Lee*, 117 F. Supp. 2d 481, 489 & n.8 (D. Md. 2000), held that "a plaintiff cannot prevail on a negligence claim" – one of the tag-along claims also asserted by Mar-Jac (Am. Compl. ¶¶ 36-40) – "after she loses a defamation claim based on the same pleadings," again without passing on the public figure issue.  And because it dealt with a cause of action arising under the Federal Tort Claims Act, in *Talbert v. United States*, the Fourth Circuit looked to "the traditional and commonly understood definition" of the relevant torts under the *Restatement* and concluded that "[a]rtful pleading cannot alter the fact that his claim resound[s] in the heartland of the tort of defamation:  the injury is to reputation; the conduct is the communication of an idea, either implicitly or explicitly," and the plaintiff was

---

[37] The only two cases Mar-Jac cites for the contrary proposition are a district court decision that addressed the issue in passing, *see Merrell v. Renier*, 2006 WL 3337368, at *10 (W.D. Wash. Nov. 16, 2006), and a New York trial court decision involving intentional infliction of emotional distress that has been expressly limited to its "unique factual circumstances," *see Esposito-Hilder v. SFX Broad.*, 665 N.Y.S.2d 697, 700, 236 A.D.2d 186, 189 (3d Dep't 1997).  *But see Idema v. Wager*, 120 F. Supp. 2d 361, 370 (S.D.N.Y. 2000) ("New York courts have consistently held that a plaintiff may not maintain a separate claim for intentional infliction of emotional distress grounded in the same facts as a claim for libel."), *aff'd*, 29 F. App'x 676 (2d Cir. 2002).

therefore obliged to prove all of the elements of a defamation claim in order to prevail.  932 F.2d

1064, 1066-67 (4th Cir. 1991) (internal quotation marks omitted).[38]

Putting aside the *Falwell* issue, there is no merit to Mar-Jac's argument that it properly

pleaded a product disparagement claim (which must relate to the *quality of goods or services*) on

the theory that "Katz stated that Mar-Jac was recording that millions upon millions – 10 million

specifically – of its chickens were dying each year."  Mar-Jac Joint Opp'n at 46.  Even assuming

*arguendo* that Katz made such a statement of fact, and she did not, *see* pp. 27-28 *supra*, Mar-

Jac's contention that the statement suggests those chickens *actually died* is necessarily fatal to its

claim that Katz accused it of laundering money by inflating the number of dead chickens.  Mar-

Jac cannot have it both ways, claiming that Katz said *both* that it overstated its losses by ten

million *and* that she claimed ten million chickens actually died due to poor quality or health.

Simply put, the statements at issue are not reasonably capable of being understood as making any

assertion about the quality or health of Mar-Jac's chickens.

Finally, Mar-Jac is simply incorrect when it argues that its claims for vicarious liability,

punitive damages, and attorneys' fees constitute independent causes of action that may properly

be maintained in the absence of a valid defamation claim.  Mar-Jac contests the issue only as to

Georgia law.  *See* Mar-Jac Joint Opp'n at 46.  But even in Georgia, courts explicitly hold that no

such independent causes of action exist.  *See*, *e.g.*, *Anderson v. Dunbar Armored, Inc.*, 678 F.

Supp. 2d 1280, 1333 (N.D. Ga. 2009) ("Georgia does not recognize vicarious/imputed liability as

a separate cause of action."); *Byrne v. Nezhat*, 261 F.3d 1075, 1093 n.34 (11th Cir. 2001) (under

Georgia law, "a prayer for punitive damages is not an independent cause of action"); *Brown v.*

---

[38] In any event, even without affording Defendants the benefit of discovery on the issue
to which they would, if necessary, be entitled, *see* pp. 38-39 *supra*, Mar-Jac is plainly a public
figure for purposes of this litigation for the reasons articulated in CBS's separate reply brief, *see*
CBS S.J. Reply at 22-24, which are incorporated herein by this reference.

*Baker*, 398 S.E.2d 797, 799 (Ga. App. 1990) (attorneys fee statute "does not create an independent cause of action.  [It] . . . merely establishes the circumstances in which a plaintiff may recover the expenses of litigation as an additional element of damages.").[39]  Mar-Jac's contentions regarding the availability of punitive damages and the propriety of shifting costs of litigation are simply not relevant at this stage of the proceedings.  Whether or not the Court is ultimately empowered to shift costs or award punitive damages, it is clear that requests for such relief do not constitute *independent causes of action*.

## CONCLUSION

For each and all of the foregoing reasons, and for the reasons stated in Defendants' prior memorandum, Defendants respectfully request that the Court grant their joint motion for summary judgment in its entirety and deny Mar-Jac's motion for summary judgment.

Dated:  September 17, 2010

Respectfully submitted,

/s/ Thomas Curley
Lee Levine (D.C. Bar No. 343095)
Gayle C. Sproul (D.C. Bar No. 495965)
Thomas Curley (D.C. Bar No. 473798)
John B. O'Keefe (D.C. Bar No. 974892)
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
1050 Seventeenth Street, NW, Suite 800
Washington, D.C. 20036-5514
(202) 508-1100
(202) 861-9888 fax

*Attorneys for Defendant*
*CBS Broadcasting Inc.*

/s/ Thomas Curley (for Laura Handman)
Laura R. Handman (D.C. Bar No. 444386)
Robert Scott (D.C. Bar No. 419559)
John Rory Eastburg (D.C. Bar No. 984434)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, D.C. 20006-3402
(202) 973-4200
(202) 973-4499 fax

*Attorneys for Defendants Rita Katz, the*
*SITE Institute, and IG, LLC*

---

[39] Mar-Jac offers *no* case to the contrary regarding vicarious liability, effectively conceding that issue as well.  And while it offers a case each as to punitive damages and attorneys' fees, the cases cited simply do not say that either can be asserted as an independent cause of action.  *See* Mar-Jac Joint Opp'n at 46 (citing *Trust Co. Bank of Augusta N.A. v. Henderson*, 364 S.E.2d 289, 293 (Ga. Ct. App. 1987); *Evans v. Willis*, 441 S.E.2d 770, 773 (Ga. Ct. App. 1994)).  Instead, they generally refer to a "claim" for punitive damages or attorneys' fees, without addressing whether either was pleaded or could properly be considered as an independent cause of action, as Mar-Jac asserts here, *see* Am. Compl. ¶¶ 45-52.