**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 03-CV-2422 (RMC)** |
| | ) | |
| **RITA KATZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

# COMPOSITE STATEMENT OF UNDISPUTED MATERIAL FACTS

Because the Response to Defendants' Statement of Undisputed Material Facts ("Response SUMF") filed by plaintiff Mar-Jac Poultry, Inc. ("Mar-Jac") [Dkt. No. 196-1] so seriously distorts the record evidence, attempts to manufacture genuine disputes of material fact where there are none, and simply omits (rather than expressly concede) dozens of the statements proffered in Defendants' original Statement of Undisputed Material Facts ("SUMF"), defendants CBS Broadcasting Inc., Rita Katz, the SITE Institute, and IG, LLC (collectively "Defendants"), respectfully submit the following composite statement of material facts as to which there is no genuine dispute in further support of their motions for summary judgment.

This composite statement addresses the specific objections made by Mar-Jac in the Response SUMF and further demonstrates the substantive accuracy of the original SUMF as well as the uncontested nature and admissibility of the evidence submitted by Defendants in support of their motions.

As the court did in *Goldstick v. The Hartford, Inc.*, this Court should disregard Mar-Jac's response to the extent that, in addition to admitting or denying Defendants' uncontested facts, "it

adds argumentative and often lengthy narrative in [order to] 'spin' the impact of the admissions plaintiffs has been compelled to make." 2002 WL 1906029, *1 (S.D.N.Y. Aug. 19, 2002). Moreover, to the extent Mar-Jac's Response SUMF lodges a series of blanket or otherwise non-specific objections to relevance and/or materiality, Defendants respectfully submit that such objections should be construed merely as shorthand references to the arguments advanced by Mar-Jac in its opposition to Defendants' summary judgment motions [Dkt. Nos. 186 & 187 (sealed); Dkt. Nos. 194-1 & 194-2 (public)] and in support of its own motion for partial summary judgment [Dkt. No. 188]. Those arguments should be rejected for the reasons stated in the contemporaneously filed Memorandum in Further Support of Defendants' Joint Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment and Reply Memorandum in Further Support of Defendant CBS Broadcasting Inc.'s Motion for Summary Judgment.

**THE PARTIES**

**Plaintiff and Its Owners, Officers, and Directors**

**1. Plaintiff Mar-Jac Poultry, Inc. ("Mar-Jac") is a Georgia corporation that produces and processes poultry products. Am. Compl. ¶ 1.**[1]

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**2. Mar-Jac's principal offices are located at 1020 Aviation Boulevard in Gainesville, Georgia. Ex. 1 (Ashraf Dep.) at 371:21-372:6.**[2]

ADMITTED, per LOCAL CIV. R. 7(h)(1).

---

[1] Citations to "Am. Compl." are to the Amended Complaint filed by Mar-Jac on June 29, 2009 [Dkt. No. 127].

[2] Numbered exhibits cited herein are annexed to the Declaration of John Rory Eastburg.

**3. From 1984 to 1996, Mar-Jac was wholly owned by Mar-Jac, Inc., which in turn was wholly or majority owned by the Saar Foundation ("Saar" or "SAAR"). Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 15, 19-21; Ex. 3 (Mirza Dep.) at 46:13-49:6.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac objects that this statement is "materially incomplete," apparently because it does not also include details that Mar-Jac adds (without explanation as to their relevance) about the various attorneys and banks that were involved in Saar's purchase and subsequent sales of its interest in Mar-Jac. Among other things, Mar-Jac also asserts that Saar was "regulated by the Internal Revenue Service," apparently on the theory that, like every other person or entity in the United States with income, it was required to adhere to the federal tax code and IRS regulations and was potentially subject to audit. There is, therefore, no genuine dispute of material fact with regard to this statement.

**4. Saar was established as a charity in 1983 and was initially funded by "members of [the] Al Rajhi family" of Saudi Arabia as well as by fifteen to twenty-five "close friends [of] . . . Shaikh Sulaiman [Abdul Aziz] Al Rajhi," principally Saudi and Kuwaiti business associates. Ex. 4 (Barzinji Dep.) at 67:16-71:13.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**5. Sulaiman Abdul Aziz Al Rajhi ("Shaikh Sulaiman") – one of the wealthiest men in Saudi Arabia who is not a member of the country's royal family – "was the greatest not only donor but also fundraiser for SAAR." Ex. 4 (Barzinji Dep.) at 140:12-14.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac objects to the portion of this statement regarding the wealth of Shaikh Sulaiman as being unsupported by the cited testimony. In fact, Mar-Jac's witnesses – at least one of whom has extensive knowledge of Shaikh Sulaiman's finances, *see* ¶ 11 *infra* (Mirza letter to Shaikh Sulaiman's son expressing gratitude

for "trusting me with the millions" of his family's money); Ex. 3 (Mirza Dep.) at 265:16-17 ("Sheik Sulaiman . . . does not need the millions") – do not contest that Shaikh Sulaiman is one of the wealthiest men in Saudi Arabia, a fact that cannot seriously be disputed. *See, e.g.*, *Saudi Rich List – Revealed: The Kingdom's Top 50 Earners*, ARABIANBUSINESS.COM, *at* http://www.arabianbusiness.com/saudi-rich-list/list?clr=2&sort=rank (identifying Sulaiman Al Rajhi as the seventh wealthiest person in Saudi Arabia, with an estimated net worth of $5.2 billion). Mar-Jac instead contends that, if that portion of the statement were "deemed material in any way, Mar-Jac would require discovery to determine the truth of Defendants' assertion," though it does not follow the proper procedure for preserving that objection. *See* FED. R. CIV. P. 56(f) (requiring "party opposing the motion [to show] by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition"). In any event, the omission of this detail would in no way alter the substantive import of this statement. There is, therefore, no genuine dispute of material fact with regard to this statement.

**6. The Saudi Arabian government prevailed upon Shaikh Sulaiman to populate Saar's leadership with persons who shared the Saudi royal family's ultra-conservative "vision" of Islam, known as Wahhabism. Ex. 4 (Barzinji Dep.) at 135:22-146:9.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not contest the substance of this statement, but rather what Mar-Jac claims it "incorrectly implies." This is not a genuine dispute of material fact.

**7. In 1995, Shaikh Sulaiman asked for the resignations of three Saar board members who were viewed by the Saudis as "aggressive" promoters of a different kind of Islamic thinking, and promoted M. Yaqub Mirza ("Mirza") to become the foundation's president. Ex. 4 (Barzinji Dep.) at 135:22-146:9; Ex. 5 (Al-Talib Dep.) at 249:8-254:4; Ex. 3 (Mirza Dep.) at 49:18-22.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**8. From 1990 to 1996, fifty-one percent of Mar-Jac, Inc., was owned by Saar and the remaining forty-nine percent was owned by three other entities: Aradi Inc., Mena Corp., and Safa Trust ("Safa"). Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 153; Ex. 6.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**9. Mena Corp. was, in turn, a wholly owned subsidiary of Safa. Ex. 7 at 4; Ex. 8 at 24-25; Ex. 9 at 22; Ex. 10 at 27; Ex. 11 at 22.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac objects that this statement "misstate[s] the Record" because "Mena Corp. was not a wholly owned subsidiary of Safa until after 1996," but offers no evidence to support this claim. There is, therefore, no genuine dispute of material fact with regard to this statement.

**10. In 1996 – at a time when Saar was under scrutiny from U.S. journalists and public officials based on perceptions it was contributing money to organizations with "ties to radical Islamic groups" or otherwise "promoting certain radical Islamic causes in the United States" – Saar transferred its assets (totaling $22-23 million), over a period of three to four years, to Humana Charitable Trust ("Humana"), an offshore trust managed by a "corporate trustee," which in turn was controlled by two individuals: Mirza and an attorney who represented the al Rajhi family. Ex. 3 (Mirza Dep.) at 41:20-42:20, 77:9-88:5, 206:18-23; 207:17-21, 210:6-15, 211:24-213:16, 217:4-10, 227:14-23; Ex. 12; *see infra* ¶¶ 143-153.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not take issue with the substance of this statement regarding the timing and nature of the transactions between Saar and Humana. Nor does it deny that, at that time, Saar was in fact under scrutiny from journalists and public officials based on perceptions it was contributing money to Muslim extremists. Instead, it asserts that Saar "was not given any reason to believe that any public officials were investigating or were suspicious of its activities," and proceeds to summarize a portion of one of its witnesses' declarations that is concededly not based on personal knowledge, and therefore inadmissible. *See* Decl. of M.Y. Mirza ¶¶ 14-22 (purporting to describe conversations and meetings involving attorney Rick Gross, Deputy National Security Adviser Sandy Berger, and FBI Special Agent John O'Neill to which Mirza was not privy). This is not a genuine dispute of material fact.

**11. In November 1997, Mirza sent a letter to Shaikh Sulaiman Al Rajhi's son, Abdullah, in which Mirza wrote: "I am thankful to you for trusting me with the millions and I want to assure you that I have protected the trust with best of my abilities." Ex. 13 at YM-016406; Ex. 3 (Mirza Dep.) at 208:22-215:9.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**12. Since 1996, Mar-Jac has been wholly owned by Mar-Jac Holdings, Inc., which in turn is wholly owned by Safa and Mena Investments, Inc., with shares of sixty-five percent and thirty-five percent, respectively. Ex. 3 (Mirza Dep.) at 46:13-49:6.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**13. Safa is a non-profit organization, funded in part by the Al Rajhi family, which was established "as an endowment for [the International Institute of Islamic Thought ("IIIT")]." Ex. 3 (Mirza Dep.) at 197:19; Ex. 4 (Barzinji Dep.) at 69:16-71:4.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**14. From 1989 to 2004, Safa had "at least one, if not two," board members in common with Mar-Jac. Ex. 3 (Mirza Dep.) at 141:18-22.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**15. Mena Investments, Inc., is owned by six individuals – and/or their family trusts/partnerships – including Mirza, Dr. Jamal Barzinji ("Barzinji"), Dr. Hisham Al-Talib ("Al-Talib"), and Dr. Ahmad Totonji ("Totonji"). Ex. 3 (Mirza Dep.) at 44:7-45:24.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**16. Beginning in 1987, and at all times relevant to this litigation, most or all of the beneficial owners of Mar-Jac maintained offices at 555 Grove Street in Herndon, Virginia. Ex. 3 (Mirza Dep.) at 76:2-7.**

RESPONSE TO MAR-JAC OBJECTION: Pursuant to Mar-Jac's objection, Defendants have modified this statement to clarify that, prior to 1987, Mar-Jac's then-beneficial owner Saar did not maintain offices at 555 Grove Street, which was not constructed until 1987, and that, from 1990 to 1996, only three of Mar-Jac's four beneficial co-owners maintained offices there. There is, therefore, no genuine dispute of material fact with regard to this statement.

**17. The 555 Grove Street property was owned, at all times relevant to this litigation, by either Grove Corporate Plaza, Inc. (which in turn was owned by Saar) or by Heritage Education Trust ("Heritage"). Ex. 1 (Ashraf Dep.) at 62:22-63:6; Ex. 5 (Al-Talib Dep.) at 54:8-17; Ex. 4 (Barzinji Dep.) at 280:8-16.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**18. At all times relevant to this litigation, and at the time of his deposition, Mirza was an officer, director, or managing agent of Mar-Jac or its holding company, serving in the role of secretary from at least 1996 until 2002, and at all times as a director. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 28-35; Ex. 3 (Mirza Dep.) at 47:12-48:2, 57:7-58:9.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**19. Mirza was also, at all times relevant to this litigation, an officer, director, trustee, or managing agent of each of the following entities, among others: Saar; Safa; African Muslim Agency; Humana, as director of its corporate trustee; York International Trust; York Foundation; Sterling Charitable Gift Fund; and Sterling Management Group. Ex. 3 (Mirza Dep.) at 40:11-44:6, 49:6-50:3, 54:11-19, 60:9-61:15, 71:17-72:24.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**20. Mirza was also an officer of Heritage from its inception until 1997 or 1998. Ex. 3 (Mirza Dep.) at 51:7-13.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**21. At all times relevant to this litigation, and at the time of his deposition, Al-Talib was an officer, director, or managing agent of Mar-Jac or its holding company. Ex. 5 (Al-Talib Dep.) at 60:21-61:22.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**22. Al-Talib was also, at all times relevant to this litigation, an officer, director, trustee, or managing agent of each of the following entities: Safa, IIIT, and African Muslim Agency. Ex. 5 (Al-Talib Dep.) at 44:7-14, 46:18-47:2, 57:18-58:7, 64:11-13.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**23. Al-Talib was also an officer of Saar for twelve years, from its inception in 1983 until 1995, when he and three other Saar board members, including Barzinji, resigned following pressure from members of the Saudi royal family who "wanted to promote their own vision" for the foundation and did not want people with different attitudes than theirs on the Saar board. Ex. 5 (Al-Talib Dep.) at 25:12-26:3; 249:8-254:4; Ex. 4 (Barzinji Dep.) at 135:22-146:9.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**24. At all times relevant to this litigation, and at the time of his deposition, Barzinji was an officer, director, or managing agent of Mar-Jac or its holding company. Ex. 4 (Barzinji Dep.) at 17:15-18:6.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**25. Barzinji was also, at all times relevant to this litigation, an officer, director, trustee, or managing agent of each of the following entities: Safa and IIIT. Ex. 4 (Barzinji Dep.) at 14:5-9, 29:7-11.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**26. Barzinji was also an officer of Saar for twelve years, from its inception in 1983 until 1995, and was a director of Heritage at the time of its inception. Ex. 4 (Barzinji Dep.) at 42:20-43:4, 267:8-11.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**27. Since 1996, and at the time of his deposition, Mohammad Omar Ashraf ("Ashraf") was an officer, director, or managing agent of Mar-Jac or its holding company. Ex. 1 (Ashraf Dep.) at 16:5-19, 25:21-26:4.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**28. Ashraf was also, at all times relevant to this litigation, an officer, director, trustee, or managing agent of each of the following entities: Humana, as director of its corporate trustee; York Foundation; and Sterling Charitable Gift Fund. Ex. 1 (Ashraf Dep.) at 86:17-87:16, 92:7-16, 319:2-4.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac contends that this statement "misstate[s] the Record" because "M. Omar Ashraf was not an officer, director, trustee or managing agent of York Foundation." Ashraf's cited testimony, however, clearly states that he was an officer of York Foundation. Ex. 1 (Ashraf Dep.) at 319:2-4. Mar-Jac evidently is confusing York *Foundation* with its similarly named affiliate York *International Trust*. *See* Decl. of M.O. Ashraf ¶ 2 ("I was not a trustee of York International Trust ('York'), nor have I ever been a trustee of York."). There is, therefore, no genuine dispute of material fact with regard to this statement.

**Defendants**

**29. Defendant Rita Katz ("Katz") is the author and subject of a book entitled Terrorist Hunter: The Extraordinary Story of a Woman Who Went Undercover to Infiltrate the Radical Islamic Groups Operating in America ("the Book"). Am. Compl. ¶¶ 10, 20.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**30. The Book was published by HarperCollins Publishers in 2003 with the author identified as "Anonymous." Ex. 14.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**31. Katz also was the director of defendant the SITE Institute ("SITE"), an organization that investigated and reported on international terrorism, and is the president of defendant IG, LLC ("IG"), which does business as the SITE Intelligence Group. Am. Compl. ¶ 2-4.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**32. Defendant CBS Broadcasting Inc. ("CBS") produces and broadcasts the award-winning television news program 60 Minutes. CBS produced and broadcast the May 4, 2003, 60 Minutes news report entitled "Terrorist Hunter" that is at issue in this action ("the Broadcast"). Am. Compl. ¶¶ 5, 8.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**THE FEDERAL INVESTIGATION OF MAR-JAC AND ITS ASSOCIATES**

**33. Following the terrorist attacks of September 11, 2001, the United States launched "Operation Green Quest," a multi-agency law enforcement initiative that was intended to investigate and cut off the sources of funding for terrorist organizations. *Unus v. Kane*, 565 F.3d 103, 107-08 (4th Cir. 2009); Ex. 15.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac's purported objection to this statement is incomprehensible. There is plainly no genuine dispute with respect to the nature and purpose of the "Operation Green Quest" task force.

**34. In connection with this initiative, in March 2002, David Kane, Senior Special Agent of the United States Customs Service, executed a 139-page Affidavit in Support of an Application for Search Warrant in the Matter of Searches Involving 555 Grove Street, Herndon, Virginia, and Related Locations ("Kane Affidavit"), which was submitted to the United States District Court for the Eastern District of Virginia. Ex. 16; Am. Compl. ¶ 20.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac incorrectly labels as "hearsay" this and other statements recounting the contents of the Kane Affidavit, which are offered to establish what the government said it was investigating when it searched Mar-Jac's offices, not "to prove the truth of the matter asserted" in the affidavit, FED. R. EVID. 801(c), and which were in any event submitted under oath by a federal law enforcement officer. For purposes of Defendants' motions, the fact that the Kane Affidavit was not unsealed until October 17, 2003 is of no relevance. There is, therefore, no genuine dispute of material fact with regard to this statement.

**35. In this Affidavit, Agent Kane averred that the United States government was then "investigating a criminal conspiracy to provide material support to terrorist organizations by a group of Middle Eastern nationals living in Northern Virginia" and that these individuals "have operated over 100 different organizations, on which they commonly serve as corporate officers[,] . . . includ[ing] charitable organizations, educational and cultural organizations, for-profit businesses and investment firms." Ex. 16 at 6-7.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**36. The Kane Affidavit referred to "the web of companies and charities controlled by these individuals as the 'Safa Group.'" Ex. 16 at 2.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**37. One of the entities identified in the Kane Affidavit as being part of the Safa Group was Mar-Jac, which the Kane Affidavit described as "a large poultry processor located at 1020 Aviation Boulevard, Gainesville, Georgia, whose principal officers are [Jamal] Barzinji, [Hisham] Al-Talib, M. Omar Ashraf and [M. Yaqub] Mirza." Ex. 16 at 50.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**38. Mar-Jac was deemed by the U.S. government to be a "target" of its investigation into the activities of the Safa Group. Ex. 17 at 2.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**39. The Kane Affidavit asserted that there was probable cause – based upon information collected by the Customs Service, the Federal Bureau of Investigation, the Internal Revenue Service, and the former Immigration and Naturalization Service – to conclude that the individuals who were in control of the Safa Group entities had "provid[ed] material support to terrorists" and engaged in "money laundering[ ] and tax evasion through the use of a variety of related for-profit companies and ostensible charitable entities under their control, most of which are located at 555 Grove Street, Herndon, Virginia." Ex. 16 at 2.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**40. The Kane Affidavit asserted that the targeted individuals – including four of the seven directors of Mar-Jac – had "moved or authorized the movement of . . . multiple millions of dollars . . . between the Safa Charities, between the for-profit members of the Safa Group and the Safa Charities, and between the Safa Charities and foreign entities represented to be charitable in nature." Ex. 16 at 45.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**41. The Kane Affidavit described various financial transactions involving "contributions to the Safa Charities from for-profit corporations of the Safa Group, loans to for-profit corporations in the Safa Group, contributions, loans, and grants between the Safa Charities and the movement of funds from the Safa Charities into offshore trusts and other foreign entities." Ex. 16 at 45-46.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**42. The Kane Affidavit further detailed what it characterized as a pattern of material omissions and misstatements in multiple tax return filings by charities in the Safa Group. Ex. 16 at 60-69.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac's hearsay objection is unfounded. For purposes of Defendants' motions, the contents of the Kane Affidavit are offered to establish what the government said it was investigating when it searched Mar-Jac's offices, not "to prove the truth of the matter asserted" in the affidavit. *See* FED. R. EVID. 801(c). *See also* ¶ 34 *supra*. There is, therefore, no genuine dispute of material fact with regard to this statement.

**43. Among the conclusions of the Kane Affidavit was that "the finances of the Safa Group . . . exhibited a convoluted web of multiple transactions between related corporations and charities that made it virtually impossible . . . to ascertain where the money that finally left the web of the Safa Group ultimately went." Ex. 16 at 7-8.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**44. According to the Kane Affidavit, the investigation of the Safa Group had "traced millions of dollars through layers of related companies" to charities that were based in and/or maintained bank accounts in foreign countries. Ex. 16 at 8, 12.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac's response to this statement does not address the facts asserted therein. There is, therefore, no genuine dispute of material fact with regard to this statement.

**45. Agent Kane asserted that "there [did] not appear to be any innocent explanation" as to "why the labyrinth of organizations and charities that comprise the Safa Group was constructed," but he surmised that "the most likely reason [was] to conceal support for terrorism." Ex. 16 at 41.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac's hearsay objection is unfounded. For purposes of Defendants' motions, the contents of the Kane Affidavit are offered to establish what the government said it was investigating when it searched Mar-Jac's offices, not "to prove the truth of the matter asserted" in the affidavit. *See* FED. R. EVID. 801(c). *See also* ¶ 34 *supra* & 45 *infra*. There is, therefore, no genuine dispute of material fact with regard to this statement.

**46. Agent Kane averred that he "and the other agents involved in th[e] investigation believe[d] that some of the moneys that move[d] overseas [we]re destined to the [Palestinian Islamic Jihad] and other terrorist organizations" or for uses "other than tax-exempt purposes." Ex. 16 at 8.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac's hearsay objection is unfounded. For purposes of Defendants' motions, the contents of the Kane Affidavit are offered to establish what the government said it was investigating when it searched Mar-Jac's offices, not "to prove the truth of the matter asserted" in the affidavit. *See* FED. R. EVID. 801(c). Moreover, to the

extent Mar-Jac asserts that "Agent Kane and government officials [subsequently] concluded that the monies were not 'destined' to terrorist organizations," that assertion is unsupported by admissible testimony based on personal knowledge. *See also* ¶ 34 *supra*. There is, therefore, no genuine dispute of material fact with regard to this statement.

**47. The Kane Affidavit concluded that, since at least 1995, "members of the Safa group . . . [had] rout[ed] financial support to [Hamas and Palestinian Islamic Jihad] by layering financial transactions though charities and businesses within the Safa Group," and that these entities and the individuals who controlled them had violated tax laws in an effort to conceal the true nature of their activities. Ex. 16 at 78-80.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**48. On March 13, 2002, the United States District Court for the Eastern District of Virginia issued warrants authorizing the requested searches of the premises at 555 Grove Street, at other Virginia locations, and at the offices maintained by Mar-Jac in Gainesville, Georgia. Am. Compl. ¶ 20.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**49. On March 20 and 21, 2002, the federal government executed search warrants at approximately 20 different locations – including the 555 Grove Street building in Herndon, Virginia; a neighboring office building that served as the headquarters of IIIT; Mar-Jac's offices in Georgia; and the homes of three of Mar-Jac's corporate directors – and seized hundreds of boxes of paper and electronic files as well as disks, recordings, and other items. Ex. 18 at 1-2; Ex. 19 at 2; Ex. 16 at 5-6.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**50. In seeking and securing these warrants, the United States relied upon information provided by Katz, who served as a confidential government informant, as well as information gathered by the various government agencies. Am. Compl. ¶¶ 21-22; *see supra* ¶ 39.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac purports to controvert this statement, albeit without evidentiary support, by asserting that "[t]he United States did not rely on information provided by Katz '*in seeking and securing* . . . [search] warrants.'" Throughout this (and other) litigation, however, Mar-Jac has not only repeatedly conceded this fact, but has trumpeted, time and again, that "Ms. Katz is the informant on the affidavit supporting the searches" as well as "a paid informant in that case." Tr. of 2/27/04 Conf. at 10:20-11:1. *See also* Ex. 117 at 14 ("Rita Katz was a government informant used by S/A David Kane to obtain a search warrant against Mar-Jac."); Pl.'s Resp. to Mot. to Dismiss Appeal, *Mar-Jac Poultry, Inc. v Katz*, Case No. 10-7035 (D.C. Cir. Apr. 9, 2010), at 3 (asserting that Katz "communicated her accusations to the government who . . . commenced an investigation"); Pl.'s Mot. to Expedite Pet. for Writ of Mandamus, *In re Mar-Jac Poultry, Inc.*, Case No. 10-5073 (D.C. Cir. Apr. 16, 2010) at 3 (referencing the federal "investigation Defendant Katz had prompted with her accusations"). Most recently, in opposing Defendants' Joint Motion for Summary Judgment, Mar-Jac placed in evidence a declaration sworn to by Katz in which she states: "Based, in part, on my information and leads I provided to the government, a number of these groups, including Mar-Jac, have been raided by U.S . law enforcement in an ongoing investigation into whether those organizations are giving support to terrorist organizations." Dkt. No. 196-10 at ¶ 3. There is, therefore, no genuine dispute of material fact with regard to this statement.

**THE *60 MINUTES* BROADCAST**

**51. More than a year after the search warrants were executed, on May 4, 2003, CBS broadcast a *60 Minutes* news report entitled "Terrorist Hunter" about Katz and her role in federal terrorism investigations. Ex. 20 (DVD); Ex. 21 (Broadcast Tr.); Am. Comp. ¶ 11.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**52. The Broadcast, which is reported and narrated by correspondent Bob Simon, begins by introducing viewers to Katz, recounting her background, summarizing her previous work ("one tipster government officials say has been especially valuable is a professional researcher who's spent five years investigating links to Muslim terrorism here in the United States"), and describing her new book "detail[ing] how groups in America have been providing significant support to terrorist outfits and how she helped track them down." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 14.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**53. At her request, Katz is identified in the Broadcast as "Sarah" and her face is disguised. Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 14, 19.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**54. The Broadcast reports that Katz began her career by helping to expose a Texas-based charity, the Holy Land Foundation for Relief and Development, as a terrorist front organization. Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 16.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**55. In an interview, Katz explains that she dressed as an observant Muslim woman and offered, through the Foundation, to sponsor the child of a Hamas suicide bomber – "[i]n the language of Hamas, a martyr." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 16.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**56. According to the Broadcast, when Katz learned that the charity had been approved to receive matching funds through the United States Agency for International Development, she contacted the White House "[a]nd it was stopped." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 16.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**57. In April 2001, the Broadcast reports, Katz arranged to videotape al-Qaeda sympathizers chanting their support for Osama bin Laden at the United Nations. Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 17.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**58. The Broadcast reports that Katz was unable to interest the federal government in that tape until September 11, 2001, at which point "the FBI was interested not only in the tape but in all her work. And the government began cracking down on the charities she'd been investigating." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 17.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**59. The Broadcast proceeds to describe how, even before September 11, Katz began visiting mosques in her Muslim garb and "record[ing] imams who were calling for jihad, holy war against Jews, against the United States." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 17.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**60. In the course of her work, the Broadcast recounts, Katz learned about "a single organization, whose founders now had offices in a Washington suburb. The address was 555 Grove Street, Herndon, Virginia." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**61. Katz says on camera that this turned out to be her "biggest lead to the government" – her discovery that "[t]his one building, 555 Grove, housed nearly a hundred organizations owned by Muslims, most of them run by the same small group of people." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**62. The Broadcast reports that Katz began gathering information about the entities headquartered at 555 Grove Street to provide to federal law enforcement authorities, including by searching the trash in a dumpster at the building. Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac asserts that the Broadcast does not indicate that Katz was gathering information about the entities headquartered at 555 Grove Street to provide to federal law enforcement authorities. This contention simply cannot be squared with the Broadcast itself, or with Mar-Jac's prior concessions. *See* ¶ 50 *supra*. There is, therefore, no genuine dispute of material fact with regard to this statement.

**63. In the dumpster, Katz explains, she located "one important letter" from which she concluded that substantial sums of money "[came] from Saudi Arabia," specifically, the Broadcast reports, "from members of an extremely wealthy Saudi family, the al-Rajhis" and was used to "fund[ ] many of the organizations in 555 Grove." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.**

RESPONSE TO MAR-JAC OBJECTION: Pursuant to Mar-Jac's objection, Defendants have modified this statement to include Katz's description of the particular document she found – a letter – which led her to conclude that "the money comes from Saudi Arabia . . . from members of an extremely wealthy Saudi family, the al-Rajhis, who [Katz] claims, funded many of the organizations in 555 Grove." Ex. 21 (Broadcast Tr.) at 18. There is, therefore, no genuine dispute of material fact with regard to this statement.

**64. The Broadcast reports that Katz "was convinced she'd stumbled upon the heart of a terrorist financing ring." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**65. Using an illustration she had prepared ("the Chart"), the Broadcast depicts Katz describing "how, she says, the money flowed from Saudi Arabia to a web of charities, think tanks, and businesses at 555 Grove, then to offshore banks and ultimately, she says, to terrorist groups." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18; Ex. 22.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**66. Through the use of arrows, the Chart posits that money flowed from the "al-Rajhi Family" and "Saudi Businessmen" to the "SAAR Network 555 Grove St." Ex. 22.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac objects to this and other statements characterizing the meaning of the words, images, and drawings on the Chart because it believes

the term "posits" is "argumentative." This contention does not raise a genuine dispute of material fact. Moreover, Mar-Jac's objection belies its assertion that the Chart "speaks for itself." The Chart, which consists entirely of the names of people and organizations connected by various arrows makes no statements, on its own; its meaning arises only by implication, derived from the context in which it was depicted.

**67. The Chart identifies the following entities as being part of the "SAAR Network 555 Grove St.": SAAR Foundation, the International Institute of Islamic Thought (IIIT), Mar-Jac Poultry, Muslim World League, and Safa. Ex. 22.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**68. A circular arrow on the Chart posits that money passed between and among entities within the SAAR Network. Ex. 22.**

RESPONSE TO MAR-JAC OBJECTION: There is no genuine dispute of material fact with regard to this statement. *See* ¶ 66 *supra*.

**69. The arrows on the Chart further posit that money flowed, directly or indirectly, from the SAAR Network entities to at least ten recipients. Ex. 22.**

RESPONSE TO MAR-JAC OBJECTION: There is no genuine dispute of material fact with regard to this statement. *See* ¶ 66 *supra*.

**70. The Chart's legend indicates that six of these recipients – among them the Holy Land Foundation for Relief and Development, Youssef Nada, Nada International, and Bank al-Taqwa – had been designated as terrorists by the U.S. government and that another three – ICP/WISE (acronyms for the Islamic Committee for Palestine and the World Islamic Studies Enterprise, respectively), Sami al-Arian (the leader of ICP/WISE), and IIRO (an acronym for the International Islamic Relief Organization) – were then under investigation by the U.S. government. Ex. 22.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**71. In 2001, the U.S. government designated the Holy Land Foundation for Relief and Development (formerly known as the Occupied Land Fund), Youssef Nada, and Bank al Taqwa as supporters of terrorism; in 2002, it similarly designated Nada International as a supporter of terrorism. Ex. 23; Ex. 24; Ex. 25; *see infra* ¶¶ 138, 191-198, 211-217.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**72. WISE and al-Arian were under federal investigation from 1995 until al-Arian's indictment in 2003. Ex. 3 (Mirza Dep.) at 104:14-106:2; Ex. 26; *see infra* ¶¶ 169-180.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**73. The IIRO's offices at 360 South Washington Street in Falls Church, Virginia, were searched by federal agents, pursuant to a warrant, on March 20, 2002, as part of the Operation Green Quest investigation. In 2006, the U.S. government designated the IIRO's Indonesia and Philippines branches as supporters of terrorism. Ex. 3 (Mirza Dep.) at 16:1-19, 59:1-17, 268:21-25, 269:1-2; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 68-70; Ex. 27 at i; Ex. 17 at 22-23; Ex. 28; *see supra* ¶ 49; *see infra* ¶¶ 169-180.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**74. Ultimately, the Chart posits that some of the money flowed from these entities, directly or indirectly, to al-Qaeda, Hamas, or Palestinian Islamic Jihad. Ex. 22.**

RESPONSE TO MAR-JAC OBJECTION: There is no genuine dispute of material fact with regard to this statement. *See* ¶ 66 *supra*.

**75. Hamas and Palestinian Islamic Jihad have been deemed to be terrorist organizations under U.S. law since 1995, and al-Qaeda has been so designated since 1998. Ex. 29; Ex. 30.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**76. The Broadcast describes Katz's view that the circulation of funds through multiple layers of entities in this manner is "designed to make it difficult to follow the money." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac objects to the phrase "describes Katz's view" as being "argumentative," but does not explain how it is inaccurate. *See* Ex. 21 (Broadcast Tr.) at 18 ("SIMON: . . . Sarah mapped out how, she says, the money flowed from Saudi Arabia to a web of charities, think tanks and businesses at 555 Grove, then to offshore banks and ultimately, she says, to terrorist groups. It's not simple because, Sarah says, it's not

meant to be. It's designed to make it difficult to follow the money."). There is, therefore, no genuine dispute of material fact with regard to this statement.

**77. The Broadcast notes that "one especially inventive idea the Saudis came up with, according to [Katz], was chickens. They bought a chicken farm in Georgia." As correspondent Simon delivers this narration, the Broadcast briefly depicts a large poultry transport truck bearing Mar-Jac's corporate logo. Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac contends "[t]here is no evidence . . . that 'the Saudis came up with' the idea of buying a 'chicken farm.'" But this is entirely beside the point. The import of this statement relates to the meaning a reasonable viewer would ascribe to the Broadcast; it is of no moment whether this particular (non-defamatory) statement attributed to Katz is accurate. All that matters is that it was part of the narration, which is undisputedly true. In any event, Mar-Jac has come forward with no evidence that anyone other than the Saudis who funded and controlled Saar was behind Saar's purchase of Mar-Jac. Mar-Jac further quibbles with the use of the adverb "briefly" to describe the period of time that an image of a truck bearing Mar-Jac's logo is depicted in the Broadcast. But, given that Mar-Jac contends elsewhere that "[o]nly 19 seconds" of the 13-minute Broadcast are devoted to the portion of the story dealing with "the government investigation involving Mar-Jac and others," Resp. SUMF ¶ 261, the small fraction of that period during which the Mar-Jac truck appears could hardly be described as anything other than "brief," or even "fleeting." There is, therefore, no genuine dispute of material fact with regard to this statement.

**78. Katz is then depicted saying that "Chicken – I see it as the best cover for money laundering." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**79. When correspondent Simon questions that assertion, Katz responds that "chicken is one of the things that no one can really track down. If you say in one year that you lost 10 million chickens, no one can prove it. They just died. You can't trace money with chickens." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**80. Simon then asks Katz whether she is contending that the "money lost has gone down the line to Hamas or Islamic Jihad or al-Qaeda?," to which she replies, "That's what we're trying to find out." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**81. "[W]ith [Katz's] help" – namely, the information gathered by Katz and provided by her and then pursued by federal law enforcement authorities – the Broadcast explains, "U.S. officials had found out enough to get a customs department task force to raid 555 Grove and 28 other locations in March 2002, carting away seven truckloads of evidence. It was one of the biggest terrorism related raids in US history. And yes, they raided a chicken farm, too." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 18-19.**

RESPONSE TO MAR-JAC OBJECTION: There is no genuine dispute of material fact with regard to this statement. *See* ¶ 50 *supra*.

**82. The Broadcast then depicts Simon visiting 555 Grove Street, at which point he explains that, while Katz "says her efforts stopped the flow of funds from here to terrorists, . . . the Muslims who work here say there never was a flow. And they point out that today, more than a year after the raids, no criminal charges have been brought against anyone." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 19.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**83. The Broadcast proceeds to present the views of Suhaib Jamal, the son of Mar-Jac Chairman Jamal Barzinji and himself an indirect beneficial owner of Mar-Jac (through his family partnership's stake in Mena Investments, Inc.): "You don't go attacking innocent Americans, you know, just because they have a Muslim background or an Arab background. And these are people, some of the most law-abiding, you know, patriotic Americans you'll ever meet, the people who . . . were raided, and it's such a shame." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 19; Ex. 5 (Al-Talib Dep.) at 176:17-179:4; *see supra* ¶¶ 12, 15.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac contends that "[t]here is no evidence that Suhaib Jamal is the son of Jamal Barzinji," even though the cited testimony in fact reflects such evidence. Mar-Jac also asserts a lack of evidence to support the statement that Mr. Jamal is "an indirect beneficial owner of Mar-Jac," even though it is otherwise conceded that a Barzinji family trust/partnership owns a stake in Mar-Jac, *see* ¶ 15 *supra*. In addition, Dr. Barzinji's sworn declaration neither contests paternity nor denies that his son is a beneficiary of his family trust/partnership. There is, therefore, no genuine dispute of material fact with regard to this statement.

**84. Simon is shown asking Jamal: "Did some of the money that was given to legitimate charities here wind up in the hands of the families of martyrs in Gaza or the West Bank? I don't know, but apparently there is suspicion that it did." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 19.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**85. In response, Jamal poses a question of his own: "Whose suspicion though? Who is tipping off the . . . federal government? Who are these people in the . . . shadows, in the . . . backgrounds, you know? What is their agenda?" Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 19.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**86. The Broadcast concludes by summarizing the conflicting positions of the protagonists in the federal investigation. First, Katz asserts, "I'm not after Muslims, I'm after hunting terrorist Muslims – Muslim terrorists. I'm not after Islam, I'm after Islamic terrorism. It's just a small group of people that are trying to destroy our life, are doing all this damage, and we must make sure that we stop it." Simon then reports that "[t]he al-Rajhi family from Saudi Arabia claims it never financed terrorists. So do the people who were raided in Virginia. So do all the charities and foundations mentioned or shown in our story. Meanwhile, the U.S. Justice Department continues its investigation." Ex. 20 (DVD); Ex. 21 (Broadcast Tr.) at 19.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not contest the substance of this statement except to assert that the Broadcast's concluding statements "did not 'summarize' Mar-Jac's position." There is, therefore, no genuine dispute of material fact with regard to this statement.

**MAR-JAC WAS A CONDUIT FOR FINANCIAL TRANSACTIONS THAT ULTIMATELY AIDED TERRORIST ORGANIZATIONS**

**Money Flow Into Mar-Jac**

**87. Mar-Jac and its holding companies received approximately $3.5 million in loans from Saar between 1984 and 1997. Ex. 31 at Ex. G; Ex. 32 at 4; Ex. 33 at 3; Ex. 34; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 199, 378.**

RESPONSE TO MAR-JAC OBJECTION: Pursuant to Mar-Jac's objection, Defendants have modified this statement to clarify that the total amount of loans Mar-Jac and its holding companies received from Saar between 1984 and 1997 was $3.5 million, not $18.5 million, as originally stated. The $15 million overstatement was the result of a misreading of one of Saar's tax returns, which reports a $15 million loan by Saar to "MARJAC INV," apparently a reference to another Saar subsidiary, Mar-Jac *Investments*, rather than to Mar-Jac, *Inc.*, which was then Mar-Jac's holding company. *See* Ex. 32 at 4. The error was both inadvertent and immaterial. There is no genuine dispute of material fact with regard to this statement.

**88. Mar-Jac and its holding companies received approximately $1.2 million in loans from Safa between 1990 and 1997. Ex. 6, Ex. 35; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 156, 507-519.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac purports to controvert a portion of this statement, but the record evidence conclusively demonstrates its accuracy. Mar-Jac concedes that Safa loaned it $500,000 in 1990, but disputes the remainder. Nevertheless, Exhibit 35 is a 1997 Promissory Note given by Mar-Jac to Safa for the principal amount of $650,000, with an annual interest rate of ten percent. There is, therefore, no genuine dispute of material fact with regard to this statement.

**89. Mar-Jac's holding company received a $5.5 million loan in 1996 from Heritage, which had itself received $8.6 million in donations from Safa that same year. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 569; Ex. 16 at 53.**

RESPONSE TO MAR-JAC OBJECTION: Pursuant to Mar-Jac's objection, Defendants have modified this statement to clarify that the $8.6 million transferred from Safa to Heritage in 1996 was in the form of donations, not a loan. The distinction is immaterial for purposes of Defendants' motions. There is, therefore, no genuine dispute of material fact with regard to this statement.

**90. Mar-Jac received a $350,000 loan in 1997 from Mena Investments, Inc. Ex. 36; Ex. 37; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 507-513, 547-559.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac purports to controvert this statement, but the record evidence conclusively demonstrates its accuracy. Exhibit 36 is a 1997 Promissory Note given by Mar-Jac to Mena Investments, Inc., for the principal amount of $350,000, with an annual interest rate of ten percent. There is, therefore, no genuine dispute of material fact with regard to this statement.

**91. Mar-Jac received a $5.1 million loan in 1990 from a Panamanian company called Key Overseas, Inc., which the Al Rajhi family had funded and used "as a vehicle to make friendly loans" to "all of the entities" which with they were associated. Ex. 38; Ex. 39; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 87-90; Ex. 3 (Mirza Dep.) at 219:1-220:4.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**92. Mar-Jac's holding company received a $400,000 loan in 1990 from Safa subsidiary Mena Corp. Ex. 40; Ex. 41; Ex. 6; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 155.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac objects that this statement "misstate[s] the Record" because "Mena Corp. was not a subsidiary of Safa," but offers no evidence to support this claim. There is, therefore, no genuine dispute of material fact with regard to this statement.

**93. Mar-Jac received a $4 million loan in 1990 from a Panamanian company called Solmagic, S.A., which was owned by a Saudi businessman named Abdul Aziz Ali Al-Direibi. Ex. 42; Ex. 6; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 91-92, 193; Ex. 3 (Mirza Dep.) at 266:20-267:15.**

RESPONSE TO MAR-JAC OBJECTION: Pursuant to Mar-Jac's objection, Defendants have modified this statement to clarify that the loan from Solmagic, S.A., to Mar-Jac was made in 1990, rather than 1993. The distinction is immaterial for purposes of Defendants' motions. There is, therefore, no genuine dispute of material fact with regard to this statement.

**94. In sum, from 1984 to 1997, Mar-Jac received more than $18.5 million in capital infusions (in the form of loans) directly and indirectly from Saar and Safa as well as from two offshore companies funded, owned, and/or controlled by Saudis. *See supra* ¶¶ 87-93.**

RESPONSE TO MAR-JAC OBJECTION: Pursuant to Mar-Jac's objection, Defendants have modified this statement to clarify that the total amount of loans Mar-Jac received was in excess of $18.5 million, rather than $35 million. The discrepancy between the total figures stems from the inadvertent error referenced in ¶ 87 *supra*, and is immaterial for purposes of

Defendants' motions. There is, therefore, no genuine dispute of material fact with regard to this statement.

**Money Flow Out of Mar-Jac**

*Use of Mar-Jac Funds by Donees*

**95. Prior to March 2002, whenever Mar-Jac and/or its holding company or beneficial owners distributed money to charities that were eligible for tax-exempt status under U.S. law, they typically neither imposed restrictions on the use of the donated funds nor required donees to produce audits or other proof regarding the expenditures made with those funds. Ex. 3 (Mirza Dep.) at 113:12-25, 114:12-116:4, 130:4-132:6, 141:9-142:12, 249:21-251:7, 257:5-16, 259:1-18.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**96. During this period, Mar-Jac did not consider itself an 'ensurer' of what its donees do with donations" they received from the company. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 208, 210, 255, 267; Ex. 3 (Mirza Dep.) at 141:9-25.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**97. Because, according to Mirza, money is "fungible," a Mar-Jac donee's subsequent expenditure of funds may be attributable, at least in part, to Mar-Jac's donation(s), and it is typically not possible to determine the precise uses to which Mar-Jac's donated funds were later put. Ex. 3 (Mirza Dep.) at 218:19-20, 245:1-3, 257:5-12, 264:8-10; *see* Ex. 43 (quoting attorney for Saar stating that, once money is given to another organization, it is impossible to "ultimately determine that something didn't happen to it").**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**98. Mirza testified that the organizations he served, including Mar-Jac, faced a "difficulty" when it came to making charitable contributions because some groups that were mostly doing charitable work may also have had "violent" factions, and donors could not be sure "with absolute certainty" that funds given to those charities would be put to the intended use. Ex. 3 (Mirza Dep.) at 232:3-18.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional excerpts from Mirza's testimony on this subject. There is, therefore, no genuine dispute of material fact with regard to this statement.

**99. In 1996, after the U.S. government had executed search warrants and seized records maintained by WISE and al-Arian, Saar hired the respected private investigative firm Kroll Associates ("Kroll") to "conduct a due diligence" review of the foundation's charitable giving and assess the "credibility of . . . rumors" that Saar and its donees had "links to militant Islamic organizations." Ex. 3 (Mirza Dep.) at 89:14-17, 96:25-97:3, 99:25-100:5, 104:14-106:2, 129:22-130:2; Ex. 12; Ex. 44; Ex. 26.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional excerpts from Mirza's testimony and from documents relating to this subject. There is, therefore, no genuine dispute of material fact with regard to this statement.

**100. In its resulting reports to Saar ("the Kroll Reports") – which were based on Kroll's review of news stories and public records as well as interviews it conducted with journalists and with officials in Congress and various law enforcement agencies – Kroll concluded that at least five of the groups to which Saar had previously donated money were "suspected by journalistic and law enforcement officials of involvement in supporting terroristic activity": IIIT; the American Muslim Council/Foundation ("AMC" and "AMF"); the Dar al Hijrah mosque in Falls Church, Virginia; the Muslim Arab Youth Association ("MAYA"); and the Islamic Society of North America ("ISNA"). Ex. 3 (Mirza Dep.) at 88:14-108:17; Ex. 12; Ex. 44.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather quibbles over the use of the word "Reports" (it favors "compilations"). Mar-Jac further contends that the contents of the Kroll Reports are hearsay, but they are offered to demonstrate that the information contained in them, whether accurate or not, had been provided to Mar-Jac's owner and at least one of its officers/directors, not "to prove the truth of the matter asserted" in the affidavit. *See* FED. R. EVID. 801(c). There is, therefore, no genuine dispute of material fact with regard to this statement.

**101. After receiving the Kroll Reports in 1996, Saar's then-President Mirza dismissed its findings as "all suspicions and perceptions" and "speculations and rumors." He testified that he had "no independent way of knowing" whether any of these suspicions, perceptions, speculations, or rumors about the terrorist affiliations of Saar donees had merit and that he formed no belief one way or the other about their validity. Ex. 3 (Mirza Dep.) at 90:4-108:17.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional testimony on this subject, much of which is inadmissible because it is not based on personal knowledge. *See* Decl. of M.Y. Mirza ¶¶ 14-22 (purporting to describe conversations and meetings involving attorney Rick Gross, Deputy National Security Adviser Sandy Berger, and FBI Special Agent John O'Neill to which Mirza was not privy). There is, therefore, no genuine dispute of material fact with regard to this statement.

**102. Safa, African Muslim Agency, York Foundation, and Sterling Charitable Gift Fund – each of which received Mar-Jac money and had Mirza as an officer and/or trustee – continued to send donations after 1996 to at least three of the groups referenced in the Kroll Reports (IIIT, AMC/AMF, and ISNA). Mirza testified that he was not aware of any decision to cease making contributions to any of the five groups based upon the Kroll Reports' findings. Ex. 3 (Mirza Dep.) at 96:7-20, 99:8-11, 101:21-102:4, 106:3-15; *see supra* ¶ 19; *see infra* ¶¶ 105-107, 109-111, 116, 122, 180, 187, 207.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac purports to dispute this statement insofar as it applies to donations to AMC or AMF after 1996 by the referenced charities (though Mar-Jac concedes that Safa *loaned* AMC $25,000 in 2001). The record evidence, however,

conclusively demonstrates its accuracy. *See* Ex. 8 at 18 (Safa donated $10,000 to AMF in 2000). There is, therefore, no genuine dispute of material fact with regard to this statement.

*Recipients of Mar-Jac Funds*

Saar

**103. Saar, as the sole or majority owner of Mar-Jac's holding company from 1984 to 1996, received at least $5.1 million in dividends from Mar-Jac's business operations during that period. Ex. 31 at Ex. G.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**104. Saar also received a $125,000 donation from Mar-Jac in 1997 and a $250,000 donation in 2001 from the Mar-Jac-funded Sterling Charitable Gift Fund (*see infra* at ¶ 0). Ex. 31 at Ex. G; Ex. 16 at 52.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac objects that Saar could not have received funds from Sterling Charitable Gift Fund "as a matter of law" in 2001 because Saar had formally dissolved in 2000. Nevertheless, Mar-Jac does not actually controvert that there were transfers from Sterling to Saar, totaling $250,000, in 2001, as reflected in the First Union bank records described in the Kane Affidavit. *See* Ex. 16 at 52 (describing records showing that "Sterling transferred $100,000 to SAAR Foundation on November 2, 2001, from the same First Union account that received [a $250,000 check from Mar-Jac on October 26, 2001]" and that "Sterling wire transferred" another $150,000 to Saar on November 29, 2001, for a total of $250,000). There is, therefore, no genuine dispute of material fact with regard to this statement.

Safa Trust

**105. Safa, as the majority owner of Mar-Jac's holding company since 1996 and a minority owner of Mar-Jac's holding company from 1990 to 1996, received at least $27 million in dividends from Mar-Jac's business operations during that period. Ex. 31 at Ex. G.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac purports to take issue with this statement, but actually misreads it. The statement does not say that Safa received $27 million in dividends from Mar-Jac between 1990 and 1996; rather, the figure reflects the entirety of the dividends paid to Safa while it was a minority or majority owner of Mar-Jac (up to 2004, the most recent year for which such information is available to Defendants). Mar-Jac acknowledges it paid Mar-Jac more than $32 million during that period, so "at least $27 million" is concededly accurate, even if it is an *understatement* of the transfers from Mar-Jac to Safa. There is, therefore, no genuine dispute of material fact with regard to this statement.

**106. Safa also received $957,500 in donations from Mar-Jac or its holding company between 1989 and 2004. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 346.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**107. Safa received a donation of $200,000 in 1998 from Mena Investments, Inc., its partner in the holding company that owned Mar-Jac, which donation came in the form of a promissory note that Mena Investments, Inc., held from Mar-Jac. Ex. 45; Ex. 46; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 552-559.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

African Muslim Agency

**108. At all times relevant to this litigation, the African Muslim Agency was a charity located at 555 Grove Street in Herndon, Virginia, and its leadership included at least two members of Mar-Jac's board: Mirza and Al-Talib. Ex. 47 at 1, 2; Ex. 48 at 1, 4; *see supra* ¶¶ 18-19, 21-22.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**109. The African Muslim Agency received more than $2.5 million in donations from Mar-Jac or its holding company between 1997 and 2001. Ex. 31 at Ex. G; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 320; Ex. 3 (Mirza Dep.) at 142:20-145:24.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**110. The African Muslim Agency also received a donation of approximately $75,000 in 1998 from the Mar-Jac-funded York Foundation (*see infra* ¶ 115). Ex. 3 (Mirza Dep.) at 153:1-18; Ex. 49 at YM-11744.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**111. In 1998 and 1999, Mar-Jac was the source of all, or virtually all, of the African Muslim Agency's funding. Ex. 50 at 1; Ex. 31 at Ex. G; Ex. 16 at 54.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**112. After September 11, 2001, Mar-Jac ceased donating to the African Muslim Agency. Ex. 1 (Ashraf Dep.) at 70:2-72:6.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**113. The African Muslim Agency did not itself provide any charitable services or administer any programs; instead, it distributed the money it received to other entities. Nearly half of the $2.5 million that the African Muslim Agency received from Mar-Jac (*i.e.*, $1.2 million) was donated to IIIT and York International Trust. Ex. 3 (Mirza Dep.) at 54:17-19, 145:25-152:12; Ex. 4 (Barzinji Dep.) at 360:4-364:9; Ex. 51 at 13; Ex. 52 at 16; Ex. 53 at 15.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

Solmagic, S.A.

**114. Solmagic, S.A., received $2.6 million from Mar-Jac between 1990 and 1996 in partial repayment of a loan. Under the terms of the note, interest and principal payments were due quarterly to the "Al Rajhi Company for Islamic Investments Limited" in London; at least one payment, in 1994, was made to the "Al Rajhi Banking & Investment Corp.," with further credit to Abdullah Abdul Aziz Ali Al-Direibi in Saudi Arabia, the Saudi businessman who owned Solmagic, S.A. Ex. 42; Ex. 54; Ex. 55; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 471-481; Ex. 3 (Mirza Dep.) at 265:25-267:23; *see supra* ¶ 93.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

<u>York Foundation</u>

**115. At all times relevant to this litigation, York Foundation was a charity located at 555 Grove Street in Herndon, Virginia, and its leadership included at least two members of Mar-Jac's board: Mirza and Ashraf. Ex. 56 at 1, 4; Ex. 57 at 1, 4; *see supra* ¶¶ 18-19, 27-28.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac again incorrectly challenges Ashraf's role as an officer of York *Foundation*. There is no genuine dispute of material fact with regard to this statement. *See* ¶ 28 *supra*.

**116. York Foundation received nearly $4.6 million in donations from Mar-Jac or its holding company between 1989 and 2004, including a $4.4 million donation of Mar-Jac's ownership interest in a company called HFC Feed Mill, LLC. Ex. 31 at Ex. G; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 342; Ex. 3 (Mirza Dep.) at 169:11-22.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

<u>International Institute of Islamic Thought</u>

**117. IIIT is an Islamic think tank – funded in large measure by Safa and associated organizations – whose declared purpose is to develop Islamic scholarship through teaching, conducting teacher training, publishing textbooks and other intellectual works, directing and supporting research, and producing seminars and conferences. Ex. 4 (Barzinji Dep.) at 28:2-22; Ex. 58.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**118. At all times relevant to this litigation, the leadership of IIIT included at least two members of Mar-Jac's board: Al-Talib and Barzinji. *See supra* ¶¶ 21-25.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**119. In 1987, IIIT received a $400,000 donation from Mar-Jac's holding company. Ex. 59; Ex. 60; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 236-239.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional information about the purported purpose of those donations. There is, therefore, no genuine dispute of material fact with regard to this statement.

**120. IIIT was also an indirect beneficiary of millions of dollars of Mar-Jac funds, via donations from charities that were supported by Mar-Jac. *See infra* ¶¶ 161-166.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

Sterling Charitable Gift Fund

**121. At all times relevant to this litigation, Sterling Charitable Gift Fund was a charity located at 555 Grove Street in Herndon, Virginia, and its leadership included at least two members of Mar-Jac's board: Mirza and Ashraf. Ex. 61 at 1, 2; Ex. 62 at 1, 4; *see supra* ¶¶ 18-19, 27-28.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**122. Sterling Charitable Gift Fund received $3.65 million in donations from Mar-Jac or its holding company between 1989 and 2004. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 334.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**123. Sterling Charitable Gift Fund, which is managed according to Islamic legal principals ("Sharia"), utilized an imam named Mohammed al-Hanooti as a Sharia advisor. Al-Hanooti was an unindicted co-conspirator both in the federal terrorism financing prosecution of the Holy Land Foundation for Relief and Development and in the federal prosecution of Omar Abdel Rahman for the 1993 World Trade Center bombing. Ex. 1 (Ashraf Dep.) at 98:7-101:10; Ex. 63 at 6; Ex. 64 at 4.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional testimony about Sterling Charitable Gift Fund. In particular, Mar-Jac does not dispute that the U.S. government identified al-Hanooti as a co-conspirator in two terrorism prosecutions or that Sterling Charitable Gift Fund had an advisory relationship with him. Instead, it offers testimony of Dr. Mirza that Sterling "did not utilize [its] advisors much" and that he "do[es] not recall" asking al-Hanooti for assistance or advice regarding "the operation" of Sterling. *See* Decl. of M.Y. Mirza ¶ 13. There is, therefore, no genuine dispute of material fact with regard to this statement.

<u>American Muslim Council</u>

**124. The American Muslim Council ("AMC") received $12,500 in donations from Mar-Jac or its holding company between 1989 and 2004. Ex. 31 at Ex. G; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 265-271.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**125. AMC was founded by Abdurahman Alamoudi ("Alamoudi"), who was also employed by Saar and a Saar subsidiary, Mar-Jac Investments, as an assistant to Barzinji. Ex. 3 (Mirza Dep.) at 103:1-20; Ex. 5 (Al-Talib Dep.) at 166:7-167:4, 170:7-8; Ex. 1 (Ashraf Dep.) at 276:10-277:4; Ex. 4 (Barzinji Dep.) at 249:4-251:2.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**126. AMC was formerly connected to the American Muslim Foundation ("AMF"), another organization that Alamoudi founded, but the two groups separated in approximately 2001 or 2002 because of concerns about the completeness of financial records. Ex. 4 (Barzinji Dep.) at 246:13-247:15.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**127. In October 2000, Alamoudi spoke at a rally near the White House and told the assembled crowd: "I have been labeled by the media in New York to be a supporter of Hamas. . . . [W]e are all supporters of Hamas! . . . I wish to add here I am also a supporter of Hezbollah!" Ex. 65 at ¶ 35.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**128. Alamoudi also served as a director of the Success Foundation, which was the successor in interest to the International Relief Organization (the North American branch of the International Islamic Relief Organization or "IIRO"), and he was the vice president of Taibah International Aid Association, an organization founded by Osama bin Laden's nephew; these organizations, in turn, are suspected by the United States of having provided financial support to groups associated with Hamas and al-Qaeda. Ex. 66.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**129. The offices of Success Foundation and AMF were searched by the federal government in March 2002. Ex. 66 at 7.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**130. Alamoudi was arrested in August 2003, with $340,000 in cash in his possession, en route to Syria. Ex. 67.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac's objection attempts to split hairs over whether Mr. Alamoudi was actually still in possession of the $340,000 when he was formally arrested, even though the arrest undisputedly arose from the seizure of the cash. For purposes of Defendants' motion (if not for all purposes), the point is the same. There is, therefore, no genuine dispute of material fact with regard to this statement.

**131. The American Muslim Council was dissolved shortly after Alamoudi's arrest. Ex. 4 (Barzinji Dep.) at 250:20-251:2.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**132. Alamoudi was subsequently indicted for crimes arising from (a) his financial dealings with and travel to Libya, which was then a designated state sponsor of terrorism, in connection with an assassination plot, (b) his false statements to immigrations and customs officials, and (c) his scheme to conceal from the IRS the financial transactions with Libya and assets maintained in foreign bank accounts and to omit material information from tax returns filed by AMF. Ex. 68.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**133. In July 2004, Alamoudi pleaded guilty to three federal felony offenses, and in October 2004 he was sentenced to 23 years in prison for those crimes. Ex. 69.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

<u>Dar al Hijrah</u>

**134. The Dar al Hijrah mosque in Falls Church, Virginia, received a $50,000 donation from Mar-Jac, via the Islamic Society of North America, in 1989; Mar-Jac's business records reflect a notation that this donation was made "as per Al-Amoudi." Ex. 70.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac objects on hearsay grounds to Exhibit 70, a document that comes from Mar-Jac's own business records and includes a notation that it made a $50,000 donation, through "ISNA," to Dar al Hijrah mosque "as per Al-Amoudi" (an employee of Mar-Jac's then-owner and an assistant to one of Mar-Jac's directors). This document is properly admissible pursuant to the exception to the hearsay rule codified in Rule 803(6). Furthermore, whether Dar al Hijrah ever actually withdrew the money from its ISNA account is beside the point for purposes of Defendants' motions, and Mar-Jac offers no evidence to suggest the mosque did not use the funds that Mar-Jac contributed. There is, therefore, no genuine dispute of material fact with regard to this statement.

**135. According to the Kroll Reports commissioned by Saar, Dar al Hijrah was perceived to be a "Hamas-oriented mosque" that also maintained "strong ties to Saudi radical, Usama bin Ladin." Ex. 44.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac reiterates its unfounded hearsay objection to the Kroll Reports. *See* ¶ 100 *supra*. Nor is there anything materially inaccurate about describing the Kroll Reports as being "commissioned by Saar," rather than stating that Saar "retained Kroll," as Mar-Jac would prefer, when it is undisputed that Saar paid Kroll to prepare the reports. There is, therefore, no genuine dispute of material fact with regard to this statement.

**136. Dar al Hijrah has provided a pulpit to two radical Islamic clerics: Mohamed al-Hanooti, who was an imam at Dar al Hijrah from 1995 until 2000 (*see supra* ¶ 0), and Anwar al-Awlaki, who was al-Hanooti's successor at the mosque from 2000 to 2002 and – according to the U.S. government, which has designated al-Awlaki as "a key leader for al-Qa'ida in the Arabian Peninsula," a Yemen-based terrorist group – "has involved himself in every aspect of the supply chain of terrorism – fundraising for terrorist groups, recruiting and training operatives, and planning and ordering attacks on innocents." Al-Awlaki, an American citizen now living as a fugitive in Yemen, reportedly had ties to two of the September 11 hijackers who prayed at Dar al Hijrah; corresponded with Maj. Nidal Hasan, the Army psychiatrist accused of killing thirteen people in a shooting rampage at Fort Hood, Texas, in November 2009; met with Umar Farouk Abdulmutallab, the Nigerian man charged with trying to detonate explosives on a Detroit-bound airliner on Christmas Day in 2009; and has been cited as an inspiration by Faisal Shahzad, the Pakistani-American man who admitted to planting a car bomb in Times Square in May 2010. Ex. 71; Ex. 72.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac objects that this statement is "utterly beyond the pale" and "prejudicial in the extreme," but does not controvert its substance. Mar-Jac's invocation of Rule 403 to exclude this statement is without merit. Mar-Jac cannot credibly argue, on the one hand, that there is no proof its donations found their way to persons and groups actually engaged in terrorism and, on the other, contend it is prejudicial for Defendants to offer evidence that its beneficiaries aided and abetted terrorist attacks. There is, therefore, no genuine dispute of material fact with regard to this statement.

Islamic Society of North America

**137. ISNA received $99,000 in donations from Mar-Jac between 1989 and 2004 and a $25,000 donation from Mar-Jac's holding company in 1987. Ex. 59; Ex. 70; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 304-306.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac objects that this is a "misstatement of the Exhibits," but Exhibit 59 clearly reflects the $25,000 donation to ISNA in 1987, and Dr. Mirza, in his deposition on written questions, agreed that "between March 6, 1989, and June 25, 2004, Mar-Jac Poultry contributed $99,000 to ISNA." Ex. 2 at No. 303. In any event, Mar-Jac now concedes that it gave at least $91,500 to ISNA. Any disagreement about the precise amount is immaterial for purposes of Defendants' motions. The remainder of Mar-Jac's objection simply offers additional information about the purported purpose of those donations. There is, therefore, no genuine dispute of material fact with regard to this statement.

**138. ISNA was named as an unindicted co-conspirator in the terrorism financing prosecution of the Holy Land Foundation for Relief and Development ("HLF"), in which the government presented evidence that "HLF raised money and supported Hamas through a bank account it held with ISNA at [the North American Islamic Trust]" and that, from this account, "HLF sent hundreds of thousands of dollars to Hamas leader Mousa Abu Marzook . . . and a number of other individuals associated with Hamas." Ex. 63 at 8; Ex. 73 at 14.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

North American Islamic Trust

**139. The North American Islamic Trust ("NAIT"), an organization that Mar-Jac director Al-Talib co-founded, received $150,000 in donations from Mar-Jac between 1989 and 2004. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 316-319; Ex. 5 (Al-Talib Dep.) at 230:7-232:8; Ex. 31 at Ex. G.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional information about the donations and the purported purposes for which they were made. Among other things, Mar-Jac asserts that NAIT was "regulated by the Internal Revenue Service," apparently on the theory that, like every other person or entity in the United States with income, it was required to adhere to the federal tax code and IRS regulations and was potentially subject to audit. There is, therefore, no genuine dispute of material fact with regard to this statement.

**140. NAIT was named as an unindicted co-conspirator in the terrorism financing prosecution of HLF, in which the government presented evidence that "HLF raised money and supported Hamas through a bank account it held with ISNA at NAIT" and that, from this account, "HLF sent hundreds of thousands of dollars to Hamas leader Mousa Abu Marzook . . . and a number of other individuals associated with Hamas." Ex. 63 at 8; Ex. 73 at 14.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

*Indirect Beneficiaries of Mar-Jac Funds*

Offshore Entities and Al Rajhis (via Saar, Safa, African Muslim Agency, and York Foundation)

**141. The Isle of Man and Channel Islands (Jersey and Guernsey) are British crown dependencies and reputed havens for offshore banking activities. Ex. 16 at 12; *see* Ex. 74 at 118-119, 126-127, 132-133 (noting that the Isle of Man and the Channel Islands, which are Crown Dependencies of the United Kingdom, are "sophisticated" offshore financial centers that, as of 2000, were considered "vulnerable to money laundering, particularly at the layering and integration stages").**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**142. Bank secrecy laws on these islands have made it difficult for U.S. law enforcement agencies to trace funds that pass through accounts there. Ex. 16 at 53. *See* Ex. 74 at 118-119, 126-127, 132-133 (noting that banking laws on the Isle of Man and Channel Islands, as of 2000, did not "provide[ ] sufficiently rigorous checks on the identity of clients" and in some cases did not require the beneficial owners of entities to be disclosed); Ex. 75 at 8-9 (text of proposed Stop Tax Haven Abuse Act, which includes Jersey and the Isle of Man on proposed initial list of "offshore secrecy jurisdictions" based on fact that each had "been previously and publicly identified by the Internal Revenue Service as [a] secrecy jurisdiction[ ] in Federal court proceedings").**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac's objection to this statements is an extended – and entirely unsupported – discussion of a Mutual Legal Assistance Treaty between the United States of America and the United Kingdom. There is, therefore, no genuine dispute of material fact with regard to this statement.

*Humana*

**143. Humana is a trust that was organized under the laws of the Isle of Man at the behest and direction of Mirza and an attorney named Cherif Sedky, with a bank account in Geneva, Switzerland. Ex. 3 (Mirza Dep.) at 41:17-42:20; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 389.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**144. Humana is, effectively, a successor entity to Saar, which transferred the majority of its funds to Humana because the leaders of Saar had determined that, "for ease of operation we would like to relocate to [the] Isle of Man." Ex. 3 (Mirza Dep.) at 217:4-11.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional information about Humana and Saar, including that Humana "did not even have a bank account in the Isle of Man" – although Mar-Jac concedes Humana was based in the Isle of Man and maintained a Swiss bank account, *see* ¶ 143, *supra* – and that Saar received "legal advice in connection with the manner in which . . . [its] assets were transferred to Humana," including from an attorney named Bruce Hopkins. Mar-Jac neglects to mention, however, that the Fourth Circuit has held that the content of Mr. Hopkins's advice to Saar was subject to the crime-fraud exception to the attorney-client privilege because his communications with his client bore a "close relationship" to an evident scheme by Saar "to defraud the United States Government . . . both by concealing the ultimate disposition of [its] funds through the transfer of assets overseas and by using [its] tax-exempt status to circumvent the collection of taxes on the profits of individuals." *In re Grand Jury Investigation*, 352 F. App'x 805, 809-10 (4th Cir. 2009); Mirza Dep. at 275:7-276:12. There is, therefore, no genuine dispute of material fact with regard to this statement.

**145. In 1998, Mar-Jac's holding company distributed more than $750,000 to Humana. The transfer reflected a payment on a loan owed by Mar-Jac to its beneficial owner and donee Saar, which Saar had assigned to Humana as a donation. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 75-76, 379-389; Ex. 76; Ex. 77.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**146. At the same time, Saar was in the process of transferring other assets to Humana; between 1997 and 2000, when Saar finally dissolved, it transferred at total of $22-23 million to Humana, including a $12 million donation by Saar to Humana in 1997. Ex. 3 (Mirza Dep.) at 84:24-85:6, 225:15-227:23; Ex. 33 at 4.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**147. The effect of this transfer was that subsequent distributions of funds by Humana became difficult for the United States government to trace. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 387.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather merely contends that it is "argumentative." There is, therefore, no genuine dispute of material fact with regard to this statement.

**148. In disclosing these transfers in its tax returns, Saar reported having no relationship to Humana, notwithstanding that Mirza was a director of Humana's corporate trustee as well as the president of Saar and a member of Saar's board of directors. Ex. 3 (Mirza Dep.) at 78:5-87:21.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**149. In 1998, Humana purchased $5.1 million in Mar-Jac debt from Key Overseas, Inc., which in turn applied those funds to the repayment of debt to the Al-Rajhis. Humana likewise repaid debt to the Al-Rajhis that year, to accounts located in the Channel Islands. In total, Key Overseas, Inc. and Humana transferred $24 million to the Al-Rajhis in 1998. Ex. 78; Ex. 79; Ex. 80; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 400-410; Ex. 3 (Mirza Dep.) at 217:12-221:15.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**150. In 1999, Humana sent the al-Rajhis another $6-7 million as a contribution to a program that had purportedly provided $10 million in grants to various groups and causes chosen by a committee in the al-Rajhis' charity office in Saudi Arabia. Ex. 81; Ex. 3 (Mirza Dep.) at 234:14-245:3.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather contends only that it is "neither relevant nor material to Mar-Jac's claim." There is, therefore, no genuine dispute of material fact with regard to this statement.

**151. Humana contributed a similar amount to the al-Rajhis' grant program in 2000. Ex. 3 (Mirza Dep.) at 240:3-19.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather contends only that it is "neither relevant nor material to Mar-Jac's claim." There is, therefore, no genuine dispute of material fact with regard to this statement.

**152. Humana did not have any safeguards in place to ensure that its contributions were not used for terrorism purposes. Ex. 3 (Mirza Dep.) at 224:1-231:15.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather merely contends that it is "neither relevant nor material to Mar-Jac's claim." There is, therefore, no genuine dispute of material fact with regard to this statement.

**153. Mirza testified that Humana "cannot assure" that none of its funds were disbursed to groups involved in terrorist activities. Ex. 3 (Mirza Dep.) at 245:12-247:23.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather contends only that it is "neither relevant nor material to Mar-Jac's claim." There is, therefore, no genuine dispute of material fact with regard to this statement.

*York International Trust*

**154. Another trust organized under the laws of the Isle of Man, York International Trust, received nearly $180,000 in 1998 from Mar-Jac, which made the transfers pursuant to Safa's assignment of a loan to York International Trust. Ex. 82; Ex. 83; Ex. 84; Ex. 85; Ex. 86; Ex. 87; Ex. 88; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 521-544.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**155. From 1998 to 2002, Mar-Jac beneficial owner and donee Safa also donated nearly $1.9 million to York International Trust. Ex. 7 at 3; Ex. 9 at 14; Ex. 10 at 18; Ex. 3 (Mirza Dep.) at 152:13-23.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**156. Mar-Jac donee African Muslim Agency donated at total of $445,000 to York International Trust in 1998 and 2000. Ex. 51 at 13; Ex. 52 at 15; Ex. 3 (Mirza Dep.) at 151:25-152:12.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**157. Mar-Jac donee York Foundation donated a total of $545,000 to York International Trust in 2000 and 2001. Ex. 89 at 17; Ex. 90 at 17; Ex. 3 (Mirza Dep.) at 168:20-169:10.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**158. During the time period of these donations, Mirza was both a trustee of York International Trust and a director, trustee, and/or officer of each of the donor organizations. *See supra* ¶¶ 18-19.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

*Amtrax Holdings, Ltd.*

**159. In 1990, Mar-Jac paid $1.5 million to Amtrax Holdings, Ltd. ("Amtrax"), a corporation established in Jersey, Channel Islands, in partial repayment of a $7.5 million debt Mar-Jac owed to its then-beneficial owner Saar, which had assigned the loan to Amtrax. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 85-86, 451-469; Ex. 91; Ex. 92.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**160. The effect of this transfer was that subsequent distributions of the funds by Amtrax became difficult for the United States government to trace. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 460.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather contends only that it is "argumentative." There is, therefore, no genuine dispute of material fact with regard to this statement.

<u>Al-Arian Organizations, Palestinian Islamic Jihad, and Hamas (via IIIT, Saar, Safa, African Muslim Agency, Sterling Charitable Gift Fund, and York Foundation)</u>

**161. In addition to the $400,000 donation IIIT received directly from Mar-Jac in 1987, IIIT received millions of dollars from Mar-Jac's donees and investors, including Mar-Jac beneficial owner and donee Safa, which gave at least $6 million to IIIT between 1998 and 2003. *See supra* ¶ 119; Ex. 7 at 3; Ex. 8 at 18; Ex. 9 at 14; Ex. 10 at 18; Ex. 11 at 16; Ex. 3 (Mirza Dep.) at 132:7-133:6, 197:19.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**162. Safa functioned as "an endowment for IIIT," had overlapping directors with IIIT, and was one of IIIT's largest donors. Ex. 3 (Mirza Dep.) at 132:21-24, 197:19; Ex. 4 (Barzinji Dep.) at 28:8-13.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**163. Mar-Jac beneficiary African Muslim Agency donated a total of more than $750,000 to IIIT, in 1998 and 2001. Ex. 51 at 13; Ex. 53 at 16; Ex. 3 (Mirza Dep.) at 145:25-152:8.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**164. Mar-Jac and Safa beneficiary York Foundation donated a total of nearly $500,000 to IIIT, in 2000 and 2001. Ex. 89 at 17; Ex. 90 at 17; Ex. 8 at 18; Ex. 3 (Mirza Dep.) at 168:20-169:10.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**165. Mar-Jac beneficiary Sterling Charitable Gift Fund donated $450,000 to IIIT in 2001. Ex. 93 at 16.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**166. Mar-Jac beneficial owner and donee Saar also provided financial support to IIIT. Ex. 94 at 3.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**167. Saar and IIIT had "common trustees" (Al-Talib and Barzinji) and Saar's board – which also had at least two members in common with the Mar-Jac board at all times relevant to this litigation – was "very well aware of the activities" of IIIT. Ex. 3 (Mirza Dep.) at 124:5-9.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**168. The individuals managing IIIT were well-known to the Mar-Jac board, and the two entities had two common officers and directors, Al-Talib and Barzinji. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 255; Ex. 5 (Al-Talib Dep.) at 57:18-58:7; Ex. 4 (Barzinji Dep.) at 14:5-9.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**169. IIIT contributed at least $40,000 and perhaps more in 1991 to WISE, the Florida-based organization operated by al-Arian. Ex. 4 (Barzinji Dep.) at 342:13-22; Ex. 3 (Mirza Dep.) at 127:25-128:12; Ex. 5 (Al-Talib Dep.) at 105:8-107:2.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac contends that the record does not "establish that in fact IIIT contributed $140,000 to WISE in 1991." The statement does not say "*$140,000*"; it says "$40,000," and the cited record evidence fully supports this fact. There is, therefore, no genuine dispute of material fact with regard to this statement.

**170. Al-Arian was at that time, and at all relevant times thereafter, an agent of Palestinian Islamic Jihad ("PIJ"), which has been designated by the United States government as a terrorist organization since 1995. Ex. 95 at 10-14.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac contends that al-Arian pleaded guilty only to "providing immigration-related services" to PIJ. In fact, al-Arian expressly confessed to creating a front organization through which PIJ operatives could (and did) gain entry into the United States, as part of a "[c]onspiracy to make or receive contributions of funds, goods or services to or for the benefit of [PIJ]." Ex. 95 at 1, 11-14. Moreover, contrary to Mar-Jac's contention that al-Arian admitted only to aiding PIJ from 1995 onward, his plea agreement expressly acknowledges his association with PIJ from as early as "the late 1980s." *Id.* at 10. There is, therefore, no genuine dispute of material fact with regard to this statement.

**171. Former IIIT President Taha Jaber al-Alwani wrote to al-Arian regarding these IIIT donations in November 1991 and, in that letter, stated that he considered al-Arian and his associates to be "part of us and an extension of us" and that their respective organizations shared the "same objectives." Ex. 16 at 33-35.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**172. IIIT also donated at least $10,000 in 2001 to another organization founded by Al-Arian, the Tampa Bay Coalition for Justice and Peace. Ex. 4 (Barzinji Dep.) at 219:16-222:4; Ex. 5 (Al-Talib Dep.) at 105:8-107:2.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac asserts that the record evidence does not show "that al-Arian 'founded' the Tampa Bay Coalition for Justice and Peace." In fact, Dr. Barzinji testified, in response to the question "[I]n 2001, IIIT gave $10,000 to a group[, the Tampa Bay Coalition for Justice and Peace,] founded by Sami Al-Arian; is that correct?", that "It's possible, yeah." Ex. 4 (Barzinji Dep.) at 222:3-5. Dr. Al-Talib testified that he was unsure whether al-Arian was the founder of the Tampa Bay Coalition for Justice and Peace, but conceded al-Arian may have been "part" of the group. Ex. 5 (Al-Talib Dep.) at 106:16-107:2. In any event, Mar-Jac offers no evidence to contravene that portion of the statement. There is, therefore, no genuine dispute of material fact with regard to this statement.

**173. Mar-Jac beneficial owner and donee Safa also provided direct financial support to WISE, in the form of a $15,000 donation in 1995. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 244-245; Ex. 16 at 39; Ex. 96; Ex. 3 (Mirza Dep.) at 129:2-131:10.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**174. Mar-Jac beneficial owner and donee Saar provided direct financial support to al-Arian, in the form of a $41,000 loan in 1984 and through grants to WISE of $10,000 and $5,000 in 1994. Ex. 97 at MJ0002201; Ex. 3 (Mirza Dep.) at 128:13-129:1; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 253; Ex. 98; Ex. 16 at 39.**

RESPONSE TO MAR-JAC OBJECTION: Pursuant to Mar-Jac's objection, Defendants have modified this statement to clarify that the grant payments were made to WISE, rather than al-Arian personally. Mar-Jac does not otherwise purport to controvert the substance of this

statement, but rather offers additional information about the Saar loan. There is, therefore, no genuine dispute of material fact with regard to this statement.

**175. In making the $10,000 donation to WISE in October 1994, Saar executive director Muhammad Jaghlit informed al-Arian that "this donation should not be publicized; neither in public meetings . . . nor in the press." Ex. 98.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**176. In February 2006, al-Arian pleaded guilty to conspiring to contribute services to or for the benefit of PIJ. In the plea agreement, al-Arian acknowledged using funds from WISE to support the ends of that conspiracy. He was sentenced to fifty-seven months in prison. Ex. 95; Ex. 99.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**177. IIIT's al-Alwani was an unindicted co-conspirator in the prosecution of al-Arian. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 252.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**178. WISE and al-Arian have also been associated with the terrorist organization Hamas. Ex. 3 (Mirza Dep.) at 105:2-106:2.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac asserts that "Dr. Mirza did not testify that WISE and al-Arian were associated with the terrorist organization Hamas." It is undisputed, however, that Mirza testified as follows:

> Q: And do you agree with the Kroll report that [IIIT] has been associated with figures surrounding Hamas?
>
> A: I don't know.
>
> Q: Would that refer to Sami Al-Arian?
>
> A: Yes.

Ex. 3 (Mirza Dep.) at 105:2-7. There is, therefore, no genuine dispute of material fact with regard to this statement.

**179. Since at least 1996, the leaders of Saar, including its then-President Mirza – who is also an officer, director, or trustee of Mar-Jac, Safa, African Muslim Agency, York Foundation, York International Trust, Sterling Charitable Gift Fund, and Humana's corporate trustee – were aware, based on the Kroll Reports they had commissioned, of perceptions that IIIT was "closely aligned with figures surrounding [Palestinian] Islamic Jihad [and] Hamas" and was "the principal source of money for WISE," and that WISE and al-Arian were "known or suspected of active involvement with radical and even terrorist groups."** ***See supra*** **¶¶18-19; Ex. 12; Ex. 44; Ex. 3 (Mirza Dep.) at 88:14-109:1.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather merely contends that it is incomplete in some unspecified manner. There is, therefore, no genuine dispute of material fact with regard to this statement. *See also* ¶¶ 99-102 *supra*.

**180. Despite this knowledge, four organizations in which Mirza held leadership positions and which collectively received millions of dollars of donations and dividends from Mar-Jac after 1996 – Safa, African Muslim Agency, York Foundation, and Sterling Charitable Gift Fund – subsequently contributed approximately $8 million to IIIT. Mirza considered the findings of the Kroll Reports to be no more than "speculation and rumors" and did not believe the reports necessitated any change in or discontinuation of the donation practices of the entities with which he was affiliated. *See* supra ¶¶ 18-19, 105-113, 115-116, 121-122, 161-165; Ex. 3 (Mirza Dep.) at 96:7-20, 99:8-11, 101:21-102:4, 106:3-15.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather contends only that it is incomplete in some unspecified manner. There is, therefore, no genuine dispute of material fact with regard to this statement. *See also* ¶¶ 99-102 *supra*.

Al-Haramyen Establishment Indonesia (via Humana)

**181. The $10 million al-Rajhi grant program that Humana contributed to in 1999 included donations of more than $175,000 to Al-Haramyen Establishment Indonesia, which since 2004 has been a U.S.-designated terror group based on its ties to al-Qaeda. *See supra* ¶¶ 150-153; Ex. 81; Ex. 100; Ex. 3 (Mirza Dep.) at 234:14-245:3.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac asserts that the record only supports a finding that $17,333 went to Al-Haramyen in 1999. That is the amount of *one* of two donations made by Humana that year; the second, which appears on a separate page of the same document, was for an additional $160,427. *See* Ex. 81 at YM-016299, YM-016300. There is, therefore, no genuine dispute of material fact with regard to this statement.

**182. According to the U.S. Treasury Department, a senior al-Qaeda operative identified Al-Haramyen in Indonesia as "one of the primary sources of funding for al-Qaida network activities" in Southeast Asia, and other evidence suggests that "money purportedly donated by [Al-Haramyen] for humanitarian purposes . . . was possibly diverted for weapons procurement with the full knowledge of [Al-Haramyen] in Indonesia." Ex. 101.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather contends only that it is irrelevant. There is, therefore, no genuine dispute of material fact with regard to this statement.

American Muslim Council/Foundation (via Saar and Safa)

**183. AMC and AMF also received financial support from Mar-Jac's donees and investors. *See supra* ¶¶ 124-133 (describing the criminal activities and professed views of the founder of AMC and AMF, Abdurahman Alamoudi).**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**184. Mar-Jac beneficial owner and donee Saar donated $40,000 to AMF in 1994. Ex. 102 at 3.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**185. Mar-Jac beneficial owner and donee Safa donated $10,000 to AMF in 2000, and in 2001 Safa loaned $25,000 to AMC, a loan that was personally guaranteed, in part, by Alamoudi. Ex. 8 at 18; Ex. 103; Ex. 104.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac asserts that "Record does not reflect that in fact, the [$25,000] loan [from Safa to AMC] was made [in 2001]," yet it elsewhere expressly admits that "[i]n 2001, Safa did make a $25,000 loan to AMC which was personally

guaranteed by its trustees . . . ." Resp. SUMF ¶ 102. *See also* Decl. of Y.M. Mirza ¶ 24 ("In 2001, the American Muslim Council requested and received a $25,000 loan from Safa."). There is, therefore, no genuine dispute of material fact with regard to this statement.

**186. The 1996 Kroll Reports commissioned by Saar stated that "published reports and congressional testimony indicate[d] that [AMC and AMF were] linked with militant organizations and figures," based upon Alamoudi's ties to Hamas leader Mousa Abu Marzook. Ex. 44.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional information about the Kroll Reports. There is, therefore, no genuine dispute of material fact with regard to this statement.

**187. Despite Mirza's knowledge in 1996 of suspicions regarding AMC's and AMF's aid for terrorist supporters, Mar-Jac beneficial owner Safa – for which Mirza served as vice president – continued to provide financial support to both organizations after 1996. Mirza considered the findings of the Kroll Reports to be no more than "speculation and rumors" and did not believe the reports necessitated any change in or discontinuation of donation practices of the entities with which he was affiliated. *See supra* ¶¶ 18-19, 105-107, 180, 185; Ex. 3 (Mirza Dep.) at 101:21-103:20.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather contends only that it is incomplete in some unspecified manner. There is, therefore, no genuine dispute of material fact with regard to this statement. *See also* ¶¶ 99-102 *supra*.

Dar al Hijrah (via Saar)

**188. Dar al Hijrah mosque in Falls Church, Virginia – which has provided a pulpit to two radical Islamic clerics – received financial and other support from Saar, Mar-Jac's beneficial owner and donee, from the time of the mosque's inception in 1989, including a $15,000 donation in 1994. *See supra* ¶¶ 134-136; Ex. 102 at 3; Ex. 44; Ex. 105; Ex. 3 (Mirza Dep.) at 97:21-99:11, 109:12-112:20, 137:1-6.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**189. Saar also loaned $90,000 to Dar al Hijrah's former imam, Mohamed al-Hanooti prior to his 1995 arrival at Dar al Hijrah. *See supra* ¶¶ 123, 136; Ex. 3 (Mirza Dep.) at 133:20-134:16.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional information about the Saar loan. There is, therefore, no genuine dispute of material fact with regard to this statement.

**190. The 1996 Kroll Reports commissioned by Saar stated that "published reports and congressional testimony indicate[d] that [Dar al Hijrah was] linked with militant organizations and figures," including Hamas and Osama bin Laden. Ex. 44; Ex. 3 (Mirza Dep.) at 98:12-101:1.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

Holy Land Foundation for Relief and Development
(via Saar and Safa)

**191. Mar-Jac beneficial owner and donee Saar provided financial support beginning in 1989 to a group then known as the Occupied Land Fund or the Palestine Occupied Land Fund ("OLF"), the purpose of which was – according to a "Report on SAAR Foundations Objectives and Charitable Activities" that was presented to the Saar board in March 1989 – "to aide the families of the imprisoned, the exiled, and those of the martyrs" in the West Bank and Gaza. Ex. 105 at YM-016152.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**192. In 1989, Barzinji, and Al-Talib were on the Saar board and Mirza was Saar's vice president. *See supra* ¶¶ 19, 23, 26.**

RESPONSE TO MAR-JAC OBJECTION: Pursuant to Mar-Jac's objection, Defendants have modified this statement to clarify that Mirza was a Saar officer, not a member of Saar's board, in 1989. There is, therefore, no genuine dispute of material fact with regard to this statement.

**193. Mirza, who was vice president of Saar at the time this report was prepared, testified that he had no understanding of what the term "martyrs" referred to or what the reference to the "Occupied Land" meant. Ex. 3 (Mirza Dep.) at 119:13-122:21.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**194. The OLF, which was established by the Islamic Association of Palestine, later changed its name to the Holy Land Foundation for Relief and Development. Ex. 105 at YM-016152; Ex. 106 at 3-4.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**195. In 1997, Mar-Jac beneficial owner Safa donated more than $200,000, and perhaps as much as $325,000, to HLF. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 624-627; Ex. 3 (Mirza Dep.) at 249:21-251:7; Ex. 16 at 40.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional information about the purported purpose of the donations to HLF. There is, therefore, no genuine dispute of material fact with regard to this statement.

**196. In 2001, the U.S. government designated the HLF as a supporter of terrorism based on the finding that the purported charity had "provided millions of dollars of material and logistical support to HAMAS," which was used to "encourag[e] children to become suicide bombers and to recruit suicide bombers by offering support to their families." Ex. 106; *see supra* ¶ 71.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**197. In July 2004, a federal grand jury indicted HLF on charges of providing material support to Hamas in violation of U.S. law. Ex. 107.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**198. In November 2008, HLF was convicted of, among other things, illegally transmitting more than $12 million in funding to Hamas, including support for the families of so-called "martyrs"; five of the HLF's leaders were convicted of similar or related crimes. Ex. 108.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

Islamic American Relief Agency (via York Foundation)

**199. Mar-Jac beneficiary the York Foundation contributed more than $1,000 in 2002 to an organization called the Islamic American Relief Agency ("IARA-USA"), which was the U.S. branch of the Islamic African Relief Agency ("IARA"). Ex. 109; Ex. 3 (Mirza Dep.) at 170:15-173:14.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**200. In 2004, the U.S. Treasury Department designated the IARA/IARA-USA as a terrorism sponsor based upon evidence indicating that the group had "provided direct financial support for [Osama bin Laden]," had "cooperated closely [with bin Laden and his associates] in the raising and expenditure of funds," and has "serv[ed] as a conduit [for transferring money] to Hamas." Ex. 110.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**201. In 2007, the IARA-USA and five of its leaders were indicted by a federal grand jury on charges of money laundering and illegally transferring funds to Iraq in violation of U.S. trade sanctions. Since then, a number of the indicted individuals have pleaded guilty. Ex. 111; *USA v. Islamic American Relief Agency*, 4:07-cr-00087-NKL (W.D. Mo.).**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

Islamic Society of North America (via Saar, Sterling Charitable Gift Fund, and York Foundation)

**202. Mar-Jac beneficial owner and donee Saar donated at least $197,000 to ISNA in 1989 and may have given more at other times. Ex. 105 at YM-016143-44; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 629; Ex. 3 (Mirza Dep.) at 112:21-114:8.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**203. Mar-Jac beneficiary the York Foundation donated $19,500 to ISNA in 2000 and another $3,000 in 2001. Ex. 89 at 17; Ex. 90 at 17; Ex. 3 (Mirza Dep.) at 168:20-169:10.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**204. Mar-Jac beneficiary the Sterling Charitable Gift Fund donated $10,000 to ISNA in November 2001. Ex. 93 at 16; Ex. 112; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 339-341; Ex. 3 (Mirza Dep.) at 253:18-254:23.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**205. ISNA was an unindicted co-conspirator in the terrorism financing prosecution of the HLF, in which the government presented evidence that "HLF raised money and supported Hamas through a bank account it held with ISNA at [the North American Islamic Trust]" and that, from this account, "HLF sent hundreds of thousands of dollars to Hamas leader Mousa Abu Marzook . . . and a number of other individuals associated with Hamas."** ***See supra*** **¶ 138.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**206. The 1996 Kroll Reports commissioned by Saar stated that ISNA had been "suspected . . . of involvement in supporting terroristic activity" and had "organized conferences to which 'extreme radicals' such as Osama bin Laden . . . have been invited or have attended." Ex. 12.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional information about the Kroll Reports. There is, therefore, no genuine dispute of material fact with regard to this statement.

**207. Despite Mirza's knowledge in 1996 of suspicions regarding ISNA's aid for terrorist supporters, two organizations in which he held leadership positions and which received donations from Mar-Jac – York Foundation and Sterling Charitable Gift Fund – subsequently contributed thousands of dollars to ISNA. Mirza considered the findings of the Kroll Reports to be no more than "speculation and rumors" and did not believe the reports necessitated any change in or discontinuation of donation practices of the entities with which he was affiliated. *See supra* ¶¶ 18-19, 115-116, 121-122, 180, 203-204.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather contends only that it is incomplete in some unspecified manner. There is, therefore, no genuine dispute of material fact with regard to this statement. *See also* ¶¶ 99-102 *supra*.

Muslim Arab Youth Association (via Saar)

**208. Mar-Jac beneficial owner and donee Saar donated more than $25,000 to the Muslim Arab Youth Association ("MAYA") prior to 1996, including a $13,206 donation in 1994. Ex. 44; Ex. 102 at 3; Ex. 3 (Mirza Dep.) at 106:23-108:21.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**209. Saar's contributions to MAYA dated back to at least 1989, when Saar provided financial support to "subsidize [MAYA's] annual national conference, which is usually attended by 4000 people." Ex. 105 at YM-016144.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**210. The 1996 Kroll Reports commissioned by Saar identified MAYA as an "organization [that] is perceived to be led by radical Islamics with strong links to militant organizations, from Islamic Jihad to Hamas" and reported that its conferences are viewed by American counterterrorism experts as a forum for extremist figures in the Muslim community. Ex. 44 at YM-023732.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac's "objection" is in fact a quibble in word choice. The statement says the Kroll Reports were "commissioned" by Saar; Mar-Jac would prefer that the sentence say that Saar "retained" Kroll to prepare the Reports. This is a distinction without a difference, not a genuine dispute of material fact.

<u>Nada International (via York International Trust)</u>

**211. Mar-Jac beneficiary the York International Trust transferred more than $50,000 to Nada International in 1998. Ex. 49 at YM-11744-46; Ex. 3 (Mirza Dep.) at 153:1-154:18.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional information about the purported source of the $50,000 that York International Trust transferred to Nada International three days after receiving a $54,000 payment from Mar-Jac. *See* Exs. 85-88. There is, therefore, no genuine dispute of material fact with regard to this statement.

**212. Mar-Jac board members Barzinji and Al-Talib both were employed by Nada International in Saudi Arabia in the late 1970s and early 1980s. Ex. 4 (Barzinji Dep.) at 38:10-40:17; Ex. 5 (Al-Talib Dep.) at 88:8-90:7.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**213. The U.S. government designated Nada International as a sponsor of terrorism in 2002; Nada International principal Youssef Nada was so designated in 2001. *See supra* ¶ 71.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**214. Those designations were based on evidence that Nada, through his controlling interest in Bank al Taqwa, had provided "financial assistance" to "Usama bin Laden and his Al Qaida organization" up until at least "late September 2001." Nada's organization also was linked by the U.S. government to the financing of Hamas. Ex. 113.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**215. Barzinji testified that he last communicated with Youssef Nada in 1998, or shortly thereafter, regarding a political issue in Malaysia; Al-Talib declined, based upon his Fifth Amendment privilege, to testify about when he had last communicated with Youssef Nada. Both men asserted their Fifth Amendment privilege in response to questions about certain financial transactions with Nada or his businesses. Ex. 4 (Barzinji Dep.) at 38:14-41:19, 43:5-55:4; Ex. 5 (Al-Talib Dep.) at 88:8-90:17, 154:20-155:11.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**216. York International Trust did not have any formal safeguards in place to ensure that its contribution to Nada International was not used for terrorism purposes. Ex. 3 (Mirza Dep.) at 158:9-159:10.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**217. York International Trust has no knowledge of how the funds it provided to Nada International were used or whether the funds were used to support terrorism. Ex. 3 (Mirza Dep.) at 158:9-159:10.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

North American Islamic Trust (via Saar)

**218. Mar-Jac beneficial owner and donee Saar also has donated money to NAIT. Ex. 2 (Mirza Resp. to Written Dep. Ques.) at No. 629; Ex. 105 at YM-016145; Ex. 3 (Mirza Dep.) at 115:6-116:4.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**219. NAIT was an unindicted co-conspirator in the terrorism financing prosecution of HLF, in which the government presented evidence that "HLF raised money and supported Hamas through a bank account it held with ISNA at NAIT" and that, from this account, "HLF sent hundreds of thousands of dollars to Hamas leader Mousa Abu Marzook . . . and a number of other individuals associated with Hamas."** ***See supra*** **¶ 140.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

International Islamic Relief Organization/Success Foundation
(via Saar, Safa, and York Foundation)

**220. Mar-Jac beneficial owner and donee Saar donated more than $1,000 in 1995 to IIRO, an organization with overseas branches that have been designated by the U.S. government as terrorism supporters. Ex. 32 at 3;** ***see supra*** **¶ 73.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**221. The IIRO's successor organization, the Success Foundation, received a $5,000 donation in 1999 from the Mar-Jac-funded York Foundation. Ex. 114; *see supra* ¶ 128.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**222. The Success Foundation received more than $5,000 in donations from Safa in 2000 and 2001. Ex. 8 at 19; Ex. 9 at 15.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**223. The IIRO's offices at 360 South Washington Street in Falls Church, Virginia, were owned by Sana-Bell, Inc. ("Sana-Bell"), an organization whose board of trustees at times included Mirza and/or Solayman Alsaih Alraghi (a/k/a Sulaiman Saleh Al-Rajhi). The IIRO provided Sana-Bell with approximately $2 million to assist with the purchase of the premises. IIRO paid a nominal rent for its office space in the 360 South Washington Street building. Ex. 3 (Mirza Dep.) at 16:1-19, 59:1-17, 268:18-269:2; Ex. 2 (Mirza Resp. to Written Dep. Ques.) at Nos. 68-70; Ex. 27 at i; Ex. 17 at 22-23; Ex. 115.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

## LITIGATION ARISING FROM THE FEDERAL INVESTIGATION OF MAR-JAC AND ITS ASSOCIATES

### Return-of-Property Proceedings

**224. In November 2003 – five months after commencing this litigation in the United States District Court for the Northern District of Georgia – Mar-Jac initiated an action in the same court seeking the return of all of its property seized during the execution of the Operation Green Quest search warrant (the "Return-of-Property Proceedings"). Ex. 116 at 1.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**225. In the Return-of-Property Proceedings, Mar-Jac asserted that it was entitled to have its property returned by the government because "the warrant was unlawfully and unconstitutionally issued." Ex. 116 at 1.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**226. In the Return-of-Property Proceedings, Mar-Jac alleged that "being the subject of an investigation into alleged links to international terrorism" had caused "'substantial harm'" to its reputation. Ex. 117 at 1.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**227. The district court denied Mar-Jac's motion for the return of its property and expressly rejected Mar-Jac's request that it "issue an order stating that the government had insufficient evidence of ties between Mar-Jac Poultry, Inc. and any terrorist organizations to justify a search warrant." Ex. 118 at 9.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather offers additional information about the legal reasoning underlying the court's order denying Mar-Jac's motion for the return of its property. There is, therefore, no genuine dispute of material fact with regard to this statement.

**228. Mar-Jac asked the court to reconsider that order, which the court declined to do. Ex. 119.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**229. Mar-Jac did not appeal the original order or the order denying reconsideration. Ex. 120 at 4.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**230. In the same proceeding, Mar-Jac separately asserted that "Agent Kane knowingly made false statements in the affidavit he submitted to the magistrate judge in Virginia in support of his request for a search warrant" and that the government's subsequent disclosure in a pleading of "information concerning its belief that SAAR's founder, Sheik Sulaiman A. Al-Rahji, had ties to Osama Bin Laden" had violated a court order prohibiting the government from revealing "details of the pending investigation of Mar-Jac." Ex. 121 at 10-11, 12-13.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**231. The Court rejected both arguments and noted that Mar-Jac's claim that Agent Kane's alleged deliberate misrepresentation of the details of certain purportedly domestic financial transactions, even if true, would not have been sufficient to alter the probable cause determination because "there would still be the evidence of transfers to the Channel Islands, which would have been sufficient to establish the existence of an international transfer," and thus support the finding of probable cause for issuance of the warrant. Ex. 121 at 16 n.6.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac does not controvert the substance of this statement, but rather contends only that it is "argumentative." There is, therefore, no genuine dispute of material fact with regard to this statement.

**Unus Litigation**

**232. In 2004, the wife and daughter of Iqbal Unus – an employee of IIIT whose Herndon, Virginia, home was among those searched pursuant to the warrants issued on March 13, 2002 – filed suit in the United States District Court for the Eastern District of Virginia (represented by Mar-Jac's lead counsel) against Katz, Agent Kane, and eleven other federal agents, alleging various constitutional and common law torts arising from the execution of the search warrant at the Unus home. *Unus*, 565 F.3d at 107, 109-12.**

RESPONSE TO MAR-JAC OBJECTION: Pursuant to Mar-Jac's objection, Defendants have modified this statement to clarify that Mar-Jac' lead counsel, Ms. Luque, actually represented Unus's *wife and daughter* in the lawsuit, not Unus himself. *Unus*, 565 F.3d at 106 (attorneys "on brief" include Nancy A. Luque). There is, therefore, no genuine dispute of material fact with regard to this statement.

**233. Among the plaintiffs' claims was that Agent Kane and Katz, as Kane's confidential informant, had conspired to violate plaintiffs' rights by making material misrepresentations to the Court in requesting the search warrant. *Id.* at 111.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**234. The district court (Brinkema, J.) ruled in favor of all defendants on all of the claims, and in particular concluded that the plaintiffs had "not sufficiently alleged" that there were material misrepresentations of fact in the Kane Affidavit and that, in light of "the totality of the information provided [in the Kane Affidavit] and the multiple examples of layering and other types of highly suspicious financial transactions among and between these various groups . . . [, the Kane Affidavit] establishes probable cause and did for this particular search."** ***Id.*** **at 112.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**235. The district court further characterized one of the transactions referenced in the Kane Affidavit – involving the movement of millions of dollars between and among Mar-Jac, Safa, and Heritage (*see supra* ¶ 89) – as "very suspicious" and alone sufficient "to give probable cause to go ahead and conduct further searches." Ex. 122 at 12.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**236. The district court's rulings with respect to the dismissal of claims against Agent Kane and Katz were affirmed by the United States Court of Appeals for the Fourth Circuit, which "agree[d] that the Affidavit established probable cause."** ***Unus*****, 565 F.3d at 125-26.**

RESPONSE TO MAR-JAC OBJECTION: Mar-Jac contends that "Nowhere in the Court's opinion does the Court 'agree that the Affidavit established probable cause,'" but that is precisely what the Fourth Circuit's opinion says. *See Unus*, 565 F.3d at 129 ("[W]e agree that the Affidavit established probable cause . . . ."). There is, therefore, no genuine dispute of material fact with regard to this statement.

**Grand Jury Proceedings**

**237. In 2006, a grand jury convened by the United States District Court for the Eastern District of Virginia began to investigate the legality of Saar's transfer of funds to Humana and, as part of that process, issued a subpoena to a former attorney for Saar – which was by then dissolved – seeking "any and all documents relating to" Saar. *In re Grand Jury Investigation*, 352 F. App'x 805, 806 (4th Cir. 2009).**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**238. Saar's former counsel withheld some responsive documents on the ground that they were protected by the attorney-client privilege. *Id.***

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**239. The government moved to compel the production of the withheld documents, arguing that the attorney-client privilege did not protect the communications of dissolved corporations when there was no officer available to assert the privilege and that, even if the attorney-client privilege were properly invoked, the crime-fraud exception applied to overcome the privilege. *Id.***

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**240. Ultimately, the district court conducted a hearing regarding the applicability of the crime-fraud exception and held that the government had made out a prima facie case that Saar had violated federal law and that the withheld communications with its counsel "bore a close relationship to the alleged violation . . . because Counsel's advice was used to 'cloak [Saar's] transfers to the Isle of Man Entity [Humana] in legitimacy.'" *In re Grand Jury Investigation*, 352 F. App'x at 807.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**241. On the ensuing appeal, the Fourth Circuit held that "the Government ha[d] provided the court with *prima facie* evidence that [Saar], its principals and the Isle of Man Entity [Humana] had an agreement to defraud the United States Government . . . both by concealing the ultimate disposition of the [Saar's] funds through the transfer of assets overseas and by using the [Saar's] tax-exempt status to circumvent the collection of taxes on the profits of individuals" and that "all of the withheld documents [bore] the requisite close relationship to the alleged violation of [federal law] because they were in furtherance of the alleged scheme." *Id.* at 809-10.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**242. The court of appeals therefore ordered Saar's counsel to produce the withheld documents to the grand jury. *Id.* at 810.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**243. Subsequently, the court of appeals upheld a contempt fine issued by the United States District Court for the Eastern District of Virginia as to "twelve interrelated for-profit and not-for-profit corporations suspected of participating in the financing of terrorist activity." All had been the subjects of "March 2002 . . . search warrants" executed at the offices they shared with "other related corporations." The otherwise unidentified corporations refused either to search for or to produce responsive documents that had previously been seized pursuant to the warrants and thereafter collectively returned "in some two hundred boxes" to their "shared counsel, Nancy Luque." *In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 191-92 (4th Cir. 2010).**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**244. On June 26, 2008, al-Arian was indicted by a grand jury in the Eastern District of Virginia on two counts of criminal contempt. He is charged with unlawfully and willfully refusing court orders that he testify in the investigations about his ties to IIIT. The charges are pending. *United States v. Al-Arian*, Case No. 1:08-cr-00131-LMB (Filed June 26, 2008).**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**Heritage and Safa Defamation Action**

**245. In June 2003, Heritage and Safa together filed suit in the Superior Court of the District of Columbia (subsequently removed to this Court) against CBS, Katz, the SITE Institute, and *60 Minutes* correspondent Bob Simon, alleging defamation arising from the Broadcast. Ex. 123.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**246. The gravamen of these plaintiffs' defamation claims was that the Broadcast portrayed them as being at "'the heart of a terrorist funding ring,'" that it depicted "555 Grove Street [as] nothing more than a hotbed of supporters of international terrorists" and "home to a network of sponsors of terrorism," and that it implied Safa "knowingly funded terrorists" and Heritage "knowingly ran a terrorist funding network." Ex. 123 ¶¶ 17, 23-24.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**247. Heritage and Safa then sought a stay of the litigation in light of the fact that "Plaintiffs' officers have been described as targets of a federal grand jury investigation into alleged terrorist funding activities," arguing that "a stay of discovery [would] protect the Fifth Amendment rights of their officers, while preserving [Heritage's and Safa's] rights to seek redress in this lawsuit." Ex. 124 at 1-2.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**248. After a brief stay was entered, discovery commenced and plaintiffs voluntarily dismissed their claims with prejudice in February 2005. Ex. 125.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**Mar-Jac's Claims in This Action**

**249. In its Complaint, Mar-Jac alleges that the Broadcast falsely states that there was "a purported flow of money from Saudi Arabia through various businesses and/or charities to [the] al-Qaeda, Hamas and Islamic Jihad" terrorist organizations, and that Mar-Jac was "one of the entities" through which the money flowed. Am. Compl. ¶ 13.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).

**250. In its Complaint, Mar-Jac further contends that "viewers of the [B]roadcast would interpret the false statements and depictions in the broadcast to mean that Plaintiff Mar-Jac knowingly laundered money to fund terrorist activities" and that the Broadcast "directly, indirectly or by innuendo created the impression that Plaintiff Mar-Jac engaged in money laundering activities in a knowing effort to support terrorists." Am. Compl. ¶¶ 23, 26.**

ADMITTED, per LOCAL CIV. R. 7(h)(1).[3]

Dated: September 17, 2010

Respectfully submitted,

/s/ Thomas Curley
Lee Levine (D.C. Bar No. 343095)
Gayle C. Sproul (D.C. Bar No. 495965)
Thomas Curley (D.C. Bar No. 473798)
John B. O'Keefe (D.C. Bar No. 974892)
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
1050 Seventeenth Street, NW, Suite 800
Washington, D.C. 20036-5514
(202) 508-1100
(202) 861-9888 fax

*Attorneys for Defendant CBS Broadcasting Inc.*

/s/ Thomas Curley (for Laura Handman)
Laura R. Handman (D.C. Bar No. 444386)
Robert Scott (D.C. Bar No. 419559)
John Rory Eastburg (D.C. Bar No. 984434)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, D.C. 20006-3402
(202) 973-4200
(202) 973-4499 fax

*Attorneys for Defendants Rita Katz, the SITE Institute, and IG, LLC*

[3] Mar-Jac's Local Rule 7(h)(1) Response to Defendants' Statement of Undisputed Material Facts and Statement of Facts Genuinely in Dispute concludes with twenty-three additional statements that Mar-Jac labels "Plaintiff's Additional Undisputed Material Facts." *See* Resp. SUMF ¶¶ 251-274. To the extent Mar-Jac seeks to proffer these statements as a supplement to the Statement of Undisputed Material Facts it submitted in support of its own Motion for Partial Summary Judgment, they should be disregarded as untimely. In any event, the vast majority of these statements lack any "references to the parts of the record relied on to support the statement," and therefore do not comply with Local Rule 7(h)(1). Moreover, no federal or local rule requires a defendant moving for summary judgment to respond to purported "undisputed material facts" proffered by the plaintiff; rather, the ordinary procedure for a plaintiff to make factual allegations and for a defendant to respond is through the filing of a Complaint by the plaintiff and an Answer by the defendant.