## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **MAR-JAC POULTRY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 03-2422 (RMC)** |
| | ) | |
| **RITA KATZ,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This case was stayed for years because a crucial witness asserted his Fifth Amendment rights. That issue resolved, the parties now address the merits of Plaintiff's allegations that it was defamed by a *60 Minutes* segment originally aired on May 4, 2003. All Defendants move for summary judgment, arguing that the segment was not defamatory as a matter of law and that Plaintiff is unable to prove the material falsity of any alleged defamation. Defendant CBS Broadcasting, Inc., moves for summary judgment on additional grounds pertaining to the media. Plaintiff cross-moves for partial summary judgment. The motions are now ripe for decision following oral argument. The Court will grant the Defendants' joint motion as it finds the challenged statements are protected by the First Amendment.

## I.  FACTS

### A.  The Parties

This matter is rooted in a *60 Minutes* news report entitled "Terrorist Hunter" which originally aired nationwide on May 4, 2003 (the "Broadcast"). The Broadcast focused on Defendant

Rita Katz and her efforts to uncover people and entities that provided financial support to Islamic extremists from within the United States. References were interwoven throughout the Broadcast that Ms. Katz turned over information from her investigations to the United States government, which often acted on that information. It is the latter half of the Broadcast, which focused on Ms. Katz's investigation of entities operating out of an office building at 555 Grove Street in Herndon, Virginia, from which this action springs. Plaintiff Mar-Jac Poultry, Inc. ("Mar-Jac") alleges that the Broadcast directly or indirectly created the impression that Mar-Jac engaged in money laundering in a knowing effort to support terrorism. As referenced in the Broadcast, the government relied on Ms. Katz's findings, at least in part, to execute various search warrants in furtherance of an investigation of terrorist financing at 555 Grove Street and at Mar-Jac's offices in Georgia.

Defendant CBS produces and broadcasts *60 Minutes*, including the May 4, 2003 "Terrorist Hunter" segment. Bob Simon was the *60 Minutes* correspondent who interviewed Rita Katz in the Broadcast.[1] Rita Katz is the author and subject of the book "Terrorist Hunter: The Extraordinary Story of a Woman Who Went Undercover to Infiltrate the Radical Islamic Groups Operating in America." At one point, she was also a director of Defendant SITE Institute (Search for International Terrorist Entities Institute), which is no longer in existence as Defendant IG, LLC, acquired all of SITE Institute's assets and liabilities in 2007. Ms. Katz is part owner of IG, LLC.

Mar-Jac is a producer and processor of poultry products in Gainesville, Georgia. From 1984 to 1996, Mar-Jac Poultry, Inc., was wholly owned by Mar-Jac, Inc. From 1984 to 1990, Mar-Jac, Inc., was wholly owned by the Saar Foundation, and from 1990 to 1996, the Saar

---

[1] Although initially named as a defendant, Mr. Simon was never served, never entered an appearance and, through the parties' agreement, was not pursued further by Mar-Jac. He will be dismissed.

Foundation owned 51% of Mar-Jac, Inc., while 49% was owned by Aradi Inc., Mena Corp., and Safa Trust. *See* Defs.' Opp'n [Dkt. ## 204, 206], [Ex. 1] Composite Statement of Undisputed Material Facts ¶¶ 3, 8. At some point in 1996, Mar-Jac Poultry, Inc., became wholly owned by Mar-Jac Holdings, Inc., which is, in turn, majority-owned by Safa Trust. *Id*. ¶ 12.

Saar Foundation was established as a charity in 1983 and was initially funded by members of the wealthy al-Rajhi family of Saudi Arabia. *Id*. ¶ 4. In 1995, a member of the al-Rajhi family requested the resignation of three Saar board members, who he allegedly believed shared a different vision of Islamic thinking, and promoted Dr. M. Yaqub Mirza to become Saar's president. *Id*. ¶ 7. In 1996, Saar came under some scrutiny in the United States about potential ties with radical Islamic groups. Thereafter, Saar began a process of transferring funds to the Humana Charitable Trust, an offshore trust in the Channel Islands, managed by a corporate trustee which was controlled by Dr. Mirza and an attorney who represented the al-Rajhi family. Saar ultimately dissolved in 2000. *See id*. ¶ 10.

At all times relevant to this litigation, Dr. Mirza was an officer, director, or managing agent of Mar-Jac or its holding company, Saar, and the Safa Trust. *Id*. ¶¶ 18–19. The Safa Trust is a non-profit organization, funded in part by the al-Rajhi family, and was established as an endowment for the International Institute of Islamic Thought. *Id*. ¶ 13. The International Institute of Islamic Thought is an Islamic think tank funded in large part by Safa. *Id*. ¶ 117. Mena Corp was a wholly owned subsidiary of Safa Trust. *Id*. ¶ 9. Roughly from 1984 to 1997—by way of loans, donations, or other arrangements—millions of dollars flowed between Mar-Jac (and/or its holding companies) and Saar, Safa, Heritage Education Trust, Mena Corp., and/or International Institute of Islamic Thought. *See id*. ¶¶ 87–89, 90, 92, 94, 102–07, 119–20.

The real property described in the Broadcast was the office building at 555 Grove Street, which was constructed in 1987. Thereafter, most, if not all, of Mar-Jac's beneficial owners maintained offices at 555 Grove. *Id.* ¶ 16. At all times relevant to this litigation, the 555 Grove Street property was owned by either Grove Corporate Plaza, Inc., which in turn was owned by Saar, or by the Heritage Education Trust. *Id.* ¶ 17. As referenced in the Broadcast, on March 20 and 21, 2002, the federal government executed search warrants at approximately twenty different locations, including the 555 Grove Street building, Mar-Jac's offices in Georgia, and the homes of three of Mar-Jac's corporate directors. *Id.* ¶ 49. Mar-Jac acknowledges that Ms. Katz was an influencing source behind the government's search warrants. *See id.* ¶ 50; Am. Compl. [Dkt. # 127] ¶¶ 20–22.

## B. The Broadcast

CBS aired the Broadcast on May 4, 2003. The "Terrorist Hunter" segment was one of several and lasted for approximately thirteen minutes. It opened with correspondent Bob Simon sitting in a chair while behind him ran the title "Terrorist Hunter" superimposed over a picture of a woman whose face was covered by a veil. Mr. Simon began: "Ever since 9/11, Washington's been trying to trace and shut down terrorist financing. It's been relying on tips from all sorts of shadowy figures in shadowy places. But one tipster government officials say has been especially valuable is a professional researcher who's spent more than five years investigating links to Muslim terrorism here in the United States." Defs.' Mem. [Dkt. # 186], [Ex. 21] 60 Minutes "Terrorist Hunter" Broadcast Tr. (May 4, 2003) ("Broadcast Tr.") at 14.[2] Mr. Simon explained that the "tipster" had just authored a book entitled "Terrorist Hunter" which "details how groups in America have been

_____

[2] To maximize clarity the Court cites to the pages of the transcript and not to the pages of the exhibit because each exhibit page contains two pages of the actual transcript.

providing significant support to terrorist outfits and how she helped track them down." *Id*. Ms. Katz was referred to as "Sarah" throughout the Broadcast to hide her identity and she was in disguise during the televised interview.

Mr. Simon underscored that Ms. Katz had provided information to the "FBI, the Treasury Department, Customs, the [Immigration and Nationality Service], even the White House." *Id*. Ms. Katz, who is a native of Iran, then described her routine of tracking down the websites of terrorist organizations like al-Qaida to provide immediate information to the government, which would then shut down the website. *See id*. Mr. Simon explained, "It's a game of cat and mouse. She can't tell us how to play it for reasons of national security." *Id*. Ms. Katz also explained how she investigated charities based in the United States that she suspected of providing financial support to terrorist groups. The Broadcast took a notedly personal turn by exploring the genesis of Ms. Katz's obsession with routing out terrorists: when she was a young girl growing up in Iraq, her father was accused of spying for Israel and was hung by Saddam Hussein's forces. *See id*. at 15. Her mother fled the country with her children. *Id*.

Mr. Simon then explained that Ms. Katz began her career as a "terrorist hunter" by going undercover to help expose a Texas-based charity that provided support to children of "martyrs," i.e. suicide bombers. *See id*. at 16. Because the "charity" was receiving federal funds from the U.S. Agency for International Development, Ms. Katz asserted that she "contacted the White House, and it was stopped." *Id*. 16. Mr. Simon revealed that the charity was ultimately shut down and a clip was shown of a press conference in which President George W. Bush announced that the Department of Treasury had frozen the assets and accounts of the charity. *Id*. Mr. Simon also presented, as Ms. Katz's belief, that many American corporations, by matching donations of

employees, had at times innocently and unknowingly donated funds to charities which supported terrorism. *See id*. at 17.

In a voice-over, Mr. Simon narrated that in April 2001 Ms. Katz had videotaped al-Qaida sympathizers in a demonstration in New York City, as footage of her recording was displayed, but the federal government was not interested in her tape. Mr. Simon noted: "But that changed after 9/11. Suddenly, Sarah says, the FBI was interested not only in the tape but in all her work. And the government began cracking down on the charities she'd been investigating." *Id*. Mr. Simon then explained that Ms. Katz continued going undercover, dressed as an observant Muslim woman, into allegedly radical mosques. *See id*. The relevant segment of the Broadcast continued:

> (Footage of a mosque; Muslim women; building at 555 Grove Street)
> **SIMON**: (Voiceover) The mosques started Sarah on a trail which ended in her biggest investigation. The most radical mosques, she says, were all owned by a single organization, whose founders now had offices in a Washington suburb. The address was 555 Grove Street, Herndon, Virginia.
>
> [Q:] So here we are at 555 Grove Street. Was this your biggest hit?
>
> **SARAH**: Yes. It's my biggest lead to the government.
> (Footage of Simon and Sarah; Dumpsters)
>
> **SIMON**: (Voiceover) Because, Sarah discovered, this one building, 555 Grove, housed nearly 100 organizations owned by Muslims, most of them run by the same small group of people. Sarah was convinced she'd stumbled upon the heart of a terrorist financing ring. One night—late one night, Sarah came to 555 with some colleagues and collected the trash from the Dumpsters.
>
> [Q:] And what did you find in the trash?
>
> **SARAH**: I found one important letter that actually gave me the first lead to understand that the money comes from Saudi Arabia.
> (Photo of a Saudi family)

**SIMON**: (Voiceover) Came from members of an extremely wealthy Saudi family, the al-Rajhis, who, Sarah claims, funded many of the organizations in 555 Grove.

**SARAH**: So what we have here is just a very simple chart of how the money flows from Saudi Arabia.
(Footage of chart showing flow of money)

**SIMON**: (Voiceover) In fact, it's not simple at all. Sarah mapped out how, she says, the money flowed from Saudi Arabia to a web of charities, think tanks and businesses at 555 Grove, then to offshore banks and ultimately, she says, to terrorist groups. It's not simple because, Sarah says, it's not meant to be. It's designed to make it difficult to follow the money. And one especially inventive idea the Saudis came up with according to Sarah was chickens. They bought a chicken farm in Georgia.

**SARAH**: Chicken—I see it as the best cover for money laundering.

**SIMON**: Chicken is the best cover for money laundering?

**SARAH**: Why? Because...

**SIMON**: Yes.

**SARAH**: ... chicken is one of the things that no one really can track it down. If you say in one year that you lost 10 million chickens, no one can prove it. They just died. You can't trace money with chickens.

**SIMON**: And that money lost has gone down the line to Hamas or Islamic Jihad or al-Qaida?

**SARAH**: That's what we're trying to find out.
(Footage of men removing boxes of evidence; 555 Grove Street building; footage of Simon)

**SIMON**: (Voiceover) But with Sarah's help, U.S. officials had found out enough to get a customs department task force to raid 555 Grove and 28 other locations in March of 2002, carting away seven truckloads of evidence. It was one of the biggest terrorism-related raids in US history. And, yes, they raided a chicken farm, too. We paid a visit to 555 Grove. Sarah says her efforts stopped the flow of

funds from here to terrorists, but the Muslims who work here said there never was a flow. And they point out that today, more than a year after the raids, no criminal charges have been brought against anyone. They're so incensed about the raid, that they kicked us out of their offices minutes after we got there. A Muslim center across the street called the cops, and then a young man, who identified himself as Suhaib Jamal, came by to express his outrage. His father's office and home had been raided.

**Mr. SUHAIB JAMAL**: You don't go attacking innocent Americans, you know, just because they happen to have a Muslim background or an Arab background. And these are people, some of the most law-abiding, you know, patriotic Americans you'll ever meet, the people who—who were raided, and it's such a shame.

**SIMON**: Did some of the money that was given to legitimate charities here wind up in the hands of the families of martyrs in Gaza or the West Bank? I don't know, but apparently there is suspicion that it did.

**Mr. JAMAL**: Whose suspicion, though? Who is tipping off the—the federal government? Who are these people in the—in the shadows, in the—in the backgrounds, you know? What is their agenda?

**SARAH**: I'm not after Muslims, I'm after hunting terrorist Muslims—Muslim terrorists. I'm not after Islam, I'm after Islamic terrorism. It's just a small group of people that are trying to destroy our life, are doing all this damage, and we must make sure that we stop it.

**SIMON**: Do you think it can happen? Do you think this small group of people, as you put it, can be stopped?

**SARAH**: I know I stopped them. I know I stopped them.

**SIMON**: You stopped a few for a day, if you'll pardon me.

**SARAH**: I'm only one person. Hey, give me the credit.

**SIMON**: The al-Rajhi family from Saudi Arabia claims it never financed terrorists. So do the people who were raided in Virginia. So do all the charities and foundations mentioned or shown in our story. Meanwhile, the U.S. Justice Department continues its investigations.

And by the way, at her request, we disguised the woman we called
'Sarah.'
[End of Transcript]

Broadcast Tr. at 17–19. It is from this piece that Mar-Jac, identifying itself as the chicken farm

mentioned in the segment, argues that Ms. Katz directly or indirectly accused it of engaging in

money laundering in a knowing effort to support terrorism.

## C. Procedural History

Mar-Jac raises seven claims arising from the Broadcast: (1) libel; (2) slander;

(3) negligence; (4) product disparagement in violation of the Georgia Uniform Deceptive Trade

Practices Act, O.C.G.A. § 10-1-372(a)(8); (5) vicarious liability (against SITE, IG LLC, and CBS);

(6) punitive damages; and (7) costs. Mar-Jac filed its suit in the District Court for the Northern

District of Georgia on June 6, 2003. That court transferred the matter to the District of Columbia

on November 21, 2003, after determining the suit was related to another case pending before this

Court at that time. *See generally Heritage Education Trust v. Katz*, No. 03-cv-1362 (D.D.C.

removed June 23, 2003). *Heritage Education Trust* subsequently was dismissed pursuant to

voluntary stipulation in 2005.

Following an initial stay of discovery in 2004, Defendants began limited discovery

of Mar-Jac's financial and operational records. *See* Order (June 4, 2004) [Dkt. # 23]. An issue

quickly arose when counsel for Dr. Mirza notified Defendants that he intended to invoke his Fifth

Amendment privilege against self-incrimination to avoid deposition. Ultimately, the Court quashed

the deposition subpoena to Dr. Mirza based on the record and representations of counsel, *see* Order

(July 30, 2004) [Dkt. # 42], and stayed the case per consent motion on August 23, 2004. *See* Minute

Entry Order 8/23/2004. For years, Defendants argued that Dr. Mirza's testimony was critical to their

defense and that the case should be dismissed for lack of prosecution if he were unwilling or unable to respond to discovery. Rather than dismissal, the Court continued the stay, awaiting Dr. Mirza's availability.[3] On June 29, 2009, Mar-Jac filed an amended complaint to add IG, LLC, as a defendant. *See* Am. Compl. Following resolution of Dr. Mirza's asserted privilege and his deposition, the Court lifted the stay on June 3, 2010. However, further discovery was deferred until after resolution of dispositive motions, now pending. *See* Minute Entry Orders 6/3/2010. The parties filed cross-motions for summary judgment on July 30, 2010. The Court heard oral argument on November 23, 2010.

## II. LEGAL STANDARD

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere

---

[3] The parties wrangled for years over whether Dr. Mirza was a critical witness. In light of the record now developed, the Court finds that he was critical.

existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The Court of Appeals for the District of Columbia Circuit has instructed that, because defamation cases pose a threat to freedom to the press even if a defendant ultimately prevails, district courts should apply close judicial scrutiny and properly dispose of defamation cases against the news media through summary procedures when and as soon as possible. *See Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996); *McBride v. Merrell Dow & Pharms., Inc.*, 717 F.2d 1460, 1466 (D.C. Cir. 1983).

**B. Choice of Law**

In a diversity case, such as this one, a federal court applies the substantive law of the forum state, including the forum state's choice of law rules, unless federal constitutional or statutory law is contrary. *See Salve Regina College v. Russell*, 111 S. Ct. 1217, 1218 (1991); *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 491 (1941). This Court generally applies the District of Columbia's choice of law analysis. *YWCA v. Allstate Ins. Co.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002). However, when venue has been transferred per 28 U.S.C. § 1404(a), a transferee court is obligated to apply state law that would have applied had there been no change of venue, *see Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964), which includes applying the choice of laws rules of the state in which the transferor court sits. *See Ferens v. John Deere Co.*, 494 U.S. 516, 523 (1990); *Van*

*Dusen*, 376 U.S. at 639 (noting that a "change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms").

This matter was initially filed in District Court for the Northern District of Georgia in Gainesville. *See Mar-Jac Poultry, Inc. v. Katz, et al.*, No. 2:03-cv-92 (N.D. Ga. filed June 6, 2003). It was transferred here on November 12, 2003, pursuant to 28 U.S.C. § 1404(a), in the interests of justice because a related matter was then pending here. *See id*., Order (Nov. 12, 2003) [Dkt. # 34] at 6–8. As a result, the Georgia District Court did not decide whether it had personal jurisdiction over defendants Rita Katz and SITE. *Id*. at 4–5.[4]

Mar-Jac argues that Georgia state law governs its tort claims while Defendants assert that there is no conflict between Georgia and D.C. tort law, and that the same result, i.e., summary judgment for Defendants, follows the application of either forum's law. In Georgia, "tort actions are adjudicated according to the law of the place where the wrong occurred." *Wallace v. Harrison*, 304 S.E.2d 487, 489 (Ga. Ct. App. 1983); *see also Sargent Indus., Inc. v. Delta Air Lines, Inc.*, 303 S.E.2d 108, 110 (Ga. 1983). "The law of the place where the tort or wrong has been committed is the law by which liability is to be determined. The place of the wrong is the place where the injury was sustained rather than where the acts were committed." *Cash v. Armco Steel Corp.*, 462 F. Supp. 272, 274 (N.D. Ga. 1978) (citation omitted); *see also Best Canvas Products & Supplies, Inc. v. Ploof*

_____

[4] The choice of law rules of the state of a transferring court does not follow the case to a transferee court if the originating court did not have personal jurisdiction over all defendants. *Wooldridge v. Beech Aircraft Corp.*, 479 F. Supp. 1041, 1059 (W.D. Mo. 1979); *see also Ellis v. Great Southwestern Corp.*, 646 F.2d 1099, 1109–10 (5th Cir. 1981); *Manley v. Engram*, 755 F.2d 1463, 1466 (11th Cir. 1985); *Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 966 (9th Cir. 1993) (choice of law of receiving court applies when "the transfer had the effect of curing a defect in personal jurisdiction"). The Court need not delve further into this procedural quagmire because the substantive law of Georgia applies to Mar-Jac's tort claims under either jurisdiction's choice of law analysis, a point the parties do not contest.

*Truck Lines, Inc.,* 713 F.2d 618, 621 (11th Cir. 1983).

Mar-Jac's injuries, if any, were sustained in Georgia as it is located in Georgia and its operations occur in Georgia. *See* Restatement (Second) of Conflict of Laws, § 150, comment f (1971) (noting that in multi-state defamation cases the principle place of business of a corporation is the place where a company's reputation will usually be "most grievously affected"); *see also Adventure Outdoors, Inc. v. Bloomberg*, 519 F. Supp. 2d 1258, 1280 (N.D. Ga. 2007) (noting, "where publication occurs simultaneously in several states," such as by a nationwide news broadcast, "courts will consider the 'most significant relationship' test, which generally points to the plaintiff's domicile").

Even were the Court to apply the District of Columbia's choice of law analysis, the law of Georgia would apply. The District of Columbia applies a "governmental interest analysis" which requires a court "to evaluate the governmental policies underlying the applicable conflicting laws and to determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Bledsoe v. Crowley*, 849 F.2d 639, 641 (D.C. Cir. 1988) (quoting *Williams v. Williams*, 390 A.2d 4, 5–6 (D.C. 1978)). Among other things, a court looks to which state has the "most significant relationship" to the dispute, by which a court considers which state's policy would be most advanced by application of its law. *See Hercules & Co. v. Shama Restaurant Corp.*, 566 A.2d 31, 40 (D.C. 1989); *see also Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004); *Thompson v. Islam*, No. 01-0585, 2005 U.S. Dist. LEXIS 37114, *10 (D.D.C. July 29, 2005). None of the parties resides in the District of Columbia; the relationship of the parties is not centered here; Mar-Jac is located in Georgia and any injury occurred there; but for the matter being transferred to this Court, the District has little genuine interest in this litigation at

least when compared to the clear interest held by Georgia.

While the Court applies Georgia law to the alleged torts, the defamation claims raise significant federal constitutional questions. All Defendants advance defenses which are grounded in the Constitution, and while a court should generally avoid constitutional questions if there is another ground on which a matter or claim can be disposed, *see Ashwander v. TVA*, 297 U.S. 288, 346–47 (1936), First Amendment jurisprudence has become "inextricably linked" with defamation common law. *Lane v. Random House*, 985 F. Supp. 141, 149 (D.D.C. 1995). Starting with *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court has "dramatically altered" the defamation common and statutory laws of the states which ultimately "created an entirely new system of liability for defamation." *Pierce v. Capital Cities Commc'ns, Inc.*, 576 F.2d 495, 505 (3d Cir. 1978) (citation omitted).[5] Accordingly and properly, the parties cite decisions of the D. C. Circuit as it applies to First Amendment jurisprudence. *Cf. In re Korean Air Lines Disaster*, 829 F.2d 1171, 1175–76 (D.C. Cir. 1987) (holding that when federal law is implicated, a transferee court is obligated to follow the interpretation of relevant federal law of the court of appeals for that circuit and the Supreme Court); *see also Murphy v. FDIC*, 208 F.3d 959, 966 (11th Cir. 2000) (adopting same for Eleventh Circuit, where Georgia is located).

### C. Georgia State Law on Defamation

Counts I and II of Mar-Jac's Amended Complaint allege libel and slander, including libel and slander per se, arising from the Broadcast. *See* Am. Compl., Counts I, II. Georgia has

---

[5] States' law on defamation has been curtailed and transformed by constitutional principles; "[t]his intermixture in the cases represents a certain lack of analytical clarity, for a defamation decision does involve two separate sorts of inquiries: first, is there an infringement of a state-protected right to be free from a tortious invasion of one's reputation?; and second, even if there is, does the First Amendment nonetheless preclude recovery?" *Pierce*, 576 F.2d at 502 n.19.

-14-

legislated its definitions for defamation actions. Libel is a published "false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1. Slander, or oral defamation, is actionable per se under Georgia law if the statement imputes the commission of a crime to another. *Id*. § 51-5-4(a)(1). A charge calculated to injure a person in his trade, office, or profession also constitutes slander per se. *Id*. § 51-5-4(a)(3); *see also Hoffmann-Pugh v. Ramsey*, 193 F. Supp. 2d 1295, 1299 (N.D. Ga. 2002). Although the statute referring to defamation per se speaks to slander and not libel, *see* O.C.G.A. § 51-5-4, "[t]he definition of slander in Georgia has been incorporated into the definition of libel." *Lucas v. Cranshaw*, 659 S.E.2d 612, 616 (Ga. Ct. App. 2008). "Therefore, that which is slander per se can also become libel per se under the aegis of O.C.G.A. § 51-5-4." *Id*. (citing *Mathis v. Cannon*, 556 S.E.2d 172, 174–75 (Ga. Ct. App. 2001)); *see also Webster v. Wilkins*, 456 S.E.2d 699, 701 (Ga. Ct. App. 1995) (noting that "libel per se consists of a charge that one is guilty of a crime, dishonesty, or immorality") (citation omitted).

"Defamation via a radio or television broadcast (or a 'defamacast,' as it has become generally known) includes elements of both libel under O.C.G.A. § 51-5-1, and slander under O.C.G.A. § 51-5-4." *Strange v. Henderson*, 477 S.E.2d 330, 332 (Ga. Ct. App. 1996). Defamation consists of "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *Mathis v. Cannon*, 573 S.E.2d 376, 380 (Ga. 2002) (internal quotation marks omitted).

Damages are inferred when a plaintiff proves defamation per se, whereas a plaintiff must plead and prove special damages to prevail on a claim of defamation per quod. *See Southland*

*Corp. v. Garren*, 225 S.E.2d 920, 923 (Ga. Ct. App. 1976); *Strange*, 477 S.E.2d at 332. "Special damages necessary to support an action for defamation, where the words are not actionable in themselves must be the loss of money, or of some other material temporal advantage capable of being assessed in monetary value." *Webster*, 456 S.E.2d at 701. "The loss of income, of profits, and even of gratuitous entertainment and hospitality will be special damage if the plaintiff can show that it was caused by the defendant's words." *Id.* Mar-Jac has pleaded special damages. *See* Am. Compl., Prayer for Relief (2).

"As a general rule, the question of whether a published statement is defamatory is a question for the jury." *Mead v. True Citizen, Inc.*, 417 S.E.2d 16, 17 (Ga. Ct. App. 1992); *see also Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1349 (N.D. Ga. 2003). A court faced with a motion for summary judgment must determine whether a statement is "not defamatory, that it is defamatory, or that it is ambiguous and the question is one for a jury." *Mead*, 417 S.E.2d at 17. Only when "the statement is not ambiguous and can reasonably have but one interpretation, the question is one of law for the judge." *Thomason v. Times-Journal*, 379 S.E.2d 551, 552 (Ga. Ct. App. 1989).[6]

An allegedly defamatory statement(s) must be construed in the context of the entire

---

[6] On this point, as others, the law is similar in D.C. "In a libel case, it is the role of the court to determine whether the challenged statement is 'capable of bearing a particular meaning' and whether 'that meaning is defamatory.'" *Tavoulareas v. Piro*, 817 F.2d 762, 779 (D.C. Cir. 1987) (en banc) (citing Restatement (Second) Of Torts § 614(i), at 311 (1977)). A court first looks to whether a statement is "capable of conveying" the alleged defamatory implication, which is a threshold issue that "the courts are charged with the responsibility of determining" as a matter of law. *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990); *see also Moldea v. New York Times Co.*, 22 F.3d 310, 316–17 (D.C. Cir. 1994) (noting whether a challenged statement is capable of a defamatory meaning is a pure question of law). If the publication is capable of bearing a defamatory meaning, a jury determines whether readers or viewers *in fact* attributed such a meaning to the statement(s)—that is, the jury determines whether the plaintiff was defamed. *White*, 909 F.2d at 518.

publication, as a whole, to determine whether it was potentially defamatory. *See id.* In reviewing a publication, "the whole item . . . should be read and construed together, and its meaning and signification thus determined." *Cox Enters. v. Bakin,* 426 S.E.2d 651, 653 (Ga. Ct. App. 1992); *see also Tavoulareas v. Piro*, 817 F.2d 762, 779 (D.C. Cir. 1987) (en banc) (noting that "a court is to consider both the words themselves and the entire context in which the statement occurs"). Further, a "publication claimed to be defamatory must be read and construed in the sense in which the reader to whom it is addressed would ordinarily understand it." *Washington Post v. Chaloner*, 250 U.S. 290, 293 (1919); *see also Macon Telegraph Publishing Co. v. Elliott*, 302 S.E.2d 692, 694 (Ga. Ct. App. 1983) (explaining that a court should look to "what construction would be placed upon [a writing] by the average reader").

A statement can be defamatory either because of what is expressly stated or because of an implied meaning. Defamation by implication "stems not from what is literally stated, but from what is implied." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990). "[A]s a defamatory statement may be made in indirect terms or by insinuation, the publication thereof must be construed as a whole. In doing so, the courts will not hunt for a strained construction in order to hold the words used as being defamatory." *S. Business Machs. v. Norwest Fin. Leasing*, 390 S.E.2d 402, 409 (Ga. Ct. App. 1990) (quoting *Thomason*, 379 S.E.2d at 553) (citations and internal quotations omitted); *see also White*, 909 F.2d at 519 ("In entertaining claims of defamation by implication, courts must be vigilant not to allow an implied defamatory meaning to be manufactured from words not reasonably capable of sustaining such meaning.").

A plaintiff can assert a defamation per se claim even when the alleged defamation is by implication. "A slanderous charge is actionable per se, whether the words directly or indirectly,

by intimation or innuendo, contain slander." *Wolff v. Middlebrooks*, 568 S.E.2d 88, 90 (Ga. Ct. App. 2002) (citation omitted). "The slanderous charge is just as effectively harmful, and therefore actionable per se . . . whether the harmful effect results from words which directly and unequivocally make a charge or whether it results from words which do so indirectly or by inference." *Id.* "It is the harmful effect of defamatory language as it is understood which renders it actionable per se, and not its directness or unequivocal nature." *Id.*; *see also Harcrow v. Struhar*, 511 S.E.2d 545, 546 (Ga. Ct. App. 1999) ("Whether stated directly or by implication or innuendo, it is libelous per se to falsely state that a person is guilty of a crime."); *Mead*, 417 S.E.2d at 17. However, a court must look to the "plain import of the words spoken" to determine whether they are defamatory per se, and only those which are "recognized as injurious on their face – without the aid of extrinsic proof" may be defamatory per se. *Bellemead, LLC v. Stoker*, 631 S.E.2d 693, 695 (Ga. 2006) (internal citations and quotation marks omitted).

## III. ANALYSIS

### A. The Parties' Positions

Mar-Jac argues that the Broadcast directly or indirectly "asserted that Mar-Jac engaged in money laundering activities, specifically by taking advantage of the asserted 'fact' that chicken 'is the best cover for money laundering' because a claim that a given number of chickens died in a year cannot be proven, and that those activities were engaged in by Mar-Jac as part of a knowing effort to support terrorists and/or terrorist organizations." Pl.'s Opp'n. [Dkt. # 196] at 8.[7]

---

[7] Defendants argue that Mar-Jac has alleged two distinct defamatory implications arising from the Broadcast: first, that Mar-Jac knowingly participated in money laundering to fund terrorist activities, and second, that Mar-Jac served as an unknowing conduit through which money flowed to terrorists. Defs.' Mem. at 15–16. Specifically, Defendants contend that Mar-Jac's conduit implication was that there was a "flow of money from Saudi Arabia through various businesses

-18-

Generally speaking, "[w]hen, as here, a libel action involves a speech of public concern, a plaintiff must show that the defendant published a defamatory statement about the plaintiff, the defamatory statement was false, the defendant was at fault in publishing it, and the plaintiff suffered actual injury from the statements." *Mathis*, 573 S.E.2d at 380. As limited discovery has occurred to this point, the motions before the Court only speak to the first two burdens Mar-Jac must surmount to launch a defamation claim: whether the alleged statements could be defamatory and accordingly submitted to a jury and whether it has shown the material falsity of the alleged defamation. *See Weyrich v. New*

---

and/or charities to" terrorist organizations and that Mar-Jac was "one of those entities" through which the money flowed. *Id*. at 15 (citing Am. Compl. ¶ 13). This alternative theory of defamation would appear to remove any scienter element on Mar-Jac's part in any money laundering scheme. The quoted language was taken from the Factual Allegations of the Amended Complaint, *see* Am. Compl. ¶ 13, which describe what Mar-Jac believes was depicted on the chart, not necessarily Mar-Jac's interpretation of the Broadcast's defamatory implication. *But see id*. ¶ 42 ("All Defendants falsely stated or implied that Plaintiff Mar-Jac's poultry business knowingly received monies from persons or entities which were used to fund terrorists or terrorist organizations and/or that some portion of proceeds from Plaintiffs' poultry business were [sic] knowingly used to fund terrorists or terrorist organizations.").

As the king of its own (amended) Complaint, Mar-Jac insists that it is not pursuing a conduit theory of defamation. *See* Pl.'s Opp'n at 7–8 ("Mar-Jac can prove the falsity of the claim that 'money flowed through it to terrorists,' but make no mistake: this is not the defamatory accusation that was made in the *60 Minutes* broadcast or alleged in Mar-Jac's Amended Complaint."). Counts I and II allege that the defamatory implication was that "Mar-Jac engaged in money laundering activities in a knowing effort to support terrorists and/or terrorist organizations, such as al-Qaeda, Hamas and Islamic Jihad." Am. Compl. ¶ 26 (Count 1); *see also id*. ¶ 33 (Count 2) (alleging that the Broadcast created the impression that "Mar-Jac knowingly laundered money to fund terrorists and/or terrorist organizations").

Although a plaintiff may proffer alternative defamatory implications, Mar-Jac does not do so here. There may be good reasons: Defendants appear ready to offer evidence to counter a defense of falsity as to whether Mar-Jac was an unknowing "conduit," and such a theory might lose the advantage of Georgia's *per se* rule of defamation. However, the Court will not analyze an alternative theory of defamation not advanced by the Plaintiff. *See Tavoulareas*, 817 F.2d at 778 n.16 ("We should have thought it beyond peradventure that an appellate court in a defamation action should refrain from embracing a defamatory interpretation of the underlying article that has not been pursued by the allegedly defamed individual.").

*Republic, Inc.*, 235 F.3d 617, 625 (D.C. Cir. 2001) (noting a district court may limit discovery to the "threshold issue of falsity" before engaging in "the more burdensome discovery surrounding evidence of" actual malice). Mar-Jac seeks partial summary judgment on three key defamation elements: (1) that the statements were "of and concerning" Mar-Jac, (2) that they were defamatory, and (3) that they were false.

Defendants jointly contend that the Broadcast is not capable of giving rise to the defamatory implication alleged by Mar-Jac. CBS, additionally and separately from the other Defendants, moves for summary judgment that it is not liable as a republisher because (1) the Broadcast did not endorse the accuracy of statements made by Ms. Katz, (2) the Broadcast constituted a privileged fair report of a governmental investigation, and (3) the Broadcast constituted a privileged neutral report.[8]

## B. Whether the Broadcast Was Defamatory Under Georgia Law

Mar-Jac alleges that the Broadcast conveyed a defamatory implication that Mar-Jac intentionally engaged in money laundering, through a process of manipulating the numbers of dead chickens, in a knowing effort to fund terrorist activities. *See* Am. Compl. ¶¶ 26–33. Thus, Mar-Jac alleges that the Broadcast was libelous per quod because it tended to expose Mar-Jac to "public hatred and/or contempt" under O.C.G.A. § 51-5-1 and libelous per se under O.C.G.A. § 51-5-4(a)(1)

---

[8] Given the Court's disposition of the motion for summary judgment filed by all Defendants jointly, it does not address the separate CBS motion except to say that it raises very serious defenses under the fair report privilege, at a minimum. *See, e.g., Shipkovitz v. Washington Post Co.*, No. 8-7126, 2010 U.S. App. LEXIS 22093, *5 (D.C. Cir. Oct. 22, 2010) (confirming that "the fair report privilege does not distinguish 'between a report about an official proceeding and that which, for all purposes, is the subject matter of the proceeding") (quoting *White*, 909 F.2d at 527); *see also* O.C.G.A. § 51-5-7 (deeming privileged, among other things, "[s]tatements made in good faith as part of an act in furtherance of the right of free speech . . . under the Constitution of the United States . . . in connection with an issue of public interest or concern"). The Court intimates no opinion.

and (a)(3) because it both created the impression that Mar-Jac engaged knowingly in the crime of money laundering to support terrorists and referred to Mar-Jac's business in a manner calculated to injure it. *See* Am. Compl., Count I. Mar-Jac alleges slander per quod and slander per se under O.C.G.A. § 51-5-4(a)(1) and (a)(3) for the same reasons. *See id.*, Count II.

Mar-Jac moves for partial summary judgment, contending that the statements in the Broadcast were "of and concerning" Mar-Jac and that the Broadcast conveyed a defamatory meaning about Mar-Jac. Pl.'s Mem. at 2. All Defendants cross-move and argue that Mar-Jac's defamatory implication fails as a matter of law because the challenged statements were not "of and concerning" Mar-Jac; that Ms. Katz's statements cannot reasonably be understood to make any defamatory assertion; that the speculative, hypothetical, and uncertain nature of Ms. Katz's comments about the relationship between "money laundering" and "chickens" forecloses any finding that those remarks give rise to an actionable defamatory implication; and that Defendants could not be said to have endorsed or intended any defamatory implication. Setting aside the question of material falsity for present purposes, Defendants can prevail only if the Court finds that the Broadcast is not reasonably capable of conveying the defamatory meaning proffered by Mar-Jac. At this stage, Mar-Jac need only show that the Broadcast is ambiguous and could reasonably convey a defamatory meaning about it.[9]

Defendants argue that Ms. Katz's statements cannot be reasonably construed to imply that Mar-Jac knowingly laundered money to fund terrorist activities. They first challenge whether

---

[9] In a television broadcast, a court must consider "the text in conjunction with the accompanying visual images . . . [to] understand the possible emotive impact of the story, as it is the juxtaposition of the audio and visual elements that conveys the meaning intended." *Southern Air Transport, Inc., v. American Broadcasting Cos.*, 877 F.2d 1010, 1015 (D.C. Cir. 1989).

any alleged defamation contained in the Broadcast is "of and concerning" Mar-Jac. To sustain a defamation claim the allegedly "defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Fiske v. Stockton*, 320 S.E.2d 590, 592 (Ga. Ct. App. 1984); *see also Service Parking Corp. v. Washington Times Co.*, 92 F.2d 502, 504 (D.C. Cir. 1937). "To satisfy the 'of and concerning' element, it suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed." *Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 216 (D.C. Cir. 1999). If the "words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory," so a claim must fail when "the words of the alleged libelous matter are so vague and uncertain that they could not have been intended to refer to any particular person." *Cox Enters.*, 426 S.E.2d at 653.

Although Mar-Jac's name is never spoken aloud in the Broadcast, its name is displayed several times throughout the piece. As the segment delved into the "terrorist financing ring" that Ms. Katz believed she had discovered at 555 Grove Street, *see* Broadcast Tr. at 18, Ms. Katz referred to a chart to demonstrate how she claimed money flowed from Saudi Arabia to the "Saar Network" and ultimately to terrorist entities. *See* Pl.'s Mem., [Ex. E] Chart. While Ms. Katz gestured generally towards the chart, Mr. Simon explained that according to Ms. Katz, money flowed from Saudi Arabia to "a web of charities, think tanks, and businesses." *See* Pl.'s Mem., [Ex. C] Recording of *60 Minutes* "Terrorist Hunter" Segment ("Recording") at 9:43; Broadcast Tr. at 18. Simultaneously, the camera zoomed in on a portion of the chart which defined the "Saar Network" as constituting the "Saar Foundation, International Institute of Islamic Thought (IIIT), Mar-Jac Poultry, Muslim World League, and Safa Trust." Recording at 9:43. Mr. Simon continued that the charities,

think tanks and businesses were located "at 555 Grove" as the camera showed "Saar Network" and, underneath, "555 Grove St." Recording at 9:46.

Several seconds later, Mr. Simon explained that "one especially inventive idea the Saudis came up with according to Sarah was chickens," as the camera again focused on the names of the five entities, thereby clearly broadcasting the name "Mar-Jac Poultry" again. *Id*. at 10:02. Footage of a commercial truck transporting caged chickens was then shown as Mr. Simon stated, "They bought a chicken farm in Georgia." *See* Recording at 10:03 to :10. Although the parties agree that the truck bore the Mar-Jac name and logo, the writing on the truck door is not easily legible, if at all. *See id*. at 10:05. However, if there were any doubt that the "chicken farm" was Mar-Jac, it was dispelled when Mr. Simon spoke of a federal customs agency task force raid at 555 Grove Street and other locations, concluding, "And, yes, they raided the chicken farm, too,"[10] as a large sign displaying the name "Mar•Jac Poultry" with a drawing of a chicken filled the entire screen. *See id*. at 10:56. A reasonable jury could readily conclude that Mar-Jac was the "chicken farm" referenced in the Broadcast.

The inquiry is not complete. It is not enough that Mar-Jac was identified in the Broadcast, but the question remains whether the proffered allegation of intentional money laundering was "of and concerning" Mar-Jac itself. Defendants argue that, at most, Ms. Katz suggested that Mar-Jac was an unknowing conduit for terrorist financing and that any statements imputing intent were directed solely at Mar-Jac's beneficial owners, such as the Saudis, the al-Rajhi family, the Saar Foundation, or Safa Trust. Thus, Defendants contend, any allegation that money flowed through

---

[10] Although the CBS transcript in evidence indicates that Mr. Simon stated that the FBI raided "a" chicken farm, Broadcast Tr. at 19, the Court viewing the Broadcast hears Mr. Simon to have said, "And yes, they raided *the* chicken farm, too." *See* Recording at 10:55.

Mar-Jac as part of an alleged Saudi terrorist financing ring would not constitute an allegation of willful conduct by Mar-Jac itself. Defendants highlight that Ms. Katz stated that the "small" group of people who set up the "ring" did so with money from Saudi Arabia and that they were part of a group of people in Saudi Arabia and Virginia, not Georgia. *See* Defs.' Opp'n [Dkt. ## 204, 206] at 26. Defendants also point to the statements in the Broadcast that framed the money laundering theory, contending that it was the Saudis who "came up with" the "especially inventive idea" to use chickens to launder money, and that it was the Saudis who "bought a chicken farm in Georgia." *See id*. (quoting Broadcast Tr. at 18).

To be sure, the Broadcast contained no direct statement that Mar-Jac knowingly engaged in money laundering. Accordingly, as it agreed at oral argument, Mar-Jac advances a claim of defamation by implication alone, not a claim of direct defamation. While direct references to Mar-Jac occurred in the Broadcast, as noted above, none of them included a direct accusation that it knowingly engaged in money laundering. The chart referenced Mar-Jac as part of the Saar Network, but it is left to inference that Mar-Jac knowingly engaged in money laundering, instead of being an innocent pass-through, merely a suspect, or completely uninvolved in any scheme. Mar-Jac alleges that it was defamed by the implication that it "knowingly" engaged in money laundering but it appears to pin the "knowingly" element on its assertion that millions of chickens could not be killed, or falsely reported dead, without active complicity by those engaged in the poultry business itself.[11] *See* Pl.'s Opp'n at 42 (arguing that the defamation lay in implying "that Mar-Jac was

---

[11] Ms. Katz never said that chickens actually died, only that "[*i*]*f you say in one year* that you lost 10 million chickens, no one can prove it. They just died. You can't trace money with chickens." Broadcast Tr. at 18 (emphasis added). In other words, if one reported dead chickens that did not actually die, there would be no way to disprove the report and the supposed resulting financial loss. Defendants contest Mar-Jac's evidence on whether it would be possible to report dead chickens

engaged in money laundering by overstating or otherwise falsifying the number of its chickens that died"); *see also* Pl.'s Mem., [Ex. A] Decl. Randall Bruce; *id.*, [Ex. F] Decl. Joel Williams.  While Mar-Jac was identified as the "chicken farm" that was searched, the Broadcast never stated, even in Ms. Katz's colloquy about mis-counting chickens, that Mar-Jac was knowingly involved.  If the alleged defamatory implication, that Mar-Jac was a knowing participant in funding terrorism, is to be drawn it is not from "words which directly and unequivocally make a charge," but, at most, words which "do so indirectly or by inference," *Wolff*, 568 S.E.2d at 90, when considered in the context of the entire Broadcast.[12]  *See Norwest Fin. Leasing*, 390 S.E.2d at 409 ("[A]s a defamatory statement may be made in indirect terms or by insinuation, the publication thereof must be construed as a whole.").[13]

A reasonable jury might conclude that the allegedly defamatory "words used really contain no reflection" on Mar-Jac itself, as opposed to other alleged malfeasors, and were therefore

---

falsely and claim a need for discovery to refute Mar-Jac's arguments on material falsity.

[12] Defendants argue that the only direct statements about Mar-Jac that could be construed as facts are:  that Mar-Jac operated as "a chicken farm," which had been "bought" by the same "Saudis" who financed the organizations at 555 Grove Street, and that its premises were searched by federal law enforcement authorities a year earlier in connection with a then-ongoing investigation of terrorism financing.  They also contend that the chart either made no "statements" on its own or, at a minimum, did not state directly that Mar-Jac was knowingly laundering funds to support terrorism, but any impression that it did so would have to arise by implication in context of the entire Broadcast.

[13] Further, in response to a question whether money lost through any potential chicken-related money laundering scheme were going to Hamas, Islamic Jihad, or al-Qaida, Ms. Katz responded unequivocally, "[t]hat's what we're trying to find out."  Broadcast Tr. at 18.  Ms. Katz thereby indicated that she was uncertain whether funds from any alleged scheme involving Mar-Jac were going to terrorists.  *See Gast v. Brittain*, 589 S.E.2d 63, 64 (Ga. 2003) ("Where there is a clear delineation between allegations of improper conduct and allegations directed at the plaintiff, the allegations of improper conduct will not create a libel action for the plaintiff."); *see also Coles v. Washington Free Weekly*, 881 F. Supp. 26, 33 (D.D.C. 1995).

not "of and concerning" Mar-Jac, *see Cox Enters.*, 426 S.E.2d at 653, or that the Broadcast did not

imply that Mar-Jac knowingly engaged in money laundering to assist terrorists or terrorist groups

but was only a conduit. However, the Court cannot conclude as a matter of law that no reasonable

viewer could interpret the Broadcast to imply that Mar-Jac knowingly engaged in money laundering

to aide terrorists. *See Mead*, 417 S.E.2d at 17; *see also Maples v. Nat'l Enquirer*, 763 F. Supp. 1137,

1141 (N.D. Ga. 1990); *White*, 909 F.2d at 518. Summary judgment cannot be granted to Defendants

that the complained-of statements were not defamatory under Georgia law; since the Broadcast is

somewhat ambiguous, a jury would have to decide its meaning. Similarly, partial summary

judgment cannot be granted to Mar-Jac because it is ambiguous whether the Broadcast is "of and

concerning" Mar-Jac and whether the Broadcast was, in fact, defamatory.

## C. Whether the Broadcast Was Protected By the First Amendment

Even if the Broadcast were capable of bearing Mar-Jac's defamatory implication and

could be found defamatory under Georgia law, the Court must still determine whether the Broadcast

was nonetheless protected by the First Amendment. *See White*, 909 F.2d at 523 (noting that "once

the publication has been found capable of a defamatory meaning[] [a] defendant may escape liability

if the defamatory meaning is established as true or as constitutionally protected expression"). The

Broadcast touched upon a topic of significant public concern, as it discussed one woman's efforts

to reveal alleged use of U.S. monies to support terrorist groups, a topic of continuing public anxiety.

"[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values,

and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation

omitted). The Broadcast centered on the illicit financing of terrorism from sources in the United

States in the years following September 11, 2011, and Ms. Katz's efforts to uncover those sources

and provide that information to the federal government, leading to government investigations and action against certain entities. As it related to Mar-Jac, the Broadcast spoke to allegations which were a cause, at least in part, of what was termed "one of the biggest terrorism-related raids in US history." Broadcast Tr. at 19. The raid admittedly targeted offices at 555 Grove Street and elsewhere, including Mar-Jac's offices in Georgia, generated nationwide press, including press in Georgia, and was in furtherance of investigations into alleged financial support to terrorist groups or terrorists.

But no reasonable jury could find that Ms. Katz's statements about laundering money through misreporting dead chickens were anything but rank speculation, surmise or hyperbole, engendered, perhaps, by her thrill at being involved in an uncover capacity.[14] Ms. Katz's story was greeted with a fair amount of skepticism by Mr. Simon, *see, e.g.,* Broadcast Tr. at 17 (asking whether Ms. Katz was "addicted" to hunting terrorists), and nothing suggested she could make knowing statements about slaughtering chickens. In fact, she said only, "Chicken – *I see it* as the best cover for money laundering" because "*[i]f you say* in one year that you lost 10 million chickens, no one can prove it." Broadcast Tr. at 18 (emphasis added). The former statement was a personal one,

_____

[14] Defendants also argue that defamation by implication is not actionable unless the speaker took affirmative, additional steps to suggest that s/he intended or endorsed the defamatory implication, *see White*, 909 F.2d at 520, and that none of the Defendants endorsed any defamatory implication here. However, the "endorsement" requirement only applies when the reported facts undergirding the alleged implied defamation are materially true. *See id.* at 519; *see also Rubin v. U.S. News & World Report Inc.*, 271 F.3d 1305, 1309 n.11 (11th Cir. 2001); *Partington v. Bugliosi*, 56 F.3d 1147, 1152 n.9 (9th Cir. 1995); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092–93 (4th Cir. 1993). Mar-Jac contests many of the underlying assertions here, such as whether Mar-Jac was owned by the Saudis or the al-Rajhi family, whether any money flowed through Mar-Jac from the Saudis to support terrorism or for any purpose, and whether any misrepresentations concerning dead chickens occurred. With disputed facts, the Court cannot rule on this point on summary judgment and does not rule on the question of material falsity as it finds any challenged statements were protected by the First Amendment.

indicating her belief, not based on any discernable fact, and the latter was phrased in the subjunctive mood, indicating something that was uncertain or contrary to fact. Ms. Katz did not say that Mar-Jac ever reported or announced that Mar-Jac had lost ten million chickens in any given year, only that "if you [were to] say that you lost 10 million chickens, no one [could] prove it." *Id.*[15]

There is no wholesale constitutional protection for expressions of opinion; opinions are actionable when a reasonable trier of fact could interpret the statement to imply an assertion of objective fact that is defamatory. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990). To ensure space for "imaginative expression" and "rhetorical hyperbole," a statement of opinion is actionable only if it implies an explicit or implicit factual foundation and therefore is "objectively verifiable." *Id.* at 20–22; *see also Washington v. Smith*, 80 F.3d 555, 556 (D.C. Cir. 1996); *White*, 909 F.2d at 522 ("Assertions of opinion on a matter of public concern only receive full constitutional protection if they do not contain a provably false factual connotation.").

Therefore, the Court looks to whether the Broadcast contained such "loose, figurative, or hyperbolic language which would negate the impression that [Ms. Katz] was seriously maintaining that [Mar-Jac] committed the crime" of money laundering to aide terrorists or terrorism groups. *Milkovich*, 497 U.S. at 21; *see also White*, 909 F.2d at 522 ("The test is intended to protect the use of loose, figurative or hyperbolic language which would preclude an impression that the author was seriously maintaining a provable fact."). In doing so, the Court must also look to "the general tenor" of the Broadcast to determine whether context would negate any impression that Ms.

---

[15] Ms. Katz spoke informally, "*If you say* in one year that you lost 10 million chickens, no one *can* prove it," while the more formal expression of the same statement would be, "*If you were to say* in one year that you lost 10 million chickens, no one *could* prove it." Both are in the subjunctive mood. In modern American English, either is acceptable.

Katz seriously asserted that Mar-Jac had, in fact, knowingly engaged in money laundering to aide terrorism. *Milkovich*, 497 U.S. at 21; *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001) ("In deciding whether a reasonable factfinder could conclude that a statement expressed or implied a verifiably false fact about appellant, the court must consider the statement in context."). Ultimately, a "statement of fact is not shielded from an action for defamation by being prefaced with the words 'in my opinion,' but if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (citing *Milkovich*, 497 U.S. at 17–21 (1990)).

The Court finds that Ms. Katz's statement that *if* one wanted, one could report ten million dead chickens a year, was clearly hyperbolic, speculative, and as surmise did not imply a verifiably false fact. Her further statement "[t]hat's what we're trying to find out," Broadcast Tr. at 18, indicating that "we" (she and the government) were still investigating whether "money lost" was going to terrorist sources, when viewed in context of the entire Broadcast, also negated the possibility that a reasonable juror would conclude that Ms. Katz implied a factual assertion that Mar-Jac had knowingly laundered money to assist terrorists.[16] The implication from her statement about the need for further investigation was either that it was needed to find out if any money were "lost" at all and/or that she was uncertain where any such money were ultimately headed. In either event,

---

[16] Further, the chart used by Ms. Katz to illustrate how the money flowed from Saudi Arabia to terrorist organizations identified three specific terrorist organizations to which money was directed: al-Qaeda, Hamas, and/or Palestinian Islamic Jihad. *See* Pl.'s Mem., [Ex. E] Chart. Yet, while standing next to the chart, Mr. Simon specifically referred to these three organizations when he followed up with Ms. Katz after her chicken colloquy, "[a]nd that money lost has gone down the line to Hamas or Islamic Jihad or al-Qaida?" Broadcast Tr. at 18. To which Ms. Katz admitted her uncertainty and that the investigation was ongoing.

the stated need for further investigation negated either or both prongs of Mar-Jac's defamation claim: either Ms. Katz conveyed that she did not know, without more investigation, whether there were "money lost" (and thereby laundered) due to mis-reporting dead chickens and/or she did not know, without more investigation, whether any such lost money was flowing to terrorist groups or terrorists.[17]

CACI Premier Tech., Inc. v. Rhodes, 536 F.3d 280 (4th Cir. 2008), supports this conclusion. As here, when the defendant in CACI listed various corporations who might have been responsible for abuse at Abu Ghraib prison, he said that the President needed to say, "look what's been done here and I know who did it and this is who did it and it was CACI and it was Titan and it was Blackwater and it was Halliburton and it was Bechtel and it was DynCorp. and it was this one and it was Triple [Canopy] – whoever it was." Id. at 303. The Fourth Circuit found that the statements, under any reasonable interpretation, did not imply that CACI itself committed the atrocities at the prison, but instead provided an open-ended list of potential targets for investigation without assigning blame to any particular party, evidenced by the fact defendant further reserved judgment by saying "whoever it was." Id. Similarly, Ms. Katz stated that there was a flow of funds from Saudis to terrorist organizations, which went through multiple organizations at 555 Grove Street, without ever explicitly identifying any organization at 555 Grove Street that was knowingly involved. The chart that listed Mar-Jac as an entity in the so-called Saar Network identified some

---

[17] For one short moment, Mar-Jac argues that "the broadcast at the very least implies that Mar-Jac was engaged in money laundering by overstating or otherwise falsifying the number of its chickens that died." Pl.'s Opp'n at 42. Given the entire content and context of the Broadcast, Counts I and II of the Amended Complaint, and the entire record, Mar Jac cannot add a new defamation theory to oppose summary judgment, premised on bald "money laundering" for unspecified purposes instead of its clearly alleged defamation by indirect accusation of money laundering to knowingly support terrorism.

candidates through which Ms. Katz alleged that money flowed.  However, there is no dispute over

the Saar Foundation's relationship to Mar-Jac or its interrelationship with the other named entities,

*see supra* Part I.A, and, in any event, Ms. Katz expressly conceded that she was still "trying to find

out" particulars, at least as to the chicken farm/Mar-Jac.

Ultimately, it is the "defamatory *implication* – not the underlying assertions giving

rise to the implication – which must be examined to discern whether the statements are entitled to

full constitutional protection."  *White*, 909 F.2d at 523.  Mar-Jac does not allege only that it was

defamed through an implication of money laundering by falsely reporting dead chickens but that the

defamation was to imply that Mar-Jac engaged in money laundering by falsely reporting dead

chickens in *knowing* support of terrorist groups or terrorism.  Although the implication of money

laundering is sufficiently factual to be proven true or false, the cumulative effect of Ms. Katz's

speculative language within the context of the Broadcast makes clear that she was only presenting

an hypothesis, and not implying that she was in possession of objectively verifiable facts.  *See*

*Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724, 729 (1st Cir. 1992) (holding that

although the connotation of deliberate deception may be sufficiently factual to be verifiable, the

"sum effect of the format, tone and entire content of the articles is to make it unmistakably clear that

Kelly was expressing a point of view only").  Looking at the Broadcast as a whole, any defamatory

implication that money flowed through Mar-Jac to terrorists was presented as mere speculation.  Any

further implication that Mar-Jac acted *knowingly* in laundering money to assist terrorists or terrorist

groups remained so unspoken that it, too, could only be—at best—speculation and surmise.

Accordingly, the challenged statements in the Broadcast are protected by the First Amendment and

the libel and slander claims will be dismissed.

### D. Remaining Claims

As the Court finds the defamation counts fail under the First Amendment, the remaining counts of the Amended Complaint must be dismissed too. Count III alleges negligence in that Defendants allegedly "owed a duty to avoid causing harm to others by refraining from making and broadcasting false, libelous, slanderous and/or defamatory statements," Am. Compl. ¶ 37. Because the Broadcast was not defamatory, as alleged by Mar-Jac, it follows that Defendants breached no duty to refrain from defamation. Count III will be dismissed.

Mar-Jac also alleges product disparagement in violation of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372(a)(8). Am. Compl., Count IV. "A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he . . ., [d]isparages the goods, services, or business of another by false or misleading representation of fact." O.C.G.A. § 10-1-372(a)(8). In its Amended Complaint, Mar-Jac alleges that "Defendants falsely stated or implied that Plaintiff Mar-Jac's poultry business knowingly received monies from persons or entities which were used to fund terrorists or terrorist organizations and/or that some portion of proceeds from Plaintiffs' [sic] poultry business were knowingly used to fund terrorists or terrorist organizations." Am. Compl. ¶ 42. To the extent this cause of action is based on the alleged defamation, it must fail for the same reasons as the defamation claim. *See Moulton v. VC3*, No. 1:00-cv-434, 2000 U.S. Dist. LEXIS 19916, *10–11 (N.D. Ga. Nov. 6, 2000) (dismissing a claim under O.C.G.A. § 10-1-372(a)(8) because the "entire basis for this claim are the statements which the Court has already held are opinion and, therefore, not defamatory" therefore they "cannot be the basis of an unfair trade practices claim that Defendant made false and misleading representations of

*fact*").[18]   The negligence and product disparagement claims also must be dismissed because ultimately "a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea v. New York Times Co.*, 22 F.3d 310, 319 (D.C. Cir. 1994).

The remaining counts of vicarious liability (Count V), punitive damages (Count VI), and expenses of litigation (Count VII) will also be dismissed because Mar-Jac's defamation claims fail as a matter of law.  Since Ms. Katz is not liable to Mar-Jac, neither SITE nor IG, LLC can be vicariously liable; the same is true of CBS by way of Bob Simon.  The claims for punitive damages, attorneys' fees, and costs must dismissed as derivative of the dismissed claims.  *See, e.g., J. Andrew Lunsford Props. v. Davis*, 572 S.E.2d 682, 685 (Ga. Ct. App. 2002) (claims seeking attorneys' fees and punitive damages dismissed as derivative); *Lilliston v. Regions Bank*, 653 S.E.2d 306, 311 (Ga. Ct. App. 2007).  Moreover, the allowance of costs falls within the discretion of the district court and the presumption is that costs will awarded to the prevailing party, which Mar-Jac is not.  *See Moore v. National Asso. of Sec. Dealers, Inc.*, 762 F.2d 1093, 1107 (D.C. Cir. 1985); Fed. R. Civ. P.

_____

[18]   Mar-Jac argues that Ms. "Katz stated that Mar-Jac was recording that millions upon millions–10 million specifically–of its chickens were dying each year. . . . [and] this claim is false, but by making it Defendant Katz disparaged the quality and wholesomeness of Mar-Jac chicken products." Pl.'s Opp'n at 45–46.  It fares no better than its predecessors.  The argument confuses the company and its product. *See, e.g., Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 274 (7th Cir. 1983) ("The[] [Uniform Deceptive Practices Act and two other Illinois laws] provide a remedy for disparagement of a product, but that is different from the disparagement of the producer, *i.e.*, from defamation."); *Van-Go Transp. Co. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997) (noting that the alleged defamation was not 'trade libel', i.e., product disparagement, since "the gist of the plaintiffs' complaint is that the statements 'falsely impugned the basic trustworthiness and integrity of [their] business . . .' As a result, these claims do not sound in trade libel, but rather, in a claim for reputational injury to their business.") (citation omitted); *New Jersey Auto. Ins. Plan v. Sciarra*, 103 F. Supp. 2d 388, 408–09 (D.N.J. 1998) (dismissing a product disparagement claim since that cause of action protects plaintiffs from false statements about their products, and the defamation alleged was really about the company and that defamation protects the plaintiff's good name and character).

54(d)(1); LCvR 54.1(a).

## IV. CONCLUSION

For the reasons discussed above, Defendant Bob Simon will be dismissed by agreement of the parties. The Court will grant the Defendants' Joint Motion for Summary Judgment [Dkt. # 186] as it finds the challenged statements were protected by the First Amendment. All remaining counts of the Amended Complaint will be dismissed. Accordingly, CBS's Supplemental Motion for Summary Judgment [Dkt. # 187] will be denied as moot and Mar-Jac's Motion for Partial Summary Judgment [Dkt. # 188] will be denied. A memorializing Order accompanies this Memorandum Opinion.


Date: March 30, 2011                    _____/s/_____
                                        ROSEMARY M. COLLYER
                                        United States District Judge